# 23-905-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

❯❯ ❮❮

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## APPENDIX
## VOLUME I OF VIII
## Pages A1 to A258

PRYOR CASHMAN LLP
*Attorneys for Defendants-Appellees*
7 Times Square, 40th Floor
New York, New York 10036
212-421-4100

PARNESS LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD. UK, ATLANTIC RECORDS UK, BDI MUSIC, BUCKS MUSIC GROUP, WARNER MUSIC GROUP CORPORATION, DBA ASYLUM RECORDS, WARNER MUSIC GROUP, LTD. UK, DOES 1-10,

*Defendants.*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries ................................................................. A1

Third Amended Complaint, dated May 30, 2019................................. A31

Answer of Defendant Edward Christopher Sheeran ("Sheeran") to
    Third Amended Complaint, dated July 8, 2019............................ A61

Letter from Hillel I. Parness to the Honorable Louis L. Stanton
    to Set Pre-Motion Discovery Conference,
    dated September 6, 2019................................................................. A81

        Exhibit A to Parness Letter -
        Responses and Objections of Sheeran, Sony/ATV Music
        Publishing LLC, Atlantic Recording Corporation and
        The Royalty Network, Inc. to Plaintiffs' Revised First
        Request for Production, dated July 1, 2019 ........................... A84

        Exhibit B to Parness Letter -
        Excerpts from the Third Amended Complaint,
        dated May 30, 2019................................................................. A99

Letter from Donald Zakarin to the Honorable Louis L. Stanton,
    dated September 10, 2019............................................................... A107

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
    dated September 11, 2019............................................................... A110

Notice of Motion by Plaintiff to Compel Discovery,
    dated October 23, 2019................................................................. A113

Certification of Hillel I. Parness, for Plaintiff, in Support of
    Motion, executed October 23, 2019............................................ A115

i

## **Table of Contents**
### **(continued)**

**Page**

Exhibit A to Parness Certification -
Third Amended Complaint, dated May 30, 2019
(Reproduced Herein at pages A31 to A60)

Exhibit B to Parness Certification -
Responses and Objections of Sheeran, Sony/ATV Music
Publishing LLC, Atlantic Recording Corporation and
The Royalty Network, Inc. to Plaintiffs' Revised First
Request for Production, dated July 1, 2019 ......................... A118

Exhibit C to Parness Certification -
Response and Objections of Defendants Bdi Music Ltd.,
Bucks Music Group Ltd. and Amy Wadge to Plaintiff's
First Requests for Production of July 31, 2019,
dated August 30, 2019........................................................... A132

Exhibit D to Parness Certification -
Statistics regarding "Thinking Out Loud" from Setlist.fm ... A146

Exhibit E to Parness Certification -
Tour Statistics for Sheeran from Setlist.fm........................... A155

Exhibit F to Parness Certification -
"Ed Sheeran's Record-Breaking Divide Tour Totals $775.6
Million, Beating U2, Guns N' Roses", by Mark Beech,
dated August 27, 2019, forbes.com....................................... A156

Exhibit G to Parness Certification -
"Ed Sheeran going on hiatus amid legal troubles,
plagiarism claims" dated August 29, 2019, foxnews.com .... A159

Exhibit H to Parness Certification -
Wikipedia Entry for Sheeran................................................. A161

## Table of Contents
**(continued)**

|  | Page |
|---|---|

Exhibit I to Parness Certification -
"Ed Sheeran's Thinking Out Loud becomes first single
ever to spend one year inside the Top 40,"
dated June 22, 2015, officialcharts.com ................................. A181

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated November 8, 2019 ............................................................. A184

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
dated November 8, 2019 ............................................................. A186

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated November 12, 2019 ........................................................... A188

Declaration of Donald S. Zakarin, for Sheeran, in Opposition to
Motion to Compel Discovery, dated November 12, 2019 ........... A190

Exhibit 1 to Zakarin Declaration -
Third Amended Complaint Ad Damnum Clause .................. A204

Declaration of Stuart Camp, for Sheeran, in Opposition to Motion
to Compel Discovery, dated November 11, 2019 ....................... A208

Exhibit 1 to Camp Declaration -
Schedule of Sheeran U.S. Concert Dates .............................. A219

Declaration of Richard H. Reimer, for Sheeran, in Opposition to
Motion to Compel Discovery, dated November 7, 2019 ............. A224

Exhibit 1 to Reimer Declaration -
Schedule of U.S. Concert Dates
(Reproduced Herein at pages A220 to A223)

Exhibit 2 to Reimer Declaration -
ASCAP Blanket License Agreement ..................................... A228

Declaration of Jose Gonzalez, for Defendants, in Opposition to
Motion to Compel Discovery, dated November 7, 2019 ............. A233

## **Table of Contents**
## **(continued)**

**Page**

Exhibit 1 to Gonzalez Declaration -
Schedule of U.S. Concert Dates
(Reproduced Herein at pages A220 to A223)

Exhibit 2 to Gonzalez Declaration -
Standard Form of BMI's Facilities Music Performance
Agreement ................................................................. A236

Exhibit 3 to Gonzalez Declaration -
Standard Form of BMI's Music License for Venue
Agreement ................................................................. A242

Exhibit 4 to Gonzalez Declaration -
Standard Form of BMI's Music License for
Promoter/Presenter Agreement ............................... A248

Supplemental Certification of Hillel I. Parness, for Plaintiff, in
Further Support of Motion to Compel Discovery, executed
November 19, 2019 .................................................... A254

Exhibit J to Parness Supplemental Certification -
Standard Form ASCAP Writer Member Agreement ............ A256

### **Volume II**

Exhibit K to Parness Supplemental Certification -
Standard Form ASCAP Publisher Member Agreement........ A259

Exhibit L to Parness Supplemental Certification -
Standard Form BMI Writer Agreement ................................ A262

Exhibit M to Parness Supplemental Certification -
Standard Form BMI Publisher Agreement............................ A270

Exhibit N to Parness Supplemental Certification -
Emails between Donald S. Zakarin and Hillel I. Parness,
dated October 29, 2019 to November 7, 2019 ...................... A280

## **Table of Contents**
### **(continued)**

**Page**

Opinion & Order of the Honorable Louis L. Stanton,
dated January 15, 2020 ................................................................ A292

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated April 8, 2020 ...................................................................... A302

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
dated April 10, 2020 .................................................................... A304

    Exhibit A to Zakarin Letter -
    Letter from Donald S. Zakarin to Hillel I. Parness,
    dated April 10, 2020 .............................................................. A307

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated April 13, 2020 .................................................................... A312

    Exhibit A to Parness Letter -
    Letter from Hillel I. Parness to Pryor Cashman,
    dated April 7, 2020.................................................................. A316

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated May 7, 2020 ....................................................................... A319

    Exhibit A to Parness Letter -
    Copyright Registration Information for "Let's Get It On" ... A323

    Exhibit B to Parness Letter -
    Draft Fourth Amended Complaint ......................................... A326

    Exhibit C to Parness Letter -
    'Arguments finding plagiarism from Marvin Gaye and
    Edward Townsend's "Let's Get It On" in Ed Sheeran's
    "Thinking Out Loud"' by Walter Everett,
    dated May 6, 2020, with *Curriculum Vitae* ........................... A357

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
dated May 11, 2020 ..................................................................... A395

**Table of Contents**
(continued)

Page

Exhibit A to Zakarin Letter -
Letter from Donald S. Zakarin to the Honorable
Louis L. Stanton, dated April 10, 2020, with Exhibit A
(Reproduced Herein at pages A304 to A311)

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
 dated May 12, 2020 ...................................................................... A398

Exhibit A to Parness Letter -
Ownership Certificate of Composition ................................. A402

Exhibit B to Parness Letter -
Quotes regarding Deposit Copy Issue ................................. A406

Exhibit C to Parness Letter -
Copyright Compendium Chapter 400 ................................. A408

Exhibit D to Parness Letter -
Images of Sound Recordings................................................ A417

Memorandum to Counsel by the Honorable Louis L. Stanton
 Denying Request to Amend Complaint, dated May 13, 2020 ..... A422

Notice of Motion by Defendants for Summary Judgment,
 dated April 5, 2021 ...................................................................... A424

Declaration of Donald S. Zakarin, for Defendants, in Support of
 Motion for Summary Judgment, dated April 5, 2021 .................. A426

Exhibit 1 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
Ph.D., dated April 22, 2020, with *Curriculum Vitae* ............ A453

**Table of Contents**
(continued)

Page

**Volume III**

Exhibit 2 to Zakarin Declaration -
Report Regarding "Let's Get It On" and "Thinking Out
Loud" by Lawrence Ferrara, Ph.D., dated May 22, 2020,
with *Curriculum Vitae*................................................................ A502

Visual Exhibit A to Ferrara Report -
Copyright Application for "Let's Get It On",
dated February 14, 1973.................................................. A568

Visual Exhibit B to Ferrara Report -
Deposit Copy of "Let's Get It On"................................. A576

Visual Exhibit C to Ferrara Report -
Sheet Music of "Thinking Out Loud" ............................ A582

Visual Exhibit D to Ferrara Report -
Excerpts from "Money Chords: A Songwriter's
Sourcebook of Popular Chord Progressions",
by Richard J. Scott ........................................................... A593

Visual Exhibit E to Ferrara Report -
Excerpts from "Guitar for Advanced Beginners
New York City Guitar School"........................................ A597

Visual Exhibit F to Ferrara Report -
Annotated Sheet Music of "Thinking Out Loud" ........... A602

Visual Exhibit G to Ferrara Report -
Sheet Music of "Get Off of My Cloud" .......................... A608

Visual Exhibit H to Ferrara Report -
Lists of Songs with Various Chord Progressions............ A611

vii

**Table of Contents**
**(continued)**

                                                                    **Page**


    Visual Exhibit I to Ferrara Report -
    List of Sheeran Songs from 2005 to 2013
    with Chord Anticipations ................................................. A615

    Visual Exhibit J to Ferrara Report -
    Sheet Music of "Camptown Races" ............................... A617

Exhibit 3 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
dated May 6, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A357 to A394)

Exhibit 4 to Zakarin Declaration -
Emails between Hillel I. Parness and Donald S. Zakarin,
dated May 22, 2020 ............................................................. A619

Exhibit 5 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised May 24, 2020, with *Curriculum Vitae* ...................... A623

Exhibit 6 to Zakarin Declaration -
Redline of Everett Reports ..................................................... A660

Exhibit 7 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., dated June 21, 2020 ........................ A698

**Table of Contents**
**(continued)**

**Page**

Exhibit 8 to Zakarin Declaration -
Rebuttal Report of The Report of Walter Everett
Regarding "Let's Get It On" and "Thinking Out Loud"
by Lawrence Ferrara, Ph.D., dated June 23, 2020 ................ A712

    Visual Exhibit A to Ferrara Rebuttal Report -
    Sheet Music of "Since I Lost My Baby"........................ A744

**Volume IV**

Exhibit 9 to Zakarin Declaration -
'A Report Regarding The Songs "Let's Get It On"
and "Thinking Out Loud"' by Anthony Ricigliano,
dated June 23, 2020................................................................ A752

    Appendix I to Ricigliano Report -
    Sheet Music of "Thinking Out Loud" ............................. A796

    Appendix II to Ricigliano Report -
    Explanation of Music Graphics ...................................... A806

    Appendix III to Ricigliano Report -
    Graphical Comparison of "Let's Get It On"
    and "Thinking Out Loud" ............................................... A808

    Appendix IV to Ricigliano Report -
    Explanation of Musical Elements and Terms ................. A811

    Appendix V to Ricigliano Report -
    *Curriculum Vitae* of Anthony Ricilgiano........................ A817

    Exhibit A to Ricigliano Report -
    Sheet Music of "I See Fire"............................................ A821

**Table of Contents**
**(continued)**

**Page**

Exhibit 10 to Zakarin Declaration -
Rebuttal Report to The Rebuttal Report of John Covach
Regarding "Let's Get It On" and "Thinking Out Loud"
by Lawrence Ferrara, Ph.D., dated July 21, 2020 ................. A823

Exhibit 11 to Zakarin Declaration -
Third Amended Complaint, dated May 30, 2019
(Reproduced Herein at pages A31 to A60)

Exhibit 12 to Zakarin Declaration -
Copyright Application for "Let's Get It On",
dated February 14, 1973
(Reproduced Herein at pages 568 to 575)

Exhibit 13 to Zakarin Declaration -
Deposit Copy of "Let's Get It On" ........................................ A839

Exhibit 14 to Zakarin Declaration -
Excerpts from the Deposition Testimony of Edward
Christopher Sheeran, taken February 1, 2018 ....................... A846

Exhibit 15 to Zakarin Declaration -
Declaration of Amy Wadge, dated June 28, 2018 ................. A862

Exhibit 16 to Zakarin Declaration -
Declaration of Jake Gosling, taken July 26, 2018 ................. A865

Exhibit 17 to Zakarin Declaration -
Excerpt from "How To Play Rock 'N' Roll Piano",
by Palmer-Hughes ................................................................ A868

Exhibit 18 to Zakarin Declaration -
Plaintiff's Revised First Request for Production of
Documents, dated April 10, 2019 ........................................ A871

**Table of Contents**
**(continued)**

Page

Exhibit 19 to Zakarin Declaration -
Defendants Sheeran, Sony/ATV Music Publishing LLC,
Atlantic Recording Corporation, and The Royalty
Network Inc.'s First Request for Document Production,
dated July 8, 2019.................................................................... A880

Defendants' Rule 56.1 Statement of Facts, dated April 5, 2021 ........ A903

Notice of Motion in *Limine* by Defendants to Preclude Dr. John
Covach and Dr. Walter Everett from Testifying At Trial,
dated April 5, 2021 ...................................................... A922

Declaration of Donald S. Zakarin, for Defendants, in Support of
Motion in *Limine*, dated April 5, 2021 ........................................ A924

Exhibit 1 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
Ph.D., dated April 22, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A453 to A501)

Exhibit 2 to Zakarin Declaration -
Report Regarding "Let's Get It On" and "Thinking Out
Loud" by Lawrence Ferrara, Ph.D., dated May 22, 2020,
with *Curriculum Vitae* and Visual Exhibits A through J
(Reproduced Herein at pages A502 to A618)

Exhibit 3 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
dated May 6, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A357 to A394)

**Table of Contents**
**(continued)**

Exhibit 4 to Zakarin Declaration -
Emails between Hillel I. Parness and Donald S. Zakarin,
dated May 22, 2020
(Reproduced Herein at pages A619 to A622)

Exhibit 5 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised May 24, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A623 to A659)

Exhibit 6 to Zakarin Declaration -
Redline of Everett Reports
(Reproduced Herein at pages A660 to A697)

Exhibit 7 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., dated June 21, 2020
(Reproduced Herein at pages A698 to A711)

Exhibit 8 to Zakarin Declaration -
Rebuttal Report of The Report of Walter Everett Regarding
"Let's Get It On" and "Thinking Out Loud" by Lawrence
Ferrara, Ph.D., dated June 23, 2020, with Visual Exhibit A
(Reproduced Herein at pages A712 to A751)

Exhibit 9 to Zakarin Declaration -
'A Report Regarding The Songs "Let's Get It On"
and "Thinking Out Loud"' by Anthony Ricigliano,
dated June 23, 2020, with Appendices I through V
and Exhibit A
(Reproduced Herein at pages A752 to A822)

**Table of Contents**
**(continued)**

**Page**

    Exhibit 10 to Zakarin Declaration -
    Rebuttal Report to The Rebuttal Report of John Covach
    Regarding "Let's Get It On" and "Thinking Out Loud"
    by Lawrence Ferrara, Ph.D., dated July 21, 2020
    (Reproduced Herein at pages A823 to A838)

Certification of Hillel I. Parness, for Plaintiff, in Support of
    Cross-Motion for Summary Judgment and in Opposition to
    Motion for Summary Judgment, executed May 10, 2021 ........... A942

    Exhibit 1 to Parness Certification -
    Expert Report on Damages and Profits by Gary Cohen,
    CPA, dated May 31, 2020 (Redacted).................................. A944

**Volume V**

    Exhibit 2 to Parness Certification -
    Amended Expert Report on Damages by
    Barry M. Massarsky, dated July 7, 2020 (Redacted) ............ A992

Response and Counterstatement of Material Facts Pursuant to
    Rule 56.1, dated May 10, 2021.................................................. A1035

Defendants' Reply to Plaintiff's Response and Counterstatement of
    Material Facts Pursuant to Rule 56.1, dated June 4, 2021......... A1083

Reply Declaration of Donald S. Zakarin, for Defendants,
    in Further Support of Motion for Summary Judgment,
    dated June 4, 2021 .................................................................... A1151

    Exhibit 1 to Zakarin Reply Declaration -
    Decision in *Stoliarov v. Marshmello Creative*,
    United States District Court, Central District of California,
    dated April 8, 2021 ............................................................. A1153

    Exhibit 2 to Zakarin Reply Declaration -
    Screenshot of Billboard.com ............................................. A1158

**Table of Contents**
**(continued)**

**Page**

Supplemental Certification of Hillel I. Parness, for Plaintiff,
    in Further Support of Cross-Motion for Summary Judgment,
    executed June 11, 2021 .............................................................. A1160

      Exhibit 3 to Parness Supplemental Certification -
      Memorandum of Law in *Stoliarov v. Marshmello*
      *Creative, LLC*, dated February 22, 2021 ............................ A1162

      Exhibit 4 to Parness Supplemental Certification -
      Opposition Memorandum of Law in *Stoliarov v.*
      *Marshmello Creative, LLC*, dated March 22, 2021 ............. A1194

      Exhibit 5 to Parness Supplemental Certification -
      Reply Memorandum of Law in *Stoliarov v. Marshmello*
      *Creative, LLC*, dated March 29, 2021 ................................ A1223

**Volume VI**

Opinion and Order of the Honorable Louis L. Stanton,
    dated September 9, 2021 ............................................................ A1241

Opinion and Order of the Honorable Louis L. Stanton,
    dated September 14, 2021 .......................................................... A1245

Notice of Renewed Motions by Defendants for Summary Judgment
    and in *Limine*, dated November 15, 2021 ................................ A1246

Declaration of Donald S. Zakarin, for Defendants,
    in Support of Renewed Motions, dated November 12, 2021 .... A1248

**Table of Contents**
**(continued)**

Page

Exhibit 1A-1D to Zakarin Declaration -
(i) Notice of Motion by Defendants for Summary Judgment,
dated April 5, 2021, with Supporting Declaration, Exhibits 1
through 19, and Rule 56.1 Statement
(Reproduced Herein at pages A424 to A921)
(ii) Memorandum of Law by Defendants in Support of
Motion for Summary Judgment, dated April 5, 2021 .........    A1251
(iii) Memorandum of Law by Plaintiff in Opposition to
Motion for Summary Judgment, dated May 10, 2021 ........    A1283
(iv) Certification of Hillel I. Parness, for Plaintiff,
in Support of Cross-Motion for Summary Judgment and
in Opposition to Motion for Summary Judgment,
executed May 10, 2021, with Exhibits 1 and 2 and
Counterstatement of Material Facts
(Reproduced Herein at pages A942 to A1082)
(v) Reply Memorandum of Law by Defendants in Further
Support of Motion, dated June 4, 2021 ..............................    A1326
(vi) Defendants' Reply to Plaintiff's Response and
Counterstatement of Material Facts Pursuant to
Rule 56.1, dated June 4, 2021
(Reproduced Herein at pages A1083 to A1150)
(vii) Reply Declaration of Donald S. Zakarin, for Defendants,
in Further Support of Motion for Summary Judgment,
 dated June 4, 2021, with Exhibits 1 and 2
(Reproduced Herein at pages A1151 to A1159)
(viii) Reply Memorandum of Law by Plaintiff in Further
Support of Cross-Motion for Summary Judgment,
dated June 11, 2021 ............................................................    A1371
(ix) Supplemental Certification of Hillel I. Parness,
for Plaintiff, in Further Support of Cross-Motion for
Summary Judgment, executed June 11, 2021,
with Exhibits 3 through 5
(Reproduced Herein at pages A1160 to A1240)

**Table of Contents**
**(continued)**

**Page**

Exhibit 2A-2B to Zakarin Declaration -
(i) Notice of Motion in *Limine* by Defendants to Preclude
Dr. John Covach and Dr. Walter Everett from Testifying
At Trial, dated April 5, 2021, with Supporting Declaration
and Exhibits 1 through 10
(Reproduced Herein at pages A922 to A941)
(ii) Memorandum of Law by Defendants in Support of
Motin in *Limine*, dated April 6, 2021 .................................. A1382
(iii) Memorandum of Law by Plaintiff in Opposition to
Motion in *Limine*, dated May 10, 2021 ............................... A1414
(iv) Reply Memorandum of Law by Defendants in Further
Support of Motion in *Limine*, dated June 4, 2021 ............... A1425

**Volume VII**

Exhibit 3 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
PhD., revised October 8, 2021, with *Curriculum Vitae* ...... A1443

Exhibit 4 to Zakarin Declaration -
Redline Comparison of Revised Covach Report to
Original Covach Report ...................................................... A1486

Exhibit 5 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., revised October 8, 2021................ A1536

Exhibit 6 to Zakarin Declaration -
Redline Comparison of Revised Covach Rebuttal to
Original Covach Rebuttal.................................................... A1549

**Table of Contents**
**(continued)**

**Page**

Exhibit 7 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised October 8, 2021, with *Curriculum Vitae* ................  A1563

Exhibit 8 to Zakarin Declaration -
Redline Comparison of Revised Everett Report to 2020
Everett Report ...................................................................  A1597

Defendants' Rule 56.1 Statement in Support of Renewed Motion,
dated November 12, 2021 ..........................................  A1634

Notice of Renewed Cross-Motion by Plaintiff for Summary
Judgment, dated December 14, 2021.........................................  A1657

Certification of Hillel I. Parness, for Plaintiff, in Support of
Renewed Cross-Motion for Summary Judgment and in
Opposition Renewed Motions for Summary Judgment
and in *Limine*, executed December 14, 2021............................  A1659

Exhibit 1 to Parness Certification -
Expert Report on Damages and Profits by Gary Cohen,
CPA, dated May 31, 2020 (Redacted)
(Reproduced Herein at pages A944 to A991)

Exhibit 2 to Parness Certification -
Amended Expert Report on Damages by
Barry M. Massarsky, dated July 7, 2020 (Redacted)
(Reproduced Herein at pages A992 to A1034)

**Volume VIII**

Exhibit 3 to Parness Certification -
Emails between Hillel I. Parness and Andrew M.
Goldsmith, dated October 8, 2021 to October 12, 2021 .....  A1661

## **Table of Contents**
### **(continued)**

**Page**

Response and Counterstatement of Material Facts by Plaintiff
in Opposition to Defendants Renewed Motions and in Support
of Renewed Cross-Motion for Summary Judgment,
dated December 14, 2021 .......................................................... A1664

Reply Declaration of Donald S. Zakarin, for Defendants, in Further
Support of Renewed Motions, dated January 14, 2022 ............. A1712

      Exhibit 9 to Zakarin Reply Declaration -
      Dictionary Definitions of "Numerous" ............................... A1714

Reply 56.1 Statement by Defendants in Response to Plaintiff's
Counterstatement, dated January 14, 2022 ............................... A1718

Supplemental Certification of Hillel I. Parness, for Plaintiff,
in Further Support of Renewed Cross-Motion,
executed February 7, 2022.......................................................... A1793

      Exhibit 4 to Parness Certification -
      Excerpts from Memoranda of Law in
      *Stoliarov v. Marshmello Creative, LLC* .............................. A1795

      Exhibit 5 to Parness Certification -
      Excerpt from Appellate Briefs in *Stoliarov v. Marshemello
      Creative, LLC* ..................................................................... A1811

Notice of Supplemental Authority by Defendants,
dated March 14, 2022 ................................................................ A1831

      Exhibit A to Notice of Supplemental Authority -
      Opinion in *Gray v. Hudson*, filed March 10, 2022,
      United States Court of Appeals for the Ninth Circuit ......... A1834

Opinion and Order of the Honorable Louis L. Stanton,
dated September 29, 2022 .......................................................... A1861

**Table of Contents**
**(continued)**

**Page**

Notice of Motion by Defendants for Reconsideration,
    dated October 13, 2022.................................................................. A1880

Opinion and Order of the Honorable Louis L. Stanton,
    dated May 16, 2023 .................................................................... A1883

Judgment of the United States District Court,
    Southern District of New York, entered May 17, 2023............. A1899

Notice of Appeal, dated June 16, 2023............................................ A1900

# A1

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

CLOSED,APPEAL,ECF,RELATED

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:18-cv-05839-LLS

Structured Asset Sales, LLC v. Sheeran et al          Date Filed: 06/28/2018
Assigned to: Judge Louis L. Stanton                   Date Terminated: 05/17/2023
Related Case: 1:17-cv-05221-LLS                        Jury Demand: Plaintiff
Cause: 17:101 Copyright Infringement                  Nature of Suit: 820 Copyright
                                                       Jurisdiction: Federal Question

**Plaintiff**

**Structured Asset Sales, LLC**          represented by    **Hillel Ira Parness**
                                                            Parness Law Firm, PLLC
                                                            136 Madison Avenue, 6th Floor
                                                            New York, NY 10007
                                                            212-447-5299
                                                            Fax: 646-722-3301
                                                            Email: hip@hiplaw.com
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Edward Christopher Sheeran**          represented by    **Andrew Mark Goldsmith**
*personally known as*                                       Pryor Cashman LLP
Ed Sheeran                                                  7 Times Square
                                                            New York, NY 10036
                                                            (212)-326-0419
                                                            Fax: (212)-798-6925
                                                            Email: agoldsmith@pryorcashman.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Brian Maida**
                                                            Pryor Cashman LLP
                                                            7 Times Square
                                                            New York, NY 10036
                                                            212-326-0437
                                                            Email: bmaida@pryorcashman.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Donald S. Zakarin**
                                                            Pryor Cashman LLP
                                                            7 Times Square
                                                            New York, NY 10036
                                                            212 326 0108
                                                            Fax: 212 326 0806
                                                            Email: DZakarin@pryorcashman.com

## A2

*ATTORNEY TO BE NOTICED*

**Giovanna Maria Marchese**
Pryor Cashman LLP
7 Times Square
New York, NY 10036
(212)-326-0821
Email: gmarchese@pryorcashman.com
*ATTORNEY TO BE NOTICED*

**Ilene Susan Farkas**
Pryor Cashman LLP
7 Times Square
New York, NY 10036
212-421-4100
Fax: 212-326-0806
Email: ifarkas@pryorcashman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ed Sheeran Limited**
*TERMINATED: 08/09/2018*

**Defendant**

**Gingerbread Man Records**
*TERMINATED: 08/09/2018*

**Defendant**

**Amy Wadge**
*TERMINATED: 08/09/2018*

**Defendant**

**Amy Wadge Records**
*TERMINATED: 08/09/2018*

**Defendant**

**Jake Gosling**
*TERMINATED: 08/09/2018*

**Defendant**

**Sticky Studios**
*TERMINATED: 08/09/2018*

**Defendant**

**Sony/Atv Music Publishing, LTD. UK**
*TERMINATED: 08/09/2018*

**Defendant**

**Sony/ATV Music Publishing, LLC**                represented by **Andrew Mark Goldsmith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Maida**

SDNY CM/ECF NextGen Version 1.7

(See above for address)
*ATTORNEY TO BE NOTICED*

**Donald S. Zakarin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Giovanna Maria Marchese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ilene Susan Farkas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Atlantic Recording Corporation**
*doing business as*
Atlantic Records

represented by **Andrew Mark Goldsmith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Maida**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donald S. Zakarin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Giovanna Maria Marchese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ilene Susan Farkas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Atlantic Records UK**
*TERMINATED: 08/09/2018*

**Defendant**

**BDi Music**
*TERMINATED: 08/09/2018*

**Defendant**

**Bucks Music Group**
*TERMINATED: 08/09/2018*

**Defendant**

**Warner Music Group Corporation**
*TERMINATED: 08/09/2018*
*doing business as*

Asylum Records
*TERMINATED: 08/09/2018*

### Defendant

**Warner Music Group, LTD UK**
*TERMINATED: 08/09/2018*

### Defendant

**Does 1 through 10**

### Defendant

| | | |
|---|---|---|
| **BDi Music Ltd.** | represented by | **Andrew Mark Goldsmith** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Brian Maida** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Donald S. Zakarin** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Ilene Susan Farkas** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

### Defendant

| | | |
|---|---|---|
| **Bucks Music Group Ltd.** | represented by | **Andrew Mark Goldsmith** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Brian Maida** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Donald S. Zakarin** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Ilene Susan Farkas** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

### Defendant

| | | |
|---|---|---|
| **The Royalty Network, Inc.** | represented by | **Andrew Mark Goldsmith** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Brian Maida** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

# A5

**Defendant**

**David Platz Music (USA) Inc.**                    represented by  **Andrew Mark Goldsmith**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Brian Maida**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Donald S. Zakarin**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Ilene Susan Farkas**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Amy Wadge**                                       represented by  **Andrew Mark Goldsmith**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Brian Maida**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Donald S. Zakarin**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Ilene Susan Farkas**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Jake Gosling**                                    represented by  **Andrew Mark Goldsmith**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Brian Maida**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Donald S. Zakarin**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Ilene Susan Farkas**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| | | |
|---|---|---|
| 06/28/2018 | 1 | COMPLAINT against ATLANTIC RECORDING CORPORATION d/b/a ATLANTIC RECORDS, Amy Wadge Records, Atlantic Records UK, BDi Music, Bucks Music Group, Ed Sheeran Limited, Gingerbread Man Records, Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, Sony/Atv Music Publishing, LTD. UK, Sticky Studios, WARNER MUSIC GROUP CORPORATION d/b/a/ ASYLUM RECORDS, Amy Wadge, Warner Music Group, LTD UK. (Filing Fee $ 400.00, Receipt Number 0208-15257712)Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 06/28/2018) |
| 06/28/2018 | 2 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR -** REQUEST FOR ISSUANCE OF SUMMONS as to All Defendants, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 6/29/2018 (pne). (Entered: 06/28/2018) |
| 06/28/2018 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 06/28/2018) |
| 06/28/2018 | 4 | RELATED CASE AFFIRMATION of Hillel I. Parness re: that this action be filed as related to 17-cv-5221. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 06/28/2018) |
| 06/28/2018 | 5 | **FILING ERROR - PDF ERROR -** CIVIL COVER SHEET filed. (Parness, Hillel) Modified on 6/29/2018 (pne). (Entered: 06/28/2018) |
| 06/28/2018 | 6 | **FILING ERROR - PDF ERROR -** AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review.(Parness, Hillel) Modified on 6/29/2018 (pne). (Entered: 06/28/2018) |
| 06/29/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Unassigned. (pne) (Entered: 06/29/2018) |
| 06/29/2018 | | Case Designated ECF. (pne) (Entered: 06/29/2018) |
| 06/29/2018 | | CASE REFERRED TO Judge Richard J. Sullivan as possibly related to 17CV5221. (pne) (Entered: 06/29/2018) |
| 06/29/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Hillel Ira Parness. The following case opening statistical information was erroneously selected/entered: County code New York. The following correction has been made to your case entry: the County code has been modified to XX Out of State. (pne)** (Entered: 06/29/2018) |
| 06/29/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Hillel Ira Parness to RE-FILE Document No. 5 Civil Cover Sheet. The filing is deficient for the following reason: defendant name error on caption; if the entire caption does not fit in the space provided, use "et al" following the name of the first defendant named on the pleading caption. Re-file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the correct PDF. Use civil cover sheet issued by S.D.N.Y. dated June 2017. The S.D.N.Y. Civil Cover Sheet dated June 2017 is located at http://nysd.uscourts.gov/file/forms/civil-cover-sheet.. (pne)** (Entered: 06/29/2018) |
| 06/29/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Hillel Ira Parness. The party information for the following parties has been modified: Atlantic Recording Corporation, Edward Christopher Sheeran, Warner Music Group Corporation. The information for the parties has been modified for the following reasons: party name was entered in all caps; alias party name was omitted. (pne)** (Entered: 06/29/2018) |

| 06/29/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 2 Request for Issuance of Summons. The filing is deficient for the following reasons: no defendant name(s) entered in the 'To' field on the summons request form; the name of the parties for whom the summons is being requested must appear on the docket entry text; caption is incomplete. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pne)** (Entered: 06/29/2018) |
| 06/29/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT COPYRIGHT FORM. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 6 AO 121 Form Copyright - Notice of Submission by Attorney. The filing is deficient for the following reasons: defendant name error on caption; if the entire caption does not fit in the space provided, use "et al" following the name of the first defendant named on the pleading caption. Re-file the document using the event type AO 121 Form Copyright - Notice of Submission by Attorney found under the event list Other Documents and attach the correct AO 121 Copyright PDF form. (pne)** (Entered: 06/29/2018) |
| 06/29/2018 | 24 | MEMO ENDORSEMENT on re: (60 in 1:17-cv-05221-RJS) Letter filed by Structured Asset Sales, LLC. ENDORSEMENT: Counsel's request is DENIED. The Court will issue a scheduling order in the related case, 18-cv-5839, once Defendants have been served. (Signed by Judge Richard J. Sullivan on 6/29/2018) (mro) (Entered: 07/02/2018) |
| 07/01/2018 | 7 | CIVIL COVER SHEET filed. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 8 | AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review.(Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Atlantic Records UK, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Atlantic Records Corporation, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 11 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST As To -** REQUEST FOR ISSUANCE OF SUMMONS as to BDI Music Group, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/2/2018 (dnh). (Entered: 07/01/2018) |
| 07/01/2018 | 12 | REQUEST FOR ISSUANCE OF SUMMONS as to Gingerbread Man Records, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 13 | REQUEST FOR ISSUANCE OF SUMMONS as to Jake Gosling, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 14 | REQUEST FOR ISSUANCE OF SUMMONS as to Ed Sheeran Limited, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 15 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR -** REQUEST FOR ISSUANCE OF SUMMONS as to Edward Christopher |

A8

|  |  | Sheeran, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/2/2018 (dnh). (Entered: 07/01/2018) |
|---|---|---|
| 07/01/2018 | 16 | REQUEST FOR ISSUANCE OF SUMMONS as to Sony/ATV Music Publishing LLC, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 17 | REQUEST FOR ISSUANCE OF SUMMONS as to Sony/ATV Music Publishing, Ltd. (UK), re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 18 | REQUEST FOR ISSUANCE OF SUMMONS as to Sticky Studios, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 19 | REQUEST FOR ISSUANCE OF SUMMONS as to Amy Wadge Records, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 20 | REQUEST FOR ISSUANCE OF SUMMONS as to Amy Wadge, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 21 | REQUEST FOR ISSUANCE OF SUMMONS as to Warner Music Group Corporation, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 22 | REQUEST FOR ISSUANCE OF SUMMONS as to Warner Music Group, Ltd. (UK), re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/01/2018) |
| 07/01/2018 | 23 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST As To -** REQUEST FOR ISSUANCE OF SUMMONS as to Bucks Music Group Limited, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/2/2018 (dnh). (Entered: 07/01/2018) |
| 07/02/2018 |  | CASE ACCEPTED AS RELATED. Create association to 1:17-cv-05221-RJS. Notice of Assignment to follow. (jc) (Entered: 07/02/2018) |
| 07/02/2018 |  | NOTICE OF CASE REASSIGNMENT to Judge Richard J. Sullivan. Judge Unassigned is no longer assigned to the case. (jc) (Entered: 07/02/2018) |
| 07/02/2018 |  | Magistrate Judge Ona T. Wang is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (jc) (Entered: 07/02/2018) |
| 07/02/2018 | 25 | ELECTRONIC SUMMONS ISSUED as to Atlantic Records UK. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 26 | ELECTRONIC SUMMONS ISSUED as to Atlantic Recording Corporation. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 |  | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 11 Request for Issuance of Summons. The filing is deficient for the following reason(s): 'As to' Error; Defendant name must directly correspond to the party of Record (BDI Music Group). Docket entry 'as to' selection does not directly correspond to the party of record. Defendant name listed in 'To:' field on PDF does not directly correspond to the party of record. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process** |

|  |  | **- select the correct filer/filers - and attach the correct summons form PDF. (dnh)** (Entered: 07/02/2018) |
|---|---|---|
| 07/02/2018 | 27 | ELECTRONIC SUMMONS ISSUED as to Gingerbread Man Records. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 28 | ELECTRONIC SUMMONS ISSUED as to Jake Gosling. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 29 | **Document replaced with correct PDF** ELECTRONIC SUMMONS ISSUED as to Ed Sheeran Limited. (dnh) (Main Document 29 replaced on 7/3/2018) (dnh). (Entered: 07/02/2018) |
| 07/02/2018 |  | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 15 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Defendant name and address omitted from PDF. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (dnh)** (Entered: 07/02/2018) |
| 07/02/2018 | 30 | ELECTRONIC SUMMONS ISSUED as to Sony/ATV Music Publishing, LLC. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 31 | ELECTRONIC SUMMONS ISSUED as to Sony/Atv Music Publishing, LTD. UK. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 32 | ELECTRONIC SUMMONS ISSUED as to Sticky Studios. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 33 | ELECTRONIC SUMMONS ISSUED as to Amy Wadge Records. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 34 | ELECTRONIC SUMMONS ISSUED as to Amy Wadge. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 35 | ELECTRONIC SUMMONS ISSUED as to Warner Music Group Corporation. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 36 | REQUEST FOR ISSUANCE OF SUMMONS as to Edward Christopher Sheeran, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/02/2018) |
| 07/02/2018 | 37 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR -** REQUEST FOR ISSUANCE OF SUMMONS as to BDi Music, re: 1 Complaint. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/3/2018 (dnh). (Entered: 07/02/2018) |
| 07/02/2018 | 38 | ELECTRONIC SUMMONS ISSUED as to Warner Music Group, LTD UK. (dnh) (Entered: 07/02/2018) |
| 07/02/2018 | 39 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST - PREVIOUSLY ISSUED TO PARTY -** REQUEST FOR ISSUANCE OF SUMMONS as to Ed Sheeran Limited, re: 1 Complaint. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/3/2018 (dnh). (Entered: 07/02/2018) |
| 07/02/2018 |  | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 23 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Defendant name must directly correspond to the party of record (Bucks Music Group Limited). Defendant name on PDF must directly** |

| | | |
|---|---|---|
| | | **correspond to the party of record. Docket Entry Error; 'as to' party name selected must directly correspond to the pleading. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (dnh)** (Entered: 07/02/2018) |
| 07/02/2018 | 40 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR** - REQUEST FOR ISSUANCE OF SUMMONS as to Bucks Music Group, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) Modified on 7/2/2018 (dnh). (Entered: 07/02/2018) |
| 07/02/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 40 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Include 'C/o' or 'via' before second party name (Roundhouse). Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (dnh)** (Entered: 07/02/2018) |
| 07/02/2018 | 41 | REQUEST FOR ISSUANCE OF SUMMONS as to BDi Music, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/02/2018) |
| 07/02/2018 | 42 | REQUEST FOR ISSUANCE OF SUMMONS as to Bucks Music Group, re: 1 Complaint,,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/02/2018) |
| 07/03/2018 | 43 | ELECTRONIC SUMMONS ISSUED as to BDi Music. (dnh) (Entered: 07/03/2018) |
| 07/03/2018 | 44 | ELECTRONIC SUMMONS ISSUED as to Edward Christopher Sheeran. (dnh) (Entered: 07/03/2018) |
| 07/03/2018 | 45 | ELECTRONIC SUMMONS ISSUED as to Bucks Music Group. (dnh) (Entered: 07/03/2018) |
| 07/10/2018 | 46 | AO 121 FORM COPYRIGHT - CASE OPENING - SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a court action has been filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (dnh) (Entered: 07/10/2018) |
| 07/13/2018 | 47 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR -** AMENDED COMPLAINT amending 1 Complaint,, against Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC with JURY DEMAND.Document filed by Structured Asset Sales, LLC. Related document: 1 Complaint,,.(Parness, Hillel) Modified on 7/16/2018 (pc). (Entered: 07/13/2018) |
| 07/16/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Hillel Ira Parness to RE-FILE Document No. 47 Amended Complaint,. The filing is deficient for the following reason(s): the wrong party/parties whom the pleading is against were selected. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pc)** (Entered: 07/16/2018) |
| 07/16/2018 | 48 | AMENDED COMPLAINT amending 1 Complaint,, against Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, Does 1 |

| | | |
|---|---|---|
| | | through 10 with JURY DEMAND.Document filed by Structured Asset Sales, LLC. Related document: 1 Complaint,,..(Parness, Hillel) (Entered: 07/16/2018) |
| 07/16/2018 | 49 | LETTER addressed to Judge Richard J. Sullivan from Hillel I. Parness dated July 16, 2018 re: Renewed Request for Conference. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 07/16/2018) |
| 07/16/2018 | 50 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint, Amended Complaint,. Sony/ATV Music Publishing, LLC served on 7/13/2018, answer due 8/3/2018. Service was accepted by Cathy Krieger-Jewell, Authorized Agent. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/16/2018) |
| 07/16/2018 | 51 | ORDER: Initial Conference set for 8/27/2018 at 11:30 AM in Courtroom 905 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007 before Judge Richard J. Sullivan. (Signed by Judge Richard J. Sullivan on 7/16/2018) (mro) (Entered: 07/17/2018) |
| 07/17/2018 | 52 | MEMO ENDORSEMENT on re: 49 Letter filed by Structured Asset Sales, LLC. ENDORSEMENT: Counsel's request is DENIED. According to the Affidavit of Service filed on July 16, 2018, Defendants were served with the Amended Complaint on July 13, 2018. (Doc. No. 50.) The deadline to file an answer or any other responsive pleading is August 3, 2018. Accordingly, the parties shall comply with the separately docketed scheduling order issued on July 16, 2018. SO ORDERED. (Signed by Judge Richard J. Sullivan on 7/17/2018) (ne) (Entered: 07/17/2018) |
| 07/20/2018 | 53 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint, Amended Complaint,. Atlantic Recording Corporation served on 7/13/2018, answer due 8/3/2018. Service was accepted by Noreen Dynyard (CT Corp clerk). Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 07/20/2018) |
| 08/03/2018 | 54 | PROPOSED STIPULATION AND ORDER. Document filed by Atlantic Recording Corporation, Sony/ATV Music Publishing, LLC. (Goldsmith, Andrew) (Entered: 08/03/2018) |
| 08/03/2018 | 55 | STIPULATION EXTENDING TIME: IT IS HEREBY STIPULATED AND AGREED, that 1. The time for defendants Sony/ATV Music Publishing LLC and Atlantic Recording Corporation d/b/a Atlantic Records (the "Defendants") to appear and to answer the Amended Complaint in this action, be and the same hereby is extended to and including August 10, 2018. Atlantic Recording Corporation answer due 8/10/2018; Sony/ATV Music Publishing, LLC answer due 8/10/2018. (Signed by Judge Richard J. Sullivan on 8/3/2018) (mro) (Entered: 08/06/2018) |
| 08/09/2018 | 56 | PROPOSED STIPULATION AND ORDER. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 08/09/2018) |
| 08/09/2018 | 57 | ORDER: Accordingly, IT IS HEREBY ORDERED THAT Defendants shall answer the amended complaint by August 29, 2018. SO ORDERED., Atlantic Recording Corporation answer due 8/29/2018; Sony/ATV Music Publishing, LLC answer due 8/29/2018. (Signed by Judge Richard J. Sullivan on 8/9/2018) (rj) Modified on 8/10/2018 (rj). (Entered: 08/10/2018) |
| 08/09/2018 | 58 | JOINT STIPULATION: The enumerated Plaintiffs and Defendants, collectively, who, by and through their respective counsel(s), and pursuant to the Federal Rules of Civil Procedure R. 41 (a)(1)(A), jointly stipulate to the following Plaintiff Structured Asset Sales, LLC, through its undersigned counsel, has dismissed the following Defendants from this action: Ed Sheeran Limited, Gingerbread Man Records, Amy Wadge, Amy Wadge Records, Jake Gosling, Sticky Studios, Sony/ATV Music Publishing (UK) Ltd., Atlantic Records (UK), BDi Music, Bucks Music Group, Warner Music Group |

|            |    | Corporation d/b/a Asylum Records, and Warner Music Group Ltd (UK) as set forth in this order., BDi Music, Bucks Music Group, Gingerbread Man Records, Jake Gosling, Edward Christopher Sheeran, Sony/Atv Music Publishing, LTD. UK, Sticky Studios, Amy Wadge, Warner Music Group Corporation, Warner Music Group, LTD UK, Amy Wadge Records and Atlantic Records UK terminated. (Signed by Judge Richard J. Sullivan on 8/9/2018) (rj) (Entered: 08/10/2018) |
|------------|----|---|
| 08/20/2018 | 59 | JOINT LETTER addressed to Judge Richard J. Sullivan from Hillel I. Parness dated August 20, 2018 re: Joint Letter and Proposed Case Management Plan and Scheduling Order. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Text of Proposed Order Proposed Case Management Plan and Scheduling Order)(Parness, Hillel) (Entered: 08/20/2018) |
| 08/23/2018 | 60 | ORDER: In light of the fact that the Court previously granted the parties' request to extend the time for Defendants to answer the amended complaint to August 29, 2018 (Doc. No. 57), IT IS HEREBY ORDERED THAT the initial conference previously scheduled for August 27, 2018 is adjourned to September 4, 2018 at 11:30 a.m. SO ORDERED. (Initial Conference set for 9/4/2018 at 11:30 AM before Judge Richard J. Sullivan.) (Signed by Judge Richard J. Sullivan on 8/23/2018) (ne) (Entered: 08/23/2018) |
| 08/29/2018 | 61 | NOTICE OF APPEARANCE by Donald S. Zakarin on behalf of Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC. (Zakarin, Donald) (Entered: 08/29/2018) |
| 08/29/2018 | 62 | NOTICE OF APPEARANCE by Ilene Susan Farkas on behalf of Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC. (Farkas, Ilene) (Entered: 08/29/2018) |
| 08/29/2018 | 63 | NOTICE OF APPEARANCE by Andrew Mark Goldsmith on behalf of Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC. (Goldsmith, Andrew) (Entered: 08/29/2018) |
| 08/29/2018 | 64 | FIRST RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Sony Corporation (Japan) for Sony/ATV Music Publishing, LLC. Document filed by Sony/ATV Music Publishing, LLC.(Goldsmith, Andrew) (Entered: 08/29/2018) |
| 08/29/2018 | 65 | FIRST RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Access Industries, Inc., Corporate Parent Warner Music Group Corp. for Atlantic Recording Corporation. Document filed by Atlantic Recording Corporation.(Goldsmith, Andrew) (Entered: 08/29/2018) |
| 08/29/2018 | 66 | ANSWER to 48 Amended Complaint,. Document filed by Atlantic Recording Corporation, Sony/ATV Music Publishing, LLC.(Goldsmith, Andrew) (Entered: 08/29/2018) |
| 08/29/2018 | 67 | ANSWER to 48 Amended Complaint,. Document filed by Edward Christopher Sheeran. (Goldsmith, Andrew) (Entered: 08/29/2018) |
| 09/04/2018 |    | Minute Entry for proceedings held before Judge Richard J. Sullivan: Initial Pretrial Conference held on 9/4/2018. Hillel I. Parness present for Plaintiff. Donald S. Zakarin and Ilene S. Farkas present for Defendants. As set forth in a separately docketed order, the Court stayed discovery in this case. (Godina, Jenya) (Entered: 09/04/2018) |
| 09/04/2018 | 68 | ORDER: IT IS HEREBY ORDERED THAT discovery in this case is stayed pending the resolution of the motion for summary judgment in the related case 17-cv-5221, Griffin et al. v. Sheeran et al. IT IS FURTHER ORDERED THAT the parties may proceed with informal discovery during this period. SO ORDERED. (Signed by Judge Richard J. Sullivan on 9/4/2018) (ne) (Entered: 09/05/2018) |

| 09/27/2018 | [69](#) | LETTER addressed to Judge Richard J. Sullivan from Hillel I. Parness dated September 27, 2018 re: Request for Pre-Motion Conference re Proposed Second Amended Complaint. Document filed by Structured Asset Sales, LLC. (Attachments: # [1](#) Exhibit Proposed Second Amended Complaint, # [2](#) Exhibit Blackline of Proposed Second Amended Complaint Against Amended Complaint)(Parness, Hillel) (Entered: 09/27/2018) |
| 09/27/2018 | [70](#) | MEMO ENDORSEMENT on re: [69](#) Letter, filed by Structured Asset Sales, LLC. ENDORSEMENT: IT IS HEREBY ORDERED THAT, no later than Tuesday, October 2, 2018, Defendants shall submit a letter to the Court indicating whether they oppose or consent to Plaintiff's motion to amend the complaint to add the above-named parties. SO ORDERED. (Responses due by 10/2/2018) (Signed by Judge Richard J. Sullivan on 9/27/2018) (ne) (Entered: 09/27/2018) |
| 10/01/2018 | [71](#) | FIRST LETTER addressed to Judge Richard J. Sullivan from Donald S. Zakarin dated October 1, 2018 re: Proposed Second Amended Complaint. Document filed by Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC. (Goldsmith, Andrew) (Entered: 10/01/2018) |
| 10/04/2018 | [72](#) | ORDER: The Court is in receipt of Plaintiff's letter, dated September 27, 2018, requesting a pre-motion conference for its contemplated motion to amend its complaint (Doc. No. 69), as well as Defendants' letter, dated October 1, 2018, stating that Defendants have no position on - and therefore do not oppose - Plaintiff's contemplated motion (Doc. No. 71). Accordingly, the Court deems Plaintiff's motion made and GRANTED. Plaintiff shall file its amended complaint by October 11, 2018. SO ORDERED. (Amended Pleadings due by 10/11/2018.) (Signed by Judge Richard J. Sullivan on 10/4/2018) (ne) (Entered: 10/05/2018) |
| 10/08/2018 | [73](#) | SECOND AMENDED COMPLAINT amending [48](#) Amended Complaint, [1](#) Complaint,, against Atlantic Recording Corporation, Does 1 through 10, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc. with JURY DEMAND.Document filed by Structured Asset Sales, LLC. Related document: [48](#) Amended Complaint, [1](#) Complaint,,.(Parness, Hillel) (Entered: 10/08/2018) |
| 10/08/2018 | [74](#) | REQUEST FOR ISSUANCE OF SUMMONS as to BDi Music Ltd., re: [73](#) Amended Complaint,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 10/08/2018) |
| 10/08/2018 | [75](#) | REQUEST FOR ISSUANCE OF SUMMONS as to Bucks Music Group Ltd., re: [73](#) Amended Complaint,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 10/08/2018) |
| 10/08/2018 | [76](#) | REQUEST FOR ISSUANCE OF SUMMONS as to The Royalty Network, Inc., re: [73](#) Amended Complaint,. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 10/08/2018) |
| 10/10/2018 | [77](#) | ELECTRONIC SUMMONS ISSUED as to The Royalty Network, Inc.. (sj) (Entered: 10/10/2018) |
| 10/10/2018 | [78](#) | ELECTRONIC SUMMONS ISSUED as to Bucks Music Group Ltd.. (sj) (sj). (Entered: 10/10/2018) |
| 10/10/2018 | [79](#) | ELECTRONIC SUMMONS ISSUED as to BDi Music Ltd.. (sj) (Entered: 10/10/2018) |
| 10/22/2018 | [80](#) | ANSWER to [73](#) Amended Complaint,. Document filed by Atlantic Recording Corporation, Sony/ATV Music Publishing, LLC.(Goldsmith, Andrew) (Entered: 10/22/2018) |

# A14

| | | |
|---|---|---|
| 10/22/2018 | 81 | ANSWER to 73 Amended Complaint,. Document filed by Edward Christopher Sheeran. (Goldsmith, Andrew) (Entered: 10/22/2018) |
| 10/25/2018 | | NOTICE OF CASE REASSIGNMENT to Judge P. Kevin Castel. Judge Richard J. Sullivan is no longer assigned to the case. (sjo) (Entered: 10/25/2018) |
| 11/11/2018 | 82 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. Bucks Music Group Ltd. served on 10/24/2018, answer due 11/14/2018. Service was accepted by Kathy Alwill. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 11/11/2018) |
| 11/11/2018 | 83 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. The Royalty Network, Inc. served on 10/24/2018, answer due 11/14/2018. Service was accepted by Kathy Alwill. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 11/11/2018) |
| 11/11/2018 | 84 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. BDi Music Ltd. served on 10/24/2018, answer due 11/14/2018. Service was accepted by Kathy Alwill. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 11/11/2018) |
| 11/14/2018 | | NOTICE OF CASE REASSIGNMENT to Judge Louis L. Stanton. Judge P. Kevin Castel is no longer assigned to the case. (sjo) (Entered: 11/14/2018) |
| 01/15/2019 | 85 | PROPOSED PROTECTIVE ORDER. Document filed by Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc.. (Goldsmith, Andrew) (Entered: 01/15/2019) |
| 01/15/2019 | 86 | STIPULATED PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material... FOR GOOD CAUSE SHOWN, IT IS SO ORDERED. (Signed by Judge Louis L. Stanton on 1/15/2019) (rro) (Entered: 01/15/2019) |
| 02/07/2019 | 87 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. Service was accepted by Kathy Alwill, The Royalty Network, Inc.. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 02/07/2019) |
| 02/07/2019 | 88 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,. Service was accepted by Kathy Alwill, The Royalty Network, Inc.. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 02/07/2019) |
| 02/15/2019 | 89 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by The Royalty Network, Inc..(Goldsmith, Andrew) (Entered: 02/15/2019) |
| 02/15/2019 | 90 | ANSWER to 73 Amended Complaint,. Document filed by The Royalty Network, Inc.. (Goldsmith, Andrew) (Entered: 02/15/2019) |
| 03/05/2019 | 91 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated March 5, 2019 re: Request for Conference. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 03/05/2019) |
| 03/07/2019 | 92 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated March 7, 2019 re: response to Plaintiff's Letter dated March 5, 2019 Requesting A Conference. Document filed by Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc..(Goldsmith, Andrew) (Entered: 03/07/2019) |
| 03/11/2019 | 93 | NOTICE OF APPEARANCE by Giovanna Maria Marchese on behalf of Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC. (Marchese, Giovanna) (Entered: 03/11/2019) |

SDNY CM/ECF NextGen Version 1.7

| 03/15/2019 | | Set/Reset Hearings: Status Conference set for 3/29/2019 at 02:30 PM in Courtroom 21C, 500 Pearl Street, New York, NY 10007 before Judge Louis L. Stanton. (ml) (Entered: 03/15/2019) |
|---|---|---|
| 03/21/2019 | 94 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated March 21, 2019 re: Consolidation and Addition of Defendants. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 03/21/2019) |
| 03/25/2019 | 95 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated March 25, 2019 re: Letter from Hillel Parness dated March 21, 2019. Document filed by Atlantic Recording Corporation, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc..(Goldsmith, Andrew) (Entered: 03/25/2019) |
| 03/29/2019 | 96 | ORDER: Counsel having appeared before me at a conference on March 29, 2019, it is ORDERED that: The issues raised in the parties' correspondence to the Court on March 5, 2019 (Dkt. No. 91), March 7, 2019 (Dkt. No. 92), March 11, 2019 (Dkt. No. 93), March 21, 2019 (Dkt. No. 94), and March 25, 2019 (Dkt. No. 95), are disposed of in accordance with the rulings made on the record in open court. (Signed by Judge Louis L. Stanton on 3/29/2019) (rro) (Entered: 03/29/2019) |
| 03/29/2019 | | Minute Entry for proceedings held before Judge Louis L. Stanton: Status Conference held on 3/29/2019. (Court Reporter Vincent Bologna) (ml) (Entered: 04/05/2019) |
| 04/15/2019 | 97 | TRANSCRIPT of Proceedings re: CONFERENCE held on 3/29/2019 before Judge Louis L. Stanton. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/6/2019. Redacted Transcript Deadline set for 5/16/2019. Release of Transcript Restriction set for 7/15/2019. (McGuirk, Kelly) (Entered: 04/15/2019) |
| 04/15/2019 | 98 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 3/29/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 04/15/2019) |
| 05/06/2019 | 99 | ORDER FOR CONFERENCE PURSUANT TO RULE 16(b): Initial Conference set for 5/31/2019 at 02:30 PM in Courtroom 21C, 500 Pearl Street, New York, NY 10007 before Judge Louis L. Stanton and further set forth in this Order. (Signed by Judge Louis L. Stanton on 5/6/2019) (rro) (Entered: 05/06/2019) |
| 05/23/2019 | 100 | PROPOSED STIPULATION AND ORDER. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Exhibit Proposed Third Amended Complaint, # 2 Exhibit Blackline Proposed Third Amended Complaint compared to Second Amended Complaint) (Parness, Hillel) (Entered: 05/23/2019) |
| 05/23/2019 | 101 | JOINT STIPULATION AND ORDER:NOW THEREFORE, the enumerated Plaintiffs and Defendants, by and through their respective counsel, and pursuant to the Federal Rules of Civil Procedure R. 41 (a)(1)(A), stipulate as follows: The existing Defendants that have been served - Sheeran, SATV, Atlantic and TRNI - consent to SAS's filing of the TAC without any acceptance of the truth of any allegation contained therein. Sheeran, SATV, Atlantic and TRNI shall answer or otherwise move in relation to the TAC on or before July 8, 2019. DPMI waives service of the TAC and shall answer or otherwise move in relation to the TAC on or before July 8, 2019. Without making an appearance |

# A16

|  |  |  |
|---|---|---|
|  |  | and without waiver of any and all defenses other than defective service of process (and specifically preserving their defenses regarding a lack of personal jurisdiction over them), BDi, Bucks and Wadge waive service the TAC and shall answer or otherwise move in relation to the TAC on or before July 8, 2019. While preserving their right to raise a lack of personal jurisdiction as an affirmative defense, BDi and Bucks further agree that they will not make a Rule 12(b)(2) motion to dismiss the TAC, and BDi, Bucks, DPMI and Wadge further agree that they will not make a Rule 12(b)(5) motion to dismiss the TAC. For the avoidance of doubt, Gosling is not currently represented by the counsel below, and therefore the signatories to this Joint Stipulation agree and acknowledge that this Joint Stipulation does not affect Gosling in any way. SO ORDERED. (Atlantic Recording Corporation answer due 7/8/2019; BDi Music Ltd. answer due 7/8/2019; Bucks Music Group Ltd. answer due 7/8/2019; Edward Christopher Sheeran answer due 7/8/2019; Sony/ATV Music Publishing, LLC answer due 7/8/2019; The Royalty Network, Inc. answer due 7/8/2019; Amy Wadge answer due 7/8/2019.) (Signed by Judge Louis L. Stanton on 5/23/2019) (rro) Modified on 5/24/2019 (rro). (Entered: 05/23/2019) |
| 05/30/2019 | 102 | THIRD AMENDED COMPLAINT amending 48 Amended Complaint, 1 Complaint,, 73 Amended Complaint, against Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., Does 1 through 10, Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge, David Platz Music (USA) Inc. with JURY DEMAND.Document filed by Structured Asset Sales, LLC. Related document: 48 Amended Complaint, 1 Complaint,, 73 Amended Complaint,. (Parness, Hillel) (Entered: 05/30/2019) |
| 05/31/2019 | 103 | JOINT REPORT AND SCHEDULING ORDER: Anticipated length of trial: 5-10 days. Trial by: Jury. Status Conference set for 10/4/2019 at 12:30 PM before Judge Louis L. Stanton. SO ORDERED. (Signed by Judge Louis L. Stanton on 5/31/2019) (rro) (Entered: 05/31/2019) |
| 05/31/2019 |  | Minute Entry for proceedings held before Judge Louis L. Stanton: Initial Pretrial Conference held on 5/31/2019. (ml) (Entered: 05/31/2019) |
| 06/27/2019 | 104 | PROPOSED STIPULATION AND ORDER. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 06/27/2019) |
| 06/27/2019 | 105 | STIPULATION AND ORDER: NOW THEREFORE, Plaintiff and Gosling, by and through their respective counsel, stipulate as follows: Without making an appearance and without waiver of any and all defenses other than service of process (and specifically preserving his defense regarding a lack of personal jurisdiction over him), Gosling waives service of the TAC. Gosling shall answer or otherwise move in relation to the TAC on or before August 26, 2019. SO ORDERED. (Jake Gosling answer due 8/26/2019.) (Signed by Judge Louis L. Stanton on 6/29/2019) (rro) (Entered: 06/27/2019) |
| 07/08/2019 | 106 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Bucks Music Group Ltd. for BDi Music Ltd.. Document filed by BDi Music Ltd.. (Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 107 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Bucks Music Group Ltd..(Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 108 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Bucks Music Group Ltd. for David Platz Music (USA) Inc.. Document filed by David Platz Music (USA) Inc..(Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 109 | ANSWER to 102 Amended Complaint,,. Document filed by Edward Christopher Sheeran.(Goldsmith, Andrew) (Entered: 07/08/2019) |

| 07/08/2019 | 110 | ANSWER to 102 Amended Complaint,,. Document filed by Atlantic Recording Corporation, Sony/ATV Music Publishing, LLC.(Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 111 | ANSWER to 102 Amended Complaint,,. Document filed by The Royalty Network, Inc.. (Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 112 | ANSWER to 102 Amended Complaint,,. Document filed by David Platz Music (USA) Inc..(Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/08/2019 | 113 | ANSWER to 102 Amended Complaint,,. Document filed by BDi Music Ltd., Bucks Music Group Ltd..(Goldsmith, Andrew) (Entered: 07/08/2019) |
| 07/09/2019 | | ADD PARTY FOR PLEADING. Defendants/Respondents Jake Gosling, Amy Wadge added. Party added pursuant to 102 Amended Complaint,,.Document filed by Structured Asset Sales, LLC. Related document: 102 Amended Complaint,,.(Parness, Hillel) (Entered: 07/09/2019) |
| 07/09/2019 | | ADD PARTY FOR PLEADING. Defendants/Respondents Amy Wadge, Jake Gosling added. Party added pursuant to 102 Amended Complaint,,.Document filed by Structured Asset Sales, LLC. Related document: 102 Amended Complaint,,.(Parness, Hillel) (Entered: 07/09/2019) |
| 07/09/2019 | 114 | ANSWER to 102 Amended Complaint,,. Document filed by Amy Wadge.(Goldsmith, Andrew) (Entered: 07/09/2019) |
| 07/09/2019 | 115 | NOTICE OF APPEARANCE by Donald S. Zakarin on behalf of BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Amy Wadge. (Zakarin, Donald) (Entered: 07/09/2019) |
| 07/09/2019 | 116 | NOTICE OF APPEARANCE by Andrew Mark Goldsmith on behalf of BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Amy Wadge. (Goldsmith, Andrew) (Entered: 07/09/2019) |
| 07/09/2019 | 117 | NOTICE OF APPEARANCE by Ilene Susan Farkas on behalf of BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Amy Wadge. (Farkas, Ilene) (Entered: 07/09/2019) |
| 08/26/2019 | 118 | ANSWER to 102 Amended Complaint,,. Document filed by Jake Gosling.(Goldsmith, Andrew) (Entered: 08/26/2019) |
| 08/26/2019 | 119 | NOTICE OF APPEARANCE by Andrew Mark Goldsmith on behalf of Jake Gosling. (Goldsmith, Andrew) (Entered: 08/26/2019) |
| 08/26/2019 | 120 | NOTICE OF APPEARANCE by Donald S. Zakarin on behalf of Jake Gosling. (Zakarin, Donald) (Entered: 08/26/2019) |
| 09/04/2019 | 121 | NOTICE OF APPEARANCE by Ilene Susan Farkas on behalf of Jake Gosling. (Farkas, Ilene) (Entered: 09/04/2019) |
| 09/06/2019 | 122 | PROPOSED PROTECTIVE ORDER. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Goldsmith, Andrew) (Entered: 09/06/2019) |
| 09/06/2019 | 123 | LETTER MOTION for Conference *re Discovery Motion - Indirect Profits* addressed to Judge Louis L. Stanton from Hillel I. Parness dated September 6, 2019. Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 09/06/2019) |

| 09/09/2019 | 124 | STIPULATED PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material...FOR GOOD CAUSE SHOWN, IT IS SO ORDERED. (Signed by Judge Louis L. Stanton on 9/6/2019) (rro) (Entered: 09/09/2019) |
| --- | --- | --- |
| 09/10/2019 | 125 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated September 10, 2019 re: Plaintiff's Request for a Pre-Motion Discovery Conference regarding Indirect Profits. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Goldsmith, Andrew) (Entered: 09/10/2019) |
| 09/11/2019 | 126 | LETTER RESPONSE in Support of Motion addressed to Judge Louis L. Stanton from Hillel I. Parness dated September 11, 2019 re: 123 LETTER MOTION for Conference *re Discovery Motion - Indirect Profits* addressed to Judge Louis L. Stanton from Hillel I. Parness dated September 6, 2019. . Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 09/11/2019) |
| 10/04/2019 |  | Minute Entry for proceedings held before Judge Louis L. Stanton: Status Conference held on 10/4/2019. (ml) (Entered: 10/04/2019) |
| 10/10/2019 | 127 | PROPOSED STIPULATION AND ORDER. Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 10/10/2019) |
| 10/15/2019 | 128 | STIPULATION AND ORDER: NOW THEREFORE, Plaintiff and Defendants, by and through their respective counsel, stipulate as follows: Plaintiffs motion to compel discovery in accordance with their Request in ECF 123 concerning "indirect profits" shall be filed and served by October 23, 2019; Defendants' response shall be filed and served by November 12, 2019; and Plaintiffs reply shall be filed and served by November 19, 2019. SO ORDERED. (Motions due by 10/23/2019., Responses due by 11/12/2019, Replies due by 11/19/2019.) (Signed by Judge Louis L. Stanton on 10/15/2019) (rro) Modified on 11/18/2019 (rro). (Entered: 10/15/2019) |
| 10/23/2019 | 129 | MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27-28 . Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 10/23/2019) |
| 10/23/2019 | 130 | MEMORANDUM OF LAW in Support re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27 -28. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Affidavit Certification of Hillel I. Parness in Support of Motion to Compel, # 2 Exhibit EX A 2019.05.30 SAS v Sheeran Third Amended Complaint FILED, # 3 Exhibit EX B 2019.07.01 Response to First RFP from Plaintiff (Sheeran, SATV, Atlantic and TRNI), # 4 Exhibit EX C 2019.08.30 Response to First RFP Addressed to BDi, Bucks and Wadge, # 5 Exhibit EX D Setlist TOL by ECS, # 6 Exhibit EX E Ed Sheeran Tour Statistics _ setlist.fm, # 7 Exhibit EX F Ed Sheerans Record-Breaking Divide Tour Totals $775.6 Million, Beating U2, Guns N Roses, # 8 Exhibit EX G Ed Sheeran going on hiatus amid legal troubles, plagiarism claims, # 9 Exhibit EX H ECS Tours Wikipedia, # 10 Exhibit EX I Ed Sheerans Thinking Out Loud celebrates huge chart milestone)(Parness, Hillel) (Entered: 10/23/2019) |
| 11/08/2019 | 131 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated November 8, 2019 re: Motion to Compel Production of Documents Regarding "Indirect Profits". Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 11/08/2019) |

# A19

| 11/08/2019 | 132 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated November 8, 2019 re: Response to Plaintiff's Letter dated November 8, 2019 regarding Plaintiff's Motion to Compel Discovery of "Indirect Profits". Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.(Goldsmith, Andrew) (Entered: 11/08/2019) |
|---|---|---|
| 11/12/2019 | 133 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated November 12, 2019 re: Motion to Compel Production of Documents Regarding "Indirect Profits". Document filed by Structured Asset Sales, LLC.(Parness, Hillel) (Entered: 11/12/2019) |
| 11/12/2019 | 134 | DECLARATION of Donald S. Zakarin in Opposition re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit Exhibit 1 - TAC Ad Damnum Clause)(Goldsmith, Andrew) (Entered: 11/12/2019) |
| 11/12/2019 | 135 | DECLARATION of Stuart Camp in Opposition re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Errata Exhibit 1 - Schedule of U.S. Concert Dates)(Goldsmith, Andrew) (Entered: 11/12/2019) |
| 11/12/2019 | 136 | DECLARATION of Richard H. Reimer in Opposition re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit Exhibit 1 - Schedule of U.S. Concert Dates, # 2 Exhibit Exhibit 2 - ASCAP Blanket License Agreement)(Goldsmith, Andrew) (Entered: 11/12/2019) |
| 11/12/2019 | 137 | DECLARATION of Jose Gonzalez in Opposition re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit Exhibit 1 - Schedule of U.S. Concert Dates, # 2 Exhibit Exhibit 2 - Standard Form of BMI's Facilities Music Performance Agreement, # 3 Exhibit Exhibit 3 - Standard Form of BMI's Music License for Venue Agreement, # 4 Exhibit Exhibit 4 - Standard Form of BMI's Music License for Promotoer/Presenter Agreement)(Goldsmith, Andrew) (Entered: 11/12/2019) |
| 11/12/2019 | 138 | MEMORANDUM OF LAW in Opposition re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents |

| | | |
|---|---|---|
| | | responsive to SAS Document Requests 15-20 and 27 . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Goldsmith, Andrew) (Entered: 11/12/2019) |
| 11/19/2019 | 139 | REPLY MEMORANDUM OF LAW in Support re: 129 MOTION to Compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. to produce "indirect profit" documents responsive to SAS Document Requests 15-20 and 27 -28. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Affidavit Parness Supplemental Certification, # 2 Exhibit EX J ascap-writer-agreement, # 3 Exhibit EX K ascap-publisher-agreement, # 4 Exhibit EX L bmi_writer_agreement_W800, # 5 Exhibit EX M bmi_publisher_agreement, # 6 Exhibit EX N Zakarin Parness Emails)(Parness, Hillel) (Entered: 11/19/2019) |
| 11/21/2019 | 140 | LETTER MOTION for Oral Argument *re: motion filed under Docket No. 129* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated November 21, 2019. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.(Goldsmith, Andrew) (Entered: 11/21/2019) |
| 11/27/2019 | 141 | LETTER MOTION for Conference *seeking permission to file a motion for an Order pursuant to Fed. R. Civ. P. 12(c) and/or Fed. R. Civ. P. 56* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated November 27, 2019. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.(Goldsmith, Andrew) (Entered: 11/27/2019) |
| 12/02/2019 | 142 | LETTER RESPONSE in Opposition to Motion addressed to Judge Louis L. Stanton from Hillel I. Parness dated December 2, 2019 re: 141 LETTER MOTION for Conference *seeking permission to file a motion for an Order pursuant to Fed. R. Civ. P. 12(c) and/or Fed. R. Civ. P. 56* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated November 27, 2019. . Document filed by Structured Asset Sales, LLC. (Parness, Hillel) (Entered: 12/02/2019) |
| 12/03/2019 | 143 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated December 3, 2019 re: Defendants' Request for A Conference seeking permission to file a motion for an Order pursuant to Fed. R. Civ. P. 12(c) and/or Fed. R. Civ. P. 56. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, The Royalty Network, Inc., Amy Wadge.(Goldsmith, Andrew) (Entered: 12/03/2019) |
| 01/15/2020 | 144 | OPINION & ORDER granting in part and denying in part 129 Motion to Compel: Plaintiff SAS's motion to compel document production (Dkt. No. 129) is granted as to Document Requests 15-18 insofar as they request documents reflecting revenues received or earned, and expenses incurred or paid, in connection with live performances and merchandise sold at concerts where TOL was performed on or after June 28, 2015, including revenues received or earned and expenses incurred or paid in connection with multiple musical works; and Requests 27-28 seeking schedules and set lists for performances on or after June 28, 2015. The motion to compel (Dkt. No. 129) is denied as to Document Requests 15-20, and 27, 28 insofar as they request information about performances prior to June 28, 2015, or merchandise sold before June 28, 2015, or not |

|            |     | connected to live performances of TOL on or after June 28, 2015. (Signed by Judge Louis L. Stanton on 1/15/2020) (ml) (Entered: 01/15/2020) |
|------------|-----|------------------------------------------------------------------------------------------------------------------------------------------|
| 04/07/2020 | 145 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 7, 2020 re: Request for Telephonic Conference to Discuss Adjustments to Case Schedule. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/07/2020) |
| 04/08/2020 | 146 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated April 8, 2020 re: Plaintiff's Request For Relief From Scheduling Order. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/08/2020) |
| 04/08/2020 | 147 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 8, 2020 re: Request for Telephonic Conference to Discuss Adjustments to Case Schedule. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/08/2020) |
| 04/08/2020 | 148 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 8, 2020 re: Request for Pre-Motion Conference - Motions to Stay, Amend, Partial Summary Judgment. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/08/2020) |
| 04/10/2020 | 149 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated April 10, 2020 re: Plaintiff's Application for Leave to Make Four Distinct Motions. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/10/2020) |
| 04/13/2020 | 150 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 13, 2020 re: Request for Pre-Motion Conference - Motions to Stay, Amend, Partial Summary Judgment. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/13/2020) |
| 04/16/2020 | 151 | ORDER: The points raised in letters from counsels to the Court, dated April 7, 2020 (plaintiff), April 8, 2020 (one defendant's, two plaintiffs), April 10, 2020 (defendant) and April 13, 2020 (plaintiff), which converge on the importance of the "deposit copy" issue in this case, are resolved as follows: Defendants' statement on page two of their counsel's April 10, 2020 letter, that "Defendants are prepared to file a motion for summary judgment based on the deposit copy" is allowed, and they may do so without any further need for a pre- motion conference. So Ordered. (Signed by Judge Louis L. Stanton on 4/16/2020) (rro) (Entered: 04/16/2020) |
| 04/23/2020 | 152 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 23, 2020 re: Request for Relief from Scheduling Order re Expert Disclosure. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Exhibit EX A: Expert Report, # 2 Exhibit EX B: Email Exchange).(Parness, Hillel) (Entered: 04/23/2020) |
| 04/24/2020 | 153 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated April 24, 2020 re: Plaintiff's Second Application for Relief from Scheduling Order. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/24/2020) |

| 04/24/2020 | 154 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated April 24, 2020 re: Request for Relief from Scheduling Order re Expert Disclosure. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/24/2020) |
| --- | --- | --- |
| 05/04/2020 | 155 | MEMO ENDORSEMENT on re: 154 Letter filed by Structured Asset Sales, LLC: that Plaintiffs time to serve the balance of his expert reports upon defendants is extended until May 31, 2020. Nothing in my April 16, 2020 Order denied plaintiffs application for that extension. That matter, and others referred to in the correspondences, were simply left open, to be dealt with if necessary in light of the clarifying effects of a motion for summary judgment. So Ordered. (Signed by Judge Louis L. Stanton on 5/4/2020) (ml) (Entered: 05/04/2020) |
| 05/07/2020 | 156 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 7, 2020 re: Request for Pre-Motion Conference - Amend Complaint. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Exhibit EX A: Copyright Registration Information, # 2 Exhibit EX B: Draft Fourth Amended Complaint, # 3 Exhibit EX C: Expert Report of Professor Walter Everett).(Parness, Hillel) (Entered: 05/07/2020) |
| 05/08/2020 | 157 | LETTER MOTION for Discovery *Seeking to Strike Plaintiff's Improper, Late And Unauthorized Attempted Service of A Second Musicologist Report from a Second Musicologist* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated May 8, 2020. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 05/08/2020) |
| 05/08/2020 | 158 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 8, 2020 re: Expert Report of Professor Walter Everett. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 05/08/2020) |
| 05/08/2020 | 159 | SECOND LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated May 8, 2020 re: Defendants' Application Seeking to Strike Plaintiff's Improper, Late And Unauthorized Attempted Service of A Second Musicologist Report from a Second Musicologist. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.. (Goldsmith, Andrew) (Entered: 05/08/2020) |
| 05/11/2020 | 160 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE DOCUMENT #161) -** LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated May 11, 2020 re: Plaintiff's Proposed Filing Of A Fourth Amended Complaint. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) Modified on 5/12/2020 (ldi). (Entered: 05/11/2020) |
| 05/11/2020 | 161 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated May 11, 2020 re: ***Corrected*** Plaintiff's Proposed Filing Of A Fourth Amended Complaint. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 05/11/2020) |
| 05/11/2020 | 162 | ORDER with respect to 157 Letter Motion for Discovery. With respect to the question on page three, defendant's time to serve responsive experts reports is 30 days after receipt of |

| | | plaintiff's expert reports, and therefore at the latest by July 1, 2020. (Signed by Judge Louis L. Stanton on 5/11/20) (yv) Modified on 5/12/2020 (yv). (Entered: 05/12/2020) |
|---|---|---|
| 05/12/2020 | 163 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 12, 2020 re: Request for Pre-Motion Conference - Amend Complaint. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Exhibit EX A - Certificate, # 2 Exhibit EX B - Quotes re Deposit Copy Issue, # 3 Exhibit EX C - Copyright Compendium Chapter 400, # 4 Exhibit EX D - Images of Sound Recordings).(Parness, Hillel) (Entered: 05/12/2020) |
| 05/13/2020 | 164 | MEMORANDUM TO COUNSEL addressed to the Parties from Judge Louis L. Stanton dated 5/13/2020 re: Memorandum to Counsel: That being so, it is better to deny permission to file the Fourth Amended Complaint. Plaintiff may, without further correspondence or conferences if it wishes, file a formal motion for leave to file it, so the matter may be presented more fully.(ml) (Entered: 05/13/2020) |
| 05/26/2020 | 165 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 26, 2020 re: Request for Extension of Time to Complete Expert Depositions. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 05/26/2020) |
| 05/26/2020 | 166 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 26, 2020 re: Request for Court's Assistance to Obtain Contracts. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 05/26/2020) |
| 05/26/2020 | 167 | LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated May 26, 2020 re: Plaintiff's Letter (ECF 165) Requesting Extension of Deadline to Complete Expert Depositions. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 05/26/2020) |
| 05/26/2020 | 168 | MEMO ENDORSEMENT on re: 166 Letter filed by Structured Asset Sales, LLC. ENDORSEMENT: Denied. (Signed by Judge Louis L. Stanton on 5/26/2020) (rro) (Entered: 05/26/2020) |
| 05/26/2020 | 169 | SECOND LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated May 26, 2020 re: Request for Extension of Time to Complete Expert Depositions. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 05/26/2020) |
| 05/27/2020 | 170 | MEMO ENDORSEMENT on re: 169 Letter filed by Structured Asset Sales, LL. ENDORSEMENT: The time is extended from July 6 to Monday, August 3, 2020. (Deposition due by 8/3/2020.) (Signed by Judge Louis L. Stanton on 5/27/2020) (rro) (Entered: 05/27/2020) |
| 06/22/2020 | 171 | LETTER MOTION for Discovery *to Preclude Expert "Rebuttal" Report of John Covach* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 22, 2020. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit Email from Counsel, # 2 Exhibit ECF 145, # 3 Exhibit ECF 152).(Goldsmith, Andrew) (Entered: 06/22/2020) |
| 06/22/2020 | 172 | MEMORANDUM OF LAW in Opposition re: 171 LETTER MOTION for Discovery *to Preclude Expert "Rebuttal" Report of John Covach* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 22, 2020. . Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 06/22/2020) |

| | | |
|---|---|---|
| 06/23/2020 | 173 | SECOND LETTER addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 23, 2020 re: Letter In Further Support of Application to Preclude "Rebuttal" Expert Report of John Covach. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit Draft Agreement dated April 11, 2019, # 2 Exhibit Draft Agreement dated May 29, 2019, # 3 Exhibit Draft Agreement dated May 30, 2019).(Goldsmith, Andrew) (Entered: 06/23/2020) |
| 06/25/2020 | 174 | MEMO ENDORSEMENT ON 173 granting 171 Letter Motion for Discovery. ENDORSEMENT: The scheduling orders nowhere forbade rebuttal reports, and both sides may use them. If that requires a re-scheduling of an expert's deposition, so be it. (Signed by Judge Louis L. Stanton on 6/25/2020) (rro) (Entered: 06/25/2020) |
| 06/26/2020 | 175 | SECOND RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent AI Entertainment Holdings LLC, Corporate Parent Warner Music Group Corp. for Atlantic Recording Corporation. Document filed by Atlantic Recording Corporation.. (Goldsmith, Andrew) (Entered: 06/26/2020) |
| 08/19/2020 | 176 | JOINT LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated August 19, 2020 re: Joint Request Regarding Scheduling of Expert Depositions. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 08/19/2020) |
| 09/03/2020 | 177 | MEMO ENDORSEMENT on re: 176 Letter filed by Structured Asset Sales, LLC. ENDORSEMENT: I would give great weight to the joint conclusion of counsel of whether expert depositions should be taken remotely or in-person in each expert's case, and to the dates which collectively serve them best. When counsel suggest their proposals on these matters and the dates for expert depositions, I expect to approve them unless some unforeseen good cause forbids it. (Signed by Judge Louis L. Stanton on 9/3/2020) (mml) (Entered: 09/04/2020) |
| 04/05/2021 | 178 | MOTION for Summary Judgment . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/05/2021 | 179 | DECLARATION of Donald S. Zakarin in Support re: 178 MOTION for Summary Judgment .. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit 1 - Covach Report, # 2 Exhibit 2 - Ferrara I Report, # 3 Exhibit 3 - Original Everett Report, # 4 Exhibit 4 - Email Correspondence between Counsel, # 5 Exhibit 5 - Revised Everett Report, # 6 Exhibit 6 - Redline of Everett Reports, # 7 Exhibit 7 - Covach Rebuttal Report, # 8 Exhibit 8 - Ferrara II Report, # 9 Exhibit 9 - Ricigliano Report, # 10 Exhibit 10 - Ferrara Rebuttal Report, # 11 Exhibit 11 - Third Amended Complaint, # 12 Exhibit 12 - 1973 Copyright Application, # 13 Exhibit 13 - Deposit Copy, # 14 Exhibit 14 - Sheeran Deposition Excerpts, # 15 Exhibit 15 - Wadge Declaration, # 16 Exhibit 16 - Gosling Declaration, # 17 Exhibit 17 - Excerpt from "How To Play Rock 'N' Roll Piano", # 18 Exhibit 18 - SAS's Requests For Production, # 19 Exhibit 19 - Defendants' Requests for Production).(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/05/2021 | 180 | RESPONSE in Support of Motion re: 178 MOTION for Summary Judgment . *Rule 56.1 Statement of Undisputed Facts*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, |

# A25

| | | Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/05/2021) |
|---|---|---|
| 04/05/2021 | 181 | MEMORANDUM OF LAW in Support re: 178 MOTION for Summary Judgment . . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/05/2021 | 182 | MOTION to Preclude *Dr. John Covach and Dr. Walter Everett From Testifying At Trial*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/05/2021 | 183 | DECLARATION of Donald S. Zakarin in Support re: 182 MOTION to Preclude *Dr. John Covach and Dr. Walter Everett From Testifying At Trial*.. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit 1 - Covach Report, # 2 Exhibit 2 - Ferrara I Report, # 3 Exhibit 3 - Original Everett Report, # 4 Exhibit 4 - Email Correspondence between Counsel, # 5 Exhibit 5 - Revised Everett Report, # 6 Exhibit 6 - Redline of Everett Reports, # 7 Exhibit 7 - Covach Rebuttal Report, # 8 Exhibit 8 - Ferrara II Report, # 9 Exhibit 9 - Ricigliano Report, # 10 Exhibit 10 - Ferrara Rebuttal Report).(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/05/2021 | 184 | MEMORANDUM OF LAW in Support re: 182 MOTION to Preclude *Dr. John Covach and Dr. Walter Everett From Testifying At Trial*. . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 04/05/2021) |
| 04/13/2021 | 185 | PROPOSED STIPULATION AND ORDER. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 04/13/2021) |
| 05/10/2021 | 186 | MEMORANDUM OF LAW in Opposition re: 178 MOTION for Summary Judgment . . Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Affidavit Certification of Hillel I. Parness, # 2 Exhibit EX 1: Cohen Expert Report, # 3 Exhibit EX 2: Massarsky Expert Report, # 4 Supplement RULE 56.1 Response and Counterstatement of Material Facts).(Parness, Hillel) (Entered: 05/10/2021) |
| 05/10/2021 | 187 | MEMORANDUM OF LAW in Opposition re: 182 MOTION to Preclude *Dr. John Covach and Dr. Walter Everett From Testifying At Trial*. . Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 05/10/2021) |
| 06/04/2021 | 188 | REPLY MEMORANDUM OF LAW in Support re: 178 MOTION for Summary Judgment . . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.. (Goldsmith, Andrew) (Entered: 06/04/2021) |
| 06/04/2021 | 189 | RESPONSE in Support of Motion re: 178 MOTION for Summary Judgment . *Defendants' Reply 56.1 Statement*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 06/04/2021) |

# A26

| | | |
|---|---|---|
| 06/04/2021 | 190 | DECLARATION of Donald S. Zakarin in Support re: 178 MOTION for Summary Judgment .. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit 1 - April 8, 2021 Decision from Stoliarov v. Marshmello Creative, # 2 Exhibit 2 - Billboard.com Screenshot).(Goldsmith, Andrew) (Entered: 06/04/2021) |
| 06/04/2021 | 191 | REPLY MEMORANDUM OF LAW in Support re: 182 MOTION to Preclude *Dr. John Covach and Dr. Walter Everett From Testifying At Trial*. . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 06/04/2021) |
| 06/04/2021 | 192 | LETTER MOTION for Oral Argument *for Defendants' Motions for Summary Judgment (ECF 178) and To Preclude Dr. John Covach and Dr. Walter Everett (ECF 182)* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 4, 2021. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 06/04/2021) |
| 06/08/2021 | 193 | LETTER MOTION for Extension of Time to File Response/Reply as to 192 LETTER MOTION for Oral Argument *for Defendants' Motions for Summary Judgment (ECF 178) and To Preclude Dr. John Covach and Dr. Walter Everett (ECF 182)* addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 4, 2021., 186 Memorandum of Law in Opposition to Motion, addressed to Judge Louis L. Stanton from Hillel I. Parness dated June 8, 2021. Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 06/08/2021) |
| 06/10/2021 | 194 | LETTER RESPONSE to Motion addressed to Judge Louis L. Stanton from Donald S. Zakarin dated June 10, 2021 re: 193 LETTER MOTION for Extension of Time to File Response/Reply as to 192 LETTER MOTION for Oral Argument *for Defendants' Motions for Summary Judgment (ECF 178) and To Preclude Dr. John Covach and Dr. Walter Everett (ECF 182)* addresse . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 06/10/2021) |
| 06/11/2021 | 195 | MEMO ENDORSED ORDER RE: 193 Letter Motion for Extension of Time to File Response/Reply: Denied. (Signed by Judge Louis L. Stanton on 6/11/2021) (ml) (Entered: 06/11/2021) |
| 06/11/2021 | 196 | REPLY MEMORANDUM OF LAW in Support re: 178 MOTION for Summary Judgment ., 193 LETTER MOTION for Extension of Time to File Response/Reply as to 192 LETTER MOTION for Oral Argument *for Defendants' Motions for Summary Judgment (ECF 178) and To Preclude Dr. John Covach and Dr. Walter Everett (ECF 182)* addresse *[REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT]*. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Affidavit 2021.06.11 Parness Supp. Certification, # 2 Exhibit EX 3 2021.02.22 Stoliarov Def MOL MSJ 89, # 3 Exhibit EX 4 2021.03.22 Stoliarov Pltf Opp MOL MSJ 95, # 4 Exhibit EX 5 2021.03.29 Def Reply MOL MSJ Stoliarov 103).(Parness, Hillel) (Entered: 06/11/2021) |

# A27

9/7/23, 11:24 AM                                      SDNY CM/ECF NextGen Version 1.7

| 09/09/2021 | 197 | OPINION & ORDER ON DEFENDANTS' MOTION IN LIMINE:To prevent the jury from any such confusion, plaintiffs expert reports must delete all references to the Gaye sound recording, and its experts shall not mention it in their testimony without prior approval by the Court. Within the next 30 days plaintiff shall furnish defendants with final copies of its experts' reports, as so amended. One of plaintiffs experts having ignored the issue of prior art, and the other having only made inquiries so superficial as to amount to no research at all, the proof as to the existence of prior art shall be only that submitted by defendants. Plaintiffs experts' corrected reports and testimony are to eschew opinions unsupported by facts, or suggesting legal conclusions and further set forth in this Order. (Signed by Judge Louis L. Stanton on 9/9/2021) (rro) (Entered: 09/09/2021) |
| --- | --- | --- |
| 09/14/2021 | 198 | OPINION & ORDER dismissing 178 Motion for Summary Judgment; with respect to 192 Motion for Oral Argument: In light of the rulings in the September 9, 2021 Opinion and Order on Defendants' Motion in Limine, the parties' motions for summary judgment are dismissed without prejudice to renewal after submission of Plaintiff's experts' final reports, addressing only claimed infringement of the Deposit Copy. (Signed by Judge Louis L. Stanton on 9/14/2021) (ml) (Entered: 09/14/2021) |
| 11/15/2021 | 199 | SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 11/15/2021) |
| 11/15/2021 | 200 | DECLARATION of Donald S. Zakarin in Support re: 199 SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett*.. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # 1 Exhibit 1-A - Original Summary Judgment Motion, # 2 Exhibit 1-B - Original Summary Judgment Motion, # 3 Exhibit 1-C Original Summary Judgment Motion, # 4 Exhibit 1-D Original Summary Judgment Motion, # 5 Exhibit 2-A Original Daubert Motion, # 6 Exhibit 2-B Original Daubert Motion, # 7 Exhibit 3 - Revised Covach Report, # 8 Exhibit 4 - Redline of Revised Covach Report to Original Covach Report, # 9 Exhibit 5 - Revised Covach Rebuttal, # 10 Exhibit 6 - Redline of Revised Covach Rebuttal to Original Covach Rebuttal, # 11 Exhibit 7 - Revised Everett Report, # 12 Exhibit 8 - Redline of Revised Everett Report to 2020 Everett Report).(Goldsmith, Andrew) (Entered: 11/15/2021) |
| 11/15/2021 | 201 | RESPONSE in Support of Motion re: 199 SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett. Local Rule 56.1 Statement In Support Of Renewed Motion For Summary Judgment*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge.. (Goldsmith, Andrew) (Entered: 11/15/2021) |
| 11/15/2021 | 202 | MEMORANDUM OF LAW in Support re: 199 SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett*. . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 11/15/2021) |

| 11/17/2021 | [203](#) | PROPOSED SCHEDULING ORDER. Document filed by Structured Asset Sales, LLC.. (Parness, Hillel) (Entered: 11/17/2021) |
| 11/17/2021 | [204](#) | PROPOSED SCHEDULING ORDER. Document filed by Structured Asset Sales, LLC.. (Parness, Hillel) (Entered: 11/17/2021) |
| 12/14/2021 | [205](#) | MEMORANDUM OF LAW in Opposition re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett. and In Support of Renewed Cross-Motion for Summary Judgment regarding Concert Revenues*. Document filed by Structured Asset Sales, LLC. (Attachments: # [1](#) Affidavit Certification of Hillel I. Parness, # [2](#) Exhibit EX 1: Cohen Expert Report, # [3](#) Exhibit EX 2: Massarsky Expert Report, # [4](#) Exhibit EX 3: Email Exchange, # [5](#) Supplement SAS Rule 56.1 Response and Counterstatement, # [6](#) Notice of Cross-Motion for Summary Judgment).(Parness, Hillel) (Entered: 12/14/2021) |
| 01/14/2022 | [206](#) | REPLY MEMORANDUM OF LAW in Support re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett.* . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 01/14/2022) |
| 01/14/2022 | [207](#) | DECLARATION of Donald S. Zakarin in Support re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett.*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge. (Attachments: # [1](#) Exhibit Ex 9 - Dictionary Definitions of "Numerous").(Goldsmith, Andrew) (Entered: 01/14/2022) |
| 01/14/2022 | [208](#) | RESPONSE in Support of Motion re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett. Reply 56.1 Statement of Undisputed Facts*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 01/14/2022) |
| 02/07/2022 | [209](#) | CROSS REPLY MEMORANDUM OF LAW in Support re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett. Reply Memo of Law and Affirmation in Support of Plaintiff Structured Asset Sales, LLC's Renewed Cross-Motion for Summary Judgment*. Document filed by Structured Asset Sales, LLC. (Attachments: # [1](#) Affidavit Supplemental Certification of Hillel I. Parness, # [2](#) Exhibit EX 4 Stoliarov CDCAL Excerpts, # [3](#) Exhibit EX 5 Stoliarov Appeal Excerpts).(Parness, Hillel) (Entered: 02/07/2022) |
| 03/14/2022 | [210](#) | RESPONSE in Support of Motion re: [199](#) SECOND MOTION for Summary Judgment *Renewed Motion for Summary Judgment and to Exclude Dr. John Covach and Dr. Walter Everett. Notice Of Supplemental Authority of Gray v. Hudson (9th Cir. 2022)*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 03/14/2022) |
| 09/29/2022 | [211](#) | OPINION & ORDER granting in part and denying in part [199](#) Motion for Summary Judgment: Sheeran's motion for summary judgment dismissing SAS's claim for infringement is denied. Sheeran's motion in the alternative to dismiss SAS's claim to |

9/7/23, 11:24 AM                                    SDNY CM/ECF NextGen Version 1.7

include concert merchandise revenue in a calculation of damages is granted, but its motion to dismiss the inclusion of concert ticket sales isdenied. Sheeran's motion to exclude Dr. Covach's and Dr. Everett's Revised Reports and testimony is granted conditionally on their present submissions. If, within thirty days from the date of entry of this Order, they submit reports which comply strictly with this Order and the September 9, 2021 Order, their reports will be received in evidence and they may testify. Those of Sheeran's objections and disputes with their reports which have not been specifically addressed by the Court are left to be dealt with on cross-examination. SAS's summary judgment motion for a finding that if the jury finds TOL infringes LGO, SAS has established a link between the infringing concert performances of TOL and profits arising from concert ticket sales is granted. It is denied in all other respects. (Signed by Judge Louis L. Stanton on 9/29/2022) (ml) (Entered: 09/29/2022)

| 10/13/2022 | 212 | MOTION for Reconsideration *Or, In The Alternative, Certification With Respect to the Court's Order dated September 29, 2022*. Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 10/13/2022) |
| --- | --- | --- |
| 10/13/2022 | 213 | MEMORANDUM OF LAW in Support re: 212 MOTION for Reconsideration *Or, In The Alternative, Certification With Respect to the Court's Order dated September 29, 2022*. . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 10/13/2022) |
| 10/27/2022 | 214 | MEMORANDUM OF LAW in Opposition re: 212 MOTION for Reconsideration *Or, In The Alternative, Certification With Respect to the Court's Order dated September 29, 2022*. . Document filed by Structured Asset Sales, LLC..(Parness, Hillel) (Entered: 10/27/2022) |
| 10/31/2022 | 215 | LETTER addressed to Judge Louis L. Stanton from Hillel I. Parness dated October 31, 2022 re: Submission of Revised Expert Reports. Document filed by Structured Asset Sales, LLC. (Attachments: # 1 Exhibit 2022.10.31 John Covach Expert Report REVISED CLEAN, # 2 Exhibit 2022.10.31 John Covach Expert Report REVISED COMPARE, # 3 Exhibit 2022.10.31 John Covach Expert Rebuttal Report REVISED CLEAN, # 4 Exhibit 2022.10.31 John Covach Expert Rebuttal Report REVISED COMPARE, # 5 Exhibit 2022.10.31 Expert Report of Walter Everett REVISED CLEAN, # 6 Exhibit 2022.10.31 Expert Report of Walter Everett REVISED COMPARE).(Parness, Hillel) (Entered: 10/31/2022) |
| 11/03/2022 | 216 | REPLY MEMORANDUM OF LAW in Support re: 212 MOTION for Reconsideration *Or, In The Alternative, Certification With Respect to the Court's Order dated September 29, 2022*. . Document filed by Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Goldsmith, Andrew) (Entered: 11/03/2022) |
| 05/16/2023 | 217 | OPINION & ORDER granting 212 Motion for Reconsideration: To prevent manifest injustice, defendants' Motion for Reconsideration is granted. Dkt. No. 212. There is no genuine issue of material fact as to whether defendants infringed the protected elements of "Let's Get It On." The answer is that they did not. Accordingly, their Motion for Summary Judgment is granted. The Complaint is dismissed with prejudice. Plaintiff's renewed cross-motion for Summary Judgment is denied. The Clerk of the Court is directed to close the case. (Signed by Judge Louis L. Stanton on 5/16/2023) (ml) (Entered: 05/16/2023) |

**A30**

| | | |
|---|---|---|
| 05/17/2023 | 218 | JUDGMENT That for the reasons stated in the Court's Opinion and Order dated May 16, 2023, defendants' Motion for Reconsideration is granted. Their Motion for Summary Judgment is granted. The Complaint is dismissed with prejudice. Plaintiff's renewed cross-motion for Summary Judgment is denied and the case is closed. (Signed by Clerk of Court Ruby Krajick on 5/17/2023) (Attachments: # 1 Notice of Right to Appeal) (ml) (Main Document 218 replaced on 5/17/2023) (ml). Modified on 5/17/2023 (ml). (Entered: 05/17/2023) |
| 06/16/2023 | 219 | NOTICE OF APPEAL from 218 Judgment,,. Document filed by Structured Asset Sales, LLC. Filing fee $ 505.00, receipt number ANYSDC-27885727. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Parness, Hillel) (Entered: 06/16/2023) |
| 06/16/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 219 Notice of Appeal..(nd) (Entered: 06/16/2023) |
| 06/16/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 219 Notice of Appeal filed by Structured Asset Sales, LLC were transmitted to the U.S. Court of Appeals..(nd) (Entered: 06/16/2023) |
| 06/16/2023 | 220 | NOTICE OF APPEARANCE by Brian Maida on behalf of Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., David Platz Music (USA) Inc., Jake Gosling, Edward Christopher Sheeran, Sony/ATV Music Publishing, LLC, The Royalty Network, Inc., Amy Wadge..(Maida, Brian) (Entered: 06/16/2023) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 09/07/2023 10:57:27 | | |
| **PACER Login:** | phpappeals10east | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-05839-LLS |
| **Billable Pages:** | 27 | **Cost:** | 2.70 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                      :

STRUCTURED ASSET SALES, LLC,     :
                      :

       Plaintiff,         :   **Index No. 1:18-cv-5839 (RJS)**
                      :

       v.           :

                      :   **THIRD AMENDED COMPLAINT**

EDWARD CHRISTOPHER SHEERAN *p/k/a/* :
ED SHEERAN, SONY/ATV MUSIC     :
PUBLISHING, LLC, ATLANTIC       :
RECORDING CORPORATION *d/b/a*   :
ATLANTIC RECORDS, BDI MUSIC LTD., :
BUCKS MUSIC GROUP LTD., THE    :
ROYALTY NETWORK, INC., DAVID PLATZ :
MUSIC (USA) INC., AMY WADGE, JAKE :
GOSLING, and DOES 1 THROUGH 10,  :
                      :

       Defendants,       :
-------------------------------------------------------- X

## <u>INTRODUCTION</u>

1.     This is an action for willful copyright infringement by an owner of the rights to

the #1 international hit song "Let's Get it On," a song written and produced by professional

songwriters Edward Townsend Jr. and Marvin Gaye Jr. in 1973 and registered with the United

States Copyright Office.  Defendant Edward Christopher Sheeran ("Sheeran"), the credited

purported writer of the #1 2014-2015 and present international hit song "Thinking Out Loud,"

along with the other Defendants, copied and exploited, without authorization or credit, the "Let's

Get it On" composition.

2.     This case is brought by Structured Asset Sales, LLC, ("SAS"), a Limited

Liability Company based in Los Angeles, California, which invests in and owns rights to

thousands of songs and musical compositions and is owned by David Pullman, who is its

Founder, Chairman and CEO, as well as the principal of The Pullman Group, LLC, the creator of

all Pullman Bonds, including the world famous financial landmark $55 million transaction rated single-A level by multiple ratings agencies Pullman Bond for David Bowie, and Pullman Bond series for the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown and The Isley Brothers, among others.  See **www.pullmanbonds.com**.  SAS is a beneficial owner of one-third of all of the copyright rights of Townsend in all of his catalog of works, including "Let's Get it On."

3.      SAS brings this action for Defendants' infringement of the copyright in the composition of "Let's Get it On," and for all damages arising from that infringement, based on 100% of the ownership of that composition, including 100% of the publishers' share and the writers' share of those rights, less any percentage of rights that are adjudicated in the pending action captioned *Griffin v. Sheeran*, No. 1:17-cv-05221 (S.D.N.Y. July 11, 2017) on behalf of the plaintiffs and against the defendants in that case.[1]

4.      "Let's Get it On" was written and produced by Townsend and Gaye in 1973, registered internationally in 1973, and renewed with the United States Copyright Office in 2000.

5.      "Thinking Out Loud" copies various elements of "Let's Get it On," including but not limited to the melody, rhythms, harmonies, drums, bass line, backing chorus, tempo, syncopation and looping.  Plaintiff brings this action for copyright infringement under 17 U.S.C.§101, 501 *et seq.,* arising from the Defendants' unauthorized reproduction, distribution and/or public performance of the infringing composition.

### JURISDICTION

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) because this

---

[1] Plaintiffs in that case brought their first action against the defendants in that case on August 9, 2016.  *Griffin v. Sheeran*, No. 1:16-cv-06309.  For purposes of calculating the statute of limitations, the claims in the present case relate back to no later than that initial filing date.

action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.* Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

7.     This Court has personal jurisdiction over the enumerated Defendants because they have directed their activities and marketing of the infringing work to New York residents, and New York residents are able to purchase, download, and stream the infringing compositions and recordings.

8.     Defendants have engaged in systematic and continuous business activities relating to the infringing work. As such, the Defendants have engaged in continuing business activities in the instant jurisdiction.

9.     The instant Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

10.     Defendant Sheeran has performed, and he and the other Defendants have authorized, organized, and promoted performances of the infringing work numerous times in New York.

11.     The Defendants have generated touring and recording revenues from the unauthorized and unlawful exploitation of the infringing work, including receiving substantial revenue from such exploitation in New York. They have advertised the infringing work to New York residents.

12.     The Defendants, individually and collectively, have generated substantial revenue from the exploitation of the infringing work in New York.

13.     New York has a considerable interest in adjudicating disputes wherein New York residents are the target of the harm resulting from exploitation of the infringing work.

14.     Sheeran is a resident and has spent substantial time, including time spent while

3

engaged in copyright infringement, in Los Angeles, California, while working on the album which included "Thinking Out Loud."

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1391(b), §1391(c), and §1400(a), respectively, because the corporate Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

### PARTIES

16.     The Plaintiff in this case is a limited liability company owned by its founder, chairman and CEO David Pullman, based in Los Angeles.  It is the owner of one third of the estate assets of Mr. Townsend Jr. Mr. Townsend Jr. died intestate in 2003 and his estate was divided one third to each of his children. One of his children, Clef Michael Townsend, sold his entire share and right in the estate to SAS. That interest was put up for sale by Clef Michael Townsend, and the sale was approved by the probate court in California. Mr. Ed Townsend Jr. was the co-writer of the lyrics of "Let's Get It On" and creator of its musical composition. Plaintiff, with the other heirs of Mr. Townsend Jr., are engaged, among other things, in conducting the business of music publishing and otherwise commercially exploiting the musical composition copyrights of the music of Mr. Townsend Jr. They are either the legal owner of the copyrights or the beneficial owner of the copyright since they share in the proceeds of exploitation of the copyright.

17.     Upon reasonable information and belief, Defendant Edward Sheeran is a musician, singer, songwriter, and producer living in the United Kingdom who does business in New York, individually, and under his company, Gingerbread Man Records. Sheeran was nominated for a Grammy Award for Best Record, Best Performance, and Song of the Year in

2016 for "Thinking Out Loud." He has numerous other awards such as British artist of the year in 2015, Album of the Year in 2015 from BRIT Awards, and Best Male Artist in 2016 from People's Choice Award. Sheeran conducts systematic and continuous business in New York including, but not limited to, public performances, and selling albums and merchandise to the citizens of New York. The Defendant, Edward Sheeran has reproduced, distributed, and publicly performed the infringing work and sound recording and/or authorized its reproduction, distribution and public performance.

18.     Upon reasonable information and belief, SONY/ATV Music Publishing, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  Upon reasonable information and belief, Sony/ATV is the music publisher for "Thinking Out Loud" and administers "Let's Get It on" with EMI Music Publishing, both of which are run by CEO and Chairman Martin "Marty" Bandier. EMI Music Publishing is owned by a consortium of companies led by Sony/ATV.  Sony/ATV has generated substantial revenue from the exploitation of the infringing work. It is in a unique position to have known about and/or participated in the exploitation of either or both works. Its conflicting position made it impossible for it correct the problem.

19.     Upon reasonable information and belief, Atlantic Recording Company d/b/a Atlantic Records is a Delaware corporation with its principal place of business in New York.  Atlantic Records is owned by Warner Music Group Corporation, which also has its principal place of business in New York.  Atlantic Records is responsible for the production, manufacture, distribution, marketing, sale and promotion of "Thinking Out Loud" in the United States.

20.     Upon reasonable information and belief, BDi Music Ltd. ("BDi") is a music

publishing company organized under the laws of the United Kingdom, and whose songwriters

include Defendant Amy Wadge ("Wadge"), the co-writer of "Thinking Out Loud."  According to

the BDi website, "BDi is administered by Bucks Music Group on a Worldwide basis."  Upon

reasonable information and belief, BDi is responsible for the publishing of Wadge's share of

"Thinking Out Loud" in the United States.  According to the ASCAP ACE database, the point of

contact for BDi in the United States is The Royalty Network, in New York.  According to

Defendants' counsel, BDi is the copyright owner of "Thinking Out Loud," and BDi has a

worldwide administration agreement with Defendant Bucks Music Group Ltd. ("Bucks").

21.     Upon reasonable information and belief, Bucks Music Group Ltd. is a music

publishing company organized under the laws of the United Kingdom, and which is responsible,

on behalf of BDi, for the administration and publishing of Wadge's share of "Thinking Out

Loud" in the United States.  According to the Bucks website, Bucks has an office in New York.

According to Defendants' counsel, Bucks has a subpublishing agreement with Defendant DPMI,

through which DPMI has the right to administer "Thinking out Loud" in the United States.

22.     Upon reasonable information and belief, The Royalty Network, Inc. ("TRNI") is a

corporation organized under the laws of the State of New York, with offices located at 224 W

30th St., Room 1007, New York, New York 10001-1077.  According to the ASCAP ACE

Database, TRNI is the point of contact for BDi in the United States.  The TRNI website indicates

that Bucks Music Group is among its catalogs, and that "Thinking Out Loud" is among the

works for which it has the authority to grant licenses.  According to Defendants' counsel, DPMI

has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in the

United States.

23.     Upon reasonable information and belief, David Platz Music (USA) Inc. is a

corporation organized under the laws of the State of New York, with offices located at 224 W

30th St., Room 1007, New York, New York 10001-1077.  According to Defendants' counsel,

DPMI has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in

the United States.

24.     Amy Wadge is the co-writer (with Sheeran) of "Thinking Out Loud."  Upon

reasonable information and belief, Wadge is a citizen of the United Kingdom.  Upon further

reasonable information and belief, Wadge collects, and directs others to collect for her, millions

of dollars each year generated from musical compositions and recordings in the United States to

which she holds rights, including "Thinking Out Loud."  Upon further reasonable information

and belief, Wadge is a member of PRS For Music ("PRS"), the UK-based performing rights

society, and has registered her musical compositions, including "Thinking Out Loud" with PRS.

Upon further reasonable information and belief, Wadge has affirmatively selected the American

Society of Composers and Authors ("ASCAP") to collect revenues on her behalf in the United

States that are generated from the musical compositions to which she holds rights, including

"Thinking Out Loud," and ASCAP does in fact collect millions of dollars on behalf of Wadge

every year.  Upon further reasonable information and belief, Wadge has affirmatively selected

Soundexchange, Inc. ("Soundexchange") to collect revenues on her behalf in the United States

that are generated from musical recordings to which she holds rights, including "Thinking Out

Loud," and Soundexchange does in fact collect millions of dollars on behalf of Wadge every

year.  Upon further information and belief, Wadge has entered into, and continues to enter into

on a regular and persistent basis, contracts and other sophisticated and high-value business

arrangements with individuals and entities in the United States in general, and this District in

particular.

25.     Jake Gosling is the producer of "Thinking Out Loud."  Upon reasonable

information and belief, Gosling is a citizen of the United Kingdom.  Upon further reasonable

information and belief, Gosling collects, and directs others to collect for him, millions of dollars

each year generated from musical compositions and recordings in the United States to which he

holds rights, including "Thinking Out Loud."  Upon further reasonable information and belief,

Gosling has affirmatively selected Soundexchange to collect revenues on his behalf in the United

States that are generated from musical recordings to which he holds rights, including "Thinking

Out Loud," and Soundexchange does in fact collect millions of dollars on behalf of Gosling

every year.  Upon further information and belief, Gosling has entered into, and continues to enter

into on a regular and persistent basis, contracts and other sophisticated and high-value business

arrangements with individuals and entities in the United States in general, and this District in

particular.

26.     Plaintiff is ignorant of the true names and capacities, whether individual,

corporate, associate or otherwise, of defendants DOES 1 through 10, inclusive.  Plaintiff is

informed, believes and thereon alleges that each fictitious defendant was in some way

responsible for, participated in, contributed to the matters and things of which Plaintiff

complains herein, including but not necessarily limited to the creation, recording, distribution or

administration of "Thinking Out Loud," and in some fashion has legal responsibility therefore.

When the exact nature and identity of such fictitious defendants' responsibility for, participation

in, and contribution to the matters and things herein alleged is ascertained by Plaintiff, Plaintiff

will seek to amend this Complaint and all proceedings herein to set forth the same.


**FACTS**

27.     The musical composition, "Let's Get It On", (the "Work") was written by Marvin

8

Gaye Jr. ("Gaye") [the copyright registration lists only Townsend as the author] and Edward

Townsend Jr. ("Townsend").  The composition was registered for copyright in 1973 and

copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063. A

recording of the song was later made by Gaye, in 1973.  As a co-author of the Work, Mr. Edward

Townsend Jr. co-owned the copyright and shared in the proceeds of the exploitation of the work,

through record sales, public performance, synchronization and other uses of the Work.  Plaintiff

SAS is one of the co-owners of the copyright in the Work through its purchase of all the rights

from Clef Michael Townsend, one of the three children of Edward Townsend Jr., approved by

California probate court.

28.     The harmonic, melodic, and rhythmic elements of composition in "Let's Get It

On" have made this song one of the most famous songs in R&B and soul and popular music

history. "Let's Get It On" has been anthologized by celebrated music producers and ranked as

one of the top greatest breakbeats of all time. It has been covered by a number other musical

performers.

29.     Defendant, Edward Sheeran, professionally known as "Ed Sheeran", is a musical

artist.  Mr. Sheeran experienced a sharp and sudden rise as an international music star in less

than eighteen (18) months as a direct result of the commercial success of the release of

"Thinking Out Loud", the lead single in the United States from Sheeran's debut album, "X", of

which "Thinking Out Loud" was the hit.

30.     "Thinking Out Loud" infringes "Let's Get It On."  This case seeks damages for

Defendants' willful copyright infringement.

**Comparison of the Two Songs**

31.     "Let's Get It On" begins with an iconic melody, harmony and rhythm that are recognized around the world.  The prominence of the bass line and drum composition throughout the Work make these compositional elements qualitatively unique, copyrightable and important to the musical work as a whole.  The combination of these elements is the driving force of this composition.

32.     The two songs share a distinctive combination of musical materials, designated as the backing pattern; it is comprised of a coordination of harmony (chord progression), bass line, and rhythm. The backing pattern as it occurs in these two recordings refers to a combination of music played by the drums, bass, and guitar and/or keyboards. This combination of instruments functions as the accompaniment to the vocal line, which is essentially present to support the vocal line.  This shared backing pattern can be heard at 0:00-0:07 in the Gaye recording and at 0:00-0:06 of the Sheeran recording. After its initial appearance in each song, this pattern is repeated many times during both songs, becoming a major element in each song, forming a distinctive accompaniment to the vocals in each case.

**Comparison of Chord Progression**

33.     The distinctiveness of this backing pattern arises in part from the harmony, or "chord progression" that it articulates. In music theoretical terms, we hear the "tonic" chord (designated as "I") with first scale degree in the bass, followed by a chord with the third scale degree in the bass, then the "subdominant" chord (or "IV") with the fourth scale degree in the bass, and finally the "dominant" chord (or "V") with the fifth scale degree in the bass.

34.     Marvin Gaye's "Let's Get It On" is based on a chord progression formed by the

chords E-flat, G minor, A-flat, and B-flat. Musicians commonly assign roman-numeral labels to chords in order to specify their harmonic function, and these numerals are based on the position of each chord with regard to the scale in use. The chord build on the first note of the scale—a C note in C major, for instance—will be labeled "I." In a similar manner, those based on the second, third, fourth, fifth, six, and seventh notes will be labeled 'ii," "iii," "IV," "V," "vi," and "vii₀" respectively (note that upper-case numerals are used for major chords and lower-case numerals for minor chords).  This system of labeling is so common that there is almost no student who studies music in North America who does not learn these numerals at some point in his/her training.

35.     The term "scale degree" is commonly used to designate a particular note's place within a particular scale. For example, using a simple C-major scale (C, D, E, F, G, A, B, C), we would refer to the first note in the scale, C, as "scale-degree one" or "first scale degree"— meaning simply that it is the first note in that scale. It thus follows that D would be referred to as "second scale degree" and E as "third scale degree," etc. The usefulness of the "scale degree" designation is that it allows musicians to discuss the properties of these notes in a way that is transferable across all keys, making comparisons between songs and musical passages much more effective.

36.     Using this system, the chord progression employed in the backing pattern of Gaye's song may be written as I – iii – IV – V (see example 1a).  Sheeran makes a slight adjustment to this chord pattern in his song: the I, IV, and V chords are maintained from Gaye's song, but the iii is replaced with a common substitute. As any freshman harmony textbook will attest, the I chord with the third scale degree in the bass may stand in (or substitute) for the iii chord without affecting the function of the progression (the bass lines in each recording are

discussed in more detail immediately below). Sheeran uses this chord, commonly labeled "$I^6$," as

a slight modification of Gaye's original (see example 1b), producing a mild and harmonically

equivalent variant: $I – I^6 – IV – V$.



*Examples 1a (Gaye) and 1b (Sheeran): chord progressions compared*

37.     In Gaye's song, this chord progression within the backing pattern occurs in the

key of E-flat, and in Sheeran's song the progression occurs in D major. But because of the power

of the roman numerals (and scale degrees) to capture the relationship between the chords in each

case, listeners will hear the two progressions as functionally equivalent. Thus, the strong and

marked similarity between the use of this progression in Gaye's and Sheeran's songs is barely

affected by the different keys used. That different keys do not affect the identity of a song is

borne out by the fact that singers often change the keys of songs to suit their voices. In fact, the

value to musicians of thinking about chord progressions in the manner described here is that they

make it easy to "transpose" (or change the key of) any given song quickly. Such transposition is

considered a basic skill for professional musicians. Many listeners will not recognize that Frank

Sinatra sang "My Way" in D major, while Elvis Presley sang that song in C major; it is clearly

the same song despite the difference in key. The difference in key between those two versions of

"My Way," is slightly greater than the difference between the Gaye and Sheeran songs

considered here. Without a direct A-B comparison of the two, virtually no listener (except the

very few who possess perfect pitch – less than a fraction of 1% of the population) would be able

to hear the difference in key between the two songs. In fact, a vinyl recording of Sheeran running

a little fast and one of Gaye running a little slow would meet in the middleground separating the two, making them identical. In short, the backing patterns of the songs use equivalent progressions, with Sheeran's introducing only one minor variation on Gaye's (see example 1a and 1b for comparison). While the shared chord progression may not be enough, in isolation, to support a claim of copyright infringement, the situation changes in an important way when the bass line is added to our consideration.

**Bass Line Comparison**

38.     An important part of why the chord progression sounds the way it does has to do with the notes that comprise the bass line in each song. In Gaye's song, the bass plays an E- flat to accompany the I chord, and then a G to accompany the iii chord. The bass then employs an A-flat to support the IV chord, and a B-flat to support the V chord. This combination creates a bass line that goes: E-flat – G – A-flat – B-flat (see example 2a). This sequence of notes in the bass is understood by musicians as the scale-degree pattern 1 – 3 – 4 – 5. Thinking of the bass pattern as 1 – 3 – 4 – 5 (instead of as specific notes) thus creates the relationship between the notes in a manner substantially similar to that of the I – iii – IV – V pattern mentioned above. Sheeran's "Thinking Out Loud" employs the bass notes D – F sharp – G – A to accompany its I – I$^6$ – IV – V chord progression (see example 2b). While these specific four notes are seemingly different from those used by in Gaye's song, this difference is entirely due to the difference in key; the relationship between scale-degrees 1 – 3 – 4 – 5 remain unaffected by the change of key from E-flat to D: the two bass lines are equivalent.



*Examples 2a (Gaye) and 2b (Sheeran): bass lines compared*

39. When we think of Sheeran's song in terms of the roman numerals as we did with Gaye's song, the strong substantial similarity between the two songs is further revealed. Sheeran's song employs the identical chord-bass pairing as Gaye's song does: $I - I^6 - IV - V$. The importance of this specific combination of elements is even more strongly reinforced when we consider the rhythm of this chord-bass pair.

**Comparison of Harmonic Rhythm**

40. There are many ways that musicians think and speak about rhythm. In order to examine the role rhythm plays in the similarity between these two songs, we will turn to a consideration of "harmonic rhythm." The term harmonic rhythm refers to the timing of the chord changes in a song. Gaye's "Let's Get It On" sets the $I - iii - IV - V$ chord-bass progression to a distinctive rhythm as shown in example 3a. This rhythm extends over two measures (or bars) according to a 4/4 time signature, dividing the duration of the first two chord-bass pairings unevenly, as represented by the dotted quarter and eight note tied to a half note. The third and fourth chord-bass pairings divide the second measure in a parallel manner to the first measure.

41. There is a marked chord progression in "Let's Get it On" that is distinctive. In addition the bass line in "Let's Get it On" is marked and the rhythm is unique. The Ed Sheeran version in "Thinking Out Loud" uses a substantially similar chord progression. In addition, the

14

bass line used is substantially similar to the bass line in "Let's Get it On," even if a different key is used.

42.     The combination of the shared chord progression, the shared bass line and shared harmonic rhythm confirm the fact that "Thinking Out Loud" infringes on the Copyright of "Let's Get it On."





*Example 3a (Gaye): harmonic rhythm, chord-bass pairing*

*Example 3b (Sheeran): harmonic rhythm, chord-bass pairing*

43.     Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in

Gaye's "Let's Get It On," and this is shown in example 3b. Played in an A-B comparison, 3a and 3b make the strong similarity between the two songs abundantly clear. It does not require an understanding of standard rhythmic notation to see (and hear) that this rhythm is identical between the two songs.

44.     In comparing the melodic vocal pitches for the first two phrases of each of the songs each example is based on a repeated chord progression, supporting variations in the vocal parts.  Although the verse of each song is built upon four hearings of the same progression, the first two phrases (essentially repeated, with ornamental variation, for phrases three and four) are sufficient for comparison purposes.

a. Marvin Gaye, "Let's Get It On," first two phrases of verse:

**I - iii** 3-4-5-4-3- | **IV** b3-4-b3-4-b3-1- **V** 2; | **I - iii** b3-2-b3-b3-2 | **IV** 2-1-6 | **V** b3-2-1

b. Ed Sheeran, "Thinking Out Loud," first two phrases of verse:

**I - I$^6$** 3-4-5-4-3-2-1- | **IV** 2-3-6-1 **V**; **I - I$^6$** 3-4-5-4-3-2-1- 1 | **IV - V**

45.     The striking similarity of the harmony, bass line and rhythm backing patterns of both songs, along with the use of the backing pattern as a repeated element on which each song is constructed, demonstrate that Sheeran's "Thinking Out Loud" is based on Marvin Gaye and Ed Townsend's "Let's Get It On."

46.     Holding aside rhythmic similarities for the moment, the two melodies exhibit many identical elements with pitch alone, all accented in relation to their ornamental differences.


**Comparison of Use of Backing Patterns**

47.     Having identified the similarity between the backing pattern in the Gaye and Sheeran songs, we will now demonstrate how often this pattern occurs in each recording. As

Example 4a shows, Gaye's song begins with a verse-chorus pair (0:00-0:48), following by a pair of verses (0:48-1:34).  All of this music is based on the backing pattern, which occurs 16 times during these sections. Since the backing pattern is two measures in length, this means that the first 32 measures of the song all feature the backing pattern. Looking at the rest of the song, we can see that there are, in fact, only two places in the song where the backing pattern is not present, and that is in portions of the bridge, which occurs twice overall on the recording. Adding up all of the measures of the song, it turns out that there are a total of 104 measures, of which 84 measures employ the backing pattern. This means that approximately 80% of the song features the backing track.

48.     Example 4b shows the structure of Sheeran's "Thinking Out Loud." The example shows that the backing track is present in 64 of the song's 90 measures, meaning that it is present during about 71% of the song. It is fair to conclude from this comparison that the backing pattern forms the basis of both songs, and that this backing pattern plays the same role in the Sheeran song as it does in the Gaye song.

*Example 4a (Gaye): The overall musical form of "Let's Get It On," indicating the number times the backing pattern appears and showing the percentage of measures that it is present*

| Timing | Section | Description |
|--------|---------|-------------|
| 0:00-0:25 | verse | 8 mm., uses backing pattern (4)*, two beat pick-up |
| 0:25-0:48 | chorus | 8 mm., uses backing pattern (4) |
| 0:48-1:12 | verse | 8 mm., uses backing pattern (4) |
| 1:12-1:34 | verse | 8 mm., uses backing pattern (4) |
| 1:34-2:20 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 2:20-2:43 | chorus | 8 mm., uses backing pattern (4) |
| 2:43-3:06 | chorus | 8 mm., uses backing pattern (4) |
| 3:06-3:51 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 3:51-4:14 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:14-4:37 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:37-4:50 | chorus | 8 mm. to fade out, uses backing pattern (4), free vocal improv |

Total number of measures in song = 104
Total number of measures that employ backing pattern = 84 (80.7%)

*The numeral 4 in parenthesis indicates that the backing pattern appears 4 times. Because the backing pattern in two measures in length, four statements of this backing pattern will be eight measures in length.

<u>*Example 4b (Sheeran): The overall musical form of "Thinking Out Loud," indicating the*</u>
   <u>*number times the backing pattern appears and showing the percentage of measures that*</u>
   <u>*it is present*</u>

| | | |
|---|---|---|
| 0:00-0:24 | A – verse | 8 mm., uses backing pattern (4)* |
| 0:24-0:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 0:49-1:13 | B – bridge | 8 mm., new chord progression, new melody |
| 1:13-1:43 | A" – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 1:43-2:08 | A – verse | 8 mm., uses backing pattern (4) |
| 2:08-2:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 2:49-2:56 | B – bridge | 8 mm., new chord progression, new melody |
| 2:56-3:27 | A" – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 3:27-3:51 | A – verse | 8 mm., guitar solo, uses backing pattern (4) |
| 3:51-4:21 | A" – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 4:21-4:35 | Ending (tag) | 4 mm., repeats last two bars of A" two times |

Total number of measures in song = 90
Total number of measures that employ backing pattern = 64 (71.1%)


**Comparison of Vocal Melodies**

49.     A comparison of the vocal melodies in these two songs shows that there are melodic passages in Sheeran's song that are substantially similar to passages in Gaye's recording. This can be seen most clearly by comparing the first four measures of "Thinking Out Loud" with the second four measures of Gaye's eight-bar chorus for "Let's Get It On." This comparison is shown in examples 5a and 5b (note that timings are given for the Gaye example to make it easier to locate the place in the song example 5a refers to). Since the two songs are in different keys, the best way to compare the melodies is by using scale-degree numbers; identical numbers shared by notes in different songs means that such notes would be the same if both songs were in the same key.

19

50.     Both melodies begin on the same chord tone, ascend and then fall in exactly the same manner. Both melodies are delayed until a second chord appears. They both descend stepwise in exactly the same way.  In both songs, verses are composed of couplets formed of a repeated line. In both songs, the repeated line itself contains a repeated progression. Each verse, then, in both songs, contains one progression heard four times, supporting a longer line performed twice. In both songs, the chorus is also in the identical pattern.  In both songs, contrasting sections lead to stop-time solo singing over climactic chords.

51.     There are further similarities in rhythm in the two songs.  They both have four beats per measure. Syncopation, which is the accentuation of a beat that occupies a normally weak metric position (such as the backbeat or offbeat), is also a telltale marker that unites the two songs in unusual ways. Chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both songs.

52.     Melodies are marked by which vocal pitches are metrically accented in relation to others, which appear directly with the chord changes (the strongest accent, especially when aligning with first beats of measures) and which appear in weaker metric locations. Both Gaye's and Sheeran's vocal melodies begin in metrically weak positions, delaying the singing until the second chord appears. Whereas in most songs, verses maintain the same or similar rhythms one after the other, both Gaye and Sheeran provide a great deal of extemporaneous rhythmic abandon in verses that appear after the first, especially ending phrases in different places (on beat 3, on the second half of beat 3, on beat 2, etc.), thus both expressing the same degree of rhythmic freedom on the musical surface.

53.     In the first measure of the Gaye example (5a), two sequences of scale-degrees are highlighted by underlining and enclosure within asterisks. The first of these is the scale-degree sequence 6 5 3 2, and the second is the scale-degree sequence 3 5 6 5 3. Note that both of these sequences occur mostly over the first measure of the two-measure backing pattern.

54.     Example 5b shows the first four bars of Sheeran's "Thinking Out Loud." Note that the scale-degree sequences 6 5 3 2 and 3 5 6 5 3 found in "Let's Get It On" both appear in Sheeran's vocal melody, and also mostly in the first measure of the two-measure backing pattern.



**Comparison of Tempos**

55.     It should be noted that the tempos of the two songs are virtually identical: Gaye's song clocks in at about 83 beats per minute, while Sheeran's sets a slightly slower pace of about 79 beats per minute. This is a very small difference, especially considering that the two songs are in the same time signature of 4/4. In fact, within this tempo range any particular live performance

of either song could vary by 4 beats per minute, thus erasing any difference, no matter how slight. Similarly to the remarks earlier in this study concerning the differences in key, most listeners could not detect the difference in tempo between the two songs if the songs were not placed in an A-B comparison with one another. In fact, certain performances in what the listener takes to be a steady tempo can actually include a slight increase (and less often decrease) in tempo over the course of the song without most listeners being aware of it. It is thus best to think of tempo in terms of a "range of similarity" in which tempos that are within approximately 5% of one another can be considered equivalent (not unlike the way the "margin of error" functions in polling). Thought of in this way, the slower end of the tempo range for the Gaye song overlaps the faster end of the tempo range for the Sheeran one: the two tempos are equivalent.

56.     Songs with four beats per measure (the same meter as in Gaye and Sheeran) that include the I – iii – IV – V progression class range from a slow 72 beats per minute to a fast 160 bpm. Both Gaye and Sheeran recordings proceed at the same, at 80 bpm (± 2 bpm, as they both fluctuate slightly). No other identified song in history prior to "Let's Get it On" includes a I – iii – IV – V or I - I$^6$ – IV – V progression and the same tempo.

57.     In songs that include the I - iii - IV - V progression class, chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both Gaye and Sheeran songs. All other known such examples of syncopated changes within the I - iii - IV - V progression class, have a tempo much faster than Gaye's and Sheeran's 80 bpm.

58.     The Gaye and Sheeran songs are two of only four songs identified in history with the I – iii – IV – V chord progression class that share the same pattern of syncopated chord

22

changes, as well as being the only two such examples with that progression class to move at the tempo of 80 bpm.

**Lack of Any "Prior Art" to "Let's Get it On"**

59.    In addition to the foregoing musical similarities between the two songs, both songs share a set of common elements that do not occur in combination in any other song:

    a. Both songs are based on the same chord progression class (I - iii - IV - V), indeed mostly on exactly the same progression, I - I$^6$ - IV - V.

    b. Both songs use this progression as a loop in both verse and chorus passages.

    c. Both upper-voice melodies are based on the shape, ^3 - ^4 - ^5 - ^4 - ^3 - ^2 - ^1, which then moves to scale degrees ^6, ^1 and ^2, with identical accents.

    d.  Both songs emphasize as scale degrees upper-voice ^5 and ^3 over the iii chord, as opposed to the more usual ^7 over iii.

    e.  Both songs end cadential phrases on a non-resolving upper-voice ^1, even though this is not a member of the goal V chord. In both cases, the lack of tension resolution is related to the song's underlying theme.

    f. Both songs share the same formal structure at sub-phrase, phrase, section, and multi-section levels.

    g.  Both songs have the identical tempo of 80 beats per minute (+2 bpm, as above), uniquely for the chord progression.

    h. Both songs share the same identical syncopated rhythm of chord changes.

    i. Both songs' vocal melodies begin in the same markedly weak metrical location, and in both, the vocal goal of ^5 is achieved at the same metrical

position within the phrase.

j.   Both songs have a similar distribution of vocal melismas, expressing in both a
     similar theme.

60.    Defendants' access to Plaintiff's work is beyond challenge, as "Let's Get it On" is
a world-famous composition and recording, and the two works are indeed substantially similar
for purposes of copyright infringement.  The additional fact that no other song shares the
foregoing characteristics is strong evidence not of arbitrary convergence or parallel development,
but knowing, willful infringement.

61.    Indeed, upon information and belief Sheeran himself regularly performs both
songs together in a "mash-up" format, moving from one song to the other and back again.  At
least one example of one such performance is publicly-available on YouTube
(https://www.youtube.com/watch?v=RxZjVZKVN7k) (see time index 4:29-5:10).  Sheeran
transitioned seamlessly between the lyrics of the two songs without changing the notes, tempo,
rhythm or any other elements.

62.    Upon reasonable information and belief, "Thinking Out Loud" has hit the number
one (1) position on the national charts in eleven (11) countries since 2014, including both the
United States and the United Kingdom, and has been certified platinum multiple times by the
Recording Industry Association of America, indicating sales in excess of one million (1,000,000)
copies sold in the United States, as well as substantial sales internationally. The single and the
album "X" sold over fifteen (15) million copies. In 2015, "Thinking Out Loud" was a top-three
song as measured by performance income in the world. Revenue derived and/or related to
"Thinking Out Loud," including but not limited to record sales, performance tour income,
merchandising, synchronization and licensing are in the hundreds of millions of dollars.

63.     According to the Official Charts Company, the recording of "Thinking Out Loud" is one (1) of the best-selling singles of all time in the U.K., having sold over 2 million (2,000,000) copies and ten (10) million albums. Upon reasonable information and belief, the Defendants have authorized the use of "Thinking Out Loud" in compilation albums, television commercials and music videos. Specifically, the music video for "Thinking Out Loud" is one of the most popular sponsored music videos on YouTube.  Prior to the viewing of "Thinking Out Loud" on YouTube, an advertisement appears for which the Defendants are entitled to and receive a royalty or other revenue, which is Plaintiff's money. As of June 2018, "Thinking Out Loud" has been played over **one billion times** on YouTube and streamed **billions** of times.

64.     The Defendant, Mr. Edward Sheeran, has had access to "Let's Get It On" by virtue of its wide dissemination. In fact, he has referenced and performed the song while also performing "Thinking Out Loud".  In addition, the Defendant, Edward Sheeran, by and through the Defendant, Sony/ATV, had increased access to "Let 's Get It On" because both songs are administered through Sony/ATV.  Furthermore, "Let's Get It On" is available on every major digital retailer and streaming service including, without limitation, iTunes and Amazon.

65.     The melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements of the "Thinking Out Loud" composition are substantially and/or strikingly similar to those elements of the "Let's Get It On" composition.  The instant Defendants copied, reproduced, distributed, and/or publicly performed copyrightable elements of "Let's Get It On" specifically, the melody, harmony, drums, bass line, backing chorus, tempo and syncopation of "Let's Get It On", without authorization. The two works in question are therefore substantially similar.

66.     To date, each of the Defendants reproduced, distributed, publicly performed, and/or authorized the reproduction, distribution, and public performance of the infringing

composition and sound recording "Thinking Out Loud" and each of the Defendants continues to

infringe "Let's Get It On".

67.     Upon information and belief, the Defendants were notified of the infringement at

least as early as April 15, 2015 (the "Notice").  Despite, upon information and belief, receiving

the Notice, the Defendants continued to exploit "Thinking Out Loud" without permission, by

using the melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements

copied from "Let's Get It On" composition, which use constitutes copyright infringement.

68.     Despite, upon information and belief, the Notice, all of the Defendants have

continued to infringe Plaintiff's copyrighted work. The infringement by the Defendants is

willful, as evidenced by their continuing to infringe "Let's Get It On" after the Notice, upon

information and belief, was provided to them.

69.     The Defendants knowingly and intentionally infringed Plaintiff's rights.  The

Defendants' collective knowledge and intent are established by, among other things, the fact that

Defendants to this day have neither sought, nor obtained, a license from the owners of the rights.

All conditions precedent to the maintenance and/or establishment of the instant action have been

satisfied and/or, otherwise, waived by the Defendants.


**FIRST CAUSE OF ACTION**

**(Willful Copyright Infringement – 17 U.S.C.  § 101, *et seq.*)**

70.     Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set

forth herein.  The Defendants' reproduction, distribution, and public performances of the

infringing work, "Thinking Out Loud" in the United States and internationally, continue to this

day, and Defendants have not deigned to compensate the copyright owners of the Work

(including SAS) for the use of the copyrighted work in "Let's Get It On". The Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of "Thinking Out Loud", and authorizing others to do the same, infringes Plaintiff's exclusive rights under the Copyright Act.

71.    The conduct of the Defendants is knowing and willful.

72.    As a direct and/or proximate result of the Defendants' wrongful conduct, the Plaintiff has been irreparably harmed, suffered damage, and Defendants have profited in an amount in the amount of hundreds of millions of dollars and to be determined at trial.

73.    One or more of the Defendants infringed on Plaintiff's exclusive copyright in "Let's Get It On" when it distributed and sold sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, and all other economic exploitation and video recordings, embodying "Thinking Out Loud". Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

74.    The Defendants infringed Plaintiff SAS's exclusive copyright in "Let's Get It On" when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of "Thinking Out Loud". Said licenses were issued without any consent or authority from the copyright owners (including Plaintiff SAS) of "Let's Get It On," from which "Thinking Out Loud" was substantially copied. By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

75.    As a direct and/or proximate result of the Defendants' infringement on Plaintiff's exclusive copyright in "Let's Get It On", Plaintiff has suffered damages. Said injuries are

continuing and will not abate in the future.

76.     Pursuant to 17 U.S.C. § 504(c), the Plaintiff is entitled to statutory damages since the infringement occurred after the copyrights were registered.

**WHEREFORE,** the Plaintiff SAS respectfully request that judgment be entered against the enumerated Defendants, as follows:

A.     For judgment that Defendants have violated the Copyright Act and that all such violations have been willful; and

B.     For judgment assessing Defendants for the damages in excess of one hundred million dollars ($100,000,000.00) suffered by Plaintiff, including an award of actual damages and Defendants' profits attributable to the infringement, or statutory damages (at Plaintiff's election) under the Copyright Act, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1.     Record sales;
2.     Downloads;
3.     Ringtones;
4.     Ringback tones;
5.     Public performance revenues;
6.     Digital revenue;
7.     Streaming revenue;
8.     Synchronization licensing;
9.     Merchandising;
10.    Public appearances;
11.    Endorsements;
12.    Sponsorships;
13.    Spokesperson work;
14.    Touring revenue;
15.    Advertising revenue;
16.    Appearance fees;
17.    Name and likeness income and increase in value;
18.    Rights of publicity income and increase in value;

19.    Increased value of all Defendants' publishing and/or record company and/or companies;

20.    Increased value of all Defendant's, including Sheeran's catalog;

21.    Increased value of music publishing and/or record royalties and rights;

22.    Increased value of social media rights, accounts and value;

23.    Increased goodwill;

24.    Promotional value;

25.    Increased value of royalty rate for record deals;

26.    Increased value in distribution deals, negotiating power and reduction in costs;

27.    Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;

28.    Value of obtaining better terms for record company advances and terms and multi-record deals;

29.    Value of obtaining better terms of publishing and/or recorded master deals for Sheeran's existing catalogue and for future works;

30.    Increased value in negotiating 360 deals with record companies and/or publishers;

31.    Sheet music sales and sheet folio income;

32.    Any and all music publisher income;

33.    Any and all record master income;

34.    Any and all record income;

35.    Any and all SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection society, mechanical society and performance society income worldwide;

36.    Any and all producer royalty income;

37.    Any and all arrangement income;

38.    Any and all income derived from any existing medium or any medium hereinafter developed worldwide;

39.    Any and all income from any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act;

40.    Any and all income from any society to which any Defendant belongs or joins in the future;

41.    Any and all income and/or residuals from SAG-AFTRA;

42.    Any and all income from Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, and any and all download and streaming services; and

43.    Any and all of Defendants' equity interests in Spotify, and any other music streaming or download services or companies in

which one or more Defendant has an interest, as it relates to the value from the inclusion of the infringing song in the service; and

C. For judgment granting such other, further, and different relief as to the Court may seem just and proper, including Plaintiff's costs and reasonable attorneys' fees.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury as to all issues triable by jury, as enumerated and set forth in more detail in this

Complaint.

Dated: New York, New York
   May 30, 2019

          PARNESS LAW FIRM, PLLC

          By:_____/s/ Hillel I. Parness_____
          Hillel I. Parness
          136 Madison Ave., 6th Floor
          New York, New York  10016
          (212) 447-5299
          hip@hiplaw.com
          *Attorneys for Plaintiff*
          *Structured Asset Sales, LLC*

Donald S. Zakarin
dzakarin@pryorcashman.com
Ilene S. Farkas
ifarkas@pryorcashman.com
Andrew M. Goldsmith
agoldsmith@pryorcashman.com
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STRUCTURED ASSET SALES, LLC,

        *Plaintiff*,

      -against-

EDWARD CHRISTOPHER SHEERAN p/k/a ED
SHEERAN, SONY/ATV MUSIC PUBLISHING,
LLC, ATLANTIC RECORDING CORPORATION
d/b/a ATLANTIC RECORDS, BDI MUSIC LTD.,
BUCKS MUSIC GROUP LTD., THE ROYALTY
NETWORK, DAVID PLATZ MUSIC (USA) INC.,
AMY WADGE, JAKE GOSLING and DOES 1
THROUGH 10

        *Defendants*.

**18-CV-5839**

**ANSWER TO THIRD AMENDED
COMPLAINT OF EDWARD
CHRISTOPHER SHEERAN**

      Defendant Edward Christopher Sheeran p/k/a Ed Sheeran ("Sheeran" or "Defendant")

responds to the Third Amended Complaint dated May 30, 2019 (the "Third Amended Complaint")

of plaintiff Structured Asset Sales, LLC ("Plaintiff" or "SAS") and states as follows:[1]

      1.      In response to Paragraph 1 of the Third Amended Complaint, Defendant denies

---

[1] Undefined capitalized terms have the meanings given to them in the Third Amended Complaint.
Defendant hereby denies any and all allegations of infringement; to the extent a specific numbered
Paragraph in the Third Amended Complaint could be interpreted to allege infringement, each such
allegation is denied to the extent not specifically reflected as being denied in the corresponding
numbered Paragraph of this Answer.  Unless otherwise stated, with respect to any and all
allegations relating to defendants other than Defendant himself, Defendant denies knowledge or
information sufficient to form a belief as to the truth of such allegations.  In addition, unless
otherwise stated, references to the recorded version of LGO or the recording of LGO refer to the
Marvin Gaye recording.

each and every allegation set forth in Paragraph 1 except admits that Plaintiff has commenced this lawsuit alleging a baseless claim of copyright infringement, admits that he is credited as one of the writers of the musical composition *Thinking Out Loud* ("TOL"), admits, upon information and belief, that the musical composition *Let's Get It On* ("LGO") was registered with the U.S. Copyright Office in 1973 and that Edward B. Townsend ("Townsend") is credited as an author of LGO.

2.      In response to Paragraph 2 of the Third Amended Complaint, Defendant admits that Structured Asset Sales, LLC ("SAS") is the named Plaintiff in this action but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 of the Third Amended Complaint, except denies that the allegations relating to the so-called "Pullman Bonds" have anything to do with any issue in this case.

3.      In response to Paragraph 3 of the Third Amended Complaint, Defendant admits that SAS asserts a baseless claim of copyright infringement and otherwise denies all allegations set forth in Paragraph 3 and specifically denies, on information and belief, that SAS has any standing to assert a claim of infringement for anything but its claimed 11% beneficial interest in the copyright of LGO through its alleged purchase of a songwriter's share of royalties from one of the heirs of Ed Townsend and further denies, on information and belief, that the claims asserted in this action relate back for statute of limitations purposes to the filing of a distinctly different lawsuit filed by distinctly different plaintiffs under Case No. 16-cv-6309 and then refiled under Case No. 17-cv-5221—a lawsuit Defendant is informed that SAS was aware of for years and in which SAS voluntarily elected not to participate.

4.      In response to Paragraph 4 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations except admits,

on information and belief, that Townsend is credited in the U.S. Copyright Office as an author of LGO and further avers, based on public records reviewed by his counsel, that LGO was registered with the U.S. Copyright Office in 1973, and that the copyright for LGO was renewed with the U.S. Copyright Office in 2001.

5.      In response to Paragraph 5 of the Third Amended Complaint, Defendant denies every allegation set forth in Paragraph 5 of the Third Amended Complaint, except admits that Plaintiff has commenced this lawsuit alleging a baseless claim of copyright infringement.

6.      In response to Paragraph 6 of the Third Amended Complaint, Defendant neither admits nor denies the allegations of Paragraph 6 as it asserts a purely legal proposition except admits that the Federal Courts have exclusive jurisdiction over United States copyright infringement claims and denies that there is any viable claim of copyright infringement in this case.

7.      In response to Paragraph 7 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 7 of the Third Amended Complaint.

8.       In response to Paragraph 8 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 8 of the Third Amended Complaint.

9.      In response to Paragraph 9 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 9 of the Third Amended Complaint.

10.     In response to Paragraph 10 of the Third Amended Complaint, Defendant denies the allegations of Paragraph 10, except admits that he has performed TOL throughout the United States, including in New York.

11.     In response to Paragraph 11 of the Third Amended Complaint, Defendant denies the allegations of Paragraph 11 of the Third Amended Complaint, except admits that Defendant

has engaged in concert tours in the United States.

12.     In response to Paragraph 12 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 12 of the Third Amended Complaint, except admits that he has indirectly received revenues from the exploitation of TOL throughout the United States, including New York.

13.     In response to Paragraph 13 of the Third Amended Complaint, Defendant responds that Paragraph 13 contains a pure conclusion of law, to which no response is required; to the extent a response is required, Defendant denies the allegations set forth in Paragraph 13 of the Third Amended Complaint.

14.     In response to Paragraph 14 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 14 of the Third Amended Complaint and avers that all creative work relating to TOL occurred in the United Kingdom.

15.     In response to Paragraph 15 of the Third Amended Complaint, Paragraph 15 contains a pure conclusion of law, to which no response is required but to the extent that a response were required, Defendant does not deny that venue is proper, as to him, in the Southern District of New York.

16.     In response to Paragraph 16 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Third Amended Complaint.

17.     In response to Paragraph 17 of the Third Amended Complaint, Defendant admits that he is a musician, singer, songwriter and producer, admits that he has been nominated for various Grammys and other awards in relation to TOL and other compositions and recordings, and admits that he has performed TOL, along with other songs he has written and/or recorded, in the

United States and New York; otherwise, Defendant denies the allegations set forth in Paragraph 17 of the Third Amended Complaint.

18.     In response to Paragraph 18 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Third Amended Complaint but denies that he has an agreement with Sony/ATV Music Publishing LLC ("SATV") and specifically denies that SATV and EMI Music Publishing are run by Martin Bandier, although the identity of the officers of SATV and EMI is irrelevant to any issue in this case.

19.     In response to Paragraph 19 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Third Amended Complaint.

20.     In response to Paragraph 20 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations stated therein.

21.     In response to Paragraph 21 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations stated therein.

22.     In response to Paragraph 22 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations stated therein.

23.     In response to Paragraph 23 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23.

24.     In response to Paragraph 24 of the Third Amended Complaint, Defendant admits that Wadge co-authored *Thinking Out Loud*, and that, on information and belief, Wadge is a citizen of the United Kingdom; Defendant otherwise denies knowledge or information sufficient to form

a belief as to the truth of the allegations set forth in Paragraph 24.

25.     In response to Paragraph 25 of the Third Amended Complaint, Defendant admits that Gosling is credited as the producer of Defendant's commercially released recording of *Thinking Out Loud*, and that, on information and belief, Gosling is a citizen of the United Kingdom; Defendant otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25.

26.     In response to Paragraph 26 of the Third Amended Complaint, Defendant avers that no response is required and that Plaintiff improperly makes allegations regarding "Doe" defendants that do not exist; to the extent a response is required, Defendant denies the remaining allegations set forth in Paragraph 26 of the Third Amended Complaint.

27.     In response to Paragraph 27 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations stated therein.

28.     In response to Paragraph 28 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief regarding the allegations set forth in Paragraph 28 of the Third Amended Complaint, including what Plaintiff means by a "famous song" and refers the Court to the relevant charts for their true and complete contents.

29.     In response to Paragraph 29 of the Third Amended Complaint, Defendant denies each and every allegation contained in Paragraph 29, except admits that he is a musical artist and further avers that he was successful prior to the release of the album *x*, which was not his "debut" album, and that said album was a worldwide success prior to the release of the single TOL and TOL was not "the hit" off of the album.

30.     In response to Paragraph 30 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 30 of the Third Amended Complaint, except admits that

Plaintiff is seeking damages from Defendants and admits that Plaintiff has no entitlement to anything.

31.     In response to Paragraph 31 of the Third Amended Complaint, Defendant denies the allegations and legal conclusions set forth in Paragraph 31 of the Third Amended Complaint.

32.     In response to Paragraph 32 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 32 of the Third Amended Complaint and avers that, as virtually all of the elements of alleged similarity in Paragraph 32 consist of elements contained in a particular recorded version of LGO and not in the deposit copy and as to those elements that are actually embodied in both in intelligible notation, the alleged similar elements are not original to LGO but are common musical elements existing in prior art and available to all.

33.     In response to Paragraph 33 of the Third Amended Complaint, Defendant denies all of the allegations of Paragraph 33 except admits that LGO and TOL both feature commonplace, unoriginal and unprotectible chord progressions, that LGO uses a variant of the commonplace I-iii-IV-V chord progression and that portions of TOL use a different or variant chord progression that does not include a "iii" chord; Defendant further avers that TOL contains chord progressions nowhere contained in LGO.

34.     In response to Paragraph 34 of the Third Amended Complaint, Defendant denies knowledge or information sufficient to form a belief as to all of the allegations of Paragraph 34 except admits that the irrelevant Marvin Gaye recorded version of LGO features a variant of the commonplace, unoriginal and unprotectible I-iii-IV-V chord progression.

35.     In response to Paragraph 35 of the Third Amended Complaint, the allegations require no response as they are purely allegations relating to musical nomenclature and make no allegation requiring a response but to the extent any response is required, Defendant denies

knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Third Amended Complaint.

36.    In response to Paragraph 36 of the Third Amended Complaint, Defendant denies all of the allegations of Paragraph 36 except admits that LGO and TOL both feature commonplace, unoriginal and unprotectible chord progressions, that LGO uses a variant of the commonplace I-iii-IV-V chord progression and that portions of TOL use a different or variant chord progression that does not include a "iii" chord; Defendant further avers that TOL contains chord progressions nowhere contained in LGO.

37.    In response to Paragraph 37 of the Third Amended Complaint, Defendant denies all of the allegations in Paragraph 37 except admits that LGO and TOL both feature commonplace, unoriginal and unprotectible chord progressions, that LGO uses a variant of the commonplace I-iii-IV-V chord progression and that portions of TOL use a different or variant chord progression that does not include a "iii" chord, and as SAS acknowledges and admits, TOL is written in the key of D major and LGO is written in the key of E-flat major; otherwise denies the remaining allegations set forth in Paragraph 37 of the Third Amended Complaint and further avers that TOL contains chord progressions nowhere contained in LGO.

38.    In response to Paragraph 38 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 38 of the Third Amended Complaint and avers that there is no "bass line" contained in the deposit copy of LGO.

39.    In response to Paragraph 39 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 39 of the Third Amended Complaint and avers that there is no "bass line" contained in the deposit copy of LGO, it appearing solely in the irrelevant Marvin Gaye recorded version of LGO, and the bass line contained in over 90% of TOL is distinctly

different from even the Marvin Gaye recorded version of LGO.

40.     In response to Paragraph 40 of the Third Amended Complaint, Defendant avers that Paragraph 40 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40 except admits that TOL and LGO are written in 4/4 time – which because of its commonality in music is called "common time" and further avers that the harmonic rhythms of TOL and LGO are markedly different.

41.     In response to Paragraph 41 of the Third Amended Complaint, Defendant denies the allegations of Paragraph 41, including the allegation that the chord progression in LGO is "distinctive" as it is exceedingly common, and denies that the bass line in the irrelevant recorded version of LGO – it does not appear in the deposit copy – is substantially similar to the bass line in TOL, except admits that LGO and TOL both feature commonplace, unoriginal and unprotectible chord progressions, that LGO uses a variant of the commonplace I-iii-IV-V chord progression and that portions of TOL use a different or variant chord progression that does not include a "iii" chord; Defendants further aver that TOL contains chord progressions nowhere contained in LGO.

42.     In response to Paragraph 42 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 42 of the Third Amended Complaint.

43.     In response to Paragraph 43 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 43 of the Third Amended Complaint.

44.     In response to Paragraph 44 of the Third Amended Complaint, Defendant specifically denies that the vocal melodies in LGO and TOL have probative or actionable similarities and denies that the verse of each song is "built upon four hearings of the same

progression"; otherwise, avers that Paragraph 44 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any further response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44.

45.     In response to Paragraph 45 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 45 of the Third Amended Complaint.

46.     In response to Paragraph 46 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 46 of the Third Amended Complaint.

47.     In response to Paragraph 47 of the Third Amended Complaint, Defendant denies any and all allegations of infringement and avers that Plaintiff's allegations are predicated on the irrelevant Marvin Gaye recording of LGO, not on the deposit copy; otherwise, avers that Paragraph 47 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47.

48.     In response to Paragraph 48 of the Third Amended Complaint, Defendant denies any and all allegations of infringement and denies that the "backing pattern" "forms the basis of both songs" and "plays the same role" in TOL and LGO and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 48 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 48.

49.     In response to Paragraph 49 of the Third Amended Complaint, Defendant

10

specifically denies that the vocal melodies in LGO, whether in the irrelevant Marvin Gaye recorded version of LGO or the deposit copy, and TOL have probative or actionable similarities; and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 49 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 49.

50.     In response to Paragraph 50 of the Third Amended Complaint, Defendant specifically denies that the vocal melodies in LGO, whether in the irrelevant Marvin Gaye recorded version of LGO or the deposit copy, and TOL have probative or actionable similarities and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 50 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 50.

51.     In response to Paragraph 51 of the Third Amended Complaint, Defendant specifically denies that the rhythms in LGO, whether in the irrelevant Marvin Gaye recorded version or in the deposit copy, and TOL have probative or actionable similarities and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 51 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 51.

52.     In response to Paragraph 52 of the Third Amended Complaint, Defendant specifically denies that the vocal melodies in LGO, whether in the irrelevant Marvin Gaye recorded version or the deposit copy, and TOL have probative or actionable similarities and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 52 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 52.

53.     In response to Paragraph 53 of the Third Amended Complaint, Defendant specifically denies that the vocal melodies in LGO, whether in the irrelevant Marvin Gaye recorded version or the deposit copy, and TOL have probative or actionable similarities and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 53 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 53.

54.     In response to Paragraph 54 of the Third Amended Complaint, Defendant specifically denies that the vocal melodies in LGO, whether in the irrelevant Marvin Gaye recorded version or the deposit copy, and TOL have probative or actionable similarities and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 54 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth

of the remaining allegations of Paragraph 54.

55.     In response to Paragraph 55 of the Third Amended Complaint, Defendant denies all of the allegations of Paragraph 55 and avers that the LGO composition (*i.e.*, as it is reflected in the deposit copy), as distinguished from the irrelevant Marvin Gaye recorded version of LGO, does not specify the tempo with which to play the composition, avers further that tempo is an unprotectible musical building block and that the Marvin Gaye recording of LGO (in which Plaintiff has no rights and which is irrelevant in any event for comparison purposes to TOL) has a similar, but not identical, tempo as compared to the recording of TOL, except admits that each composition is written in 4/4 time, also known as "common time" because of its commonality in music; otherwise, Defendant denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 55 of the Third Amended Complaint.

56.     In response to Paragraph 56 of the Third Amended Complaint, Defendant specifically denies any and all allegations of infringement and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 56 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 56.

57.     In response to Paragraph 57 of the Third Amended Complaint, Defendant avers that the harmonic rhythms of TOL and LGO are markedly different and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 57 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is

required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 57.

58.     In response to Paragraph 58 of the Third Amended Complaint, Defendant specifically denies any and all allegations of infringement and avers that the allegations made by a purported musicologist purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 58 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 58.

59.     In response to Paragraph 59 of the Third Amended Complaint, Defendant specifically denies any and all allegations of infringement, denies that each composition features a I-I$^6$-IV-V chord progression, denies that the vocal melodies in TOL and LGO, whether in the irrelevant Marvin Gaye recorded version or the deposit copy, have any probative or actionable similarities, denies that the structures of TOL and LGO have any probative or actionable similarities, denies that the harmonic rhythms of TOL and LGO have any probative or actionable similarities, and avers that tempo is an unprotectible musical building block and that the LGO composition does not specify the tempo with which to play the composition and avers that the allegations made by a purported musicologist, purport to compare TOL with the irrelevant Marvin Gaye recorded version of LGO; otherwise avers that Paragraph 59 consists of no claim requiring a response but is instead a statement appropriate for a musicologist's response but to the extent any response is required, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 59.

60.     In response to Paragraph 60 of the Third Amended Complaint, Defendant denies

14

each and every allegation and legal conclusion in Paragraph 60 except admits that he had heard the Marvin Gaye recording of LGO years before he and Amy Wadge independently wrote TOL, albeit TOL as written by Sheeran and Wadge was without either the percussion or the bass-line allegedly similar to the percussion and bass-line contained not in the LGO deposit copy but only in the irrelevant Marvin Gaye LGO recording.

61.     In response to Paragraph 61 of the Third Amended Complaint, Defendant denies each and every allegation in paragraph 61 and avers that, on a single occasion, he performed a short segment of LGO during a live performance of TOL, that he often performs short segments of other compositions during live performances of his songs that share common, unprotectible chord progressions, that LGO and TOL both feature commonplace, unoriginal and unprotectible chord progressions, that LGO uses a variant of the commonplace I-iii-IV-V chord progression and that portions of TOL use a different or variant chord progression that does not include a "iii" chord.

62.     In response to Paragraph 62 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 62 of the Third Amended Complaint and respectfully refers the Court to the relevant charts referenced therein for their true and complete contents and avers that the success of TOL in any country other than the United States is irrelevant to any issue or claim in this case.

63.     In response to Paragraph 63 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 63 of the Third Amended Complaint and respectfully refers the Court to the relevant charts and YouTube pages referenced therein for their true and complete contents and avers, in any event, that the success of TOL in any country other than the United States is irrelevant to any issue or claim in this case.

64.     In response to Paragraph 64 of the Third Amended Complaint, Defendant denies

each and every allegation in Paragraph 64 but admits that he had heard the Marvin Gaye recording of LGO years before he and Amy Wadge independently wrote TOL.

65.     In response to Paragraph 65 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 65 of the Third Amended Complaint.

66.     In response to Paragraph 66 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 66 of the Third Amended Complaint.

67.     In response to Paragraph 67 of the Third Amended Complaint, Defendant denies the allegations and legal conclusions set forth in Paragraph 67 of the Third Amended Complaint, denies any knowledge of any claim having been made by SAS until it belatedly sought to intervene in the *Griffin, et al. v. Sheeran et al.* case after the close of discovery in that case in or about May of 2018 and in any event avers that he did not need permission to exploit TOL as it does not infringe LGO.

68.     In response to Paragraph 68 of the Third Amended Complaint, Defendant denies the allegations and legal conclusions set forth in Paragraph 68 of the Third Amended Complaint.

69.     In response to Paragraph 69 of the Third Amended Complaint, Defendant denies the allegations and legal conclusions set forth in Paragraph 69 of the Third Amended Complaint and in any event avers that he did not need permission or a license to exploit TOL as it does not infringe LGO.

70.     In response to Paragraph 70 of the Third Amended Complaint, Defendant repeats and realleges the responses contained in the foregoing Paragraphs 1 through 69 hereinabove as if fully set forth herein; otherwise, Defendant denies the allegations set forth in Paragraph 70 of the Third Amended Complaint and further avers that he has not compensated Plaintiff because Plaintiff has no entitlement to any compensation as TOL does not infringe LGO.

71.     In response to Paragraph 71 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 71 of the Third Amended Complaint.

72.     In response to Paragraph 72 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 72 of the Third Amended Complaint and further avers that Plaintiff's claim that Defendants profited in the amount of "hundreds of millions of dollars" could not have been asserted in good faith but instead is a clear attempt to grab publicity.

73.     In response to Paragraph 73 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 73 of the Third Amended Complaint.

74.     In response to Paragraph 74 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 74 of the Third Amended Complaint and avers, on information and belief, that SAS owns no copyright and has no licensing rights but only a fractional beneficial interest in the songwriter's share of royalties payable from LGO.

75.     In response to Paragraph 75 of the Third Amended Complaint, Defendant denies the allegations set forth in Paragraph 75 of the Third Amended Complaint.

76.     In response to Paragraph 76 of the Third Amended Complaint, Defendant denies the factual allegations and legal conclusions set forth in Paragraph 76 of the Third Amended Complaint and respectfully refers the Court to 17 U.S.C. § 504(c) for its true and correct contents.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations set forth in the Third Amended Complaint and without admitting or suggesting that Defendant bears the burden of proof on any of the following defenses, as separate and independent affirmative defenses, Defendant states as follows:

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

77.     The Third Amended Complaint fails to state a claim upon which relief can be

granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

78.     The Third Amended Complaint is barred, in whole or in part, by documentary evidence.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

79.     The Third Amended Complaint is barred, in whole or in part, because the statute of limitations has expired.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

80.     The Third Amended Complaint is barred because the elements of TOL that allegedly infringe LGO are neither original nor protectible in LGO or are not contained in the deposit copy but only in the irrelevant Marvin Gaye recorded version of LGO.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

81.     The request for injunctive relief must be rejected because Plaintiff has an adequate remedy at law, it cannot establish irreparable harm, and it cannot establish that the equities balance in their favor and it has delayed bringing this action for over three years.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

82.     The Third Amended Complaint is barred because TOL is not substantially similar to LGO.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

83.     On information and belief, the Third Amended Complaint is barred because Plaintiff lacks standing.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

84.     The Third Amended Complaint is barred, in whole or in part, because Plaintiff

failed to mitigate its damages, if any.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

85.     The Third Amended Complaint is barred, in whole or in part, because the alleged

use, which is not admitted, was a fair use under 17 U.S.C. § 107.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

86.     The Third Amended Complaint is barred because TOL was created independently.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

87.     The Third Amended Complaint is barred because the alleged use, which is not

admitted, is *de minimis*.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

88.     The Third Amended Complaint is barred, in whole or in part, by the doctrine of

laches.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

89.     The Third Amended Complaint is barred, in whole or in part, by the doctrines of

waiver, estoppel, acquiescence and/or unclean hands.

## RESERVATION

90.     Defendant reserves the right to assert additional affirmative defense in the event

that a further investigation or discovery in this action reveals them to be proper.

**WHEREFORE**, Defendant respectfully requests that the Third Amended Complaint be dismissed in its entirety and that Defendant be awarded such other and further relief as the Court deems just and proper, including attorneys' fees and costs.

Dated: New York, New York
July 8, 2019

PRYOR CASHMAN LLP

By:*/s/ Donald S. Zakarin*
Donald S. Zakarin
dzakarin@pryorcashman.com
Ilene S. Farkas
ifarkas@pryorcashman.com
Andrew M. Goldsmith
agoldsmith@pryorcashman.com
7 Times Square
New York, New York 10036-6569
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806

*Attorneys for Defendant Edward*
*Christopher Sheeran p/k/a Ed Sheeran*

# Hillel I. Parness

(Cell) 646-526-8261 • (Office) 212-447-5299 • (Fax) 212-202-6002
Parness Law Firm, PLLC • www.hiplaw.com • hip@hiplaw.com
136 Madison Avenue, 6th Floor • New York, New York  10016

September 6, 2019                                                        **Via ECF**

Hon. Louis L. Stanton
U.S. District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     _Structured Asset Sales, LLC v. Sheeran_, 1:18-cv-05839

Dear Judge Stanton:

I represent Plaintiff Structured Asset Sales, LLC's ("SAS") in the above-referenced
matter.  In accordance with Rule 2.A. of Your Practices and Local Civil Rule 37.2, I
am writing to request that Your Honor set a pre-motion discovery conference to
address certain of SAS's requests for the production of documents to which
Defendants have objected and refused to produce anything.  Counsel for the
parties met and conferred telephonically on July 8 and 12, 2019, but were unable to
resolve their disagreement.[1]

**Issue 1: Requests for Documents Regarding Defendants' Indirect Profits**

SAS has made requests of Defendants for the production of documents relating to
Defendants' revenues and expenses associated with merchandise revenue, touring
revenue, and endorsement revenue linked to "Thinking Out Loud."  _See_ **Exhibit A**
(Defendants' Written Objections and Responses to Plaintiff's First Requests for
Production), Requests and Responses 15-20.

Defendants asserted boilerplate objections to each of these requests on the basis of
vagueness, ambiguity, overbreadth and relevance, and also asserted that each
Request "has no causal nexus to the claim of infringement or any revenue or
income allegedly attributable to any alleged infringement."

Plaintiffs who prove copyright infringement at trial are entitled not only to
"direct" profits, but also what has been termed "indirect profits," assuming
Plaintiff also proves – after the parties conduct discovery – a nexus between the
infringement and those profits.  _Sunset Lamp Corp. v. Alsy Corp._, No. 88 CIV. 2332
(MBM), 1990 WL 169136, at *3 (S.D.N.Y. June 7, 1990) ("In addition [to direct

---

[1] In the period since July 12, counsel has been working through other disputed discovery
issues, which will be brought to the Court's attention if and as necessary.

Hon. Louis L. Stanton
September 6, 2019

profits], a copyright owner can recover ascertainable indirect profits attributable to the promotional value of the infringing goods"), *aff'd*, 749 F. Supp. 520 (S.D.N.Y. 1990) (citing *Frank Music Corp. v. Metro–Goldwyn–Mayer*, 886 F.2d 1545, 1550 (9th Cir. 1989); *Frank Music Corp. v. Metro–Goldwyn*–Mayer, 772 F.2d 505, 517 (9th Cir. 1985).  At this stage of the case, SAS need only enunciate a reasonable argument for such linkage, and need not <u>prove</u> such linkage in order to receive relevant documents from the Defendants.  *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 592 (W.D.N.Y. 1996) (Granting motion to compel discovery, explaining that because "Plaintiffs are entitled to any profits attributable to the infringement, including any indirect profits, the information sought by Plaintiffs' Discovery Request is relevant"); *Graham v. Prince*, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017) (denying motion to dismiss as to indirect profits because "Graham has adequately pled a causal nexus between the alleged infringement and indirect profits by alleging facts…from which it can be reasonably inferred that the infringing photograph generated profits beyond those earned from the direct sale"); *Viktor v. Top Dawg Entm't LLC*, No. 18 CIV. 1554, 2018 WL 5282886, at *3 (S.D.N.Y. Oct. 24, 2018) (Denying early motion for summary judgment regarding indirect profits, over defendants' argument that plaintiff would not be able to meet the burden of showing a nexus, because "without discovery, including expert discovery, it is premature to so assume").

Defendants objected that each of Requests 15-20 "has no causal nexus to the claim of infringement or any revenue or income allegedly attributable to any alleged infringement," but as the cases cited above make clear, SAS's obligation is to allege facts in the Complaint that would support a reasonable argument for a nexus, not prove or even allege a nexus in the Requests.

SAS alleged facts sufficient to support an argument for a nexus between Defendants' infringement and their indirect profits.  *See* Third Amended Complaint (ECF 102) ¶¶ 11, 17, 62, 70 (excerpts attached as **Exhibit B**).

SAS has adequately pled a causal nexus between the alleged infringement and indirect profits, entitling SAS to receive discovery from the Defendants going to the issue of indirect profits.  We respectfully request that the Court direct Defendants to produce all documents in their possession, custody or control responsive to Requests 15 through 20.

**Issue 2: Requests for Documents Regarding Sheeran's Performances of "Thinking Out Loud"**

Plaintiff also requested that Defendants produce documents reflecting Ed Sheeran's performances of his composition – "Thinking Out Loud." *See* **Exhibit A**, Requests and Responses 27-28.  As to each, Defendants referred back to the

Hon. Louis L. Stanton
September 6, 2019

objections to Requests 15-20, adding the boilerplate assertion that responding would be "unduly burdensome."

Assuming the Court concludes that SAS is entitled to discovery of any documents concerning Defendants' indirect profits arising from performances of "Thinking Out Loud," each of these boilerplate objections should be rejected, and Defendants should be ordered to produce all documents in their possession custody or control concerning (or at a minimum documents sufficient to identify) all such performances.

The importance of "Thinking Out Loud" to Mr. Sheeran and the other Defendants, and its ability to drive ancillary revenues, is not mere speculation.  According to Setlist, a website that collects user-provided information about musical artists' concerts, Sheeran has performed "Thinking Out Loud" 456 times in concert, the first being on May 24, 2014, and the most recent being August 28, 2019.[2]

The Setlist website also reports that "Thinking Out Loud" is Sheeran's fourth-most-frequently-performed song, after The A Team (645 times since May 11, 2011), You Need Me, I Don't Need You (528 times since May 11, 2011), and Sing (486 times since April 12, 2011).[3]  If Defendants have documents indicating when, where and how frequently Mr. Sheeran performed "Thinking Out Loud," they should be ordered to produce them.

SAS thanks the Court for its anticipated assistance.

Respectfully submitted,

Hillel I. Parness

Attachment

cc:      Counsel of Record (via ECF)

---

[2] *See* https://www.setlist.fm/stats/songs/ed-sheeran-53d5f3bd.html?song=Thinking+Out+Loud.

[3] *See* https://www.setlist.fm/stats/ed-sheeran-53d5f3bd.html.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STRUCTURED ASSET SALES, LLC,

                    Plaintiff,

      v.

EDWARD CHRISTOPHER SHEERAN,
*p/k/a* ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC
RECORDING CORPORATION *d/b/a*
ATLANTIC RECORDS, BDI MUSIC LTD.,
BUCK MUSIC GROUP LTD., THE
ROYALTY NETWORK, INC., and DOES 1
THROUGH 10,

                    Defendants.

Index No. 1:18-cv-5839 (LLS)

**RESPONSES AND OBJECTIONS
OF DEFENDANTS EDWARD
CHRISTOPHER SHEERAN, SONY/ATV
MUSIC PUBLISHING LLC, ATLANTIC
RECORDING CORPORATION AND
THE ROYALTY NETWORK, INC.
TO PLAINTIFFS' REVISED FIRST
REQUESTS FOR PRODUCTION**

        Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rules 26.2

through 26.4 of the Local Civil Rules of the United States District Court for the Southern District

of New York ("Local Civil Rules"), defendants Edward Christopher Sheeran ("Sheeran"),

Sony/ATV Music Publishing LLC ("SATV"), Atlantic Recording Corporation ("Atlantic") and

The Royalty Network, Inc. ("TRNI," together with Sheeran, SATV, and Atlantic, the

"Defendants") hereby respond and object to the Revised First Requests for Production (the

"Requests") of plaintiff Structured Asset Sales, LLC ("SAS" or "Plaintiff")[1] as follows:

### GENERAL OBJECTIONS

        1.      Defendants object to the Requests, including the definitions and instructions set

forth therein, to the extent they attempt to impose upon Defendant obligations that are greater

than those imposed by the Federal Rules of Civil Procedure, the Local Civil Rules, and

applicable law.

        2.      Defendants object to the Requests to the extent they call for the disclosure of

information or the production of documents protected by the attorney-client privilege, the work

---

[1] Undefined capitalized terms have the meanings given to them in the Requests.

product doctrine, or any other applicable privilege, immunity, statute, regulation or rule.  The inadvertent disclosure of any such information shall not be deemed to be a waiver of any such privilege or immunity.

3. Defendants object to the Requests to the extent they seek documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case.

4. To the extent the Requests seek the disclosure of information or the production of documents containing trade secrets or other confidential, business or proprietary information, Defendants will provide such information or produce documents containing such information only in accordance with an appropriate confidentiality order.

5. Defendants object to the Requests to the extent they are vague, ambiguous or unintelligible.

6. Defendants object to the Requests to the extent they are overbroad, oppressive, harassing, unduly burdensome, palpably improper and to the extent there exist more practical methods of obtaining the information Plaintiffs seek.

7. Defendants object to the Requests to the extent they request the disclosure of documents not within their possession, custody or control.  Defendants will make a reasonably diligent inquiry concerning the subject matter of non-objectionable Requests.

8. Defendants object to the Requests to the extent they call for the disclosure of information for an undefined period of time.

9. Defendants object to the Requests to the extent they seek information or documents that are publicly available, equally available to Plaintiff and/or already in the possession of Plaintiff.

10. Defendants object to the Requests to the extent they are duplicative and cumulative.

11. Defendants object to the Requests to the extent they are not properly addressed to Defendants.

12.     Defendants object to the Requests to the extent they contain erroneous or inaccurate assumptions or purported statements of fact.

13.     Defendants object to the Requests to the extent they seek information and/or documents concerning the exploitation of *Thinking Out Loud* ("TOL") outside the United States or otherwise seek information and/or documents which are beyond the permissible, relevant scope of discoverable information consistent with the U.S. Copyright Act.

14.     Defendants object to the Requests to the extent they seek documents in which Defendants and/or third parties have a legitimate expectation and/or right of privacy pursuant to federal and state constitutions, statutes or case law.

15.     In responding to the Requests and producing documents and information in response to non-objectionable Requests, Defendants neither waive nor intend to waive, but expressly reserve, any and all objections to the relevance, competence, susceptibility to discovery, materiality or admissibility of any information provided.

16.     To the extent the Requests seek ESI, and to the extent responsive, non-objectionable ESI exists, such ESI shall be produced as load files compatible with Relativity or in another reasonably usable format.

17.     Defendants make these responses based upon their knowledge as of the date of these responses.  Defendants will supplement these responses only to the extent required by applicable law, regulation, rule, or court order.  Defendants hereby reserve the right to introduce into evidence at trial, hearing or other proceedings in this action information discovered subsequent to the date of these responses.

18.     By agreeing to comply with a particular Request, Defendants represent only that they will conduct a reasonably diligent search as indicated above and, subject to all objections and an appropriate confidentiality order, will produce non-objectionable, non-privileged documents responsive to the Requests.

19.     Each of the foregoing General Objections is incorporated by reference into each specific response below, even if not expressly stated therein.

## SPECIFIC RESPONSES & OBJECTIONS

**DOCUMENT REQUEST NO. 1:**

All documents produced by any of the parties, any non-parties and any experts in connection with *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 1:**

Defendants object to this Request because it seeks documents that already have been provided to Plaintiff and because it prematurely seeks expert materials to which Plaintiff has no entitlement at this time in an effort to obtain an improper benefit by reversing the order in which expert discovery is to be conducted by virtue of the exchange of expert opinions in the *Griffin* case while Plaintiff here has not provided any such expert opinion.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants respond that they will produce to Plaintiff all fact documents and fact discovery materials that have been exchanged in *Griffin* to the extent Plaintiff has not already been provided with these materials.  Defendants further refer Plaintiff to the public docket in *Griffin*, which includes the expert musicologist reports of the parties in that case.

**DOCUMENT REQUEST NO. 2:**

Copies of all transcripts of depositions conducted in *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 2:**

Subject to, and without waiver of, the foregoing General Objections, Defendants respond that they will produce to Plaintiff all fact documents and fact discovery materials that have been exchanged in *Griffin* to the extent Plaintiff has not already been provided with these materials.

**DOCUMENT REQUEST NO. 3:**

Copies of all expert reports produced in *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 3:**

Defendants object to this Request because it prematurely seeks expert materials to which Plaintiff has no entitlement.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the public docket in *Griffin*, which includes the expert musicologist reports of the parties in that case.

**DOCUMENT REQUEST NO. 4:**

All documents concerning the creation of "Thinking Out Loud," including any written or recorded preliminary or draft versions of that work.

**RESPONSE TO DOCUMENT REQUEST NO. 4:**

Defendants object to this Request to the extent it is vague and ambiguous.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff.

**DOCUMENT REQUEST NO. 5:**

All documents concerning "Let's Get it On," including any partial or complete sheet music, audio recordings or audiovisual recordings, from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 5:**

Plaintiffs object to this Request as vague, ambiguous, overbroad, burdensome, to the extent it is not properly addressed to Defendants and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to third parties that own or may own the recorded versions of "Let's Get It On."

**DOCUMENT REQUEST NO. 6:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Thinking Out Loud."

      **RESPONSE TO DOCUMENT REQUEST NO. 6:**

      Defendants object to this Request as vague, ambiguous, overbroad and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case. Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff. Further, Defendants submit that to the extent that artists other than Sheeran have recorded versions of "Thinking Out Loud," such versions should be sought from such non-parties.

**DOCUMENT REQUEST NO. 7:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Let's Get it On," from any time periods.

      **RESPONSE TO DOCUMENT REQUEST NO. 7:**

      See Response No. 5.

**DOCUMENT REQUEST NO. 8:**

All documents concerning comparisons, similarities or differences between all or part of any composition, audio recording or audiovisual recording of "Thinking Out Loud" and all or part of any composition, audio recording or audiovisual recording of "Let's Get it On."

      **RESPONSE TO DOCUMENT REQUEST NO. 8:**

      Defendants object to this Request to the extent it is vague and ambiguous and to the extent it seeks documents or information immune from disclosure on the basis of privilege. Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and repeat their responses with respect to any expert reports provided in the *Griffin*

6

case set forth above.

## DOCUMENT REQUEST NO. 9:

Complete, itemized documents reflecting revenues received or earned in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works (*e.g*., revenues from the sale of albums that include "Thinking Out Loud" among other works).

### RESPONSE TO DOCUMENT REQUEST NO. 9:

Defendants object to this Request as vague and ambiguous and to the extent it seeks documents concerning exploitation of TOL in territories outside the United States.  Subject to, and without waiver of, the foregoing General and Specific Objections, Sheeran, SATV and Atlantic refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to documents and information already provided to Plaintiff from non-parties Broadcast Music Inc., ASCAP, SoundExchange and The Harry Fox Agency; TRNI responds that it will produce non-privileged documents in its possession, custody or control that are revealed by a reasonable and diligent search, which are sufficient to identify its revenues/income, if any, derived from domestic exploitation of TOL and its expenses, if any, related thereto.

## DOCUMENT REQUEST NO. 10:

Complete, itemized documents reflecting expenses incurred or paid in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

### RESPONSE TO DOCUMENT REQUEST NO. 10:

See Response No. 9.

## DOCUMENT REQUEST NO. 11:

Complete, itemized documents reflecting music publishing revenues received or earned in connection with "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 11:**

See Response No. 9.

**DOCUMENT REQUEST NO. 12:**

Complete, itemized documents reflecting music publishing expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 12:**

See Response No. 9.

**DOCUMENT REQUEST NO. 13:**

Complete, itemized documents reflecting revenues received or earned in connection with public performances of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 13:**

See Response No. 9.

**DOCUMENT REQUEST NO. 14:**

Complete, itemized documents reflecting expenses incurred or paid in connection with public performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 14:**

See Response No. 9.

**DOCUMENT REQUEST NO. 15:**

Complete, itemized documents reflecting revenues received or earned in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud" or where "Thinking Out Loud" was performed, including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 15:**

Defendants object to this Request as vague, ambiguous, overbroad and because it seeks

information that is not relevant to any party's claim or defense, not proportional to the needs of

this case, and has no causal nexus to the claim of infringement or any revenue or income allegedly attributable to any alleged infringement. Defendant will not produce any documents responsive to this Request consistent with the above-stated objections.

**DOCUMENT REQUEST NO. 16:**

Complete, itemized documents reflecting expenses incurred or paid in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud," or where "Thinking Out Loud" was performed, including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 16:**

See Response No. 15.

**DOCUMENT REQUEST NO. 17:**

Complete, itemized documents reflecting revenues received or earned in connection with touring concerning and/or live performances of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 17:**

See Response Nos. 9 and 15.

**DOCUMENT REQUEST NO. 18:**

Complete, itemized documents reflecting expenses incurred or paid in connection with touring concerning and/or live performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO.18:**

See Response Nos. 9 and 15.

**DOCUMENT REQUEST NO. 19:**

Complete, itemized documents reflecting revenues received or earned in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 19:**

See Response No. 15.

**DOCUMENT REQUEST NO. 20:**

Complete, itemized documents reflecting expenses incurred or paid in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 20:**

See Response No. 15.

**DOCUMENT REQUEST NO. 21:**

To the extent not provided in response to another Request, complete, itemized documents reflecting revenues received or earned in connection with "Thinking Out Loud," including revenues received or earned in connection with multiple musical works, in connection with any of the following: sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, video recordings, synchronization licensing, advertising revenue, appearance fees, social media income, sheet music sales and sheet folio income; any and all music publisher income; any and all record master income; any and all producer royalty income; any and all arrangement income; and any equity interests in Spotify or any other music streaming or download services.

**RESPONSE TO DOCUMENT REQUEST NO. 21:**

Defendants object to this Request as being non-specific, overbroad and in summary and

improper form seeking all documents not otherwise provided in response to other Requests.

Subject to such objection and the general objections, see Response No. 9.

**DOCUMENT REQUEST NO. 22:**

To the extent not provided in response to another Request, complete, itemized documents reflecting expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 22:**

Defendants object to this Request as being non-specific, overbroad and in summary and

improper form seeking all documents not otherwise provided in response to other Requests.

Subject to such objection and the general and specific objections,  see Response No. 9.

**DOCUMENT REQUEST NO. 23:**

To the extent not provided in response to another Request, all documents concerning the publication, sub-publication, distribution or administration of "Thinking Out Loud" by and/or for any person or entity, including but not limited to Bucks Music Group, Amy Wadge, and/or any writer or publisher, sub-publisher, distributor or administrator.

**RESPONSE TO DOCUMENT REQUEST NO. 23:**

Defendants object to this Request as vague, ambiguous, and overbroad.  Defendants further object to this Request to the extent it seeks documents concerning persons or entities other than the defendants identified in this Request and which persons and entities have not yet responded to the Third Amended Complaint in this action and other unidentified entities or persons.  Plaintiff is free to seek discovery from such persons and entities directly and such persons and entities will have their own right to respond and object.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to information Plaintiff has already obtained pursuant to premature subpoenas issued to BMI, ASCAP, SoundExchange and The Harry Fox Agency.

**DOCUMENT REQUEST NO. 24:**

To the extent not provided in response to another Request, all documents created or provided by the following entities regarding "Thinking Out Loud":

   a.   SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, SAG-AFTRA, and any and all collection society, mechanical society and performance society;

   b.   Sony/ATV, Atlantic, Warner Music Group Corporation, and any music publisher, music administrator, record company or record label, including any such company based in the United Kingdom;

11

    c.      Any entity owned, operated by or affiliated with Sheeran;

    d.      Any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act; and/or

    e.      Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, YouTube, and/or any and all download and/or streaming services.

**RESPONSE TO DOCUMENT REQUEST NO. 24:**

Defendants object to this Request as wildly overbroad and insufficiently specific. Defendants further object to this Request to the extent it seeks information that is not relevant to any party's claim or defense, not proportional to the needs of this case, and has no causal nexus to the claim of infringement and any revenue or income allegedly attributable to any alleged infringement. Defendants further object to this Request to the extent it should be addressed to the non-parties identified in the Request, beyond those from whom Plaintiff has already prematurely, in violation of the Federal Rules, obtained information by subpoena, to the extent it relates to the claimed infringement of a United States copyright for exploitation in the United States and not to any foreign copyrights and exploitation thereof in countries and territories other than the United States. Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to their Response to Request No. 9 and otherwise refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and the discovery provided to Plaintiff by BMI, ASCAP, SoundExchange and The Harry Fox Agency.

**DOCUMENT REQUEST NO. 25:**

All documents concerning or comprising Sheeran's performance, in whole or in part, of "Let's Get it On," including audio recordings or audiovisual recordings, from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 25:**

Defendants object to this Request as incomprehensible.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff.

**DOCUMENT REQUEST NO. 26:**

All documents from any source concerning or comprising one or more general ledgers reflecting financial transactions involving Sheeran or any company owned, controlled or managed by Sheeran.

**RESPONSE TO DOCUMENT REQUEST NO. 26:**

Defendants object to this Request as wildly overbroad and because it seeks information that is not relevant to any party's claim or defense, not proportional to the needs of this case, and has no causal nexus to the claim of infringement and any revenue or income allegedly attributable to any alleged infringement.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to their Response to Request No. 9.

**DOCUMENT REQUEST NO. 27:**

Documents sufficient to identify Sheeran's past, current and/or future live musical performance and/or touring schedule, and including dates, times and locations of all such live performances.

**RESPONSE TO DOCUMENT REQUEST NO. 27:**

See Response No. 15.  Defendants further object to this Request as unduly burdensome.

**DOCUMENT REQUEST NO. 28:**

For each and every one of Sheeran's past, current and/or future live musical performance and/or tours, documents sufficient to identify all musical compositions performed, in whole or in part, by Sheeran at each such performance.

**RESPONSE TO DOCUMENT REQUEST NO. 28:**

See Response No. 27.

**DOCUMENT REQUEST NO. 29:**

Documents sufficient to identify all people, credited or otherwise, who performed any work or services of any kind in connection with "Thinking Out Loud," including but not limited to any producers, musicians, engineers, recording studio personnel, sound mixers, music arrangers, writers, singers, and/or music coaches.

**RESPONSE TO DOCUMENT REQUEST NO. 29:**

Defendants object to this Request as vague and ambiguous.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the liner notes of Sheeran's LP titled *x*.

Dated: New York, New York
       July 1, 2019

PRYOR CASHMAN LLP

By:*/s/ Donald S. Zakarin*
    Donald S. Zakarin
    dzakarin@pryorcashman.com
    Ilene S. Farkas
    ifarkas@pryorcashman.com
    Andrew M. Goldsmith
    agoldsmith@pryorcashman.com
7 Times Square
New York, New York 10036-6569
Telephone:  (212) 421-4100

*Attorneys for Defendants Edward
Christopher Sheeran, Sony/ATV Music
Publishing LLC, Atlantic Recording
Corporation and The Royalty Network, Inc.*

# EXHIBIT B

**A100**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                     :

STRUCTURED ASSET SALES, LLC,            :
                                       :

          Plaintiff,                   :     **Index No. 1:18-cv-5839 (RJS)**
                                       :

          v.                               :
                                       :     **THIRD AMENDED COMPLAINT**

EDWARD CHRISTOPHER SHEERAN *p/k/a/*   :
ED SHEERAN, SONY/ATV MUSIC          :
PUBLISHING, LLC, ATLANTIC
RECORDING CORPORATION *d/b/a*       :
ATLANTIC RECORDS, BDI MUSIC LTD.,   :
BUCKS MUSIC GROUP LTD., THE
ROYALTY NETWORK, INC., DAVID PLATZ   :
MUSIC (USA) INC., AMY WADGE, JAKE   :
GOSLING, and DOES 1 THROUGH 10,
                                       :

          Defendants,                :
-------------------------------------------------------- X

## <u>INTRODUCTION</u>

     1.     This is an action for willful copyright infringement by an owner of the rights to

the #1 international hit song "Let's Get it On," a song written and produced by professional

songwriters Edward Townsend Jr. and Marvin Gaye Jr. in 1973 and registered with the United

States Copyright Office.  Defendant Edward Christopher Sheeran ("Sheeran"), the credited

purported writer of the #1 2014-2015 and present international hit song "Thinking Out Loud,"

along with the other Defendants, copied and exploited, without authorization or credit, the "Let's

Get it On" composition.

     2.     This case is brought by Structured Asset Sales, LLC, ("SAS"), a Limited

Liability Company based in Los Angeles, California, which invests in and owns rights to

thousands of songs and musical compositions and is owned by David Pullman, who is its

Founder, Chairman and CEO, as well as the principal of The Pullman Group, LLC, the creator of

**A101**

action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.* Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over the enumerated Defendants because they have directed their activities and marketing of the infringing work to New York residents, and New York residents are able to purchase, download, and stream the infringing compositions and recordings.

8.      Defendants have engaged in systematic and continuous business activities relating to the infringing work. As such, the Defendants have engaged in continuing business activities in the instant jurisdiction.

9.      The instant Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

10.     Defendant Sheeran has performed, and he and the other Defendants have authorized, organized, and promoted performances of the infringing work numerous times in New York.

11.     The Defendants have generated touring and recording revenues from the unauthorized and unlawful exploitation of the infringing work, including receiving substantial revenue from such exploitation in New York. They have advertised the infringing work to New York residents.

12.     The Defendants, individually and collectively, have generated substantial revenue from the exploitation of the infringing work in New York.

13.     New York has a considerable interest in adjudicating disputes wherein New York residents are the target of the harm resulting from exploitation of the infringing work.

14.     Sheeran is a resident and has spent substantial time, including time spent while

3

engaged in copyright infringement, in Los Angeles, California, while working on the album which included "Thinking Out Loud."

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1391(b), §1391(c), and §1400(a), respectively, because the corporate Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

## PARTIES

16.     The Plaintiff in this case is a limited liability company owned by its founder, chairman and CEO David Pullman, based in Los Angeles.  It is the owner of one third of the estate assets of Mr. Townsend Jr. Mr. Townsend Jr. died intestate in 2003 and his estate was divided one third to each of his children. One of his children, Clef Michael Townsend, sold his entire share and right in the estate to SAS. That interest was put up for sale by Clef Michael Townsend, and the sale was approved by the probate court in California. Mr. Ed Townsend Jr. was the co-writer of the lyrics of "Let's Get It On" and creator of its musical composition. Plaintiff, with the other heirs of Mr. Townsend Jr., are engaged, among other things, in conducting the business of music publishing and otherwise commercially exploiting the musical composition copyrights of the music of Mr. Townsend Jr. They are either the legal owner of the copyrights or the beneficial owner of the copyright since they share in the proceeds of exploitation of the copyright.

17.     Upon reasonable information and belief, Defendant Edward Sheeran is a musician, singer, songwriter, and producer living in the United Kingdom who does business in New York, individually, and under his company, Gingerbread Man Records. Sheeran was nominated for a Grammy Award for Best Record, Best Performance, and Song of the Year in

2016 for "Thinking Out Loud." He has numerous other awards such as British artist of the year in 2015, Album of the Year in 2015 from BRIT Awards, and Best Male Artist in 2016 from People's Choice Award. Sheeran conducts systematic and continuous business in New York including, but not limited to, public performances, and selling albums and merchandise to the citizens of New York. The Defendant, Edward Sheeran has reproduced, distributed, and publicly performed the infringing work and sound recording and/or authorized its reproduction, distribution and public performance.

18.      Upon reasonable information and belief, SONY/ATV Music Publishing, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  Upon reasonable information and belief, Sony/ATV is the music publisher for "Thinking Out Loud" and administers "Let's Get It on" with EMI Music Publishing, both of which are run by CEO and Chairman Martin "Marty" Bandier. EMI Music Publishing is owned by a consortium of companies led by Sony/ATV.  Sony/ATV has generated substantial revenue from the exploitation of the infringing work. It is in a unique position to have known about and/or participated in the exploitation of either or both works. Its conflicting position made it impossible for it correct the problem.

19.      Upon reasonable information and belief, Atlantic Recording Company d/b/a Atlantic Records is a Delaware corporation with its principal place of business in New York.  Atlantic Records is owned by Warner Music Group Corporation, which also has its principal place of business in New York.  Atlantic Records is responsible for the production, manufacture, distribution, marketing, sale and promotion of "Thinking Out Loud" in the United States.

20.      Upon reasonable information and belief, BDi Music Ltd. ("BDi") is a music

position within the phrase.

j.   Both songs have a similar distribution of vocal melismas, expressing in both a
similar theme.

60.   Defendants' access to Plaintiff's work is beyond challenge, as "Let's Get it On" is
a world-famous composition and recording, and the two works are indeed substantially similar
for purposes of copyright infringement.   The additional fact that no other song shares the
foregoing characteristics is strong evidence not of arbitrary convergence or parallel development,
but knowing, willful infringement.

61.   Indeed, upon information and belief Sheeran himself regularly performs both
songs together in a "mash-up" format, moving from one song to the other and back again.   At
least one example of one such performance is publicly-available on YouTube
(https://www.youtube.com/watch?v=RxZjVZKVN7k) (see time index 4:29-5:10).   Sheeran
transitioned seamlessly between the lyrics of the two songs without changing the notes, tempo,
rhythm or any other elements.

62.   Upon reasonable information and belief, "Thinking Out Loud" has hit the number
one (1) position on the national charts in eleven (11) countries since 2014, including both the
United States and the United Kingdom, and has been certified platinum multiple times by the
Recording Industry Association of America, indicating sales in excess of one million (1,000,000)
copies sold in the United States, as well as substantial sales internationally. The single and the
album "X" sold over fifteen (15) million copies. In 2015, "Thinking Out Loud" was a top-three
song as measured by performance income in the world. Revenue derived and/or related to
"Thinking Out Loud," including but not limited to record sales, performance tour income,
merchandising, synchronization and licensing are in the hundreds of millions of dollars.

composition and sound recording "Thinking Out Loud" and each of the Defendants continues to

infringe "Let's Get It On".

67.     Upon information and belief, the Defendants were notified of the infringement at

least as early as April 15, 2015 (the "Notice").  Despite, upon information and belief, receiving

the Notice, the Defendants continued to exploit "Thinking Out Loud" without permission, by

using the melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements

copied from "Let's Get It On" composition, which use constitutes copyright infringement.

68.     Despite, upon information and belief, the Notice, all of the Defendants have

continued to infringe Plaintiff's copyrighted work. The infringement by the Defendants is

willful, as evidenced by their continuing to infringe "Let's Get It On" after the Notice, upon

information and belief, was provided to them.

69.     The Defendants knowingly and intentionally infringed Plaintiff's rights.  The

Defendants' collective knowledge and intent are established by, among other things, the fact that

Defendants to this day have neither sought, nor obtained, a license from the owners of the rights.

All conditions precedent to the maintenance and/or establishment of the instant action have been

satisfied and/or, otherwise, waived by the Defendants.


**FIRST CAUSE OF ACTION**

**(Willful Copyright Infringement – 17 U.S.C.  § 101, *et seq.*)**

70.     Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set

forth herein.  The Defendants' reproduction, distribution, and public performances of the

infringing work, "Thinking Out Loud" in the United States and internationally, continue to this

day, and Defendants have not deigned to compensate the copyright owners of the Work

(including SAS) for the use of the copyrighted work in "Let's Get It On". The Defendants'
reproduction, distribution, public performance, streaming, concerts, merchandizing,
synchronization, licensing and economic exploitation of "Thinking Out Loud", and authorizing
others to do the same, infringes Plaintiff's exclusive rights under the Copyright Act.

71.    The conduct of the Defendants is knowing and willful.

72.    As a direct and/or proximate result of the Defendants' wrongful conduct, the
Plaintiff has been irreparably harmed, suffered damage, and Defendants have profited in an
amount in the amount of hundreds of millions of dollars and to be determined at trial.

73.    One or more of the Defendants infringed on Plaintiff's exclusive copyright in
"Let's Get It On" when it distributed and sold sound recordings, including compact discs,
phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, and all other
economic exploitation and video recordings, embodying "Thinking Out Loud". Such
reproduction and release was wholly unauthorized, as it was without any license or consent of
authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, Defendants
have realized illegal revenues.

74.    The Defendants infringed Plaintiff SAS's exclusive copyright in "Let's Get It On"
when they issued and/or authorized others to issue licenses to third parties for the use,
publication, and exploitation of "Thinking Out Loud". Said licenses were issued without any
consent or authority from the copyright owners (including Plaintiff SAS) of "Let's Get It On,"
from which "Thinking Out Loud" was substantially copied. By virtue of this unauthorized
commercial exploitation, Defendants have realized illegal revenues.

75.    As a direct and/or proximate result of the Defendants' infringement on Plaintiff's
exclusive copyright in "Let's Get It On", Plaintiff has suffered damages. Said injuries are



New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806          www.pryorcashman.com

**Donald Zakarin**
**Partner**
Direct Tel: 212-326-0108
DZakarin@pryorcashman.com

September 10, 2019

**VIA ECF**
Hon. Louis L. Stanton
United States District Judge
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007

Re:    **Structured Asset Sales, LLC. v. Sheeran, et al., 18-cv-5839 (LLS)**

Dear Judge Stanton:

We write in response to the letter of plaintiff Structured Asset Sales, LLC ("SAS") seeking a Pre-Motion Conference.  SAS wishes to move to compel the production of documents reflecting all touring, merchandising and endorsement revenues and expenses of Defendants, over a more than five year period (collectively, "Collateral Revenue"), a massive amount of material.[1]  SAS admits it is irrelevant to direct profits but supposedly relates to potential "indirect profits." [2]

A.    **SAS Offers No Causal Basis For Discovery of Defendants' Touring, Merchandising and Endorsement Profits**

To be discoverable, matter must be "relevant to [a] party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Here, the discovery that SAS seeks does not remotely satisfy these standards.

Under the Copyright Act, a plaintiff may recover "profits of the infringer that are <u>attributable</u> to the infringement."  17 U.S.C. § 504(b) (emphasis added).  In a music copyright case, direct profits relate to revenues derived from the exploitation of the allegedly infringing song itself.  In response to plaintiffs who sought to massively multiply the value of their claims by seeking "indirect profits," the Courts have drawn a clear line distinguishing between profits directly and indirectly attributable to an alleged infringement.  *See, e.g.*, *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08-cv-7497 (KBF), 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013).  Plaintiffs are

---

[1] One of the least of the flaws of SAS's demand is that it also covers time periods barred by the Copyright Act's three year statute of limitations.

[2] SAS claims to owns a one-third interest in the late Ed Townsend's two-thirds writer share interest in LGO. SAS thus owns an 11% economic interest in LGO.

# PRYOR CASHMAN LLP

Hon. Louis L. Stanton
September 10, 2019
Page 2

required to plead and prove a causal nexus between the alleged infringement and the profits they seek, and indirect profits claims have been strictly limited.  *Id.* ("copyright owner [must] provide sufficient proof of a causal nexus between the infringement and the profit as to which the copyright owner is seeking disgorgement," and "[d]amages only remotely or speculatively attributable to the infringement should be precluded"); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001).

Here, SAS offers no causal nexus whatsoever between the portions of TOL that are allegedly infringing and the revenues related to Ed Sheeran's tour ticket sales, t-shirt and other merchandise sales and his endorsement deals (which are not linked to TOL).  SAS only offers conclusory allegations that such revenues have been generated and the further conclusion that such Collateral Revenue is indirectly attributable to the alleged infringement.  But not a single fact is alleged in SAS's Third Amended Complaint ("TAC") identifying any nexus, let alone a **causal nexus** between the alleged infringement and the Collateral Revenue.  Instead, in asking this Court to compel the production of a massive amount of material relating to Defendants' revenues and expenses associated with merchandise revenue, touring revenue, and endorsement revenue supposedly "linked" to TOL, SAS simply assumes such nexus.  The paragraphs of the TAC that SAS identifies confirm that these are mere conclusions, not facts, entitled to no weight at all.  *See, e.g.*, *V.E.C. Corp. of Delaware v. Hilliard*, 896 F. Supp. 2d 253, 258-59 (S.D.N.Y. 2012); *Rodriguez v. Diaz*, No. 05-cv-1831 (CM) (MHD), 2010 WL 1838814, at *5 (S.D.N.Y. May 5, 2010).

SAS's failure to plead any factual basis for the required nexus is unsurprising because there is none.  First, Sheeran's concert performances are not infringing because ASCAP and BMI licensed all venues for LGO and TOL (and SAS has already received full disclosure of public performance income, including from ASCAP and BMI).  SAS does not allege (and cannot allege) that concert goers buy tickets to hear TOL (more specifically, to hear the chord progression of TOL and other elements at issue) rather than to see Sheeran perform dozens of his songs live, nor has SAS offered (and cannot offer) any other facts showing that any tour revenue is even remotely linked to TOL's alleged infringement of LGO.  As to merchandising revenue, SAS has not even identified any merchandise that is connected to TOL (or LGO) – there is none – nor identified any facts that provide any nexus between the alleged infringement of LGO and TOL and the sale of merchandise.  As to endorsements, SAS has not even identified any such endorsements, much less alleged any facts that provide a nexus between the alleged infringement of LGO and any hypothetical endorsements of other unrelated products (if any exist).

SAS's letter nowhere mentions the leading case that has considered whether touring revenues are recoverable as indirect profits from claimed infringements because it squarely rejected such claim.  *See Gray v. Perry*, No. 15-cv-5642 (CAS) (JCx), 2017 WL 1240740, at *2-10 (C.D. Cal. Apr. 3, 2017) ("*Perry I*"); *Perry v. Gray*, No. 15-cv-5642 (CAS) (JCx), 2019 WL 2992007, at *21 (Jul. 5, 2019) ("*Perry II*").  Like SAS, the plaintiffs in *Perry* claimed that the defendants performed an infringing composition at concerts and sought discovery of the profits from those performances.  Because the venues were licensed to perform the infringed song by

▚ **PRYOR CASHMAN LLP**

Hon. Louis L. Stanton
September 10, 2019
Page 3

ASCAP, the Court held defendants "could not have infringed plaintiffs' performance rights in [the allegedly infringed composition]" and profits from defendants' performances were "not relevant." *Perry II*, 2019 WL 2992007, at \*21 (citing *Perry I*, 2017 WL 1240740, at \*9-10). Here too, the venues were indisputably licensed to perform LGO and SAS already has full financial disclosure of performance income from all venues.[3]

In contrast, the cases cited by SAS are inapposite. In *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 592 (W.D.N.Y. 1996), the indirect profits (revenues tied to an amusement park attraction based on an allegedly infringing film) "would not have existed" but for the film. Here, Sheeran successfully performed concert tours before TOL was even written. In *Graham v. Prince*, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017), plaintiffs alleged the infringing artwork had been used in marketing materials to promote "other [] works and exhibitions." Here, SAS has not alleged that Sheeran induced concert ticket purchases by promising to play TOL (he did not). In *Viktor v. Top Dawg Entm't LLC*, No. 18-cv-1554 (PAE), 2018 WL 5282886, at \*3 (S.D.N.Y. Oct. 24, 2018), the Court permitted the plaintiffs to engage in discovery to ascertain whether a causal nexus between indirect profits and the alleged infringement could be shown. Here, SAS presumes the nexus without providing any factual basis for its presumption. In *Frank Music Corp. v. Metro-Goldwyn-Mayer*, 772 F.2d 505, 517 (9th Cir. 1985), unlike here, the infringing stage show was expressly used to attract guests/gamblers to MGM Grand.

B.      **Discovery of Set-list Information Is Irrelevant and Would Be Unduly Burdensome**

Having cited a public database supposedly tracking set-lists, SAS nonetheless also seeks documents concerning the frequency with which Sheeran has performed TOL. But set-lists tell what songs **were performed**, not what songs are going **to be performed**. No concert goer knows what songs will be included on a set-list until after the concert is over (which is long after the ticket has been purchased). Unless and until SAS can establish a causal nexus between the allegedly infringing portions of the TOL composition and the decision of ticket buyers to buy tickets to hear those allegedly infringing elements – and it has offered none – the post hoc set-list information is irrelevant. Even were this information arguably relevant, it would be unduly burdensome to require Sheeran to search for set-lists of each of his concerts (especially when an independent public database already exists).

Respectfully submitted,

*[signature]*

Donald Zakarin

---

[3] In *Perry*, the Court provided the plaintiffs an opportunity to identify "what, other than the performances [of the infringing song], would give rise to concert revenues attributable to defendants' alleged infringement of [the infringed song]." *Perry II*, 2019 WL 2992007, at \*21. The plaintiffs made no attempt to satisfy this test, and SAS has not done so and cannot do so here.

# Hillel I. Parness

(Cell) 646-526-8261 • (Office) 212-447-5299 • (Fax) 212-202-6002
Parness Law Firm, PLLC • www.hiplaw.com • hip@hiplaw.com
136 Madison Avenue, 6th Floor • New York, New York  10016

September 11, 2019                                                    **Via ECF**

Hon. Louis L. Stanton
U.S. District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     _Structured Asset Sales, LLC v. Sheeran_, 1:18-cv-05839

Dear Judge Stanton:

I represent Plaintiff Structured Asset Sales, LLC's ("SAS") in the above-referenced
matter.  I write briefly in response to Mr. Zakarin's letter of September 10, 2019
(ECF 125) and in further support of SAS's request for a pre-motion discovery
conference (ECF 123).[1]

First, SAS alleges a "causal nexus" between the infringing "Thinking Out Loud"
and Indirect Profits, including revenues from concert tickets and merchandise.
_See, e.g._, Third Amended Complaint (ECF 102) ¶¶ 29 ("Mr. Sheeran experienced a
sharp and sudden rise as an international music star in less than eighteen (18)
months as a direct result of the commercial success of the release of 'Thinking Out
Loud', the lead single in the United States from Sheeran's debut album, 'X', of
which 'Thinking Out Loud' was the hit."), 62 ("In 2015, 'Thinking Out Loud' was a
top-three song as measured by performance income in the world. Revenue
derived and/or related to 'Thinking Out Loud,' including but not limited to
record sales, performance tour income, merchandising, synchronization and
licensing are in the hundreds of millions of dollars.")  It is a matter of public
record that Mr. Sheeran has just completed the most successful concert tour in
history, apparently so successful that he has decided to take an 18-month hiatus.
_See, e.g., Fox News_, "Ed Sheeran going on hiatus amid legal troubles, plagiarism
claims" (Aug. 29, 2019) (https://www.foxnews.com/entertainment/ed-sheeran-
plagiarism-lawsuit-hiatus) (reprinted from _New York Post_).

Second, the cases SAS cited in its September 6, 2019 all stand for the proposition
that SAS is entitled to discovery on issues relating to Indirect Profits.  Defendants

---

[1] Your Honor's Rule 2.A. and Local Rule 37.2 do not appear to address submission of
reply letters in connection with requests for pre-motion conferences.  To the extent
necessary, we respectfully request permission to submit this letter.

Hon. Louis L. Stanton
September 11, 2019

acknowledge this point and then unsuccessfully try to distinguish those cases on their facts. They point out, for example, that in *Burns v. Imagine Film Entm't, Inc.*, 164 F.R.D. 589, 592 (W.D.N.Y. 1996), the "Backdraft" amusement park attraction would not have existed but for the "Backdraft" screenplay, but fail to note that even though the attraction "contains no infringing materials," the court granted discovery to determine whether "some profits of the Backdraft Attraction may be indirectly attributable to any infringement of the Plaintiffs' screenplays." They likewise try to distinguish *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (1985), arguing that "the infringing stage show was expressly used to attract guest/gamblers," but fail to realize that in that case the plaintiff alleged that it was specific songs, comprising 6 of 100 minutes in total of the stage show that infringed. SAS similarly alleges that Defendants entice people to buy tickets to Mr. Sheeran's concerts, at which "Thinking Out Loud" is but one of the songs performed. SAS is entitled to discovery regarding Indirect Revenues.

Third, assuming that the Court agrees that SAS is entitled to engage in discovery regarding Indirect Profits, the frequency with which Mr. Sheeran performs "Thinking Out Loud" is highly relevant, as it is a reflection of the importance of that song among Sheeran's works. Defendants' argument that people do not know what an artist is going to play is simply wrong (and offered without support). There is no question that Sheeran's fan's know and expect him to play his hit songs, and would be sorely disappointed if he did not do so, especially if – as indicated by the website we referenced – he has done so 456 times previously. Defendants' statement that assembling the setlists from Mr. Sheeran's concerts would be burdensome is also made without any support or even explanation. Their reference to the website as an "independent public database" is amusing, as Defendants surely are not conceding to its accuracy or admissibility.

Finally, the *Gray v. Perry* decisions were rendered by the District Court for the Southern District of California, and thus they are at best instructive to, and not binding upon, this Court. In addition, the judge in *Gray* granted a motion to compel discovery regarding Indirect Profits. She then temporarily stayed imposition of that order, while inviting the plaintiffs to make the argument that "[s]ome portion of Tour revenues may be attributable to infringements that allegedly preceded the performances themselves." In her later decision, she observed that plaintiffs had "misunderst[ood] this order," thus missing the opportunity to present the evidence they wished to present.

No such problem exists here. SAS has alleged that the massive popularity of the infringing "Thinking Out Loud" drove a wide range of other revenues, including but in no way limited to sales of concert tickets and concert merchandise. This meshes squarely with the conclusion that infringements can drive revenues generated down the road, from concerts, merchandise, sponsorships and the like,

Hon. Louis L. Stanton
September 11, 2019

and a plaintiff is entitled to discovery to determine whether, and the extent to which it has occurred.

We respectfully request that the Court grant SAS's discovery motion.

Respectfully submitted,

Hillel I. Parness

cc:    Counsel of Record (via ECF)

**A113**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | |
| *Plaintiff*, | |
| -against- | |
| EDWARD CHRISTOPHER SHEERAN p/k/a ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION d/b/a ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10 | **18-CV-5839 (LLS)** <br><br> <u>**NOTICE OF MOTION**</u> |
| *Defendants*. | |

**PLEASE TAKE NOTICE**, that upon the annexed Memorandum of Law, the Certification of Hillel I. Parness, and the Exhibits submitted therewith, and upon the Third Amended Complaint and all prior papers and proceedings herein, Plaintiff Structured Assets Sales, LLC ("SAS" or "Plaintiff") will move this Court, before the Honorable Louis L. Stanton, United States District Judge, at the United States District Court for the Southern District of New York, located at 500 Pearl Street, Courtroom 21C, New York, New York 10007, on a date to be determined by the Court, for an Order pursuant to Rules 26(b), 34 and 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure, granting Plaintiff's motion to compel Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation and The Royalty Network, Inc. (collectively, "Defendants") to produce certain documents relating to Defendants' "indirect profits" to Plaintiff.

**PLEASE TAKE NOTICE**, that Defendants' opposition papers, if any, shall be served

and filed by November 12, 2019, and Plaintiff's reply, if any, shall be served and filed by

November 19, 2019.

Dated: New York, New York
       October 23, 2019

               Respectfully submitted,


               /s/ Hillel I. Parness
               Hillel I. Parness
               PARNESS LAW FIRM, PLLC
               136 Madison Ave., 6th Floor
               New York, New York  10016
               212-447-5299
               hip@hiplaw.com
               *Attorneys for Plaintiff Structured Asset Sales, LLC*

To:    Donald S. Zakarin
       PRYOR CASHMAN, LLP
       7 Times Square
       New York, New York 10036
       (212) 326-0108
       dzakarin@pryorcashman.com
       *Attorneys for Defendants Edward*
       *Christopher Sheeran, Sony/ATV*
       *Music Publishing LLC, Atlantic*
       *Recording Corporation and The*
       *Royalty Network, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STRUCTURED ASSET SALES, LLC,

*Plaintiff*,

-against-

EDWARD CHRISTOPHER SHEERAN p/k/a ED
SHEERAN, SONY/ATV MUSIC PUBLISHING,
LLC, ATLANTIC RECORDING CORPORATION
d/b/a ATLANTIC RECORDS, BDI MUSIC LTD.,
BUCKS MUSIC GROUP LTD., THE ROYALTY
NETWORK, DAVID PLATZ MUSIC (USA) INC.,
AMY WADGE, JAKE GOSLING and DOES 1
THROUGH 10

*Defendants*.

---

18-CV-5839 (LLS)

**CERTIFICATION OF
<u>HILLEL I. PARNESS</u>**

---

Hillel I. Parness, being of full age, hereby certifies and states:

1.    I am counsel for the Plaintiff, Structured Asset Sales, LLC ("SAS" or "Plaintiff")

in the above-referenced action.

2.    As detailed in SAS's pre-motion letters (ECF 123 & 125), and discussed at the

October 4, 2019 pre-motion conference, counsel for SAS has in good faith conferred with

counsel for the Defendants in an effort to obtain certain documents that SAS requested from

Defendants without court action, in accordance with Fed. R. Civ. P. 37(a)(1).

3.    Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of Plaintiff's Third

Amended Complaint (ECF 102), dated April 30, 2019.

4.    Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the Responses and

Objections of Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC,

Atlantic Recording Corporation and The Royalty Network, Inc. to Plaintiff's Revised First

Requests for Production, dated July 1, 2019.

5.      Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of the Responses and

Objections of Defendants BDI Music Ltd., Bucks Music Group Ltd. and Amy Wadge to

Plaintiff's First Requests for Production, dated August 30, 2019.

6.      Attached hereto as **<u>Exhibit D</u>** are true and correct copy of pages retrieved from

the www.setlist.com website by the undersigned on October 19, 2019, showing information

regarding 456 live performances of "Thinking Out Loud" by Edward Sheeran between May 24,

2014 and August 26, 2019 (https://www.setlist.fm/stats/songs/ed-sheeran-

53d5f3bd.html?song=Thinking+Out+Loud)

7.      Attached hereto as **<u>Exhibit E</u>** are true and correct copy of pages retrieved from

the www.setlist.com website by the undersigned on October 23, 2019, showing information

regarding Sheeran's most-performed songs (https://www.setlist.fm/stats/ed-sheeran-

53d5f3bd.html).

8.      Attached hereto as **<u>Exhibit F</u>** is a true and correct copy of *Forbes*, "Ed Sheeran's

Record-Breaking Divide Tour Totals $775.6 Million, Beating U2, Guns N' Roses" (Aug. 27,

2019) (https://www.forbes.com/sites/markbeech/2019/08/27/ed-sheerans-record-breaking-

divide-tour-totals-7756-million-beating-u2-guns-n-roses/#20764b036c2d)

9.      Attached hereto as **<u>Exhibit G</u>** is a true and correct copy of *Fox News*, "Ed

Sheeran going on hiatus amid legal troubles, plagiarism claims" (Aug. 29, 2019)

(https://www.foxnews.com/entertainment/ed-sheeran-plagiarism-lawsuit-hiatus) (reprinted from

*New York Post*).

10.      Attached hereto as **<u>Exhibit H</u>** are true and correct copy of the Wikipedia pages

concerning Defendant Sheeran's three tours, found at

https://en.wikipedia.org/wiki/%2B_(Ed_Sheeran_album)#Tour_dates;

https://en.wikipedia.org/wiki/X_Tour_(Ed_Sheeran); and

https://en.wikipedia.org/wiki/%C3%B7_Tour.

11.     Attached hereto as **Exhibit I** is a true and correct copy of *Official Charts*, Ed

Sheeran's Thinking Out Loud becomes first single ever to spend one year inside the Top 40

(June 22, 2015), found at https://www.officialcharts.com/chart-news/ed-sheeran-s-thinking-out-

loud-becomes-first-single-ever-to-spend-one-year-inside-the-top-40__9885/.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on October 23, 2019 in New York, New York.

Hillel I. Parness

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Index No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **RESPONSES AND OBJECTIONS OF DEFENDANTS EDWARD CHRISTOPHER SHEERAN, SONY/ATV MUSIC PUBLISHING LLC, ATLANTIC RECORDING CORPORATION AND THE ROYALTY NETWORK, INC. TO PLAINTIFFS' REVISED FIRST REQUESTS FOR PRODUCTION** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., and DOES 1 THROUGH 10, | |
| Defendants. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rules 26.2 through 26.4 of the Local Civil Rules of the United States District Court for the Southern District of New York ("Local Civil Rules"), defendants Edward Christopher Sheeran ("Sheeran"), Sony/ATV Music Publishing LLC ("SATV"), Atlantic Recording Corporation ("Atlantic") and The Royalty Network, Inc. ("TRNI," together with Sheeran, SATV, and Atlantic, the "Defendants") hereby respond and object to the Revised First Requests for Production (the "Requests") of plaintiff Structured Asset Sales, LLC ("SAS" or "Plaintiff")[1] as follows:

## GENERAL OBJECTIONS

1.      Defendants object to the Requests, including the definitions and instructions set forth therein, to the extent they attempt to impose upon Defendant obligations that are greater than those imposed by the Federal Rules of Civil Procedure, the Local Civil Rules, and applicable law.

2.      Defendants object to the Requests to the extent they call for the disclosure of information or the production of documents protected by the attorney-client privilege, the work

---

[1] Undefined capitalized terms have the meanings given to them in the Requests.

1

product doctrine, or any other applicable privilege, immunity, statute, regulation or rule.  The inadvertent disclosure of any such information shall not be deemed to be a waiver of any such privilege or immunity.

3.     Defendants object to the Requests to the extent they seek documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case.

4.     To the extent the Requests seek the disclosure of information or the production of documents containing trade secrets or other confidential, business or proprietary information, Defendants will provide such information or produce documents containing such information only in accordance with an appropriate confidentiality order.

5.     Defendants object to the Requests to the extent they are vague, ambiguous or unintelligible.

6.     Defendants object to the Requests to the extent they are overbroad, oppressive, harassing, unduly burdensome, palpably improper and to the extent there exist more practical methods of obtaining the information Plaintiffs seek.

7.     Defendants object to the Requests to the extent they request the disclosure of documents not within their possession, custody or control.  Defendants will make a reasonably diligent inquiry concerning the subject matter of non-objectionable Requests.

8.     Defendants object to the Requests to the extent they call for the disclosure of information for an undefined period of time.

9.     Defendants object to the Requests to the extent they seek information or documents that are publicly available, equally available to Plaintiff and/or already in the possession of Plaintiff.

10.     Defendants object to the Requests to the extent they are duplicative and cumulative.

11.     Defendants object to the Requests to the extent they are not properly addressed to Defendants.

12.     Defendants object to the Requests to the extent they contain erroneous or inaccurate assumptions or purported statements of fact.

13.     Defendants object to the Requests to the extent they seek information and/or documents concerning the exploitation of *Thinking Out Loud* ("TOL") outside the United States or otherwise seek information and/or documents which are beyond the permissible, relevant scope of discoverable information consistent with the U.S. Copyright Act.

14.     Defendants object to the Requests to the extent they seek documents in which Defendants and/or third parties have a legitimate expectation and/or right of privacy pursuant to federal and state constitutions, statutes or case law.

15.     In responding to the Requests and producing documents and information in response to non-objectionable Requests, Defendants neither waive nor intend to waive, but expressly reserve, any and all objections to the relevance, competence, susceptibility to discovery, materiality or admissibility of any information provided.

16.     To the extent the Requests seek ESI, and to the extent responsive, non-objectionable ESI exists, such ESI shall be produced as load files compatible with Relativity or in another reasonably usable format.

17.     Defendants make these responses based upon their knowledge as of the date of these responses.  Defendants will supplement these responses only to the extent required by applicable law, regulation, rule, or court order.  Defendants hereby reserve the right to introduce into evidence at trial, hearing or other proceedings in this action information discovered subsequent to the date of these responses.

18.     By agreeing to comply with a particular Request, Defendants represent only that they will conduct a reasonably diligent search as indicated above and, subject to all objections and an appropriate confidentiality order, will produce non-objectionable, non-privileged documents responsive to the Requests.

19.     Each of the foregoing General Objections is incorporated by reference into each specific response below, even if not expressly stated therein.

## SPECIFIC RESPONSES & OBJECTIONS

**DOCUMENT REQUEST NO. 1:**

All documents produced by any of the parties, any non-parties and any experts in connection with *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 1:**

Defendants object to this Request because it seeks documents that already have been provided to Plaintiff and because it prematurely seeks expert materials to which Plaintiff has no entitlement at this time in an effort to obtain an improper benefit by reversing the order in which expert discovery is to be conducted by virtue of the exchange of expert opinions in the *Griffin* case while Plaintiff here has not provided any such expert opinion.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants respond that they will produce to Plaintiff all fact documents and fact discovery materials that have been exchanged in *Griffin* to the extent Plaintiff has not already been provided with these materials.  Defendants further refer Plaintiff to the public docket in *Griffin*, which includes the expert musicologist reports of the parties in that case.

**DOCUMENT REQUEST NO. 2:**

Copies of all transcripts of depositions conducted in *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 2:**

Subject to, and without waiver of, the foregoing General Objections, Defendants respond that they will produce to Plaintiff all fact documents and fact discovery materials that have been exchanged in *Griffin* to the extent Plaintiff has not already been provided with these materials.

**DOCUMENT REQUEST NO. 3:**

Copies of all expert reports produced in *Griffin*.

**RESPONSE TO DOCUMENT REQUEST NO. 3:**

Defendants object to this Request because it prematurely seeks expert materials to which Plaintiff has no entitlement.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the public docket in *Griffin*, which includes the expert musicologist reports of the parties in that case.

**DOCUMENT REQUEST NO. 4:**

All documents concerning the creation of "Thinking Out Loud," including any written or recorded preliminary or draft versions of that work.

**RESPONSE TO DOCUMENT REQUEST NO. 4:**

Defendants object to this Request to the extent it is vague and ambiguous.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff.

**DOCUMENT REQUEST NO. 5:**

All documents concerning "Let's Get it On," including any partial or complete sheet music, audio recordings or audiovisual recordings, from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 5:**

Plaintiffs object to this Request as vague, ambiguous, overbroad, burdensome, to the extent it is not properly addressed to Defendants and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to third parties that own or may own the recorded versions of "Let's Get It On."

**DOCUMENT REQUEST NO. 6:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Thinking Out Loud."

   **RESPONSE TO DOCUMENT REQUEST NO. 6:**

   Defendants object to this Request as vague, ambiguous, overbroad and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case. Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff. Further, Defendants submit that to the extent that artists other than Sheeran have recorded versions of "Thinking Out Loud," such versions should be sought from such non-parties.

**DOCUMENT REQUEST NO. 7:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Let's Get it On," from any time periods.

   **RESPONSE TO DOCUMENT REQUEST NO. 7:**

   See Response No. 5.

**DOCUMENT REQUEST NO. 8:**

All documents concerning comparisons, similarities or differences between all or part of any composition, audio recording or audiovisual recording of "Thinking Out Loud" and all or part of any composition, audio recording or audiovisual recording of "Let's Get it On."

   **RESPONSE TO DOCUMENT REQUEST NO. 8:**

   Defendants object to this Request to the extent it is vague and ambiguous and to the extent it seeks documents or information immune from disclosure on the basis of privilege. Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and repeat their responses with respect to any expert reports provided in the *Griffin*

case set forth above.

**DOCUMENT REQUEST NO. 9:**

Complete, itemized documents reflecting revenues received or earned in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works (*e.g.*, revenues from the sale of albums that include "Thinking Out Loud" among other works).

> **RESPONSE TO DOCUMENT REQUEST NO. 9:**
>
> Defendants object to this Request as vague and ambiguous and to the extent it seeks documents concerning exploitation of TOL in territories outside the United States. Subject to, and without waiver of, the foregoing General and Specific Objections, Sheeran, SATV and Atlantic refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to documents and information already provided to Plaintiff from non-parties Broadcast Music Inc., ASCAP, SoundExchange and The Harry Fox Agency; TRNI responds that it will produce non-privileged documents in its possession, custody or control that are revealed by a reasonable and diligent search, which are sufficient to identify its revenues/income, if any, derived from domestic exploitation of TOL and its expenses, if any, related thereto.

**DOCUMENT REQUEST NO. 10:**

Complete, itemized documents reflecting expenses incurred or paid in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

> **RESPONSE TO DOCUMENT REQUEST NO. 10:**
>
> See Response No. 9.

**DOCUMENT REQUEST NO. 11:**

Complete, itemized documents reflecting music publishing revenues received or earned in connection with "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 11:**

See Response No. 9.

**DOCUMENT REQUEST NO. 12:**

Complete, itemized documents reflecting music publishing expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 12:**

See Response No. 9.

**DOCUMENT REQUEST NO. 13:**

Complete, itemized documents reflecting revenues received or earned in connection with public performances of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 13:**

See Response No. 9.

**DOCUMENT REQUEST NO. 14:**

Complete, itemized documents reflecting expenses incurred or paid in connection with public performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 14:**

See Response No. 9.

**DOCUMENT REQUEST NO. 15:**

Complete, itemized documents reflecting revenues received or earned in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud" or where "Thinking Out Loud" was performed, including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 15:**

Defendants object to this Request as vague, ambiguous, overbroad and because it seeks

information that is not relevant to any party's claim or defense, not proportional to the needs of

this case, and has no causal nexus to the claim of infringement or any revenue or income allegedly attributable to any alleged infringement.  Defendant will not produce any documents responsive to this Request consistent with the above-stated objections.

**DOCUMENT REQUEST NO. 16:**

Complete, itemized documents reflecting expenses incurred or paid in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud," or where "Thinking Out Loud" was performed, including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 16:**

See Response No. 15.

**DOCUMENT REQUEST NO. 17:**

Complete, itemized documents reflecting revenues received or earned in connection with touring concerning and/or live performances of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 17:**

See Response Nos. 9 and 15.

**DOCUMENT REQUEST NO. 18:**

Complete, itemized documents reflecting expenses incurred or paid in connection with touring concerning and/or live performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO.18:**

See Response Nos. 9 and 15.

**DOCUMENT REQUEST NO. 19:**

Complete, itemized documents reflecting revenues received or earned in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 19:**

See Response No. 15.

**DOCUMENT REQUEST NO. 20:**

Complete, itemized documents reflecting expenses incurred or paid in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 20:**

See Response No. 15.

**DOCUMENT REQUEST NO. 21:**

To the extent not provided in response to another Request, complete, itemized documents reflecting revenues received or earned in connection with "Thinking Out Loud," including revenues received or earned in connection with multiple musical works, in connection with any of the following: sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, video recordings, synchronization licensing, advertising revenue, appearance fees, social media income, sheet music sales and sheet folio income; any and all music publisher income; any and all record master income; any and all producer royalty income; any and all arrangement income; and any equity interests in Spotify or any other music streaming or download services.

**RESPONSE TO DOCUMENT REQUEST NO. 21:**

Defendants object to this Request as being non-specific, overbroad and in summary and

improper form seeking all documents not otherwise provided in response to other Requests.

Subject to such objection and the general objections,  see Response No. 9.

**DOCUMENT REQUEST NO. 22:**

To the extent not provided in response to another Request, complete, itemized documents reflecting expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 22:**

Defendants object to this Request as being non-specific, overbroad and in summary and

improper form seeking all documents not otherwise provided in response to other Requests.

Subject to such objection and the general and specific objections,  see Response No. 9.

**DOCUMENT REQUEST NO. 23:**

To the extent not provided in response to another Request, all documents concerning the publication, sub-publication, distribution or administration of "Thinking Out Loud" by and/or for any person or entity, including but not limited to Bucks Music Group, Amy Wadge, and/or any writer or publisher, sub-publisher, distributor or administrator.

**RESPONSE TO DOCUMENT REQUEST NO. 23:**

Defendants object to this Request as vague, ambiguous, and overbroad.  Defendants further object to this Request to the extent it seeks documents concerning persons or entities other than the defendants identified in this Request and which persons and entities have not yet responded to the Third Amended Complaint in this action and other unidentified entities or persons.  Plaintiff is free to seek discovery from such persons and entities directly and such persons and entities will have their own right to respond and object.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to information Plaintiff has already obtained pursuant to premature subpoenas issued to BMI, ASCAP, SoundExchange and The Harry Fox Agency.

**DOCUMENT REQUEST NO. 24:**

To the extent not provided in response to another Request, all documents created or provided by the following entities regarding "Thinking Out Loud":

a.   SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, SAG-AFTRA, and any and all collection society, mechanical society and performance society;

b.   Sony/ATV, Atlantic, Warner Music Group Corporation, and any music publisher, music administrator, record company or record label, including any such company based in the United Kingdom;

11

c.      Any entity owned, operated by or affiliated with Sheeran;

d.      Any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act; and/or

e.      Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, YouTube, and/or any and all download and/or streaming services.

**RESPONSE TO DOCUMENT REQUEST NO. 24:**

Defendants object to this Request as wildly overbroad and insufficiently specific. Defendants further object to this Request to the extent it seeks information that is not relevant to any party's claim or defense, not proportional to the needs of this case, and has no causal nexus to the claim of infringement and any revenue or income allegedly attributable to any alleged infringement. Defendants further object to this Request to the extent it should be addressed to the non-parties identified in the Request, beyond those from whom Plaintiff has already prematurely, in violation of the Federal Rules, obtained information by subpoena, to the extent it relates to the claimed infringement of a United States copyright for exploitation in the United States and not to any foreign copyrights and exploitation thereof in countries and territories other than the United States. Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to their Response to Request No. 9 and otherwise refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and the discovery provided to Plaintiff by BMI, ASCAP, SoundExchange and The Harry Fox Agency.

**DOCUMENT REQUEST NO. 25:**

All documents concerning or comprising Sheeran's performance, in whole or in part, of "Let's Get it On," including audio recordings or audiovisual recordings, from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 25:**

Defendants object to this Request as incomprehensible.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff.

**DOCUMENT REQUEST NO. 26:**

All documents from any source concerning or comprising one or more general ledgers reflecting financial transactions involving Sheeran or any company owned, controlled or managed by Sheeran.

**RESPONSE TO DOCUMENT REQUEST NO. 26:**

Defendants object to this Request as wildly overbroad and because it seeks information that is not relevant to any party's claim or defense, not proportional to the needs of this case, and has no causal nexus to the claim of infringement and any revenue or income allegedly attributable to any alleged infringement.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to their Response to Request No. 9.

**DOCUMENT REQUEST NO. 27:**

Documents sufficient to identify Sheeran's past, current and/or future live musical performance and/or touring schedule, and including dates, times and locations of all such live performances.

**RESPONSE TO DOCUMENT REQUEST NO. 27:**

See Response No. 15.  Defendants further object to this Request as unduly burdensome.

**DOCUMENT REQUEST NO. 28:**

For each and every one of Sheeran's past, current and/or future live musical performance and/or tours, documents sufficient to identify all musical compositions performed, in whole or in part, by Sheeran at each such performance.

**RESPONSE TO DOCUMENT REQUEST NO. 28:**

See Response No. 27.

**DOCUMENT REQUEST NO. 29:**

Documents sufficient to identify all people, credited or otherwise, who performed any work or services of any kind in connection with "Thinking Out Loud," including but not limited to any producers, musicians, engineers, recording studio personnel, sound mixers, music arrangers, writers, singers, and/or music coaches.

**RESPONSE TO DOCUMENT REQUEST NO. 29:**

Defendants object to this Request as vague and ambiguous.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the liner notes of Sheeran's LP titled *x*.

Dated: New York, New York
        July 1, 2019

PRYOR CASHMAN LLP

By:*/s/ Donald S. Zakarin*
        Donald S. Zakarin
        dzakarin@pryorcashman.com
        Ilene S. Farkas
        ifarkas@pryorcashman.com
        Andrew M. Goldsmith
        agoldsmith@pryorcashman.com
7 Times Square
New York, New York 10036-6569
Telephone:  (212) 421-4100

*Attorneys for Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation and The Royalty Network, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STRUCTURED ASSET SALES, LLC,

                Plaintiff,

      v.

EDWARD CHRISTOPHER SHEERAN,
*p/k/a* ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC
RECORDING CORPORATION *d/b/a*
ATLANTIC RECORDS, BDI MUSIC LTD.,
BUCK MUSIC GROUP LTD., THE
ROYALTY NETWORK, INC., and DOES 1
THROUGH 10,

                Defendants.

Index No. 1:18-cv-5839 (LLS)

**RESPONSES AND OBJECTIONS
OF DEFENDANTS BDi MUSIC LTD.,
BUCKS MUSIC GROUP LTD. AND
AMY WADGE TO PLAINTIFF'S FIRST
REQUESTS FOR PRODUCTION
DATED JULY 31, 2019**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rules 26.2

through 26.4 of the Local Civil Rules of the United States District Court for the Southern District

of New York ("Local Civil Rules"), defendants BDi Music Ltd. ("BDi"), Bucks Music Group

Ltd. ("Bucks," together with BDi, the "Bucks Defendants") and Amy Wadge ("Wadge," together

with BDi and Bucks, "Defendants"), respond and object to the First Requests for Production (the

"Requests") of plaintiff Structured Asset Sales, LLC ("SAS" or "Plaintiff") dated July 31, 2019[1]

as follows:

<u>**GENERAL OBJECTIONS**</u>

1.      Defendants object to the Requests, including the definitions and instructions set

forth therein, to the extent they attempt to impose upon Defendants obligations that are greater

than those imposed by the Federal Rules of Civil Procedure, the Local Civil Rules, and

---

[1] Undefined capitalized terms have the meanings given to them in the Third Amended Complaint.
Although the Requests purport to be addressed to defendant Jake Gosling ("Gosling"), he had not
appeared in this action at the time the Requests were served.  As such, the Requests are null and void to
the extent they purport to be addressed to him.

1

applicable law.

2.      Defendants object to the Requests to the extent they call for the disclosure of information or the production of documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, statute, regulation or rule.  The inadvertent disclosure of any such information shall not be deemed to be a waiver of any such privilege or immunity.

3.      Defendants object to the Requests to the extent they seek documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case.

4.      To the extent the Requests seek the disclosure of information or the production of documents containing trade secrets or other confidential, business or proprietary information, Defendants will provide such information or produce documents containing such information only in accordance with an appropriate confidentiality order.

5.      Defendants object to the Requests to the extent they are vague, ambiguous or unintelligible.

6.      Defendants object to the Requests to the extent they are overbroad, oppressive, harassing, unduly burdensome, palpably improper and to the extent there exist more practical methods of obtaining the information Plaintiffs seek.

7.      Defendants object to the Requests to the extent they request the disclosure of documents not within their possession, custody or control.  Defendants will make a reasonably diligent inquiry concerning the subject matter of non-objectionable Requests.

8.      Defendants object to the Requests to the extent they call for the disclosure of information for an undefined period of time.

2

9.      Defendants object to the Requests to the extent they seek information or documents that are publicly available, equally available to Plaintiff and/or already in the possession of Plaintiff.

10.     Defendants object to the Requests to the extent they are duplicative and cumulative.

11.     Defendants object to the Requests to the extent they are not properly addressed to Defendants.

12.     Defendants object to the Requests to the extent they contain erroneous or inaccurate assumptions or purported statements of fact.

13.     Defendants object to the Requests to the extent they seek information and/or documents concerning the exploitation of *Thinking Out Loud* ("TOL") outside the United States or otherwise seek information and/or documents which are beyond the permissible, relevant scope of discoverable information consistent with the U.S. Copyright Act.

14.     Defendants object to the Requests to the extent they seek documents in which Defendants and/or third parties have a legitimate expectation and/or right of privacy pursuant to federal and state constitutions, statutes or case law.

15.     Defendants object to the definition of "Revenue" – to the extent it is defined to mean "any economic benefit of any kind" – as vague and ambiguous and as inconsistent with the plain meaning of the term "Revenue."

16.     In responding to the Requests and producing documents and information in response to non-objectionable Requests, Defendants neither waive nor intend to waive, but expressly reserve, any and all objections to the relevance, competence, susceptibility to discovery, materiality or admissibility of any information provided.

17.     To the extent the Requests seek ESI, and to the extent responsive, non-objectionable ESI exists, such ESI shall be produced as load files compatible with Relativity or in another reasonably usable format.

18.     Defendants make these responses based upon their knowledge as of the date of these responses.  Defendants will supplement these responses only to the extent required by applicable law, regulation, rule, or court order.  Defendants hereby reserve the right to introduce into evidence at trial, hearing or other proceedings in this action information discovered subsequent to the date of these responses.

19.     By agreeing to comply with a particular Request, Defendants represent only that they will conduct a reasonably diligent search as indicated above and, subject to all objections and an appropriate confidentiality order, will produce non-objectionable, non-privileged documents responsive to the Requests.

20.     Each of the foregoing General Objections is incorporated by reference into each specific response below, even if not expressly stated therein.

### SPECIFIC RESPONSES & OBJECTIONS

### DOCUMENT REQUEST NO. 1:

All documents concerning the creation of "Thinking Out Loud," including any written or recorded preliminary or draft versions of that work.

### RESPONSE TO DOCUMENT REQUEST NO. 1:

Defendants object to this Request to the extent it is vague and ambiguous.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to documents and information already provided to Plaintiff from non-parties Broadcast Music Inc., ASCAP, SoundExchange and The Harry Fox Agency; Defendants further respond that, to

4

the extent not already produced in *Griffin* or by non-parties in this action, they will produce non-privileged documents in their possession, custody or control that are revealed by a reasonable and diligent search concerning the creation of TOL.

**DOCUMENT REQUEST NO. 2:**

All documents concerning "Let's Get it On," including any partial or complete sheet music, audio recordings or audiovisual recordings, from any time periods.

RESPONSE TO DOCUMENT REQUEST NO. 2:

Plaintiffs object to this Request as vague, ambiguous, overbroad, burdensome, to the extent it is not properly addressed to Defendants and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case. Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to third parties that own or may own the recorded versions of "Let's Get It On."

**DOCUMENT REQUEST NO. 3:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Thinking Out Loud."

RESPONSE TO DOCUMENT REQUEST NO. 3:

Defendants object to this Request as vague, ambiguous, overbroad and because it seeks documents or other materials that are not relevant to any party's claim or defense and not proportional to the needs of this case. Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff; Wadge further responds that, to the extent she has recorded and released a different version of TOL – which Plaintiff has not alleged

infringes LGO – it is publicly available for purchase.

**DOCUMENT REQUEST NO. 4:**

All non-identical partial or complete audio recordings or audiovisual recordings of "Let's Get it On," from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 4:**

See Response No. 2.

**DOCUMENT REQUEST NO. 5:**

All documents concerning comparisons, similarities or differences between all or part of any composition, audio recording or audiovisual recording of "Thinking Out Loud" and all or part of any composition, audio recording or audiovisual recording of "Let's Get it On."

**RESPONSE TO DOCUMENT REQUEST NO. 5:**

Defendants object to this Request as premature, to the extent it is vague and ambiguous and to the extent it seeks documents or information immune from disclosure on the basis of privilege.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and further respond that they will make all required expert disclosures in accordance with the Federal Rules of Civil Procedure and in accordance with the Schedule established in this matter.

**DOCUMENT REQUEST NO. 6:**

Complete, itemized documents reflecting Revenues or anything of value received or earned in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including Revenues received or earned in connection with multiple musical works (*e.g*., Revenues from the sale of albums that include "Thinking Out Loud" among other works).

**RESPONSE TO DOCUMENT REQUEST NO. 6:**

Defendants object to this Request as vague and ambiguous and to the extent it seeks documents concerning exploitation of TOL in territories outside the United States, which  is not

a proper subject of discovery in this case for alleged infringement of the United States copyright in "Let's Get It On."  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants respond that they will produce non-privileged documents in their possession, custody or control that are revealed by a reasonable and diligent search, which are sufficient to identify their revenues/income, if any, derived from United States exploitation of TOL and their expenses, if any, related thereto.

**DOCUMENT REQUEST NO. 7:**

Complete, itemized documents reflecting expenses incurred or paid in connection with audio recordings or audiovisual recordings of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

   **RESPONSE TO DOCUMENT REQUEST NO. 7:**

   See Response No. 6.

**DOCUMENT REQUEST NO. 8:**

Complete, itemized documents reflecting music publishing Revenues received or anything of value received or earned in connection with "Thinking Out Loud," including Revenues received or earned in connection with multiple musical works.

   **RESPONSE TO DOCUMENT REQUEST NO. 8:**

   See Response No. 6.

**DOCUMENT REQUEST NO. 9:**

Complete, itemized documents reflecting music publishing expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

   **RESPONSE TO DOCUMENT REQUEST NO. 9:**

   See Response No. 6.

**DOCUMENT REQUEST NO. 10:**

Complete, itemized documents reflecting Revenues or anything of value received or earned in connection with public performances of "Thinking Out Loud," including revenues received or

earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 10:**

See Response No. 6.

**DOCUMENT REQUEST NO. 11:**

Complete, itemized documents reflecting expenses incurred or paid in connection with public performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 11:**

See Response No. 6.

**DOCUMENT REQUEST NO. 12:**

Complete, itemized documents reflecting Revenues or anything of value received or earned in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud" or where "Thinking Out Loud" was performed, including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 12:**

Defendants object to this Request as vague, ambiguous, overbroad and because it seeks

information that is not relevant to any party's claim or defense, not proportional to the needs of

this case, and has no causal nexus to the claim of infringement or any revenue or income

allegedly attributable to any alleged infringement.  Defendants further respond that they do not

have documents in their possession, custody or control that are responsive to this Request.

**DOCUMENT REQUEST NO. 13:**

Complete, itemized documents reflecting expenses incurred or paid in connection with merchandise, including retail merchandise and merchandise sold on tour, concerning "Thinking Out Loud," or where "Thinking Out Loud" was performed, including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 13:**

See Response No. 12.

**DOCUMENT REQUEST NO. 14:**

Complete, itemized documents reflecting Revenues or anything of value received or earned in connection with touring concerning and/or live performances of "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 14:**

See Response Nos. 12.

**DOCUMENT REQUEST NO. 15:**

Complete, itemized documents reflecting expenses incurred or paid in connection with touring concerning and/or live performances of "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO.15:**

See Response Nos. 12.

**DOCUMENT REQUEST NO. 16:**

Complete, itemized documents reflecting Revenues or anything of value received or earned in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including revenues received or earned in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 16:**

See Response No. 12.

**DOCUMENT REQUEST NO. 17:**

Complete, itemized documents reflecting expenses incurred or paid in connection with endorsements, sponsorships, and/or name and likeness arrangements or agreements concerning "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

**RESPONSE TO DOCUMENT REQUEST NO. 17:**

See Response No. 12.

**DOCUMENT REQUEST NO. 18:**

To the extent not provided in response to another Request, complete, itemized documents reflecting Revenues or anything of value received or earned in connection with "Thinking Out

Loud," including revenues received or earned in connection with multiple musical works, in connection with any of the following: sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, video recordings, synchronization licensing, advertising revenue, appearance fees, social media income, sheet music sales and sheet folio income; any and all music publisher income; any and all record master income; any and all producer royalty income; any and all arrangement income; and any equity interests in Spotify or any other music streaming or download services.

### RESPONSE TO DOCUMENT REQUEST NO. 18:

Defendants object to this Request as being non-specific, overbroad and in summary and improper form seeking all documents not otherwise provided in response to other Requests. Subject to such objection and the general objections, see Response No. 6.

### DOCUMENT REQUEST NO. 19:

To the extent not provided in response to another Request, complete, itemized documents reflecting expenses incurred or paid in connection with "Thinking Out Loud," including expenses incurred or paid in connection with multiple musical works.

### RESPONSE TO DOCUMENT REQUEST NO. 19:

Defendants object to this Request as being non-specific, overbroad and in summary and improper form seeking all documents not otherwise provided in response to other Requests. Subject to such objection and the general and specific objections, see Response No. 6.

### DOCUMENT REQUEST NO. 20:

To the extent not provided in response to another Request, all documents concerning the publication, sub-publication, distribution or administration of "Thinking Out Loud" by and/or for any person or entity, including but not limited to Bucks Music Group, Amy Wadge, and/or any writer or publisher, sub-publisher, distributor or administrator.

### RESPONSE TO DOCUMENT REQUEST NO. 20:

Defendants object to this Request as vague, ambiguous, and overbroad.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff and to information Plaintiff has already

obtained pursuant to premature subpoenas issued to BMI, ASCAP, SoundExchange and The

Harry Fox Agency, as well as documents already voluntarily provided to Plaintiff by Defendants.

**DOCUMENT REQUEST NO. 21:**

To the extent not provided in response to another Request, all documents created or provided by
the following entities regarding "Thinking Out Loud":

   a.   SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox
        Agency, SAG-AFTRA, and any and all collection society, mechanical society and
        performance society;
   b.   Sony/ATV, Atlantic, Warner Music Group Corporation, and any music publisher,
        music administrator, record company or record label, including any such company
        based in the United Kingdom;
   c.   Any entity owned, operated by or affiliated with Sheeran;
   d.   Any new collection society and/or collection agency to be created anywhere in the
        world, including by the U.S. Congress under the Music Modernization Act; and/or
   e.   Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, YouTube, and/or any and all
        download and/or streaming services.

**RESPONSE TO DOCUMENT REQUEST NO. 21:**

Defendants object to this Request as wildly overbroad and insufficiently specific.

Defendants further object to this Request to the extent it seeks information that is not relevant to

any party's claim or defense, not proportional to the needs of this case, and has no causal nexus

to the claim of infringement and any revenue or income allegedly attributable to any alleged

infringement.  Defendants further object to this Request to the extent it should be addressed to

the non-parties identified in the Request, beyond those from whom Plaintiff has already

prematurely, in violation of the Federal Rules, obtained information by subpoena, to the extent it

relates to the claimed infringement of a United States copyright for exploitation in the United

States and not to any foreign copyrights and exploitation thereof in countries and territories other

than the United States.  Subject to, and without waiver of, the foregoing General and Specific

Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to

their Response to Request No. 6 and otherwise refer Plaintiff to the discovery materials produced

in *Griffin*, which already have been provided to Plaintiff and the discovery provided to Plaintiff by BMI, ASCAP, SoundExchange and The Harry Fox Agency.

**DOCUMENT REQUEST NO. 22:**

All documents concerning or comprising Sheeran's performance, in whole or in part, of "Let's Get it On," including audio recordings or audiovisual recordings, from any time periods.

**RESPONSE TO DOCUMENT REQUEST NO. 22:**

Defendants object to this Request as incomprehensible.  Subject to, and without waiver of, the foregoing General and Specific Objections, and to the extent Defendants understand this Request, Defendants refer Plaintiff to the discovery materials produced in *Griffin*, which already have been provided to Plaintiff.

**DOCUMENT REQUEST NO. 23:**

All documents from any source concerning or comprising one or more general ledgers reflecting financial transactions involving Sheeran or any company owned, controlled or managed by Sheeran.

**RESPONSE TO DOCUMENT REQUEST NO. 23:**

Defendants object to this Request as wildly overbroad and because it seeks information that is not relevant to any party's claim or defense, not proportional to the needs of this case, and has no causal nexus to the claim of infringement and any revenue or income allegedly attributable to any alleged infringement.  Subject to, and without waiver of, the foregoing General and Specific Objections, Defendants respond that they do not have documents in their possession, custody or control that are responsive to this Request.

**DOCUMENT REQUEST NO. 24:**

Documents sufficient to identify Sheeran's past, current and/or future live musical performance and/or touring schedule, and including dates, times and locations of all such live performances.

**RESPONSE TO DOCUMENT REQUEST NO. 24:**

See Response No. 12.  Defendants further respond that they do not have documents in

their possession, custody or control that are responsive to this Request..

**DOCUMENT REQUEST NO. 25:**

For each and every one of Sheeran's past, current and/or future live musical performance and/or
tours, documents sufficient to identify all musical compositions performed, in whole or in part,
by Sheeran at each such performance.

**RESPONSE TO DOCUMENT REQUEST NO. 25:**

See Response No. 24.

**DOCUMENT REQUEST NO. 26:**

Documents sufficient to identify all people, credited or otherwise, who performed any work or
services of any kind in connection with "Thinking Out Loud," including but not limited to any
producers, musicians, engineers, recording studio personnel, sound mixers, music arrangers,
writers, singers, and/or music coaches.

**RESPONSE TO DOCUMENT REQUEST NO. 26:**

Defendants object to this Request as vague and ambiguous.  Subject to, and without

waiver of, the foregoing General and Specific Objections, Defendants refer Plaintiff to the liner

notes of Sheeran's LP titled *x*.

Dated: New York, New York
        August 30, 2019

PRYOR CASHMAN LLP

By:*/s/ Donald S. Zakarin____*
    Donald S. Zakarin
    dzakarin@pryorcashman.com
    Ilene S. Farkas
    ifarkas@pryorcashman.com
    Andrew M. Goldsmith
    agoldsmith@pryorcashman.com
7 Times Square
New York, New York 10036-6569
Telephone:  (212) 421-4100

*Attorneys for Defendants BDi Music Ltd.,*
*Bucks Music Group Ltd. and Amy Wadge*

14

Thinking Out Loud by Ed Sheeran Song Statistics | setlist.fm

# setlist.fm

## Thinking Out Loud by Ed Sheeran

### Facts

| | |
|---|---|
| **Total Plays** | 680 times by 51 Artists |
| **From the release** | x (Album) |
| **First Played in Concert** | May 24, 2014 by Ed Sheeran at Radio 1's Big Weekend 2014 |
| **Most Recently Played** | August 26, 2019 by Ed Sheeran at Chantry Park, Ipswich, England |

Report a problem: Wrong album assigned

### Detailed Statistics by Artist

Thinking Out Loud stats Ed Sheeran Lady Antebellum Lilly Singh (iiSuperwomanii) Shawn Mendes Nathan Sykes Chloe half•alive Peter & Jeremy Before You Exit Elliot Levine The Baseballs Codename Colin Dan + Shay Lauren Light Christina Perri Hanson Engelbert Humperdinck Alfred García Venice Luke Bryan Luis Fonsi Liam Gleason Julien Loko Austin Mahone Mia Dimšić Peter Asher & Albert Lee Poet Section Tyrone Wells Shoshana Bean Black Violin Carlos Right Colt Clark Jordan Indiana Gonzalez Ben Haenow Jérôme Couture Kato Christie Lamb Lennox Lust Lovebettie Bruno Mars John Mayer Joe McElderry Parmalee Rachel Platten Rascal Flatts Reborn Rivertied Yass Smaali Laura Tesoro The Rose Not Today

### Performing Artists



- ● Ed Sheeran
- ● Lady Antebellum
- ● Lilly Singh (iiSuperwomanii)
- ● Shawn Mendes
- ● Nathan Sykes
- ● Chloe
- ● half•alive
- ● Peter & Jeremy

▲ 1/7 ▼

| 1 | Ed Sheeran | | 456 |
|---|---|---|---|
| | JUN 11 2014 | **ACL Live at The Moody Theater, Austin, TX** <br> Ed Sheeran | |
| | JUN 08 2014 | **Pinkpop Festival 2014** <br> Ed Sheeran | |
| | JUN 06 2014 | **RTL Late Night, Amsterdam** <br> Ed Sheeran | |
| | MAY 31 2014 | **Rock in Rio Lisboa 2014** <br> Ed Sheeran | |
| | MAY 24 2014 | **Radio 1's Big Weekend 2014** <br> Ed Sheeran | |
| 2 | Lady Antebellum | | 36 |
| 3 | Lilly Singh (iiSuperwomanii) | | 30 |
| 4 | Shawn Mendes | | 17 |
| 5 | Nathan Sykes | | 13 |
| 6 | Chloe | | 8 |
| | half•alive | | 8 |
| | Peter & Jeremy | | 8 |
| 9 | Before You Exit | | 7 |
| | Elliot Levine | | 7 |
| 11 | The Baseballs | | 6 |
| | Codename Colin | | 6 |
| | Dan + Shay | | 6 |
| | Lauren Light | | 6 |
| | Christina Perri | | 6 |
| 16 | Hanson | | 5 |
| | Engelbert Humperdinck | | 5 |

10/19/2019

| 18 | Alfred García | 4 |
|---|---|---|
|  | Venice | 4 |
| 20 | Luke Bryan | 3 |
| 21 | Luis Fonsi | 2 |
|  | Liam Gleason | 2 |
|  | Julien Loko | 2 |
|  | Austin Mahone | 2 |
|  | Mia Dimšić | 2 |
|  | Peter Asher & Albert Lee | 2 |
|  | Poet Section | 2 |
|  | Tyrone Wells | 2 |
| 29 | Shoshana Bean | 1 |
|  | Black Violin | 1 |
|  | Carlos Right | 1 |
|  | Colt Clark | 1 |
|  | Jordan Indiana Gonzalez | 1 |
|  | Ben Haenow | 1 |
|  | Jérôme Couture | 1 |
|  | Kato | 1 |
|  | Christie Lamb | 1 |
|  | Lennox Lust | 1 |
|  | Lovebettie | 1 |
|  | Bruno Mars | 1 |
|  | John Mayer | 1 |
|  | Joe McElderry | 1 |
|  | Parmalee | 1 |
|  | Rachel Platten | 1 |
|  | Rascal Flatts | 1 |
|  | Reborn | 1 |
|  | Rivertied | 1 |
|  | Yass Smaali | 1 |
|  | Laura Tesoro | 1 |
|  | The Rose | 1 |
|  | Not Today | 1 |

## Years



| 1 | 2015 | 212 |
|---|---|---|
| 2 | 2017 | 137 |

A148

| 3 | 2018 | 116 |
| 4 | 2014 | 97 |
| 5 | 2019 | 81 |
| 6 | 2016 | 36 |

**setlist**.fm

MAY 24 2014

**Ed Sheeran Setlist**
at Glasgow Green, Glasgow, Scotland

1. You Need Me, I Don't Need You
2. Lego House
3. Don't
4. I See Fire
5. Thinking Out Loud
6. The A Team
7. Sing

10/19/2019                    Case 1:18-cv-05839-LLS   Document 49-5   Filed 10/23/19   Page 5 of 9
                                      Thinking Out Loud by Ed Sheeran Song Statistics | setlist.fm

**setlist**.fm

### Thinking Out Loud by Ed Sheeran

#### Facts

| | |
|---|---|
| **Total Plays** | 680 times by 51 Artists |
| **From the release** | x (Album) |
| **First Played in Concert** | May 24, 2014 by Ed Sheeran at Radio 1's Big Weekend 2014 |
| **Most Recently Played** | August 26, 2019 by Ed Sheeran at Chantry Park, Ipswich, England |

Report a problem: Wrong album assigned

#### Detailed Statistics by Artist

Thinking Out Loud stats Ed Sheeran Lady Antebellum Lilly Singh (iiSuperwomanii) Shawn Mendes Nathan Sykes Chloe half•alive Peter & Jeremy Before You Exit Elliot Levine The Baseballs Codename Colin Dan + Shay Lauren Light Christina Perri Hanson Engelbert Humperdinck Alfred García Venice Luke Bryan Luis Fonsi Liam Gleason Julien Loko Austin Mahone Mia Dimšić Peter Asher & Albert Lee Poet Section Tyrone Wells Shoshana Bean Black Violin Carlos Right Colt Clark Jordan Indiana Gonzalez Ben Haenow Jérôme Couture Kato Christie Lamb Lennox Lust Lovebettie Bruno Mars John Mayer Joe McElderry Parmalee Rachel Platten Rascal Flatts Reborn Rivertied Yass Smaali Laura Tesoro The Rose Not Today

#### Performing Artists



- 🟢 Ed Sheeran
- 🟡 Lady Antebellum
- 🟡 Lilly Singh (iiSuperwomanii)
- 🟠 Shawn Mendes
- 🟠 Nathan Sykes
- 🔴 Chloe
- 🔴 half•alive
- ⚫ Peter & Jeremy

▲ 1/7 ▼

| 1 | Ed Sheeran | 456 |
|---|---|---|

| | | | |
|---|---|---|---|
| AUG 26 2019 | **Chantry Park, Ipswich**<br>Ed Sheeran | | |
| AUG 25 2019 | **Chantry Park, Ipswich**<br>Ed Sheeran | | |
| AUG 24 2019 | **Chantry Park, Ipswich**<br>Ed Sheeran | | |
| AUG 23 2019 | **Chantry Park, Ipswich**<br>Ed Sheeran | | |
| AUG 17 2019 | **Roundhay Park, Leeds**<br>Ed Sheeran | | |
| AUG 16 2019 | **Roundhay Park, Leeds**<br>Ed Sheeran | | |
| AUG 11 2019 | **Laugardalsvöllur, Reykjavik**<br>Ed Sheeran | | |
| AUG 10 2019 | **Laugardalsvöllur, Reykjavik**<br>Ed Sheeran | | |
| AUG 07 2019 | **Sziget Festival 2019**<br>Ed Sheeran | | |
| AUG 03 2019 | **Messegelände, Hanover**<br>Ed Sheeran | | |
| AUG 02 2019 | **Messegelände, Hanover**<br>Ed Sheeran | | |
| JUL 28 2019 | **Tusindårsskoven, Odense**<br>Ed Sheeran | | |
| JUL 27 2019 | **Tusindårsskoven, Odense**<br>Ed Sheeran | | |
| JUL 24 2019 | **Helsinki-Malmin lentoasema, Helsinki**<br>Ed Sheeran | | |
| JUL 23 2019 | **Helsinki-Malmin lentoasema, Helsinki**<br>Ed Sheeran | | |
| JUL 19 2019 | **Otkritie Arena, Moscow**<br>Ed Sheeran | | |
| JUL 14 2019 | **Theatre Royal Haymarket, London**<br>Ed Sheeran | | |
| JUL 12 2019 | **Lucavsala, Riga**<br>Ed Sheeran | | |
| JUL 08 2019 | **Letiště Praha Letňany, Prague**<br>Ed Sheeran | | |
| JUL 07 2019 | **Letiště Praha Letňany, Prague**<br>Ed Sheeran | | |
| JUL 03 2019 | **National Arena, Bucharest**<br>Ed Sheeran | | |
| JUN 29 2019 | **Wörthersee-Stadion, Klagenfurt**<br>Ed Sheeran | | |
| JUN 28 2019 | **Wörthersee-Stadion, Klagenfurt**<br>Ed Sheeran | | |
| JUN 23 2019 | **Hockenheimring, Hockenheim**<br>Ed Sheeran | | |
| JUN 22 2019 | **Hockenheimring, Hockenheim**<br>Ed Sheeran | | |
| 2 | Lady Antebellum | 36 | |
| 3 | Lilly Singh (iiSuperwomanii) | 30 | |
| 4 | Shawn Mendes | 17 | |
| 5 | Nathan Sykes | 13 | |
| 6 | Chloe | 8 | |
| | half•alive | 8 | |
| | Peter & Jeremy | 8 | |
| 9 | Before You Exit | 7 | |
| | Elliot Levine | 7 | |
| 11 | The Baseballs | 6 | |

10/19/2019                    Thinking Out Loud by Ed Sheeran Song Statistics | setlist.fm

| | | |
|---|---|---|
| | Codename Colin | 6 |
| | Dan + Shay | 6 |
| | Lauren Light | 6 |
| | Christina Perri | 6 |
| 16 | Hanson | 5 |
| | Engelbert Humperdinck | 5 |
| 18 | Alfred García | 4 |
| | Venice | 4 |
| 20 | Luke Bryan | 3 |
| 21 | Luis Fonsi | 2 |
| | Liam Gleason | 2 |
| | Julien Loko | 2 |
| | Austin Mahone | 2 |
| | Mia Dimšić | 2 |
| | Peter Asher & Albert Lee | 2 |
| | Poet Section | 2 |
| | Tyrone Wells | 2 |
| 29 | Shoshana Bean | 1 |
| | Black Violin | 1 |
| | Carlos Right | 1 |
| | Colt Clark | 1 |
| | Jordan Indiana Gonzalez | 1 |
| | Ben Haenow | 1 |
| | Jérôme Couture | 1 |
| | Kato | 1 |
| | Christie Lamb | 1 |
| | Lennox Lust | 1 |
| | Lovebettie | 1 |
| | Bruno Mars | 1 |
| | John Mayer | 1 |
| | Joe McElderry | 1 |
| | Parmalee | 1 |
| | Rachel Platten | 1 |
| | Rascal Flatts | 1 |
| | Reborn | 1 |
| | Rivertied | 1 |
| | Yass Smaali | 1 |
| | Laura Tesoro | 1 |
| | The Rose | 1 |
| | Not Today | 1 |

**Years**

https://www.setlist.fm/stats/songs/ed-sheeran-53d5f3bd.html?song=Thinking+Out+Loud                    3/4



| | | |
|---|---|---|
| 3 | 2018 | 116 |
| 4 | 2014 | 97 |
| 5 | 2019 | 81 |
| 6 | 2016 | 36 |

Ed Sheeran Setlist at Chantry Park, Ipswich, England August 26, 2019 | setlist.fm

setlist.fm

AUG 26 2019

**Ed Sheeran Setlist**
at Chantry Park, Ipswich, England
Tour: ÷

1. Castle on the Hill
2. Eraser
3. The A Team
4. Don't / Remember the Name
5. Dive
6. Love Yourself
   (Justin Bieber cover)
7. Bloodstream
8. I Don't Care
9. Tenerife Sea
10. Hearts Don't Break Around Here
11. Give Me Love
12. Galway Girl
13. I See Fire
14. Thinking Out Loud
15. Photograph
16. Perfect
17. BLOW
18. Sing

Encore:

19. Shape of You
20. You Need Me, I Don't Need You

Note: The last show of the 'Divide Tour'

**A155**

Ed Sheeran Tour Statistics | setlist.fm



## Songs played total

| | Song | Play Count |
|---|---|---|
| 1 | The A Team | 645 |
| 2 | You Need Me, I Don't Need You | 528 |
| 3 | Sing | 486 |
| 4 | Thinking Out Loud | 456 |
| 5 | Bloodstream | 451 |
| 6 | Lego House | 357 |
| 7 | Give Me Love | 303 |
| 8 | Shape of You | 295 |
| 9 | Castle on the Hill | 290 |
| 10 | Photograph | 285 |
| 11 | Drunk | 280 |
| 12 | Perfect | 277 |
| 13 | Tenerife Sea | 266 |

10/20/2019    Ed Sheeran's Record-Breaking Divide Tour Totals $775.6 Million, Beating U2, Guns N' Roses

3,162 views | Aug 27, 2019, 04:59pm

# Ed Sheeran's Record-Breaking Divide Tour Totals $775.6 Million, Beating U2, Guns N' Roses



**Mark Beech** Contributor ⓘ
Hollywood & Entertainment



BUDAPEST, HUNGARY - AUGUST 07: Ed Sheeran performs on stage at Sziget Festival on August 7, 2019 in …

[+]  REDFERNS

The final figures are in from Ed Sheeran's record-breaking Divide Tour. The British singer-songwriter achieved an overall gross of $775.6 million from 8.9 million tickets sold on six continents. The tour was already confirmed as the highest-grossing tour of a

# A157

time, beating U2, Guns N' Roses, the Rolling Stones, Coldplay, Roger Waters, AC/DC, Madonna and P!nk. The figures from Pollstar also reveal how Sheeran achieved this milestone.

Sheeran was at No. 5 in the Forbes list of 2019 Celebrity 100 Earnings, as of July, with $110 million. This was based on the two-year Divide Tour grossing more than $600 million worldwide.

Sheeran reached No. 1 on the list of the all-time top-grossing tours on August 2 with th first night of a two-show run at Messegelände in Hannover, Germany. Sales from the first show took the tour's gross to $736.8 million, surpassing the record held by U2 for eight years.

The Irish band earned $735.3 million on the two-year 360 Tour from 2009 through 2011.

> **Today In:** Consumer

Sheeran's final show, on Monday, August 26, was at Chantry Park in Ipswich, England, near his hometown. It was part of a four-night stand that alone grossed $12.9 million o 139,984 tickets.

The takings are all the most extraordinary given the Sheeran, 28, does his shows with just a guitar and without the multiple effects, costume changes, dancers and backing musicians favored by other pop performers.

**Among Sheeran's achievements on the tour are:**

**Australia & New Zealand**: Highest ticket sales for a single concert tour in both countries.

**Iceland:** The biggest shows in Iceland's history with one in seven of the population attending.

**Jakarta, Kuala Lumpur**: Biggest concert in its history.

10/20/2019    Case 1:18-cv-05938-LS-BCM Document 130-1 Ed Sheeran's Record-Breaking Divide Tour Totals $776 Million, Beating U2, Guns N' Roses

**South Africa**: Biggest ever and highest-grossing tour with 225,000 tickets sold.

**Pollstar's** Top-Grossing Tours of All-Time

Artist, Tour Name, Year(s), Gross (in millions), Tickets Sold (in millions), number of shows

1. **Ed Sheeran** - Divide - 2017-2019 - $775.6 - 8.9 - 255

2. **U2** - 360 - 2009-2011 - $735.3 - 7.2 - 110

3. **Guns N' Roses** - Not In This Lifetime... - 2016-ongoing - $561.1 - 5.1 - 145

4. **The Rolling Stones** - A Bigger Bang - 2005-2007 - $558.2 - 4.6 - 144

5. **Coldplay** - A Head Full of Dreams - 2017-2017 - $523.0 - 5.3 - 114

6. **Roger Waters** - The Wall Live - 2010-2013 - $460.2 - 4.1 - 220

7. **AC/DC** - Black Ice - 2008-2010 - $441.9 - 4.9 - 165

8. **Madonna** - Sticky & Sweet - 2008-2009 - $411.1 - 3.5 - 85

9. **U2** - Vertigo - 2005-2006 - $395.6 - 4.6 - 131

10. **P!nk** - Beautiful Trauma - 2018-ongoing - $380.3 - 3.0 – 154

*Follow me on* Twitter *or* LinkedIn. *Check out my* website.

 **Mark Beech**

Hi. I'm Mark Beech. I've written about arts, performing arts, entertainment and culture, especially rock music, for longer than Taylor Swift has been on earth. I'm the e... **Read More**

10/23/2019      Ed Sheeran going on hiatus amid legal troubles, plagiarism claims

🖨 Print    ⊗ Close



# Ed Sheeran going on hiatus amid legal troubles, plagiarism claims

Published August 29, 2019

New York Post

Radio's favorite redhead is stepping down.

Ed Sheeran announced to his audience Tuesday at Chantry Park in Ipswich, England, that he would be taking a break from music after two years of touring. The 28-year-old wrapped up his 260th show with his song "You Need Me, I Don't Need You." Maybe so, but with 9 million people attending his "Divide" tour, and his fourth album, "No. 6 Collaborations Project," debuting at No. 1 in 12 countries, melancholy-pop fans definitely need him.

"There is something very bittersweet about it. I love that you guys are here and we are ending it in Ipswich. This is my last gig for probably 18 months," said the "A Team" singer, who will be dealing with legal battles over his music in the coming months.

## ED SHEERAN ACCUSED OF COPYING 'X FACTOR' WINNER'S SONG

The surprise news comes about two weeks before his scheduled court date over allegations that he ripped off Marvin Gaye's 1973 hit "Let's Get It On" on his 2014 track "Thinking Out Loud." Structured Asset Sales, which owns partial copyrights to Gaye's music (James Brown and David Bowie are among its other clients), is suing Sheeran for $100 million.

What's more, the pop god has been blocked from receiving royalties for his blockbuster "Shape of You" after accusations from musician Sam Chokri that he appropriated the music. Chokri claims the catchy chorus is actually lifted from his song "Oh Why," from 2015, a song he sent to Sheeran's team in a bid to work with the superstar. The High Court of England is expected to hear the case in 2020.

## ED SHEERAN DENIES LIABILITY IN SONG COPYRIGHT LAWSUIT

In addition to fellow artists, Sheeran has also angered neighbors over a massive pond he built on his English estate that he got permits for based on its use as "wildlife preservation . . . providing a natural habitat for breeding and wetland invertebrates such as dragonflies and water beetles." Locals say it's a swimming pool, and that it supports nothing but the star's own "wild lifestyle."

Beyond the water feature, which has since been blocked from neighbors' sights with 8-foot bales of hay, Sheeran's Framlingham property features an on-site pub, a recording studio and a four-room treehouse. He shares the property with wife Cherry Seaborn, a 27-year-old accountant. The duo, who have known each other since childhood and were married last December, plan to enjoy the spoils of the highest-grossing tour of all time, $736.7 million according to Pollstar, on their sprawling estate. Sheeran said on his YouTube channel in June, "I've already achieved more than I thought I would, so now I'm just trying to have fun."

## ED SHEERAN SETTLES COPYRIGHT LAWSUIT OVER SONG 'PHOTOGRAPH'

The singer-songwriter joins fellow UK artist Adele in the breather, who canceled two shows in July 2017 due to vocal cord damage and hasn't performed since. Still, Adele hinted to fans that she's working on new music in an Instagram post celebrating her 31st birthday.

Sheeran, too, may soon be back in the spotlight. "See you in a few years' time," he said to the British crowd. Just as long he gets out of court.

**CLICK HERE TO GET THE FOX NEWS APP**

*This article originally appeared in the New York Post.*

 Print      Close

URL

https://www.foxnews.com/entertainment/ed-sheeran-plagiarism-lawsuit-hiatus

- Home
- Video
- Politics
- U.S.
- Opinion
- Entertainment
- Tech
- Science
- Health
- Travel
- Lifestyle
- World
- Sports
- Weather

- Privacy
- Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. All market data delayed 20 minutes. Updated Privacy(What's Changed) - Terms of Use - FAQ

**WIKIPEDIA**

# + (Ed Sheeran album)

**+** (pronounced "plus") is the debut studio album by English singer-songwriter Ed Sheeran. It was released on 9 September 2011 by Asylum Records and Atlantic Records. The album is considered Sheeran's commercial breakthrough. He previously released five EPs independently. Jake Gosling and Sheeran produced the majority of the album, with additional production by American hip-hop producer No I.D.

Media interest surrounding + was heightened by its two preceding singles—"The A Team" and "You Need Me, I Don't Need You"—which peaked at numbers three and four on the UK Singles Chart, respectively. "Lego House" was released on 11 November 2011 as the album's third single and matched the chart success of its predecessors, peaking at number five in the UK. Three additional singles —"Drunk", "Small Bump", and "Give Me Love"—were released throughout the year, all charting within the top 25 of the UK Singles Chart. Worldwide, the album has sold more than 4 million copies.

The album was met with generally positive reviews from music critics. Upon release, + debuted atop of the UK Albums Chart with first-week sales exceeding 102,000 copies. The album performed well on the US Billboard 200, peaking at number five, selling 42,000 copies. The album was the highest debut for a British artist's first studio album in the US since Susan Boyle's *I Dreamed a Dream* in 2009. + is the ninth best-selling album of the decade in the United Kingdom.

## Contents

Background
Music
Critical reception
Commercial performance
Tour dates
Track listing
Personnel
Production
Charts
    Weekly charts
    Year-end charts
Certifications
Release history
See also
Notes
References

| + |
| :---: |
|  |
| Studio album by Ed Sheeran |
| **Released** | 9 September 2011 |
| **Recorded** | January–March 2011 |
| **Genre** | Folk |
| **Length** | 49:53 |
| **Label** | Asylum · Atlantic |
| **Producer** | Jake Gosling · Charlie Hugall · No I.D. · Ed Sheeran |

| Ed Sheeran chronology | | |
| :---: | :---: | :---: |
| *One Take* (2011) | **+** (2011) | *The Slumdon Bridge* (2012) |

| Ed Sheeran studio album chronology | |
| :---: | :---: |
| **+** (2011) | *x* (2014) |

| Singles from + |
| :--- |
| 1. "The A Team" Released: 1 May 2011 |
| 2. "You Need Me, I Don't Need You" Released: 26 August 2011 |
| 3. "Lego House" Released: 13 November 2011 |
| 4. "Drunk" Released: 19 February 2012 |
| 5. "Small Bump" Released: 25 May 2012 |
| 6. "Give Me Love" Released: 21 November 2012 |

| |
| :---: |
| Alternate cover |
| HMV 2017 vinyl exclusive re-issue cover |

## Background



Sheeran performing at Academy 1 in Manchester.

After dropping out of school at age 16, Sheeran spent his student grant on rail tickets. Moving from place to place, he performed at open-mic nights across the United Kingdom, where he would sleep on his friends' sofas spending time self-releasing homemade EPs and albums.[1] After spending four years performing in the British live scene, Sheeran met singer Jamie Foxx in Los Angeles, and Foxx liked Sheeran enough to "put [Sheeran] on the path to success".[2]

In early 2010, Sheeran was having what he described as a "rough time" in the UK, and he spontaneously left for Los Angeles to spend a month "to see what could happen". After performing a gig in the city, he was approached by Foxx's contact, who produced open-mic nights endorsed by Foxx.[2] She invited him to perform, which he agreed to, and after the performance he was contacted by Foxx's manager, who then asked him to perform on Foxx's radio show.[2] After performing on the radio show, Foxx gave Sheeran the number offering studio time free of charge.[2] Sheeran took the opportunity to record several tracks in the studio and attended several parties with Foxx, describing the time as "surreal".[2] In addition, Sheeran's appearances on YouTube also garnered success when he uploaded a performance of track "You Need Me, I Don't Need You", which garnered over half a million views, making him "one of the most talked about UK acts".[2]

Following this, Sheeran signed to Atlantic Records and was signed to Elton John's management team called Rocket, which Sheeran discussed, saying: "Elton walked in and said. 'Where's Ed Sheeran?' I was like, 'F-ing hell! He knows my name!' It's surreal, growing up listening to his music and now he is one of the people who sings my praises and helps my career and rings me up and actually has an interest in me".[3] Sheeran started performing with the acoustic guitar aged 11 and his love for the instrument was what "got [him] into music and singing".[3] His musical inspirations from an early age surfaced from The Beatles and Bob Dylan, but he noted Damien Rice as a larger influence on his music whom he met after an intimate performance in Dublin.[2] Throughout the production of +, Sheeran knew "how [he] wanted every single song to sound", and because of this they only took around one day each to record, with the final product featuring "the same sound", which he described as an achievement.[2]

## Music

+ is influenced by hip-hop inspired duo Nizlopi and recording artist Damien Rice.[3] Sheeran performs throughout the record with a small acoustic guitar, with "no band" and "no beats". *The Daily Telegraph* found that the lyricism is based around subjects he cares about in his own life, performing with a "soft toned, flexible voice" with a hip-hop theme.[1] The record features "chipper" beats with staccato guitar riffs throughout. It differs between genres, with tracks such as "Grade 8" showing R&B influences, garnering comparisons to Bruno Mars, while the album also features folk-hop inspired tracks such as "Drunk", a "self-pitying, domestic treasure" to resurrect a lost relationship".[4] Lyricism also derives from Sheeran's own "self-doubt" heard in tracks such as "Wake Me Up" and "Kiss Me", which has been compared to musician Van Morrison.[4] The album also visits a "darker side" on tracks such as "The City", which depicts homeless street-life and features Sheeran beat-boxing. The album concludes with the track "Give Me Love" and the Scottish folk song "The Parting Glass" as a bonus track.[4]

It is Ed Sheeran's only album to contain profanity, heard in the song "You Need Me, I Don't Need You". His next two subsequent albums ordinarily would contain profanity but they are censored on the album due to a deal he made with his taxi driver because his younger daughter is a fan.[5]

## Critical reception

+ received mixed to positive reviews from critics. At Metacritic, which assigns a normalized rating out of 100 to reviews from mainstream critics, the album received an average score of 67, based on 9 reviews, which indicates "generally favorable reviews".[8] Andy Gill of *The Independent* gave the album four stars out of five, finding that Sheeran was right to follow his own "instincts" and not conform to mainstream pop music, saying: "if he had followed the advice to tone down the crackhead portrait of 'The A Team', Sheeran might have wound up with a respectable, if predictable, career as a mainstream folkie singer-songwriter rocking the outer reaches of Radio Two" but found his "nimble hip-hop delivery rides a slick R&B groove" and his "blue-collar sensibilities cut through" after not attending schools such as the Brits school.[4] Alex Petridis of *The Guardian* gave the album three out of five stars, writing that, "at its worst, + is a pretty winsome business"; Petridis found the lyricism of tracks such as "Wake Me Up" weak, but stated that, "apart from his teen appeal, Sheeran's strength is his melodic ability, a way with a really strong, radio-friendly tune, as on 'The City' or 'Grade 8'". However, Petridis concluded his review by stating: "You can't help wishing he'd put said ability to slightly more edgy use, but then again, he still might: at least there's evidence that Ed Sheeran might still be around when the screaming girls grow up and calm down."[10] Jon O'Brien of AllMusic found that Sheeran failed to "capitalize on his unique selling point", stating: "Indeed, the unexpected hugely popular response to lead single 'The A Team', an achingly tender tale of a heroin-addicted prostitute (think a socially aware James Blunt) seems to have thrown him off course, as rather than pursue the more urban direction that set him apart from his contemporaries, the majority of Plus' 12 tracks feel like self-conscious attempts to replicate its sound".[7]

> "I'm always being introduced to new people that are really good. Being a songwriter myself, I love the way they put lyrics together. If you listen to Ghetts' flow, it's not necessarily like four-bar, four-bar, four-bar. He'll do a two and a half bar rhyme and then stop, and go into something else. And me as a songwriter, that sort of fascinated me, like how can you get away with that? That really interested me. I've started writing songs a bit more like that, lyrically."
>
> —Sheeran explaining the influence of the "Grime" style on +.[2]

Natalie Shaw of BBC Music gave the album a mixed response, calling + at times "precocious" and "self-referencing", with the track "You Need Me, I Don't Need You" being listed as an example of this. However, in contrast, she found "Drunk" as one of five, finding that Sheeran might have wound up with a respectable, if predictable... this however, is often too bare-bones for this sort of thing. Let it ditches his bottom-of-a-Tube-escalator ballads (see 'Kiss Me') and stops trying to show off, Sheeran could well become a thrilling proposition over an entire long-player, rather than just in all-too-brief moments of magic."[15] John Lewis of newspaper *Metro* gave the album a mixed review. He stating that Sheeran "is at his best when he combines both worlds. Accompanying himself on acoustic guitar, his lovelorn ballads will suddenly lurch into verbose, rhythmically complex rhymes that display all the verbal dexterity of a grime MC". However, Lewis also found that Sheeran failed to maintain the success throughout, performing "gloopy" and "unknowing" ballads.[16] Emily Mackay of *NME* gave the album four out of ten marks, questioning his authenticity as a musician. She wrote: "He's got the touches of 'urban' styling with flimsy hip-hop rhythms and Plan B-lite veering between half-arsed rapping and boyband emoting. He's got the 'issues' songs (the Dido-ish, maudlin 'Drunk', the omnipresent saccharine horror of the drugs/homelessness/prostitution triple-whammy of 'The A-Team')". She concluded her review by noting that "There's little here that moves on from the kind of trip-hop balladeers that abounded in the late '90s".[12]

## Commercial performance

"Experimentation with styles and the melding of musical approaches is to be commended, obviously; but to relate authenticity with consistent, similar output is something very wrong indeed, as not everybody singing the same song is coming from the same place. These charting mutations and variations have as much to do with our culture of instant gratification as they do with music growing out-of-date more quickly – and what better person to stand tall at the lectern than 20-year-old Ed Sheeran, whose unlikely combination of acoustic folk and grime has seen him become one of 2011's biggest domestic successes."

—Natalie Shaw of BBC Music. [15]

[28][29] In Australia, the album debuted at number 41 on the ARIA Albums Chart for the week commencing 31 October 2011, peaking at number one on 13 August 2012. [30] The album has been certified Triple Platinum by the Australian Recording Industry Association (ARIA). By January 2013, the album had spent 65 consecutive weeks on the ARIA Albums Chart and was still in the Top 5. [31] With 222 weeks, it is the all-time longest charting album in Australia. [32] It reached the top 10 in 6 non-consecutive years, in 2011, 2012, 2013, 2015, 2017 and 2018, including a placement at No. 6 in its 222nd charting week in March 2018. [33] In New Zealand, the album debuted at number 34 and ultimately topped the chart 54 weeks later. [34] + debuted at number five on the *Billboard* 200 in the United States, selling 42,000 units in its first week. [35] As of March 2017, + has sold 1.21 million copies in the United States. [36]

## Tour dates

Ed Sheeran announced in May 2011 a 21 date UK & Ireland tour where he played songs from the newly released album. [37] Sheeran then went on to add further dates for the start of 2012 and it was confirmed he would be playing his largest gig yet at Brixton Academy. [38] Ed Sheeran would be touring the US for the first time in early 2012 by supporting Snow Patrol on their Fallen Empires Tour. [39] It was announced that Sheeran would be touring Australia and New Zealand for the first time in the July and August 2012. [40] Sheeran then announced in January that he would be doing his first headline tour of the US and his largest headline shows to date in the UK. [41][42] Before supporting Taylor Swift on her The Red Tour, Sheeran embarked on an 18 date tour across the US [43]

In the United Kingdom, midweek sales reports showed that + was set to top the UK Albums Chart, although Digital Spy reported that it still faced competition from Laura Marling's album *A Creature I Don't Know*. [17] For the week of 18 September 2011, + debuted atop the UK Albums Chart with first-week sales of 102,000 copies. [18] After the album topped the chart, Sheeran wrote on his Twitter account "No. 1 album and 2 songs in the top 20! mental! Thank you all so much!", and then added "Here's my THANK YOU for getting my album to #1! Hope you enjoy it", including a link to download a free EP. [19] The EP featured three tracks: "Fire Alarms", "She" and a remix of single "You Need Me, I Don't Need You". [19] By the end of 2011, the album had been certified Triple Platinum, indicating sales of over 900,000 copies. [20] As of June 2015, the album has sold 1,958,000 copies in the UK, making it the sixth-best-selling album of the 2010s and the 44th-best-selling album of the 21st century. It is also one of the longest-charting albums in UK chart history, with over 200 weeks on the UK Albums Chart. [21]

In Ireland, the album was placed in the top 10 for 8 consecutive years, from 2011 to 2018. [22][23][24][25][26][27]

| Professional ratings | |
|---|---|
| **Aggregate scores** | |
| Source | Rating |
| Metacritic | 67/100[6] |
| **Review scores** | |
| Source | Rating |
| AllMusic | ★★★★☆[7] |
| *The Daily Telegraph* | ★★★★★[8] |
| *Entertainment Weekly* | B–[9] |
| *The Guardian* | ★★★★☆[10] |
| *The Independent* | ★★★★★[4] |
| *London Evening Standard* | ★★★★★[11] |
| *NME* | 4/10[12] |
| *The Observer* | ★★★☆☆[13] |
| *The Scotsman* | ★★★★★ |
| *State* | ★★★★☆[14] |

# A163

List of concerts, showing date, city, country, venue.

| Date | City | Country | Venue |
|---|---|---|---|
| **British Isles** | | | |
| 2 October 2011 | Oxford | | O2 Academy Oxford |
| 3 October 2011 | London | | O2 Shepherd's Bush Empire |
| 4 October 2011 | Bournemouth | | O2 Academy Bournemouth |
| 5 October 2011 | Falmouth | | Falmouth Princess Pavilion |
| 6 October 2011 | Brighton | England | Brighton Concorde 2 |
| 8 October 2011 | London | | O2 Forum Kentish Town |
| 9 October 2011 | Bristol | | University of Bristol Students' Union |
| 10 October 2011 | Nottingham | | Nottingham Rock City |
| 11 October 2011 | Birmingham | | O2 Academy Birmingham 2 |
| 13 October 2011 | Leeds | | Leeds University Union |
| 14 October 2011 | Glasgow | Scotland | O2 ABC Glasgow |
| 15 October 2011 | Newcastle | | Newcastle University Students' Union |
| 17 October 2011 | Manchester | England | Manchester Academy 2 |
| 18 October 2011 | Keele | | Keele University |
| 19 October 2011 | Cardiff | Wales | Wales Millennium Centre |
| 20 October 2011 | Reading | | Reading sub89 |
| 23 October 2011 | Norwich | England | University of East Anglia |
| 25 October 2011 | Cambridge | | Cambridge Junction |
| 1 November 2011 | Belfast | Northern Ireland | Mandela Hall |
| 2 November 2011 | Galway | Ireland | Róisín Dubh |
| 3 November 2011 | Dublin | | Vicar Street |
| 8 January 2012 | Aberdeen | | Music Hall Aberdeen |
| 9 January 2012 | Edinburgh | Scotland | Edinburgh Picture House |
| 10 January 2012 | | | |
| 13 January 2012 | Manchester | | Manchester Academy |
| 17 January 2012 | Wolverhampton | | Wolverhampton Civic Hall |
| 18 January 2012 | | England | |
| 19 January 2012 | London | | Brixton Academy |
| 20 January 2012 | | | |
| 21 January 2012 | Belfast | Northern Ireland | Waterfront Hall |
| **Continental Europe** | | | |
| 1 March 2012 | Oslo | Norway | Rockefeller Music Hall |
| 2 March 2012 | Stockholm | Sweden | Debaser Hornstulls Strand |
| 3 March 2012 | Copenhagen | Denmark | Vega, Copenhagen |
| 4 March 2012 | Berlin | | Heimathafen Neukölln |
| 5 March 2012 | Hamburg | Germany | Docks |
| 7 March 2012 | Munich | | Backstage Werk |
| 8 March 2012 | Zurich | Switzerland | Kaufleuten |
| 9 March 2012 | Paris | France | La Maroquinerie |
| 10 March 2012 | Brussels | Belgium | Ancienne Belgique |
| 11 March 2012 | Amsterdam | Netherlands | Melkweg |
| **Oceania** | | | |
| 29 July 2012 | Auckland | New Zealand | ASB Theatre |
| 31 July 2012 | Brisbane | | QPAC Concert Hall |
| 1 August 2012 | Sydney | | Enmore Theatre |
| 3 August 2012 | Melbourne | Australia | Palais Theatre |
| 4 August 2012 | Adelaide | | Thebarton Theatre |
| 6 August 2012 | Perth | | Riverside Theatre |
| **Europe** | | | |
| 2 September 2012[a] | London | England | Roundhouse |
| **North America** | | | |
| 17 September 2012 | Toronto | Canada | The Guvernment |
| 18 September 2012 | Montreal | | Olympia |
| 19 September 2012 | Boston | | House of Blues |
| 21 September 2012 | New York City | | Terminal 5 |
| 22 September 2012 | Washington | | 9:30 Club |
| 23 September 2012 | Philadelphia | | Theatre of Living Arts |
| 25 September 2012 | Chicago | United States | Riviera Theatre |
| 26 September 2012 | Minneapolis | | State Theatre |
| 28 September 2012 | Denver | | Bluebird Theater |
| 1 October 2012 | Los Angeles | | Pellissier Building and Wiltern Theatre |
| 2 October 2012 | San Diego | | House Of Blues |
| 4 October 2012 | Vancouver | Canada | Commodore Ballroom |
| 5 October 2012 | Portland | United States | Wonder Ballroom |
| 6 October 2012 | Seattle | | The Showbox |
| **British Isles** | | | |
| 12 October 2012 | | England | |
| 13 October 2012 | | | |
| 14 October 2012 | London | | Hammersmith Apollo |
| 15 October 2012 | | | |
| 16 October 2012 | | | |

| Date | City | | Venue |
|---|---|---|---|
| 18 October 2012 | Brighton | | Brighton Centre |
| 19 October 2012 | Newport | Wales | Newport Centre |
| 20 October 2012 | Bournemouth | | Bournemouth International Centre |
| 21 October 2012 | Plymouth | | Plymouth Pavilions |
| 23 October 2012 | Swindon | | Oasis Leisure Centre |
| 25 October 2012 | Reading | | Rivermead |
| 26 October 2012 | | | |
| 27 October 2012 | Birmingham | | O2 Academy Birmingham |
| 28 October 2012 | | | |
| 30 October 2012 | Nottingham | England | Motorpoint Arena |
| 31 October 2012 | Manchester | | O2 Apollo Manchester |
| 1 November 2012 | | | |
| 2 November 2012 | | | |
| 4 November 2012 | Doncaster | | The Dome Leisure Centre |
| 5 November 2012 | | | |
| 6 November 2012 | Hull | | Hull Arena |
| 7 November 2012 | Blackpool | | Empress Ballroom |
| 9 November 2012 | Newcastle | | Newcastle City Hall |
| 10 November 2012 | | | |
| 11 November 2012 | Edinburgh | Scotland | Usher Hall |
| 13 November 2012 | Glasgow | | Barrowlands |
| 14 November 2012 | | | |
| **North America** | | | |
| 17 January 2013 | Houston | | House of Blues |
| 18 January 2013 | Dallas | | The Palladium Ballroom |
| 19 January 2013 | Austin | | Stubb's BBQ |
| 22 January 2013 | Nashville | | Ryman Auditorium |
| 25 January 2013 | Cincinnati | | Bogart's |
| 26 January 2013 | Indianapolis | | Old National Centre |
| 28 January 2013 | Pittsburgh | | Stage AE |
| 29 January 2013 | Baltimore | | Rams Head Live! |
| 30 January 2013 | New York City | | Radio City Music Hall |
| 1 February 2013 | Louisville | United States | The Louisville Palace |
| 2 February 2013 | St. Louis | | The Pageant |
| 3 February 2013 | Kansas | | Midland Theatre |
| 5 February 2013 | Broomfield | | 1stBank Center |
| 6 February 2013 | Magna | | The Great Saltair |
| 9 February 2013 | Los Angeles | | Hollywood Palladium |
| 12 February 2013 | San Diego | | Spreckels Theater |
| 13 February 2013 | Tempe | | Marquee Theatre |
| 14 February 2013 | Tucson | | Rialto Theatre |

## Track listing

All tracks produced by Jake Gosling, except where noted; all tracks co-produced by Ed Sheeran.

**Standard edition**

| No. | Title | Writer(s) | Producer(s) | Length |
|---|---|---|---|---|
| 1. | "The A Team" | Ed Sheeran | | 4:18 |
| 2. | "Drunk" | Sheeran · Gosling | | 3:20 |
| 3. | "U.N.I." | Sheeran · Gosling | | 3:48 |
| 4. | "Grade 8" | Sheeran · True Tiger (Robert Conlon · Sukhdeep Uppal) | Gosling · Charlie Hugall[a] | 2:59 |
| 5. | "Wake Me Up" | Sheeran · Gosling | | 3:49 |
| 6. | "Small Bump" | Sheeran | | 4:19 |
| 7. | "This" | Sheeran · Gordon Mills Jr. | | 3:15 |
| 8. | "The City" | Sheeran · Gosling | | 3:54 |
| 9. | "Lego House" | Sheeran · Gosling · Chris Leonard | | 3:05 |
| 10. | "You Need Me, I Don't Need You" | Sheeran | Gosling · Hugall | 3:40 |
| 11. | "Kiss Me" | Sheeran · Justin Franks · Julie Frost | Sheeran · No I.D. | 4:40 |
| 12. | "Give Me Love" (followed by the hidden track, "The Parting Glass") | Sheeran · Gosling · Leonard | | 8:46 |
| | | | Total length: | 49:53 |

**Deluxe edition bonus tracks**[44]

| No. | Title | Writer(s) | Length |
|---|---|---|---|
| 13. | "Autumn Leaves" | Sheeran · Gosling | 3:20 |
| 14. | "Little Bird" | Sheeran | 3:44 |
| 15. | "Gold Rush" | Sheeran · Amy Wadge | 4:03 |
| 16. | "Sunburn" | Sheeran | 4:35 |
| | | Total length: | 65:35 |

**Japanese deluxe edition CD bonus track**[45]

| No. | Title | Length |
|---|---|---|
| 17. | "The A Team" (acoustic version) | 4:01 |

**Japanese deluxe edition digital bonus tracks**[46]

| No. | Title | Length |
|---|---|---|
| 17. | "Sofa" | 3:19 |
| 18. | "Homeless" | 3:30 |
| 19. | "Lego House" (music video) | 4:05 |

**Australian deluxe edition bonus DVD:** *Live from O₂ Shepherd's Bush Empire, London*[47]

| No. | Title | Length |
|---|---|---|
| 1. | "Grade 8" | |
| 2. | "The City" | |
| 3. | "U.N.I." | |

4. "Homeless"
5. "Drunk"
6. "Small Bump"
7. "Lego House"
8. "Kiss Me"
9. "Wake Me Up"
10. "The A Team"
11. "Give Me Love"
12. "You Need Me, I Don't Need You"

**Notes**

- *[a] signifies an additional producer.
- "The City," "You Need Me, I Don't Need You" and "Sunburn" are all re-recorded versions from 2009's *You Need Me* EP, whereas "The A Team", "Little Bird," "Sofa" and "Homeless" originally appeared on the 2010s *Loose Change* EP; on later EP pressings, "The A Team" would be replaced with "Let It Out."

## Personnel

Credits taken from Allmusic and +'s liner notes.[48]

- Ed Sheeran – vocals and acoustic guitar (all tracks), beat box (8, 10), bass (2, 10), electric guitar (1, 2, 4, 6, 8-11, 14), handclaps (12), percussion (10), piano (5, 10)
- Jake Gosling – backing vocals (track 12), drums (track 10), handclapping (12), keyboards (2, 3, 6, 8, 14), piano (1, 4, 9), programming (1, 2, 4, 6, 8-10, 12-16), string arrangements (12), strings (1, 13)
- Chris Leonard – acoustic guitar (tracks 3, 4, 9, 12), backing vocals (track 3), bass (3, 9), electric guitar (3-5, 7, 15), handclaps (12)
- Anna Leddra Chapman – backing vocals (track 3)
- Louisa Fuller – violin (track 12)
- Tom Greenwood – piano (track 10)
- Sally Herbert – string arrangements (track 12)
- Ben Hollingsworth – drums (track 10)
- Charlie Hugall – additional drums and percussion (track 10)
- Oli Langford – violin (track 12)
- John Metcalfe – viola (track 12)
- No I.D. – programming (track 11)
- Chris Worsey – cello (track 12)

## Production

- Produced by Jake Gosling (tracks 1-10, 12-16), Charlie Hugall (10), Ed Sheeran (track 11), No I.D. (track 11)
  - All Tracks Co-Produced by Ed Sheeran
- Recorded by Jake Gosling (tracks 1-4, 6, 8-10, 12-16), Guy Massey (5, 7), Charlie Hugall (10), Rob Kinaelski (11)
  - Additional Recording by Guy Massey (tracks 3, 9, 12), Charlie Hugall (4)
  - Assisted by Edd Hartwell (tracks 2-5, 9, 12)
  - Additional Vocal Recording by Ruadhri Cushnan (track 9)
- Mixed by Jake Gosling (tracks 1, 13-16), Ruadhri Cushnan (2-4, 6, 8, 9, 12), Guy Massey (5, 7), Charlie Hugall (10), Rob Kinaelski (11)
  - Assisted by Grant Rawlinson and Marco Martini (tracks 2-4, 6, 8, 9, 10), Anna Ugarte (11)
  - Vocals Mixed by Jake Gosling (track 11)
- Mastering by Christian Wright
- Illustrations by Phillip Butah
- Executive Production by Ben Cook and Ed Howard
- Managed by Stuart Camp

## Charts

**Weekly charts**                                          **Year-end charts**

# A166

| Chart (2011–19) | Peak position |
|---|---|
| Australian Albums (ARIA)[30] | 1 |
| Austrian Albums (Ö3 Austria)[49] | 21 |
| Belgian Albums (Ultratop Flanders)[50] | 9 |
| Belgian Albums (Ultratop Wallonia)[51] | 38 |
| Canadian Albums (Billboard)[52] | 5 |
| Czech Albums (ČNS IFPI)[53] | 60 |
| Danish Albums (Hitlisten)[54] | 13 |
| Dutch Albums (Album Top 100)[55] | 8 |
| Finnish Albums (Suomen virallinen lista)[56] | 34 |
| French Albums (SNEP)[57] | 44 |
| German Albums (Offizielle Top 100)[58] | 12 |
| Hungarian Albums (MAHASZ)[59] | 30 |
| Irish Albums (IRMA)[60] | 1 |
| Italian Albums (FIMI)[61] | 28 |
| Japanese Albums (Oricon)[62] | 75 |
| Mexican Albums (Top 100 Mexico)[63] | 61 |
| New Zealand Albums (RMNZ)[34] | 1 |
| Norwegian Albums (VG-lista)[64] | 11 |
| Polish Albums (ZPAV)[65] | 40 |
| Scottish Albums (OCC)[66] | 1 |
| Spanish Albums (PROMUSICAE)[67] | 59 |
| Swedish Albums (Sverigetopplistan)[68] | 19 |
| Swiss Albums (Schweizer Hitparade)[69] | 2 |
| UK Albums (OCC)[70] | 1 |
| US Billboard 200[71] | 5 |
| US Folk Albums (Billboard)[72] | 1 |
| US Top Rock Albums (Billboard)[73] | 2 |

| Chart (2011) | Position |
|---|---|
| Australian Albums (ARIA)[74] | 58 |
| Irish Albums (IRMA)[75] | 19 |
| UK Albums (OCC)[76] | 9 |
| **Chart (2012)** | **Position** |
| Australian Albums (ARIA)[77] | 5 |
| Belgian Albums (Ultratop Flanders)[78] | 50 |
| Canadian Albums (Billboard)[79] | 48 |
| Dutch Albums (MegaCharts)[80] | 22 |
| Irish Albums (IRMA)[81] | 3 |
| New Zealand Albums (RMNZ)[82] | 2 |
| Swiss Albums (Schweizer Hitparade)[83] | 54 |
| UK Albums (OCC)[84] | 3 |
| US Billboard 200[85] | 136 |
| US Folk Albums (Billboard)[86] | 7 |
| US Rock Albums (Billboard)[87] | 37 |
| **Chart (2013)** | **Position** |
| Australian Albums (ARIA)[88] | 12 |
| Belgian Albums (Ultratop Flanders)[89] | 99 |
| Dutch Albums (MegaCharts)[90] | 53 |
| Irish Albums (IRMA)[91] | 17 |
| New Zealand Albums (RMNZ)[92] | 6 |
| UK Albums (OCC)[93] | 47 |
| US Billboard 200[94] | 46 |
| US Folk Albums (Billboard)[95] | 3 |
| US Rock Albums (Billboard)[96] | 8 |
| **Chart (2014)** | **Position** |
| Australian Albums (ARIA)[97] | 38 |
| Dutch Albums (MegaCharts)[98] | 71 |
| New Zealand Albums (RMNZ)[99] | 17 |
| Swedish Albums (Sverigetopplistan)[100] | 31 |
| UK Albums (OCC)[101] | 51 |
| US Billboard 200[102] | 122 |
| **Chart (2015)** | **Position** |
| Australian Albums (ARIA)[103] | 30 |
| Danish Albums (Hitlisten)[104] | 50 |
| Irish Albums (IRMA)[105] | 20 |
| New Zealand Albums (RMNZ)[106] | 23 |
| Swedish Albums (Sverigetopplistan)[107] | 46 |
| UK Albums (OCC)[108] | 38 |
| US Billboard 200[109] | 59 |
| **Chart (2016)** | **Position** |
| Danish Albums (Hitlisten)[110] | 65 |
| Swedish Albums (Sverigetopplistan)[111] | 76 |
| **Chart (2017)** | **Position** |
| Australian Albums (ARIA)[112] | 12 |
| Danish Albums (Hitlisten)[113] | 44 |
| Swedish Albums (Sverigetopplistan)[114] | 56 |
| UK Albums (OCC)[115] | 16 |
| **Chart (2018)** | **Position** |
| Australian Albums (ARIA)[116] | 23 |
| Danish Albums (Hitlisten)[117] | 80 |
| Irish Albums (IRMA)[118] | 36 |
| UK Albums (OCC)[119] | 57 |

## Certifications

| Region | Certification | Certified units/sales |
|---|---|---|
| Australia (ARIA)[120] | Diamond | 500,000^ |
| Austria (IFPI Austria)[121] | Gold | 10,000* |
| Canada (Music Canada)[122] | 4× Platinum | 320,000* |
| Denmark (IFPI Denmark)[123] | 2× Platinum | 40,000^ |
| France (SNEP)[124] | Gold | 50,000* |
| Germany (BVMI)[125] | Platinum | 200,000* |
| Ireland (IRMA)[126] | 6× Platinum | 90,000^ |
| Italy (FIMI)[127] | Gold | 30,000* |
| New Zealand (RMNZ)[128] | 5× Platinum | 75,000^ |
| Poland (ZPAV)[129] | 2× Platinum | 40,000* |
| Sweden (GLF)[130] | Platinum | 40,000* |
| Switzerland (IFPI Switzerland)[131] | Gold | 15,000^ |
| United Kingdom (BPI)[133] | 8× Platinum | 2,400,000[132] |
| United States (RIAA)[134] | 6× Platinum | 1,210,000[36] |
| **Summaries** | | |
| Europe (IFPI)[135] | 2× Platinum | 2,000,000* |
| Worldwide | — | 4,000,000[136] |

^sales figures based on certification alone

*shipments figures based on certification alone

## Release history

| Region | Date | Format(s) | Label |
|---|---|---|---|
| Ireland[137] | 9 September 2011 | CD · digital download (standard, deluxe) | Asylum Records · Atlantic Records |
| United Kingdom[138][139] | 12 September 2011 | CD · digital download (standard, deluxe) · LP (standard) | |
| Japan[140][141] | 13 September 2011 | CD · digital download (standard, special) | |
| Australia[142] | 23 September 2011 | | |
| Netherlands[143] | 18 November 2011 | | Warner Music |
| Switzerland[144] | 13 January 2012 | CD · digital download | |
| Poland[145] | 16 January 2012 | | |
| Germany[146] | 10 February 2012 | | |
| Argentina[147] | 15 May 2012 | | |
| United States[148] | 12 June 2012 | | Elektra Records |

## See also

- List of UK Albums Chart number ones of the 2010s
- List of number-one albums of 2012 (Australia)
- List of number-one albums of 2012 (Ireland)
- List of number-one albums of 2013 (Ireland)

## Notes

a. The show of 2 September 2012 in London at the Roundhouse was part of the 2012 iTunes Festival

## References

1. McCormick, Neil (3 August 2011). "Ed Sheeran: 'I haven't got used to the screams'" (https://www.telegraph.co.uk/culture/music/rockandpopfeatures/8679492/Ed-Sheeran-I-havent-got-used-to-the-screams.html). *The Daily Telegraph*. Retrieved 25 January 2012.
2. Patterson, Joseph (13 January 2011). "Ed Sheeran: The Interview" (http://www.mtv.co.uk/music/urban/253058-ed-sheeran-the-interview). *MTV*. Viacom. Retrieved 25 January 2012.
3. Martin, Gavin (9 September 2011). "Ed Sheeran interview" (https://www.mirror.co.uk/celebs/columnists/gavin-martin/2011/09/09/ed-sheeran-interview-115875-23403723/). *Daily Mirror*. Retrieved 25 January 2012.
4. Gill, Andy (9 September 2011). "Album: Ed Sheeran, + (Atlantic)" (https://www.independent.co.uk/arts-entertainment/music/reviews/album-ed-sheeran--atlantic-2351379.html). *The Independent*. Retrieved 25 January 2012.
5. "Taxi driver told Ed Sheeran to stop swearing - so he did" (https://www.nzherald.co.nz/entertainment/news/article.cfm?c_id=1501119&objectid=11276632). 18 June 2014. ISSN 1170-0777 (https://www.worldcat.org/issn/1170-0777). Retrieved 1 March 2019.
6. "Critical reviews for + at Metacritic" (http://www.metacritic.com/music/+/critic-reviews). *Metacritic*. Retrieved 25 January 2012.
7. O'Brien, Jon. "+ - Ed Sheeran" (http://www.allmusic.com/album/r2246596/review). *AllMusic*. Retrieved 25 January 2012.
8. Lachno, James (8 September 2011). "Ed Sheeran: – +, CD review" (https://www.telegraph.co.uk/culture/music/cdreviews/8750892/Ed-Sheeran-CD-review.html). *The Daily Telegraph*. Retrieved 10 December 2014.
9. *Entertainment Weekly*. 22 June 2012, p. 64.
10. Petridis, Alex (9 September 2011). "Ed Sheeran: "+" review" (https://www.theguardian.com/music/2011/sep/08/ed-sheeran-plus-review). *The Guardian*. Retrieved 25 January 2012.
11. "CDs of the week: Laura Marling and Ed Sheeran" (https://web.archive.org/web/20140110173839/http://www.standard.co.uk/goingout/music/cds-of-the-week-laura-marling-and-ed-sheeran-644170 4.html). *London Evening Standard*. 9 September 2011. Archived from the original (https://www.standard.co.uk/goingout/music/cds-of-the-week-laura-marling-and-ed-sheeran-6441704.html) on 10 January 2014. Retrieved 10 December 2014.
12. Mackay, Emily (9 September 2011). "NME Album reviews: Ed Sheeran - +" (http://www.nme.com/reviews/ed-sheeran/12309). *NME*. Retrieved 25 January 2012.
13. Hermione Hoby (11 September 2011). "Ed Sheeran: + – review" (https://www.theguardian.com/music/2011/sep/11/ed-sheeran-plus-album-review). *The Guardian*. Retrieved 12 February 2013.
14. Udell, Phil (14 September 2011). "Ed Sheeran – +" (http://state.ie/album-reviews/ed-sheeran). *State*. Retrieved 10 December 2014.
15. Shaw, Natalie (13 September 2011). "Ed Sheeran + review" (https://www.bbc.co.uk/music/reviews/zfvh). *BBC Music*. Retrieved 25 January 2012.
16. Lewis, John (11 September 2011). "Ed Sheeran's + offers promising stuff from the Prince Harry lookalike" (http://www.metro.co.uk/music/875117-ed-sheerans-offers-promising-stuff-from-the-prince-harry-lookalike). *Metro*. Retrieved 25 January 2012.
17. Copsey, Robert (16 September 2011). "Sunday chart predictions: One Direction, Ed Sheeran, Laura Marling" (https://www.digitalspy.co.uk/music/thesound/a340746/sunday-chart-predictions-one-direction-ed-sheeran-laura-marling.html). Digital Spy. Retrieved 25 January 2012.
18. Sperling, Daniel (18 September 2011). "Ed Sheeran tops UK album chart with '+'" (https://www.digitalspy.co.uk/music/news/a340995/ed-sheeran-tops-uk-album-chart-with-.html). Digital Spy. Retrieved 25 January 2012.
19. Corner, Lewis (19 September 2011). "Ed Sheeran celebrates No. 1 album with free EP for fans" (http://www.digitalspy.co.uk/music/news/a341114/ed-sheeran-celebrates-no1-album-with-free-ep-for-fans.html). Digital Spy. Retrieved 25 January 2012.
20. "Certified Awards" (http://www.bpi.co.uk/certified-awards.aspx). British Phonographic Industry. 10 December 2011. Archived (https://www.webcitation.org/6EEYfrVwc?url=http://www.bpi.co.uk/certified-awards.aspx) from the original on 6 February 2013. Retrieved 25 January 2012.
21. Copsey, Rob (9 June 2015). "Official Biggest Selling Albums of the decade so far revealed" (http://www.officialcharts.com/chart-news/official-biggest-selling-albums-of-the-decade-so-far-revealed__9787/). Official Charts Company. Retrieved 12 June 2015.
22. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_test.jsp&ct=240002&arch=t&lyr=2011&year=2011&week=48). *chart-track.co.uk*. Retrieved 2 March 2017.
23. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_test.jsp&ct=240002&arch=t&lyr=2012&year=2012&week=35). *chart-track.co.uk*. Retrieved 2 March 2017.
24. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_test.jsp&ct=240002&arch=t&lyr=2013&year=2013&week=6). *chart-track.co.uk*. Retrieved 2 March 2017.
25. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_test.jsp&ct=240002&arch=t&lyr=2014&year=2014&week=41). *chart-track.co.uk*. Retrieved 2 March 2017.
26. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_test.jsp&ct=240002&arch=t&lyr=2015&year=2015&week=31). *chart-track.co.uk*. Retrieved 2 March 2017.

27. "GFK Chart-Track" (http://www.chart-track.co.uk/index.jsp?c=p/musicvideo/music/archive/index_te st.jsp&ct=240002&arch=t&lyr=2016&year=2016&week=40). chart-track.co.uk. Retrieved 2 March 2017.

28. ">> IRMA << Welcome to our site >>" (http://www.irma.ie/#chartTab2). irma.ie. Retrieved 2 March 2017.

29. http://www.irma.ie/#chartTab2

30. "Australiancharts.com – Ed Sheeran – %2B" (https://australian-charts.com/showitem.asp?interpret =Ed+Sheeran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

31. "ARIA Australian Top 50 Albums Chart" (https://web.archive.org/web/20150409113130/http://www. ariacharts.com.au/chart/albums/78168). Australian Recording Industry Association. 6 April 2015. Archived from the original (http://www.ariacharts.com.au/chart/albums/78168) on 9 April 2015. Retrieved 4 April 2015.

32. http://australian-charts.com/bestall_a.asp

33. http://www.australian-charts.com/showitem.asp?interpret=Ed+Sheeran&titel=%2B&cat=a

34. "Charts.nz – Ed Sheeran – %2B" (https://charts.nz/showitem.asp?interpret=Ed+Sheeran&titel=%2 B&cat=a). Hung Medien. Retrieved 26 December 2013.

35. Caulfield, Keith (20 June 2012). "Usher Finds Fourth No. 1 Album on Billboard 200" (http://www.bil lboard.com/articles/news/482882/usher-finds-fourth-no-1-album-on-billboard-200). Billboard. Prometheus Global Media. Retrieved 20 June 2012.

36. Caulfield, Keith (6 April 2017). "Billboard 200 Chart Moves: Ed Sheeran's 'Divide' Reaches Half-Million in U.S. Album Sales" (http://www.billboard.com/articles/columns/chart-beat/7752423/ed-sh eeran-divide-half-million-sales-billboard-200). Billboard. Retrieved 7 April 2017.

37. Chang, Mary (26 May 2011). "Ed Sheeran / October 2011 UK Tour" (https://www.theregoesthefear. com/2011/05/ed-sheeran-october-2011-uk-tour.php). There Goes Fear. Retrieved 10 July 2019.

38. Chang, Mary (31 August 2011). "Ed Sheeran / January 2012 UK Tour" (https://www.theregoesthef ear.com/2011/08/ed-sheeran-january-2012-uk-tour.php). There Goes Fear. Retrieved 10 July 2019.

39. "Ed Sheeran to Support Snow Patrol on Tour" (https://www.theregoesthefear.com/2011/08/ed-she eran-january-2012-uk-tour.php). 9 January 2012. Retrieved 11 July 2019.

40. Zanotti, Marc (19 April 2012). "Ed Sheeran Australian Tour July/August 2012" (https://musicfeeds. com.au/news/ed-sheeran-australian-tour-julyaugust-2012/). Music Feeds. Retrieved 11 July 2019.

41. FM, Capital (6 June 2012). "Ed Sheeran Announces 2012 North American Tour" (https://www.capit alfm.com/artists/ed-sheeran/news/2012-north-american-tour/). Capital FM. Retrieved 10 July 2019.

42. FM, Capital (23 January 2012). "Ed Sheeran Announces Autumn 2012 UK Tour" (https://www.capi talfm.com/artists/ed-sheeran/news/2012-autumn-uk-tour/). Capital FM. Retrieved 10 July 2019.

43. FM, Capital (25 September 2012). "Ed Sheeran Announces 2013 US Tour Dates" (https://www.ca pitalfm.com/artists/ed-sheeran/news/2013-us-tour/). Capital FM. Retrieved 10 July 2019.

44. "iTunes – Music – + (Deluxe) by Ed Sheeran" (https://itunes.apple.com/us/album/+-deluxe-versio n/id448213992). iTunes Store (US). Apple Inc. 22 October 2013. Retrieved 20 October 2013.

45. "プラス【初回限定特別価格盤】ド・シーラァ 全英プ九バム・チャート1位」、発売週でゼロネ
ド・デイスクを獲得した英国の新鋭、エド・シーランのメジャー・デビュー・アルバムが卓越し
たミメ゛イディアズのセンスと、すば抜けたグリムム(ラップ)のスキルを携え、毎晩繰り返され
るライヴでの名をあげファンを拡大していった。「シンガー・ソング・ライターという骨を超越
したし、次々新しい楽声と才能、エド・シーラン、レコード会社争奪戦後、アドラッディ゛ングとジャ
ー契約! エロトン・ジョンも才能に惚れ込み、マネージメント契約 「The A Team-唄でな
い天使たち~」の楽曲から英国で火が付き、ゼド・アルバムでの本作はプラチナ・アルバ
ム60万枚以3000枚突破(10.21枚点)。全英初登録f位&初週セールス、この10年で男性新人
NO.1を記録。解説・歌詞・対訳付き。日本盤ポーナス・トラック収録！日本だけの特典つき
j/product/WPCR-14317). CDJapan.co.jp. Retrieved 18 January 2012.

46. "iTunes – mUsic - + by Ed Sheeran" (https://itunes.apple.com/jp/album/id493328060?l=en). iTunes Store (JP). Apple. Archived (https://www.webcitation.org/6V6DQ5Mpi?url=https://itunes.ap ple.com/jp/album/id493328060?l=en) from the original on 26 December 2014. Retrieved 18 January 2012.

47. "(Deluxe Edition) | CD & DVD Music, Music Genres, Pop/Rock : JB HI-FI" (http://www.jbhifionline.c om.au/music/pop-rock/deluxe-edition/676304). Jbhifionline.com.au. Retrieved 12 February 2013.

48. "Ed Sheeran : Credits" (http://www.allmusic.com/album/r2246596/credits). AllMusic. 12 September 2011. Retrieved 12 February 2013.

49. "Austriancharts.at – Ed Sheeran – %2B" (https://austriancharts.at/showitem.asp?interpret=Ed+Sh eeran&titel=%2B&cat=a) (in German). Hung Medien. Retrieved 26 December 2013.

50. "Ultratop.be – Ed Sheeran – %2B" (https://www.ultratop.be/nl/showitem.asp?interpret=Ed+Sheera n&titel=%2B&cat=a) (in Dutch). Hung Medien. Retrieved 26 December 2013.

51. "Ultratop.be – Ed Sheeran – %2B" (https://www.ultratop.be/fr/showitem.asp?interpret=Ed+Sheera n&titel=%2B&cat=a) (in French). Hung Medien. Retrieved 26 December 2013.

52. "Ed Sheeran Chart History (Canadian Albums)" (https://www.billboard.com/music/Ed-Sheeran/cha rt-history/canadian-albums). Billboard. Retrieved 26 December 2013.

53. "Czech Albums – Ed Sheeran – %2B" (https://www.ifpicr.cz/hitparada/index.php?hitp=P). ČNS IFPI. Note: On the chart page, select 201508 on the field besides the word "Zobrazit", and then click over the word to retrieve the correct chart data. Retrieved 26 March 2017.

54. "Danishcharts.dk – Ed Sheeran – %2B" (https://danishcharts.dk/showitem.asp?interpret=Ed+Shee ran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

55. "Dutchcharts.nl – Ed Sheeran – %2B" (https://dutchcharts.nl/showitem.asp?interpret=Ed+Sheeran &titel=%2B&cat=a) (in Dutch). Hung Medien. Retrieved 26 December 2013.

56. "Ed Sheeran: +" (https://www.ifpi.fi/tilastot/virallinen-lista/artisti/Ed+Sheeran/%2B) (in Finnish). Musiikkituottajat – IFPI Finland. Retrieved 26 March 2017.

57. "Lescharts.com – Ed Sheeran – %2B" (https://lescharts.com/showitem.asp?interpret=Ed+Sheeran &titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

58. "Offizielecharts.de – Ed Sheeran – +" (https://www.offizielecharts.de/album-details-174749) (in German). GfK Entertainment Charts. Retrieved 26 December 2013.

59. "Top 40 album DVD és válogatáslemez-lista – 2019. 17. hét" (http://zene.slagerlistak.hu/top-40-alb um-dvd-es-valogataslemez-lista/2019/17) (in Hungarian). MAHASZ. Retrieved 4 May 2019.

60. "GFK Chart-Track Albums: Week 23, 2012" (http://www.chart-track.co.uk/index.jsp?c=p%2Fmusi cvideo%2Fmusic%2Farchive%2Findex_test.jsp&ct=240002&arch=t&lyr=2012&year=2012&week= 23). Chart-Track. Retrieved 26 December 2013.

61. "Italiancharts.com – Ed Sheeran – %2B" (https://italiancharts.com/showitem.asp?interpret=Ed+Sh eeran&titel=%2B&cat=a). Hung Medien. Retrieved 6 September 2013.

62. Ｅ ｄ 　Ｓ ｈ ｅ ｅ ｒ ａ ｎのアルバム売り上げランキング (http://www.oricon.co.jp/prof/artist/546629/r anking/cd_album/) [Ed Sheeran album sales ranking] (in Japanese). Oricon. Retrieved 20 March 2013.

63. "Mexicancharts.com – Ed Sheeran – +" (http://www.mexicancharts.com/showitem.asp?interpret=E d+Sheeran&titel=+&cat=a). Hung Medien. Retrieved 26 December 2013.

64. "Norwegiancharts.com – Ed Sheeran – %2B" (https://norwegiancharts.com/showitem.asp?interpre t=Ed+Sheeran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

65. "Oficjalna lista sprzedaży :: OLiS - Official Retail Sales Chart" (http://olis.onyx.pl/listy/index.asp?idl isty=822&lang=en). OLiS. Polish Society of the Phonographic Industry. Retrieved 27 February 2013.

66. "Official Scottish Albums Chart Top 100" (https://www.officialcharts.com/charts/scottish-albums-ch art/2011-09-24/40/). Official Charts Company. Retrieved 26 March 2017.

67. "Spanishcharts.com – Ed Sheeran – %2B" (https://spanishcharts.com/showitem.asp?interpret=Ed +Sheeran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

68. "Swedishcharts.com – Ed Sheeran – %2B" (https://swedishcharts.com/showitem.asp?interpret=E d+Sheeran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

69. "Swisscharts.com – Ed Sheeran – %2B" (https://swisscharts.com/showitem.asp?interpret=Ed+She eran&titel=%2B&cat=a). Hung Medien. Retrieved 26 December 2013.

70. "Official Albums Chart Top 100" (https://www.officialcharts.com/charts/albums-chart/2011-09-24/75/ 02/). Official Charts Company. Retrieved 26 December 2013.

71. "Ed Sheeran Chart History (Billboard 200)" (https://www.billboard.com/music/Ed-Sheeran/chart-his tory/billboard-200). Billboard. Retrieved 26 December 2013.

72. "Ed Sheeran Chart History (Top Americana/Folk Albums)" (https://www.billboard.com/music/Ed-Sh eeran/chart-history/americana-folk-albums). Billboard. Retrieved 26 March 2017.

73. "Ed Sheeran Chart History (Top Rock Albums)" (https://www.billboard.com/music/Ed-Sheeran/cha rt-history/rock-albums). Billboard. Retrieved 26 March 2017.

74. "ARIA Charts – End Of Year Charts – Top 100 Albums 2011" (http://www.aria.com.au/pages/aria-c harts-end-of-year-charts-top-100-albums-2011.htm). ARIA. Retrieved 4 May 2013.

75. "Best of 2011 – Top 20 Albums" (http://www.irma.ie/best-of-20111). IRMA. Retrieved 6 January 2012.

76. "End of Year Album Chart Top 100 – 2011" (http://www.officialcharts.com/charts/end-of-year-artist-albums-chart/20110109/37502/). OCC. Retrieved 2 May 2012.

77. "ARIA Charts – End Of Year Charts – Top 100 Albums 2012" (http://www.aria.com.au/pages/aria-c harts-end-of-year-charts-top-100-albums-2012.htm). ARIA. Retrieved 4 May 2013.

78. "Jaaroverzichten 2012" (http://www.ultratop.be/nl/annual.asp?year=2012&cat=a) (in Dutch). Ultratop. Retrieved 23 December 2012.

79. "Canadian Albums – Year End 2012" (http://www.billboard.com/charts/year-end/2012/top-canadia n-albums). Billboard. Retrieved 27 March 2017.

80. "Jaaroverzichten – Album 2012" (http://dutchcharts.nl/jaaroverzichten.asp?year=2012&cat=a) (in Dutch). Hung Medien. Retrieved 27 December 2012.

81. "Best of 2012 – Top 20 Albums" (http://www.irma.ie/best-of-20121). IRMA. Retrieved 4 May 2013.

82. "Top Selling Albums of 2012" (http://nztop40.co.nz/chart/albums?chart=2131). RIANZ. Retrieved 12 February 2013.

83. "Swiss Year-End Charts 2012" (http://swisscharts.com/year.asp?key=2012). Hung Medien. Retrieved 30 December 2012.

84. "End of Year Album Chart Top 100 – 2012" (http://www.officialcharts.com/charts/end-of-year-artist-albums-chart/20120108/37502/). OCC. Retrieved 7 January 2013.

85. "2012 Year-End Charts – Billboard 200 Albums" (http://www.billboard.com/charts/year-end/2012/to p-billboard-200-albums). Prometheus Global Media. Retrieved 28 February 2015.

86. "Folk Albums – 2012 Year End Charts" (http://www.billboard.com/charts/year-end/2012/folk-album s). Billboard. Prometheus Global Media. Retrieved 4 May 2013.

87. "Rock Albums – 2012 Year End Charts" (http://www.billboard.com/charts/year-end/2012/top-rock-albums?page=3). Billboard. Prometheus Global Media. Retrieved 5 June 2014.

88. "ARIA Charts – End Of Year Charts – Top 100 Albums 2013" (http://www.aria.com.au/pages/aria-c harts-end-of-year-charts-top-100-albums-2013.htm). ARIA. Retrieved 7 January 2014.

89. "Jaaroverzichten 2013" (http://www.ultratop.be/nl/annual.asp?year=2013&cat=a) (in Dutch). Ultratop. Retrieved 23 May 2014.

90. "Jaaroverzichten – Album 2013" (http://dutchcharts.nl/jaaroverzichten.asp?year=2013&cat=a) (in Dutch). Hung Medien. Retrieved 6 January 2014.

91. "Best of 2013 – Top 20 Albums" (http://www.irma.ie/best-of-20131). IRMA. Retrieved 6 January 2014.

92. "Top Selling Albums of 2013" (http://nztop40.co.nz/chart/albums?chart=4181). RIANZ. Retrieved 23 May 2014.

93. "End of Year Album Chart Top 100 – 2013" (http://www.officialcharts.com/charts/end-of-year-artist-albums-chart/20130106/37502/). OCC. Retrieved 25 December 2015.

94. "2013 Year-End Charts – Billboard 200 Albums" (http://www.billboard.com/charts/year-end/2013/to p-billboard-200-albums). Prometheus Global Media. Retrieved 28 February 2015.

95. "Folk Albums – 2013 Year End Charts" (http://www.billboard.com/charts/year-end/2013/folk-album s). Billboard. Prometheus Global Media. Retrieved 5 June 2014.

96. "Rock Albums – 2013 Year End Charts" (http://www.billboard.com/charts/year-end/2013/top-rock-albums). Billboard. Prometheus Global Media. Retrieved 5 June 2014.

97. "ARIA Charts – End Of Year Charts – Top 100 Albums 2014" (http://aria.com.au/aria-charts-end-of -year-charts-top-100-albums-2014.htm). ARIA. Retrieved 7 January 2015.

98. "Jaaroverzichten – Album 2014" (http://dutchcharts.nl/jaaroverzichten.asp?year=2014&cat=a) (in Dutch). Hung Medien. Retrieved 27 March 2017.

99. "Top Selling Albums of 2014" (http://nztop40.co.nz/chart/albums?chart=4184). RIANZ. Retrieved 29 December 2014.

100. "Årslista Album (inkl samlingar) – År 2014" (http://www.sverigetopplistan.se/netdata/ghl002.mbr/lis ta?liid=42&dfom=20140001&navi=no) (in Swedish). GLF. Retrieved 27 March 2017.

101. "End of Year Album Chart Top 100 – 2014" (http://www.officialcharts.com/charts/end-of-year-artist-albums-chart/20150104/37502/). OCC. Retrieved 25 September 2015.

102. "2014 Year-End Charts – Billboard 200 Albums" (http://www.billboard.com/charts/year-end/2014/to p-billboard-200-albums). Billboard. Retrieved 9 January 2015.

103. "ARIA Charts – End Of Year Charts – Top 100 Albums 2015.htm). ARIA. Retrieved 6 January 2016.

104. "Album Top-100 2015" (http://www.hitlisten.nu/top2015.asp) (in Danish). IFPI Denmark. Retrieved 27 March 2017.

105. "Best of 2015 – Top 20 Albums" (http://www.irma.ie/best-of-20151). IRMA. Retrieved 2 March 2017.

106. "Top Selling Albums of 2015" (http://nztop40.co.nz/chart/albums?chart=4200). RIANZ. Retrieved 27 March 2017.

107. "Årslista Album (inkl samlingar) – År 2015" (http://www.sverigetopplistan.se/netdata/ghl002.mbr/lis ta?liid=42&dfom=20150001&navi=no) (in Swedish). GLF. Retrieved 27 March 2017.

108. "End of Year Album Chart Top 100 – 2015" (http://www.officialcharts.com/charts/end-of-year-artist-albums-chart/20160104/37502/). OCC. Retrieved 5 January 2016.

109. "2015 Year-End Charts – Billboard 200 Albums" (http://www.billboard.com/charts/year-end/2015/to p-billboard-200-albums). Billboard. Retrieved 9 January 2016.

110. "Album Top-100 2016" (http://www.hitlisten.nu/top2016.asp) (in Danish). IFPI Denmark. Retrieved 31 December 2016.

111. "Årslista Album (inkl samlingar) – År 2016" (http://www.sverigetopplistan.se/netdata/ghl002.mbr/lis ta?liid=42&dfom=20160001&navi=no) (in Swedish). GLF. Retrieved 27 March 2017.

112. "2017 ARIA Albums Chart" (https://www.ariacharts.com.au/annual-charts/2017/albums-chart). Australian Recording Industry Association. Retrieved 4 January 2018.

113. "Album Top-100 2017" (http://hitlisten.nu/top2017.asp?list=Album%20100). Hitlisten. Retrieved 11 January 2018.

114. "Årslista Album – År 2017" (http://www.sverigetopplistan.se/netdata/ghl002.mbr/lista?liid=83&dfom =20170001) (in Swedish). Sverigetopplistan. Retrieved 16 January 2018.

115. White, Jack (3 January 2018). "The Top 40 biggest albums of 2017 on the Official Chart" (http://w ww.officialcharts.com/chart-news/the-top-40-biggest-albums-of-2017-on-the-official-chart__2131 6/). Official Charts Company. Retrieved 3 January 2018.

116. "2018 Annual ARIA Albums Chart" (https://www.ariacharts.com/annual-charts/2018/albums-ch art). Australian Recording Industry Association. Retrieved 10 January 2019.

117. "Album Top-100 2018" (http://hitlisten.nu/2018_album_t100.html) (in Danish). Hitlisten. Retrieved 16 January 2019.

118. White, Jack (4 January 2019). "Ireland's Official Top 40 biggest albums of 2018" (https://www.offici alcharts.com/chart-news/irelands-official-top-40-biggest-albums-of-2018__25261/). Official Charts Company. Retrieved 13 January 2019.

119. "End of Year Album Chart Top 100 – 2018" (https://www.officialcharts.com/charts/end-of-year-artis t-albums-chart/20181231/37502). Official Charts Company. Retrieved 4 January 2019.

120. "ARIA Charts – Accreditations – 2018 Albums" (http://www.aria.com.au/pages/AlbumAccreds201 8.htm). Australian Recording Industry Association. Retrieved 10 August 2019.

121. "Austrian album certifications – Ed Sheeran – +" (https://ifpi.at/auszeichnungen/?fwp_per_page=1 00&fwp_interpret=Ed+Sheeran&fwp_titel=%2B&fwp_format=album&) (in German). IFPI Austria. Retrieved 26 March 2017.

122. "Canadian album certifications – Ed Sheeran – +" (https://musiccanada.com/gold-platinum/?_gp_s earch=%2B%20Ed+Sheeran). Music Canada. Retrieved 6 November 2018.

123. "Danish album certifications" (http://www.ifpi.dk/certificeringer-0). IFPI Denmark. Scroll through the page-list below until year 2018 to obtain certification.

124. "French album certifications – Ed Sheeran – +" (http://www.snepmusique.com/les-disques-dor/?a wards_cat=65&awards_artist=Ed+Sheeran&awards_title=%2B) (in French). Syndicat National de l'Édition Phonographique. Retrieved 26 March 2017.

125. "Gold-/Platin-Datenbank (Ed Sheeran; '+')" (http://www.musikindustrie.de/markt-bestseller/gold-/pl atin-und-diamond-auszeichnung/datenbank/?action=suche&strTitel=%2B&strInterpret=Ed+Sheera n&strTitArt=alle&strAwards=checked) (in German). Bundesverband Musikindustrie. Retrieved 26 March 2017.

126. "Irish album certifications – Ed Sheeran – +" (http://www.irishcharts.ie/awards/multi_platinum12.ht m). Irish Recorded Music Association. Retrieved 26 March 2017.

127. "Italian album certifications – Ed Sheeran – +" (https://www.fimi.it/top-of-the-music/certificazioni/ce rtificazioni.kl#/certifications) (in Italian). Federazione Industria Musicale Italiana. Retrieved 20 December 2016. Select "2016" in the "Anno" drop-down menu. Select "+" in the "Filtra" field. Select "Album e Compilation" under "Sezione".

128. "New Zealand album certifications – Ed Sheeran – +" (https://nztop40.co.nz/chart/albums?chart=4 180). Recorded Music NZ. Retrieved 26 March 2017.

129. "Polish album certifications – Ed Sheeran – +" (http://bestsellery.zpav.pl/wyroznienia/platynoweplyt y/cd/archiwum.php?year=2016) (in Polish). Polish Society of the Phonographic Industry. Retrieved 7 September 2016.

130. "Guld- och Platinacertifikat" (http://www.sverigetopplistan.se) (in Swedish). IFPI Sweden. Retrieved 26 March 2017. Type Ed Sheeran in the top right search bar. Click on "Sök" and select "Visa" under + to see certification.

131. "The Official Swiss Charts and Music Community: Awards (Ed Sheeran; '+')" (http://www.swissacha rts.com/search_certifications.asp?search=Ed+Sheeran+%2B). IFPI Switzerland. Hung Medien. Retrieved 26 March 2017.

132. Copsey, Rob (2 March 2017). "The incredible numbers behind Ed Sheeran's first two albums revealed" (http://www.officialcharts.com/chart-news/the-incredible-numbers-behind-ed-sheerans-fi rst-two-albums-revealed__18340/). Official Charts Company. Retrieved 2 March 2017.

133. "British album certifications – Ed Sheeran – +" (https://www.bpi.co.uk/brit-certified/). British Phonographic Industry. Retrieved 9 September 2016. Select albums in the Format field. Select Platinum in the Certification field. Type + in the "Search BPI Awards" field and then press Enter.

134. "American album certifications – Ed Sheeran – +" (https://www.riaa.com/gold-platinum/?tab_active =default-award&ar=Ed+Sheeran&ti=%2B#search_section). Recording Industry Association of America. Retrieved 26 March 2017. If necessary, click Advanced, then click Format, then select Album, then click SEARCH.

135. "Platinum Europe Award" (http://web.archive.org/web/20150619162018/http://www.ifpi.org/platinu m_awards.php) (in German). IFPI. Archived from the original (http://www.ifpi.org/platinum_awards.php) on 19 June 2015. Retrieved 3 October 2017.

136. Mark Beech (8 January 2017). "Ed Sheeran In Top 2 Chart Places Worldwide After 48 Hours" (htt ps://www.forbes.com/sites/markbeech/2017/01/08/ed-sheeran-heads-for-top-chart-places-after-on ly-two-days/#180bc80a6ac8). Forbes. Retrieved 19 July 2019.

137. "by Ed Sheeran – Preorder + on iTunes" (https://itunes.apple.com/ie/preorder/id448410899). Itunes.apple.com. Retrieved 4 August 2011.

138. "by Ed Sheeran – Preorder + on iTunes" (https://itunes.apple.com/gb/preorder/id448410899). Itunes.apple.com. Retrieved 4 August 2011.

139. "Ed Sheeran – + (Plus) (2011): LP" (https://web.archive.org/web/20121012031329/http://hmv.com/h mvweb/displayProductDetails.do?ctx=280%3B-1%3B-1%3B-1&sku=262534). hmv.com. 15 December 2005. Archived from the original (http://hmv.com/hmvweb/displayProductDetails.do?ctx =280;-1;-1;-1;-1&sku=262534) on 12 October 2012. Retrieved 3 March 2012.

140. "エド・シーラン・プラス" (http://wmg.jp/artist/edsheeran/PKG0000007478.html). Wmg.jp. Retrieved 12 February 2013.

141. "エド・シーラン・プラス（初回限定スペシャル・プライス盤）" (https://web.archive.org/web/201 30218025044/http://wmg.jp/artist/edsheeran/WPCR000014317.html). Wmg.jp. Archived from the original (http://wmg.jp/artist/edsheeran/WPCR000014317.html) on 18 February 2013. Retrieved 12 February 2013.

142. "| Music , Music Genres, Pop/Rock : JB HI-FI" (https://www.jbhifionline.com.au/music/pop-rock//654 553). Jbhifionline.com.au. Retrieved 3 March 2012.

143. "Plus '+', Ed Sheeran | Muziek" (https://www.bol.com/nl/p/muziek/plus/1000004011667851/index.ht ml). bol.com. Retrieved 3 March 2012.

144. "album pop – Warner Music Switzerland" (https://www.warnermusic.ch/catalogue_detail-n40-i8256 46634422-sF.html). Warnermusic.ch. 13 January 2012. Retrieved 3 March 2012.

145. "Ed Sheeran – +" (https://web.archive.org/web/20150620192213/http://www.warnermusic.pl/index. php?option=com_content&view=article&id=637%3Aed-sheeran-&catid=43%3Aaktualne-premiery &Itemid=66I). Warnermusic.pl. 16 January 2012. Archived from the original (http://www.warnermus ic.pl/index.php?option=com_content&view=article&id=637%3Aed-sheeran-&catid=43%3Aaktualn e-premiery&Itemid=66I) on 20 June 2015. Retrieved 5 May 2012.

146. "Warner Music Germany – Ed Sheeran – Veröffentlichungen" (http://www.warnermusic.de/edsheer an/music/?allreleasepage=1). Warnermusic.de. 25 November 2011. Retrieved 3 March 2012.

147. "Warner Music Argentina – Ed Sheeran" (https://www.facebook.com/WarnerMusicArgentina/app_ 203575496426797?ref=ts). 7 May 2012. Retrieved 3 May 2012.

148. "Ed Sheeran's Debut Album "+" Now Available to Pre-Order on iTunes" (https://web.archive.org/w eb/20151022221250/http://www.elektra.com/news/ed-sheerans-debut-album-now-available-pre-or der-itunes-34766). Elektra Records. 8 May 2012. Archived from the original (http://www.elektra.co m/news/ed-sheerans-debut-album-now-available-pre-order-itunes-34766) on 22 October 2015. Retrieved 12 February 2013.

Retrieved from "https://en.wikipedia.org/w/index.php?title=%2B_(Ed_Sheeran_album)&oldid=919725221"

This page was last edited on 5 October 2019, at 11:43 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

WIKIPEDIA

# x Tour (Ed Sheeran)

The **x Tour** (pronounced "Multiply Tour") was the second world concert tour by English singer-songwriter and musician, Ed Sheeran, in support of his second album, ×, (pronounced "multiply"). The tour began in Osaka, Japan on 6 August 2014, and continued through Europe, the Americas, Oceania and Asia until 12 December 2015. Sheeran planned 180 shows. In June 2015, the singer announced a documentary would be filmed during the tour's three sold-out dates, 10–12 July 2015, at 80,000-person capacity Wembley Stadium.[2]

## Contents

Background
Set list
Tour dates
    Notes
References

## Background

Throughout 2013, Sheeran supported Taylor Swift on her North American Red Tour, as well as performing throughout the show itself. He also is featured on her single, "Everything Has Changed", which was promoted at the Summertime Ball and the final of *Britain's Got Talent*. While touring, he began recording his second studio album, ×. The album was preceded by the lead single, "Sing", which reached number one in the UK. The album, released on 20 June 2014, received critical acclaim, and Sheeran performed at series of festivals in 2014, including Glastonbury Festival, T in the Park and Southside Festival. On 14 April 2014, following a performance on *Saturday Night Live*, Sheeran announced his first ever North American arena tour. Beginning in Seattle, the 15-date tour would travel all around North America.[3] Due to demand, three dates were added to the tour (one date at the SAP Center and at the Staples Center in Los Angeles).

During the 2015 leg of the X Tour, Ed Sheeran chose to use a Fender Stratocaster loaned to him by British contemporary artist Teddy M. The guitar known as Green T featuring graphics by the artist was played in 18 countries and used for the songs requiring an electric guitar including "Thinking Out Loud". Green T was returned to Teddy M at the end of the X Tour and later auctioned by Bonhams for £12,500 (Dec 2015). https://www.bonhams.com/auctions/22818/lot/179/

The documentary movie *Jumpers for Goalposts: Live at Wembley Stadium* shot at Wembley Stadium at the end of the X Tour features the graffiti'd Fender Stratocaster Ed Sheeran commissioned as a collaboration between New York street art pioneer John Crash Matos and Teddy M. Known as the 'Crash x Teddy M' Stratocaster, the guitar features the debut of the Teddy M Heart design and Crash's signature eye symbol. GQ magazine featured a full page article on the 'Crash x Teddy M' Stratocaster in their July 2015 edition.[4]

According to Pollstar, the X Tour was the 43rd highest-grossing tour of 2014, with 667,066 tickets sold and US$33.4 million grossed.[5] The next year, the X Tour became the seventh highest-grossing tour of 2015, with 1,823,410 tickets sold and a gross of US$117.3 million,[6] accumulating a total of US$150.7 million grossed.

The support acts were: Rudimental, Rixton, Foy Vance, Kodaline and Christina Perri.

## Set list

This set list is representative of the show on August 27, 2014. It does not represent all concerts for the duration of the tour.[7]

1. "I'm a Mess"
2. "Lego House"
3. "Don't"
4. "Drunk"
5. "Take It Back"
6. "One"
7. "Bloodstream"
8. "Tenerife Sea"
9. "Afire Love"
10. "Runaway"
11. "Thinking Out Loud"
12. "Give Me Love"
13. "I See Fire"

**Encore**

1.
14. "You Need Me, I Don't Need You"
15. "The A Team"
16. "Chasing Cars"
17. "Sing"

## Tour dates

| X Tour | |
| --- | --- |
| Tour by Ed Sheeran | |
| Poster of x Tour (North American 4th leg) | |
| Associated album | × |
| Start date | August 6, 2014 |
| End date | December 12, 2015 |
| Legs | 13 |
| No. of shows | 11 in Asia<br>61 in Europe<br>77 in North America<br>23 in Oceania<br>8 in South America<br>180 in total |
| Box office | US$150.7 million ($159.29 million in 2018 dollars)[1] |
| Ed Sheeran concert chronology | |

10/23/2019                                              X Tour (Ed Sheeran) - Wikipedia

List of concerts, showing date, city, country, venue, tickets sold, amount of available tickets and gross revenue

| Date | City | Country | Venue | Attendance | Revenue |
|---|---|---|---|---|---|
| Asia | | | | | |
| 6 August 2014 | Osaka | Japan | Big Cat | N/A | N/A |
| 8 August 2014 | Tokyo | | Studio Coast | | |
| Europe | | | | | |
| 15 August 2014[a] | Hasselt | Belgium | Kiewit | N/A | N/A |
| 16 August 2014[b] | Chelmsford | England | Hylands Park (V Festival) | | |
| 17 August 2014[c] | Weston-under-Lizard | | Weston Park (V Festival) | | |
| North America[8][9] | | | | | |
| 21 August 2014 | Seattle | United States | WaMu Theater | 7,200 / 7,200 | $404,362 |
| 23 August 2014 | Vancouver | Canada | Ambleside Park | 10,768 / 10,768 | $565,895 |
| 26 August 2014 | San Jose | | SAP Center | 7,485 / 7,485 | $423,475 |
| 27 August 2014 | Los Angeles | | Staples Center | N/A | N/A |
| 29 August 2014 | Las Vegas | | The Chelsea | 6,000 / 6,000 | $237,415 |
| 30 August 2014 | | | | | |
| 31 August 2014 | Glendale | | Jobing.com Arena | 8,918 / 8,918 | $329,272 |
| 3 September 2014 | Kansas City | | Sprint Center | 5,514 / 5,514 | $285,408 |
| 4 September 2014 | Cleveland | | Wolstein Center | 5,139 / 5,139 | $272,367 |
| 6 September 2014 | Columbia | United States | Merriweather Post Pavilion | 11,563 / 11,563 | $507,170 |
| 8 September 2014 | Philadelphia | | Wells Fargo Center | 10,723 / 10,723 | $523,115 |
| 9 September 2014 | Mansfield | | Xfinity Center | 10,808 / 10,808 | $545,623 |
| 11 September 2014 | Charlotte | | Time Warner Cable Arena | 6,533 / 6,533 | $314,548 |
| 12 September 2014 | Duluth | | Arena at Gwinnett Center | 9,276 / 9,276 | $475,402 |
| 13 September 2014 | Nashville | | Bridgestone Arena | 10,231 / 10,231 | $569,296 |
| 15 September 2014 | Minneapolis | | Target Center | 7,369 / 7,369 | $413,428 |
| 16 September 2014 | Rosemont | | Allstate Arena | 10,532 / 10,532 | $532,328 |
| 17 September 2014 | Auburn Hills | | The Palace of Auburn Hills | 6,419 / 6,419 | $340,873 |
| 18 September 2014 | Toronto | Canada | Air Canada Centre | 14,156 / 14,156 | $767,910 |
| 20 September 2014[d] | Las Vegas | United States | MGM Grand Garden Arena | N/A | N/A |
| Europe[10][11] | | | | | |
| 29 September 2014[e] | London | England | Roundhouse | N/A | N/A |
| 3 October 2014 | Dublin | Ireland | 3Arena | | |
| 4 October 2014 | | | | | |
| 5 October 2014 | | | | | |
| 6 October 2014 | | | | | |
| 8 October 2014 | Belfast | Northern Ireland | Odyssey Arena | | |
| 9 October 2014 | | | | | |
| 11 October 2014 | Leeds | | First Direct Arena | | |
| 12 October 2014 | London | | The O2 Arena | 68,748 / 70,489 | $4,011,080 |
| 13 October 2014 | | | | | |
| 14 October 2014 | | | | | |
| 15 October 2014 | | | | | |
| 19 October 2014 | Birmingham | England | LG Arena | N/A | N/A |
| 20 October 2014 | | | | | |
| 22 October 2014 | Nottingham | | Capital FM Arena | | |
| 23 October 2014 | | | | | |
| 25 October 2014 | Newcastle | | Metro Radio Arena | | |
| 27 October 2014 | Manchester | | Phones 4u Arena | 32,303 / 32,610 | $1,688,860 |
| 28 October 2014 | | | | | |
| 30 October 2014 | Glasgow | Scotland | SSE Hydro | N/A | N/A |
| 31 October 2014 | | | | | |
| 3 November 2014 | Amsterdam | Netherlands | Ziggo Dome | | |
| 4 November 2014 | Brussels | Belgium | Forest National | 8,000 / 8,400 | $299,784 |
| 5 November 2014 | Düsseldorf | Germany | ISS Dome | 11,820 / 11,820 | $414,299 |
| 6 November 2014 | Hamburg | | O2 World Hamburg | 12,121 / 12,303 | $395,006 |
| 11 November 2014 | Copenhagen | Denmark | Forum Copenhagen | N/A | N/A |
| 12 November 2014 | Stockholm | Sweden | Ericsson Globe | 13,994 / 13,994 | $604,594 |
| 14 November 2014 | Berlin | | Max-Schmeling-Halle | 8,969 / 8,969 | $313,251 |
| 15 November 2014 | Stuttgart | Germany | Porsche-Arena | 6,283 / 6,283 | $226,940 |
| 17 November 2014 | Munich | | Olympiahalle | 12,084 / 12,084 | $480,936 |
| 18 November 2014 | Frankfurt | | Festhalle Frankfurt | 11,739 / 11,739 | $411,033 |
| 19 November 2014 | Zürich | Switzerland | Maag Halle | N/A | N/A |
| 20 November 2014 | Milan | Italy | Alcatraz | | |
| 22 November 2014 | Villeurbanne | France | Le Transbordeur | | |
| 24 November 2014 | Barcelona | Spain | Palau Sant Jordi | | |
| 25 November 2014 | Madrid | | Barclaycard Center | | |
| 27 November 2014 | Paris | France | Bataclan | | |
| Europe | | | | | |
| 26 January 2015 | Rome | Italy | PalaLottomatica | | |
| 27 January 2015 | Milan | | Mediolanum Forum | | |
| 28 January 2015 | Zürich | Switzerland | Hallenstadion | 13,000 / 13,000 | $892,945 |
| 30 January 2015 | Amnéville | France | Galaxie Amnéville | N/A | |
| 1 February 2015 | Clermont-Ferrand | | Zénith de Clermont-Ferrand | | |
| 2 February 2015 | Paris | | Zénith de Paris | | |

| Date | City | Country/Region | Venue | Attendance | Revenue |
|---|---|---|---|---|---|
| 3 February 2015 | Nantes | | Zénith de Nantes | | |
| 12 February 2015 | Prague | Czech Republic | Tipsport Arena | | |
| 13 February 2015 | Warsaw | Poland | Torwar Hall | | |
| 15 February 2015 | Vilnius | Lithuania | Siemens Arena | | |
| 16 February 2015 | Riga | Latvia | Arena Riga | | |
| 17 February 2015 | Tallinn | Estonia | Saku Suurhall | | |
| **Asia** | | | | | |
| 27 February 2015 | Muscat | Oman | Shangri-La's Barr Al Jissah Resort and Spa | | |
| 1 March 2015 | Mumbai | India | Mahalaxmi Racecourse | N/A | N/A |
| 3 March 2015 | Doha | Qatar | Qatar National Convention Centre | | |
| 5 March 2015 | Dubai | United Arab Emirates | Dubai Media City | | |
| 7 March 2015 | Shanghai | China | Mercedes-Benz Arena | 7,160 / 7,160 | $610,589 |
| 8 March 2015 | Seoul | South Korea | SK Olympic Handball Gymnasium | 3,296 / 3,977 | $402,518 |
| 10 March 2015 | Hong Kong | Hong Kong | AsiaWorld–Expo | 7,869 / 7,869 | $678,550 |
| 12 March 2015 | Manila | Philippines | Mall of Asia Arena | 10,408 / 10,408 | $979,927 |
| 14 March 2015 | Singapore | | Star Theatre | 4,985 / 4,985 | $462,931 |
| 16 March 2015 | Kuala Lumpur | Malaysia | Plenary Hall | 4,694 / 4,694 | $377,910 |
| **Oceania**[12] | | | | | |
| 20 March 2015 | | | | | |
| 21 March 2015 | Brisbane | | Riverstage | 27,928 / 27,928 | $1,783,370 |
| 22 March 2015 | | | | | |
| 24 March 2015 | | | | | |
| 25 March 2015 | Sydney | | Sydney Entertainment Centre | 36,545 / 36,545 | $2,519,210 |
| 26 March 2015 | | | | | |
| 28 March 2015 | | Australia | | | |
| 29 March 2015 | Melbourne | | Rod Laver Arena | 40,108 / 40,108 | $2,547,170 |
| 30 March 2015 | | | | | |
| 1 April 2015 | Adelaide | | Adelaide Entertainment Centre | 18,318 / 18,318 | $1,159,190 |
| 2 April 2015 | | | | | |
| 4 April 2015 | Perth | | Perth Arena | 29,692 / 29,692 | $1,964,960 |
| 5 April 2015 | | | | | |
| 8 April 2015 | Christchurch | | Horncastle Arena | | |
| 10 April 2015 | Wellington | New Zealand | TSB Bank Arena | N/A | N/A |
| 11 April 2015 | Auckland | | Vector Arena | | |
| 12 April 2015 | | | | | |
| **South America** | | | | | |
| 19 April 2015 | Bogotá | Colombia | C.C Bima Gran Carpa | 6,630 / 6,630 | $521,902 |
| 21 April 2015 | Lima | Peru | Jockey Club del Perú | 11,649 / 11,649 | $820,792 |
| 23 April 2015 | Santiago | Chile | Pista Atlética | 14,797 / 14,797 | $770,746 |
| 25 April 2015 | Buenos Aires | Argentina | Estadio Luna Park | 15,884 / 15,884 | $961,749 |
| 26 April 2015 | | | | | |
| 28 April 2015 | São Paulo | | Espaço das Américas | 14,823 / 14,823 | $912,765 |
| 29 April 2015 | | Brazil | | | |
| 30 April 2015 | Rio de Janeiro | | HSBC Arena | 11,245 / 11,245 | $739,028 |
| **North America**[13] | | | | | |
| 2 May 2015[7] | New Orleans | | Fair Grounds Race Course | 10,500 / 10,500 | $800,500 |
| 3 May 2015[g] | Memphis | | Tom Lee Park | N/A | N/A |
| 6 May 2015 | Austin | | Frank Erwin Center | 11,593 / 11,951 | $683,306 |
| 7 May 2015 | Grand Prairie | | Verizon Theatre | | |
| 9 May 2015 | Tulsa | | BOK Center | 12,230 / 12,230 | $681,958 |
| 10 May 2015 | St. Louis | | Scottrade Center | | |
| 12 May 2015 | Pittsburgh | | Consol Energy Center | 13,389 / 13,389 | $754,355 |
| 13 May 2015 | Albany | | Times Union Center | 11,022 / 12,935 | $654,538 |
| 19 May 2015 | Salt Lake City | United States | EnergySolutions Arena | | |
| 23 May 2015 | Uncasville | | Mohegan Sun Arena | 7,090 / 7,090 | $464,890 |
| 24 May 2015 | Bangor | | Darling's Waterfront Pavilion | N/A | N/A |
| 26 May 2015 | Philadelphia | | The Mann Center | | |
| 28 May 2015 | New York City | | Forest Hills Stadium | 26,214 / 26,214 | $1,785,832 |
| 29 May 2015 | | | | | |
| 30 May 2015 | Newark | | Prudential Center | | |
| 31 May 2015 | Brooklyn | | Barclays Center | 14,341 / 14,341 | $1,083,905 |
| 2 June 2015 | Montreal | | Bell Centre | N/A | N/A |
| 3 June 2015 | Ottawa | | Canadian Tire Centre | | |
| 5 June 2015 | London | Canada | Budweiser Gardens | 9,003 / 9,003 | $542,962 |
| 6 June 2015 | Toronto | | Air Canada Centre | 14,278 / 14,278 | $798,615 |
| 7 June 2015 | Hopewell | | CMAC | N/A | N/A |
| 9 June 2015 | Des Moines | United States | Wells Fargo Arena | | |
| 10 June 2015 | Sioux Falls | | Denny Sanford Premier Center | 10,657 / 10,657 | $625,543 |
| 12 June 2015 | Winnipeg | | MTS Centre | N/A | N/A |
| 13 June 2015 | Regina | | Brandt Centre | | |
| 14 June 2015 | Edmonton | Canada | Rexall Place | | |
| 16 June 2015 | Saskatoon | | SaskTel Centre | | |
| 17 June 2015 | Calgary | | Scotiabank Saddledome | | |
| 19 June 2015 | Vancouver | | Rogers Arena | | |

| Date | City | Country | Venue | | |
|---|---|---|---|---|---|
| 20 June 2015 | Portland | United States | Moda Center | | |
| 23 June 2015 | San Diego | | Valley View Casino Center | | |
| 24 June 2015 | Los Angeles | | Hollywood Bowl | | |
| 25 June 2015 | | | | | |
| 26 June 2015 | Berkeley | | Hearst Greek Theatre | | |
| 29 June 2015 | Morrison | | Red Rocks Amphitheatre | | |
| 30 June 2015 | | | | | |
| 2 July 2015 | Noblesville | | Klipsch Music Center | | |
| 3 July 2015[N] | Milwaukee | | Marcus Amphitheater | | |
| Europe | | | | | |
| 10 July 2015 | London | England | Wembley Stadium | 229,725 / 229,725 | $18,008,988 |
| 11 July 2015 | | | | | |
| 12 July 2015 | | | | | |
| 24 July 2015 | Dublin | Ireland | Croke Park | 162,208 / 162,208 | $11,590,800 |
| 25 July 2015 | | | | | |
| North America | | | | | |
| 3 September 2015 | Houston | United States | BBVA Compass Stadium | N/A | N/A |
| 5 September 2015 | Frisco | | Toyota Stadium | | |
| 8 September 2015 | Orlando | | Amway Center | 13,638 / 13,638 | $898,415 |
| 9 September 2015 | Miami | | American Airlines Arena | | |
| 10 September 2015 | Tampa | | Amalie Arena | 12,598 / 12,598 | $747,953 |
| 12 September 2015 | Atlanta | | Philips Arena | 13,551 / 13,551 | $834,508 |
| 13 September 2015 | Nashville | | Bridgestone Arena | 15,754 / 15,754 | $905,096 |
| 15 September 2015 | Saint Paul | | Xcel Energy Center | | |
| 16 September 2015 | Tinley Park | | Hollywood Casino Amphitheatre | N/A | N/A |
| 17 September 2015 | Cincinnati | | Riverbend Music Center | | |
| 18 September 2015 | Cuyahoga Falls | | Blossom Music Center | | |
| 20 September 2015 | Toronto | Canada | Air Canada Centre | | |
| 22 September 2015 | Washington, D.C. | United States | Verizon Center | 23,484 / 23,484 | $1,464,570 |
| 23 September 2015 | | | | | |
| 25 September 2015 | Foxborough | | Gillette Stadium | 51,996 / 54,000 | $3,234,377 |
| 26 September 2015[J] | New York City | | Central Park | N/A | N/A |
| Oceania | | | | | |
| 28 November 2015 | Brisbane | Australia | Suncorp Stadium | N/A | N/A |
| 2 December 2015 | Perth | | HBF Park | | |
| 5 December 2015 | Melbourne | | AAMI Park | | |
| 6 December 2015 | | | | | |
| 9 December 2015 | Sydney | | Allianz Stadium | | |
| 12 December 2015 | Auckland | New Zealand | Mount Smart Stadium | | |

### Notes

a. The show of 15 August 2014 in Hasselt at Kiewit was part of the Pukkelpop.
b. The show of 16 August 2014 in Chelmsford at Hylands Park was part of the V Festival.
c. The show of 17 August 2014 in Weston-under-Lizard at Weston Park was part of the V Festival.
d. The show of 20 September 2014 in Las Vegas at the MGM Grand Garden Arena was part of the 2014 iHeartRadio Music Festival.
e. The show of 29 September 2014 in London at the Roundhouse was part of the 2014 iTunes Festival.

f. The show of 2 May 2015 in New Orleans at Fair Grounds Race Course was part of the New Orleans Jazz & Heritage Festival.
g. The show of 3 May 2015 in Memphis at Tom Lee Park was part of the Beale Street Music Festival.
h. The show of 3 July 2015 in Milwaukee at Marcus Amphitheatre was part of Summerfest.
i. The 26 September 2015 performance at Central Park in New York City was part of the Global Citizen Festival.

## References

1. Federal Reserve Bank of Minneapolis. "Consumer Price Index (estimate) 1800–" (https://www.minneapolisfed.org/community/financial-and-economic-education/cpi-calculator-information/consumer-price-index-1800). Retrieved January 2, 2019.
2. "Ed Sheeran Says He'll Star In Movie To Be Shot At Wembley Stadium" (http://www.inquisitr.com/2200888/ed-sheeran-says-hell-star-in-movie-to-be-shot-at-wembley-stadium/). inquisitr.com. June 25, 2015. Retrieved June 29, 2015.
3. "Ed Sheeran Announces Solo Arena Tour" (http://www.billboard.com/articles/news/6052272/ed-sheeran-announces-solo-arena-tour). Billboard.
4. "Teddy M - Contemporary British Artist" (http://teddym.com/crash-x-teddy-m-free-strat/4592641506). Teddym.com. Retrieved January 6, 2018.
5. "Pollstar 2014 Year-End Top 100 Worldwide Tours" (https://www.pollstarpro.com/files/charts2014/2014YearEndTop100WorldwideTours.pdf) (PDF). Retrieved January 23, 2014.
6. "2015 YEAR-END TOP 20 WORLDWIDE TOURS" (http://www.pollstarpro.com/files/charts2016/011816Top20WorldwideTours.pdf) (PDF). Retrieved January 23, 2016.
7. Atkinson, Katie (August 28, 2014). "Ed Sheeran Brings His One-Man Band to L.A.'s Staples Center: Concert Review" (http://www.billboard.com/articles/news/6229491/ed-sheeran-staples-center-concert-review). Billboard. Retrieved June 10, 2015.
8. "Billboard Boxscore : Current Scores" (https://www.webcitation.org/6Sf6HyzVO). Billboard. September 17, 2014. Archived from the original (http://www.billboard.biz/bbbiz/charts/currentboxscore.jsp) on September 17, 2014. Retrieved September 17, 2014.

9. "Billboard Boxscore :: Current Scores" (https://www.webcitation.org/6TiTChUzr). Billboard. October 29, 2014. Archived from the original (http://www.billboard.biz/bbbiz/charts/currentboxscore.jsp) on October 30, 2014. Retrieved October 30, 2014.
10. "Billboard Boxscore : Current Scores" (https://www.webcitation.org/6TrdbhQwW). Billboard. November 5, 2014. Archived from the original (http://www.billboard.biz/bbbiz/charts/currentboxscore.jsp) on November 5, 2014. Retrieved November 5, 2014.
11. "Billboard Boxscore :: Current Scores" (https://www.webcitation.org/6UEXwyUYY). Billboard. November 19, 2014. Archived from the original (http://www.billboard.biz/bbbiz/charts/currentboxscore.jsp) on November 20, 2014. Retrieved November 20, 2014.
12. "Billboard Boxscore :: Current Scores" (https://www.webcitation.org/6XTT5XsBm). Billboard. April 1, 2015. Archived from the original (http://www.billboard.com/biz/current-boxscore) on April 1, 2015.
13. Billboard box score:
    - "Billboard Boxscore :: Current Scores" (https://www.webcitation.org/6ZMKbjsga). Billboard. June 17, 2015. Archived from the original (http://www.billboard.com/biz/current-boxscore) on June 17, 2015.
    - "Billboard Boxscore : Current Scores" (https://www.webcitation.org/6ZX15czy2). Billboard. June 24, 2015. Archived from the original (http://www.billboard.com/biz/current-boxscore) on June 24, 2015.
    - "Billboard Boxscore :: Current Scores" (https://www.webcitation.org/6fEKQZV3E). Billboard. February 12, 2016. Archived from the original (http://www.billboard.com/biz/current-boxscore) on February 12, 2016.

Retrieved from "https://en.wikipedia.org/w/index.php?title=X_Tour_(Ed_Sheeran)&oldid=922238095"

This page was last edited on 20 October 2019, at 21:31 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

**W** WIKIPEDIA

# ÷ Tour

The ÷ **Tour** (pronounced "Divide Tour")[2] was the third world concert tour by English singer and songwriter, Ed Sheeran, in support of his third studio album, ÷ (pronounced "divide"). Comprising 260 shows, it officially began on 16 March 2017, in Turin, Italy and ended on 26 August 2019, in Ipswich, England. Ticket sales started on 2 February 2017.[3][4][5] The tour set world records for the highest-grossing concert tour and the most tickets sold by a tour.[6]

## Contents

Development
Commercial performance
Set list
Tour dates
Cancelled shows
Notes
See also
References
External links

## Development

On the morning of 26 January 2017, the European dates of the tour were announced through Sheeran's social networks. Hours later through the same networks were announced the dates for Latin America. Tickets for the tour sold out quickly, prompting new dates to be added in London, Turin and Santiago. On 13 February 2017 it was announced that he would be part of the line up for a week of gigs at the Royal Albert Hall in aid of the Teenage Cancer Trust taking place on 28 March 2017.[7] On 22 February 2017, Sheeran announced that Anne-Marie and Ryan McMullan would be the opening acts for the European dates.[8] On 6 March 2017, Sheeran announced the North American leg.[9] James Blunt was announced as the opening act, except for Indianapolis and Cleveland, where the opener was Joshua Radin. On 10 May 2017, Sheeran announced the Oceanian leg.[10] The tour was originally slated to have seven shows, but demand was high, the leg became eighteen shows.[11] On 8 June 2017, Sheeran announced the Asian leg of the tour, which originally planned for October 2017 until November 2017.[12] However, due to bone fractures in his arms from a bike accident, he had to postpone and cancel parts of the Asian leg. Rescheduled shows in Manila, Osaka, and Tokyo occurred in April 2018, but Taipei, Seoul, Hong Kong, and Jakarta were cancelled.[13]

Lauv served as the opening act in Asia in November. On 28 June 2017, Sheeran announced a stadium tour across Europe. After the initial announcement, tickets sold quickly, which prompted new dates in Cork, Dublin, Manchester, Glasgow, Newcastle, London, Cardiff, Amsterdam, Paris, Gothenburg, Munich, Zürich, Vienna, and Warsaw.[14] Anne-Marie returned as the opening act, while Jamie Lawson was added, and Beoga was added for Ireland. On 22 September 2017, Sheeran announced a stadium tour across North America.[15] On 6 February 2018, Sheeran added dates to the leg with new cities that weren't in the initial announcement, and second shows in Toronto, Foxborough, and East Rutherford.[16] Snow Patrol was announced as the main opener for the North American stadium leg, along with Anne-Marie and Lauv in selected dates.[17] On 25 June 2018, Sheeran added two dates, performing in South Africa in March 2019.[18]

On September 19, 2018, Sheeran added more 2019 dates to the tour, performing in stadiums across Europe and the UK, starting in May 2019. Due to high demand, numerous additional dates were added to the tour itinerary.

Sheeran later added even more 2019 dates to the Divide tour, performing in Brazil, Uruguay, and Argentina in February 2019. He also announced that he would be returning to Asia in April 2019, performing the long-awaited dates that were scheduled to take place in Fall 2017 but were cancelled and rescheduled due to bone fractures in the arms from a bike accident. These were affected by the cancellation were Taipei, Seoul, Hong Kong and Jakarta. Sheeran will perform three Asia 2019 dates in Singapore, Seoul, and Bangkok. Since Sheeran has been adding so many 2019 dates to his tour lately, it is expected that he will announce dates in Taipei, Jakarta, and Hong Kong, seeing as he will be in the region for the first time since April 2018, when the rescheduled dates for Asia took place, and he has already announced that he will perform in Seoul, a date that was cancelled in late 2017. Sheeran later announced a second date in Cape Town, South Africa at Cape Town Stadium, scheduled for March 28, 2019. On October 28, Sheeran added dates in Tokyo, Osaka, and Jakarta. On January 10, 2019, Sheeran added dates in Taoyuan, Hong Kong and Kuala Lumpur.

For the last four shows, Sheeran played at Chantry Park in Ipswich in what was advertised as a homecoming set of gigs. For each of the four nights, a different additional support act performed - three were chosen by BBC Music Introducing in Suffolk and one by Hoax. The local acts that performed were Bessie Turner, Caswell, Salvador and Piers James.[19]

## Commercial performance

In Ireland, more than 300,000 tickets for seven shows across Cork, Belfast, Galway and Dublin were sold in a single day, making history with Sheeran being the only artist to ever do such feat in Irish territory.[20] Due to the phenomenal demand, extra dates were added in both Cork and Dublin, with three dates for each city in total.[21] Sellout status occurred once again in Santiago during his first concert on May 15, prompting to add one more date.

In Oceania, the tour broke the official record for the most tickets sold, at over 1 million (previously held by the Dire Straits Brothers in Arms Tour of 1985, with around 950,000), as well as most stadium shows by a single artist on one tour (18, formerly held by AC/DC at 14). Sheeran also broke records for the biggest stadium tour of Australia and New Zealand, venue record for highest cumulative attendance on one tour and venue record for highest attendance for a single show.[22] More than 710,000 tickets were sold within a single day of general public sale. In Sydney, a total of 243,513 tickets were sold for three shows at the ANZ Stadium, which rolled out over three successive nights from 15—17 March 2018. The attendance per show was 79,728, 81,752 and 82,035, respectively. This set a new record for aggregate attendance at a series of stadium concerts in NSW, smashing the old benchmark of 213,045 set by AC/DC during their Black Ice World Tour in 2010.[23]

According to Billboard, Sheeran's tour has grossed $551.8 million and sold 6,209,122 tickets across 201 dates reported so far, from 16 March 2017 to 31 October 2018. The tour was the eighth's highest-grossing tour of 2017, accumulating $122 million and selling 1,408,681 tickets.[24] The Divide Tour became 2018's highest-grossing tour with $429 million, setting all-time records for the highest-grossing solo tour and highest year-end gross ever.[25] It then broke the all-time highest-grossing record of $735m for any tour set by the U2 360° Tour before it finished, despite playing mostly in smaller venues and deliberately keeping the ticket price relatively low with no VIP areas. This is due to the larger number of shows (255) in the tour, and it also became the most attended tour of all time with over 8.5 million having attended in 43 countries with further dates to play.[6]

## Set list

This set list is from the concert on 5 August 2018 in Glendale. It is not intended to represent all shows from the tour.[26]

1. "Castle on the Hill"
2. "Eraser"
3. "The A Team"
4. "Don't" / "New Man"
5. "Dive"
6. "Bloodstream"
7. "Happier"
8. "Galway Girl"
9. "Feeling Good" / "I See Fire"
10. "How Would You Feel (Paean)"
11. "Photograph"
12. "Perfect"
13. "Nancy Mulligan"
14. "Thinking Out Loud"
15. "Sing"

**Encore**

1.
16. "Shape of You"
17. "You Need Me, I Don't Need You"

## Tour dates



### ÷ Tour

**Tour by Ed Sheeran**

Promotional image for UK and Ireland shows in the first European leg

| | |
|---|---|
| **Associated album** | ÷ |
| **Start date** | 16 March 2017 |
| **End date** | 26 August 2019 |
| **Legs** | 14 |
| **No. of shows** | 258 |
| **Attendance** | 8.787 million |
| **Box office** | $776.2 million[1] |

**Ed Sheeran concert chronology**

List of concerts, showing date, city, country, venue, opening acts, tickets sold, amount of available tickets and gross revenue

| Date | City | Country | Venue | Opening acts | Attendance | Revenue |
|---|---|---|---|---|---|---|
| **Leg 1 – Europe**[2][27] | | | | | | |
| 16 March 2017 | Turin | Italy | Pala Alpitour | | 23,255 / 23,255 | $1,223,750 |
| 17 March 2017 | | | | | | |
| 19 March 2017 | Zürich | Switzerland | Hallenstadion | | 14,000 / 14,000 | $1,156,950 |
| 20 March 2017 | Munich | | Olympiahalle | Anne-Marie Ryan McMullan | 12,076 / 12,076 | $932,166 |
| 22 March 2017 | Mannheim | | SAP Arena | | 10,843 / 10,843 | $753,785 |
| 23 March 2017 | Cologne | Germany | Lanxess Arena | | 16,223 / 16,223 | $1,138,720 |
| 26 March 2017 | Hamburg | | Barclaycard Arena | | 12,779 / 13,227 | $837,705 |
| 27 March 2017 | Berlin | | Mercedes-Benz Arena | | 14,104 / 14,104 | $1,036,360 |
| 28 March 2017[A] | London | England | Royal Albert Hall | Busted | N/A | N/A |
| 30 March 2017 | Stockholm | Sweden | Ericsson Globe | | 14,024 / 14,024 | $1,024,640 |
| 1 April 2017 | Herning | Denmark | Jyske Bank Boxen | | 14,814 / 14,996 | $1,268,380 |
| 3 April 2017 | Amsterdam | Netherlands | Ziggo Dome | | 33,255 / 33,255 | $2,115,870 |
| 4 April 2017 | | | | | | |
| 5 April 2017 | Antwerp | Belgium | Sportpaleis | | 21,109 / 21,151 | $1,325,480 |
| 6 April 2017 | Paris | France | AccorHotels Arena | | 15,988 / 15,988 | $801,973 |
| 8 April 2017 | Madrid | Spain | Wizink Center | | 15,748 / 15,748 | $908,417 |
| 9 April 2017 | Barcelona | | Palau Sant Jordi | | 17,476 / 17,476 | $955,236 |
| 12 April 2017 | Dublin | Ireland | 3Arena | | 25,538 / 25,538 | $2,156,330 |
| 13 April 2017 | | | | | | |
| 16 April 2017 | Glasgow | Scotland | SSE Hydro | Anne-Marie Ryan McMullan | 25,220 / 25,220 | $1,997,460 |
| 17 April 2017 | | | | | | |
| 19 April 2017 | Newcastle | | Metro Radio Arena | | 21,558 / 21,558 | $1,657,950 |
| 20 April 2017 | | | | | | |
| 22 April 2017 | Manchester | | Manchester Arena | | 31,333 / 31,379 | $2,631,120 |
| 23 April 2017 | | | | | | |
| 25 April 2017 | Nottingham | England | Motorpoint Arena | | 18,790 / 18,790 | $1,607,780 |
| 26 April 2017 | | | | | | |
| 28 April 2017 | Birmingham | | Barclaycard Arena Birmingham | | 30,994 / 30,994 | $2,630,310 |
| 29 April 2017 | | | | | | |
| 1 May 2017 | London | | The O₂ Arena | | 55,708 / 55,708 | $5,093,280 |
| 2 May 2017 | | | | | | |
| 3 May 2017 | | | | | | |
| **Leg 2 – Latin America**[28][29][30] | | | | | | |
| 13 May 2017 | Lima | Peru | Estadio Nacional | Antonio Lulic | 19,745 / 19,745 | $1,299,630 |
| 15 May 2017 | Santiago | Chile | Movistar Arena | Intimate Stranger Antonio Lulic | 26,983 / 26,983 | $2,087,600 |
| 16 May 2017 | | | | | | |
| 20 May 2017 | La Plata | Argentina | Estadio Ciudad de La Plata | Benjamin Amadeo Antonio Lulic | 33,584 / 33,584 | $2,303,960 |
| 23 May 2017 | Curitiba | | Pedreira Paulo Leminski | | 17,400 / 17,400 | $1,369,190 |
| 25 May 2017 | Rio de Janeiro | Brazil | Jeunesse Arena | Antonio Lulic | 12,087 / 12,087 | $995,741 |
| 28 May 2017 | São Paulo | | Allianz Parque | | 37,075 / 37,075 | $3,379,710 |
| 30 May 2017 | Belo Horizonte | | Esplanada do Mineirão | | 14,143 / 14,143 | $1,039,570 |
| 2 June 2017 | Bogotá | Colombia | Simón Bolívar Park | Sebastián Yatra Antonio Lulic | 15,588 / 15,588 | $1,176,970 |
| 4 June 2017 | San Juan | Puerto Rico | José Miguel Agrelot Coliseum | Yebba | 14,426 / 14,426 | $1,017,458 |
| 6 June 2017 | Alajuela | Costa Rica | Parque Viva | | 17,464 / 17,464 | $1,288,350 |
| 10 June 2017 | Mexico City | | Palacio de los Deportes | Antonio Lulic | 21,429 / 21,500 | $1,333,238 |
| 12 June 2017 | Guadalajara | Mexico | Arena VFG | | 11,648 / 12,204 | $966,096 |
| 14 June 2017 | Monterrey | | Auditorio Citibanamex | | 7,865 / 8,084 | $910,014 |
| **Leg 3 – Europe**[2][31] | | | | | | |
| 22 June 2017[b] | London | England | The O₂ Arena | Fuse ODG | 18,552 / 19,085 | $1,678,980 |
| 25 June 2017[c] | Pilton | | Glastonbury Festival | | N/A | N/A |
| **Leg 4 – North America**[2][33] | | | | | | |
| 29 June 2017 | Kansas City | | Sprint Center | James Blunt | 13,382 / 13,382 | $1,217,313 |
| 30 June 2017 | Des Moines | United States | Wells Fargo Arena | | 13,375 / 13,375 | $1,078,939 |
| 1 July 2017 | Saint Paul | | Xcel Energy Center | | 14,938 / 14,938 | $1,375,063 |
| 7 July 2017 | Toronto | Canada | Air Canada Centre | | 30,516 / 30,516 | $2,554,110 |
| 8 July 2017 | | | | | | |
| 9 July 2017 | Buffalo | | KeyBank Center | | 14,305 / 14,305 | $1,167,095 |
| 11 July 2017 | Philadelphia | United States | Wells Fargo Center | | 28,922 / 28,922 | $2,633,260 |
| 12 July 2017 | | | | | | |
| 14 July 2017 | Uncasville | | Mohegan Sun Arena | | 13,670 / 13,670 | $1,384,770 |
| 15 July 2017 | | | | | | |
| 18 July 2017 | Quebec City | | Videotron Centre | | 13,611 / 13,611 | $1,162,530 |
| 19 July 2017 | Montreal | | Bell Centre | | 15,264 / 15,264 | $1,281,710 |
| 22 July 2017 | Winnipeg | | Bell MTS Place | | 11,843 / 11,843 | $1,009,380 |
| 23 July 2017 | Saskatoon | Canada | SaskTel Centre | | 12,585 / 12,585 | $1,059,270 |
| 25 July 2017 | Edmonton | | Rogers Place | | 27,411 / 27,411 | $2,343,200 |
| 26 July 2017 | | | | | | |
| 28 July 2017 | Vancouver | | Rogers Arena | | 14,070 / 14,070 | $1,212,330 |
| 29 July 2017 | Tacoma | United States | Tacoma Dome | | 19,538 / 19,538 | $1,575,039 |
| 30 July 2017 | Portland | | Moda Center | | 13,420 / 13,420 | $1,074,959 |

| Date | City | | Venue | Opening act | Attendance | Revenue |
|---|---|---|---|---|---|---|
| 1 August 2017 | Sacramento | | Golden 1 Center | | 13,424 / 13,424 | $1,220,937 |
| 2 August 2017 | Oakland | | Oracle Arena | | 13,662 / 13,662 | $1,219,722 |
| 4 August 2017 | Las Vegas | | T-Mobile Arena | | 15,243 / 15,243 | $1,326,231 |
| 5 August 2017 | Glendale | | Gila River Arena | | 13,654 / 13,654 | $1,239,478 |
| 6 August 2017 | San Diego | | Valley View Casino Center | | 10,233 / 10,233 | $917,154 |
| 10 August 2017 | | | | | | |
| 11 August 2017 | Los Angeles | | Staples Center | | 40,731 / 40,731 | $3,622,204 |
| 12 August 2017 | | | | | | |
| 15 August 2017 | Denver | | Pepsi Center | | 12,917 / 12,917 | $1,159,523 |
| 17 August 2017 | Tulsa | | BOK Center | | 12,069 / 12,069 | $961,178 |
| 18 August 2017 | Dallas | | American Airlines Center | | 13,632 / 13,632 | $1,207,645 |
| 19 August 2017 | Houston | | Toyota Center | | 11,811 / 11,811 | $1,067,592 |
| 22 August 2017 | San Antonio | | AT&T Center | | 13,928 / 13,928 | $1,112,573 |
| 25 August 2017 | Duluth | | Infinite Energy Arena | | 21,055 / 21,055 | $1,970,117 |
| 26 August 2017 | | | | | | |
| 29 August 2017 | Tampa | | Amalie Arena | | 13,459 / 13,459 | $1,076,537 |
| 30 August 2017 | Miami | | American Airlines Arena | | 12,813 / 12,813 | $1,144,534 |
| 31 August 2017 | Orlando | | Amway Center | | 12,360 / 12,360 | $1,007,408 |
| 2 September 2017 | Raleigh | | PNC Arena | | 13,805 / 13,805 | $1,134,012 |
| 3 September 2017 | Charlotte | | Spectrum Center | | 13,927 / 13,927 | $1,243,772 |
| 5 September 2017 | North Charleston | | North Charleston Coliseum | | 8,517 / 8,517 | $673,759 |
| 7 September 2017 | Louisville | | KFC Yum! Center | | 15,721 / 15,721 | $1,257,529 |
| 8 September 2017 | Indianapolis | | Bankers Life Fieldhouse | Joshua Radin | 12,740 / 12,740 | $1,014,966 |
| 9 September 2017 | Cleveland | | Quicken Loans Arena | | 15,073 / 15,073 | $1,365,524 |
| 12 September 2017 | Omaha | | CenturyLink Center Omaha | | 13,990 / 13,990 | $1,125,765 |
| 15 September 2017 | Rosemont | | Allstate Arena | | 26,346 / 26,346 | $2,347,880 |
| 16 September 2017 | | | | | | |
| 19 September 2017 | Washington, D.C. | | Capital One Arena | | 27,497 / 27,497 | $2,456,334 |
| 20 September 2017 | | | | | | |
| 22 September 2017 | Boston | | TD Garden | | 25,590 / 25,590 | $2,295,216 |
| 23 September 2017 | | | | | | |
| 26 September 2017 | Pittsburgh | | PPG Paints Arena | James Blunt | 13,331 / 13,331 | $1,190,946 |
| 27 September 2017 | Detroit | | Little Caesars Arena | | 14,124 / 14,124 | $1,268,652 |
| 29 September 2017 | | | | | | |
| 30 September 2017 | Brooklyn | | Barclays Center | | 41,066 / 41,066 | $3,658,480 |
| 1 October 2017 | | | | | | |
| 3 October 2017 | Columbus | | Nationwide Arena | | 27,255 / 27,255 | $2,199,218 |
| 4 October 2017 | | | | | | |
| 6 October 2017 | Nashville | | Bridgestone Arena | | 27,721 / 27,721 | $2,503,808 |
| 7 October 2017 | | | | | | |
| **Leg 5 – Asia**[2][34][35][36] | | | | | | |
| 11 November 2017 | Singapore | | Singapore Indoor Stadium | | 18,297 / 18,297 | $2,584,230 |
| 12 November 2017 | | | | | | |
| 14 November 2017 | Kuala Lumpur | Malaysia | Axiata Arena | Lauv | 11,597 / 11,597 | $980,033 |
| 16 November 2017 | Bangkok | Thailand | IMPACT Arena | | 14,394 / 14,394 | $1,744,270 |
| 19 November 2017 | Mumbai | India | JioGarden | | 11,103 / 11,103 | $1,100,040 |
| 23 November 2017 | Dubai | United Arab Emirates | Autism Rocks Arena | | 23,272 / 23,272 | $2,783,800 |
| **Leg 6 – Europe**[37][38][39] | | | | | | |
| 19 February 2018[d] | London | England | indigo at The O2 | | 2,056 / 2,717 | $244,719 |
| **Leg 7 – Oceania**[2][40][23] | | | | | | |
| 2 March 2018 | Perth | | Optus Stadium | Missy Higgins Fergus James | 114,031 / 114,031 | $9,146,953 |
| 3 March 2018 | | | | | | |
| 7 March 2018 | Adelaide | | Adelaide Oval | | 62,915 / 62,915 | $5,103,599 |
| 9 March 2018 | | | | | | |
| 10 March 2018 | Melbourne | Australia | Etihad Stadium | Missy Higgins Bliss n Eso | 256,622 / 256,622 | $20,838,652 |
| 11 March 2018 | | | | | | |
| 12 March 2018 | | | | | | |
| 15 March 2018 | Sydney | | ANZ Stadium | Missy Higgins Ryan McMullan | 231,185 / 231,185 | $19,948,066 |
| 16 March 2018 | | | | | | |
| 17 March 2018 | | | | | | |
| 20 March 2018 | Brisbane | | Suncorp Stadium | Missy Higgins Fergus James | 103,744 / 103,744 | $8,595,585 |
| 21 March 2018 | | | | | | |
| 24 March 2018 | Auckland | | Mount Smart Stadium | Drax Project | 132,876 / 132,876 | $10,766,558 |
| 25 March 2018 | | New Zealand | | | | |
| 26 March 2018 | | | | | | |
| 29 March 2018 | Dunedin | | Forsyth Barr Stadium | Six60 Mitch James | 105,014 / 105,014 | $8,475,218 |
| 31 March 2018 | | | | | | |
| 1 April 2018 | | | | | | |
| **Leg 8 – Asia**[41] | | | | | | |
| 8 April 2018[e] | Manila | Philippines | Mall of Asia Concert Grounds | | N/A | N/A |
| 11 April 2018[f] | Osaka | Japan | Osaka-jō Hall | N/A | | |
| 13 April 2018[g] | Tokyo | | Nippon Budokan | | | |
| 14 April 2018[g] | | | | | | |
| **Leg 9 – Europe**[2][42][39] | | | | | | |
| 4 May 2018 | Cork | Ireland | Páirc Uí Chaoimh | Anne-Marie | 128,969 / 130,200 | $12,371,587 |

| Date | City | Country | Venue | | Attendance | Revenue |
|---|---|---|---|---|---|---|
| 5 May 2018 | | | | Jamie Lawson Beoga | | |
| 6 May 2018 | | | | | | |
| 9 May 2018 | Belfast | Northern Ireland | Boucher Playing Fields | | N/A | N/A |
| 12 May 2018 | Galway | | Pearse Stadium | | 63,991 / 63,991 | $5,952,120 |
| 13 May 2018 | | | | | | |
| 16 May 2018 | | Ireland | | | | |
| 18 May 2018 | Dublin | | Phoenix Park | | 184,187 / 184,187 | $17,090,104 |
| 19 May 2018 | | | | | | |
| 24 May 2018 | | | | | | |
| 25 May 2018 | Manchester | England | Etihad Stadium | | 215,600 / 219,452 | $19,806,800 |
| 26 May 2018 | | | | | | |
| 27 May 2018 | | | | | | |
| 1 June 2018 | | | | | | |
| 2 June 2018 | Glasgow | Scotland | Hampden Park | | 152,024 / 152,024 | $13,746,027 |
| 3 June 2018 | | | | | | |
| 8 June 2018 | | | | | | |
| 9 June 2018 | Newcastle | | St James' Park | | 149,226 / 151,995 | $13,498,865 |
| 10 June 2018 | | | | | | |
| 14 June 2018 | | England | | | | |
| 15 June 2018 | London | | Wembley Stadium | | 299,013 / 301,428 | $28,726,438 |
| 16 June 2018 | | | | | | |
| 17 June 2018 | | | | | | |
| 21 June 2018 | | | | | | |
| 22 June 2018 | Cardiff | Wales | Principality Stadium | | 238,085 / 242,684 | $21,249,947 |
| 23 June 2018 | | | | | | |
| 24 June 2018 | | | | | | |
| 28 June 2018 | Amsterdam | Netherlands | Amsterdam Arena | Anne-Marie Jamie Lawson | 102,463 / 102,463 | $7,722,001 |
| 29 June 2018 | | | | | | |
| 1 July 2018 | Werchter | Belgium | Werchter Festival Park | | 64,987 / 65,000 | $5,470,934 |
| 6 July 2018 | Paris | France | Stade de France | | 153,065 / 153,422 | $9,308,969 |
| 7 July 2018 | | | | | | |
| 10 July 2018 | Gothenburg | Sweden | Ullevi | | 122,522 / 123,165 | $11,295,200 |
| 11 July 2018 | | | | | | |
| 14 July 2018 | Stockholm | | Friends Arena | | 54,234 / 55,336 | $4,860,670 |
| 19 July 2018 | Berlin | | Olympiastadion | | 69,055 / 69,780 | $6,392,576 |
| 22 July 2018 | Gelsenkirchen | | Veltins-Arena | | 102,778 / 112,373 | $9,044,900 |
| 23 July 2018 | | Germany | | | | |
| 25 July 2018 | Hamburg | | Trabrennbahn Bahrenfeld | | 80,326 / 80,413 | $7,029,260 |
| 29 July 2018 | Munich | | Olympiastadion | | 135,036 / 135,164 | $12,865,527 |
| 30 July 2018 | | | | | | |
| 3 August 2018 | Zürich | Switzerland | Letzigrund | | 95,142 / 95,830 | $11,039,800 |
| 4 August 2018 | | | | | | |
| 7 August 2018 | Vienna | Austria | Ernst-Happel-Stadion | | 110,459 / 110,459 | $9,444,760 |
| 8 August 2018 | | | | | | |
| 11 August 2018 | Warsaw | Poland | PGE Narodowy | Anne-Marie Jamie Lawson BeMy | 104,836 / 105,063 | $7,251,980 |
| 12 August 2018 | | | | | | |
| Leg 10 – North America[2] | | | | | | |
| 18 August 2018 | Pasadena | | Rose Bowl | | 62,321 / 62,321 | $6,315,596 |
| 21 August 2018 | San Francisco | United States | AT&T Park | | 38,647 / 38,647 | $4,199,073 |
| 25 August 2018 | Seattle | | CenturyLink Field | | 55,891 / 55,891 | $4,932,401 |
| 30 August 2018 | Toronto | Canada | Rogers Centre | | 98,462 / 98,462 | $8,530,220 |
| 31 August 2018 | | | | | | |
| 6 September 2018 | St. Louis | | Busch Stadium | Snow Patrol Anne-Marie | 41,522 / 41,522 | $3,726,271 |
| 8 September 2018 | Detroit | | Ford Field | | 47,804 / 47,804 | $4,481,290 |
| 14 September 2018 | Foxborough | | Gillette Stadium | | 110,238 / 110,238 | $9,382,550 |
| 15 September 2018 | | | | | | |
| 21 September 2018 | East Rutherford | | MetLife Stadium | | 107,500 / 107,500 | $11,220,207 |
| 22 September 2018 | | | | | | |
| 27 September 2018 | Philadelphia | | Lincoln Financial Field | | 54,292 / 54,292 | $5,161,683 |
| 29 September 2018[b] | Pittsburgh | | PNC Park | | 41,014 / 41,014 | $4,169,874 |
| 4 October 2018 | Chicago | United States | Soldier Field | | 47,263 / 47,263 | $4,339,350 |
| 6 October 2018 | Nashville | | Nissan Stadium | Snow Patrol Lauv | 45,888 / 45,888 | $3,954,931 |
| 13 October 2018 | Kansas City | | Arrowhead Stadium | | 51,324 / 51,324 | $4,008,748 |
| 17 October 2018 | Fargo | | Fargodome | | 17,762 / 17,762 | $1,766,790 |
| 20 October 2018 | Minneapolis | | U.S. Bank Stadium | | 49,359 / 49,359 | $4,512,422 |
| 24 October 2018[c] | Milwaukee | | Miller Park | N/A | 37,288 / 37,288 | $3,390,498 |
| 27 October 2018 | Arlington | | AT&T Stadium | | 46,249 / 46,249 | $4,528,561 |
| 31 October 2018 | New Orleans | | Mercedes-Benz Superdome | Snow Patrol Lauv | 42,295 / 42,295 | $2,827,815 |
| 3 November 2018 | Houston | | Minute Maid Park | | 39,354 / 39,354 | $3,985,595 |
| 7 November 2018 | Tampa | | Raymond James Stadium | | 51,120 / 51,120 | $4,197,412 |
| 9 November 2018 | Atlanta | | Mercedes-Benz Stadium | | 50,906 / 50,906 | $5,021,395 |
| Leg 11 – Latin America[2] | | | | | | |
| 13 February 2019 | São Paulo | Brazil | Allianz Parque | Passenger | 81,156 / 82,622 | $6,373,990 |
| 14 February 2019 | | | | | | |

| Date | City | Country | Venue | Opening act(s) | Attendance | Revenue |
|---|---|---|---|---|---|---|
| 17 February 2019 | Porto Alegre | | Arena do Grêmio | | 38,635 / 39,995 | $3,074,240 |
| 20 February 2019 | Montevideo | Uruguay | Estadio Centenario | | 20,799 / 21,074 | $1,886,550 |
| 23 February 2019 | Buenos Aires | Argentina | Campo Argentino de Polo | | 40,130 / 40,987 | $2,406,860 |
| **Leg 12 – Africa[2]** | | | | | | |
| 23 March 2019 | Johannesburg | South Africa | FNB Stadium | Passenger Shekhinah | 128,977 / 128,977 | $7,153,430 |
| 24 March 2019 | | | | | | |
| 27 March 2019 | Cape Town | | Cape Town Stadium | | 96,915 / 96,915 | $4,976,060 |
| 28 March 2019 | | | | | | |
| **Leg 13 – Asia[2]** | | | | | | |
| 4 April 2019 | Taoyuan | Taiwan | Taoyuan City Stadium | | 28,136 / 28,136 | $3,312,190 |
| 9 April 2019 | Tokyo | Japan | Tokyo Dome | | 47,454 / 47,454 | $6,092,370 |
| 13 April 2019 | Kuala Lumpur | Malaysia | Bukit Jalil National Stadium | | 40,351 / 43,743 | $2,871,470 |
| 17 April 2019 | Hong Kong | | Fantasy Road Outdoor Venue Hong Kong Disneyland | | 20,294 / 20,294 | $2,853,320 |
| 21 April 2019 | Incheon | South Korea | Songdo Moonlight Festival Park | One Ok Rock | 24,910 / 25,033 | $2,657,640 |
| 23 April 2019 | Osaka | Japan | Kyocera Dome | | 37,790 / 37,790 | $4,855,440 |
| 26 April 2019 | Singapore | | Singapore National Stadium | | 49,810 / 49,810 | $5,565,410 |
| 28 April 2019 | Bangkok | Thailand | Rajamangala Stadium | | 29,119 / 32,691 | $3,565,360 |
| 3 May 2019 | Jakarta | Indonesia | Gelora Bung Karno Stadium | | 48,959 / 52,060 | $4,763,680 |
| **Leg 14 – Europe[2]** | | | | | | |
| 24 May 2019 | Lyon | France | Groupama Stadium | James Bay Zara Larsson | 157,070 / 162,563 | $11,639,153 |
| 25 May 2019 | | | | | | |
| 26 May 2019 | | | | | | |
| 29 May 2019 | Bordeaux | | Matmut Atlantique | | 41,449 / 41,716 | $2,756,572 |
| 1 June 2019 | Lisbon | Portugal | Estádio da Luz | Ben Kweller Zara Larsson James Bay | 118,085 / 118,085 | $8,910,674 |
| 2 June 2019 | | | | | | |
| 7 June 2019 | Barcelona | Spain | Estadi Olímpic Lluís Companys | James Bay Zara Larsson | 54,658 / 54,658 | $4,126,520 |
| 11 June 2019 | Madrid | | Wanda Metropolitano | | 51,944 / 51,944 | $3,793,350 |
| 14 June 2019[j] | Florence | Italy | Ippodromo del Visarno | N/A | N/A | N/A |
| 16 June 2019 | Rome | | Stadio Olimpico | | 58,959 / 58,959 | $4,549,350 |
| 19 June 2019 | Milan | | San Siro | | 54,892 / 54,892 | $4,020,920 |
| 22 June 2019 | Hockenheim | Germany | Hockenheimring | | 191,120 / 202,888 | $16,289,640 |
| 23 June 2019 | | | | | | |
| 28 June 2019 | Klagenfurt | Austria | Wörthersee Stadion | | 67,535 / 67,535 | $6,279,570 |
| 29 June 2019 | | | | | | |
| 3 July 2019 | Bucharest | Romania | Arena Națională | | 48,044 / 48,044 | $2,984,810 |
| 7 July 2019 | Prague | Czech Republic | Letňany | | 139,036 / 157,980 | $11,454,940 |
| 8 July 2019 | | | | | | |
| 12 July 2019 | Riga | Latvia | Lucavsala Park | James Bay Zara Larsson | 50,437 / 50,437 | $3,982,565 |
| 19 July 2019 | Moscow | Russia | Otkritie Arena | | 39,841 / 39,841 | $3,585,231 |
| 23 July 2019 | Helsinki | Finland | Malmi Airport | | 108,000 / 120,000 | $9,481,707 |
| 24 July 2019 | | | | | | |
| 27 July 2019 | Odense | Denmark | Tusindårsskoven | | 87,768 / 87,768 | $8,661,263 |
| 28 July 2019 | | | | | | |
| 2 August 2019 | Hannover | Germany | Messegelände | | 131,538 / 148,721 | $12,560,432 |
| 3 August 2019 | | | | | | |
| 7 August 2019[k] | Budapest | Hungary | Sziget Festival | N/A | N/A | N/A |
| 10 August 2019 | Reykjavik | Iceland | Laugardalsvöllur | James Bay Zara Larsson | 43,830 / 56,642 | $7,180,912 |
| 11 August 2019 | | | | | | |
| 16 August 2019 | Leeds | England | Roundhay Park | The Darkness Lewis Capaldi | 136,358 / 140,000 | $12,405,249 |
| 17 August 2019 | | | | | | |
| 23 August 2019 | Ipswich | | Chantry Park | The Darkness Passenger | 139,984 / 181,548 | $12,971,665 |
| 24 August 2019 | | | | | | |
| 25 August 2019 | | | | The Darkness Lewis Capaldi | | |
| 26 August 2019 | | | | | | |
| **Total** | | | | | 8,787,593 / 8,956,901 (98.10%) | — |

## Cancelled shows

List of cancelled concerts, showing date, city, country, venue and reason for cancellation

| Date | City | Country | Venue | Reason |
|---|---|---|---|---|
| 17 September 2017 | St. Louis | United States | Scottrade Center | Safety concerns[45] |
| 22 October 2017 | Taipei | Taiwan | Nangang Exhibition Center | |
| 29 October 2017 | Seoul | South Korea | The 88 Garden | Arm fracture from a bike accident[41] |
| 4 November 2017 | Hong Kong | | AsiaWorld-Expo | |
| 5 November 2017 | | | | |
| 9 November 2017 | Jakarta | Indonesia | Indonesia Convention Exhibition | |
| 18 April 2019 | Hong Kong | | Fantasy Road Outdoor Venue Hong Kong Disneyland | Lightning storm[46] |

## Notes

a. The show on 28 March 2017, in London at Royal Albert Hall is part of Teenage Cancer Trust fundraising week.[7]

b. The show on 22 June 2017, in London at The O2 Arena is part of the venue's 10th anniversary celebrations.[92]

c. The show on 25 June 2017, in Pilton at Worthy Farm is part of the Glastonbury Festival.

d. The show on 19 February 2018, in London at Indigo at The O₂ is part of the BRITs Week War Child 2018.[37]

e. The show on 8 April 2018, in Manila at the Mall of Asia Concert Grounds was originally scheduled for 7 November 2017, but was postponed due to Sheeran's injury from a bike accident.[41]

f. The show on 11 April 2018, in Osaka at the Osaka-jō Hall was originally scheduled for 25 October 2017, but was postponed due to Sheeran's injury from a bike accident.[41]

g. The shows on 13 and 14 April 2018, in Tokyo at the Nippon Budokan were originally scheduled for 31 October and 1 November 2017, but were postponed due to Sheeran's injury from a bike accident.[41]

h. The show on 29 September 2018, in Pittsburgh at PNC Park was originally scheduled for 30 September 2018, but was rescheduled to accommodate the Pittsburgh Steelers now announced 8:20 p.m. kickoff for Sunday Night Football at Heinz Field.[43]

i. The show was originally scheduled for 23 October 2018, in Milwaukee at Miller Park, was rescheduled to give more time for stage setup after the 2018 National League Championship Series ended 20 October (it would have moved to November had the Brewers advanced to the 2018 World Series).

j. The show on 14 June 2019, in Florence at Ippodromo dele Casine is part of Firenze Rocks 2019.

k. The show on 7 August 2019, in Budapest at Hajógyári Island is part of Sziget Festival 2019.

## See also

- List of highest-grossing concert tours

## References

1. Frankenberg, Eric (27 August 2019). "Ed Sheeran's Record-Breaking Divide Tour Posts Final Numbers: 255 Shows, $776.2 Million Grossed" (https://www.billboard.com/articles/business/chart-beat/8528217/ed-sheeran-divide-tour-final-numbers). Billboard. Retrieved 3 September 2019.
2. "Upcoming Dates" (http://www.edsheeran.com/tour). edsheeran.com. 26 January 2017. Retrieved 26 January 2017.
3. "European Tour Dates Announced!" (http://www.edsheeran.com/news/european-tour-dates-announced-35526). edsheeran.com. 26 January 2017. Retrieved 26 January 2017.
4. "UK + Irish Dates Announced!" (http://www.edsheeran.com/news/uk-irish-dates-announced-35521). edsheeran.com. 26 January 2017. Retrieved 26 January 2017.
5. "Latin American Dates Announced!" (http://www.edsheeran.com/news/latin-american-dates-announced-35531). edsheeran.com. 26 January 2017. Retrieved 26 January 2017.
6. Beaumont-Thomas, Ben (2 August 2019). "Ed Sheeran breaks U2's record for highest-grossing tour ever" (https://www.theguardian.com/music/2019/aug/02/ed-sheeran-breaks-u2-record-for-highest-grossing-tour-ever). The Guardian.
7. Jones, Damian (13 February 2017). "Ed Sheeran announces huge Royal Albert Hall show" (http://www.nme.com/news/music/ed-sheeran-announces-huge-london-show-1974430). NME.com. Retrieved 13 March 2017.
8. "Anne-Marie to support Ed Sheeran on UK and Europe tour" (https://www.list.co.uk/article/88910-anne-marie-to-support-ed-sheeran-on-uk-and-europe-tour/). The list. 22 February 2017. Retrieved 13 March 2017.
9. Kaufman, Gil (8 March 2017). "Ed Sheeran Announces 48-Date North American Arena Tour" (http://www.billboard.com/articles/columns/pop/7716617/ed-sheeran-2018-north-american-arena-tour). Billboard. Retrieved 13 March 2017.
10. "Ed Sheeran Plots 2018 Stadium Tour of Australia and New Zealand" (https://www.billboard.com/articles/news/779205 7/ed-sheeran-2018-stadium-tour-australia-new-zealand). Billboard. 10 May 2017. Retrieved 26 May 2018.
11. "Ed Sheeran Smashes More Records as Australasian Stadium Tour Swells to 18 Dates" (https://www.billboard.com/art icles/news/7809452/ed-sheeran-smashes-records-australasian-stadium-tour). Billboard. 26 May 2017. Retrieved 26 May 2018.
12. "Ed Sheeran announces tour dates across Asia" (https://www.philstar.com/entertainment/2017/06/08/1707951/ed-she eran-announces-tour-dates-across-asia). Phil Star. 8 June 2017. Retrieved 26 May 2018.
13. "Ed Sheeran Reschedules Asia Tour: See the New Dates" (https://www.billboard.com/articles/news/international/8014 993/ed-sheeran-reschedule-asia-tour-new-dates). Billboard. 27 October 2017. Retrieved 26 May 2018.
14. "Ed Sheeran Adds 2018 Tour Dates for Europe and UK: Ticket Presale & On-Sale Info" (https://zumic.com/ed-sheeran -adds-2018-tour-dates-europe-uk-ticket-presale-sale-info). Zumic. 28 June 2017. Retrieved 26 May 2018.
15. "Ed Sheeran Announces 2018 North American Stadium Tour Dates" (https://www.billboard.com/articles/columns/pop/7 973801/ed-sheeran-2018-north-american-stadium-tour-dates). Billboard. 22 September 2017. Retrieved 26 May 2018.
16. "Ed Sheeran Adds Eight More Shows to His 2018 Stadium Tour" (https://www.billboard.com/articles/columns/pop/809 8413/ed-sheeran-2018-stadium-tour-added-dates). Billboard. 6 February 2018. Retrieved 26 May 2018.
17. Enos, Morgan (25 May 2018). "Ed Sheeran Announces Support Acts For North American Stadium Tour" (https://www. billboard.com/articles/columns/pop/8457901/ed-sheeran-opening-acts-tour). Billboard. 25 May 2018. Retrieved 26 May 2018.
18. "Sheeran to perform in South Africa, March 2019" (http://www.ipswichstar.co.uk/news/support-acts-for-ed-sheeran-ipswich-gigs-revealed-1-6192617). 25 June 2018. Retrieved 25 June 2018.
19. https://www.ipswichstar.co.uk/news/support-acts-for-ed-sheeran-ipswich-gigs-revealed-1-6192617
20. "Ed Sheeran 'creates history' as record 300,000 tickets sold - the most ever sold by an artist in Ireland in one day" (htt ps://m.independent.ie/entertainment/music/music-news/ed-sheeran-creates-history-as-record-300000-tickets-sold-the-most-ever-sold-by-an-artist-in-ireland-in-one-day-35908154.html). 8 July 2017. Retrieved 9 July 2017.
21. "Extra tickets added for Ed Sheeran's Cork, Dublin dates" (http://www.rte.ie/amp/922901/). 26 November 2017. Retrieved 27 November 2017.
22. "Ed Sheeran's Australian and New Zealand Tour Just Cracked 1 Million Tickets Sold" (http://themusic.com.au/news/al l/2018/03/01/ed-sheerans-australian-and-new-zealand-tour-just-cracked-1-million-tickets-sold/). 1 March 2018. Retrieved 2 March 2018.
23. "ANZ STADIUM'S ED SHEERAN CONCERTS BREAK ALL-TIME ATTENDANCE RECORDS IN SYDNEY" (http://www.anzstadium.com.au/footer/news-and-media/2018/anz-stadium-s-ed-sheeran-concerts-break-all-time-attendance-rec ords-in-sydney). ANZ Stadium. 3 April 2018. Retrieved 4 April 2018.
24. "Year End Worldwide 2017 Ticket Sales Top 100 Tours" (https://www.pollstar.com/Chart/2018/01/2017YearEndWorldw ideTicketSalesTop100Tours_626.pdf) (PDF). Pollstar. 5 January 2018. Retrieved 9 December 2018.
25. Eric, Frankenberg (5 December 2018). "The Year in Touring Charts: Ed Sheeran Claims 2018's Top Tour; Taylor Swift, Beyoncé & Jay-Z Do Big Business" (https://www.billboard.com/articles/events/year-in-music-2018/8488851/touring-ch arts-year-end-ed-sheeran-tops-taylor-swift-beyonce). Billboard. 9 December 2018.
26. Masley, Ed (6 August 2018). "Ed Sheeran captivates with one-man-and-his-looping-pedals show on Divide Tour in Glendale" (https://www.azcentral.com/story/entertainment/music/2018/08/06/ed-sheeran-captivates-divide-tour-glenda le/527253001/). AZCentral. Retrieved 4 August 2018.
27. Box score:
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170503012805/http://www.billboard.com/bi z/current-boxscore). Billboard. 2 May 2017. Archived from the original (http://www.billboard.com/biz/current-boxsco re) on 2 May 2017. Retrieved 2 May 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170524004110/http://www.billboard.com/biz/ current-boxscore). Billboard. 2 May 2017. Archived from the original (http://www.billboard.com/biz/current-boxscor e) on 24 May 2017. Retrieved 24 May 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170601021619/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 1 June 2017. Retrieved 1 June 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170614011856/http://www.billboard.com/biz/ current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 14 June 2017. Retrieved 14 June 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170620022929/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 20 June 2017. Retrieved 20 June 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20171004131929/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 4 October 2017. Retrieved 4 October 2017.

28. Vega Czurry, Rafael (5 June 2017). "Ed Sheeran no defrauda al público boricua" (https://www.elnuevodia.com/entreteni miento/musica/nota/edsheeranodefraudaalpublicoboricua-2327934/). El Nuevo Día. Retrieved 9 August 2017.
29. Vega Czurry, Rafael (5 June 2017). "Ed Sheeran no defrauda al público boricua" (http://www.indicepr.com/noticias/201 7/06/05/spot/70831/ed-sheeran-retumba-el-choliseo/). Indice. Retrieved 9 August 2017.
30. Box score:
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170614011856/http://www.billboard.com/biz/ current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 14 June 2017. Retrieved 14 June 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170620022929/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 20 June 2017. Retrieved 20 June 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20171012190202/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 12 October 2017. Retrieved 12 October 2017.
31. Europe boxscore:
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170725213515/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 25 July 2017. Retrieved 25 July 2017.
32. O'Connor, Roisin (13 March 2017). "Ed Sheeran at O2 Arena: Buy tickets for 10th anniversary show here" (https://www.independent.co.uk/arts-entertainment/music/news/ed-sheeran-o2-arena-tickets-buy-tour-dates-10th-anniversary-a7 627351.html). The Independent. Retrieved 14 March 2017.
33. North America boxscore:
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170802005800/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 2 August 2017. Retrieved 2 August 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170815215849/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 15 August 2017. Retrieved 15 August 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170822193603/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 22 August 2017. Retrieved 22 August 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170907021157/http://www.billboard.com/biz/ current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 7 September 2017. Retrieved 7 September 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20170913020218/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 13 September 2017. Retrieved 13 September 2017.
   - "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20171114154452/http://www.billboard.com/bi z/current-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore) on 14 November 2017. Retrieved 14 November 2017.
34. Team, AL365 (4 May 2017). "Confirmed: Ed Sheeran is bringing Divide Tour to Southeast Asia" (https://asialive365.co m/confirmed-ed-sheeran-divide-tour-se-asia/). asialive365.com. Retrieved 2 June 2017.
35. "Ed Sheeran announces tour dates across Asia" (https://www.philstar.com/entertainment/2017/06/08/1707951/ed-sheer an-announces-tour-dates-across-asia). philstar.com. 8 June 2017. Retrieved 3 June 2017.
36. "Lauv to open for Ed Sheeran on Asia tour" (https://www.bandwagon.asia/articles/lauv-to-open-for-ed-sheeran-on-asia -tour). bandwagon.asia. 4 September 2017. Retrieved 5 September 2017.
37. "Ed Sheeran Announces Brits' Warchild 'Gig" (http://www.edsheeran.com/news/ed-sheeran-announces-brits-warchild-gig-39366). 22 January 2018.
38. "Billboard Boxscore :: Current Scores" (https://web.archive.org/web/20180426181643/http://www.billboard.com/biz/cur rent-boxscore). Billboard. Archived from the original (http://www.billboard.com/biz/current-boxscore/) on 26 April 2018. Retrieved 26 April 2018.
39. "2018 Year End Top 100 International Box Office" (https://www.pollstar.com/Chart/2018/12/2018YearEndTop100Intern ationalBoxoffice_701.pdf) (PDF). Pollstar. Retrieved 22 December 2018.
40. Company, The Frontier Touring. "Ed Sheeran 2018 Australia & New Zealand Tickets, Concert Dates, Pre-sale & Tour Information | Frontier Touring Australia & New Zealand" (https://www.frontiertouring.com/edsheeran). Frontier Touring Australia & New Zealand. Retrieved 17 May 2017.
41. "Tour Dates Rescheduled in Osaka, Tokyo and Manila; cancelled in Taipei, Hong Kong and Jakarta" (http://www.edshe eran.com/news/tour-dates-rescheduled-osaka-tokyo-and-manila-cancelled-taipei-seoul-hong-kong-and-jakarta). edsheeran.com. 25 October 2017. Retrieved 26 October 2017.
42. "Ed Sheeran Dates Announced for 2018" (http://www.edsheeran.com/news/european-stadium-dates-announ ced-2018-37291). edsheeran.com. Retrieved 28 June 2017.
43. "Ed Sheeran Concert" (https://www.mlb.com/pirates/tickets/concerts/ed-sheeran). MLB Advanced Media. Retrieved 30 April 2018.
44. "Ed Sheeran concert at Miller Park rescheduled for Oct. 24" (https://fox6now.com/2018/10/21/ed-sheeran-concert-at-miller-park-rescheduled-for-oct-24/). FOX6Now.com. 21 October 2018. Retrieved 22 October 2018.
45. Kreps, Daniel (16 September 2017). "Ed Sheeran Cancels St. Louis Concert Over Safety Concerns" (https://www.rolli ngstone.com/music/news/ed-sheeran-cancels-st-louis-concert-over-safety-concerns-w503597). Rolling Stone. Retrieved 16 September 2017.
46. "Ed Sheeran's Hong Kong concert cancelled due to lightning storm" (https://www.channelnewsasia.com/news/asia/ed-sheeran-hong-kong-concert-cancelled-lightning-storm-fans-11459918). Channel News Asia. 18 April 2019. Retrieved 18 April 2019.

## External links

- + Tour on Ed Sheeran Official Website (http://www.edsheeran.com/tour/index/tour/id/97)

Retrieved from "https://en.wikipedia.org/w/index.php?title=+_Tour&oldid=920520439"

**This page was last edited on 10 October 2019, at 08:51 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

10/23/2019

 **Official Charts**    News    New Releases    Charts    Archive    Artists    

WE'RE CHANGING A LOT MORE THAN THE NAME.    Mount Sinai South Nassau

22 June 2015

# Ed Sheeran's Thinking Out Loud becomes first single ever to spend one year inside the Top 40

The singer-songwriter has a lot to celebrate as his album X reaches its first birthday...

FACEBOOK 1,055    TWITTER 308    FLIPBOARD    REDDIT    2 COMMENTS



By Rob Copsey

Ed Sheeran has yet another accolade to add to his list of achievements; his single Thinking Out Loud has become the first ever to spend a full year inside the Official Singles Chart Top 40.

Exactly one year after its release, Thinking Out Loud has logged 52 consecutive weeks on the tally, finishing this week at Number 28.

Other chart main stayers that have come close to a full year in the Top 40 in recent years are John Legend's All Of Me (44 consecutive weeks) and Pharrell Williams' Happy (49 consecutive weeks).

The feat is yet another massive milestone for Thinking Out Loud, which holds the title for the longest climb ever to the top spot, taking 19 weeks reach the summit after first entering the Top 40 at Number 26 last June.



Thinking Out Loud is also one of the UK's 161 million-selling singles and the 26th best-selling track of the decade to far. To date, the song has a combined sales and streams total of 1.65 million.

Sheeran's album X also celebrates an important milestone this week, having logged a full year in the Official Albums Chart Top 10.

The record, which has so far spent 12 non-consecutive weeks at the summit, landed at Number 5 for its 52nd week on the chart. The record's total sales to date stand at 2.23 million and it is currently the fifth best-selling album of the decade (see the full list list here).

In addition to Thinking Out Loud, X has spawned a string of successful singles; the chart-topping Sing and Top 10s Don't (Number 8) and Bloodstream (2). His current single Photograph reached a new peak at 22 on this



New Top 40 charts announced in...

| 02 | 12 | 11 | 37 |
|----|----|----|----|
| DAYS | HOURS | MINS | SECS |

FEATURED VIDEOS

Tom Walker celebrates What A Time To Be Alive debuting at Number 1 Official Charts *Read More*

**Official Singles Chart**

| SINGLES | ALBUMS | FILM |

| 01 | DANCE MONKEY — TONES & I |
| 02 | RIDE IT — REGARD |
| 03 | LIGHTS UP — HARRY STYLES |
| 04 | CIRCLES — POST MALONE |
| 05 | HIGHEST IN THE ROOM — TRAVIS SCOTT |

VIEW THE TOP 100

**Access The Archive**

Day    Month    Year    GO
Search artists & news    GO
Search by title    GO

The charts in your inbox





week's tally. To date, individual track downloads from X total 2.96 million, while songs from the album have been streamed 298 million times.

FACEBOOK 1,055 | TWITTER 309 | FLIPBOARD | REDDIT

Related stories

Ed Sheeran's Official Irish Singles Chart history so far

The UK's Top 40 biggest studio albums of the 21st Century

Ed Sheeran claims fifth week at UK singles Number 1

2 Comments

Sponsored

2 Comments Official Charts Login

Recommend 14 Tweet Share Sort by Best

Join the discussion…

LOG IN WITH OR SIGN UP WITH DISQUS ?

Name

**Gavin Ryan** • 4 years ago
"x" has spent the past 52 weeks in the Australian Top 10, and has never left, dropping as low as #10.
1 ^ | v • Reply • Share ›

**jimmy** ➦ Gavin Ryan • 4 years ago
yeah and thats probaly famous in austalia but no one cares here in usa
^ | v • Reply • Share ›

Subscribe Add Disqus to your siteAdd DisqusAdd Disqus' Privacy PolicyPrivacy PolicyPrivacy

Sponsored

comments powered by Disqus

The Charts in your inbox
Sign up for our newsletter
SUBMIT
View privacy policy

## Twitter feed

Make It Right makes an impact! @BTS_twt enter the UK's Official Trending Chart with a little help from @lauvsongs… https://t.co/KtrlbK6xl9

Looks like @Camila_Cabello will have TWO Top 20 hits on the UK's Official Singles Chart this Friday…… https://t.co/N4F71vrcNi

The Script are going back to their roots - interview https://t.co/CGd2EosUj8

FOLLOW US ON TWITTER

Follow us on Flipboard

More Charty Stuff...

Official Chart Picker

Music Video Chart

01  **40 LIVE - CURAETION-25 + ANNIVERSARY** CURE

02  **HITSVILLE - THE MAKING OF MOTOWN** VARIOUS ARTISTS

03  **AMAZING GRACE** ARETHA FRANKLIN

04 **MY WORLD** JOJO SIWA

05  **AS IT WAS** LIAM GALLAGHER

VIEW THE FULL CHART

Now That's What I Call Music! 104 tracklisting revealed

Christina Aguilera's UK tour support act announced

Cher's Top 20 biggest UK singles revealed

Picture This set for highest new entry on Irish Singles Chart

Artists who switched from songs to books

Kanye West sets Jesus Is King album release date

Foals vs James Arthur for this week's Number 1 album

Dance Monkey set to claim fourth week at UK Number 1

Riton & Oliver Heldens' Turn Me On is Number 1 trending song

Dance Monkey holds off Number 1 challenge from Harry Styles

Sign up for the latest chart news your email SIGN UP

View privacy policy

Official Charts

© The Official UK Charts Company 2019

WHO WE ARE
- The Official Charts
- History of the Official Charts
- Our charts and data
- Contact Us
- Our partners
- Copyright notice
- Privacy Policy
- Cookie Policy
- Jobs Section
- Consent Information

GETTING INTO THE CHARTS
- How the charts are compiled
- Releasing your music
- Registering a release
- Meeting the chart rules
- The chart retailers

OUR BUSINESS SERVICES
- Our services
- B2B data
- Chart licensing
- Brand licensing
- Advertising on OfficialCharts.com
- Official Number 1 Award

**A184**

# Hillel I. Parness

(Cell) 646-526-8261 • (Office) 212-447-5299 • (Fax) 212-202-6002
Parness Law Firm, PLLC • www.hiplaw.com • hip@hiplaw.com
136 Madison Avenue, 6th Floor • New York, New York  10016

November 8, 2019                                                    **Via ECF**

Hon. Louis L. Stanton
U.S. District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:    *Structured Asset Sales, LLC v. Sheeran,* 1:18-cv-05839

Dear Judge Stanton:

I represent Plaintiff Structured Asset Sales, LLC's ("SAS") in the above-referenced matter, and I am writing to the Court with respect to SAS's motion to compel discovery from Defendants regarding "indirect profits."  In my opening Memorandum of Law filed October 23, 2019 (ECF 130), I wrote the following regarding the *Gray v. Perry* decisions issued by the District Court for the Central District of California, cases on which Defendants place substantial reliance:

> First, the decisions of the *Gray* district court are not binding on this Court, and would not be binding even if *Gray* were affirmed by the Ninth Circuit, which it has not been. Second, the *Gray* court reached its legal conclusion based on evidence submitted to that court regarding the ASCAP public performance license, and no such evidence has been submitted here, nor is there any evidence that the requisite blanket licenses would cover both of the works at issue. Third, despite the California district court's conclusion that the ASCAP blanket license allows performers to perform copyright infringing works with impunity, that court nevertheless gave the plaintiffs the opportunity to press on and to develop an argument for their entitlement to discovery of indirect profits derived from something other than the in-concert performances. The plaintiffs in *Gray* either failed or declined to make that effort.

> No such failing exists here. SAS specifically alleges that the release and massive popularity of the infringing "Thinking Out Loud" drove a wide range of other revenues, including but in no way limited to sales of concert tickets and concert merchandise, in advance of and unconnected to any in-concert performances of the infringing song. This meshes squarely with the conclusion that

Hon. Louis L. Stanton
November 8, 2019

> infringements can drive revenues generated down the road, from
> concerts, merchandise, sponsorships and the like, and a plaintiff is
> entitled to discovery to determine whether, and the extent to which
> it has occurred.

ECF 130 at 11-12 (emphasis added).  In the weeks since, ASCAP and BMI have
provided the parties with documents that show that:

1.  the venues in which Mr. Sheeran performed during his second and third
    tours were licensed by ASCAP and BMI; and

2.  during that same period of time, both "Let's Get It On" and "Thinking Out
    Loud" were within the ASCAP and BMI repertories.

In view of the materials provided by ASCAP and BMI, we withdraw the "Second"
argument quoted and underlined above, without withdrawing or affecting any
other argument set forth in my opening brief.  As I have advised Defendants'
counsel several times, we are willing to stipulate to the two <u>facts</u> above, but not –
as Defendants have requested of us – to any <u>legal</u> <u>conclusions</u> they wish to draw
from those facts.

Respectfully submitted,

Hillel I. Parness

cc:     Counsel of Record (via ECF)



**PRYOR CASHMAN LLP**

New York | Los Angeles

7 Times Square, New York, NY 10036  Tel: 212-421-4100  Fax: 212-326-0806

www.pryorcashman.com

**Donald S. Zakarin**
**Partner**
Direct Tel: 212-326-0108
dzakarin@pryorcashman.com

November 8, 2019

<u>**VIA ECF**</u>

Hon. Louis L. Stanton
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007-1312

      **Re:**    <u>**Structured Asset, Sales, LLC v. Sheeran, et. al., 18-cv-5839 (LLS)**</u>

Dear Judge Stanton:

      On behalf of the Defendants, we write in brief response to the November 8, 2019 letter of Hillel Parness, Esq., sent on behalf of plaintiff Structured Asset Sales, LLC ("SAS"). Mr. Parness advises the Court that he has "withdraw[n]" the "Second" argument quoted on pages 11-12 of SAS's memorandum of law. *See* Dkt. No. 130. While it may appear that we are "looking a gift horse in the mouth," that is not exactly the case. Mr. Parness would have Your Honor believe that his "withdrawal" is voluntary and timely. Unfortunately, that is not the case.

      Both SAS and Mr. Parness have extensive experience in the music business (indeed, Mr. Parness was involved in the claimed infringement on behalf of Atlantic Records when the claim was first made before switching to the other side to represent SAS). They were both fully aware that every one of Ed Sheeran's concerts would have been covered by blanket licenses issued by ASCAP and BMI (and hence, his performance of *Thinking Out Loud* could not have infringed *Let's Get It On*).

      Yet, SAS and Mr. Parness argued, in SAS's motion to compel, that this case was distinguishable from the California District Court's decisions in *Gray v. Perry* because in that case the defendants provided evidence that Perry's concerts were subject to blanket licenses and hence the performance of her song could not have infringed the plaintiff's song whereas here Defendants had not provided such evidence. They made that argument knowing that the issuance of blanket licenses to concert venues or promoters was not some anomaly peculiar to the venues where Katy Perry performed.[1]

---

[1] SAS is a vehicle of David Pullman, who describes himself on his website as a "pioneer" of the music industry with "intrinsic knowledge of the 'inner workings'" of, among other things, BMI and ASCAP. Mr. Pullman is neither a music publisher nor a writer. Rather, he started out in the music business in the 1990s doing securitizations of songwriter royalty streams and then turned to purchasing songwriter royalty rights from writers (or heirs of writers).

**PRYOR CASHMAN LLP**

Hon. Louis L. Stanton
November 8, 2019
Page 2

Accordingly, on October 29, 2019, shortly after SAS filed its motion, I offered Mr. Parness the opportunity to stipulate to withdraw the assertions SAS made on pages 11-12 of its memorandum of law and admit that Ed Sheeran's concert performances were licensed and could not have infringed SAS's public performance rights in LGO. I did so hoping to avoid burdening this Court and to avoid having to obtain declarations from ASCAP and BMI confirming that Mr. Sheeran's concert performances were fully licensed. SAS rejected the proposed stipulation and agreed only to stipulate to the fact that the concert venues were licensed by ASCAP and BMI under their form blanket licenses, apparently trying to preserve some ability to argue that Ed Sheeran's performance of TOL somehow still infringed LGO despite the fact that the public performance of both songs was fully licensed.

Accordingly, I proceeded to obtain declarations from ASCAP and BMI confirming what SAS and Mr. Parness already knew when they made the argument in SAS's motion – that Ed Sheeran's concert performances were licensed and could not have infringed SAS's public performance rights in LGO. And we have prepared opposition papers (due on Tuesday) including the argument necessitated by SAS's refusal to agree to the stipulation I offered. That work is already done and it could have been and should have been avoided.

There is a reason why Mr. Parness has belatedly written to Your Honor. Yesterday, in the interest of full disclosure, ASCAP provided Mr. Parness with its sworn declaration at the same time it provided it to me. Further, I also wrote to Mr. Parness yesterday to explain why his half-baked response to my offer had necessitated our obtaining declarations from ASCAP and BMI and explaining to Your Honor why SAS's proffered distinction of this case to the *Perry* case could not have been offered in good faith. I believe that Mr. Parness's and SAS's belated "withdrawal" is simply an attempt to "pull the teeth" from what they know will be part of our opposition.

We believe that it is appropriate for Your Honor to know the context in which SAS has now proposed to withdraw an argument it never should have made to begin with.

Respectfully submitted,

Donald S. Zakarin

# Hillel I. Parness

(Cell) 646-526-8261 • (Office) 212-447-5299 • (Fax) 212-202-6002
Parness Law Firm, PLLC • www.hiplaw.com • hip@hiplaw.com
136 Madison Avenue, 6th Floor • New York, New York  10016

November 12, 2019                                             **Via ECF**

Hon. Louis L. Stanton
U.S. District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:    _Structured Asset Sales, LLC v. Sheeran_, 1:18-cv-05839

Dear Judge Stanton:

I represent Plaintiff Structured Asset Sales, LLC's ("SAS") in the above-referenced
matter.  In <u>very</u> brief response to Mr. Zakarin's letter of November 8, 2019 (ECF
132), I wish to advise the Court that in my very first response to Mr. Zakarin on
October 29, I offered the following: "If ASCAP and BMI confirm that every
performance venue was properly blanket-licensed on each performance date
(which would not shock me) I expect we will be able to stipulate to that fact
(leaving aside the potential legal ramifications)."  Mr. Zakarin persisted, in a series
of strident emails, to demand that I stipulate not just to the facts but to the <u>legal
conclusion</u> that he wishes to draw from them.  I patiently explained over and over
again that I could not do so, especially on an issue of unsettled law in this Circuit.

In my final email to Mr. Zakarin on the subject – on October 31 – I wrote as
follows: "Now that we have been provided with the ASCAP and BMI information,
and the representations of the ASCAP and BMI representatives, we are willing to
stipulate to the fact that the identified venues were licensed by ASCAP and BMI
under their form blanket licenses, and to the fact that the two compositions were
in the ASCAP and BMI repertories.  We are not willing to stipulate to the legal
conclusions you wish to draw from those stipulated facts, and leave it to you as to
how you wish to proceed.  If you would like to prepare a stipulation as to the facts
and send it to me for review, please feel free to do so."

Mr. Zakarin did not respond to me further <u>until a full week later</u> – November 7 –
refusing my offer of a factual stipulation and reiterating his demand that I
stipulate to his legal position.  It was at that point that I decided to write to the
Court, and I did so the next day (ECF 131).  Mr. Zakarin's complaint that I
somehow forced the Pryor Cashman firm to do "extra work" is belied by the
timing and substance of our correspondence, which I can of course share with the
Court if requested.

Hon. Louis L. Stanton
November 12, 2019

Respectfully submitted,

Hillel I. Parness

cc:      Counsel of Record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Case No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **DECLARATION OF DONALD S. ZAKARIN IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10 | |
| Defendants. | |

I, **DONALD S. ZAKARIN**, declare under penalty of perjury as follows:

1.      I am a member of Pryor Cashman LLP, attorneys for the defendants in this action. I submit this Declaration in opposition to the motion of the Plaintiff, Structured Asset Sales, LLC ("SAS"), which seeks to compel the defendants (primarily Edward Christopher Sheeran ("Sheeran") to provide sweeping discovery relating to "indirect profits" supposedly attributable to the alleged infringement of the musical composition *Let's Get It On* ("LGO") by the musical composition co-authored by Sheeran with defendant Amy Wadge entitled *Thinking Out Loud* ("TOL").[1]  My knowledge is based on both documents I have reviewed, my personal knowledge of the facts and applicable law and my active involvement in this case since inception.

---

[1] SAS is a vehicle of David Pullman.  Mr. Pullman is neither a music publisher nor a writer.  Rather, he started out doing securitizations of songwriter royalty streams and then turned to purchasing songwriter royalty rights from writers (or heirs of writers).  Many of those purchases have resulted in litigated disputes with the writers and heirs (Pullman has an extensive litigation history) regarding the circumstances of his purchases and their "fairness."

2.      SAS's document requests, identified at pages 3 through 5 of its Memorandum of Law, seek the production of documents and information relating to three categories of "indirect profits."  The first category is all revenues and expenses related to the sale of "merchandise," whether sold at retail or on tour.  The second category is all revenues and expenses associated with all tours or live performances of TOL.  The third category is all revenues and expenses associated with sponsorships or endorsements concerning TOL.[2]

### Ed Sheeran's Concert Performances Of TOL Did Not Infringe LGO

3.      SAS's motion to compel should be denied for multiple reasons.  First, as confirmed by the accompanying declarations from ASCAP and BMI, the public performance of every song performed at every one of Ed Sheeran's United States concerts was fully licensed.  His performance of TOL at any or all of his concerts in the United States could not have infringed LGO because the right to publicly perform both songs was licensed by ASCAP and BMI.  Because the performances at Sheeran's concerts were not infringing, there is no basis for SAS's claim to any of the concert revenues and no entitlement to any discovery of these non-infringing activities.[3]

---

[2] These three categories of revenue and expense, which on the face of the discovery requests are not linked to TOL in any meaningful way, barely scratch the surface of SAS's wish list of "indirect profits."  As I will discuss below, the *ad damnum* clause of SAS's TAC, in line items 9 through 30, seeks recovery of the most exhaustive and attenuated list of "indirect profits" I have ever seen, stretching from the supposed value of Ed Sheeran's rights of publicity and name and likeness (and any purported increase in the value thereof) to the supposed increase in value of Ed Sheeran's "good will."  SAS also seeks a share of any theoretical "improved" record deal terms and "improved" publishing deal terms, as well as any value supposedly obtained by virtue of Ed Sheeran's increased "leverage" in negotiating new deals in the future.

[3] Assuming that SAS could establish that TOL infringed LGO, it has already been provided with full disclosure from defendants as well as ASCAP and BMI of the performance income paid with respect to all of Sheeran's concerts in the United States.  As discussed more fully below, because Sheeran generally performed some 18 to 24 songs at each concert, SAS would have an entitlement to the portion of that performance income allocable to the alleged infringing elements in TOL (after deducting the portion allocable to the other songs performed by Sheeran) should it prevail on its infringement claim.

4.      At page 11 of its Memorandum of Law, SAS tries to distinguish this case from the

Court's decisions in *Gray v. Perry* based on the fact that the defendants there provided evidence

that Katy Perry's performances of the allegedly infringing song in concert were not infringing

because the venues were covered by blanket performance licenses issued by ASCAP (whereas

here, defendants supposedly had not provided such evidence).

5.      But I have no doubt that both SAS and its counsel were fully aware when they made

that allegation in their motion that ASCAP's (and BMI's) issuance of blanket licenses to concert

venues or promoters was not some anomaly peculiar to the venues where Katy Perry performed.

Rather, I am certain that they both knew that ASCAP and BMI also issued blanket licenses to all

of Ed Sheeran's concert venues or promoters and that, accordingly, no different than in *Perry*, Ed

Sheeran's performances of TOL could not have infringed the public performance rights in LGO

(even assuming that SAS could prove that TOL infringes LGO).

6.      Accordingly, rather than burdening this Court with an argument about the fact that

Ed Sheeran's concert performances of TOL did not infringe LGO (and in effort to avoid having to

obtain declarations from ASCAP and BMI), I proposed to SAS's counsel a stipulation in which

SAS would withdraw the assertions it made on page 11 of its Memorandum of Law and admit that

Ed Sheeran's concert performances were licensed and could not have infringed SAS's public

performance rights in LGO.

7.      SAS rejected my proposed stipulation and agreed only to stipulate to the fact that

the concert venues were licensed by ASCAP and BMI under their form blanket licenses and that

the two compositions (LGO and TOL) were in the ASCAP and BMI repertories.  SAS refused to

agree that the ASCAP and BMI licenses necessarily meant that the live performances could not be

infringing (as the Court in *Perry* concluded), apparently hoping to pretend that the ASCAP and

BMI licenses did not bar a claim that Ed Sheeran's performance of TOL somehow still infringed LGO.

8.      SAS's refusal to stipulate, which would have necessitated the withdrawal of its proffered baseless distinction between the *Perry* decision and this case, has therefore required defendants to obtain the accompanying declarations of ASCAP and BMI and to burden this Court, unnecessarily, with demonstrating that which SAS and its counsel already know to be the case: Ed Sheeran did not infringe and could not have infringed LGO by performing TOL at his concerts because the right to publicly perform both songs (as well as every other song in the ASCAP and BMI repertories) was fully licensed.[4]

**SAS Has Failed To Plead Any Causal Nexus Between TOL and Any Indirect Profits**

9.      Second, as set forth in the accompanying Memorandum of Law, in order to pursue a claim (and discovery) regarding what are known as "indirect profits" allegedly attributable to an infringement, the plaintiff must plead and prove a "causal nexus" between the alleged infringement and the "indirect profits."    SAS's Memorandum of Law, at pages 1 and 2, identifies all of the paragraphs of its Third Amended Complaint ("TAC") that it contends allege facts showing the supposed "causal nexus."

10.      But those paragraphs – 29, 62, 11, 17 and 70 – nowhere identify any causal link (let alone plead any facts showing such linkage) between the alleged infringement of LGO and any of the three categories of "indirect profits" as to which SAS is seeking discovery (and even less so as

---

[4] Because the public performance of TOL could not have infringed LGO and because, as shown below, many of the concert dates are beyond the three year statute of limitations (and because SAS has not even alleged any "causal nexus" for any of its "indirect profit" claims), defendants will be submitting a letter in accordance with this Court's rules seeking permission to move for partial summary judgment dismissing all of SAS's "indirect profit" claims.

to all of the categories of "indirect profits" identified in at least sub-paragraphs 9 through 30 of the *ad damnum* clause of the TAC (a copy of just the *ad damnum* clause of the TAC is attached hereto as **Exhibit 1**).

11.     On the contrary, those paragraphs simply allege, in conclusory fashion, that Ed Sheeran supposedly experienced a sudden rise as a music star as a result of the success of TOL; that TOL was a great financial success, supposedly generating hundreds of millions of dollars; that defendants generated touring revenue from the exploitation of TOL; and, that the exploitation of TOL infringes SAS's rights in LGO.

### i.     SAS's claim for Indirect Profits From Merchandise

12.     Starting with SAS's demand for discovery relating to any merchandise, nowhere in the TAC is there any allegation that defendants sold any official (authorized) merchandise branded with or by TOL.  And as set forth in the accompanying declaration of Stuart Camp, Ed Sheeran's manager, no such merchandise was ever sold.

13.     Nowhere is there any allegation that any consumer purchased any merchandise due to any association with TOL (and since there is no authorized merchandise that is in any fashion branded with or by TOL, it is impossible to conceive of there being any such supposed linkage). To the extent that SAS is linking the sale of merchandise to the supposed linkage it theorizes exists (but fails to plead in the TAC) between TOL and Ed Sheeran's successful concert tours in the United States, not only is this supposed linkage twice removed from any actual connection to any alleged infringement by TOL of LGO but, as discussed below (and detailed in the accompanying Camp Declaration), there is no such linkage between TOL and any of Ed Sheeran's concerts in the United States.

ii.      **SAS's Claim For Indirect Profits From Concert Tours**

14.      As with SAS's demand for discovery relating to merchandise, nowhere in the TAC is there any allegation that a single concert goer purchased a single ticket to an Ed Sheeran concert solely (or even partly) to see him perform TOL live (as opposed to buying tickets to see Ed Sheeran performing a live concert of dozens of his other songs).  Any fan of Ed Sheeran can listen to him perform any of his songs for free on the radio or by purchasing a CD or by streaming on Spotify or Apple (or any other streaming service).

15.      In fact, as set forth in detail in the accompanying Camp Declaration, the chronological facts respecting the timing of Ed Sheeran's concert tours in the United States conclusively refute any "causal nexus" between any "indirect profits" supposedly attributable to the alleged infringement of LGO by TOL at any of Ed Sheeran's concert performances.

16.      First, even putting to the side that concert tickets are bought in advance, as shown in Exhibit 1 to the Camp Declaration (the full list of Ed Sheeran's United States concert performances in the United States following the release of the album *X*, which included TOL), with the exception of a single concert date in December 2014, every single concert date performed by Ed Sheeran in the United States in 2014 **preceded** the release of TOL as a single recording (it was the third single released from *X*).  And the album *X* became a Number 1 selling album months before TOL was released (but after the first single from *X* was released).

17.      Second, when Ed Sheeran resumed his United States tour on May 2, 2015, it was more than seven months after TOL had been released but it was close in time to the release of the next two singles from *X*.  In fact, this leg of the tour closely coincided with the release of *Photograph*, another extremely successful song from *X*.

18.     While SAS does not allege – and frankly has no good faith basis on which to allege – that Ed Sheeran fans buy concert tickets to see him perform a single specific song as opposed to seeing him perform many songs live and in concert, to the extent that SAS's theory had any basis, the May to September 2015 leg of Ed Sheeran's concert tour in the United States would have a far greater linkage to the two successful singles released in February 2015 (*Bloodstream*) and May 2015 (*Photograph*) than to TOL.

19.     Moreover, as the Camp Declaration also shows, the next United States concert tour by Ed Sheeran did not begin until June 2017, after the release of Ed Sheeran's third album for Warner UK entitled ÷ (Divide) and also after the release of two hugely successful single recordings from that album: *Shape Of You* and *Castle On The Hill*.  In fact, as the Camp Declaration notes, *Shape Of You* was by far Ed Sheeran's most successful song.

20.     The Divide tour also had two United States legs, one in 2017 and the second in 2018.  TOL was released as a single nearly three years before this tour started and nearly four years before it ended.  SAS does not allege – nor could it in good faith – that Ed Sheeran fans bought concert tickets to the Divide tour dates to see him perform a song that was not even on the ÷ album but which had instead been released some three or four years earlier.

21.     But that complete lack of connection has not stopped SAS from demanding that defendants assume a massive discovery burden (discussed below) based solely on SAS's conclusory theory, unsupported by its pleading or any facts, that the entirety of Ed Sheeran's professional and financial success is attributable solely to TOL.

### iii.     SAS's Claim For Indirect Profits From Sponsorships

22.     Nowhere is there any allegation that Ed Sheeran has entered into any sponsorship or endorsement agreements, nor any alleged causal nexus pleaded between these imagined agreements and TOL.  Again, the entirety of SAS's claims for "indirect profits" simply assumes that every professional and financial achievement in Ed Sheeran's life is attributable not to his talent as a musical artist and writer, not to his professional dedication and hard work, touring all of the world for years in support of his albums, but solely to TOL which allegedly infringed LGO.

23.     In fact, not only is there no such allegation and not only do the actual facts, documented in the accompanying Camp Declaration refute SAS's thesis that Ed Sheeran's success is singularly attributable to a single song, in the case of sponsorships and endorsements, the only "sponsorships" ever entered into by Ed Sheeran have had nothing whatsoever to do with TOL. Accordingly, there is no basis for this discovery demand.

### SAS's Claim For Indirect Profits For Alleged Infringing Activity Prior To June 27, 2015 Is Time Barred

24.     It is undisputed that SAS commenced this action on June 28, 2018 and it is undisputed as well that the Copyright Act statute of limitations bars claims for infringing acts that occurred more than three years prior to the commencement of the action.  Thus, even assuming that SAS had pleaded a causal nexus between the alleged infringement of LGO by TOL and Ed Sheeran's concerts prior to June 27, 2015 and even ignoring that every concert performance by Ed Sheeran in the United States was subject to blanket licenses from ASCAP and BMI and hence were not infringing, every Ed Sheeran concert in the United States in 2014 and every concert between May 2, 2015 and June 27, 2015 is beyond the three year statute of limitations for claims of infringement.

25.     Accordingly, any claim for indirect profits arising from Ed Sheeran's concerts or merchandise or anything else prior to June 28, 2015 is time barred.  As such, SAS motion to compel discovery as to such activities is infirm for this reason as well.

### SAS's Demand For Discovery Of Indirect Profits
### Is Overly Burdensome And Disproportionate

26.     As discussed above, while SAS's motion to compel focuses on three categories of indirect profits, the *ad damnum* clause of the TAC (Exhibit 1) does not have any such limitations. Rather, it demands recovery of "indirect profits" from virtually every conceivable human activity that SAS imagines Ed Sheeran has engaged in or ever might engage in.  And it does so without the TAC bothering to identify any alleged connection between any item in this laundry list of activities and the alleged infringement of LGO by TOL.  Rather SAS simply operates under the presumption that every success in Ed Sheeran's professional and financial life can be directly traced solely to TOL.

27.     But even if one simply limited the focus to the three categories of "indirect profits" identified in SAS's motion, the discovery burden imposed on defendants (primarily Ed Sheeran) would be enormous and completely disproportionate to the value of any claim.

28.     Backing out the concerts that are time barred, the revenues that Ed Sheeran received from his United States concert tours for those dates at which TOL was performed is not, in itself, hugely burdensome to obtain.  But that is only the starting point of the discovery.  Based on over forty years of experience in litigating music copyright infringement actions, my understanding of the nature of the cost documentation involved, confirmed by my discussions with Ed Sheeran's accounting firm, I am aware that the information relating to the deductible costs is massive and massively difficult to compile.

29.     The cost deductions include the costs and fees payable for equipment, advertising and promotion, transportation (including tour buses and air travel), freight, insurance and salaries payable to security, staff, and others.   There are also production services expenses, label commissions, management commissions, booking agent commissions and legal and accounting fees.  Further costs include food and lodging for Ed Sheeran, his tour support and road staff as well as trucking (for equipment and sets).   Many of these expenses are on a venue by venue basis.  The expenses total millions of dollars and the burden of documenting each of these expenses, not merely on a tour by tour basis but also, in many cases, on a venue by venue basis, would be an enormous undertaking, comprising tens of thousands of documents.

30.     Once one deducts all of the expenses from the share of revenue received by Ed Sheeran (or his United States touring company), as with all other economic activities in the United States, there are also federal, state and local taxes that must be paid.  All of these taxes would have to be documented, federally and state by state.  And then Ed Sheeran must also pay taxes on this income in the United Kingdom (albeit the taxes paid here are credited against the taxes that Ed Sheeran must pay on his income in the United Kingdom).  But allocating the taxes paid in the UK to Ed Sheeran's touring is itself no easy task as taxes are not paid on a project by project basis.

31.     Beyond having to undertake the effort to document all of these expenses covering some 100 or more tour dates, each date would have to be checked to verify and document what songs were performed.  This is not merely to determine whether TOL was performed (because, obviously, if TOL was not performed, SAS's claim becomes even more remote) but also to determine how many other songs were performed at each concert.  And this analysis is necessary in order to do the allocation between allegedly infringing and non-infringing activity (even though, as confirmed by ASCAP and BMI, none of the concert performances were infringing).

10

32.    But it is not just the magnitude of the discovery burden that SAS's demands would impose on, primarily, Ed Sheeran.  It is that this burden is also completely disproportionate to the economic significance of the claim for "indirect profits."

33.    Without specifically disclosing the precise figures, if one assumes that the net after tax "profit" from Ed Sheeran's concert tours in the United States was as much as $25 million, the value of SAS's claim amounts to a small fraction of that number, consistent with applicable copyright law.

34.    First of all, based on my personal review of the set lists performed by Ed Sheeran (and SAS has already submitted to this Court a supposed set list it downloaded from the internet), Ed Sheeran appears to have performed between 18 and 24 songs (or more) at virtually all of his concert dates.  For the sake of simplicity, if one assumes that Ed Sheeran performed, on average, some 20 songs at each concert, the allegedly infringing work, TOL (which as discussed above, would not be infringing to begin with) would account for some 5% of the total songs performed (1/20).  In fact, I believe, on average, the number of songs performed exceeded 20 (but 20 is a simpler number to work with).

35.    On a purely mathematical basis, one can therefore reasonably allocate or apportion roughly 1/20 of the "profits" from Ed Sheeran's United States concerts to TOL (or $1,250,000).  While SAS may contend that TOL should have a greater allocation, it has offered no evidence, only conclusions, for such a contention.  Regardless, this is merely the starting point for the allocations that must be made under the Copyright Act.

36.    Even assuming that TOL were infringing, SAS would only be entitled to "profits" attributable to the allegedly infringing portions of TOL.  There is no claim that the lyrics of TOL are infringing.  While one can reasonably argue that the lyrics of TOL account for more than 50%

of the value of the song (and I personally believe that the lyrics of TOL are particularly powerful and entitled to a valuation of more than 50% of the song), even conservatively assuming that one allocated only 50% to the lyrics, that would reduce the "profits" attributable to the allegedly infringing elements to $625,000 (1/2 of $1,250,000).

37.     But not all of the musical elements of TOL are alleged to be infringing.  While the question of whether LGO's copyright is limited to the deposit copy or includes elements only found in the Marvin Gaye recording remains open, there is no viable claim that the melody of TOL infringes LGO (and melody is the most important musical part of a song).  Rather, the claim relates primarily to a chord progression (which defendants contend is commonplace and unprotectable), a particular rhythmic technique and (from the recording) a bass line and percussion.  Even assuming that as much as 25% of the musical elements were allegedly infringing – and I believe that is a significantly inflated percentage – that would reduce the "profits" attributable to the allegedly infringing elements to $156,250 (1/4 of $625,000).

38.     But Ed Sheeran's performance as a live performing artist is what his fans are going to see.  So his drawing power also has to be factored into the equation as a non-infringing element. Contrary to the conclusory assumptions of SAS that concert goers wanted simply to see TOL performed (it apparently making no difference who performed it), I believe that one could reasonably argue that as much as 95-99% of the people buying tickets did so to see Ed Sheeran perform live.  But purely for the sake of this analysis, even if one assumes that only 50% of the people who bought tickets to see Ed Sheeran did so purely to see him perform live, that would reduce the "profits" attributable to the alleged infringement down to $78,125 (1/2 of $156,250). As I said, I believe the more likely percentage would reduce the "profits" down to between 1% and 5% of $156,250, or between $1,562.50 and $7,812.50.

39.     We then turn to the interest held by SAS in LGO.  SAS holds a 1/3 share of the 2/3 writer share derived from Ed Townsend's original writer share (Ed Townsend was credited as a 2/3 writer and Marvin Gaye was credited as a 1/3 writer of LGO).  This 1/3 of 2/3 of a 50% writer's share interest in LGO gives SAS a total economic interest of 11%.[5]

40.     Accordingly, based on SAS's 11% claimed interest in LGO, the ultimately high end value of its claim with respect to the "indirect profits" attributable to the alleged infringement of LGO by TOL from Ed Sheeran's United States concert tours under this scenario would amount to some $8,593.75 (11% of $78,125).  Again, my view is that most Sheeran fans attend his concerts to see him perform live, not to see him perform some specific song.  If one applies the far higher percentage in the allocation, the value of SAS's claim, assuming it could prove infringement to begin with (and assuming that the concert performances were not fully licensed and hence not infringing to begin with), would amount to between $171.88 and $859.38

41.     So for a claim value between zero and less than $9,000 (even assuming relevant, non-time-barred U.S. concert profits are as high as $25 million), SAS is demanding that Defendants undertake a massive discovery burden that will cost many multiples of the value of the claim.  And this is before there has been any determination that TOL infringes LGO.

42.     The discovery that SAS is demanding of "indirect profits" is vastly disproportionate and on that basis alone should be denied.  Even had SAS pleaded the requisite causal nexus and provided any factual basis for such claimed nexus, given the disparity between the claim value and

---

[5] SAS's TAC professes to have the right to assert a claim based on 100% of LGO.  That is impossible and patently untrue.  First, the owner of the remaining 2/3 of the Ed Townsend writer share is separately suing in the Griffin case.  Second, SAS has no interest in the Gaye share of LGO or any authority to act on their behalf.  Third, EMI is the legal owner of the Townsend copyright interest equivalent to his 2/3 songwriter share (SAS and Griffin hold beneficial interests only) and SAS has no right to pursue a claim on behalf of EMI.

the discovery burden it would impose, any such claim should be bifurcated for discovery purposes and await a determination on liability.

43.     Here, however, SAS has not pleaded any such causal nexus and, accordingly, its motion to compel should be denied outright.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated:  New York, New York
            November 12, 2019

DONALD S. ZAKARIN

14

# EXHIBIT 1

continuing and will not abate in the future.

76.     Pursuant to 17 U.S.C. § 504(c), the Plaintiff is entitled to statutory damages since the infringement occurred after the copyrights were registered.

**WHEREFORE,** the Plaintiff SAS respectfully request that judgment be entered against the enumerated Defendants, as follows:

A.     For judgment that Defendants have violated the Copyright Act and that all such violations have been willful; and

B.     For judgment assessing Defendants for the damages in excess of one hundred million dollars ($100,000,000.00) suffered by Plaintiff, including an award of actual damages and Defendants' profits attributable to the infringement, or statutory damages (at Plaintiff's election) under the Copyright Act, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1.     Record sales;
2.     Downloads;
3.     Ringtones;
4.     Ringback tones;
5.     Public performance revenues;
6.     Digital revenue;
7.     Streaming revenue;
8.     Synchronization licensing;
9.     Merchandising;
10.    Public appearances;
11.    Endorsements;
12.    Sponsorships;
13.    Spokesperson work;
14.    Touring revenue;
15.    Advertising revenue;
16.    Appearance fees;
17.    Name and likeness income and increase in value;
18.    Rights of publicity income and increase in value;

19.   Increased value of all Defendants' publishing and/or record company and/or companies;

20.   Increased value of all Defendant's, including Sheeran's catalog;

21.   Increased value of music publishing and/or record royalties and rights;

22.   Increased value of social media rights, accounts and value;

23.   Increased goodwill;

24.   Promotional value;

25.   Increased value of royalty rate for record deals;

26.   Increased value in distribution deals, negotiating power and reduction in costs;

27.   Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;

28.   Value of obtaining better terms for record company advances and terms and multi-record deals;

29.   Value of obtaining better terms of publishing and/or recorded master deals for Sheeran's existing catalogue and for future works;

30.   Increased value in negotiating 360 deals with record companies and/or publishers;

31.   Sheet music sales and sheet folio income;

32.   Any and all music publisher income;

33.   Any and all record master income;

34.   Any and all record income;

35.   Any and all SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection society, mechanical society and performance society income worldwide;

36.   Any and all producer royalty income;

37.   Any and all arrangement income;

38.   Any and all income derived from any existing medium or any medium hereinafter developed worldwide;

39.   Any and all income from any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act;

40.   Any and all income from any society to which any Defendant belongs or joins in the future;

41.   Any and all income and/or residuals from SAG-AFTRA;

42.   Any and all income from Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, and any and all download and streaming services; and

43.   Any and all of Defendants' equity interests in Spotify, and any other music streaming or download services or companies in

which one or more Defendant has an interest, as it relates to the value from the inclusion of the infringing song in the service; and

C.    For judgment granting such other, further, and different relief as to the Court may seem just and proper, including Plaintiff's costs and reasonable attorneys' fees.

### REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury as to all issues triable by jury, as enumerated and set forth in more detail in this

Complaint.

Dated: New York, New York
        May 30, 2019

PARNESS LAW FIRM, PLLC

By:_____/s/ Hillel I. Parness_____
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Plaintiff*
*Structured Asset Sales, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Case No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **DECLARATION OF STUART CAMP IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10, | |
| Defendants. | |

I, **STUART CAMP**, declare under penalty of perjury as follows:

1.     I am a United Kingdom citizen and resident.  Since 2010, I, or companies I have owned or with which I have been affiliated or to whom I have provided services, have continuously provided personal management to defendant Edward Christopher Sheeran ("Sheeran").  I manage, supervise and oversee all aspects of Sheeran's professional activities, including, without limitation, his touring, writing and recording activities.  If called and sworn as a witness in this matter, I could and would testify competently with respect to the facts set forth in this Declaration based on my personal knowledge and/or my review of my business records kept in the ordinary course of business.

2.     Undefined capitalized terms have the meanings given to them in the Third Amended Complaint ("TAC"), which I have read and with which I am familiar.

3.     I respectfully submit this Declaration in opposition to the motion of the Plaintiff,

Structured Asset Sales, LLC ("SAS"), which seeks to compel the defendants in this action (primarily Sheeran, Atlantic Recording Corporation ("Atlantic") and Sony/ATV Music Publishing LLC ("SATV") to produce documents that relate to three categories of what I understand are known as "indirect profits."  As I will explain in detail below (and, as is addressed in the accompanying declarations of Donald S. Zakarin, counsel for the defendants, Richard Reimer, Esq. of the American Society of Composers, Authors and Publishers and Jose Gonzalez of Broadcast Music, Inc.), SAS's motion suffers from several fundamental deficiencies:

i.   The TAC nowhere pleads any facts showing any connection between the "indirect profits" that SAS seeks and the alleged infringement of the song *Let's Get It On* ("LGO") by Sheeran's song *Thinking Out Loud* ("TOL");

ii.  The undisputed facts establish that Sheeran's popularity and success preceded the release of TOL and his successful concert tours in the United States are not attributable to the success of a single song, TOL, when many of Sheeran's recordings, including those released both prior to and after TOL achieved comparable or greater success;

iii. The chronological facts establish that there were no concert performances by Sheeran in the United States that were proximate in time to the release of TOL as a single recording.  Rather, virtually every single concert performance by Sheeran in the United States between 2014 and 2018 was proximate in time to either the release of other singles from the album *X* (or the album itself) or singles from his subsequent album ÷;

iv.  Even if one assumes that TOL supposedly infringes LGO as a general matter, Sheeran's performances of TOL at any and all of his concert performances in the United States were not infringing because the public performances of both TOL and LGO (and every other song performed by Sheeran in the repertories of both ASCAP and BMI) had been licensed on a blanket basis by ASCAP and BMI; and,

v.   Sheeran's concert dates in the United States in support of his album *X* took place from August through September of 2014 (with one date in December 2014) and resumed on May 2, 2015 and ran through September 2015.  SAS filed this action on June 28, 2018.  As noted in the accompanying Zakarin Declaration, SAS's claims with respect to every single concert date in 2014 is barred by the statute of limitations as are every single concert date between May 2, 2015 and June 27, 2015.

I.    **The Rank Speculation In SAS's Memorandum Of Law**
      **That *Thinking Out Loud* Directly Caused US Consumers**
      **to Purchase Sheeran Concert Tickets Is Objectively Unfounded**

4.    At the outset, as set forth in both the accompanying Zakarin Declaration and in the accompanying Memorandum of Law, in its motion, SAS points to specific paragraphs of the TAC, which it apparently contends show some supposed linkage between the popular success of TOL and all manner of professional and financial benefits supposedly reaped by Sheeran beyond the income that he has earned from TOL itself.  In particular, SAS points to Paragraphs 29, 62, 11, 17 and 70 of the TAC.

5.    However, as the Zakarin Declaration points out, none of these paragraphs identifies any factual connection between TOL (and in particular, the allegedly infringing elements in TOL) with any of the supposed professional and financial benefits obtained by Sheeran beyond the publishing and recording income he has earned from TOL.  In fact, SAS's conclusory thesis – for which it offers no specific factual allegations in support – that TOL was the "lead single" from Sheeran's 2014 album *X* and that Sheeran's stature as a recording artist was singularly attributable to TOL is utterly untrue.

    A.    <u>Sheeran's Career Beginnings and International Success upon the Release of +</u>

6.    Sheeran has been writing and recording original music since he was a teenager.  In fact, Sheeran achieved worldwide success at a very young age.  Even now, after the release of four enormously successful albums for Warner Music UK Limited ("Warner UK") over the course of eight years, Sheeran is only 28 years of age.

7.    Prior to signing a recording contract with Warner UK in January 2011, Sheeran self-released one full-length album (*i.e.*, an LP) and four extended-play albums (*i.e.*, EPs).  The final EP, *No. 5 Collaborations Project*, achieved success in the United Kingdom, peaking at

Number 46 on the UK Albums Chart.

8.     In June 2011, Sheeran released the first single, *The A-Team*, from his forthcoming full-length album, + (pronounced "plus"), which album represented the first album that Sheeran recorded and released under his recording contract with Warner UK.  I would note that it is common in the music industry to release what the artist and the label expect to be the "lead" single from a forthcoming album in advance of the release of the album in order to generate interest and momentum for the later release of the full album.

9.     *The A-Team* achieved success on the *Billboard* Hot 100 single charts in the United States, debuting at Number 95 and ultimately peaking at Number 16.  Subsequently, *The A-Team* received a nomination for Song of the Year at the 2013 Grammy Awards.

10.     In June 2012, Sheeran released the album + in the United States, which also achieved tremendous success in the United States, peaking at Number 5 on the *Billboard* 200 Charts on June 30, 2012.

11.     In support of his album +, Sheeran extensively toured the United States, headlining around three-dozen shows.  In addition to the shows at which Sheeran headlined, he also extensively toured the United States with the band *Snow Patrol* and then with Taylor Swift.

12.     In October 2013 – before *X* was released and before TOL was even written – Sheeran headlined three successive sold-out concerts at Madison Square Garden.

13.     As a consequence of +'s success, Sheeran received a nomination for Best New Artist at the 2014 Grammy Awards.

**B.     Sheeran Achieves Continued Success upon the Release of *X***

14.     On April 7, 2014, in advance of the release of his second full-length album *X* (pronounced "multiply"), Sheeran released the first single from that album titled *Sing*.  Again, in

4

keeping with music industry practice, the first single to be released from an album is what the label and artist anticipate will be the "lead" single, which will generate interest and momentum for the later release of the album.  *Sing* debuted at Number 15 in the United States on the *Billboard* Hot 100 Charts, ultimately peaking at Number 13 on June 7, 2014.  By the end of July 2014, *Sing* had achieved one million sales in the United States (and a huge number of streams).

15.     On June 23, 2014, following upon the success of *Sing*, Sheeran released the album *X*, his second full-length album under his recording contract with Warner UK.

16.     *X* achieved widespread success in the United States, debuting at Number 1 on the *Billboard* 200 Charts on July 12, 2014, having sold approximately 210,000 copies during its first week of sales.  I want to emphasize that *X* achieved this Number 1 position long before TOL was released as a single recording (as discussed below, TOL was actually the third single released from the album).

17.     On August 24, 2014, Sheeran released the second single from *X*, titled *Don't*. While *Sing* reached Number 15 on the charts in the United States, *Don't*, in the wake of the incredible success of *X*, reached Number 9 on the *Billboard* Hot 100 Charts, Number 3 on the *Billboard* Adult Top 40 charts and Number 2 on the *Billboard* Mainstream Top 40 Charts.

18.     On September 24, 2014, following the momentum generated by *X*, *Sing and Don't*, Sheeran released TOL, the third single from *X*.

19.     Like the two singles from *X* released before it and like the success already achieved by *X* itself, TOL too was successful in the United States, ultimately peaking at Number 2 on the *Billboard* Hot 100 Charts on January 31, 2015.

20.     Subsequent to the release of TOL as a single recording, Sheeran released two additional singles from *X*, *Bloodstream* on February 11, 2015 and *Photograph* on May 11, 2015.

*Bloodstream* received a Gold certification from the RIAA in the United States, and *Photograph* received 4x Platinum certification from the RIAA in the United States.  *Photograph* also peaked at Number 10 on the *Billboard* Hot 100 Charts on September 26, 2015.

21.     As he had in support of his album +, Sheeran performed a concert tour in the United States (and elsewhere) performing at some 60 shows across the United States (and many more than that number outside the United States).  In fact, the first eighteen concerts on Sheeran's United States tour were between August 21, 2014 and September 20, 2014, all before TOL was released as a single (but after the release and success of *X*, *Sing* and, most dates, after the release of *Don't*).  There was one further date on December 4, 2014, the only United States concert date in 2014 after the release of TOL as a single.[1]

22.     Sheeran resumed touring the United States on May 2, 2015 – more than six months after TOL's release – a tour which ended in Central Park, New York (at the Global Citizen Festival, which is a charity show) on September 26, 2015.  Almost all of these tour dates followed in close proximity to the release of the single *Photograph* on May 11, 2015.[2]

23.     In short, while SAS has not pleaded any facts showing any linkage between TOL and the sale of tickets to any of Sheeran's concert dates, the above described chronology of facts refutes the unsupported thesis of SAS's motion.  Every one of the concert dates (save one) occurred either before the release of TOL as a single or long after its release.  If one assumes, as SAS does, that Sheeran fans buy concert tickets to see him perform one particular song – and that assumption

---

[1] As discussed in Paragraph 35 below, Exhibit 1 hereto lists all of Ed Sheeran's United States concert dates from 2014 through 2018.

[2] As addressed in the Zakarin Declaration, every one of the 2014 concert dates occurred more than three (3) years prior to the commencement of this action on June 28, 2018.  All of the concert dates between May 2, 2015 and June 27, 2015 also occurred more than three (3) years prior to the commencement of this action.  Accordingly, in addition to all of the other infirmities of SAS's claim for "indirect profits," any claim relating to these concert dates are time barred.

is contrary to everything I know about the music business and why fans pay to see an artist perform live, instead of simply listening to a song on their phone or at home – the concerts were in proximity not to TOL, but to the release of other successful single recordings.

      **C.**    **Sheeran Achieves "Record-Breaking" Success upon the Release of ÷**

24.    On January 6, 2017, nearly two and one-half years after the release of TOL (and *X*), in advance of the release of his third full-length album titled ÷ (pronounced "divide"), Sheeran released two singles from ÷, titled *Shape of You* and *Castle on the Hill*.

25.    On January 17, 2017, *Shape of You* debuted at Number 1 on the *Billboard* Hot 100 Charts, and *Castle on the Hill* debuted at Number 6.  *Billboard* subsequently reported that this marked the first time a single recording artist had two songs in the US Top 10 at the same time.

26.    *Shape of You* has since become Sheeran's most successful selling song, and *Billboard* has identified *Shape of You* as the ninth most successful song of all time in the United States.  As of September 22, 2017 – around nine months after its release as a single – *Shape of You* became the most-streamed track in the history of *Spotify*, achieving more than 1.3 billion streams on *Spotify* alone.

27.    On March 3, 2017, Sheeran released the album ÷.

28.    With the momentum provided by the enormous success of *Shape Of You* and *Castle On The Hill,* ÷ debuted at Number 1 on the *Billboard* 200 charts (as had *X*), having sold approximately 451,000 copies during its first week of sales (more than twice the sales of *X* in its first week of sales).

29.    In addition to the first two singles released from ÷, *Shape of You* and *Castle on the Hill*, Sheeran also released a third single from ÷, *Perfect*, which also reached Number 1 on the *Billboard* Hot 100 Charts.

30.     Commencing on June 29, 2017 (almost two years after completing his *X* tour of the United States in September 2015) and running through October 7, 2017 and then again from August 18, 2018 through November 9, 2018, Sheeran extensively toured the United States in support of his album ÷, performing  more than 70 shows across the United States.

31.     As SAS has noted in its motion papers, the Divide Tour, with the momentum provided by the success of the ÷ album and three immensely popular singles from that album, achieved "record-breaking" success during its nearly two year run.   Unmentioned by SAS, however, is that while there were some 70 shows in the United States, most of Sheeran's performances – some 185 shows – were outside the United States and most of the income generated by the tour was also from outside the United States.   SAS also simply assumes that the success of the Divide Tour was somehow attributable to TOL, despite the fact that TOL had been released nearly three years before the Divide Tour and despite the fact that the ÷ album and the three singles from the album, all released in close proximity to the Divide Tour, were hugely successful.

**D.**   **Sheeran Releases A Third Album Debuting At Number 1 on Billboard Charts**

32.     On July 12, 2019, Sheeran released the album *No. 6 Collaborations Project*.

33.     Like *X* and ÷ before it, *No. 6 Collaborations Project* debuted at Number 1 on the *Billboard* 200 charts.

34.     To date, Sheeran has released eight singles from this album, with all but one making the *Billboard* Hot 100 Charts.

**II.**   **Sheeran's Concert Performances of *Thinking Out Loud* Were Licensed**

35.     Annexed hereto as **Exhibit 1** is a true and correct schedule of concerts that Sheeran performed in the United States between 2014 and 2019, all of which occurred after the release of the album *X* (and, with respect to the 2014 concert dates, all of which, with the exception of one

date in December 2014, occurred before the release of TOL as a single).  Again, the 2014 concert dates and those in 2015 before June 27, 2015 all occurred more than three years before SAS commenced this action.

36.     As set forth in the Zakarin Declaration, while SAS has asserted a claim for what I understand is called "indirect profits" earned from the alleged infringing United States concert performances by Sheeran of TOL (and from a host of other even more remote activities), in fact, every one of Sheeran's concert performances were fully licensed by both ASCAP and BMI.  This is confirmed by the accompanying Declarations of ASCAP and BMI.

37.     Simply put, whether at any or all of his concerts in the United States, Sheeran performed TOL or performed LGO, the song that TOL allegedly infringes, Sheeran's performance of TOL did not infringe and could not have infringed the public performance rights in LGO because the public performance of both songs were fully licensed by both ASCAP and BMI.

III.     **Sheeran Never Sold _Thinking Out Loud_ Merchandise**

38.     While I understand SAS's motion to be seeking three categories of information relating to "indirect profits" with a supposed connection to the alleged infringement of LGO by TOL – profits from  Sheeran's concerts (which, as shown above, were not infringing), merchandise supposedly sold by Sheeran and sponsorships obtained by Sheeran – the TAC actually goes way beyond these three categories in seeking monies supposedly indirectly linked to the alleged infringement.  The Zakarin Declaration addresses these other categories (which SAS's motion carefully avoids mentioning).

39.     For purposes of addressing the two remaining categories of "indirect profits" that are addressed by SAS's motion, however, there is no TOL branded merchandise and there is no linkage between TOL and any "official" merchandise that has ever been sold at any Sheeran

concert.  Instead, ignoring the lack of any identified connection between the alleged infringement and income supposedly earned by Sheeran, just like with virtually all other categories of "indirect profits" sought in the TAC, SAS simply seems to assume its conclusion that TOL is uniquely responsible for every single penny of income Sheeran has made in virtually every human endeavor, regardless of how unrelated to the alleged infringement it may be.  Not only is that assumed conclusion not pleaded in the TAC, but the facts, as shown above, are actually completely to the contrary.

40.     As discussed in detail in the accompanying Zakarin Declaration, without having pleaded any connection between the alleged infringement of LGO by TOL and all manner of "indirect profits" (instead simply assuming the conclusion that TOL is somehow responsible for all of the professional and financial success in Sheeran's life), SAS seeks to impose an onerous and disproportionate discovery burden on Sheeran.  While the gross revenues generated by the concert dates may be relatively obtainable, as Mr. Zakarin explains, all of the information relating to the relevant expense deductions (the promoters' share; ticket sellers' payments; advertising and promotional costs; the costs incurred by Sheeran on tour; federal, state and local taxes paid by or on behalf of Sheeran) as well as information relating to the apportionment of allegedly infringing and non-infringing elements (and, again, because all of Sheeran's performances were fully licensed, there could not have been any infringing performances to begin with) creates an enormous discovery burden.

**IV.    Endorsements**

41.     In all of the years I have represented Ed Sheeran, he has only had two relatively short-lived endorsements.  The first endorsement was done before *X* was released (meaning, before TOL was released and more than three (3) years before this action was commenced).  Sheeran did

# A218

an advertisement for "Beats Headphones" and the song *Don't* was synched to the advertisement. In other words, it had nothing to do with TOL.

42.     The second endorsement was done in May of this year for Heinz Ketchup. Not only did TOL have nothing to do with it, there was no Sheeran music involved at all. That endorsement was brief and has since expired.

43.     That is the sum total of Ed Sheeran's "endorsements," neither of which have anything to do with TOL.

44.     Accordingly, for all of the foregoing reasons, I respectfully submit that SAS's motion should be denied.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: London, England
November *11* , 2019

STUART CAMP

# EXHIBIT 1

**A220**

**2014**

| Date | Venue | Location | Notes |
|---|---|---|---|
| 21-Aug | WaMu Theater | Seattle, WA | |
| 26-Aug | SAP Center | San Jose, CA | |
| 27-Aug | Staples Center | Los Angeles, CA | |
| 29-Aug | The Chelsea | Las Vegas, NV | |
| 30-Aug | The Chelsea | Las Vegas, NV | |
| 31-Aug | Jobing.Com Arena | Glendale, AZ | |
| 2-Sep | Sprint Center | Kansas City, MO | |
| 4-Sep | Wolstein Center | Cleveland, OH | |
| 6-Sep | Merriweather Post Pavillion | Columbia, MD | |
| 8-Sep | Wells Fargo Center | Philadelphia, PA | |
| 9-Sep | Xfinity Center | Mansfield, MA | |
| 11-Sep | Time Warner Cable Arena | Charlotte, NC | |
| 12-Sep | Arena at Gwinnett Center | Duluth, GA | |
| 13-Sep | Bridgestone Arena | Nashville, TN | |
| 15-Sep | Target Center | Minneapolis, MN | |
| 16-Sep | Allstate Arena | Rosemont, IL | |
| 17-Sep | The Palace of Auburn Hills | Auburn Hills, MI | |
| 20-Sep | MGM Grand Garden Arena | Las Vegas, NV | Part of the iHeart Radio Festival |
| 4-Dec | The Masonic | San Francisco, CA | Alice in Winterland Holiday Concert |

**2015**

| Date | Venue | Location | Notes |
|------|-------|----------|-------|
| 2-May | Fair Grounds Race Course | New Orleans, LA | Part of New Orleans Jazz & Heritage Festival |
| 3-May | Tom Lee Park | Memphis, TN | Part of Beale Street Music Festival |
| 6-May | Frank Erwin Center | Austin, TX | |
| 7-May | Verizon Theatre | Grand Prairie, TX | |
| 9-May | BOK Center | Tulsa, OK | |
| 10-May | Scottrade Center | St. Louis, MO | |
| 12-May | Consol Energy Center | Pittsburgh, PA | |
| 13-May | Times Union Center | Albany, NY | |
| 15-May | Las Vegas Festival Grounds | Las Vegas, NV | Rock In Rio Festival |
| 19-May | EnergySolutions Arena | Salt Lake City, UT | |
| 23-May | Mohegan Sun Arena | Uncasville, CT | |
| 24-May | Darling's Waterfront Pavilion | Bangor, ME | |
| 26-May | The Mann Center | Philadelphia, PA | |
| 28-May | Forest Hills Stadium | Queens, NY | |
| 29-May | Forest Hills Stadium | Queens, NY | |
| 30-May | Prudential Center | Newark, NJ | |
| 31-May | Barclays Center | Brooklyn, NY | |
| 7-Jun | CMAC | Hopewell, NY | |
| 9-Jun | Wells Fargo Arena | Des Moines, IA | |
| 10-Jun | Denny Sanford Premier Center | Sioux Falls, SD | |
| 20-Jun | Moda Center | Portland, OR | |
| 23-Jun | Valley View Casino Center | San Diego, CA | |
| 24-Jun | Hollywood Bowl | Los Angeles, CA | |
| 25-Jun | Hollywood Bowl | Los Angeles, CA | |
| 27-Jun | Arrowhead Stadium | Kansas City, MO | Supporting The Rolling Stones |
| 29-Jun | Red Rocks Ampitheatre | Morrison, CO | |
| 30-Jun | Red Rocks Ampitheatre | Morrison, CO | |
| 2-Jul | Klipsch Music Center | Noblesville, IN | |
| 3-Jul | Marcus Ampitheater | Milwaukee, WI | Part of Summerfest Festival |
| 3-Sep | BBVA Compass Stadium | Houston, TX | |
| 5-Sep | Toyota Stadium | Frisco, TX | |
| 8-Sep | Amway Center | Orlando, FL | |
| 9-Sep | American Airlines Arena | Miami, FL | |
| 10-Sep | Amalie Arena | Tampa, FL | |
| 12-Sep | Philips Arena | Atlanta, GA | |
| 13-Sep | Bridgestone Arena | Nashville, TN | |
| 15-Sep | Xcel Energy Center | Saint Paul, MN | |
| 16-Sep | Hollywood Casino Ampitheatre | Tinley Park, IL | |
| 17-Sep | Riverbend Music Center | Cincinnati, OH | |
| 18-Sep | Blossom Music Center | Cuyahoga Falls, OH | |
| 22-Sep | Verizon Center | Washington, D.C. | |
| 23-Sep | Verizon Center | Washington, D.C. | |
| 25-Sep | Gilette Stadium | Foxborough, MA | |
| 26-Sep | Central Park | New York, NY | Part of Global Citizen Festival (Charity Show) |

**2017**

| Date | Venue | Location | Notes |
|---|---|---|---|
| 29-Jun | Sprint Center | Kansas City, MO | |
| 30-Jun | Wells Fargo Arena | Des Moines, IA | |
| 1-Jul | Xcel Energy Center | Saint Paul, MN | |
| 9-Jul | KeyBank Center | Buffalo, NY | |
| 11-Jul | Wells Fargo Center | Philadelphia, PA | |
| 12-Jul | Wells Fargo Center | Philadelphia, PA | |
| 14-Jul | Mohegan Sun Arena | Uncasville, CT | |
| 15-Jul | Mohegan Sun Arena | Uncasville, CT | |
| 29-Jul | Tacoma Dome | Tacoma, WA | |
| 30-Jul | Moda Center | Portland, OR | |
| 1-Aug | Golden 1 Center | Sacramento, CA | |
| 2-Aug | Oracle Arena | Oakland, CA | |
| 4-Aug | T-Mobile Arena | Las Vegas, NV | |
| 5-Aug | Gila River Arena | Glendale, AZ | |
| 6-Aug | Valley View Casino Center | San Diego, CA | |
| 10-Aug | Staples Center | Los Angeles, CA | |
| 11-Aug | Staples Center | Los Angeles, CA | |
| 12-Aug | Staples Center | Los Angeles, CA | |
| 15-Aug | Pepsi Center | Denver, CO | |
| 17-Aug | BOK Center | Tulsa, OK | |
| 18-Aug | American Airlines Center | Dallas, TX | |
| 19-Aug | Toyota Center | Houston, TX | |
| 22-Aug | AT&T Center | San Antonio, TX | |
| 25-Aug | Infinite Energy Arena | Duluth, GA | |
| 26-Aug | Infinite Energy Arena | Duluth, GA | |
| 29-Aug | Amalie Arena | Tampa, FL | |
| 30-Aug | American Airlines Arena | Miami, FL | |
| 31-Aug | Amway Center | Orlando, FL | |
| 2-Sep | PNC Arena | Raleigh, NC | |
| 3-Sep | Spectrum Center | Charlotte, NC | |
| 5-Sep | North Charleston Coliseum | North Charleston, SC | |
| 7-Sep | KFC Yum! Center | Louisville, KY | |
| 8-Sep | Bankers Life Fieldhouse | Indianapolis, IN | |
| 9-Sep | Quicken Loans Arena | Cleveland, OH | |
| 12-Sep | CenturyLink Center Omaha | Omaha, NE | |
| 15-Sep | Allstate Arena | Rosemont, IL | |
| 16-Sep | Allstate Arena | Rosemont, IL | |
| 19-Sep | Capital One Arena | Washington, D.C. | |
| 20-Sep | Capital One Arena | Washington, D.C. | |
| 22-Sep | TD Garden | Boston, MA | |
| 23-Sep | TD Garden | Boston, MA | |
| 26-Sep | PPG Paints Arena | Pittsburgh, PA | |
| 27-Sep | Little Caesars Arena | Detroit, MI | |
| 29-Sep | Barclays Center | Brooklyn, NY | |
| 30-Sep | Barclays Center | Brooklyn, NY | |
| 1-Oct | Barclays Center | Brooklyn, NY | |
| 3-Oct | Nationwide Arena | Columbus, OH | |
| 4-Oct | Nationwide Arena | Columbus, OH | |
| 6-Oct | Bridgestone Arena | Nashville, TN | |
| 7-Oct | Bridgestone Arena | Nashville, TN | |

**A223**

**2018**

| Date | Venue | Location | Notes |
|---|---|---|---|
| 18-Aug | Rose Bowl | Pasadena, CA | |
| 21-Aug | AT&T Park | San Francisco, CA | |
| 25-Aug | CenturyLink Field | Seattle, WA | |
| 6-Sep | Busch Stadium | St. Louis, MO | |
| 8-Sep | Ford Field | Detroit, MI | |
| 14-Sep | Gilette Stadium | Foxborough, MA | |
| 15-Sep | Gilette Stadium | Foxborough, MA | |
| 21-Sep | MetLife Stadium | East Rutherford, NJ | |
| 22-Sep | MetLife Stadium | East Rutherford, NJ | |
| 27-Sep | Lincoln Financial Field | Philadelphia, PA | |
| 29-Sep | PNC Park | Pittsburgh, PA | |
| 4-Oct | Soldier Field | Chicago, IL | |
| 6-Oct | Nissan Stadium | Nashville, TN | |
| 13-Oct | Arrowhead Stadium | Kansas City, MO | |
| 17-Oct | Fargodome | Fargo, ND | |
| 20-Oct | U.S. Bank Stadium | Minneapolis, MN | |
| 24-Oct | Miller Park | Milwaukee, WI | |
| 27-Oct | AT&T Stadium | Arlington, TX | |
| 31-Oct | Mercedes-Benz Superdome | New Orleans, LA | |
| 3-Nov | Minute Maid Park | Houston, TX | |
| 7-Nov | Raymond James Stadium | Tampa, FL | |
| 9-Nov | Mercedes-Benz Stadium | Atlanta, GA | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STRUCTURED ASSET SALES, LLC,

       Plaintiff,

  v.

EDWARD CHRISTOPHER SHEERAN,
*p/k/a* ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC
RECORDING CORPORATION *d/b/a*
ATLANTIC RECORDS, BDI MUSIC LTD.,
BUCK MUSIC GROUP LTD., THE
ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10

       Defendants.

Case No. 1:18-cv-5839 (LLS)

**DECLARATION OF
RICHARD H. REIMER**

---

I, **RICHARD H. REIMER**, declare:

  1.  I am an attorney first admitted to practice law in New York State in 1972. I was

first hired by the American Society of Composers, Authors and Publishers ("ASCAP") in 1971 as

a staff attorney and I have been employed by ASCAP ever since serving as Senior Attorney,

Assistant General Counsel, Deputy General Counsel, Director of Legal Affairs and Managing

Attorney, and Vice President – Legal Services. Since 2004 I have served as ASCAP's Senior Vice

President of Legal Services (now "Business and Legal Affairs"). If called and sworn as a witness

in this matter, I could and would testify competently with respect to the facts set forth in this

Declaration based on my personal knowledge and/or information maintained in ASCAP business

records kept in the ordinary course of its business activities.

  2.  During my ongoing tenure at ASCAP, I have been and am involved in virtually all

matters of a legal nature pertaining to ASCAP's primary functions as a performing rights licensing

organization ("PRO"). As a PRO, ASCAP licenses on behalf of its now over 725,000 songwriter,

composer, and music publisher members the non-exclusive right to publicly perform the more than

11.5 million musical compositions in the ASCAP repertory; collects license fees from those who

hold ASCAP public performance licenses; distributes royalties for such licensed public

performances to ASCAP's members; and enforces ASCAP members' public performance rights

against those who choose to give public performances of musical compositions in the ASCAP

repertory without obtaining ASCAP licenses or permission directly from ASCAP's members.

3.       Counsel for Defendant Edward Christopher Sheeran ("Sheeran") has provided

ASCAP with a schedule of the U.S. venues where Sheeran publicly performed musical

compositions during his x Tour and his ÷ Tour ("Sheeran Concerts"). A true copy of that schedule

is attached as **Exhibit 1** to this Declaration.

4.       On the basis of ASCAP's records with respect to its licensees, I can confirm that

the entities responsible for the promotion and/or presentation of all of the Sheeran Concerts at the

venues identified on Exhibit 1 held valid ASCAP licenses.

5.       The ASCAP licenses granted by ASCAP to the promoters and/or presenters of the

Sheeran Concerts were "blanket" licenses that authorized the non-dramatic public performance of

every musical composition in the ASCAP repertory, whether in whole or in part, and without any

restriction as to the manner in which the music was performed, or the performers who gave the

performances. A copy of the standard form of ASCAP's "Concerts and Recitals – Blanket License

Agreement," is attached as **Exhibit 2** to this Declaration.

6.       The promoters and/or presenters of all of the Sheeran Concerts held either the form

of ASCAP license agreement attached as Exhibit 2 or they were licensed under two separate

agreements executed between ASCAP and the North American Concert Promoters Association

("NACPA"), covering the license terms 2001 – 2017 and 2018 – 2021. ASCAP's license

agreements with NACPA contained either identical or substantively the same language with respect to the scope of the license and the rights granted to the licensed promoters and/or presenters as Exhibit 2.

7.      The licenses granted by ASCAP and described above authorized Sheeran (and any other performers at the licensed venues), to perform publicly any or all of the works in the ASCAP repertory at each of the licensed venues.

8.      I have also reviewed ASCAP records with respect to the song (or songs) at issue in this action.  ASCAP's records confirm that since prior to 2014, the song entitled *Let's Get It On*, co-written by Edward B. Townsend and Marvin Gaye, has been in the ASCAP repertory by virtue of the fact that Marvin Gaye was an ASCAP writer member when he died in 1984, and his successors have maintained his ASCAP writer membership since then.   As a result, since prior to 2014 ASCAP has had the non-exclusive right to license public performances of the song.  *Let's Get It On* has been assigned ASCAP Work ID number 420172156.

9.      ASCAP's records also confirm that Amy Victoria Wadge, the co-author of *Thinking Out Loud*, is a member of PRS, the PRO for the United Kingdom with which ASCAP has had a reciprocal licensing relationship for more than 80 years.  ASCAP claims its interest in Ms. Wadge's songs through its reciprocal licensing arrangements with PRS for her songwriter share of *Thinking Out Loud* and through ASCAP publisher member Roynet Music as administrator for PRS publisher member BDI Music Limited for the corresponding publisher's share of the song. ASCAP has had the non-exclusive right to license public performances of *Thinking Out Loud* on behalf of Amy Wadge and Roynet Music since the song was created and released.  *Thinking Out Loud* has been assigned ASCAP Work ID number 887073500.

10.    Because ASCAP issued blanket licenses covering all of the concerts on the dates shown on Exhibit 1, whether Sheeran performed *Thinking Out Loud* or *Let's Get It On* during the Sheeran Concerts (or any other song in the ASCAP repertory), the public performances of either or both songs (and other ASCAP songs) at all of the Sheeran Concerts were licensed by ASCAP on behalf of the ASCAP and PRS members with interests in those songs.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
        November _7_, 2019

RICHARD H. REIMER

EXHIBIT 2

# CONCERTS AND RECITALS-BLANKET LICENSE AGREEMENT

*Agreement* between American Society of Composers, Authors and Publishers ("ASCAP"), located at One Lincoln Plaza, New York, NY 10023

by

("LICENSEE"), located at

as follows:

**1.      Grant and Term of License**

(a)      ASCAP grants and LICENSEE accepts a license to perform publicly or cause to be performed publicly at concerts or recitals ("concerts") in the United States presented by or under the auspices of LICENSEE, and not elsewhere or otherwise, non-dramatic renditions of the separate musical compositions in the "ASCAP repertory." For purposes of this Agreement "ASCAP repertory" means all copyrighted musical compositions written or published by ASCAP members or members of affiliated foreign performing rights societies, including compositions written or published prior to or during the term of this Agreement and of which ASCAP has the right to license non-dramatic public performances.

(b)      This license shall be for an initial term commencing                        and ending December 31 of the same calendar year, and shall continue thereafter for additional terms of one year each unless either party terminates it by giving the other party notice at least 30 days before the end of the initial or any renewal term. If such notice is given, the license shall terminate on December 31 of the year in which notice is given.

**2.      Limitations on License**

(a)      This license is not assignable or transferable by operation of law or otherwise, except upon the express written consent of the parties, but no assignment shall relieve the parties of their respective obligations as to performances rendered, acts done and obligations incurred prior to the effective date of the assignment.

(b)      This license is strictly limited to the LICENSEE and to the premises where each concert is presented, and does not authorize any other performances other than those given at the premises as part of licensed concerts. This license shall not cover concerts for which the information required under Paragraph 3. of this Agreement has not been provided.

(c)      This license does not authorize the broadcasting or telecasting or transmission by wire, internet, webcasting, on-line service or otherwise, of renditions of musical compositions in ASCAP's repertory to persons outside of the premises where each concert shall be presented.

(d)      This license is limited to non-dramatic performances, and does not authorize any dramatic performances. For purposes of this Agreement, a dramatic performance shall include, but not be limited to, the following:

   (i)     performance of a "dramatico-musical work" (as hereinafter defined) in its entirety;
   (ii)    performance of one or more musical compositions from a "dramatico-musical work" (as hereinafter defined) accompanied by dialogue, pantomime, dance, stage action, or visual representation of the work from which the music is taken;
   (iii)   performance of one or more musical compositions as part of a story or plot, whether accompanied or unaccompanied by dialogue, pantomime, dance, stage action, or visual representation;
   (iv)    performance of a concert version of a "dramatico-musical work" (as hereinafter defined).

The term "dramatico-musical work" as used in this Agreement, shall include, but not be limited to, a musical comedy, opera, play with music, revue, or ballet.

(e)      This license does not authorize the performance of any special orchestral arrangements or transcriptions of any musical composition in the ASCAP repertory, unless such arrangements or transcriptions have been copyrighted by members of ASCAP or foreign societies which have granted ASCAP the right to license such performances. ASCAP reserves the right at any time to restrict the first American performance of any composition in its repertory.

(f)      ASCAP reserves the right at any time to withdraw from its repertory and from operation of this license, any musical work as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in ASCAP's repertory, or on a claim that ASCAP does not have the right to license the performing rights in such composition.

(g)      This license does not authorize any performance by means of a coin-operated phonorecord player (jukebox) for which a license is otherwise available from the Jukebox License Office.

(h)      This license is limited to the United States, its territories and possessions and the Commonwealth of Puerto Rico.

**3.      License Fees, Reports and Payments**

(a)      In consideration of the license granted herein, LICENSEE agrees to pay ASCAP the applicable license fee for each concert presented based on the Rate Schedule, attached to and made a part of this Agreement.

(b)      Fifteen days after the end of each calendar quarter of this Agreement, LICENSEE shall submit to ASCAP a report in printed or computer readable form stating whether concerts were presented during the previous quarter. For each concert presented during the previous quarter, the report shall state:

(i)      the date presented;
(ii)     the name of the attraction(s) appearing;
(iii)    the name, location and seating capacity of the venue where the concert was presented (Where the total seating capacity of a location has been altered to accommodate a particular performance, the term "Seating Capacity" shall mean the total number of seats made available for that particular performance and shall be so indicated on the report.);
(iv)     the "Gross Revenue" of the event ("Gross Revenue" means all monies received by LICENSEE or on LICENSEE'S behalf from the sale of tickets for each concert. Gross revenue shall not include per ticket entertainment, amusement, or sales taxes, commissions or fees paid to automated ticket distributors, such as "Ticketmaster," per-ticket theatre restoration or other facility fees, or parking fees when included in the ticket price.) LICENSEE may deduct from "Gross Revenue" the portion of the ticket price donated by the performing artist to a specific charity, provided that the deduction may not exceed $5.00. The LICENSEE shall furnish ASCAP with a copy of the artist agreement setting forth the exact amount of the charitable donation per ticket sold;
(v)      if the concert is a "Benefit Event", the name and address of the organization for which the benefit is conducted. "Benefit Event" means a concert which is not exempt from copyright liability under Section 110(4) of the United States Copyright Law, and which is held to raise money for a specific, bona fide charitable institution or cause, not affiliated in any way with LICENSEE, to which all the proceeds from the concert, after deducting the reasonable costs of producing the concert, are donated. LICENSEE, upon ASCAP's request, shall provide documentation of expenses and proof of payment to the institution or cause;
(vi)     the license fee due for each concert; and
(vii)    the total license fees due for the previous quarter.(c)      License fees shall be payable at the time the quarterly report is submitted. The minimum annual fee shall be payable within thirty days of invoicing by ASCAP.

(d)      If LICENSEE presents, sponsors or promotes a concert with another person or entity licensed under ASCAP's Concert & Recital License Agreement, LICENSEE'S quarterly report shall indicate the name, address, phone number and ASCAP account number of the other person(s) or entity(ies) and the party responsible for payment. If the other party is not licensed by ASCAP under an ASCAP Concert & Recital or Symphony Orchestra License Agreement, LICENSEE shall pay the license fee due hereunder, notwithstanding any agreement to the contrary between LICENSEE and the other party.

(e)      If LICENSEE fails to submit a report or payment in a timely manner, ASCAP may calculate the fees due from data provided by concert industry publications such as *Pollstar* or based upon fees payable in prior years.

(f)      LICENSEE shall furnish to ASCAP, where available, at the same time payment of license fees is made a program containing a list of all musical works, including encores, performed in each of LICENSEE'S concerts.

(g)      LICENSEE shall pay a finance charge of 1.5% per month from the date due, on any required payment or report that is not made or submitted within thirty days of its due date. LICENSEE shall pay ASCAP a $25 service charge for each unpaid check, draft or other form of instrument submitted by LICENSEE to ASCAP.

**4.      Breach or Default**

Upon any breach or default by LICENSEE of any term or condition herein contained, ASCAP may terminate this license by giving LICENSEE thirty days notice to cure such breach or default, and in the event that such breach or default has not been cured within said thirty days, this license shall terminate on the expiration of such thirty-day period without further notice from ASCAP. In the event of such termination, ASCAP shall refund to LICENSEE any unearned license fees paid in advance.

5.      **Right To Verify Reports**

(a)      Upon thirty days written notice to LICENSEE, ASCAP shall have the right, by its duly authorized representatives, at any time during customary business hours, to examine the books and records of account and program information of LICENSEE only to such extent as may be necessary to verify any and all reports rendered and accountings made by LICENSEE to ASCAP. ASCAP shall consider all data and information coming to its attention as the result of any such examination as completely and entirely confidential.

(b)      The period for which ASCAP may audit pursuant to this Agreement shall be limited to three calendar years preceding the year in which the audit is made; provided, however, that if an audit is postponed at LICENSEE's request, ASCAP shall have the right to audit for the period commencing with the third calendar year preceding the year in which notification of intention to audit was first given by ASCAP to LICENSEE. This three-year limitation shall not apply if LICENSEE fails or refuses after written notice from ASCAP to produce the books and records necessary to verify any report or statement of accounting required pursuant to this Agreement. Should the three-year audit period extend into a previous license agreement, nothing herein shall restrict ASCAP's right to audit for the full three calendar years preceding the year in which notification was given.

(c)      If any such examination shows LICENSEE to have underpaid the license fees due ASCAP by 5% or more, LICENSEE shall pay a finance charge on the license fees shown due of 1.5% per month from the date(s) the license fees should have been paid pursuant to this Agreement.

(d)      If any such examination shows LICENSEE to have underpaid the license fees due ASCAP by less than 5%, LICENSEE shall pay a finance charge on the license fees shown due of 1.5% per month from the date ASCAP demands payment of such amount.

6.      **Additional Termination Provisions**

(a)      ASCAP shall have the right to terminate this license upon thirty days written notice if there is any major interference with, or substantial increase in the cost of ASCAP's operations as the result of any law in the state, territory, dependency, possession or political subdivision in which LICENSEE is located or in which LICENSEE presents concerts which is applicable to the licensing of performing rights. In the event of such termination, ASCAP shall refund to LICENSEE any unearned license fees paid in advance.

(b)      Notwithstanding the provisions of Paragraph 1.(b) above, ASCAP shall have the right to terminate this Agreement at any time upon thirty days written notice provided that ASCAP terminates all Blanket Concert and Recital Licenses at the same time.

7.      **Notices**

ASCAP or LICENSEE may give any notice required by this Agreement by sending it by United States Mail, generally recognized same-day or overnight delivery service, or by transmitting the notice electronically to the other party's last known facsimile number or e-mail (or similar electronic transmission) address. Each party agrees to notify the other of any change of address.

8.      **Applicable Law**

The meaning of the provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

IN WITNESS WHEREOF, this Agreement has been duly executed by ASCAP and LICENSEE.
this                    day of                    , 20      .

AMERICAN SOCIETY OF COMPOSERS,                    LICENSEE
         AUTHORS AND PUBLISHERS
                                                   By _____
By _____
                                                   TITLE _____

                                                   (Fill in capacity in which signed: (a) If corporation, state corporate
                                                   office held; (b) If partnership, write word "partner" under signature
                                                   of signing partner; (c) If individual owner, write "individual owner"
                                                   under signature.)



# BLANKET CONCERT AND RECITAL (BCON)
### *2018 Rate Schedule*

**Schedule I.**

| Seating Capacity* | | Percentage Applied to |
| --- | --- | --- |
| **Low** | **High** | **Gross Ticket Revenue**** |
| 0 | 2,500 | 0.80% |
| 2,501 | 5,000 | 0.40% |
| 5,001 | 10,000 | 0.25% |
| 10,001 | 25,000 | 0.20% |
| over | 25,000 | 0.10% |

*Where the total seating capacity of a location has been altered to accommodate a particular performance, the term "Seating Capacity" shall mean the total number of seats made available for that particular performance and shall be so indicated on the report.

**"Gross Revenue" means all monies received by LICENSEE or on LICENSEE'S behalf from the sale of tickets for each concert.  Gross revenue shall not include per ticket entertainment, amusement, or sales taxes, commissions or fees paid to automated ticket distributors, such as "Ticketmaster," per-ticket theatre restoration or other facility fees, or parking fees when included in the ticket price.

**Schedule II.  Free and Benefit Events ***

| Seating Capacity | | |
| --- | --- | --- |
| **Low** | **High** | **Fee per Event** |
| 0 | 5,500 | $ 10.00 |
| 5,501 | 10,000 | $ 52.00 |
| 10,001 | 20,000 | $ 108.00 |
| 20,001 | 60,000 | $ 181.00 |
| over | 60,000 | $ 355.00 |

***"Benefit Event" means a concert which is not exempt from copyright liability under Section 110(4) of the United States Copyright Law, and which is held to raise money for a specific, bona fide, charitable institution or cause not affiliated in any way with LICENSEE, to which all the proceeds from the concert, after deducting the reasonable costs of producing the concert, are donated.

**Minimum Annual Fee.**  The minimum annual fee payable hereunder shall be $250.00.

### Annual License Fee for Year 2019 and Thereafter

The annual license rate under Schedule II. and the minimum annual fee for each calendar year commencing 2019 shall be the license fee for the preceding calendar year, adjusted in accordance with the increase in the Consumer Price Index - All Urban Consumers (CPI-U) between the preceding October and the next preceding October, rounded to the nearest $1.00.

**ASCAP**
**Toll Free: 1-800-505-4052 Fax: 615-691-7795**
**Epayment Websites: http://www.ascap.com/mylicense or http://www.ascap.com**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STRUCTURED ASSET SALES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10,<br><br>Defendants. | Case No. 1:18-cv-5839 (LLS)<br><br>**DECLARATION OF JOSE GONZALEZ** |

I, **JOSE GONZALEZ**, declare:

1.     I am Vice President, Licensing at Broadcast Music, Inc. ("BMI").  Among my responsibilities is overseeing BMI's General Licensing department, including the licensing of music venues and promoters/presenters.  If called and sworn as a witness in this matter, I could and would testify competently with respect to the facts set forth in this Declaration based on my personal knowledge and my review of BMI business records kept in the ordinary course of its business.

2.     Founded in 1939, BMI is a performing rights organization ("PRO") that obtains the non-exclusive right to license the public performing right in musical compositions from songwriters, composers, and music publishers (collectively, BMI's "Affiliates") pursuant to section 106(4) of the Copyright Act, 17 U.S.C. § 106(4).  BMI then issues performing right licenses to music users, collects license fees from them, and distributes the fees generated as royalties to its Affiliates.

3.      The collection of rights in compositions that BMI has the right to license is referred to as its "Repertoire."  BMI's Repertoire presently consists of approximately 15 million musical works from the catalogs of approximately 1 million Affiliates, covering the entire range of musical genres and styles.

4.      Defendant Edward Christopher Sheeran ("Sheeran") is a member of PRS, the PRO for the United Kingdom, and has designated BMI to license works written or cowritten by him in the United States.  Counsel for Sheeran has provided BMI with a schedule of the U.S. venues where Sheeran publicly performed musical compositions during his x Tour and his ÷ Tour ("Sheeran Concerts").  A true copy of that schedule is attached hereto as **Exhibit 1**.

4.      I have reviewed the records of BMI and can confirm that the entities responsible for the promotion and/or presentation of each of the Sheeran Concerts held BMI licenses.

5.      The license granted by BMI to the presenter and/or promoter of each of the Sheeran Concerts were "blanket" licenses that authorize the non-dramatic public performance of musical works in the BMI Repertoire, whether in whole or in part, and without restriction as to the manner in which the music is performed, nor the performers who give the performances.  Copies of the standard form of BMI's Facilities (10,000 or more seats), Music License for Venue (10,000 or fewer seats), and Promoter/Presenter licenses are attached as **Exhibits 2-4** of this Declaration.

6.      I have also reviewed BMI records with respect to the works at issue in this action. BMI's records show that the composition entitled *Let's Get It On*, co-written by Edward B. Townsend and Marvin Gaye (BMI Work #857218), is in the BMI Repertoire and BMI has the non-exclusive right to license the public performance rights in *Let's Get It On*.  BMI's records also show that the composition entitled *Thinking Out Loud*, co-written by Sheeran and Amy Victoria

Wadge (BMI Work #17551691), is also in the BMI Repertoire and BMI has the non-exclusive right to license the public performance rights in *Thinking Out Loud*.

7.     Because BMI issued licenses for the Sheeran Concerts and because rights in both works are in the BMI Repertoire, any public performance of either or both *Thinking Out Loud* or *Let's Get It On* at any of the Sheeran Concerts at the venues on Exhibit 1 were licensed by BMI.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: Nashville, Tennessee
       November 7, 2019

_____   JOSE GONZALEZ

**A236**

EXHIBIT 2

**A237**



| **BMI** Music Performance Agreement | **Facilities**<br>**- 10,000 and more seats -** | **39M**<br>**LI-06/18-39M** |

## 1. DEFINITIONS

(a) **Facility** shall include, but not be limited to, a concert hall, stadium, auditorium, civic center, coliseum, theatre, amphitheater, museum, library, stage, restaurants/nightclubs or similar venues whether enclosed or not, where an Attraction may be presented, located within the United States of America, its territories and possessions.

(b) **Attractions** shall mean concerts, variety shows (excluding circuses), pageants and other similar spectator events (including events sponsored by charitable organizations or for charitable purposes) that include music, whether or not music is the principal type of entertainment.

(c) **Seating Capacity** shall mean the total number of seats permanently affixed in the Facility where the Attraction is presented plus any temporary seats added within the Facility for a particular Attraction. If the total number of seats available for the Attraction shall be less than that of the permanent Seating Capacity of the Facility, "Seating Capacity" shall mean the total number of seats available for the particular Attraction. If a Facility does not have permanent seating, "Seating Capacity" shall mean the total number of persons attending a particular Attraction. If a Facility has lawn seating, then "Seating Capacity" shall mean the total number of seats permanently affixed in the Facility, in addition to total lawn Seating Capacity as determined by the local Fire Marshall.

(d) **Gross Ticket Revenues** shall mean the total monies received, directly or indirectly, by LICENSEE or their authorized representatives from all ticket sales per Attraction. The term "Gross Ticket Revenues" shall not include: 1) federal, state and/or local taxes; 2) building/facility charge per ticket sold; 3) ticketing agent/service charge placed on each ticket sold; or 4) facility parking fees.  Should the artist/performing act(s) choose to donate a portion of their fees from each ticket sale to a particular charity, then the appropriate deduction may be taken from the "Gross Ticket Revenues"; provided however, that BMI be given copies of said artist/performing act(s) agreement(s) stipulating such with the exact amount of the charitable donation per ticket sold.

(e) **Benefit Concert** shall mean a public entertainment performance or social event held to raise funds for a specific person or cause in which all proceeds less direct expenses are donated to charity.

## 2. BMI GRANT

(a) BMI hereby grants to LICENSEE, for the Term of this Agreement, a non-exclusive license solely to perform, present or cause the performance of, as part of Attractions in Facilities, **including recorded music** performed in conjunction with Attractions before, after or during the intermissions thereof, all the musical works as to which BMI shall have the right to grant public performance licenses during the Term hereof. Such license shall be restricted to performance of music in the manner described herein, and is granted in consideration of payment of the license fees as set forth herein and is subject to all of the terms and conditions hereof. This license does not include: (i) dramatic rights, the right to perform dramatico-musical works in whole or in substantial part, the right to present individual works in a dramatic setting or the right to use the music licensed hereunder in any context which may constitute an exercise of the "grand rights" therein; or (ii) the right to simultaneously broadcast, telecast, cablecast, or otherwise transmit (including by the Internet or on-line service) the performances licensed hereunder to persons outside of the Facility in which they originate; (iii) performances of music by means of a coin-operated phonorecord player (jukebox).

(b) BMI reserves the right at its discretion to withdraw from the license granted hereunder any musical work as to which any legal action has been instituted or a claim made that BMI does not have the right to license the performing rights in such work or that such work infringes another composition.

## 3. REVIEW OF STATEMENTS/ACCOUNTINGS

(a) BMI shall have the right to verify such data or information that is required to be furnished by LICENSEE pursuant to Paragraph 11(a) and (b), by reference to a reliable, published, third-party industry source (such as Pollstar) and by BMI's authorized representatives, at any time during customary business hours, and upon thirty (30) days advance written notice, examining those portions of LICENSEE's books and records of account to such extent as may be necessary to verify any and all statements and/or accountings made hereunder. BMI shall consider all data and information coming to its attention as the result of any such examination of LICENSEE's books and records confidential.

(b) In the event BMI discovers an inaccuracy in any information reported by LICENSEE pursuant to Paragraph 11(b), either through an examination of LICENSEE, or otherwise, and as a result it is revealed that LICENSEE underpaid license fees to BMI, and the correct license fee is not paid to BMI within thirty (30) days of BMI's notice to LICENSEE of the inaccuracy or underpayment, then LICENSEE shall pay a late payment charge on the additional license fees due as a result of the examination(s) of one and one-half percent (1 ½%) per month, or the maximum rate permitted by law, whichever is less, from the date(s) the license fees should have been paid pursuant to this Agreement.

## 4. LATE PAYMENT CHARGE

BMI may impose a late payment charge of one and one-half percent (1 ½%) per month from the date any payment is due hereunder on any payment that is received by BMI more than one month after the due date.

## 5. INDEMNITY BY BMI

BMI agrees to indemnify, save harmless and defend LICENSEE, its officers and employees, from and against any and all claims, demands or suits that may be made or brought against them or any of them with respect to the performance of any material licensed under this Agreement. This indemnity shall be limited to works which are licensed by BMI at the time of LICENSEE's performances. BMI will, upon reasonable written request, advise LICENSEE whether particular musical works are available for performance as part of BMI's repertoire. LICENSEE shall provide the title and the writer/composer of each musical composition requested to be identified. LICENSEE agrees to give BMI immediate notice of any such claim, demand or suit, to deliver to BMI any papers pertaining thereto, and to cooperate with BMI with respect thereto, and BMI shall have full charge of the defense of any such claim, demand or suit.

## 6. TERMINATIONS OF AGREEMENT BY LICENSEE

If LICENSEE permanently ceases to present Attractions, this Agreement and LICENSEE's obligation to BMI shall thereupon terminate, provided, that LICENSEE shall, within ten (10) days thereafter, give written notice of such termination to BMI, setting forth the effective date thereof and that LICENSEE shall submit all reports and pay to BMI all fees due hereunder until said effective date.

## 7. BREACH OR DEFAULT/WAIVER

Upon any breach or default of the terms and conditions of this Agreement, BMI has the right to cancel this Agreement, but any such cancellation shall only become effective if such breach or default continues thirty (30) days after the date of BMI's written notice to LICENSEE. The right to cancel shall be in addition to any and all other remedies which BMI may have. No waiver by BMI of full performance of this Agreement by LICENSEE in any one or more instances will be a waiver of the right to require full and complete performance of this Agreement thereafter or of the right to cancel this Agreement in accordance with the terms of this Paragraph.

## 8. OFFER OF COMPARABLE AGREEMENT

In the event that BMI, at any time during the Term hereof, shall, for the same class and category as that of LICENSEE, issue licenses granting rights similar to those in this Agreement on a more favorable basis, BMI shall, for the balance of the Term, offer LICENSEE a comparable agreement.

## 9. ARBITRATION

All disputes of any kind, nature or description arising in connection with the terms and conditions of this Agreement, not subject to the jurisdiction of the BMI Rate Court, shall be submitted to the American Arbitration Association in the City, County and State of New York, for arbitration under its then prevailing arbitration rules. The arbitrator(s) are to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon a third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and judgment may be, but need not be, entered in any court having jurisdiction. Such award shall include the fixing of the costs, expenses and attorneys' fees of arbitration, which shall be borne by the unsuccessful party.

## 10. FEES

(a) LICENSEE agrees to pay BMI a fee for each performance of an Attraction that the LICENSEE promotes, except where another person, entity or venue is responsible for paying the license fee for that performance, computed on the basis set forth in Schedule A (or in the case of a Benefit Concert or no charge Attraction, Schedule B) of this Agreement.

(b) The minimum annual fee billed and payable shall be $150.00 per year.

(c) When an Attraction is believed to be comprised entirely of musical compositions for which BMI shall not have the right to grant public performance licenses, LICENSEE may, at its option, submit a schedule, including writer and publisher information, for all those musical compositions performed at said Attraction, *including opening acts and recorded music, if any*, and in those instances in the opinion of BMI, where all of the musical compositions performed at said Attraction are ones to which BMI does not have the right to grant public performance licenses, no fee shall be due and payable to BMI. In the event no schedule is submitted to BMI, LICENSEE must pay the applicable fee for said Attraction pursuant to Schedule A (or in the case of a Benefit Concert or no charge Attraction, Schedule B) of this Agreement.

## 11. REPORTING OF ATTRACTIONS/PAYMENT

(a) LICENSEE shall submit reports and payments quarterly. LICENSEE shall submit the reports setting forth the Attractions which actually were presented during each period. For all quarterly periods, reports and payments shall be due on the twentieth (20th) day of January, April, July and October of each year of this Agreement for all Attractions presented by LICENSEE during the prior calendar quarter. Should LICENSEE fail to report and submit payments to BMI within thirty (30) days after the specified date, then BMI will apply estimated billings to the account based on the prior quarter's figures for such LICENSEE. Any differences between the estimated and the actual reported fee shall be payable by LICENSEE when the report is submitted. If BMI's estimated fee is greater than the actual reported fee, then LICENSEE's account shall be credited with the difference.

(b) As required in this Paragraph, LICENSEE shall furnish to BMI, when it makes payment of license fees pursuant to this Agreement, a statement, on forms available from BMI, signed by an officer or auditor of LICENSEE, setting forth all performances of *all* Attractions occurring during the applicable calendar quarter reporting period in LICENSEE's Facility. Such statement shall include the name of each Attraction, the Seating Capacity for each Attraction, the dates of each Attraction, the number of performances each day and the Gross Ticket Revenues (as defined in Paragraph 1(d)) for a regularly scheduled performance of each Attraction. LICENSEE's statement shall also include performances of Attractions where another person, entity or venue is responsible for paying the license fee. A statement shall be furnished to BMI by LICENSEE for each reporting period during the Term of the Agreement, regardless of whether or not any performances occurred during that period.

(c) In the event that LICENSEE engages in the presentation of an Attraction in conjunction with, or sells or otherwise transfers the promotional responsibility of an Attraction to, other persons or entities licensed separately by BMI under its Musical Attractions or Facility Music Performance Agreements, LICENSEE shall indicate on the statement required by Sub-paragraph 5(b) hereof the names of all other persons, entities or venues promoting or co-promoting, or otherwise responsible for, each Attraction and who is responsible for payment of the BMI license fee for such Attraction. Transferring liability for promoted Attractions to anyone **but** a licensed promoter or co-promoter of the Musical Attractions is not permitted. If the responsible promoter, co-promoter or person, entity, or venue is not licensed by BMI under its Musical Attractions or Facility Music Performance Agreements, LICENSEE shall be deemed liable for payment of the fees due for such Attraction.  In the event BMI receives a fee for an Attraction from both LICENSEE and one or more of its co-promoters or other promoter, or person, entity or venue, the total of which exceeds the amount due, BMI shall refund or credit the excess proportionally among all promoters, co-promoters, persons, entities, or venues who made payment.

(d) LICENSEE shall deliver to BMI for each calendar quarter, by the twentieth (20th) day following the end of the calendar quarter, copies of any programs or lists of the musical works presented by LICENSEE in its Musical Attractions during such quarter. Programs prepared for audiences or for the LICENSEE's own use are to be included, and shall include the presentation of encores to the extent possible. Nothing contained herein shall be deemed to require LICENSEE to deliver material not otherwise prepared.

| SCHEDULE A.   LICENSEE FEE SCHEDULE | |
| --- | --- |
| SEATING CAPACITY | FEE BASIS PERCENTAGE APPLIED TO GROSS TICKET REVENUES PER ATTRACTION |
| 10,000 AND MORE SEATS | 0.15% |

| SCHEDULE B.   LICENSEE FEE SCHEDULE | | | |
| --- | --- | --- | --- |
| SEATING CAPACITY | | | FEE PER BENEFIT CONCERT OR ATTRACTIONS WITH NO CHARGES |
| 0 | to | 250 | $15.00 |
| 251 | to | 750 | $18.00 |
| 751 | to | 1,500 | $28.00 |
| 1,501 | to | 2,500 | $45.00 |
| 2,501 | to | 5,000 | $67.00 |
| 5,001 | to | 7,500 | $90.00 |
| 7,501 | to | 10,000 | $125.00 |
| 10,001 | to | 15,000 | $190.00 |
| 15,001 | to | 20,000 | $260.00 |
| 20,001 | to | 25,000 | $315.00 |
| 25,001 | to | 40,000 | $345.00 |
| 40,001 | to | over | $480.00 |

## 12. NOTICES

Any notice under this Agreement will be in writing and deemed given upon mailing, when sent by ordinary first-class U.S. mail to the party intended, at its mailing address stated, or any other address which either party may designate. Any such notice sent to BMI shall be to the attention of the Vice President, Licensing Department at 10 Music Square East, Nashville, TN 37203.  Any notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or such other person as LICENSEE may advise BMI in writing.

## 13. MISCELLANEOUS

(a) This Agreement shall not be prejudicial to any position taken by either of the parties as to what is a reasonable license fee or as to the form of license for any subsequent licensing period.

(b) This Agreement is the entire understanding between the parties, will not be binding until signed by both parties, and cannot be waived or added to or modified orally, and no waiver, addition or modification will be valid unless in writing and signed by the parties. This Agreement is executed by the duly authorized representative of BMI and LICENSEE. The rights of LICENSEE are not assignable. This Agreement, its validity, construction and effect, will be governed by the substantive laws of the State of New York.  The fact that any provisions are found by a court of competent jurisdiction to be void or unenforceable will not affect the validity or enforceability of any other provisions. All headings on this Agreement are for the purpose of convenience and shall not be considered to be part of this Agreement.

# A240

**14. TERM OF AGREEMENT**

The Term of this Agreement shall begin on the first day of (*month/year*) _____ and end on June 30, 2018.

## AGREEMENT

THIS AGREEMENT made and entered into on (*Date will be entered by BMI upon execution*) _____

between BROADCAST MUSIC, INC., a corporation with principal offices at 7 World Trade Center, 250 Greenwich Street, New York, N.Y. 10007-0030, hereinafter referred to as BMI, and the entity described below and hereinafter referred to as LICENSEE.

**PLEASE RETURN THIS ENTIRE SIGNED LICENSE AGREEMENT TO:**
**BMI, 10 MUSIC SQUARE EAST, NASHVILLE, TN 37203**

**ENTER LEGAL NAME:**                          **LICENSED PREMISES**

_____
(Name of Corporation, Partnership, or Individual Owner)

(Street Address)

**ENTER TRADE NAME:**

(City)                    (State)           (Zip)

(Telephone Number)            (Fax Number)

_____
(Doing business under the name of)

(Contact Name)                (Title)

(Email Address)                (Web Address)

**CHECK APPROPRIATE BOX AND COMPLETE**          **MAILING ADDRESS**
(if different from Licensed Premises)

☐ Individual Ownership

(Street Address)

☐ LLC      ☐ Corporation _____
(State of Incorporation, if different from Licensed Premises)

(City)                    (State)           (Zip)

☐ LLP      ☐ Partnership _____
(Enter names of partners)

(Telephone Number)            (Fax Number)

☐ Other _____

(Contact Name)                (Title)

Fed. Tax ID # _____

(Email Address)

---

**TO BE COMPLETED BY LICENSEE**
**By signing this Agreement you agree that the foregoing is a true and accurate representation of your Music Policy.**

I have read and have understood all of the terms and conditions herein and my signature below is evidence of this.
***(SIGN HERE – PLEASE INCLUDE PAYMENT)***


_____
Signature

_____
Print Name / Title

**FOR ADMINISTRATIVE USE ONLY**
**TO BE COMPLETED BY BMI**
BROADCAST MUSIC, INC.

| **FOR BMI USE ONLY** | |
|---|---|
|  |  |
| **Account No.** | **COID** |

 **BMI 2018 Facilities Interim Extension Agreement**

WHEREAS, **BMI**® and _____ ("LICENSEE") are parties to a BMI Music License for Facilities dated _____, which authorizes the public performance of BMI musical works at LICENSEE's Facilities for the period ending June 30, 2018 (the "Prior Final License").

WHEREAS, LICENSEE desires to continue to be licensed to perform BMI musical works at its Facilities for the license term commencing July 1, 2018; and

WHEREAS, BMI has been in negotiations with concert promoters over the reasonable license fees, terms and conditions of a BMI Facilities license for the period commencing July 1, 2018; and

WHEREAS, BMI intends to quote new final blanket license fees and terms to LICENSEE and all other Facilities for the period commencing July 1, 2018; and

WHEREAS, LICENSEE and BMI desire to enter into an Interim Extension Agreement pending the finalization of such license fees, terms and conditions;

NOW THEREFORE, by signing below LICENSEE and BMI agree as follows:

1.   LICENSEE agrees to be bound by all of the terms and conditions in the Prior Final License on an interim fee basis for the period commencing July 1, 2018 (the "Interim Extension Agreement"), with the final license fees and terms to be determined either by negotiations between the parties or as may be determined by the BMI rate court in a proceeding to determine reasonable BMI blanket license fees for facilities and promoter/presenters. LICENSEE's interim quarterly and annual license fees shall be adjusted retroactively to July 1, 2018 at such time as final fees and terms are determined.

2.   Once final fees are determined, LICENSEE shall be obligated to pay BMI any additional monies owed BMI as a result of such retroactive adjustment of rates or fees if such rates are higher than the interim fees, and BMI shall be obligated to credit LICENSEE's account any monies owed LICENSEE as a result of such retroactive adjustment of rates or fees in the event that the final rates are lower than the interim rate.

3.   LICENSEE's agreement to the above terms and conditions shall be evidenced by the signature below of an individual duly authorized to bind LICENSEE to this Interim Extension Agreement.

This agreement may be executed in counterparts.

| Accepted:<br>Broadcast Music, Inc. | (a) If corporation, signatory must be an officer. Print corporate office held under signature.<br><br>(b) If partnership, print the word "partner" under signature.<br><br>(c) If individual owner, print "individual owner" under signature. | Legal Name |
| --- | --- | --- |
| Signatory/Title | | Authorized Signature |
| | | Print Name of Signatory |
| Execution Date | | Print Title of Signatory |

06/18 - 39MFU118_IntExt

# EXHIBIT 3



# Music License for Venue
## - with less than 10,000 seats -

## 1. DEFINITIONS

(a) **LICENSEE** shall mean the entity identified on Page 4 herein that presents an Attraction at a Venue.

(b) **Venue** shall include, but not be limited to, a concert hall, stadium, auditorium, civic center, coliseum, theatre, amphitheater, stage, or similar facility, whether enclosed or not, where an Attraction may be presented, located within the United States of America, its territories and possessions.

(c) **Attractions** shall mean concerts, variety shows (excluding circuses), pageants and other similar spectator events (including events sponsored by charitable organizations or for charitable purposes) that include music, whether or not music is the principal type of entertainment.

(d) **Seating Capacity** shall mean the total number of seats permanently affixed in the Venue where the Attraction is presented plus any temporary seats added within the Venue for a particular Attraction. If the total number of seats available for the Attraction shall be less than that of the permanent Seating Capacity of the Venue, "Seating Capacity" shall mean the total number of seats available for the particular Attraction. If a Venue does not have permanent seating, "Seating Capacity" shall mean the total number of persons attending a particular Attraction. If a Venue has lawn seating, then "Seating Capacity" shall mean the total number of seats permanently affixed in the Venue, in addition to total lawn Seating Capacity as determined by the local Fire Marshall.

(e) **Gross Ticket Revenues** shall mean the total monies received, directly or indirectly, by LICENSEE or their authorized representatives from all ticket sales per Attraction. The term "Gross Ticket Revenues" shall not include: 1) federal, state and/or local taxes; 2) building/facility charge per ticket sold; 3) ticketing agent/service charge placed on each ticket sold; or 4) facility parking fees.  Should the artist/performing act(s) choose to donate a portion of their fees from each ticket sale to a particular charity, then the appropriate deduction may be taken from the "Gross Ticket Revenues"; provided however, that BMI be given copies of said artist/performing act(s) agreement(s) stipulating such with the exact amount of the charitable donation per ticket sold.

(f) **Benefit Event** shall mean a public entertainment performance or social event held to raise funds for a specific person or cause in which all proceeds less direct expenses are donated to charity.

## 2. BMI GRANT

(a) BMI hereby grants to LICENSEE, for the Term of this Agreement, a non-exclusive license solely to perform, present or cause the performance of, as part of Attractions in Venues, **including recorded music** performed in conjunction with Attractions before, after or during the intermissions thereof, all the musical works as to which BMI shall have the right to grant public performance licenses during the Term. Such license shall be restricted to performance of music in the manner described herein, and is granted in consideration of payment of the license fees as set forth herein and is subject to all of the terms and conditions hereof. This license does not include: (i) dramatic rights, the right to perform dramatico-musical works in whole or in substantial part, the right to present individual works in a dramatic setting or the right to use the music licensed hereunder in any context which may constitute an exercise of the "grand rights" therein; or (ii) the right to simultaneously broadcast, telecast, cablecast, or otherwise transmit (including by the Internet or on-line service) the performances licensed hereunder to persons outside of the Venue in which they originate; (iii) performances of music by means of a coin-operated phonorecord player (jukebox).

(b) BMI reserves the right at its discretion to withdraw from the license granted hereunder any musical work as to which any legal action has been instituted or a claim made that BMI does not have the right to license the performing rights in such work or that such work infringes another composition.

## 3. REVIEW OF STATEMENTS/ACCOUNTINGS

(a) BMI shall have the right to verify such data or information that is required to be furnished by LICENSEE pursuant to Paragraph 10, by reference to a reliable, published, third-party industry source (such as Pollstar) and by BMI's authorized representatives, at any time during customary business hours, and upon thirty (30) days advance written notice, examining those portions of LICENSEE's books and records of account to such extent as may be necessary to verify any and all statements and/or accountings made hereunder. BMI shall consider all data and information coming to its attention as the result of any such examination of LICENSEE's books and records confidential.

(b) In the event that BMI discovers an inaccuracy in any information reported by LICENSEE pursuant to Paragraph 10, either through an examination of LICENSEE's books and records, or otherwise, and as a result it is revealed that LICENSEE underpaid license fees to BMI, and the correct license fee is not paid to BMI within thirty (30) days of BMI's notice to LICENSEE of the inaccuracy or underpayment, then LICENSEE shall pay a late payment charge on the additional license fees due as a result of the examination(s) of one and one-half percent (1½%) per month, or the maximum rate permitted by law, whichever is less, from the date(s) the license fees should have been paid pursuant to this Agreement.

## 4. LATE PAYMENT CHARGE

BMI may impose a late payment charge of one and one-half percent (1½%) per month from the date any payment is due hereunder on any payment that is received by BMI more than one (1) month after the due date.

## 5. INDEMNITY BY BMI

BMI agrees to indemnify, save harmless and defend LICENSEE, its officers and employees, from and against any and all claims, demands or suits that may be made or brought against them or any of them with respect to the performance of any musical works licensed under this Agreement.  Such indemnity shall be limited to musical works which are licensed by BMI at the time of LICENSEE's performances.  BMI will, upon reasonable written request, advise LICENSEE whether particular musical works are available for performance as part of BMI's repertoire. LICENSEE shall provide the title and the writer/composer of each musical composition requested to be identified. LICENSEE agrees to give BMI immediate notice of any such claim, demand or suit, to deliver to BMI any papers pertaining thereto, and to cooperate with BMI with respect thereto, and BMI shall have full charge of the defense of any such claim, demand or suit.

**6.   BREACH OR DEFAULT/WAIVER**

Upon any breach or default of the terms and conditions of this Agreement, BMI shall have the right to cancel this Agreement, but any such cancellation shall only become effective if such breach or default continues for thirty (30) days after the date of BMI's written notice to LICENSEE thereof. The right to cancel shall be in addition to any and all other remedies which BMI may have.  No waiver by BMI of full performance of this Agreement by LICENSEE in any one or more instances shall be a waiver of the right to require full and complete performance of this Agreement thereafter or of the right to cancel this Agreement in accordance with the terms of this Paragraph.

**7.   ARBITRATION**

All disputes of any kind, nature or description arising in connection with the terms and conditions of this Agreement shall be submitted to the American Arbitration Association in the City, County and State of New York for arbitration under its then prevailing arbitration rules. The arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator.  If two arbitrators are so appointed, they shall appoint a third arbitrator.  If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator.  The award made in the arbitration shall be binding and conclusive on the parties and judgment may be, but need not be, entered in any court having jurisdiction.  Such award shall include the fixing of the costs, expenses and attorneys' fees of arbitration, which shall be borne by the unsuccessful party.

**8.   OFFER OF COMPARABLE AGREEMENT**

In the event that BMI, at any time during the Term of this Agreement, shall, for the same class and category as that of LICENSEE, issue licenses granting rights similar to those in this Agreement on a more favorable basis, BMI shall, for the balance of the Term, offer LICENSEE a comparable agreement.

**9.   FEES**

(a)   LICENSEE agrees to pay BMI a license fee for each performance of an Attraction that LICENSEE promotes, except where another person, entity or Venue is responsible for paying the license fee for that performance.  Such license fee shall be computed on the basis set forth in the License Fee Schedule of this Agreement.

(b)   License fees for Attractions *with* paid admission shall be calculated pursuant to Schedule A of the License Fee Schedule.  License fees for Attractions *with no* paid admission (i.e., free to guests) or Benefit Events shall be calculated pursuant to Schedule B of the License Fee Schedule.  License fees outlined in Schedule B for subsequent Contract Years will be adjusted by the Consumer Price Index, as described in subparagraph 9(c) hereunder.

(c)   In no event shall an Attraction's annual license fee for any Contract Year be less than the Minimum Annual Fee for the applicable year.  The Minimum Annual Fee for the 2018 Contract Year is $240. The Minimum Annual Fee for subsequent Contract Years shall be an adjustment of the previous Contract Year rates based upon any percentage increase in the Consumer Price Index – All Urban Consumers (CPI-U) between the preceding July and the next preceding July, and shall be rounded to the nearest dollar.

(d)   When an Attraction is believed to be comprised entirely of musical compositions for which BMI shall not have the right to grant public performance licenses, LICENSEE may, at its option, submit a schedule, including writer and publisher information, for all those musical compositions performed at said Attraction, *including opening acts and recorded music, if any*, and in those instances in the opinion of BMI, where all of the musical compositions performed at said Attraction are ones to which BMI does not have the right to grant public performance licenses, no fee shall be due and payable to BMI. In the event no schedule is submitted to BMI, LICENSEE must pay the applicable fee for said Attraction pursuant to Schedule A (or in the case of a Benefit Event or no charge Attraction, Schedule B) of this Agreement.

## LICENSE FEE SCHEDULE

| SCHEDULE A EVENTS <u>WITH</u> PAID ADMISSION | | |
|---|---|---|
| <u>Seating Capacity</u> | | <u>% of Gross Ticket Revenue</u> |
| 0 | to | 2,500 | 0.80% |
| 2,501 | to | 3,500 | 0.60% |
| 3,501 | to | 5,000 | 0.40% |
| 5,001 | to | 9,999 | 0.30% |

| SCHEDULE B FREE OR BENEFIT EVENTS | | |
|---|---|---|
| <u>Seating Capacity</u> | | Fee Per Benefit Event <u>With No Charge</u> |
| 0 | to | 250 | $16.00 |
| 251 | to | 750 | $19.00 |
| 751 | to | 1,500 | $32.00 |
| 1,501 | to | 2,500 | $52.00 |
| 2,501 | to | 5,000 | $75.00 |
| 5,001 | to | 7,500 | $102.00 |
| 7,501 | to | 9,999 | $143.00 |

*Minimum Annual Fee is $240*

## 10. REPORTING OF ATTRACTIONS/PAYMENT

(a)  Upon signing this Agreement, LICENSEE shall pay at least the Minimum Annual Fee, plus any additional amounts immediately due as initially reported.  LICENSEE shall submit reports and payments for those Attractions which actually were presented during each period on a quarterly basis and shall pay all fees due.  For all quarterly periods, reports and payments shall be due on the twentieth (20th) day of January, April, July and October of each year of this Agreement for all Attractions presented by LICENSEE during the prior calendar quarter.  Should LICENSEE fail to report and submit payments to BMI within thirty (30) days after the specified date, then BMI will apply estimated billings to the account based on either LICENSEE's prior year's corresponding quarter figures or reports from a reliable, published, third-party industry source (e.g., Pollstar), whichever is higher.  BMI shall give written notice to LICENSEE of the estimated fee calculated.  LICENSEE shall have thirty (30) days after such written notice by BMI to submit the report.  If BMI does not receive the report from LICENSEE within those thirty (30) days, BMI and LICENSEE agree that BMI's Estimated License Fee shall then be established as the Actual License Fee for the period unreported by LICENSEE.  BMI and LICENSEE further agree that such established Actual License Fee (subject to adjustment by audit) shall also become the Estimated License Fee for the following contract period.  LICENSEE agrees to waive its right to file its report for any period in which BMI's Estimated License Fee becomes the Actual License Fee.  Any differences between the estimated and the actual reported fee shall be payable by LICENSEE when the report is submitted. If BMI's estimated fee is greater than the actual reported fee, then LICENSEE's account shall be credited with the difference, provided however that LICENSEE's annual license fee shall not fall below the Minimum Annual Fee.

(b)  Upon payment of license fees to BMI, LICENSEE shall furnish to BMI a statement, on forms available from BMI, signed by an officer or auditor of LICENSEE, setting forth all performances of **all** Attractions occurring during the applicable calendar quarter in LICENSEE's Venue. Such statement shall include the name of each Attraction, the Seating Capacity for each Attraction, the dates of each Attraction, the number of performances each day and the Gross Ticket Revenues (as defined in Paragraph 1(e)) for a regularly scheduled performance of each Attraction. LICENSEE's statement shall also include performances of Attractions where another person, entity or Venue is responsible for paying the license fee. A statement shall be furnished to BMI by LICENSEE for each calendar quarter during the Term of the Agreement, regardless of whether or not any performances occurred during that calendar quarter.

(c)  In the event that LICENSEE engages in the presentation of an Attraction in conjunction with, or sells or otherwise transfers the promotional responsibility of an Attraction to other persons or entities licensed separately by BMI under another BMI Music Performance Agreement, LICENSEE shall indicate on the statement required by subparagraph 10(b) hereof the names of all other persons, entities or Venues promoting or co-promoting, or otherwise responsible for, each Attraction and shall identify which party is responsible for payment of the BMI license fee for such Attraction. Transferring liability for promoted Attractions to anyone **but** a licensed promoter or co-promoter of the Attractions is not permitted. If the responsible promoter, co-promoter or person, entity, or Venue is not licensed by BMI under a BMI Music Performance Agreement, LICENSEE shall be deemed liable for payment of the fees due for such Attraction.  In the event BMI receives a fee for an Attraction from both LICENSEE and one or more of its co-promoters or other promoter, or person, entity or Venue, the total of which exceeds the amount due, BMI shall refund or credit the excess proportionally among all promoters, co-promoters, persons, entities, or Venues who made payment.

(d)  LICENSEE shall deliver to BMI for each calendar quarter, by the twentieth (20th) day following the end of the calendar quarter, copies of any programs or lists of the musical works presented by LICENSEE in its Attractions during such quarter. Programs prepared for audiences or for LICENSEE's own use are to be included, and shall include the presentation of encores to the extent possible. Nothing contained herein shall be deemed to require LICENSEE to deliver material not otherwise prepared.

## 11. TERMINATIONS OF AGREEMENT BY LICENSEE

If LICENSEE permanently ceases to present Attractions, this Agreement and LICENSEE's obligation to BMI shall thereupon terminate, provided that LICENSEE shall, within ten (10) days thereafter, give written notice of such termination to BMI, setting forth the effective date thereof and that LICENSEE shall submit all reports and pay to BMI all fees due hereunder until said effective date.

## 12. CANCELLATION OF ENTIRE CATEGORY

BMI shall have the right to cancel this Agreement along with the simultaneous cancellation of the agreements of all other licensees of the same class and category as LICENSEE, as of the end of any month during the Term, upon sixty (60) days advance written notice.

## 13. STATE OR LOCAL TAX

In the event that the payment of any license fee to BMI by LICENSEE pursuant to this Agreement causes BMI to become liable to pay any state or local tax which is based upon the license fees received by BMI from LICENSEE, LICENSEE agrees to pay to BMI the full amount of such tax together with license fee payment(s) as invoiced by BMI; provided, however, that BMI shall make reasonable efforts to be exempted or excused from paying such tax, and BMI is permitted by law to pass through such tax to LICENSEE.

## 14. OKLAHOMA RATE CHANGE NOTICE

BMI shall notify LICENSEE of any rate change thirty (30) days prior to the expiration date of this Agreement.

## 15. COLORADO 3 BUSINESS DAY REVIEW

LICENSEE shall have the right to rescind the Agreement for a period of three (3) business days after the execution of the Agreement.

## 16. NOTICES

All notices, if any, under this Agreement will be in writing and deemed given upon "mailing," when sent by ordinary first-class U.S. mail to the party intended, at its mailing address herein stated, or any other address which either party may designate.  Any such notices sent to BMI shall be to the attention of the Vice President, Licensing Department at 10 Music Square East, Nashville, TN 37203.  Any notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or such other person as LICENSEE may designate to BMI in writing.

## 17. MISCELLANEOUS

This Agreement constitutes the entire understanding between the parties, will not be binding until signed by both parties, and cannot be waived or added to or modified orally, and no waiver, addition or modification shall be valid unless in writing and signed by the parties. The rights of LICENSEE are not assignable.  This Agreement, its validity, construction and effect, shall be governed by the laws of the State of New York.  The fact that any provisions contained herein are found by a court of competent jurisdiction to be void or unenforceable shall not affect the validity or enforceability of any other provisions.  All headings in this Agreement are for the purpose of convenience and shall not be considered to be part of this Agreement.

# A246

**18. CUSTOMER OUTREACH**
LICENSEE agrees to accept from time to time pre-recorded messages from BMI that may contain important information regarding your account.

**19. TERM OF AGREEMENT**
The Term of this Agreement shall begin on the first day of (*month/year*) _____ and end on June 30, 2018.

## AGREEMENT

THIS AGREEMENT made and entered into on *(Date will be entered by BMI upon execution)*_____
between BROADCAST MUSIC, INC., a corporation with principal offices at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007-0030, herein referred to as BMI, *and the entity described below and herein referred to as LICENSEE.*

| **LEGAL NAME** | **LICENSED PREMISES** | | |
|---|---|---|---|
| *(Name of Corporation, Partnership, or Individual Owner)* | *(Street Address)* | | |
| **TRADE NAME** | *(City)* | *(State)* | *(Zip)* |
| *(Doing business under the name of)* | *(Telephone Number)* | *(Fax Number)* | |
| **PLEASE CHECK APPROPRIATE BOX** | *(Contact Name)* | *(Title)* | |
| ☐ Individual Ownership | *(Email Address)* | *(Web Address)* | |
| ☐ LLC    ☐ Corporation    *(State of Incorporation, if different from Licensed Premises)* | | | |
| ☐ LLP  ☐ Partnership    *(Enter names of partners)* | **MAILING ADDRESS** (if different from Licensed Premises) | | |
| ☐ Other | *(Street Address)* | | |
| Federal Tax ID No. | *(City)* | *(State)* | *(Zip)* |
| **GOVERNMENT ENTITIES** (if applicable, please check one) | *(Telephone Number)* | *(Fax Number)* | |
| ☐ Federal  ☐ State    *(State)* | *(Contact Name)* | *(Title)* | |
| ☐ Local    *(Municipality/City and State)* | *(Email Address – if different from above)* | | |

| **TO BE COMPLETED BY LICENSEE** | **FOR ADMINISTRATIVE USE ONLY** |
|---|---|
| By signing this Agreement you represent that you have the authority to bind LICENSEE and that you have read, understood and agree to all of the terms and conditions herein. *(SIGN HERE – PLEASE INCLUDE PAYMENT)* | **TO BE COMPLETED BY BMI** BROADCAST MUSIC INC. |
| _____ Signature | |
| _____ Print Name / Title | |
| _____ Signatory Email Address* *(if different from above)* | |

| | | FOR BMI USE ONLY | VEN1 | LI-2018/JUNE |
|---|---|---|---|---|
| **\*In order to receive a copy of your executed Agreement, please provide the email address of the Signatory.** | | | | **EFFECTIVE: January 2018** |
| **PLEASE RETURN THIS __ENTIRE__ SIGNED LICENSE AGREEMENT TO:** BMI, 10 MUSIC SQUARE E., NASHVILLE, TN  37203 | | ACCOUNT NO. | COID | |



### BMI 2018 Venue Interim Extension Agreement

WHEREAS, **BMI**® and _____ ("LICENSEE") are parties to a BMI Music License for Venue dated _____, which authorizes the public performance of BMI musical works at LICENSEE's Venue for the period ending June 30, 2018 (the "Prior Final License").

WHEREAS, LICENSEE desires to continue to be licensed to perform BMI musical works at Attractions and Events held at its Venue for the license term commencing July 1, 2018; and

WHEREAS, BMI has been in negotiations with concert promoters over the reasonable license fees, terms and conditions of a BMI Venue license for the period commencing July 1, 2018; and

WHEREAS, BMI intends to quote new final blanket license fees and terms to LICENSEE and all other venues for the period commencing July 1, 2018; and

WHEREAS, LICENSEE and BMI desire to enter into an Interim Extension Agreement pending the finalization of such license fees, terms and conditions;

NOW THEREFORE, by signing below LICENSEE and BMI agree as follows:

1. LICENSEE agrees to be bound by all of the terms and conditions in the Prior Final License on an interim fee basis for the period commencing July 1, 2018 (the "Interim Extension Agreement"), with the final license fees and terms to be determined either by negotiations between the parties or as may be determined by the BMI rate court in a proceeding to determine reasonable BMI blanket license fees for venues and promoters/presenters. LICENSEE's interim quarterly and annual license fees shall be adjusted retroactively to July 1, 2018 at such time as final fees and terms are determined.

2. Once final fees are determined, LICENSEE shall be obligated to pay BMI any additional monies owed BMI as a result of such retroactive adjustment of rates or fees if such rates are higher than the interim fees, and BMI shall be obligated to credit LICENSEE's account any monies owed LICENSEE as a result of such retroactive adjustment of rates or fees in the event that the final rates are lower than the interim rate.

3. LICENSEE's agreement to the above terms and conditions shall be evidenced by the signature below of an individual duly authorized to bind LICENSEE to this Interim Extension Agreement.

This agreement may be executed in counterparts.

| **Accepted:**<br>**Broadcast Music, Inc.** | (a) If corporation, signatory must be an officer. Print corporate office held under signature.<br><br>(b) If partnership, print the word "partner" under signature.<br><br>(c) If individual owner, print "individual owner" under signature. | Legal Name |
| --- | --- | --- |
| Signatory/Title | | Authorized Signature |
| | | Print Name of Signatory |
| Execution Date | | Print Title of Signatory |

06/18 - VENFU118_IntExt

# EXHIBIT 4

**A249**



# Music License for Promoter/Presenter

## 1. DEFINITIONS

(a) **LICENSEE** shall mean the entity identified on Page 4 herein that presents an Attraction at a Venue.

(b) **Venue** shall include, but not be limited to, a concert hall, stadium, auditorium, civic center, coliseum, theatre, amphitheater, museum, library, stage, restaurant/nightclubs or similar facility, whether enclosed or not, where an Attraction may be presented, located within the United States of America, its territories and possessions.

(c) **Attractions** shall mean concerts, variety shows (excluding circuses), pageants and other similar spectator events (including events sponsored by charitable organizations or for charitable purposes) that include music, whether or not music is the principal type of entertainment.

(d) **Seating Capacity** shall mean the total number of seats permanently affixed in the Venue where the Attraction is presented plus any temporary seats added within the Venue for a particular Attraction. If the total number of seats available for the Attraction shall be less than that of the permanent Seating Capacity of the Venue, "Seating Capacity" shall mean the total number of seats available for the particular Attraction. If a Venue does not have permanent seating, "Seating Capacity" shall mean the total number of persons attending a particular Attraction. If a Venue has lawn seating, then "Seating Capacity" shall mean the total number of seats permanently affixed in the Venue, in addition to total lawn Seating Capacity as determined by the local Fire Marshall.

(e) **Gross Ticket Revenues** shall mean the total monies received, directly or indirectly, by LICENSEE or their authorized representatives from all ticket sales per Attraction. The term "Gross Ticket Revenues" shall not include: 1) federal, state and/or local taxes; 2) building/facility charge per ticket sold; 3) ticketing agent/service charge placed on each ticket sold; or 4) facility parking fees.  Should the artist/performing act(s) choose to donate a portion of their fees from each ticket sale to a particular charity, then the appropriate deduction may be taken from the "Gross Ticket Revenues"; provided however, that BMI be given copies of said artist/performing act(s) agreement(s) stipulating such with the exact amount of the charitable donation per ticket sold.

(f) **Benefit Event** shall mean a public entertainment performance or social event held to raise funds for a specific person or cause in which all proceeds less direct expenses are donated to charity.

## 2. BMI GRANT

(a) BMI hereby grants to LICENSEE, for the Term of this Agreement, a non-exclusive license solely to perform, present or cause the performance of, as part of Attractions in Venues, **including recorded music** performed in conjunction with Attractions before, after or during the intermissions thereof, all the musical works as to which BMI shall have the right to grant public performance licenses during the Term. Such license shall be restricted to performance of music in the manner described herein, and is granted in consideration of payment of the license fees as set forth herein and is subject to all of the terms and conditions hereof. This license does not include: (i) dramatic rights, the right to perform dramatico-musical works in whole or in substantial part, the right to present individual works in a dramatic setting or the right to use the music licensed hereunder in any context which may constitute an exercise of the "grand rights" therein; or (ii) the right to simultaneously broadcast, telecast, cablecast, or otherwise transmit (including by the Internet or on-line service) the performances licensed hereunder to persons outside of the Venue in which they originate; (iii) performances of music by means of a coin-operated phonorecord player (jukebox).

(b) BMI reserves the right at its discretion to withdraw from the license granted hereunder any musical work as to which any legal action has been instituted or a claim made that BMI does not have the right to license the performing rights in such work or that such work infringes another composition.

## 3. REVIEW OF STATEMENTS/ACCOUNTINGS

(a) BMI shall have the right to verify such data or information that is required to be furnished by LICENSEE pursuant to Paragraph 9, by reference to a reliable, published, third-party industry source (e.g., Pollstar) and by BMI's authorized representatives, at any time during customary business hours, and upon thirty (30) days advance written notice, examining those portions of LICENSEE's books and records of account to such extent as may be necessary to verify any and all statements and/or accountings made hereunder. BMI shall consider all data and information coming to its attention as the result of any such examination of LICENSEE's books and records confidential.

(b) In the event that BMI discovers an inaccuracy in any information reported by LICENSEE pursuant to Paragraph 9, either through an examination of LICENSEE's books and records, or otherwise, and as a result it is revealed that LICENSEE underpaid license fees to BMI, and the correct license fee is not paid to BMI within thirty (30) days of BMI's notice to LICENSEE of the inaccuracy or underpayment, then LICENSEE shall pay a late payment charge on the additional license fees due as a result of the examination(s) of one and one-half percent (1½%) per month, or the maximum rate permitted by law, whichever is less, from the date(s) the license fees should have been paid pursuant to this Agreement.

## 4. LATE PAYMENT CHARGE

BMI may impose a late payment charge of one and one-half percent (1½%) per month from the date any payment is due hereunder on any payment that is received by BMI more than one (1) month after the due date.

## 5. INDEMNITY BY BMI

BMI agrees to indemnify, save harmless and defend LICENSEE, its officers and employees, from and against any and all claims, demands or suits that may be made or brought against them or any of them with respect to the performance of any musical works licensed under this Agreement.  Such indemnity shall be limited to musical works which are licensed by BMI at the time of LICENSEE's performances.  BMI will, upon reasonable written request, advise LICENSEE whether particular musical works are available for performance as part of BMI's repertoire. LICENSEE shall provide the title and the writer/composer of each musical composition requested to be identified. LICENSEE agrees to give BMI immediate notice of any such claim, demand or suit, to deliver to BMI any papers pertaining thereto, and to cooperate with BMI with respect thereto, and BMI shall have full charge of the defense of any such claim, demand or suit.

**6.   BREACH OR DEFAULT/WAIVER**

Upon any breach or default of the terms and conditions of this Agreement, BMI shall have the right to cancel this Agreement, but any such cancellation shall only become effective if such breach or default continues for thirty (30) days after the date of BMI's written notice to LICENSEE thereof. The right to cancel shall be in addition to any and all other remedies which BMI may have.  No waiver by BMI of full performance of this Agreement by LICENSEE in any one or more instances shall be a waiver of the right to require full and complete performance of this Agreement thereafter or of the right to cancel this Agreement in accordance with the terms of this Paragraph.

**7.   ARBITRATION**

All disputes of any kind, nature or description arising in connection with the terms and conditions of this Agreement shall be submitted to the American Arbitration Association in the City, County and State of New York for arbitration under its then prevailing arbitration rules. The arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator.  If two arbitrators are so appointed, they shall appoint a third arbitrator.  If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator.  The award made in the arbitration shall be binding and conclusive on the parties and judgment may be, but need not be, entered in any court having jurisdiction.  Such award shall include the fixing of the costs, expenses and attorneys' fees of arbitration, which shall be borne by the unsuccessful party.

**8.   FEES**

(a)   LICENSEE agrees to pay BMI a license fee for each performance of an Attraction that LICENSEE promotes, except where another person, entity or Venue is responsible for paying the license fee for that performance.  Such license fee shall be computed on the basis set forth in the License Fee Schedule of this Agreement.

(b)   License fees for Attractions *with* paid admission shall be calculated pursuant to Schedule A of the License Fee Schedule.  License fees for Attractions *with no* paid admission (i.e., free to guests) or Benefit Events shall be calculated pursuant to Schedule B of the License Fee Schedule.  License fees outlined in Schedule B for subsequent Contract Years will be adjusted by the Consumer Price Index, as described in subparagraph 8(c) hereunder.

(c)   In no event shall an Attraction's annual license fee for any Contract Year be less than the Minimum Annual Fee for the applicable year.  The Minimum Annual Fee for the 2018 Contract Year is $240.  The Minimum Annual Fee for subsequent Contract Years shall be an adjustment of the previous Contract Year rates based upon any percentage increase in the Consumer Price Index – All Urban Consumers (CPI-U) between the preceding July and the next preceding July, and shall be rounded to the nearest dollar.

(d)   When an Attraction is believed to be comprised entirely of musical compositions for which BMI shall not have the right to grant public performance licenses, LICENSEE may, at its option, submit a schedule, including writer and publisher information, for all those musical compositions performed at said Attraction, *including opening acts and recorded music, if any*, and in those instances in the opinion of BMI, where all of the musical compositions performed at said Attraction are ones to which BMI does not have the right to grant public performance licenses, no fee shall be due and payable to BMI. In the event no schedule is submitted to BMI, LICENSEE must pay the applicable fee for said Attraction pursuant to Schedule A (or in the case of a Benefit Event or no charge Attraction, Schedule B) of this Agreement.

## LICENSE FEE SCHEDULE

| SCHEDULE A<br>EVENTS **WITH** PAID ADMISSION | | |
|---|---|---|
| **Seating Capacity** | | **% of Gross Ticket Revenue** |
| 0 | to | 2,500 | 0.80% |
| 2,501 | to | 3,500 | 0.60% |
| 3,501 | to | 5,000 | 0.40% |
| 5,001 | to | 9,999 | 0.30% |
| 10,000 | and | Over | 0.15% |

| SCHEDULE B<br>FREE OR BENEFIT EVENTS | | |
|---|---|---|
| **Seating Capacity** | | **Fee Per Benefit Event<br>With No Charge** |
| 0 | to | 250 | $16.00 |
| 251 | to | 750 | $19.00 |
| 751 | to | 1,500 | $32.00 |
| 1,501 | to | 2,500 | $52.00 |
| 2,501 | to | 5,000 | $75.00 |
| 5,001 | to | 7,500 | $102.00 |
| 7,501 | to | 9,999 | $143.00 |
| 10,000 | to | 15,000 | $216.00 |
| 15,001 | to | 20,000 | $295.00 |
| 20,001 | to | 25,000 | $360.00 |
| 25,001 | to | 40,000 | $392.00 |
| 40,001 | and | Over | $545.00 |

*Minimum Annual Fee is $240*

**9. REPORTING OF ATTRACTIONS/PAYMENT**

(a) Upon signing this Agreement, LICENSEE shall pay at least the Minimum Annual Fee, plus any additional amounts immediately due as initially reported. LICENSEE shall submit reports and payments for those Attractions which actually were presented during each period on a quarterly basis and shall pay all fees due. For all quarterly periods, reports and payments shall be due on the twentieth (20th) day of January, April, July and October of each year of this Agreement for all Attractions presented by LICENSEE during the prior calendar quarter. Should LICENSEE fail to report and submit payments to BMI within thirty (30) days after the specified date, then BMI will apply estimated billings to the account based on either LICENSEE's prior year's corresponding quarter figures or reports from a reliable, published, third-party industry source (e.g., Pollstar), whichever is higher. BMI shall give written notice to LICENSEE of the estimated fee calculated. LICENSEE shall have thirty (30) days after such written notice by BMI to submit the report. If BMI does not receive the report from LICENSEE within those thirty (30) days, BMI and LICENSEE agree that BMI's Estimated License Fee shall then be established as the Actual License Fee for the period unreported by LICENSEE. BMI and LICENSEE further agree that such established Actual License Fee (subject to adjustment by audit) shall also become the Estimated License Fee for the following contract period. LICENSEE agrees to waive its right to file its report for any period in which BMI's Estimated License Fee becomes the Actual License Fee. Any differences between the estimated and the actual reported fee shall be payable by LICENSEE when the report is submitted. If BMI's Estimated License Fee is greater than the actual reported fee, then LICENSEE's account shall be credited with the difference, provided however that LICENSEE's Annual License Fee shall not fall below the Minimum Annual Fee.

(b) Upon payment of license fees to BMI, LICENSEE shall furnish to BMI a statement, on forms available from BMI, signed by an officer or auditor of LICENSEE, setting forth all performances of **all** Attractions occurring during the applicable calendar quarter in LICENSEE's Venue. Such statement shall include the name of each Attraction, the Seating Capacity for each Attraction, the dates of each Attraction, the number of performances each day and the Gross Ticket Revenues (as defined in Paragraph 1(e)) for a regularly scheduled performance of each Attraction. LICENSEE's statement shall also include performances of Attractions where another person, entity or Venue is responsible for paying the license fee. A statement shall be furnished to BMI by LICENSEE for each calendar quarter during the Term of the Agreement, regardless of whether or not any performances occurred during that calendar quarter.

(c) In the event that LICENSEE engages in the presentation of an Attraction in conjunction with, or sells or otherwise transfers the promotional responsibility of an Attraction to other persons or entities licensed separately by BMI under another BMI Music Performance Agreement, LICENSEE shall indicate on the statement required by subparagraph 9(b) hereof the names of all other persons, entities or Venues promoting or co-promoting, or otherwise responsible for, each Attraction and shall identify which party is responsible for payment of the BMI license fee for such Attraction. Transferring liability for promoted Attractions to anyone **but** a licensed promoter or co-promoter of the Attractions is not permitted. If the responsible promoter, co-promoter or person, entity, or Venue is not licensed by BMI under a BMI Music Performance Agreement, LICENSEE shall be deemed liable for payment of the fees due for such Attraction. In the event BMI receives a fee for an Attraction from both LICENSEE and one or more of its co-promoters or other promoter, or person, entity or Venue, the total of which exceeds the amount due, BMI shall refund or credit the excess proportionally among all promoters, co-promoters, persons, entities, or Venues who made payment.

(d) LICENSEE shall deliver to BMI for each calendar quarter, by the twentieth (20th) day following the end of the calendar quarter, copies of any programs or lists of the musical works presented by LICENSEE in its Attractions during such quarter. Programs prepared for audiences or for LICENSEE's own use are to be included, and shall include the presentation of encores to the extent possible. Nothing contained herein shall be deemed to require LICENSEE to deliver material not otherwise prepared.

**10. CANCELLATION OF ENTIRE CATEGORY**

BMI shall have the right to cancel this Agreement along with the simultaneous cancellation of the agreements of all other licensees of the same class and category as LICENSEE, as of the end of any month during the Term, upon sixty (60) days advance written notice.

**11. OFFER OF COMPARABLE AGREEMENT**

In the event that BMI, at any time during the Term of this Agreement, shall, for the same class and category as that of LICENSEE, issue licenses granting rights similar to those in this Agreement on a more favorable basis, BMI shall, for the balance of the Term, offer LICENSEE a comparable agreement.

**12. TERMINATIONS OF AGREEMENT BY LICENSEE**

If LICENSEE permanently ceases to present Attractions, this Agreement and LICENSEE's obligation to BMI shall thereupon terminate, provided that LICENSEE shall, within ten (10) days thereafter, give written notice of such termination to BMI, setting forth the effective date thereof and that LICENSEE shall submit all reports and pay to BMI all fees due hereunder until said effective date.

**13. STATE OR LOCAL TAX**

In the event that the payment of any license fee to BMI by LICENSEE pursuant to this Agreement causes BMI to become liable to pay any state or local tax which is based upon the license fees received by BMI from LICENSEE, LICENSEE agrees to pay to BMI the full amount of such tax together with license fee payment(s) as invoiced by BMI; provided, however, that BMI shall make reasonable efforts to be exempted or excused from paying such tax, and BMI is permitted by law to pass through such tax to LICENSEE.

**14. OKLAHOMA RATE CHANGE NOTICE**

BMI shall notify LICENSEE of any rate change thirty (30) days prior to the expiration date of this Agreement.

**15. COLORADO 3 BUSINESS DAY REVIEW**

LICENSEE shall have the right to rescind the Agreement for a period of three (3) business days after the execution of the Agreement.

**16. NOTICES**

All notices, if any, under this Agreement will be in writing and deemed given upon "mailing," when sent by ordinary first-class U.S. mail to the party intended, at its mailing address herein stated, or any other address which either party may designate. Any such notices sent to BMI shall be to the attention of the Vice President, Licensing Department at 10 Music Square East, Nashville, TN 37203. Any notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or such other person as LICENSEE may designate to BMI in writing.

**17. MISCELLANEOUS**

This Agreement constitutes the entire understanding between the parties, will not be binding until signed by both parties, and cannot be waived or added to or modified orally, and no waiver, addition or modification shall be valid unless in writing and signed by the parties. The rights of LICENSEE are not assignable. This Agreement, its validity, construction and effect, shall be governed by the laws of the State of New York. The fact that any provisions contained herein are found by a court of competent jurisdiction to be void or unenforceable shall not affect the

# A252

validity or enforceability of any other provisions.  All headings in this Agreement are for the purpose of convenience and shall not be considered to be part of this Agreement.

**18.  CUSTOMER OUTREACH**
LICENSEE agrees to accept from time to time pre-recorded messages from BMI that may contain important information regarding your account.

**19.  TERM OF AGREEMENT**
The Term of this Agreement shall begin on the first day of (*month/year*) _____ and end on June 30, 2018.

## AGREEMENT

THIS AGREEMENT made and entered into on *(Date will be entered by BMI upon execution)*_____

between BROADCAST MUSIC, INC., a corporation with principal offices at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007-0030, herein referred to as BMI, *and the entity described below and herein referred to as LICENSEE*.

| LEGAL NAME | LICENSED PREMISES |
|---|---|
| *(Name of Corporation, Partnership, or Individual Owner)* | *(Street Address)* |
| **TRADE NAME** | *(City)*          *(State)*          *(Zip)* |
| *(Doing business under the name of)* | *(Telephone Number)*          *(Fax Number)* |
| **PLEASE CHECK APPROPRIATE BOX** | *(Contact Name)*          *(Title)* |
| ☐ Individual Ownership | *(Email Address)*          *(Web Address)* |
| ☐ LLC   ☐ Corporation     *(State of Incorporation, if different from Licensed Premises)* | |
| ☐ LLP   ☐ Partnership     *(Enter names of partners)* | **MAILING ADDRESS** **(if different from Licensed Premises)** |
| ☐ Other | |
| Federal Tax ID No. | *(Street Address)* |
| | *(City)*          *(State)*          *(Zip)* |
| **GOVERNMENT ENTITIES** **(if applicable, please check one)** | *(Telephone Number)*          *(Fax Number)* |
| ☐ Federal   ☐ State     *(State)* | *(Contact Name)*          *(Title)* |
| ☐ Local     *(Municipality/City and State)* | *(Email Address – if different from above)* |

| TO BE COMPLETED BY LICENSEE | FOR ADMINISTRATIVE USE ONLY TO BE COMPLETED BY BMI BROADCAST MUSIC INC. |
|---|---|
| By signing this Agreement you represent that you have the authority to bind LICENSEE and that you have read, understood and agree to all of the terms and conditions herein. *(SIGN HERE – PLEASE INCLUDE PAYMENT)* | |
| Signature | |
| Print Name / Title | |
| Signatory Email Address* *(if different from above)* | FOR BMI USE ONLY │ PRM1 │ LI-2018/JUNE |
| *In order to receive a copy of your executed Agreement, please provide the email address of the Signatory. | EFFECTIVE: January 2018 |
| **PLEASE RETURN THIS <u>ENTIRE</u> SIGNED LICENSE AGREEMENT TO:** **BMI, 10 MUSIC SQUARE E., NASHVILLE, TN  37203** | ACCOUNT NO.          COID |



### BMI 2018 Promoter/Presenter Interim Extension Agreement

WHEREAS, **BMI**® and _____ ("LICENSEE") are parties to a BMI Music License for Promoter/Presenter dated _____, which authorizes the public performance of BMI musical works at LICENSEE's Attractions and Events for the period ending June 30, 2018 (the "Prior Final License").

WHEREAS, LICENSEE desires to continue to be licensed to perform BMI musical works at its Attractions and Events for the license term commencing July 1, 2018; and

WHEREAS, BMI has been in negotiations with concert promoters over the reasonable license fees, terms and conditions of a BMI license for Promoter/Presenters for the period commencing July 1, 2018; and

WHEREAS, BMI intends to quote new final blanket license fees and terms to LICENSEE and all other promoter/presenters for the period commencing July 1, 2018; and

WHEREAS, LICENSEE and BMI desire to enter into an Interim Extension Agreement pending the finalization of such license fees, terms and conditions;

NOW THEREFORE, by signing below LICENSEE and BMI agree as follows:

1. LICENSEE agrees to be bound by all of the terms and conditions in the Prior Final License on an interim fee basis for the period commencing July 1, 2018 (the "Interim Extension Agreement"), with the final license fees and terms to be determined either by negotiations between the parties or as may be determined by the BMI rate court in a proceeding to determine reasonable BMI blanket license fees for venues and promoter/presenters. LICENSEE's interim quarterly and annual license fees shall be adjusted retroactively to July 1, 2018 at such time as final fees and terms are determined.

2. Once final fees are determined, LICENSEE shall be obligated to pay BMI any additional monies owed BMI as a result of such retroactive adjustment of rates or fees if such rates are higher than the interim fees, and BMI shall be obligated to credit any monies owed LICENSEE's account as a result of such retroactive adjustment of rates or fees in the event that the final rates are lower than the interim rate.

3. LICENSEE's agreement to the above terms and conditions shall be evidenced by the signature below of an individual duly authorized to bind LICENSEE to this Interim Extension Agreement.

This agreement may be executed in counterparts.

| Accepted:<br>Broadcast Music, Inc. | (a) If corporation, signatory must be an officer. Print corporate office held under signature.<br><br>(b) If partnership, print the word "partner" under signature.<br><br>(c) If individual owner, print "individual owner" under signature. | Legal Name |
| --- | --- | --- |
| Signatory/Title | | Authorized Signature |
| | | Print Name of Signatory |
| Execution Date | | Print Title of Signatory |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| STRUCTURED ASSET SALES, LLC, |
| *Plaintiff,* |
| -against- |
| EDWARD CHRISTOPHER SHEERAN p/k/a ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION d/b/a ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10 |
| *Defendants.* |

**18-CV-5839 (LLS)**

**SUPPLEMENTAL CERTIFICATION OF HILLEL I. PARNESS**

Hillel I. Parness, being of full age, hereby certifies and states:

1.      I am counsel for the Plaintiff, Structured Asset Sales, LLC ("SAS" or "Plaintiff") in the above-referenced action.  I submit this Supplemental Certification in further support of SAS's motion to compel discovery from the Defendants.

2.      Attached hereto as **Exhibit J** is a true and correct copy of the ASCAP Writer Member Agreement, which I retrieved from the ASCAP website on November 15, 2019.

3.      Attached hereto as **Exhibit K** is a true and correct copy of the ASCAP Publisher Member Agreement, which I retrieved from the ASCAP website on November 15, 2019.

4.      Attached hereto as **Exhibit L** is a true and correct copy of the BMI Writer Agreement, which I retrieved from the BMI website on November 15, 2019.

5.      Attached hereto as **Exhibit M** is a true and correct copy of the BMI Publisher Agreement, which I retrieved from the BMI website on November 15, 2019.

6.      Attached hereto as **Exhibit N** are true and correct copies of two email chains

between Donald Zakarin and the undersigned, which together span the period October 29, 2019

through November 7, 2019.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on November 19, 2019 in New York, New York.

Hillel I. Parness



# Writer Member Agreement

## WARRANTIES AND REPRESENTATIONS

**A.** I represent that there are no existing assignments or licenses, direct or indirect, of non-dramatic performing rights in my musical works, except to or with the publisher(s). If there are assignments or licenses other than with publishers, I have attached copies of such assignments or licenses.

**B.** I have read the ASCAP Articles of Association, Compendium of Rules and Regulations, and Second Amended Final Judgment entered in *U.S. v. ASCAP* (*"AFJ2"*), and agree to be bound by them, as now in effect, and as they may be amended, and I agree to execute agreements in such form and for such periods as the Board of Directors shall have required and shall hereafter require for all members.

**C.** I represent that I meet the eligibility requirements for membership as set forth herein as I have written or co-written a musical work or song that has been performed publicly in any venue licensable by ASCAP (club, live concert, symphonic concert or recital venue, college or university, etc.), performed in an audio visual or electronic medium (film, website, television program, radio station, etc.), commercially recorded, or published as sheet music, a score, or folio which is available for sale or rental. I understand that ASCAP reserves the right to request substantiation of my eligibility for ASCAP membership at any time.

**D.** I warrant and represent that all of the information furnished in this application is true. I acknowledge that any agreement entered into between ASCAP and me will be in reliance upon the representations contained in this application, and that my membership will be subject to termination if the information contained in this application is not complete and accurate.

## MEMBERSHIP AGREEMENT

Agreement made between the Undersigned (for brevity called *"Owner"*) and the AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS (for brevity called "Society"), in consideration of the premises and of the mutual covenants hereinafter contained, as follows:

**1.** The *Owner* grants to the *Society* for the term hereof, the right to license non-dramatic public performances (as hereinafter defined), of each musical work:

Of which the *Owner* is a copyright proprietor; or

Which the *Owner*, alone, or jointly, or in collaboration with others, wrote, composed, published, acquired or owned; or

In which the *Owner* now has any right, title, interest or control whatsoever, in whole or in part; or

Which hereafter, during the term hereof, may be written, composed, acquired, owned, published or copyrighted by the *Owner*, alone, jointly or in collaboration with others; or

In which the *Owner* may hereafter, during the term hereof, have any right, title, interest or control, whatsoever, in whole or in part.

The right to license the public performance of every such musical work shall be deemed granted to the *Society* by this instrument for the term hereof, immediately upon the work being written, composed, acquired, owned, published or copyrighted.

The rights hereby granted shall include:

(a) All the rights and remedies for enforcing the copyright or copyrights of such musical works, whether such copyrights are in the name of the *Owner* and/or others, as well as the right to sue under such copyrights in the name of the *Society* and/or in the name of the *Owner* and/or others, to the end that the *Society* may effectively protect and be assured of all the rights hereby granted.

(b) The non-exclusive right of public performance of the separate numbers, songs, fragments or arrangements, mel-

odies or selections forming part or parts of musical plays and dramatico-musical compositions, the *Owner* reserving and excepting from this grant the right of performance of musical plays and dramatico-musical compositions in their entirety, or any part of such plays or dramatico-musical compositions on the legitimate stage.

(c) The non-exclusive right of public performance by means of radio broadcasting, telephony, "wired wireless," all forms of synchronism with motion pictures, and/or any method of transmitting sound other than television broadcasting.

(d) The non-exclusive right of public performance by television broadcasting; provided, however, that:

(i) This grant does not extend to or include the right to license the public performance by television broadcasting or otherwise of any rendition or performance of (a) any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or (b) any composition from any opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form) in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form): provided, however, that the rights hereby granted shall be deemed to include a grant of the right to license non-dramatic performances of compositions by television broadcasting of a motion picture containing such composition if the rights in such motion picture other than those granted hereby have been obtained from the parties in interest.

(ii) Nothing herein contained shall be deemed to grant the right to license the public performance by television broadcasting of dramatic performances. Any performance of a separate musical composition which is not a dramatic performance, as defined herein, shall be deemed to be a non-dramatic performance. For the purposes of this agreement, a dramatic performance shall mean a performance of a musical composition on a television program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action. The use of dialogue to establish a mere program format or the use of any non-dramatic device merely to introduce a

performance of a composition shall not be deemed to make such performances dramatic.

(iii) The definition of the terms "dramatic" and "non-dramatic" performances contained herein are purely for the purposes of this agreement and for the term thereof and shall not be binding upon or prejudicial to any position taken by either of us subsequent to the term hereof or for any purpose other than this agreement.

(e) The *Owner* may at any time and from time to time, in good faith, restrict the radio or television broadcasting of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast, only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interest under the copyrights thereof; provided, however, that the right to grant limited licenses will be given, upon application, as to restricted compositions, if and when the *Owner* is unable to show reasonable hazards to his or its major interests likely to result from such radio or television broadcasting; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition, and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial radio or television broadcast thereof, be restricted for the purpose of confining further radio or television broadcasts thereof to a particular artist, station, network or program. The *Owner* may also at anytime and from time to time, in good faith, restrict the radio or television broadcasting of any composition, as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the repertory of *Society* or on a claim by a non-member of *Society* that *Society* does not have the right to license the public performance of such composition by radio or television broadcasting.

2. The term of this Agreement shall be for a period commencing on the date hereof and continuing indefinitely thereafter unless terminated by either party in accordance with the Articles of Association.

3. The *Society* agrees, during the term hereof, in good faith to use its best endeavors to promote and carry out the objects for which it was organized, and to hold and apply all roy-

alties, profits, benefits and advantages arising from the exploitation of the rights assigned to it by its several members, including the *Owner*, to the uses and purposes as provided in its Articles of Association (which are hereby incorporated by reference), as now in force or as hereafter amended.

4. The *Owner* hereby irrevocably, during the term hereof, authorizes, empowers and vests in the *Society* the right to enforce and protect such rights of public performance under any and all copyrights, whether standing in the name of the *Owner* and/or others, in any and all works copyrighted by the *Owner*, and/or by others; to prevent the infringement thereof, to litigate, collect and receipt for damages arising from infringement, and in its sole judgment to join the *Owner* and/or others in whose names the copyright may stand, as parties plaintiff or defendants in suits or proceedings; to bring suit in the name of the *Owner* and/or in the name of the *Society*, or others in whose name the copyright may stand, or otherwise, and to release, compromise, or refer to arbitration any actions, in the same manner and to the same extent and to all intents and purposes as the *Owner* might or could do, had this instrument not been made.

5. The *Owner* hereby makes, constitutes and appoints the *Society*, or its successor, the *Owner's* true and lawful attorney, irrevocably during the term hereof, and in the name of the *Society* or its successor, or in the name of the *Owner*, or otherwise, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process and pleadings that may be necessary, proper or expedient to restrain infringements and recover damages in respect to or for the infringement or other violation of the rights of public performance in such works, and to discontinue, compromise or refer to arbitration any such proceedings or actions, or to make any other disposition of the differences in relation to the premises.

6. The *Owner* agrees from time to time, to execute, acknowledge and deliver to the *Society*, such assurances, powers of attorney or other authorizations or instruments as the *Society* may deem necessary or expedient to enable it to exercise, enjoy and enforce, in its own name or otherwise, all rights and remedies aforesaid.

7. It is mutually agreed that during the term hereof the Board of Directors of the *Society* shall be composed of an equal number of writers and publishers respectively, and that the royalties distributed by the Board of Directors shall be divided into two (2) equal sums, and one (1) each of such sums credited respectively to and for division amongst (a)

the writer members, and (b) the publisher members, in accordance with the system of apportionment and distribution of royalties as determined by the Board of Directors in accordance with the Articles of Association as they may be amended from time to time.

8. The *Owner* agrees that the apportionment and distribution of royalties by the *Society* as determined from time to time by the Board of Directors of the *Society*, in case of appeal by him, shall be final, conclusive and binding upon him. The *Society* shall have the right to transfer the right of review of any apportionment and distribution of royalties from the Board of Directors to any other agency or instrumentality that in its discretion and good judgment it deems best adapted to assuring to the *Society's* membership a just, fair, equitable and accurate apportionment and distribution of royalties. The *Society* shall have the right to adopt from time to time such systems, means, methods and formulae for the establishment of a member's apportionment and distribution of royalties as will assure a fair, just and equitable distribution of royalties among the membership.

9. **"Public Performance" Defined.** The term "public performance" shall be construed to mean vocal, instrumental and/or mechanical renditions and representations in any manner or by any method whatsoever, including transmissions by radio and television broadcasting stations, transmission by telephony and/or "wired wireless"; and/or reproductions of performances and renditions by means of devices for reproducing sound recorded in synchronism or timed relation with the taking of motion pictures.

10. **"Musical Works" Defined.** The phrase "musical works" shall be construed to mean musical compositions and dramatico-musical compositions, the words and music there of, and the respective arrangements thereof, and the selections therefrom.

11. The powers, rights, authorities and privileges by this instrument vested in the *Society*, are deemed to include the World, provided, however, that such grant of rights for foreign countries shall be subject to any agreements now in effect, a list of which is attached hereto.

12. The grant made herein by the *Owner* is modified by and subject to the provisions of (a) the Second Amended Final Judgment in United States vs ASCAP, Civ. Action No. 41-1395 (S.D.N.Y. June 11, 2001), as the same may be amended from time to time, and (b) the provisions of the Articles of Association and resolutions of the Board of Directors.