# 23-905-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

––––––––––––––––

*On Appeal from the United States District Court
for the Southern District of New York*

## APPENDIX
## VOLUME VIII OF VIII
## Pages A1661 to A1900

PRYOR CASHMAN LLP
*Attorneys for Defendants-Appellees*
7 Times Square, 40th Floor
New York, New York 10036
212-421-4100

PARNESS LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD. UK, ATLANTIC RECORDS UK, BDI MUSIC, BUCKS MUSIC GROUP, WARNER MUSIC GROUP CORPORATION, DBA ASYLUM RECORDS, WARNER MUSIC GROUP, LTD. UK, DOES 1-10,

*Defendants.*

# **Table of Contents**

**Page**

## **Volume I**

District Court Docket Entries ................................................................. A1

Third Amended Complaint, dated May 30, 2019................................. A31

Answer of Defendant Edward Christopher Sheeran ("Sheeran") to
    Third Amended Complaint, dated July 8, 2019............................ A61

Letter from Hillel I. Parness to the Honorable Louis L. Stanton
    to Set Pre-Motion Discovery Conference,
    dated September 6, 2019................................................................. A81

        Exhibit A to Parness Letter -
        Responses and Objections of Sheeran, Sony/ATV Music
        Publishing LLC, Atlantic Recording Corporation and
        The Royalty Network, Inc. to Plaintiffs' Revised First
        Request for Production, dated July 1, 2019 ........................... A84

        Exhibit B to Parness Letter -
        Excerpts from the Third Amended Complaint,
        dated May 30, 2019................................................................ A99

Letter from Donald Zakarin to the Honorable Louis L. Stanton,
    dated September 10, 2019............................................................. A107

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
    dated September 11, 2019............................................................. A110

Notice of Motion by Plaintiff to Compel Discovery,
    dated October 23, 2019................................................................. A113

Certification of Hillel I. Parness, for Plaintiff, in Support of
    Motion, executed October 23, 2019............................................ A115

i

**Table of Contents**
**(continued)**

**Page**

Exhibit A to Parness Certification -
Third Amended Complaint, dated May 30, 2019
(Reproduced Herein at pages A31 to A60)

Exhibit B to Parness Certification -
Responses and Objections of Sheeran, Sony/ATV Music
Publishing LLC, Atlantic Recording Corporation and
The Royalty Network, Inc. to Plaintiffs' Revised First
Request for Production, dated July 1, 2019 ......................... A118

Exhibit C to Parness Certification -
Response and Objections of Defendants Bdi Music Ltd.,
Bucks Music Group Ltd. and Amy Wadge to Plaintiff's
First Requests for Production of July 31, 2019,
dated August 30, 2019........................................................... A132

Exhibit D to Parness Certification -
Statistics regarding "Thinking Out Loud" from Setlist.fm ... A146

Exhibit E to Parness Certification -
Tour Statistics for Sheeran from Setlist.fm........................... A155

Exhibit F to Parness Certification -
"Ed Sheeran's Record-Breaking Divide Tour Totals $775.6
Million, Beating U2, Guns N' Roses", by Mark Beech,
dated August 27, 2019, forbes.com....................................... A156

Exhibit G to Parness Certification -
"Ed Sheeran going on hiatus amid legal troubles,
plagiarism claims" dated August 29, 2019, foxnews.com .... A159

Exhibit H to Parness Certification -
Wikipedia Entry for Sheeran................................................. A161

## **Table of Contents**
### (continued)

**Page**

Exhibit I to Parness Certification -
"Ed Sheeran's Thinking Out Loud becomes first single
ever to spend one year inside the Top 40,"
dated June 22, 2015, officialcharts.com ............................... A181

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated November 8, 2019 ............................................... A184

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
dated November 8, 2019 ............................................... A186

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
dated November 12, 2019 .............................................. A188

Declaration of Donald S. Zakarin, for Sheeran, in Opposition to
Motion to Compel Discovery, dated November 12, 2019 ........... A190

Exhibit 1 to Zakarin Declaration -
Third Amended Complaint Ad Damnum Clause ................. A204

Declaration of Stuart Camp, for Sheeran, in Opposition to Motion
to Compel Discovery, dated November 11, 2019 ...................... A208

Exhibit 1 to Camp Declaration -
Schedule of Sheeran U.S. Concert Dates ............................. A219

Declaration of Richard H. Reimer, for Sheeran, in Opposition to
Motion to Compel Discovery, dated November 7, 2019 ............. A224

Exhibit 1 to Reimer Declaration -
Schedule of U.S. Concert Dates
(Reproduced Herein at pages A220 to A223)

Exhibit 2 to Reimer Declaration -
ASCAP Blanket License Agreement .................................... A228

Declaration of Jose Gonzalez, for Defendants, in Opposition to
Motion to Compel Discovery, dated November 7, 2019 ............. A233

iii

**Table of Contents**
**(continued)**

**Page**

Exhibit 1 to Gonzalez Declaration -
Schedule of U.S. Concert Dates
(Reproduced Herein at pages A220 to A223)

Exhibit 2 to Gonzalez Declaration -
Standard Form of BMI's Facilities Music Performance
Agreement ................................................................................ A236

Exhibit 3 to Gonzalez Declaration -
Standard Form of BMI's Music License for Venue
Agreement ................................................................................ A242

Exhibit 4 to Gonzalez Declaration -
Standard Form of BMI's Music License for
Promoter/Presenter Agreement ............................................. A248

Supplemental Certification of Hillel I. Parness, for Plaintiff, in
Further Support of Motion to Compel Discovery, executed
November 19, 2019 .................................................................. A254

Exhibit J to Parness Supplemental Certification -
Standard Form ASCAP Writer Member Agreement ............ A256

**Volume II**

Exhibit K to Parness Supplemental Certification -
Standard Form ASCAP Publisher Member Agreement........ A259

Exhibit L to Parness Supplemental Certification -
Standard Form BMI Writer Agreement ................................ A262

Exhibit M to Parness Supplemental Certification -
Standard Form BMI Publisher Agreement............................ A270

Exhibit N to Parness Supplemental Certification -
Emails between Donald S. Zakarin and Hillel I. Parness,
dated October 29, 2019 to November 7, 2019 ...................... A280

# **Table of Contents**
## **(continued)**

**Page**

Opinion & Order of the Honorable Louis L. Stanton,
  dated January 15, 2020 ................................................................. A292

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
  dated April 8, 2020 ..................................................................... A302

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
  dated April 10, 2020 ................................................................... A304

    Exhibit A to Zakarin Letter -
    Letter from Donald S. Zakarin to Hillel I. Parness,
    dated April 10, 2020 ................................................................ A307

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
  dated April 13, 2020 ................................................................... A312

    Exhibit A to Parness Letter -
    Letter from Hillel I. Parness to Pryor Cashman,
    dated April 7, 2020 .................................................................. A316

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
  dated May 7, 2020 ...................................................................... A319

    Exhibit A to Parness Letter -
    Copyright Registration Information for "Let's Get It On" ... A323

    Exhibit B to Parness Letter -
    Draft Fourth Amended Complaint ........................................ A326

    Exhibit C to Parness Letter -
    'Arguments finding plagiarism from Marvin Gaye and
    Edward Townsend's "Let's Get It On" in Ed Sheeran's
    "Thinking Out Loud"' by Walter Everett,
    dated May 6, 2020, with *Curriculum Vitae* ........................... A357

Letter from Donald S. Zakarin to the Honorable Louis L. Stanton,
  dated May 11, 2020 ..................................................................... A395

**Table of Contents**
(continued)

**Page**

Exhibit A to Zakarin Letter -
Letter from Donald S. Zakarin to the Honorable
Louis L. Stanton, dated April 10, 2020, with Exhibit A
(Reproduced Herein at pages A304 to A311)

Letter from Hillel I. Parness to the Honorable Louis L. Stanton,
    dated May 12, 2020 ..................................................................... A398

Exhibit A to Parness Letter -
Ownership Certificate of Composition ................................. A402

Exhibit B to Parness Letter -
Quotes regarding Deposit Copy Issue................................... A406

Exhibit C to Parness Letter -
Copyright Compendium Chapter 400 ................................... A408

Exhibit D to Parness Letter -
Images of Sound Recordings................................................. A417

Memorandum to Counsel by the Honorable Louis L. Stanton
    Denying Request to Amend Complaint, dated May 13, 2020 ..... A422

Notice of Motion by Defendants for Summary Judgment,
    dated April 5, 2021 ..................................................................... A424

Declaration of Donald S. Zakarin, for Defendants, in Support of
    Motion for Summary Judgment, dated April 5, 2021................... A426

Exhibit 1 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
Ph.D., dated April 22, 2020, with *Curriculum Vitae* ............ A453

**Table of Contents**
**(continued)**

**Page**

**Volume III**

Exhibit 2 to Zakarin Declaration -
Report Regarding "Let's Get It On" and "Thinking Out
Loud" by Lawrence Ferrara, Ph.D., dated May 22, 2020,
with *Curriculum Vitae*............................................................ A502

    Visual Exhibit A to Ferrara Report -
    Copyright Application for "Let's Get It On",
    dated February 14, 1973.................................................. A568

    Visual Exhibit B to Ferrara Report -
    Deposit Copy of "Let's Get It On".................................. A576

    Visual Exhibit C to Ferrara Report -
    Sheet Music of "Thinking Out Loud" ............................. A582

    Visual Exhibit D to Ferrara Report -
    Excerpts from "Money Chords: A Songwriter's
    Sourcebook of Popular Chord Progressions",
    by Richard J. Scott ........................................................ A593

    Visual Exhibit E to Ferrara Report -
    Excerpts from "Guitar for Advanced Beginners
    New York City Guitar School" ....................................... A597

    Visual Exhibit F to Ferrara Report -
    Annotated Sheet Music of "Thinking Out Loud" ........... A602

    Visual Exhibit G to Ferrara Report -
    Sheet Music of "Get Off of My Cloud" ......................... A608

    Visual Exhibit H to Ferrara Report -
    Lists of Songs with Various Chord Progressions............ A611

**Table of Contents**
(continued)

**Page**

Visual Exhibit I to Ferrara Report -
List of Sheeran Songs from 2005 to 2013
with Chord Anticipations ................................................. A615

Visual Exhibit J to Ferrara Report -
Sheet Music of "Camptown Races" ............................... A617

Exhibit 3 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
dated May 6, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A357 to A394)

Exhibit 4 to Zakarin Declaration -
Emails between Hillel I. Parness and Donald S. Zakarin,
dated May 22, 2020 ............................................................... A619

Exhibit 5 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised May 24, 2020, with *Curriculum Vitae* ...................... A623

Exhibit 6 to Zakarin Declaration -
Redline of Everett Reports .................................................... A660

Exhibit 7 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., dated June 21, 2020 ....................... A698

**Table of Contents**
**(continued)**

                                                                    **Page**


Exhibit 8 to Zakarin Declaration -
Rebuttal Report of The Report of Walter Everett
Regarding "Let's Get It On" and "Thinking Out Loud"
by Lawrence Ferrara, Ph.D., dated June 23, 2020 ................   A712

    Visual Exhibit A to Ferrara Rebuttal Report -
    Sheet Music of "Since I Lost My Baby"........................   A744

**Volume IV**

Exhibit 9 to Zakarin Declaration -
'A Report Regarding The Songs "Let's Get It On"
and "Thinking Out Loud"' by Anthony Ricigliano,
dated June 23, 2020.................................................   A752

    Appendix I to Ricigliano Report -
    Sheet Music of "Thinking Out Loud" ...........................   A796

    Appendix II to Ricigliano Report -
    Explanation of Music Graphics .....................................   A806

    Appendix III to Ricigliano Report -
    Graphical Comparison of "Let's Get It On"
    and "Thinking Out Loud" ..............................................   A808

    Appendix IV to Ricigliano Report -
    Explanation of Musical Elements and Terms .................   A811

    Appendix V to Ricigliano Report -
    *Curriculum Vitae* of Anthony Ricilgiano........................   A817

    Exhibit A to Ricigliano Report -
    Sheet Music of "I See Fire"...........................................   A821

**Table of Contents**
**(continued)**

**Page**

Exhibit 10 to Zakarin Declaration -
Rebuttal Report to The Rebuttal Report of John Covach
Regarding "Let's Get It On" and "Thinking Out Loud"
by Lawrence Ferrara, Ph.D., dated July 21, 2020 ................. A823

Exhibit 11 to Zakarin Declaration -
Third Amended Complaint, dated May 30, 2019
(Reproduced Herein at pages A31 to A60)

Exhibit 12 to Zakarin Declaration -
Copyright Application for "Let's Get It On",
dated February 14, 1973
(Reproduced Herein at pages 568 to 575)

Exhibit 13 to Zakarin Declaration -
Deposit Copy of "Let's Get It On"........................................ A839

Exhibit 14 to Zakarin Declaration -
Excerpts from the Deposition Testimony of Edward
Christopher Sheeran, taken February 1, 2018 ....................... A846

Exhibit 15 to Zakarin Declaration -
Declaration of Amy Wadge, dated June 28, 2018................. A862

Exhibit 16 to Zakarin Declaration -
Declaration of Jake Gosling, taken July 26, 2018................. A865

Exhibit 17 to Zakarin Declaration -
Excerpt from "How To Play Rock 'N' Roll Piano",
by Palmer-Hughes ................................................................. A868

Exhibit 18 to Zakarin Declaration -
Plaintiff's Revised First Request for Production of
Documents, dated April 10, 2019......................................... A871

**Table of Contents**
(continued)

**Page**

Exhibit 19 to Zakarin Declaration -
Defendants Sheeran, Sony/ATV Music Publishing LLC,
Atlantic Recording Corporation, and The Royalty
Network Inc.'s First Request for Document Production,
dated July 8, 2019.................................................................... A880

Defendants' Rule 56.1 Statement of Facts, dated April 5, 2021 ........ A903

Notice of Motion in *Limine* by Defendants to Preclude Dr. John
Covach and Dr. Walter Everett from Testifying At Trial,
dated April 5, 2021 ..................................................... A922

Declaration of Donald S. Zakarin, for Defendants, in Support of
Motion in *Limine*, dated April 5, 2021 ....................................... A924

Exhibit 1 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
Ph.D., dated April 22, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A453 to A501)

Exhibit 2 to Zakarin Declaration -
Report Regarding "Let's Get It On" and "Thinking Out
Loud" by Lawrence Ferrara, Ph.D., dated May 22, 2020,
with *Curriculum Vitae* and Visual Exhibits A through J
(Reproduced Herein at pages A502 to A618)

Exhibit 3 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
dated May 6, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A357 to A394)

**Table of Contents**
**(continued)**

**Page**

Exhibit 4 to Zakarin Declaration -
Emails between Hillel I. Parness and Donald S. Zakarin,
dated May 22, 2020
(Reproduced Herein at pages A619 to A622)

Exhibit 5 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised May 24, 2020, with *Curriculum Vitae*
(Reproduced Herein at pages A623 to A659)

Exhibit 6 to Zakarin Declaration -
Redline of Everett Reports
(Reproduced Herein at pages A660 to A697)

Exhibit 7 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., dated June 21, 2020
(Reproduced Herein at pages A698 to A711)

Exhibit 8 to Zakarin Declaration -
Rebuttal Report of The Report of Walter Everett Regarding
"Let's Get It On" and "Thinking Out Loud" by Lawrence
Ferrara, Ph.D., dated June 23, 2020, with Visual Exhibit A
(Reproduced Herein at pages A712 to A751)

Exhibit 9 to Zakarin Declaration -
'A Report Regarding The Songs "Let's Get It On"
and "Thinking Out Loud"' by Anthony Ricigliano,
dated June 23, 2020, with Appendices I through V
and Exhibit A
(Reproduced Herein at pages A752 to A822)

**Table of Contents**
**(continued)**

**Page**

    Exhibit 10 to Zakarin Declaration -
    Rebuttal Report to The Rebuttal Report of John Covach
    Regarding "Let's Get It On" and "Thinking Out Loud"
    by Lawrence Ferrara, Ph.D., dated July 21, 2020
    (Reproduced Herein at pages A823 to A838)

Certification of Hillel I. Parness, for Plaintiff, in Support of
    Cross-Motion for Summary Judgment and in Opposition to
    Motion for Summary Judgment, executed May 10, 2021 ........... A942

    Exhibit 1 to Parness Certification -
    Expert Report on Damages and Profits by Gary Cohen,
    CPA, dated May 31, 2020 (Redacted).................................. A944

**Volume V**

    Exhibit 2 to Parness Certification -
    Amended Expert Report on Damages by
    Barry M. Massarsky, dated July 7, 2020 (Redacted) ............ A992

Response and Counterstatement of Material Facts Pursuant to
    Rule 56.1, dated May 10, 2021................................................. A1035

Defendants' Reply to Plaintiff's Response and Counterstatement of
    Material Facts Pursuant to Rule 56.1, dated June 4, 2021......... A1083

Reply Declaration of Donald S. Zakarin, for Defendants,
    in Further Support of Motion for Summary Judgment,
    dated June 4, 2021 .................................................................... A1151

    Exhibit 1 to Zakarin Reply Declaration -
    Decision in *Stoliarov v. Marshmello Creative*,
    United States District Court, Central District of California,
    dated April 8, 2021 ............................................................. A1153

    Exhibit 2 to Zakarin Reply Declaration -
    Screenshot of Billboard.com ............................................. A1158

**Table of Contents**
**(continued)**

**Page**

Supplemental Certification of Hillel I. Parness, for Plaintiff,
    in Further Support of Cross-Motion for Summary Judgment,
    executed June 11, 2021 ............................................................... A1160

      Exhibit 3 to Parness Supplemental Certification -
      Memorandum of Law in *Stoliarov v. Marshmello*
      *Creative, LLC*, dated February 22, 2021 ............................ A1162

      Exhibit 4 to Parness Supplemental Certification -
      Opposition Memorandum of Law in *Stoliarov v.*
      *Marshmello Creative, LLC*, dated March 22, 2021 ............. A1194

      Exhibit 5 to Parness Supplemental Certification -
      Reply Memorandum of Law in *Stoliarov v. Marshmello*
      *Creative, LLC*, dated March 29, 2021 ................................. A1223

**Volume VI**

Opinion and Order of the Honorable Louis L. Stanton,
    dated September 9, 2021 ............................................................. A1241

Opinion and Order of the Honorable Louis L. Stanton,
    dated September 14, 2021 ........................................................... A1245

Notice of Renewed Motions by Defendants for Summary Judgment
    and in *Limine*, dated November 15, 2021 ................................. A1246

Declaration of Donald S. Zakarin, for Defendants,
    in Support of Renewed Motions, dated November 12, 2021 .... A1248

**Table of Contents**
**(continued)**

Exhibit 1A-1D to Zakarin Declaration -
(i) Notice of Motion by Defendants for Summary Judgment,
dated April 5, 2021, with Supporting Declaration, Exhibits 1
through 19, and Rule 56.1 Statement
(Reproduced Herein at pages A424 to A921)
(ii) Memorandum of Law by Defendants in Support of
Motion for Summary Judgment, dated April 5, 2021 .........   A1251
(iii) Memorandum of Law by Plaintiff in Opposition to
Motion for Summary Judgment, dated May 10, 2021 ........   A1283
(iv) Certification of Hillel I. Parness, for Plaintiff,
in Support of Cross-Motion for Summary Judgment and
in Opposition to Motion for Summary Judgment,
executed May 10, 2021, with Exhibits 1 and 2 and
Counterstatement of Material Facts
(Reproduced Herein at pages A942 to A1082)
(v) Reply Memorandum of Law by Defendants in Further
Support of Motion, dated June 4, 2021 ...............................   A1326
(vi) Defendants' Reply to Plaintiff's Response and
Counterstatement of Material Facts Pursuant to
Rule 56.1, dated June 4, 2021
(Reproduced Herein at pages A1083 to A1150)
(vii) Reply Declaration of Donald S. Zakarin, for Defendants,
in Further Support of Motion for Summary Judgment,
 dated June 4, 2021, with Exhibits 1 and 2
(Reproduced Herein at pages A1151 to A1159)
(viii) Reply Memorandum of Law by Plaintiff in Further
Support of Cross-Motion for Summary Judgment,
dated June 11, 2021 ............................................................   A1371
(ix) Supplemental Certification of Hillel I. Parness,
for Plaintiff, in Further Support of Cross-Motion for
Summary Judgment, executed June 11, 2021,
with Exhibits 3 through 5
(Reproduced Herein at pages A1160 to A1240)

**Table of Contents**
**(continued)**

**Page**

Exhibit 2A-2B to Zakarin Declaration -
(i) Notice of Motion in *Limine* by Defendants to Preclude
Dr. John Covach and Dr. Walter Everett from Testifying
At Trial, dated April 5, 2021, with Supporting Declaration
and Exhibits 1 through 10
(Reproduced Herein at pages A922 to A941)
(ii) Memorandum of Law by Defendants in Support of
Motin in *Limine*, dated April 6, 2021 .................................. A1382
(iii) Memorandum of Law by Plaintiff in Opposition to
Motion in *Limine*, dated May 10, 2021 ............................... A1414
(iv) Reply Memorandum of Law by Defendants in Further
Support of Motion in *Limine*, dated June 4, 2021 ............... A1425

**Volume VII**

Exhibit 3 to Zakarin Declaration -
'A Detailed Music-Analytical Comparison of Marvin Gaye
and Ed Townsend's "Let's Get It On" and Ed Sheeran and
Amy Wadge's "Thinking Out Loud"' by John Covach,
PhD., revised October 8, 2021, with *Curriculum Vitae* ...... A1443

Exhibit 4 to Zakarin Declaration -
Redline Comparison of Revised Covach Report to
Original Covach Report ....................................................... A1486

Exhibit 5 to Zakarin Declaration -
Rebuttal Report in Response to Dr. Lawrence Ferrara's
Entitled 'A Detailed Music-Analytical Comparison of
Marvie Gaye and Ed Townsend's "Let's Get It On" and
Ed Sheeran and Amy Wadge's "Thinking Out Loud"'
by John Covach, Ph.D., revised October 8, 2021................ A1536

Exhibit 6 to Zakarin Declaration -
Redline Comparison of Revised Covach Rebuttal to
Original Covach Rebuttal.................................................... A1549

**Table of Contents**
**(continued)**

**Page**

Exhibit 7 to Zakarin Declaration -
'Arguments finding plagiarism from Marvin Gaye and
Edward Townsend's "Let's Get It On" in Ed Sheeran's
"Thinking Out Loud"' by Walter Everett,
revised October 8, 2021, with *Curriculum Vitae* ................  A1563

Exhibit 8 to Zakarin Declaration -
Redline Comparison of Revised Everett Report to 2020
Everett Report ....................................................................  A1597

Defendants' Rule 56.1 Statement in Support of Renewed Motion,
dated November 12, 2021 ..........................................................  A1634

Notice of Renewed Cross-Motion by Plaintiff for Summary
Judgment, dated December 14, 2021 .........................................  A1657

Certification of Hillel I. Parness, for Plaintiff, in Support of
Renewed Cross-Motion for Summary Judgment and in
Opposition Renewed Motions for Summary Judgment
and in *Limine*, executed December 14, 2021 ...........................  A1659

Exhibit 1 to Parness Certification -
Expert Report on Damages and Profits by Gary Cohen,
CPA, dated May 31, 2020 (Redacted)
(Reproduced Herein at pages A944 to A991)

Exhibit 2 to Parness Certification -
Amended Expert Report on Damages by
Barry M. Massarsky, dated July 7, 2020 (Redacted)
(Reproduced Herein at pages A992 to A1034)

**Volume VIII**

Exhibit 3 to Parness Certification -
Emails between Hillel I. Parness and Andrew M.
Goldsmith, dated October 8, 2021 to October 12, 2021 .....  A1661

## Table of Contents
### (continued)

**Page**

Response and Counterstatement of Material Facts by Plaintiff
in Opposition to Defendants Renewed Motions and in Support
of Renewed Cross-Motion for Summary Judgment,
dated December 14, 2021 ........................................................... A1664

Reply Declaration of Donald S. Zakarin, for Defendants, in Further
Support of Renewed Motions, dated January 14, 2022 ............. A1712

    Exhibit 9 to Zakarin Reply Declaration -
    Dictionary Definitions of "Numerous" ............................... A1714

Reply 56.1 Statement by Defendants in Response to Plaintiff's
Counterstatement, dated January 14, 2022 ............................... A1718

Supplemental Certification of Hillel I. Parness, for Plaintiff,
in Further Support of Renewed Cross-Motion,
executed February 7, 2022......................................................... A1793

    Exhibit 4 to Parness Certification -
    Excerpts from Memoranda of Law in
    *Stoliarov v. Marshmello Creative, LLC* ............................. A1795

    Exhibit 5 to Parness Certification -
    Excerpt from Appellate Briefs in *Stoliarov v. Marshemello*
    *Creative, LLC* ................................................................... A1811

Notice of Supplemental Authority by Defendants,
dated March 14, 2022 ................................................................ A1831

    Exhibit A to Notice of Supplemental Authority -
    Opinion in *Gray v. Hudson*, filed March 10, 2022,
    United States Court of Appeals for the Ninth Circuit ......... A1834

Opinion and Order of the Honorable Louis L. Stanton,
dated September 29, 2022 .......................................................... A1861

**Table of Contents**
**(continued)**

**Page**

Notice of Motion by Defendants for Reconsideration,
dated October 13, 2022 ............................................................. A1880

Opinion and Order of the Honorable Louis L. Stanton,
dated May 16, 2023 ................................................................. A1883

Judgment of the United States District Court,
Southern District of New York, entered May 17, 2023 ............. A1899

Notice of Appeal, dated June 16, 2023 ............................................ A1900

# EXHIBIT 3 to
# December 14, 2021
# Certification of Hillel I. Parness

**Hillel Parness**

| | |
|---|---|
| **From:** | Hillel Parness |
| **Sent:** | Tuesday, October 12, 2021 8:57 AM |
| **To:** | Goldsmith, Andrew M. |
| **Cc:** | Zakarin, Donald S.; Farkas, Ilene S. |
| **Subject:** | RE: Structured Asset Sales, LLC v. Sheeran, 1:18-cv-05839-LLS |
| **Attachments:** | 2021.10.XX John Covach Expert Report COMPARE.pdf; 2021.10.XX Walter Everett Expert Report COMPARE.pdf; 2021.10.XX John Covach Expert Rebuttal Report COMPARE.pdf |

Andrew:

While I feel a bit foolish making you exhibits for your next round of motions, I have done my best to create redlines, which I have attached.

As I said in my email last week, if after reviewing the reports or the redlines you have any further issues you wish to discuss, please reach out.

Best regards,

**Hillel I. Parness**
hip@hiplaw.com
(C) 646-526-8261
(O) 212-447-5299
PARNESS LAW FIRM, PLLC
136 Madison Ave., 6th Floor
New York, NY  10016
www.hiplaw.com
*Essential Legal Guidance for Today's Changing World®*

---

**From:** Goldsmith, Andrew M. <AGoldsmith@PRYORCASHMAN.com>
**Sent:** Friday, October 8, 2021 5:01 PM
**To:** Hillel Parness <hip@hiplaw.com>
**Cc:** Zakarin, Donald S. <DZakarin@PRYORCASHMAN.com>; Farkas, Ilene S. <IFarkas@PRYORCASHMAN.com>
**Subject:** RE: Structured Asset Sales, LLC v. Sheeran, 1:18-cv-05839-LLS

Hillel,

Could you please send us redlines compared to the prior submitted copies of each report?

Thanks,

---

ANDREW M. GOLDSMITH
PRYOR CASHMAN LLP
7 Times Square, New York, NY 10036-6569
Direct Tel:  212-326-0419
Mobile: 917-834-6661
www.pryorcashman.com
*A member of Interlaw, an International Association of Independent Law Firms*

**From:** Hillel Parness <hip@hiplaw.com>
**Sent:** Friday, October 8, 2021 4:23 PM
**To:** Zakarin, Donald S. <DZakarin@PRYORCASHMAN.com>; Farkas, Ilene S. <IFarkas@PRYORCASHMAN.com>; Goldsmith, Andrew M. <AGoldsmith@PRYORCASHMAN.com>
**Subject:** Structured Asset Sales, LLC v. Sheeran, 1:18-cv-05839-LLS

Don, Ilene and Andrew:

In accordance with the Court's recent orders, attached please find revised versions of Drs. Everett's and Covach's expert reports.  If after reviewing them you have any further issues, I suggest that we meet and confer first in an effort to avoid unnecessary motion practice.

Regards,

**Hillel I. Parness**
hip@hiplaw.com
(C) 646-526-8261
(O) 212-447-5299
PARNESS LAW FIRM, PLLC
136 Madison Ave., 6th Floor
New York, NY  10016
www.hiplaw.com
*Essential Legal Guidance for Today's Changing World®*

***CONFIDENTIALITY NOTICE***
This email contains confidential information which may also be legally privileged and which is intended only for the use of the recipient(s) named above. If you are not the intended recipient, you are hereby notified that forwarding or copying of this email, or the taking of any action in reliance on its contents, may be strictly prohibited. If you have received this email in error, please notify us immediately by reply email and delete this message from your inbox.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
STRUCTURED ASSET SALES, LLC,                    :
                                                :
                                                :   Index No. 1:18-cv-5839 (LLS)
           Plaintiff,                           :
                                                :
        v.                                      :   **RESPONSE AND**
                                                :   **COUNTERSTATEMENT OF**
EDWARD CHRISTOPHER SHEERAN, p/k/a               :   **MATERIAL FACTS OF**
ED SHEERAN, SONY/ATV MUSIC                      :   **STRUCTURED ASSET SALES,**
PUBLISHING, LLC, ATLANTIC                       :   **LLC MADE PURSUANT TO**
RECORDING CORPORATION d/b/a                     :   **LOCAL CIVIL RULE 56.1(B), IN**
ATLANTIC RECORDS, BDI MUSIC LTD.,               :   **OPPOSITION TO DEFENDANTS'**
BUCKS MUSIC GROUP LTD., THE                     :   **RENEWED MOTION FOR**
ROYALTY NETWORK, INC., DAVID PLATZ              :   **SUMMARY JUDGMENT AND IN**
MUSIC (USA) INC., AMY WADGE, JAKE               :   **SUPPORT OF PLAINTIFF'S**
GOSLING and DOES 1 THROUGH 10,                  :   **RENEWED CROSS-MOTION FOR**
                                                :   **SUMMARY JUDGMENT**
           Defendants,                          :
-------------------------------------------------------- X

Plaintiff Structured Asset Sales ("SAS" or "Plaintiff"), by and through its

undersigned attorneys, pursuant to Local Civil Rule 56.1(b), submits this Response to the

Statement of Material Facts submitted by Defendants Edward Christopher Sheeran, p/k/a

Ed Sheeran, Sony/ATV Music Publishing, LLC, Atlantic Recording Corporation d/b/a

Atlantic Records, BDI Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc.,

David Platz Music (USA) Inc., Amy Wadge and Jake Gosling (collectively,

"Defendants") (ECF 201) in support of their Renewed Motion for Summary Judgment

(ECF 199) and Counterstatement of Material Facts in Opposition to Defendants' motion

and in support of SAS's Renewed Cross-Motion for Summary Judgment.

As reflected herein and in the accompanying papers, including the Certification of

Hillel I. Parness ("Parness Cert."), and the exhibits attached thereto, the facts put forth by

Defendants include material facts that are in fact disputed, and there are additional

material facts that may or may not be disputed by Defendants.  All of this warrants denial

of Defendants' Renewed Motion for Summary Judgment and grant of Plaintiff's

Renewed Cross-Motion for Summary Judgment.

### Plaintiff's Responses to Defendants' Local Civil Rule 56.1 Statement of Material Facts

**I.      Procedural Background**

1.      Plaintiff Structured Asset Sales, LLC ("SAS") commenced this action on June 28,

2018 by filing a complaint, alleging that the musical composition Thinking Out Loud ("TOL")

infringes the registered copyright in the musical composition Let's Get It On ("LGO"). (ECF 1).

**Response:** Undisputed.

2.      SAS twice amended its complaint; the operative pleading is the Third Amended

Complaint ("TAC"). (ECF 102; Declaration of Donald S. Zakarin ("dated April 5, 2021

("Original Zakarin Decl."), available at ECF 179, at Exhibit 11).

**Response:** Undisputed.

3.      Defendants filed Answers to the TAC on July 8, 2019 and August 26, 2019. (ECF

109-113, 118).

**Response:** Undisputed.

4.      With a single narrow exception (documents concerning Sheeran income for

United States concerts and merchandise sold at such concerts, which was the subject of a

pending motion), fact discovery concluded on December 26, 2019. (ECF 103, 146).

**Response**: Disputed.  On April 7, 2020, Plaintiff wrote to the Court regarding the case

schedule, asking for additional time to complete fact and expert discovery in light of, among

other things, the impact of the COVID-19 pandemic.  ECF 145 ("SAS was and is willing to

make some concessions, but does not believe it has waived any of its discovery rights").  SAS

repeated its position on April 8, 2020.  ECF 147 ("SAS respectfully requests that the Court adjust

the current schedule in this case in the manner we proposed in our letter of April 7 (ECF 145),

beginning with June 30, 2020 as the date by which to raise any remaining fact discovery issues,

with fact depositions and the expert schedule following from there, once COVID-19 restrictions

are lifted").

On April 16, 2020, the Court issued an Order, referencing ECF 145-150, writing that the

requests regarding the "deposit copy" issue "are resolved as follows: Defendants' statement on

page two of their counsel's April 10, 2020 letter, that 'Defendants are prepared to file a motion

for summary judgment based on the deposit copy' is allowed, and they may do so without any

further need for a pre-motion conference." ECF 151.  The Court declined to address Plaintiff's

request to make a "deposit copy" motion.

By Endorsement dated May 4, 2020, the Court clarified that with respect to its April 16

Order (ECF 151), other than allowing Defendants to make a motion "based on the deposit copy,"

all other matters in "were simply left open, to be dealt with if necessary in light of the clarifying

effects of a motion for summary judgment." ECF 155.

On June 25, 2020, after Defendants objected to Plaintiff's service of expert rebuttal

reports, the Court wrote: "The scheduling orders nowhere forbade rebuttal reports, and both sides

may use them. If that requires a re-scheduling of an expert's deposition, so be it." ECF 174.  On

September 3, 2020, after the parties made a joint request for additional time to take expert

depositions due to the challenges presented by the COVID-19 pandemic, the Court wrote "I

would give great weight to the joint conclusion of counsel of whether expert depositions should

be taken remotely or in-person in each expert's case, and to the dates which collectively serve

them best. When counsel suggest their proposals on these matters and the dates for expert

depositions, I expect to approve them unless some unforeseen good cause forbids it." ECF 177.

The September 3, 2020 Endorsement was the last entry on the docket before Defendants' April 5, 2021 Motion for Summary Judgment (ECF 178-81) and Motion In Limine (ECF 182-84).

5.      Further to the Court's Opinion and Order dated January 15, 2020 (ECF 144), Defendants completed their production of Sheeran concert and merchandise income on May 14, 2020. (Original Zakarin Decl. ¶ 7).

**Response:** Disputed.  Defendants purport to have completed their production of Sheeran concert and merchandise income, but SAS lacks sufficient information to know whether Defendants have or have not in fact completed their production or produced all documents required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

6.      On April 22, 2020, SAS submitted an expert musicologist report authored by John Covach, Ph.D. ("Dr. Covach") (the "Covach Report"). (Original Zakarin Decl. at Exhibit 1).

**Response:** Undisputed.

7.      On May 22, 2020, Defendants submitted an expert musicologist report authored by Lawrence Ferrara, Ph.D. ("Dr. Ferrara"), including a response to the Covach Report (the "Ferrara I Report"). (Original Zakarin Decl. at Exhibit 2).

**Response:** Undisputed.

8.      On May 6, 2020, SAS submitted an expert musicologist report authored by Walter Everett ("Dr. Everett") (the "Original 2020 Everett Report"). (Original Zakarin Decl. at Exhibit 3).

**Response:** Undisputed.

9.      The Original 2020 Everett Report lacked information required by Rule 26 for an expert report, and Defendants so advised SAS. (Id. at Exhibit 4).

**Response:** Undisputed.

**A1668**

10.     On May 24, 2020, two days after receipt of the Ferrara I Report, SAS, in addition to supplying the required information omitted from the Original 2020 Everett Report and without permission or consent from Defendants, submitted a "Revised" expert musicologist report authored by Dr. Everett (the "Revised 2020 Everett Report," together with the Original 2020 Everett the "2020 Everett Reports"). (Id. at Exhibit 5).

**Response:** Undisputed.

FOOTNOTE 3: Unless otherwise noted, references to the "2020 Everett Report" correspond to the Revised 2020 Everett Report.

**Response:** Undisputed.  Plaintiff will follow the same convention herein.

11.     The Revised 2020 Everett Report deleted, among other things, Dr. Everett's prior admission in Paragraph 6 of the Original 2020 Everett Report that the I-iii-IV-V chord progression used in LGO was one of "the most common major-key progressions opening with [a I chord]." (Id.).

**Response:** Disputed.  The following language was unchanged between the Original 2020 and Revised 2020 Everett Reports: "In order of decreasing frequency of appearance, based on a study of more than 6,000 tonal songs of the 1950s through the 1970s, the most common major-key progressions opening with I are:"  Original Zakarin Dec. Ex. 3 (ECF 179-3) at 4 ¶ 6, Ex. 5 (ECF 179-5) at 4 ¶ 6, Ex. 6 (ECF 179-6) at 4 ¶ 6.

The following edit was made to a <u>later</u> section of the Report:

Original: "Among the most common progression classes beginning with I listed above, however, the sixth most commonly heard is I - iii - IV - V. **This is the progression shared between our exhibits by Marvin Gaye - Edward Townsend and Ed Sheeran**."

Revised: "Among the progression classes beginning with I listed above, however, **the progression class shared between our exhibits by Marvin Gaye - Edward**

**Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it**."

Original Zakarin Dec. Ex. 3 (ECF 179-3) at 4-5 ¶ 7, Ex. 5 (ECF 179-5) at 4-5 ¶ 7, Ex. 6 (ECF 179-6) at 4-5 ¶ 7. Defendants' suggestion that this edit changed the substance of the Report is false and without foundation.

FOOTNOTE 4: A redline comparing the Original Everett Report against the Revised Everett Report is annexed to the Zakarin Declaration as Exhibit 6.

**Response:** Undisputed.

12.     On June 21, 2020, SAS submitted a "Rebuttal Report" from Dr. Covach, responding to the Ferrara I Report (the "Covach Rebuttal Report"). (Id. at Exhibit 7).

**Response:** Undisputed.

13.     On June 23, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Original 2020 Everett Report and the Revised Everett Report (the "Ferrara II Report"). (Id. at Exhibit 8).

**Response:** Undisputed.

14.     On June 23, 2020, Defendants submitted an expert musicologist report authored by Anthony Ricigliano ("Mr. Ricigliano") responding to the Original 2020 Everett Report and the Revised 2020 Everett Report (the "Ricigliano Report"). (Id. at Exhibit 9).

**Response:** Undisputed.

15.     On July 21, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Covach Rebuttal Report (the "Ferrara Rebuttal Report"). (Id. at Exhibit 10).

**Response:** Undisputed.

16.     On April 16, 2020, the Court granted Defendants leave to seek summary judgment without further notice. (ECF 151).

**Response:** Disputed.  ECF 149, 151.  This issue has been rendered moot by the Court's

September 9, 2021 Opinion and Order ("Original MIL Opinion") (ECF 197) concerning

Defendants' April 5, 2021 Motion *in limine* to Exclude the Reports and Testimony of Dr. John

Covach and Dr. Walter Everett (ECF 182-184) ("Original MIL"), but SAS reserves its rights

with respect to the "deposit copy" issue.

FOOTNOTE 5: While Defendants originally contemplated moving for summary

judgment after the completion of expert depositions, because Covid restrictions and medical

safety dictated that in-person depositions be deferred until in-person activity was safe and

because both SAS and Defendants agreed that deposing musicologists cannot effectively be

conducted remotely, the depositions of musicologists have not yet been conducted. Nevertheless,

given the passage of time and because Defendants maintain that the admissions contained in the

Covach Reports and Everett Report, even without the benefit of depositions, warrant summary

judgment, Defendants have determined to move in advance of deposing SAS's musicologists.

**Response:** Disputed.  ECF 149, 151.  This issue has been rendered moot by the Original

MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.  For the

avoidance of doubt, Plaintiff has not waived, and does not forego, the right to depose

Defendants' experts.

Supplemental Statement No. 1. In its Daubert Order, the Court determined that SAS had

caused "waste and confusion" by "failing to take seriously the understanding that 'copyright law

protects only that which is literally expressed, not that which might be inferred or possibly

derived from what is expressed.'" (ECF 197 at 3 (citation omitted)).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF

197.

Supplemental Statement No. 2. In its Daubert Order, the Court reiterated the Ninth

Circuit's holding in Skidmore and its own earlier ruling in *Griffin* that the "Deposit Copy is the

sole definition of the elements included in the protection of copyright," and held that the LGO

Recording "is inadmissible in any way which might confuse the jury into thinking it represents

what is protected by copyright." (Id.).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF

197.

Supplemental Statement No. 3. In its Daubert Order, the Court permitted SAS to submit

amended expert reports consistent with four specific requirements set forth in the Daubert Order.

(Id.).

**Response:** Disputed.  The Court <u>directed</u> Plaintiff to serve revised expert reports upon

Defendants that did not include certain items.  ECF 197.

Supplemental Statement No. 4. First, the Court ruled the amended reports "must delete all

references to the Gaye sound recording." (Id. at 3).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF

197.

Supplemental Statement No. 5. Second, the Court barred SAS's experts from opining on

prior art, ruling "the proof as to the existence of prior art shall be only that submitted by

defendants" since Dr. Covach "ignored the issue of prior art," and Dr. Everett "made inquiries so

superficial as to amount to no [prior art] research at all." (Id. at 4).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF

197.

**A1672**

Supplemental Statement No. 6. Third, the Court held that the amended reports must "eschew opinions unsupported by facts, or suggesting legal conclusions." (Id.).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 7. Fourth, the Court rejected the theory of "functional equivalence" proffered by SAS, describing it as a "concoction" that had "serious analytic problems." (Id. at 3).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.  Furthermore, as discussed in the accompanying Memorandum of Law, Dr. Covach's references to "functional equivalence" related to the functional equivalence of certain chord sequences, and not to the interpolation of a bass line from sheet music, which is what the Court was referring to.

Supplemental Statement No. 8. On September 14, 2021, this Court denied the Original Summary Judgment Motion "without prejudice to renewal after submission of Plaintiff's expert's final reports, addressing only claimed infringement of the Deposit Copy." (ECF 198).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 9. On October 8, 2021, SAS submitted (1) a "revised" original report of Dr. Covach ("Revised Covach Report"), (2) a "revised" rebuttal report of Dr. Covach ("Revised Covach Rebuttal") and (3) a "revised" Report of Dr. Everett ("Revised Everett Report") (collectively, the "Revised Reports"). (Renewed Zakarin Decl. at Exhibit 3, 5 and 7).

**Response:** Undisputed.

FOOTNOTE 6: Redlines comparing the Revised Reports to the original Reports are annexed to the Renewed Zakarin Declaration as Exhibits 4, 6 and 8.

**Response:** Undisputed.  The Redlines were voluntarily prepared by Plaintiff's counsel.

**II.      Let's Get It On**

17.      Edward Benjamin Townsend ("Townsend") and Marvin Gaye Jr. ("Gaye") authored LGO in 1973. (TAC ¶ 1).

**Response:** Undisputed.

18.      SAS purports to have acquired a one-third share of Townsend's two-thirds songwriter share of LGO (the songwriter share represents a 50% interest in LGO, with the other 50% share being the publisher share owned by Stone Diamond Music Corp. ("Stone Diamond"), an affiliate of Jobete Music Company ("Jobete"), both of which were affiliated with Motown Records), which would provide SAS with an 11 and one-ninth percent beneficial interest in LGO (i.e., an 11.11% interest). (TAC ¶ 16).

**Response:** Undisputed.

19.      On or about July 17, 1973, music publishers Stone Diamond and Cherritown Music Co. ("Cherritown Music"), Ed Townsend's own music publishing company, as copyright owners, filed an Application for Registration of a Claim to Copyright with the U.S. Copyright Office for the musical composition LGO (the "Copyright Application"). (Original Zakarin Decl. at Exhibit 12).

**Response:** Undisputed, except to note that there are two 1973 registrations for LGO.  The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

20.     In support of the Copyright Application, Stone Diamond and Cherritown Music deposited sheet music with the U.S. Copyright Office for LGO (the "Deposit Copy"). (Id.).

**Response:** Undisputed, except to clarify that what was submitted was sheet music written in the "lead sheet" notation style (Revised Covach Report (ECF 200-7) ¶ 10; Revised Everett Report (ECF 200-11) ¶ I.A.7), and to note that there are two 1973 registrations for LGO.  The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

21.     The Copyright Office ultimately registered LGO for copyright – as memorialized by the Deposit Copy – under Registration No. EP 314589. (Id.; Original Zakarin Decl. at Exhibit 13).

**Response:** Disputed.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.  Also, there are two 1973 registrations for LGO.  The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

22.     The musical elements notated in the Deposit Copy include only the following elements: key, meter, harmony (i.e., the chord progression), rhythm, melody, lyrics and song structure. (Id.; Ferrara I Report ¶¶ 23-24).

**Response:** Disputed.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

23.     The Deposit Copy does not notate, among other things, a bass-line, percussion elements (e.g., drums) or a tempo in which to perform the composition (i.e., the number of beats

per minute, which dictates how fast or slow the composition is to be performed). (Id.; see also Revised Covach Report ¶ 8; Revised Covach Rebuttal ¶ 6).

**Response:** Disputed. This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

### III. Thinking Out Loud

24.     On or about February 3, 2014, Sheeran and Wadge co-authored TOL in Suffolk, England. (Sheeran Tr. at 62:12-20, 128:8-129:24;4 Declaration of Amy Wadge dated June 28, 2018 ("Wadge Decl." or "Wadge Declaration") at ¶¶ 3-7).

**Response:** Undisputed that Sheeran and Wadge so testified.

25.     Sheeran testified that he did not copy LGO when authoring TOL, and that he and Wadge independently created TOL at his home, with Wadge authoring the chords. (Sheeran Tr. at 62:12-67:10, 78:12-79:18).

**Response:** Disputed. Sheeran was never asked about copying and the testimony cited contains no denial of copying or claim of independent creation. Here is the actual testimony:

> Q. At the time that Ms. Wadge and you were writing "Thinking Out Loud", was there any discussion about any similarities or possible perceptions to that and "Let's Get It On"?
>
> A. No.
>
> Q. Okay. Any time after that, before it was released?
>
> A. No.
>
> Q. Okay.
>
> A. It was always called the Van Morrison song, always.
>
> Q. Okay.

MR. FRANK: Why was it called the Van Morrison song?

Q. Yeah, why was it called the Van Morrison song?

A. It emulates the sounds, I guess; piano, guitar, drums, song about love.

Sheeran Tr. (ECF 179-14), 78:23-79:18.

26.     On February 5, 2014, Sheeran recorded what would become the commercially

released version of TOL at Sticky Studios in Surrey, England. (Id. at 128:8-129:24; Declaration

of Jake Gosling dated July 26, 2018 ("Gosling Decl." or "Gosling Declaration") at ¶ 3, annexed

to Original Zakarin Declaration at Exhibit 16).

**Response:** Undisputed that Gosling so testified.

27.     The commercially released recording of TOL includes, among other things,

electric-guitar, bass-guitar, piano, organ, lyrics, vocals and percussion/drums. (Ferrara I Report

at Audio Exhibit 1, Track 1).

**Response:** Undisputed.

28.     Sheeran and Wadge did not author the bass-guitar part or the drum part in TOL.

(Sheeran Tr. 128:8-130:23; Gosling Decl. ¶¶ 3-6).

**Response:** Disputed. Sheeran testified that Gosling "added" the drums and bass; there is

no testimony as to who composed the drums and bass. Sheeran Tr. (ECF 179-14), 128:8-130:23;

Gosling Dec. (ECF 179-16) ¶¶ 3-6.

FOOTNOTE 7: Excerpts of the Sheeran Transcript ("Sheeran Tr.") from the action

captioned Griffin v. Sheeran, et al., Case No. 17-cv-5221 (the "Griffin Action") are annexed as

Exhibit 14 to the Original Zakarin Declaration. The parties have agreed to the use in this action

of materials exchanged during discovery in the Griffin Action. (Original Zakarin Decl. ¶ 26).

**Response:** Undisputed.

FOOTNOTE 8: A copy of the Wadge Declaration, submitted in the Griffin Action, is annexed as Exhibit 15 to the Original Zakarin Declaration. While there is no evidence that contradicts the testimony of Mr. Sheeran and of Ms. Wadge, Defendants' motion is not dependent on their testimony. Rather, this motion is based on the admissions of SAS's own musicologists, which confirm that there is no viable claim of infringement in this case.

**Response:** Undisputed as to the first sentence.  Disputed that there is no evidence that contradicts the testimony of Mr. Sheeran and Ms. Wadge, and disputed that Defendants have grounds for summary judgment under any circumstances.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.  Please see Plaintiff's responses to paragraphs 25 and 28, which are incorporated in full into this response.

### IV.   Musical Comparison Of LGO And TOL

<u>Key & Meter</u>

29.     The Deposit Copy is written in the key of E-flat major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶¶ 7-8).

**Response:** Undisputed.

30.     TOL is written in the key of D major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶ 7).

**Response:** Undisputed.

31.     Due to its ubiquity in popular music, 4/4 meter is also known as "common time." (Ferrara I Report ¶ 68).

**Response:** Undisputed that 4/4 meter is known is "common time" or "quadruple time." Disputed that the naming has anything to do with "popular music."

<u>Chord Progressions</u>

32.    The LGO Deposit Copy features a I-iii-IV-V7 (or a 1-3-4-5) chord progression.

(Ferrara I Report ¶ 32; Revised Covach Report ¶ 6; Revised Everett Report at 5).6

**Response:** Undisputed.

FOOTNOTE 9: A "7" denotes the addition of a pitch that is the interval of a minor

seventh above the root or name of the chord. (Ferrara I Report ¶ 32 n.14).

**Response:** Undisputed.

33.    None of the chord progressions in TOL are the same as the I-iii-IV-V7 (or

simplified I-iii-IV-V) chord progression used in LGO. (Ferrara I Report ¶ 39; Revised Covach

Report ¶ 6).

**Response:** Disputed.  Dr. Covach explains as follows in his opening report:

> Using this system, the chord progression employed in the backing pattern of Gaye
> and Townsend's song may be written as I – iii – IV – V (see example 1a). This is
> a very common progression, used in many songs, and by itself—as an isolated
> entity—does not constitute an element that one could copyright in most cases.
> The Sheeran and Wadge work employs a slight adjustment to this chord pattern:
> the I, IV, and V chords are maintained from the Gaye and Townsend work, but
> the iii is replaced with a common substitute. As any freshman harmony textbook
> will attest, the I chord with the third scale degree in the bass may stand in (or
> substitute) for the iii chord without affecting the function of the progression. The
> Sheeran and Wadge work uses this chord, commonly labeled "I6," as a slight
> modification the Gaye and Townsend original (see example 1b), producing a <u>mild
> variant that is harmonically equivalent: I – I6 – IV – V</u>.



*Examples 1a (Gaye-Townsend) and 1b (Sheeran-Wadge): chord progressions compared*

Revised Covach Report (200-7) ¶ 6 (emphasis added) (citing and quoting from an undergraduate

music textbook for the proposition that "iii may substitute for I6 to create a tonic extension").

# A1679

Dr. Everett, similarly, explained the equivalence between the iii and I6 chords, and thus the equivalence between the two primary chord patterns:

> For our purposes, we must recognize the essential functional identities of the I6 chord and the iii chord as being indistinguishable. Both triads appear over ^3 in the bass; both also include both ^3 and ^5 in common among upper voices. The only difference in their identity is the inclusion of ^1 (= ^8) in the I6 chord, as opposed to ^7 in the iii chord. Particularly among texturally less significant inner voices, these two pitches just a half step apart (^8 and ^7) sound interchangeable, registering only differences of color between them. (^8 and ^1 are exactly the same scale degree, given that the scale replicates in octaves. We will refer to ^1 as ^8 when recognized in connection to its neighbor, ^7) Often, any difference between the two chords I6 and iii is unrecognizable, especially if ^3 is present in both outer voices, the lead vocal as well as the bass.
>
> ….
>
> Another perspective will add weight to what might be for some an anti-intuitive argument, that the minor iii chord could be equivalent to a major I6 triad. This relates to the interchangeability of the two triads, based largely on the fact that scale degrees ^3 and ^5 are common to both. [Providing example]. Thus, iii is here equivalent to the I which it replaces (because of ^5 and ^3, common between them, emphasized in the vocal, and because the tiny difference between ^8 and ^7 is buried in an inner voice), but iii is even closer to I6 than to I.

Revised Everett Report (ECF 200-11) ¶¶ I.A.4-5.  Dr. Everett goes further to explain why – in his view – the progression one hears in TOL is the same as the LGO sheet music:

> it is clear from the Gaye - Townsend written notation that the "iii" chord, Gm, can be performed interchangeably with the "I6" chord, Eb/G, as long as ^3 is played in the bass. Therefore, Sheeran's band (which performs I6 chords more often than iii chords) <u>performs identical chord progressions to those notated</u> in the Gaye - Townsend deposit copy.

Revised Everett Report (ECF 200-11) ¶ I.A.7 (emphasis added).

Dr. Ferrara, Defendants' musicology expert, takes issue with Drs. Covach's and Everett's views on the equivalence of the chord progressions in TOL and LGO, but Dr. Covach responds to those criticisms, driving home the point that we are dealing with experts with materially differing opinions that cannot be resolved on a motion for summary judgment.  Dr. Covach

builds upon the single undergraduate music textbook he cites in his opening report, arguing

based on multiple sources that there is a "consensus among experts" on the subject that Dr.

Ferrara choses to ignore:

> The textbook in use in Dr. Ferrara's own department at New York University is
> The Musician's Guide to Theory and Analysis by Jane Piper Clendinning (Florida
> State University) and Elizabeth West Marvin (Eastman School of Music).
> Clendinning and Marvin write: "The progression I – iii may in fact be considered
> a variation of I – I6."2 Similar passages may be found in widely used textbooks
> by Miguel A. Roig-Francoli (Cincinnati College-Conservatory of Music) and L.
> Poundie Burstein (CUNY) and Joseph N. Straus (CUNY).3 Yet in spite of this
> general consensus among experts writing on the functional equivalence of I6 and
> iii in this harmonic context, Dr. Ferrara writes that "not one of the chord
> progressions in TOL is the same as the I – iii – IV – V7 (or even I – iii – IV – V)
> chord progression in LGO" (¶40, p. 15-16). Dr. Ferrara is out of step with his
> colleagues owing to the narrowness of his interpretation; he seems to argue that
> because one thing is a slight variation of another, these two things are completely
> different. They are, according to consensus among experts, very similar.

Revised Covach Rebuttal (ECF 200-9) ¶ 4 (emphasis added).

> 34.    TOL features multiple, different chord progressions, including:
>
> I5-I6-IV5-Vsus2
>
> I5-I6-IV5-V5
>
> I-I6-IV-Vsus2
>
> I-I6-IV-V
>
> I-I6-IV-V11
>
> I-I6-IV-Vsus4
>
> vi-V-IV-I6-ii7-V-I

(Ferrara I Report ¶¶ 39, 47).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is

incorporated in full into this response.

FOOTNOTE 10: A "I6" chord also can be written as a "I/3" chord. (Ferrara II Report ¶ 9 n.3).

**Response:** Undisputed.

35.      A "I6" chord, a major chord, is different from a "iii" chord, a minor chord. (Ferrara II Report ¶¶ 9-15; Ferrara Rebuttal Report ¶¶ 2-5, 7).

**Response:** Undisputed that the two chords do not have identical notes, but disputed that these differences have relevance to the musicological analysis at issue here.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

36.      SAS has admitted that the I-iii-IV-V progression "is a very common progression, used in many songs, and by itself – as an isolated entity – does not constitute an element that one could copyright in most cases." (Revised Covach Report ¶ 6; emphasis added; see also Original 2020 Everett Report at 4-5).

**Response:** Undisputed that the incomplete quote above is from Dr. Covach's report, but disputed that Dr. Covach's views as to what one could or could not <u>copyright</u> has relevance to the musicological analysis at issue here.  Indeed, Defendants have criticized SAS's experts from even using language that could be construed as relating to copyright law.

37.      In addition to the admission of Dr. Covach in the Revised Covach Report, Defendants have identified at least 52 songs that utilize a I-iii-IV-V or I-I6-IV-V chord progression. (Ferrara I Report at Visual Exhibit H; Ricigliano Report at 8).

**Response:** Undisputed that Dr. Ferrara purports to identify 52 such songs, but disputed that what Dr. Ferrara said is tied to what Dr. Covach said, and disputed that Dr. Covach made an "admission."  Please see Plaintiff's response to paragraph 36, which is incorporated in full into this response.

38.     A guitar method book, titled Guitar for Advanced Beginners, states that "dozens of other I-iii-IV-V songs" predated LGO and that the authors of LGO were "simply writing a song using a common progression, just like every other professional songwriter does." (Ferrara I Report at Visual Exhibit E).

**Response:** Disputed as the document is inadmissible hearsay.  In addition, Plaintiff notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit E.

39.     A guitar method book, titled Money Chords, identifies the I-iii-IV-V progression as "a popular chord progression" and one of the "most frequent chord progressions." (Ferrara I Report at Visual Exhibit D).

**Response:** Disputed as the document is inadmissible hearsay.  In addition, Plaintiff notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit D.

40.     A piano method book, titled How To Play Rock 'N' Roll Piano, copyrighted in 1967, six years prior to the creation of LGO, identifies the I-iii-IV-V chord progression as one of ten "popular rock 'n' roll progressions." (Original Zakarin Decl. at Exhibit 17).

**Response:** Disputed as the document is inadmissible hearsay.

<u>Harmonic Rhythms</u>

41.     SAS alleges that TOL "uses the identical harmonic rhythm as found in" LGO because both songs anticipate (or syncopate) chord changes on the second and fourth chords of the four-chord progressions that SAS places in issue. (TAC ¶ 43; Revised Covach Report ¶¶ 10-11; Revised Everett Report at 13-14).

**Response:** Disputed.  Dr. Covach explains that while the two songs are notated using two different time signatures ("fast" and "slow"), their harmonic rhythms are the same:

> Gaye and Townsend's "Let's Get It On" sets the I – iii – IV – V chord-bass progression to a noteworthy rhythm. This rhythm extends over two measures (or bars) according to a "slow" 4/4 time signature (see below), dividing the duration of the first two chords unevenly, as represented by the dotted quarter and eight note tied to a half note. The third and fourth chords divide the second measure in a parallel manner to the first measure. <u>The musical notation of rhythm allows for alternate ways of notating the same rhythm</u>. A second possible notation for this rhythm is notated below as "fast" 4/4. Note that the eighth notes in the "slow" 4/4 are notated as quarter notes in the "fast" 4/4 version.

> ….

> Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in Gaye's "Let's Get It On." It does not require an understanding of standard rhythmic notation to see it in the sheet music and hear it in the music played from it that this rhythm is identical between the two songs.

Revised Covach Report (ECF 200-7) ¶¶ 10-11.

Dr. Everett refers to the same phenomenon as "syncopation," explaining that it is an uncommon feature shared by LGO and TOL:

> In songs that include the I - iii - IV - V progression class, chords typically change every four beats (a full bar), providing a "harmonic accent" on strong downbeats (the first beat of every bar). Syncopated chord changes, occurring on weak beats, are much less common, but these are heard in both Gaye - Townsend and Sheeran exhibits.

Revised Everett Report (ECF 200-11) ¶ I.D.1.

Dr. Ferrara takes issues with these conclusions as well, but Dr. Covach explains that Dr. Ferrara is disingenuously elevating form over substance, as the particular notation employed in the sheet music for the two songs has no bearing on whether the harmonic rhythms of the two compositions are similar:

> Dr. Ferrara argues that this difference in notational practice makes the resulting rhythmic pattern "not the same." And again, in a very literal (though not particularly musical) sense, this is true. <u>But these rhythms are identical in sound</u>. This variation in ways one may notate the same rhythmic figure is another type of

<u>basic principle we teach musicians routinely</u>. It is as if one would argue that this rebuttal would mean something different if I used 24 pt. font rather than 12 pt. My words would retain all of their meaning, even if the page were twice as big.

Revised Covach Rebuttal (ECF 200-9) ¶ 5.

42.     SAS deleted the admission from the Original Covach Report that "the harmonic rhythm common between these two songs occurs in other songs as well" and "can be thought of in terms of stylistic commonplaces." (Renewed Zakarin Decl. Exhibit 4 ¶ 18).

**Response:** Disputed.  SAS deleted the language in question in compliance with – not in violation of – the Original MIL Opinion.  Also disputed as it misstates what Dr. Covach wrote. Dr. Covach wrote "In the case of the present comparison between 'Let's Get It On' and 'Thinking Out Loud,' it is clear that certain aspects of the backing pattern described above can be thought of in terms of stylistic commonplaces."   Original Covach Report (ECF 179-1) ¶ 18.

43.     The rhythmic anticipation of chord changes is an unprotectable musical technique. (Ferrara I Report ¶¶ 16, 61; Ricigliano Report at 9; ECF 197 at 3; Griffin Action ECF 138 at 1-2).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

44.     The rhythmic anticipation of chord changes is commonplace in popular music. (Id.; Revised Covach Rebuttal (ECF 200-9) ¶ 5).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF

200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

45.     Dr. Covach describes anticipation as "[a] type of syncopation that is common in popular music of the 20th century," and admits that "American popular music of the last 100 years employs a high degree of rhythmic syncopation." (Revised Covach Rebuttal ¶ 5; see also Original Covach Report ¶ 18 (anticipation "occurs in other songs as well").

**Response:** Undisputed that the incomplete quotes above are from Dr. Covach's report. Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

46.     The technique of syncopation employed in LGO and TOL is different: LGO features a four-bar chord progression with two chords in bar 1, the continuation of the second chord in bar 1 into bar 2, two chords in bar 3, and the continuation of the second chord in bar 3 into bar 4; in contrast, TOL features a two-bar chord progression (not a four-bar chord progression), with two chords in bar 1 and two chords in bar 2. (Ferrara I Report ¶ 49).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

47.     Whereas the second chord in LGO is on beat 4 and anticipates beat 1 of measure 2, the second chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 1. (Id. ¶ 50).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

48.     Whereas the fourth chord in LGO is on beat 4 and anticipates beat 1 of measure 4, the fourth chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 2. (Id. ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

49.     Anticipation in LGO occurs before beat 1; anticipation in TOL occurs before beat 3. (Id. ¶ 52).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

50.     In LGO each anticipated chord has a duration of one quarter note, while each anticipated chord in TOL has the duration of an eighth note. (Id. ¶ 53).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

51.     To find equivalence between the harmonic rhythms in each work, one must disregard the objective differences recited above in Paragraphs 46 through 50 and also cut in half the value of the notes and chords in LGO. (Id. ¶ 55).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

52.     As this Court's Daubert Order has found, Dr. Covach failed to perform any prior art search and Dr. Everett's prior art analysis was so "superficial" as to amount to no prior art search, resulting in their being barred from offering any evidence as to prior art; consequently, SAS's experts failed to address the fact that Sheeran used the anticipation technique in at least twenty songs that he wrote or co-wrote prior to TOL; in ten of those twenty songs, anticipation

occurs on the second and fourth chords of the chord progression, as in TOL. (Ferrara I Report ¶ 61 & Visual Exhibit I; 2020 Everett Report at 4).

**Response:** Disputed.  The quoted and paraphrased language is incomplete and taken out of context, and the Original MIL Opinion makes no mention whatsoever of Sheeran's pre-TOL songs.  ECF 197.  Furthermore, Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

53.     Prior to co-authoring TOL, Wadge authored a composition that includes a I-I6-IV-V chord progression that anticipates chord changes on the second, third, and fourth chords. (Ferrara I Report ¶ 63; Ricigliano Report at 19).

**Response:** Disputed.  Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

<u>Melodic Elements Placed In Issue By Dr. Covach</u>

54.     At Paragraph 15 of his Revised Report, Dr. Covach notates the vocal melodies that he places in issue as follows:

| LGO | 1 | 1 | 1 | *6 | 5 | b3 | 2* | 6 | 5 | *3 | 5 | 6 | 5 | 3* | 3 | 5 | 6 | | |
|-----|---|---|---|----|---|----|----|---|---|----|---|---|---|----|---|---|---|---|---|
| TOL | 3 | 5 | *6 | 3 | 2* | 1 | 2 | 3 | 5 | 1 | *3 | 5 | 6 | 5 | 3* | 3 | 2 | 1 | 1 |

(Revised Covach Report ¶ 15).

**Response:** Undisputed.

55.      Track 2 of Audio Exhibit 1 to the Ferrara I Report includes performances of the above different melodies.

**Response:** Undisputed that Track 2 of Audio Exhibit 1 purports to include such performances.

56.      Dr. Covach's analysis of the vocal melodies omits any analysis of the rhythmic durations and metric placements of the melodies. (Ferrara I Report ¶¶ 131-32).

**Response:** Disputed that Dr. Covach "omitted" anything relevant to the musicological analysis.

57.      Differences also exist between the rhythmic durations and metric placements of the melodies in each work. (Id. ¶¶ 142-49).

**Response:** Disputed that the "differences" are relevant to the musicological analysis.

58.      The alleged similarity that exists in the pitch sequence of the second segment of the above melodic phrase that Dr. Covach places in issue lines up with greater similarity to the opening pitches of the well-known Stephen Foster song, "Camptown Races," than it does with TOL. (Id. ¶ 141).

**Response:** Disputed, as the concept of "greater similarity" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

FOOTNOTE 11: The TOL melody is set to the words "When your legs don't work like they used to before, and I can't sweep you off of your feet," and the LGO melody is set to the words "Let's get it on, sugar, let's get it on, ooh."

**Response:** Undisputed.

FOOTNOTE 12 The cited Audio Exhibit may be accessed at the following URL:

https://pryorcashman.sharefile.com/share/view/s8130f2e51a0a46cab1f8a0416d3ea0d9.

**Response:** Undisputed.

FOOTNOTE 13: For reference, "Camptown Races" includes the well-known vocal refrain "Oh, doo-dah day!"

**Response:** Undisputed.

<u>Melodic Elements Placed In Issue By Dr. Everett</u>

A. Dr. Everett's Third Summary Bullet

59.     Dr. Everett compares TOL's opening to the opening two phrases of LGO, through his analysis of what he refers to as the "Upper Voice" melodies. (Revised Everett Report at 5-10).

**Response:** Undisputed.

60.     The 2020 Everett Reports (and the Revised Everett Report) omit any transcription in musical notation of the "Upper Voice" melodies. (Ricigliano Report at 22; see also generally Revised Everett Report).

**Response:** Disputed that Dr. Everett "omitted" anything relevant to the musicological analysis.

61.     The actual pitch sequences of "Upper Voice" Melody Phrase 1 are:

| LGO | 3 | 4 | 5 | 4 | b3 | 2 | b3 | 2 | b3 | 2 | 2 | 2 | 1 | 2 |
|-----|---|---|---|---|----|---|----|---|----|---|---|---|---|---|
| TOL | 3 | 5 | 6 | 5 | 3  | 2 | 1  | 2 | 3  | 6 | 1 |   |   |   |

(Ferrara II Report ¶ 30).

**Response:** Disputed.  Revised Everett Report (ECF 200-11) at 6-10.

62.     Dr. Everett claims that "Upper Voice" Melody Phrase 1 begins with scale-degrees 3-4-5 in each work. (Revised Everett Report at 6-7).

**Response:** Undisputed.

63.     As shown above, only because Dr. Everett fails to transcribe TOL can he make this demonstrably false assertion; in fact, it is indisputable that TOL begins with scale-degrees 3-5-6. (Ferrara Report II ¶¶ 30-31, 39-40; see also Track 3 Audio Exhibit 1 to the Ferrara II Report).

**Response**: Disputed.  Revised Everett Report (ECF 200-11) ¶ B.1-3.

64.     In fact, even Dr. Covach's Revised Report refutes Dr. Everett's conclusion regarding the opening scale-degrees of "Upper Voice" Melody Phrase 1. (Revised Covach Report ¶ 15).

**Response**: Disputed that Dr. Covach "refutes" Dr. Everett.  Both experts are transcribing from audio recordings and there is no "official" transcription of TOL.  To the extent Dr. Covach and Dr. Everett disagree on this minor point, SAS adopts the position of Dr. Covach.  Revised Everett Report (ECF 200-11) ¶ B.1-3; Revised Covach Report (ECF 200-7) ¶ 15.

65.     The pitch sequences of "Upper Voice" Melody Phrase 2 are:

| LGO | b3 | b3 | 2 | b3 | 2 | 2 | 2 | 2 | 1 | 6 | b3 | 2 | 1 | 6 |
|-----|----|----|----|----|---|---|---|---|---|---|----|---|---|---|
| TOL | 3 | 5 | 6 | 5 | 3 | 3 | 2 | 1 | 1 | | | | | |

(Ferrara II Report ¶ 40).

**Response**: Disputed.  Please see Plaintiff's response to paragraph 64, which is incorporated in full into this response.

FOOTNOTE 14: For ease of reference, Dr. Ferrara refers to these melodies in the Ferrara II Report as "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, which is the

terminology Defendants use herein and in the accompanying papers. (Ferrara II Report ¶¶ 30-49).

    **Response:** Undisputed.

    66.    For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the range of the lowest to the highest pitches is different. (Ferrara II Report ¶¶ 31-34, 42-43).

    **Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

    67.    For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the specific highest and lowest pitches are different. (Id.).

    **Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

    68.    For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the melodic motions are different. (Id.).

    **Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.  Also disputed as to the implications of the term "melodic motion," which means nothing more than two notes in sequence.

    69.    For both "Upper Voice Melody" Phrase 1 and "Upper Voice" Melody Phrase 2, the metric placements on or within beats and the rhythmic durations of the pitches are different. (Id. ¶¶ 28, 37, 45).

    **Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

    70.    The 2020 Everett Report (and the Revised Everett Report) omit any analysis of the metric placements on or within beats and the rhythmic durations of the pitches for both

"Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2. (Id.; see also generally Revised Everett Report).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

71.    The objective differences between "Upper Voice" Melody Phrase 1 in each work can be heard by the naked ear on Track 1 of Audio Exhibit 1 to the Ferrara II Report.12

**Response:** Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

72.    The objective differences between "Upper Voice" Melody Phrase 2 in each work can be heard by the naked ear on Track 2 of Audio Exhibit 1 to the Ferrara II Report.13

**Response:** Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

73.    Pages 25 and 27 of the Ricigliano Report also include visual graphs of "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, which further illustrate the objective differences between each melody in each work.

**Response:** Undisputed that the Ricigliano Report includes graphs, but disputed as to the idea of what those graphs do or do not illustrate, which is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

FOOTNOTE 15: The cited Audio Exhibit may be accessed at the URL provided in Footnote 12.

**Response:** Undisputed.

FOOTNOTE 16**:** The cited Audio Exhibit may be accessed at the same URL cited in Footnote 12.

**Response:** Undisputed.

B. Dr. Everett's Fourth Summary Bullet

74.    Dr. Everett's Revised Report claims that both songs emphasize certain notes – scale degrees 5 and 3 – over the "iii" chord, and he opines that it would be more "usual" to emphasize scale degree 7 over the "iii" chord. (Revised Everett Report at 9, 17).

**Response:** Undisputed.

75.    With respect to Dr. Everett's claim about TOL not emphasizing scale degree 7 over the "iii" chord, Dr. Ferrara, Mr. Ricigliano <u>and even Dr. Covach all agree</u> that there is no "iii" chord in TOL (Ferrara I Report ¶ 39; Ricigliano Report at 8; Revised Covach Report ¶ 6), so Dr. Everett's assertion regarding the fact that TOL does not emphasize scale degree 7 over a nonexistent "iii" chord has no meaning. (Ferrara II Report ¶ 51).

**Response:** Disputed.  Defendants and their experts are misreading or misinterpreting Dr. Everett.  As he explains on page 10 (¶ B.7), "The Gaye - Townsend composition's upper-voice emphasis on ^5 and ^3 shown throughout the deposit copy is unusual when supported by the iii chord, which is more characteristic with ^7 in the upper voice."  The "iii chord" here refers to the second chord of the progression in the songs at issue. The unusual nature of this pairing is further melodic evidence that the iii and I6 are musicologically equivalent chords in LGO and TOL. Revised Everett Report (ECF 200-11) ¶ B.7.

76.    It is undisputed that TOL does not include a "iii" chord. (Ricigliano Report at 28-20; Ferrara II Report ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

77.     Even if TOL did include a "iii" chord, which it does not, there is nothing unusual about omitting scale-step 7 in songs that use a I-iii chord progression. (Ricigliano Report at 28-29; Ferrara II Report ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.  Dr. Everett's opinion is that this pairing is in fact unusual. Revised Everett Report (ECF 200-11) ¶¶ B.7.

78.     The melodies "concurrent" with the second chord of the chord sequence in each song are different. (Ferrara II Report ¶¶ 52-57).

**Response:** Disputed, as the concept of "different" melodies is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

79.     The supposed "similarity" that Dr. Everett claims regarding the absence of scale degree 7 over the non-existent "iii" chord in TOL (which has no "iii" chord) comprises matter that is not expressed rather than what is expressed. (Id.)

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

80.     Avoiding scale degree 7 is consistent with Sheeran's general style and his earlier works. (Ricigliano Report at 30-31).

**Response:** Undisputed, but disputed that this has relevance to the musicological analysis at issue here.

81.     It is common for songs that use the basic building block of a pentatonic scale, like LGO and TOL, to avoid scale-step 7. (Id.).

**Response:** Disputed that either TOL or LGO are purely major pentatonic scale compositions.  Revised Covach Report (ECF 200-7) ¶ 15.

82.     TOL and LGO express their melodic phrases in different ways. (Ricigliano Report at 35-36).

**Response:** Disputed, as the idea of how two songs "express their melodic phrases," and whether they are "different," is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

C. Dr. Everett's Fifth Summary Bullet

83.     Dr. Everett claims that both songs end melodic phrases on the same note – a "non-resolving" scale degree 1. (Revised Everett Report at 17).

**Response:** Disputed, and disputed that this has relevance to the musicological analysis at issue here.  Defendants and their experts are misreading or misinterpreting Dr. Everett.  As he explains on page 8 (¶ B.4.d.), "Perhaps most tellingly, both melodies end with an ornamented ^1 in the vocal despite the fact that all phrases end on V (which is normally most characteristic in withholding ^1), making for the same tension-filled, non-resolving non-chord tones in the phrases' climaxes."  A review of the notation clearly shows that ^1 (E-flat) is the last primary note of the melody.  Indeed, in the excerpt from the sheet music Dr. Everett annotates "final ^1 is ornamented here with upper neighbor ^2."  Revised Everett Report (ECF 200-11) ¶¶ B.4-5.

84.     However, as objectively demonstrated in the Ferrara II Report, the phrases do not, in fact, both end on scale degree 1. (Ferrara Report II ¶¶ 59-63; see also Ricigliano Report at 32-33).

**Response:** Disputed, and disputed that this has relevance to the musicological analysis at issue here.  Please see Plaintiff's response to paragraph 83, which is incorporated in full into this response.

85.    Moreover, the notes and rhythmic values of these melodies are different. (Ferrara II Report ¶¶ 26-47; Ricigliano Report at 22-28).

**Response:** Undisputed that the notes and rhythmic values are not identical.  Otherwise disputed, as the idea of whether and how they are "different" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

86.    Countless songs that are totally different end on the same note. (Ricigliano Report at 33).

**Response:** Undisputed.

87.    Ending phrases in this manner is a common melodic technique, which Sheeran has employed in his earlier works. (Id.).

**Response:** Paragraph 87 is vague as to what "in this manner" refers to, and is therefore disputed.  Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

D. Dr. Everett's Eighth Summary Bullet

88.    Dr. Everett opines that both songs begin in a "weak metrical location." (Revised Everett Report at 17).

**Response:** Undisputed

89.      However, Dr. Everett obscures that both songs begin on different beats. (Ferrara II Report II ¶¶ 79-83).

**Response:** Disputed.  Dr. Everett obscures nothing, and Dr. Ferrara does not so claim. Revised Everett Report (ECF 200-11), *passim*; Ferrara II Report ¶¶ 79-83.

90.      Moreover, it is commonplace for vocal melodies to begin in weak metrical positions. (Id.; Ricigliano Report at 34).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

91.      Countless songs begin after a rest on a weak metrical position. (Id.).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Covach Report (ECF 179-1), *passim*; Covach Rebuttal (ECF 179-7), *passim*; Everett Report (ECF 179-5), *passim*.

E. Dr. Everett's Ninth Summary Bullet

92.      Dr. Everett notes that both songs make use of "melisma." (Revised Everett Report at 15-17).

**Response:** Undisputed.

93.      Melisma (an unprotectable commonplace technique) is a vocal technique that occurs when a vocalist sings a single lyrical syllable over multiple notes (as opposed to one note per syllable). (Ricigliano Report at 34).

**Response:** Undisputed.

94.     Melisma has been used for centuries and is commonplace in popular music. (Ferrara Report II ¶¶ 85, 90).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

95.     Sheeran frequently used melisma in his prior songs. (Ricigliano Report at 34-35).

**Response:** Undisputed.  Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

96.     The two songs use the technique of melisma in significantly different ways, in different segments of the songs and in connection with different lyrics. (Ferrara II Report ¶¶ 88, 90).

**Response:** Undisputed that the two songs do not have identical segments or identical lyrics, which means – tautologically – that they cannot be said to use melisma in connection with their segments and lyrics in the exact same way.  Otherwise disputed, as the concept of "significantly different" use of melisma is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

97.     As detailed in the Memorandum of Law submitted in support of the Original
Summary Judgment Motion, melisma is so commonplace a technique that case law confirms it is
not protectable or copyrightable.  (ECF 181 at 11-12).

**Response:** Disputed, as the paragraph expresses a legal position, not a purported
undisputed fact.

Song Structures

98.     LGO and TOL both incorporate generic structural building blocks of music
through the use of verse and chorus sections; yet, beyond the general commonplace musical
building blocks of structure used by millions of songs, TOL and LGO are not structurally
similar. (Ferrara I Report ¶¶ 26-28; Ricigliano Report at 11).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.
Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

99.     TOL includes two pre-chorus sections; LGO has none. (Ferrara I Report ¶ 27).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

100.    LGO includes two bridge sections; TOL has none. (Id.).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

101.    TOL includes an interlude; LGO has none. (Id.).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

102.    Even as charted by Dr. Covach, structural differences exist between the two songs.  (Id. ¶¶ 124-26).

**Response:** Disputed.  Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

103.    Looping (i.e., repeating) a chord progression both generally, and in more than one section of a composition, is common in popular music. (Ferrara II Report ¶ 20; Ricigliano Report at 17-19, 35).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

104.    Sheeran's prior works frequently utilize looping. (Ricigliano Report at 17-19, 35).

**Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

105.    TOL does not use the same chord progression throughout its choruses. (Ferrara II Report ¶¶ 20-21, 24-25; Ricigliano Report at 17).

**Response:** Disputed.  Please see Plaintiff's responses to paragraphs 33 and 41, which incorporated in full into this response.

106.    The duration of the "looped" chord progressions is different in each work. (Ferrara II Report ¶¶ 20-21, 24-25).

**Response:** Disputed. Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

107. The final two measures of the TOL choruses use a different chord progression that "breaks away" from the basic I-I6-IV-V progression. (Id.).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

108. Dr. Everett's conclusion – that both songs "share the same formal structure at sub-phrase, phrase, section, and multi-section levels" – is demonstrably incorrect. (Id. ¶¶ 66-72).

**Response:** Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF 200-7), *passim*.

 The Alleged "Combination" Or "Backing Pattern"

109. Beyond the foregoing factually baseless attempt to fabricate alleged melodic and structural similarities that do not exist, which are commonplace musical techniques, including techniques which were previously employed by both Sheeran and Wadge in their prior songs and are a part of both Sheeran's and Wadge's musical toolkits, SAS's infringement claim is based essentially exclusively on what Dr. Covach alleges is a "backing pattern" that he claims exists in each song. (Revised Covach Report ¶¶ 3, 17-22).

**Response:** Undisputed that the commonalities between LGO and TOL is reflected in the "backing pattern," which forms a part of Dr. Covach's conclusion that the two songs are similar. Disputed as to the remainder of the characterizations in this paragraph, which are nothing more than attorney hyperbole and argument. Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*.

110.    This alleged "backing pattern," as identified by Dr. Covach, is comprised of a "coordination of harmony (chord progression) and rhythm." (Revised Covach Report ¶ 3).

**Response:** Undisputed.

111.    Dr. Covach's Original Report specifically required that the combination include all three elements (including a bass line) and opined that it was the "precise combination" of these three required elements that gave rise to his opinion of copying; without all three elements, Dr. Covach admitted that his conclusion of copying has no foundation.  (Covach Report ¶¶ 3, 17-22).

**Response:** Disputed.  In his Original Report, Dr. Covach identified three elements in the "backing pattern," but never stated that all three elements are required for a finding of similarity. Original Covach Report (ECF 179-1), *passim*; Original Covach Rebuttal (ECF 179-7), *passim*. As discussed in the accompanying Memorandum of Law, this Court has concluded – in its decision in the *Griffin* matter that is binding on Defendants – that the disputed material questions of fact concerning purported commonality of two elements requires that the Court deny Defendants' motion for summary judgment of infringement.  *Griffin* ECF 93 (Jan. 3, 2019) at 2, 10-13, 18.  Also as discussed in the accompanying Memorandum of Law, Defendants' cases in purported support of the argument that two elements cannot, as a matter of law, support a selection and arrangement argument, provide no such support.

112.    [Intentionally omitted as resolved by the Court's Daubert Order].

**Response: [**This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]

113.    [Intentionally omitted as resolved by the Court's Daubert Order].

**Response:** [This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]

Supplemental Statement No. 10. As noted, in its Daubert Order, the Court reaffirmed its prior ruling that the Deposit Copy does not notate a bass-line, and that a bass-line is not part of LGO's copyright. (ECF 197).

**Response:** Undisputed.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

Supplemental Statement No. 11. Despite the Original Covach Report requiring the combination of all three elements, the Revised Covach Report proceeds as if the Court's elimination of the third element (the bass line) that the Original Covach Report previously required, is of no consequence and that now it is the "precise combination" of only two elements, both of which this Court has already held are commonplace and unprotectible, that give rise to his opinion of copying. (Revised Covach Report ¶¶ 3, 17-22).

**Response:** Disputed.  The quoted language is incomplete and taken out of context. Please see Plaintiff's response to paragraph 111, which is incorporated in full into this response.

114.    As detailed above, Dr. Covach admits that LGO's I-iii-IV-V chord progression and its rhythmic anticipation of chord changes are both commonplace musical elements. (Supra ¶¶ 36, 42).

**Response:** Undisputed that each element, standing alone, is unprotectible.  The use of the combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

115.     Indeed, even without having performed any prior art search – itself a flaw that
warrants exclusion of Dr. Covach's Reports – Dr. Covach previously admitted that there may be
songs prior to LGO that employ both of these elements. (Original Covach Report ¶ 22).

**Response:** Disputed that Dr. Covach was required to conduct a prior art search.  Original
Everett Report (ECF 179-5), *passim*.  Disputed that "Dr. Covach previously admitted that there
may be songs prior to LGO that employ both of these elements."  What he actually wrote was
"perhaps even two of them together."  Original Covach Report (ECF 179-1) ¶ 22.

116.     In fact, multiple works exist that use a I-iii-IV-V chord progression (or a I-I6-IV-
V chord progression) together with anticipation of chord changes on the second and fourth
chords. (Ferrara I Report ¶¶ 56-65, 107; see also Revised Covach Report ¶¶ 11-13; Ferrara
Rebuttal ¶¶ 30-38).

**Response:** Disputed.  Dr. Everett explains that based on his study, the sixth most popular
chord progression beginning with I is the progression at issue here: "I - iii - IV - V (or its bass-
line equivalent, I - I6 - IV - V)."  He goes on to explain: "the progression class shared between
our exhibits by Marvin Gaye - Edward Townsend and Ed Sheeran, I - iii - IV - V, is uncommon,
with far fewer examples than any of those progressions listed above it."  Revised Everett Report
(ECF 200-11) ¶¶ A.6-7.

Dr. Everett identifies 12 songs released <u>before</u> LGO with the same "combined upper
voice and chord progression" as LGO and TOL, but then makes the point that LGO and TOL
depart in a critical way:

> Because neither the Gaye - Townsend composition nor Sheeran in his
> performance are interested in the upper-voice ^7, the melodies in the Gaye -
> Townsend deposit copy and the Sheeran recording are marked as deviant from the
> most common vocalization against iii in this specific progression, further
> supporting the connection of class members I - iii - IV - V and I - I6 - IV - V in
> these exhibits.

Revised Everett Report (ECF 200-11) ¶ B.7.

Dr. Everett also takes note of common but unusual features of TOL and LGO, identifying

only one other song that is potentially similar:

> It is very unusual to repeat the I - iii - IV - V progression as a loop without
> contrast, and beyond rare to do so throughout the entirety of both verses and
> choruses; the Commodores' "Easy" is the only such example known to me other
> than our Gaye - Townsend and Sheeran exhibits.

Revised Everett Report (ECF 200-11) ¶ C.3.

On the topic of harmonic rhythm or syncopation, Dr. Everett once again opines that

"Syncopated chord changes, occurring on weak beats, are much less common, but these are

heard in both Gaye - Townsend and Sheeran exhibits.  Revised Everett Report (ECF 200-11) ¶

D.1.

Dr. Everett summarizes his overall analysis of the two works as follows:

> In summary, comparison of the Gaye - Townsend deposit copy with the Sheeran
> recording yields a number of correspondences: both songs share the same
> repeated four-chord progression. Both feature melodies based on the same
> distinctive structural shape, including similar relations between vocal tones and
> underlying chords, and both display the same rhythmic freedom. Both songs share
> the same formal structures at all levels, from surface phrases to largest sections.
> Both are among the only three known songs to share the same syncopation of the
> repeated four-chord pattern. The sharing of all of these elements strongly
> evidence copying by Sheeran of Gaye - Townsend.

Revised Everett Report (ECF 200-11) ¶ E.4.

Dr. Ferrara argues in response that there are many songs that use the I – iii – IV – V

chord progression (about which there is no real debate), and claims that he found three pre-1973

songs that have the same combination of elements identified by Dr. Covach.  Dr. Covach meets

Dr. Ferrara with respect to all three songs, explaining why – in his expert opinion – they do not

share the combination of elements and are not "prior art" to LGO.  Regarding "Downtown" he

says that Dr. Ferrara – who did not provide musical transcription to back up his claim – is simply

incorrect:

> As indicated by the example, the chord progression moves from I to IV and then
> to V, with all three harmonies occurring over a repeated D note in the bass (a
> centuries-old technique called "pedal point"), indicated by the label "tonic pedal"
> in Example 1. As least as far as concerns the published sheet music, the backing
> pattern as I have defined it is not present.

Revised Covach Rebuttal (ECF 200-9) ¶ 10 (emphasis added).

As for "Since I Lost My Baby," Dr. Covach points out that Dr. Ferrara chose an obscure

version of the song recorded by Ray French, as opposed to the mainstream version recorded by

the Temptations that reached Number 17 on the U.S. pop music charts, which – based on the

sheet music – does not use the same combination of elements:

> Example 2 provides the opening measures to the verse section as it appears in the
> published sheet music for "Since I Lost My Baby." Note that while the harmonic
> rhythm from the backing pattern is present in "Since I Lost My Baby," the final
> chord differs: instead of the V chord that is part of the LGO and TOL patterns, a I
> chord is used here with a C in the bass (traditionally referred to as a "I64 chord").

Revised Covach Rebuttal (ECF 200-9) ¶ 11.

Dr. Covach identifies the same problem with Dr. Ferrara's use of "Georgy Girl" – Dr.

Ferrara points an obscure "easy listening" orchestral version of the song, rather than the global

hit version recorded by The Seekers.  When compared to the mainstream version, Dr. Covach

explains, the combination of elements is not there:

> Note that while the four-chord progression is the same as the one in LGO, the
> harmonic rhythm does not match the one found in LGO, since the chords all
> change directly on the beats one and three, and thus lacking the element of
> syncopation or "anticipation," as Dr. Ferrara labels it.

Revised Covach Rebuttal (ECF 200-9) ¶ 13.

117.    As noted above, TOL co-author Amy Wadge co-authored a song prior to co-

authoring TOL that includes a I-I6-IV-V chord progression that anticipates chord changes on the

second, third and fourth chords (i.e., the only difference between TOL and this prior work by Amy Wadge is that the prior work also happens to anticipate the third chord change). (Supra ¶ 53).

**Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

118.    As noted above, prior to releasing the album x (which includes TOL), Sheeran used anticipation in at least twenty songs that he wrote or co-wrote, and in ten of those twenty songs, anticipation occurs on the second and fourth chords of a chord progression (as in TOL and LGO). (Supra ¶ 52).

**Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

119.    TOL does not use the two commonplace and unprotectible elements in an identical or virtually identical manner to LGO, as even Dr. Covach has admitted through his "functional equivalence" assertion and as shown above in Paragraphs 41-51. (Revised Covach Report ¶ 7 Ferrara Rebuttal Report ¶ 26; supra ¶¶ 41-51).

**Response:** Disputed.  Please see Plaintiff's responses to paragraphs 22, 33, 41 and 116, which are incorporated in full into this response.

**V.      Indirect Touring And Merchandising Profits**

120.    SAS has no evidence showing that Sheeran's touring and merchandising profits

have any causal nexus to the alleged infringement. (Original Zakarin Decl. ¶¶ 116-120).

**Response:** As discussed in the accompanying Memorandum of Law, Defendants are

laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's

performances of TOL – if TOL infringes LGO – were separate acts of infringement, giving rise

to direct profits, for which no showing of nexus is required, or if required has already been

satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment

of their profits.

121.    SAS did not serve requests for production that bear upon whether a causal nexus

exists between Sheeran's touring and merchandising profits and TOL's alleged infringement of

LGO. (Id. at Exhibit 18).

**Response:** Undisputed, but as discussed in the accompanying Memorandum of Law,

Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr.

Sheeran's performances of TOL – if TOL infringes LGO – were separate acts of infringement,

giving rise to direct profits, for which no showing of nexus is required, or if required has already

been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper

apportionment of their profits.

122.    Defendants served requests for production on SAS seeking documents and other

tangible items that support SAS's claim of a causal nexus between Sheeran's touring and

merchandising profits and TOL's alleged infringement of LGO. (Id. at Exhibit 19, Request Nos.

33, 35, 36, 44, 61, 86).

**Response:** Undisputed, but as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were separate acts of infringement, giving rise to direct profits, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.

123.    SAS has not produced any documents or tangible items responsive to the above-mentioned requests. (Original Zakarin Decl. ¶ 119).

**Response:** Undisputed, but, as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were separate acts of infringement, giving rise to direct profits, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.  Moreover, SAS would not have access to any such documents, which – if they exist – would be in the exclusive possession of Defendants.

124.    Instead, SAS produced a total of 403 pages of documents, which fall under the following seven categories: (1) documents from and correspondence with ASCAP, BMI, SoundExchange and The Harry Fox Agency concerning public performance income, interactive streaming income and mechanical royalties; (2) hearsay articles from print publications and the Internet; (3) probate records for the Estate of Ed Townsend; (4) sheet music; (5) excerpts from a book on Marvin Gaye's "Greatest Hits"; (6) email correspondence between SAS's principal and others regarding this matter and other music infringement cases; and (7) royalty statements for LGO. (Id.).

**Response:** Undisputed but, as discussed in the accompanying Memorandum of Law,

Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr.

Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>,

giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already

been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper

apportionment of their profits.  Moreover, SAS would not have access to any such documents,

which – if they exist – would be in the exclusive possession of Defendants.


**Plaintiff's Counterstatement of Material Facts
in Opposition to Defendants' Motion for Summary Judgment and
in Support of Plaintiff's Cross-Motion for Summary Judgment**

125.    On May 31, 2020, Plaintiff served the Expert Report on Damages and Profits,

authored by Gary Cohen, CPA ("Cohen Report"), on Defendants.  Parness Cert. ¶ 3 & Ex. 1.

126.    On July 7, 2020, Defendants served the Amended Expert Report of Barry M.

Massarsky ("Massarsky Report"), on Plaintiff.  Parness Cert. ¶ 4 & Ex. 2

127.    According to Plaintiff, a proper apportionment of the profits arising from Mr.

Sheeran's 94 concert performances of TOL on or after June 28, 2015 ranged from 13.13% (based

on Chartmasters Spotify data) to 23.97% (using Recording Industry Association of America

certified sales data).  Cohen Report (Parness Cert. Ex. 1) at 9-10.

128.    Defendants admit that if TOL infringes LGO, sales of multi-track albums

containing single recordings of TOL are separate acts of infringement.  Massarsky Report

(Parness Cert. Ex. 2) at 4-5.

129.    Defendants admit that if TOL infringes LGO, profits arising from sales of record

albums containing recordings of TOL are direct profits.  Massarsky Report (Parness Cert. Ex. 2)

at 4-5.

130.    Defendants admit that if TOL infringes LGO, there is a causal nexus between the infringing TOL, and the profits arising from sales of record albums containing recordings of TOL.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

131.    Defendants argue that if TOL infringes LGO, the profits arising from sales of record albums containing recordings of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of tracks on the album.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

132.    Defendants argue that if TOL infringes LGO, the profits arising from live performances of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of songs performed.  Massarsky Report (Parness Cert. Ex. 2) at 21.

Dated: New York, New York
       December 14, 2021

PARNESS LAW FIRM, PLLC

By:_____/s/ Hillel I. Parness_____
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Plaintiff*
  *Structured Asset Sales, LLC*

**A1712**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC,<br><br>                              Plaintiff,<br><br>              v.<br><br>EDWARD CHRISTOPHER SHEERAN,<br>*p/k/a* ED SHEERAN, SONY/ATV MUSIC<br>PUBLISHING, LLC, ATLANTIC<br>RECORDING CORPORATION *d/b/a*<br>ATLANTIC RECORDS, BDI MUSIC LTD.,<br>BUCK MUSIC GROUP LTD., THE<br>ROYALTY NETWORK, INC., DAVID<br>PLATZ MUSIC (USA) INC., AMY<br>WADGE, JAKE GOSLING and DOES 1<br>THROUGH 10,<br><br>                              Defendants. | Case No. 1:18-cv-5839 (LLS)<br><br>**REPLY DECLARATION OF DONALD<br>S. ZAKARIN IN FURTHER SUPPORT<br>OF DEFENDANTS' RENEWED<br>MOTIONS FOR SUMMARY<br>JUDGMENT AND TO EXCLUDE<br>DR. JOHN COVACH AND<br>DR. WALTER EVERETT** |

I, **DONALD S. ZAKARIN**, declare under penalty of perjury as follows:

1.       I am a member of Pryor Cashman LLP, counsel for Defendants.[1]  I have personal

knowledge of, and am fully familiar with, the facts set forth in this Reply Declaration, which I

respectfully submit in further support of (a) Defendants' renewed motion for summary judgment

and (b) Defendants' motion to exclude the Revised Reports of Dr. John Covach and Dr. Walter

Everett and to exclude Dr. Covach and Dr. Everett from testifying at trial and offering evidence in

opposition to Defendants' renewed motion for summary judgment.

2.       Internet screenshots from *Lexico.com*, *Dictionary.com* and *Merriam-Webster.com*,

which document the dictionary definition of "numerous," are annexed as **Exhibit 9**.

3.       In regard to Defendants' motion *in limine* addressing the Revised Reports of SAS's

---

[1] Undefined capitalized terms have the meanings given to them in the accompanying Reply Memorandum
of Law.

experts, SAS argues that the Court did not authorize Defendants to address them.   In fact, Defendants did not need to seek permission to make an *in limine* motion because the Court has permitted the parties to file *in limine* motions without prior Court approval.   Indeed, during a status conference in *Griffin* held in July 2019 (a conference that I recall SAS's counsel attending as an "observer"), the Court indicated the parties did not need to seek permission before filing *in limine* motions.   Consistent therewith, we did not seek permission to make our original *in limine* Daubert Motion directed to the prior reports of Dr. Covach and Dr. Everett and were not required to seek Court permission to make the current *in limine* Daubert Motion.

4.      I would also note, as a matter of logic, given that SAS was given leave to submit Revised Reports compliant with both this Court's Daubert Order and Rule 702 of the Federal Rules of Evidence, it would make no sense for SAS to be free to ignore both the Daubert Order and Rule 702 – which in fact it did – and then to deprive Defendants of the ability and entitlement to show the Court that the Revised Reports remained flawed and should be excluded (or to first require Defendants to seek leave to do so).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 14, 2022

_____
DONALD S. ZAKARIN

# EXHIBIT 9

Case 23-905, Document 37, 09/29/2023, 3575656, Page77 of 262

Case 1:18-cv-05639-LLS   Document 207-1   Filed 01/14/22   Page 2 of 4



**LEXICO**
Powered by OXFORD

ENGLISH DICTIONARY   SYNONYMS   TRANSLATE   GRAMMAR ∨   EXPLORE ∨   SPANISH DICTIONARY

Oxford English and Spanish Dictionary, Synonyms, and Spanish to English Translator

SITE LANGUAGE ∨

US DICTIONARY

numerous

Home › US English › numerous

Definition of numerous in English:

# numerous

See synonyms for numerous
Translate numerous into Spanish

**ADJECTIVE**

1   Great in number; many.
    'he has attended numerous meetings and social events'

    + More example sentences   + Synonyms

1.1   Consisting of many members.
      'the orchestra and chorus were numerous'

      + More example sentences

**Pronunciation** ⓘ

**numerous**

/ˈn(y)o͞om(ə)rəs/ /ˈn(y)um(ə)rəs/ 🔊

**Origin**
Late Middle English from Latin numerosus, from numerus 'a number'.

arvo 🔊

/ ˈɑːvəʊ /
NOUN

Does English Have More Words
Than Any Other Language?

'Climactic' or 'Climatic'?
Which of the following is correct?

○ The climactic game is well
  edited

○ The climatic game is well
  edited

NEXT                    0/10

TRENDING WORDS

feedback

FEEDBACK

Numerous Definition & Meanin... ×

https://www.dictionary.com/browse/numerous

Managed favorites

DICTIONARY.COM

THESAURUS.COM

MEANINGS | GAMES | LEARN | WRITING | WORD OF THE DAY

DEFINITIONS ∨ | numerous

Top Definitions    Quiz    Related Content    Examples    British

Save This Word!

# numerous [ noo-mer-uhs, nyoo- ] SHOW IPA 🔊 ☆

See synonyms for: numerous / numerousness on Thesaurus.com

🎓 Elementary Level

*adjective*

1  very many; being or existing in great quantity:
   *numerous visits; numerous fish.*

2  consisting of or comprising a great number of units or individuals:
   *Recent audiences have been more numerous.*

QUIZ

## TAKE ROUND 2 OF OUR PSAT VOCABULARY QUIZ!

Here is our second set of teacher-selected PSAT vocabulary words. Do you know the meanings of these terms?

QUESTION 1 OF 10

advocate

to give up possession or occupancy of.

Case 23-905, Document 37, 09/29/2023, 3575656, Page79 of 262

Numerous Definition & Meaning

https://www.merriam-webster.com/dictionary/numerous

Managed favorites

Merriam-Webster — SINCE 1828

GAMES & QUIZZES | THESAURUS | WORD OF THE DAY | FEATURES | SHOP ∨

LOG IN | REGISTER | 📑 MY WORDS

numerous

**Dictionary** | Thesaurus

# numerous adjective

🔊 Save Word

nu·mer·ous | \ ˈnüm-rəs 🔊 , ˈnyüm-; ˈnü-mə-, ˈnyü-mə-\

### Definition of *numerous*

: consisting of great numbers of units or individuals

// born into a *numerous* family

*also* : MANY

// received *numerous* complaints

// The people I'd like to thank are too *numerous* to mention.

→ **Other Words from *numerous***

→ **Synonyms & Antonyms**

→ **More Example Sentences**

→ **Learn More About *numerous***

WORD OF THE DAY

tome 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email address

**SUBSCRIBE**

TEST YOUR VOCABULARY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Case No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **DEFENDANTS' RULE 56.1 REPLY TO PLAINTIFF'S RULE 56.1 "RESPONSE AND COUNTERSTATEMENT OF MATERIAL FACTS"** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10, | |
| Defendants. | |

Defendants respectfully submit this Reply ("56.1 Reply") to the "Response And Counterstatement Of Material Facts" submitted by SAS (the "56.1 Response").[1]

Rule 56.1 is intended to identify and then isolate those factual issues supposedly in dispute, so that the Court can determine whether there is a disputed issue of material fact that would warrant denial of a motion for summary judgment. When a moving party has shown that there are no disputed issues of material fact, it is not sufficient for the opposing party to state that a fact is "disputed." Rather, the opposing party must also provide factual support showing that an alleged factual dispute actually exists and is material. Nor is it proper for the opposing party to assert that there is a factual dispute when it is clear, upon examination of the supposed "dispute," that there is no dispute and the facts are actually admitted. Further, it is also not proper to respond to Statements in a Rule 56.1 Statement by referring to specific responses to earlier Statements in a

---

[1] Undefined capitalized terms have the meanings given to them in Defendants' 56.1 Statement on this motion.

Rule 56. 1 when, in fact, the responses to the earlier Statements do not at all address the subsequent Statements.  Such practice only imposes an undue burden on the Court to cross-reference the Statements and Responses in order to determine whether there are any disputed issues of material fact identified.

SAS's 56.1 Response violates all of the foregoing principles.  As such, as will be shown below, SAS's 56.1 Response actually admits that there is no disputed issue of material fact, and that Defendants are entitled to summary judgment dismissing the Third Amended Complaint.

For ease of reference, this 56.1 Reply proceeds as follows in three Parts.  In Part I (which begins on Page 3), Defendants provide a summary of SAS's 56.1 Response, grouping SAS's specific numbered Responses into separate and identifiable categories according to the nature of each numbered Response.  In Part II (which begins on Page 4), Defendants provide a Reply to each "Response" that SAS has submitted in opposition to the 56.1 Statement (except for those numbered Responses that specifically admit that the corresponding paragraph of Defendants' 56.1 Statement is "Undisputed).  Defendants have bolded each factual statement included in the 56.1 Statement, italicized each Response included in SAS's 56.1 Response and then, where applicable, included a Reply in standard font preceded by **"DEFENDANTS' REPLY:"**.  Finally, in Part III (which begins on Page 72), Defendants submit their Reply to SAS's Counterstatement of Material Facts.

As with the 56.1 Statement submitted in support of the instant motion, for ease of reference for the Court, this Reply 56.1 substantially tracks the original 56.1 Reply that Defendants submitted in further support of their Original Summary Judgment Motion (the "Original 56.1 Reply") (*See* ECF 189).  All changes to the Original 56.1 Reply (whether made by Defendants or caused by SAS making changes to its 56.1 Response) have been illustrated below in Track Changes.

## PART I:  SUMMARY OF SAS'S 56.1 RESPONSE

SAS's specific Responses to Defendants' 56.1 Statement can be grouped into the following categories.

| Category | Description | Paragraphs |
|---|---|---|
| Category 1 | SAS admits the Statement of Fact is Undisputed. | 1-3, 6-10, 12-15, 17-20, 24, 26, 27, 29-32, 43-45, 54, 55, 59, 62, 66-70, 73, 74, 80, 85, 86, 88, 90-96, 103, 104, 109, 110, 114, 117 and 118 <br><br> Supplemental Statement 10 |
| Category 2 | SAS purports to "dispute" the Statement of Fact but provides no facts or other admissible evidence contradicting Defendants' Statement of Fact or fails to identify any alleged facts in dispute or fails to address the specific fact in question. | 4-5, 25, 28, 38-40, 53, 56-58, 60, 61, 63-65, 76-79, 81-84, 87, 89, 97-102, 105-108, 111-113, 115, 120-124 <br><br> Supplemental Statements 1-9 and 11 |
| Category 3 | SAS purports to "dispute" the Statement of Fact, but when its Response is examined, it actually admits the Statement of Fact. | 11, 16, 21, 22, 23, 33-37, 41, 42, 46-52, 72, 75, 116, 119 |

<u>PART II:  REPLY TO SAS'S 56.1 RESPONSE</u>

I.    <u>Procedural Background</u>

1.      Plaintiff Structured Asset Sales, LLC ("SAS") commenced this action on June 28, 2018 by filing a complaint, alleging that the musical composition Thinking Out Loud ("TOL") infringes the registered copyright in the musical composition Let's Get It On ("LGO"). (ECF 1).

*SAS Response:* Undisputed.

2.      SAS twice amended its complaint; the operative pleading is the Third Amended Complaint ("TAC"). (ECF 102; Declaration of Donald S. Zakarin ("**dated April 5, 2021 ("Original** Zakarin Decl."**), available at ECF 179,** at Exhibit 11).

*SAS Response:* Undisputed.

3.      Defendants filed Answers to the TAC on July 8, 2019 and August 26, 2019. (ECF 109-113, 118).

*SAS Response:* Undisputed.

4.      With a single narrow exception (documents concerning Sheeran income for United States concerts and merchandise sold at such concerts, which was the subject of a pending motion), fact discovery concluded on December 26, 2019. (ECF 103, 146).

*SAS Response: Disputed. On April 7, 2020, Plaintiff wrote to the Court regarding the case schedule, asking for additional time to complete fact and expert discovery in light of, among other things, the impact of the COVID-19 pandemic. ECF 145 ("SAS was and is willing to make some concessions, but does not believe it has waived any of its discovery rights"). SAS repeated its position on April 8, 2020. ECF 147 ("SAS respectfully requests that the Court adjust the current schedule in this case in the manner we proposed in our letter of April 7 (ECF 145), beginning with*

*June 30, 2020 as the date by which to raise any remaining fact discovery issues, with fact depositions and the expert schedule following from there, once COVID-19 restrictions are lifted").*

*On April 16, 2020, the Court issued an Order, referencing ECF 145-150, writing that the requests regarding the "deposit copy" issue "are resolved as follows: Defendants' statement on page two of their counsel's April 10, 2020 letter, that 'Defendants are prepared to file a motion for summary judgment based on the deposit copy' is allowed, and they may do so without any further need for a pre-motion conference." ECF 151. The Court declined to address Plaintiff's request to make a "deposit copy" motion.*

*By Endorsement dated May 4, 2020, the Court clarified that with respect to its April 16 Order (ECF 151), other than allowing Defendants to make a motion "based on the deposit copy," all other matters in "were simply left open, to be dealt with if necessary in light of the clarifying effects of a motion for summary judgment." ECF 155.*

*On June 25, 2020, after Defendants objected to Plaintiff's service of expert rebuttal reports, the Court wrote: "The scheduling orders nowhere forbade rebuttal reports, and both sides may use them. If that requires a re-scheduling of an expert's deposition, so be it." ECF 174. On September 3, 2020, after the parties made a joint request for additional time to take expert depositions due to the challenges presented by the COVID-19 pandemic, the Court wrote "I would give great weight to the joint conclusion of counsel of whether expert depositions should be taken remotely or in-person in each expert's case, and to the dates which collectively serve them best. When counsel suggest their proposals on these matters and the dates for expert depositions, I expect to approve them unless some unforeseen good cause forbids it." ECF 177.*

*The September 3, 2020 Endorsement was the last entry on the docket before Defendants' April 5, 2021 Motion for Summary Judgment (ECF 178-81) and Motion In Limine (ECF 182-84).*

**DEFENDANTS' REPLY:**  SAS's unnecessarily longwinded response effectively admits that, consistent with the Joint Report And Scheduling Order dated May 31, 2019 (ECF 103), and with the exception of discovery relating to touring and merchandising income, fact discovery concluded in this matter on December 26, 2019.  The remainder of SAS's "Response" is irrelevant and does not constitute a factual dispute; but, for the avoidance of doubt, as SAS notes, the Court permitted Defendants "to file a motion for summary judgment based on the deposit copy" (ECF 151), and that is exactly what Defendants have done.

5.     **Further to the Court's Opinion and Order dated January 15, 2020 (ECF 144), Defendants completed their production of Sheeran concert and merchandise income on May 14, 2020. (Original Zakarin Decl. ¶ 7).**

*SAS Response: Disputed. Defendants purport to have completed their production of Sheeran concert and merchandise income, but SAS lacks sufficient information to know whether Defendants have or have not in fact completed their production or produced all documents required by the Federal Rules of Civil Procedure and the Local Rules of this Court.*

**DEFENDANTS' REPLY:**  This is not a disputed issue of fact.  At most, SAS is suggesting that it does not know if Defendants "completed" their production of Sheeran concert and merchandise income on May 14, 2020, over a year ago, but offers nothing to dispute the statement of fact.

6.     **On April 22, 2020, SAS submitted an expert musicologist report authored by John Covach, Ph.D. ("Dr. Covach") (the "Covach Report"). (Original Zakarin Decl. at Exhibit 1).**

*SAS Response: Undisputed.*

7.     **On May 22, 2020, Defendants submitted an expert musicologist report**

authored by Lawrence Ferrara, Ph.D. ("Dr. Ferrara"), including a ~~SAS~~ response to the Covach Report (the "Ferrara I Report"). (**Original** Zakarin Decl. at Exhibit 2).

*SAS Response: Undisputed.*

8.      On May 6, 2020, SAS submitted an expert musicologist report authored by Walter Everett ("Dr. Everett") (the "Original **2020** Everett Report"). (**Original** Zakarin Decl. at Exhibit 3).

*SAS Response: Undisputed.*

9.      The Original **2020** Everett Report lacked information required by Rule 26 for an expert report, and Defendants so advised SAS. (*Id.* at Exhibit 4).

*SAS Response: Undisputed.*

10.      On May 24, 2020, two days after receipt of the Ferrara I Report, SAS, in addition to supplying the required information omitted from the Original **2020** Everett Report and without permission or consent from Defendants, submitted a "Revised" expert musicologist report authored by Dr. Everett (the "Revised **2020** Everett Report," together with the Original **2020** Everett the "**2020** Everett Reports"). (*Id.* at Exhibit 5).

*SAS Response: Undisputed.*

FOOTNOTE ~~13~~: Unless otherwise noted, references to the "**2020** Everett Report" correspond to the Revised **2020** Everett Report.

*SAS Response: Undisputed. Plaintiff will follow the same convention herein.*

11.      The Revised **2020** Everett Report deleted, among other things, Dr. Everett's prior admission in Paragraph 6 of the Original **2020** Everett Report that the I-iii-IV-V chord progression used in LGO was one of "the most common major-key progressions opening with [a I chord]." (*Id.*).

***SAS Response:*** *Disputed. The following language was unchanged between the Original* 2020 *and Revised* 2020 *Everett Reports: "In order of decreasing frequency of appearance, based on a study of more than 6,000 tonal songs of the 1950s through the 1970s, the most common major-key progressions opening with I are:"* Original *Zakarin Dec. Ex. 3 (ECF 179-3) at 4 ¶ 6, Ex. 5 (ECF 179-5) at 4 ¶ 6, Ex. 6 (ECF 179-6) at 4 ¶ 6.*

*The following edit was made to a* later *section of the Report:*

*Original: "Among the most common progression classes beginning with I listed above, however, the sixth most commonly heard is I - iii - IV - V.* **This is the progression shared between our exhibits by Marvin Gaye – Edward Townsend and Ed Sheeran***."*

*Revised: "Among the progression classes beginning with I listed above, however,* **the progression class shared between our exhibits by Marvin Gaye – Edward Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it***."*

Original *Zakarin Dec. Ex. 3 (ECF 179-3) at 4-5 ¶ 7, Ex. 5 (ECF 179-5) at 4-5 ¶ 7, Ex. 6 (ECF 179-6) at* 4 5 4-5 *¶ 7. Defendants' suggestion that this edit changed the substance of the Report is false and without foundation.*

**DEFENDANTS' REPLY:**  There is no dispute here.  Rather, SAS seizes on an inadvertent error in numbering - Defendants mistakenly cited Paragraph 6 of the Original Everett Report when they intended to cite Paragraph 7.  SAS thus admits that Paragraph 7 in the Original Everett Report admits that the I-iii-IV-V chord progression is "[a]mong the most common progression classes beginning with" a I chord, and that the I-iii-IV-V chord progression is "the sixth most commonly heard" chord progression in this "class."  It is undisputed that these admissions were deleted from the Revised Everett Report.  (Original Zakarin Decl. at Exhibit 6 ¶ 7).

**FOOTNOTE** 2 **4: A redline comparing the Original Everett Report against the Revised Everett Report is annexed to the Zakarin Declaration as Exhibit 6.**

***SAS Response:*** *Undisputed.*

12.    On June 21, 2020, SAS submitted a "Rebuttal Report" from Dr. Covach, responding to the Ferrara I Report (the "Covach Rebuttal Report"). (*Id.* at Exhibit 7).

*SAS Response: Undisputed.*

13.    On June 23, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Original <u>2020</u> Everett Report and the Revised Everett Report (the "Ferrara II Report"). (*Id.* at Exhibit 8).

*SAS Response: Undisputed.*

14.    On June 23, 2020, Defendants submitted an expert musicologist report authored by Anthony Ricigliano ("Mr. Ricigliano") responding to the Original <u>2020</u> Everett Report and the Revised <u>2020</u> Everett Report (the "Ricigliano Report"). (*Id.* at Exhibit 9).

*SAS Response: Undisputed.*

15.    On July 21, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Covach Rebuttal Report (the "Ferrara Rebuttal Report"). (*Id.* at Exhibit 10).

*SAS Response: Undisputed.*

16.    On April 16, 2020, the Court granted Defendants leave to seek summary judgment without further notice. (ECF 151).

*SAS Response: Disputed. ECF 149, 151. This issue has been rendered moot by the Court's September 9, 2021 Opinion and Order ("Original MIL Opinion") (ECF 197) concerning Defendants' April 5, 2021 Motion in limine to Exclude the Reports and Testimony of Dr. John Covach and Dr. Walter Everett (ECF 182-184) ("Original MIL"), but SAS reserves its rights with respect to the "deposit copy" issue.*

*SAS Response: Disputed. What the Court actually wrote was the following:*

*The points raised in letters from counsels to the Court, dated April 7, 2020 (plaintiff), April 8, 2020 (one defendant's, two plaintiffs), April 10, 2020 (defendant) and April 13, 2020 (plaintiff), which converge on the importance of the "deposit copy" issue in this case, are resolved as follows: Defendants' statement on page two of their counsel's April 10, 2020 letter, that "Defendants are prepared to file a motion for summary judgment based on the deposit copy" is allowed, and they may do so without any further need for a pre-motion conference.*

*ECF 151. In the referenced portion of Defendants' April 10, 2020 letter (ECF 149), their counsel wrote:*

*Fourth, SAS seeks to file a motion for partial summary judgment, seeking, in essence, to reargue Your Honor's in limine ruling from the Griffin case. Defendants are prepared to file a motion for summary judgment based on the deposit copy. SAS has not provided any expert report showing any actionable similarity between LGO and TOL because there is none. As noted in my letter to Your Honor of April 8, 2020, SAS has already had its bite at the deposit copy apple by filing an amicus brief to the en banc panel in Skidmore.*

*Thus, when the Court wrote on April 16, 2020 that Defendants were "allowed...to do so without any further need for a pre-motion conference," Plaintiff understood the Court to be referring to, and expecting, a motion for summary judgment from Defendants (and not from Plaintiff) on the issue of whether the scope of copyright is limited to the deposit copy, not a motion for summary judgment of noninfringement based on the non binding "deposit copy" decision in Griffin (as discussed in the accompanying Memorandum of Law), as Defendants had already made and lost a motion for summary judgment of noninfringement in Griffin, which decision is binding on Defendants (as discussed in the accompanying Memorandum of Law). ECF 149, 151.*

**DEFENDANTS' REPLY:** ~~The Court's Order (ECF 151) speaks for itself.  The Court permitted Defendants "to file a motion for summary judgment based on the deposit copy" (ECF 151), and that is exactly what Defendants have done.~~ This fact remains undisputed.

**FOOTNOTE ~~3~~5: While Defendants originally contemplated moving for summary judgment after the completion of expert depositions, because Covid restrictions and medical safety dictated that in-person depositions be deferred until in-person activity was safe and**

because both SAS and Defendants agreed that deposing musicologists cannot effectively be conducted remotely, the depositions of musicologists have not yet been conducted. Nevertheless, given the passage of time and because Defendants maintain that the admissions contained in the Covach Reports and Everett Report, even without the benefit of depositions, warrant summary judgment, Defendants have determined to move in advance of deposing SAS's musicologists.

*SAS Response: Disputed. ~~Defendants' motion is premature and contrary to the Court's rulings. ECF 149, 151. It is also improper for Defendants to presume to be able to make a motion for summary judgment and still expect to take Plaintiff's experts depositions~~ECF 149, 151. This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue. For the avoidance of doubt, Plaintiff has not waived, and does not forego, the right to depose Defendants' experts.*

**DEFENDANTS' REPLY:**  This ~~is neither a disputed issue of material fact nor is it accurate.  The motion is proper in timing and in accordance with the Court's permission.  (*See Supra ¶ 16)*~~fact remains undisputed.  Should the Court deny summary judgment and should Defendants determine that taking SAS's musicology experts is warranted, they can and will do so.

**Supplemental Statement No. 1. In its Daubert Order, the Court determined that SAS had caused "waste and confusion" by "failing to take seriously the understanding that 'copyright law protects only that which is literally expressed, not that which might be inferred or possibly derived from what is expressed.'" (ECF 197 at 3 (citation omitted)).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY: The Daubert Order speaks for itself, the Statement is neither**

incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 2. In its Daubert Order, the Court reiterated the Ninth Circuit's holding in Skidmore and its own earlier ruling in *Griffin* that the "Deposit Copy is the sole definition of the elements included in the protection of copyright," and held that the LGO Recording "is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright." (*Id.*).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 3. In its Daubert Order, the Court permitted SAS to submit amended expert reports consistent with four specific requirements set forth in the Daubert Order. (*Id.*).**

*SAS Response: Disputed. The Court directed Plaintiff to serve revised expert reports upon Defendants that did not include certain items. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, and this Statement remains undisputed, notwithstanding SAS's semantics.

**Supplemental Statement No. 4. First, the Court ruled the amended reports "must delete all references to the Gaye sound recording." (*Id.* at 3).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 5. Second, the Court barred SAS's experts from opining on prior art, ruling "the proof as to the existence of prior art shall be only that submitted by defendants" since Dr. Covach "ignored the issue of prior art," and Dr. Everett "made inquiries so superficial as to amount to no [prior art] research at all." (*Id.* at 4).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 6. Third, the Court held that the amended reports must "eschew opinions unsupported by facts, or suggesting legal conclusions." (*Id.*).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 7. Fourth, the Court rejected the theory of "functional equivalence" proffered by SAS, describing it as a "concoction" that had "serious analytic problems." (*Id.* at 3).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197. Furthermore, as discussed in the accompanying Memorandum of Law, Dr. Covach's references to "functional equivalence" related to the functional equivalence of certain chord sequences, and not to the interpolation of a bass line from sheet music, which is what the Court was referring to.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither

incomplete nor taken out of context, and this Statement remains undisputed. Furthermore, as discussed in the accompanying Reply Memorandum of Law, SAS's assertion regarding the Court's reference to "functional equivalence" is baseless.

**Supplemental Statement No. 8. On September 14, 2021, this Court denied the Original Summary Judgment Motion "without prejudice to renewal after submission of Plaintiff's expert's final reports, addressing only claimed infringement of the Deposit Copy." (ECF 198).**

*SAS Response: Disputed. The quoted language is incomplete and taken out of context. ECF 197.*

**DEFENDANTS' REPLY:** The Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed.

**Supplemental Statement No. 9. On October 8, 2021, SAS submitted (1) a "revised" original report of Dr. Covach ("Revised Covach Report"), (2) a "revised" rebuttal report of Dr. Covach ("Revised Covach Rebuttal") and (3) a "revised" Report of Dr. Everett ("Revised Everett Report") (collectively, the "Revised Reports"). (Renewed Zakarin Decl. at Exhibit 3, 5 and 7).**

*SAS Response: Undisputed.*

**FOOTNOTE 6: Redlines comparing the Revised Reports to the original Reports are annexed to the Renewed Zakarin Declaration as Exhibits 4, 6 and 8.**

*SAS Response: Undisputed. The Redlines were voluntarily prepared by Plaintiff's counsel.*

**II.    Let's Get It On**

17.    Edward Benjamin Townsend ("Townsend") and Marvin Gaye Jr. ("Gaye") authored LGO in 1973. (TAC ¶ 1).

*SAS Response: Undisputed.*

**18.      SAS purports to have acquired a one-third share of Townsend's two-thirds songwriter share of LGO (the songwriter share represents a 50% interest in LGO, with the other 50% share being the publisher share owned by Stone Diamond Music Corp. ("Stone Diamond"), an affiliate of Jobete Music Company ("Jobete"), both of which were affiliated with Motown Records), which would provide SAS with an 11 and one-ninth percent beneficial interest in LGO (i.e., an 11.11% interest). (TAC ¶ 16).**

*SAS Response: Undisputed.*

**19.      On or about July 17, 1973, music publishers Stone Diamond and Cherritown Music Co. ("Cherritown Music"), Ed Townsend's own music publishing company, as copyright owners, filed an Application for Registration of a Claim to Copyright with the U.S. Copyright Office for the musical composition LGO (the "Copyright Application"). (Original Zakarin Decl. at Exhibit 12).**

*SAS Response: Undisputed, except to note that there are two 1973 registrations for LGO. The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.*

**20.      In support of the Copyright Application, Stone Diamond and Cherritown Music deposited sheet music with the U.S. Copyright Office for LGO (the "Deposit Copy"). (Id.).**

*SAS Response: Undisputed, except to clarify that what was submitted was sheet music written in the "lead sheet" notation style (Revised Covach Report ¶¶ 3, 21; Covach Rebuttal Report ¶ 6(ECF 200-7) ¶ 10; Revised Everett Report (ECF 200-11) ¶ I.A.7), and to note that there are two 1973 registrations for LGO. The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE*

*0000848835 and RE 0000840063.*

**21.     The Copyright Office ultimately registered LGO for copyright – as memorialized by the Deposit Copy – under Registration No. EP 314589. (*Id.*; Original Zakarin Decl. at Exhibit 13).**

*SAS Response: Disputed. ~~SAS agrees that the registration issued, but does not agree that the scope of the registration is "memorialized by the Deposit Copy." Defendants' statement is premised on the non binding in limine decision in the Griffin matter~~, ~~as discussed in the accompanying Memorandum of Law~~This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue. Also, there are two 1973 registrations for LGO. The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.*

**DEFENDANTS' REPLY:**   SAS's "Response" is nonresponsive and does not cite admissible evidence to support any supposed "dispute."  It is undisputed that the Copyright Office registered LGO for copyright under Registration No. EP 314589, and that the material deposited with the Copyright Office corresponded to the LGO sheet music, *i.e.*, the Deposit Copy.  The Deposit Copy issue has been determined consistently by this Court, the Ninth Circuit and the Copyright Office.  In any event, this is a legally baseless argument, not a disputed issue of material fact.

**22.     The musical elements notated in the Deposit Copy include only the following elements: key, meter, harmony (i.e., the chord progression), rhythm, melody, lyrics and song structure. (*Id.*; Ferrara I Report ¶¶ 23-24).**

*SAS Response: Disputed. This issue has been rendered moot by the Original MIL Opinion,*

*but SAS reserves its rights with respect to the "deposit copy" issue.*

~~**SAS Response:** Disputed. Dr. Covach acknowledges that the 1973 deposit copy "does not notate a separate bass part," but he then goes on to explain that a specific bass line is nevertheless found within the deposit copy, because the deposit copy is written in "lead sheet" notation format:~~

~~This sheet music deposit copy is in "lead sheet" format — a form of notation that is extremely common in the notation of popular music. A lead sheet typically provides the melody notated on the treble clef, with lyrics below and chord symbols above. Example 2c shows the first four measures of the "deposit copy" sheet music for "Let's Get It On." But even though a bass part is not specified here, any performer must play a bass line of some kind in order to realize the content of the lead sheet. After all, there must be a lowest-sounding note in any musical realization. The most direct and basic practice is for the bass line to be formed from the roots of each the chords specified above the melody in the lead sheet.~~

~~(Del)~~~~ample 2c (Gaye-Townsend): lead sheet showing melody, lyrics, and chord symbols~~



~~Since the chords specified are Eb — G minor — Ab — Bb7, the most obvious bass line is simply a succession of the notes Eb — G — Ab — Bb, and this is precisely what musicians would understand the lead sheet to be specifying. Thus, a specific bass line is indicated by the chord symbols on the lead sheet, even though it is not notated separately.~~

~~Covach Report (ECF 179-1) ¶ 8.~~

~~Dr. Ferrara objects to this approach by arguing that many different bass lines *could* be played if a musician chose to do so. Dr. Covach acknowledges this obvious point, but explains again how the "lead sheet" notation actually dictates what bass line notes should be played:~~

~~If presented with the chord progression I — iii — IV — V and asked to provide the simplest and most obvious bass part, musicians would overwhelmingly posit the one I provide in my report. An actual bass player might not be satisfied with playing the most simple and obvious bass line, so Dr. Ferrara is quite right to point out that many possibilities exist. But as a basic fundamental of music theory, the bass part I posit for LGO is noncontroversial. He argues that other variants are possible, but the one I provide is the most simple and direct one that a musician or musicologist would play from that lead sheet.~~

*Covach Rebuttal (ECF 179-7) ¶ 6 (emphasis added).*

*Dr. Covach goes on to respond to Dr. Ferrara's criticism of his argument that the bass line in TOL and LGO is distinctive, and the choice in TOL to replicate the bass line from LGO is noteworthy for the analysis of similarity:*

> *Dr. Ferrara seems to miss the point of the bass part as I present it. It is not so much that the 1 – 3 – 4 – 5 bass part is an exceptional feature of LGO; the point is rather that it is an exceptional feature in TOL. Without considering the bass part at all and thinking only about the harmonic pattern in TOL, the four chord progression is I – I – IV – V. If one posited the simplest and most obvious bass part for TOL based only on this progression, it would be 1 – 1 – 4 – 5; there is no reason whatsoever to think that the second note in the bass part would change from repeating 1 before moving to 4. But TOL uses the 1 – 3 – 4 – 5 bass part to create the chord progression I – i6 – IV – V. Of the vast possibility of variants Sheeran and Wadge could have used (following precisely the argument Dr. Ferrara employs in his discussion of bass lines), they chose the very one, 1 – 3 – 4 – 5, that duplicates the bass part found in LGO.*

*Covach Rebuttal (ECF 179-7) ¶ 7 (first and third emphases added).*

**DEFENDANTS' REPLY:** First, SAS does not deny ~~that the Deposit Copy does not notate tempo.  That is therefore~~ This fact remains undisputed.

As for the bass line, SAS has expressly admitted in its "Response" above (and in the Covach Report) that "a specific bass line … is not notated separately" in the Deposit Copy, and that "a bass part is not specified" in the Deposit Copy.  Claiming that a bass line can be "found within the deposit copy" is simply a euphemism for saying it is "inferred."

Dr. Covach admits that there is no bass line notated.  While he infers one that could be derived from the lowest note in each chord, it is still not notated and it is but one of many possible bass lines that could be played with the chord progression (and, in fact, it is not the bass line played even on the LGO Recording).  This is the very argument advanced — and rejected — in *Griffin*. Simply because there are various bass parts that can be played with the chords in the chord progression, one of which uses the lowest notes in each chord, that does not mean that it is the only bass part that could be played or that it is a bass line that is notated in the Deposit Copy.

~~The Deposit Copy sets only the most generalized parameters—ideas, not expression—for what a bass line may encompass: it must include notes in the same key and be related to the chord progression, and it must be played in 4/4 meter. (Ferrara I Report ¶¶ 90, 109; Ferrara Rebuttal Report ¶¶ 18-20). That is precisely what this Court ruled in *Griffin. See* 351 F. Supp. 3d 492, 500 (S.D.N.Y. 2019) (observing the LGO chords "merely set parameters for what a potential bass line could encompass").~~

~~Copyright law does not protect that which could be derived, extrapolated from, "found" or suggested by what has been deposited with and registered by the Copyright Office. It protects that which has been expressed in intelligible notation (under the 1909 Act), and that which has been fixed in tangible expression (under the Current Act). As SAS admits, the bass line inferred by Dr. Covach is not expressed in the Deposit Copy; therefore, it is not within the scope of LGO's copyright.~~

**23.    The Deposit Copy does not notate, among other things, a bass-line, percussion elements (e.g., drums) or a tempo in which to perform the composition (i.e., the number of beats per minute, which dictates how fast or slow the composition is to be performed). (*Id.*; *see also* Revised Covach Report ¶ 8; Revised Covach Rebuttal ~~Report~~ ¶ 6).**

*SAS Response: Disputed.* ~~*Please see Plaintiff's SAS Response to paragraph 22, which is incorporated in full into this SAS Response*~~*This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.*

**DEFENDANTS' REPLY:**   ~~Please see Defendants' Reply to SAS's Response to Paragraph 22, *supra*. Defendants also reiterate that SAS has not even attempted to dispute that LGO does notate a tempo.~~This fact remains undisputed.

III.     <u>Thinking Out Loud</u>

24.     On or about February 3, 2014, Sheeran and Wadge co-authored TOL in Suffolk, England. (Sheeran Tr. at 62:12-20, 128:8-129:24;4 Declaration of Amy Wadge dated June 28, 2018 ("Wadge Decl." or "Wadge Declaration") at ¶¶ 3-7).

*SAS Response: Undisputed that Sheeran and Wadge so testified.*

25.     Sheeran testified that he did not copy LGO when authoring TOL, and that he and Wadge independently created TOL at his home, with Wadge authoring the chords. (Sheeran Tr. at 62:12-67:10, 78:12-79:18).

*SAS Response: Disputed. Sheeran was never asked about copying and the testimony cited contains no denial of copying or claim of independent creation. Here is the actual testimony:*

*Q. At the time that Ms. Wadge and you were writing "Thinking Out Loud", was there any discussion about any similarities or possible perceptions to that and "Let's Get It On"?*

*A. No.*

*Q. Okay. Any time after that, before it was released?*

*A. No.*

*Q. Okay.*

*A. It was always called the Van Morrison song, always.*

*Q. Okay.*

*MR. FRANK: Why was it called the Van Morrison song?*

*Q. Yeah, why was it called the Van Morrison song?*

*A. It emulates the sounds, I guess; piano, guitar, drums, song about love.*

*Sheeran Tr. (ECF 179-14), 78:23-79:18.*

**DEFENDANTS' REPLY:**  The cited testimony speaks for itself.  Sheeran and Wadge did not copy from LGO in authoring TOL.

26.    **On February 5, 2014, Sheeran recorded what would become the commercially released version of TOL at Sticky Studios in Surrey, England. (*Id.* at 128:8-129:24; Declaration of Jake Gosling dated July 26, 2018 ("Gosling Decl." or "Gosling Declaration") at ¶ 3, annexed to Original Zakarin Declaration at Exhibit 16).**

*SAS Response: Undisputed that Gosling so testified.*

27.    **The commercially released recording of TOL includes, among other things, electric-guitar, bass-guitar, piano, organ, lyrics, vocals and percussion/drums. (Ferrara I Report at Audio Exhibit 1, Track 1).**

*SAS Response: Undisputed.*

28.    **Sheeran and Wadge did not author the bass-guitar part or the drum part in TOL. (Sheeran Tr. 128:8-130:23; Gosling Decl. ¶¶ 3-6).**

*SAS Response: Disputed. Sheeran testified that Gosling "added" the drums and bass; there is no testimony as to who composed the drums and bass. Sheeran Tr. (ECF 179-14), 128:8-130:23; Gosling Dec. (ECF 179-16) ¶¶ 3-6.*

**DEFENDANTS' REPLY:**  SAS's "dispute" presents neither a disputed issue of material fact nor even a dispute.  It is a semantic irrelevancy.

**FOOTNOTE 47: Excerpts of the Sheeran Transcript ("Sheeran Tr.") from the action captioned Griffin v. Sheeran, et al., Case No. 17-cv-5221 (the "Griffin Action") are annexed as Exhibit 14 to the Original Zakarin Declaration. The parties have agreed to the use in this action of materials exchanged during discovery in the Griffin Action. (Original Zakarin Decl. ¶ 26).**

*SAS Response: Undisputed.*

**FOOTNOTE 58: A copy of the Wadge Declaration, submitted in the Griffin Action, is annexed as Exhibit 15 to the Original Zakarin Declaration. While there is no evidence that contradicts the testimony of Mr. Sheeran and of Ms. Wadge, Defendants' motion is not dependent on their testimony. Rather, this motion is based on the admissions of SAS's own musicologists, which confirm that there is no viable claim of infringement in this case.**

*SAS Response: Undisputed as to the first sentence. Disputed that there is no evidence that contradicts the testimony of Mr. Sheeran and Ms. Wadge, and disputed that Defendants have grounds for summary judgment under any circumstances. Revised Covach Report (ECF 179-1200-7), passim; Revised Covach Rebuttal (ECF 179-7200-9), passim; Revised Everett Report (ECF 179-5200-11), passim. Please see Plaintiff's SAS responses to paragraphs 25 and 28, which are incorporated in full into this SAS response.*

**DEFENDANTS' REPLY:**  SAS's statement of a "dispute" exists in thin air.  It cites no contra evidence and its Response is therefore effectively an admission that there is no dispute.

IV.   <u>Musical Comparison Of LGO And TOL</u>

*<u>Key & Meter</u>*

29.    **The Deposit Copy is written in the key of E-flat major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶¶ 7-8).**

*SAS Response: Undisputed.*

30.    **TOL is written in the key of D major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶ 7).**

*SAS Response: Undisputed.*

31.    **Due to its ubiquity in popular music, 4/4 meter is also known as "common time." (Ferrara I Report ¶ 68).**

*SAS Response: Undisputed that 4/4 meter is known is "common time" or "quadruple time." Disputed that the naming has anything to do with "popular music."*

**DEFENDANTS' REPLY:**  This is again a "dispute" with no evidence to support it and hence is admitted.

### *Chord Progressions*

**32.**      The LGO Deposit Copy features a I-iii-IV-V7 (or a 1-3-4-5) chord progression. (Ferrara I Report ¶ 32; ~~Revised~~ Covach Report ¶ 6; ~~Original~~Revised Everett Report at 5).

*SAS Response: Undisputed.*

**FOOTNOTE 6̶9**: A "7" denotes the addition of a pitch that is the interval of a minor seventh above the root or name of the chord. (Ferrara I Report ¶ 32 n.14).

*SAS Response: ~~[SAS did not respond to Footnote 6.  Hence it is~~ Undisputed~~]~~.*

**33.**      None of the chord progressions in TOL are the same as the I-iii-IV-V7 (or simplified I-iii-IV-V) chord progression used in LGO. (Ferrara I Report ¶ 39; **Revised Covach Report ¶ 6**).

*SAS Response: Disputed. Dr. Covach explains as follows in his opening report:*

*Using this system, the chord progression employed in the backing pattern of Gaye and Townsend's song may be written as I – iii – IV – V (see example 1a). This is a very common progression, used in many songs, and by itself—as an isolated entity—does not constitute an element that one could copyright in most cases. The Sheeran and Wadge work employs a slight adjustment to this chord pattern: the I, IV, and V chords are maintained from the Gaye and Townsend work, but the iii is replaced with a common substitute. As any freshman harmony textbook will attest, the I chord with the third scale degree in the bass may stand in (or substitute) for the iii chord without affecting the function of the progression~~(the bass lines in each recording are discussed in more detail immediately below)~~. The Sheeran and Wadge work uses this chord, commonly labeled "I6," as a slight modification the Gaye and Townsend original (see example 1b), producing a <u>mild variant that is harmonically equivalent: I – I6 – IV – V.</u>*



*Examples 1a (Gaye-Townsend) and 1b (Sheeran-Wadge): chord progressions compared*

*Revised* Covach Report (~~ECF 179-1~~200-7) ¶ 6 (emphasis added) (citing and quoting from an undergraduate music textbook for the proposition that "iii may substitute for I6 to create a tonic extension").

Dr. Everett, similarly, explained the equivalence between the iii and I6 chords, and thus the equivalence between the two primary chord patterns:

> For our purposes, we must recognize the essential functional identities of the I6 chord and the iii chord as being indistinguishable. Both triads appear over ^3 in the bass; both also include both ^3 and ^5 in common among upper voices. The only difference in their identity is the inclusion of ^1 (= ^8) in the I6 chord, as opposed to ^7 in the iii chord. Particularly among texturally less significant inner voices, these two pitches just a half step apart (^8 and ^7) sound interchangeable, registering only differences of color between them. (^8 and ^1 are exactly the same scale degree, given that the scale replicates in octaves. We will refer to ^1 as ^8 when recognized in connection to its neighbor, ^7) Often, any difference between the two chords I6 and iii is unrecognizable, especially if ^3 is present in both outer voices, the lead vocal as well as the bass.
> ….
>
> Another perspective will add weight to what might be for some an anti-intuitive argument, that the minor iii chord could be equivalent to a major I6 triad. This relates to the interchangeability of the two triads, based largely on the fact that scale degrees ^3 and ^5 are common to both. [Providing example]. Thus, iii is here equivalent to the I which it replaces (because of ^5 and ^3, common between them, emphasized in the vocal, and because the tiny difference between ^8 and ^7 is buried in an inner voice), but iii is even closer to I6 than to I.

*Revised* Everett Report (ECF ~~179-5~~200-11) ¶¶ *I.*A.4-5. Dr. Everett goes further to explain why – in his view – the progression one hears in TOL is the same as the LGO sheet music:

> it is clear from the Gaye - Townsend written notation that the "iii" chord, Gm, can be performed interchangeably with the "I6" chord, Eb/G, as long as ^3 is played in the bass. Therefore, Sheeran's band (which performs I6 chords more often than iii chords) _performs identical chord progressions to those notated_ in the Gaye - Townsend deposit copy.

*Revised* Everett Report (ECF ~~179-5~~200-11) ¶ ~~B~~I.A.7 (emphasis added).

Dr. Ferrara, Defendants' musicology expert, takes issue with Drs. Covach's and Everett's views on the equivalence of the chord progressions in TOL and LGO, but Dr. Covach responds to those criticisms, driving home the point that we are dealing with experts with materially differing opinions that cannot be resolved on a motion for summary judgment. Dr. Covach builds upon the single undergraduate music textbook he cites in his opening report, arguing based on multiple sources that there is a "consensus among experts" on the subject that Dr. Ferrara choses to ignore:

> The textbook in use in Dr. Ferrara's own department at New York University is The Musician's Guide to Theory and Analysis by Jane Piper Clendinning (Florida State University) and Elizabeth West Marvin (Eastman School of Music). Clendinning and Marvin write: "The progression I – iii may in fact be considered a variation of I – I6."2 Similar passages may be found in widely used textbooks by Miguel A. Roig-Francoli (Cincinnati College-Conservatory of Music) and L. Poundie Burstein (CUNY) and Joseph N. Straus (CUNY).3 Yet in spite of this general consensus among experts writing on the functional equivalence of I6 and iii in this harmonic context, Dr. Ferrara writes that "not one of the chord progressions in TOL is the same as the I – iii – IV – V7 (or even I – iii – IV – V) chord progression in LGO" (¶40, p. 15-16). <u>Dr. Ferrara is out of step with his   colleagues owing to the narrowness of his interpretation; he seems to argue that  because one thing is a slight variation of another, these two things are completely   different.</u> They are, according to consensus among experts, ~~strikingly~~*very* similar.

*Revised* Covach Rebuttal (ECF ~~179-7~~200-9) ¶ 4 (emphasis added).‡

**DEFENDANTS' REPLY:** Paragraph 39 of the Ferrara I Report identifies the various chord progressions used in TOL, none of which is a I-iii-IV-V progression.  SAS's extraction of lengthy sections from Dr. Covach's Report neither addresses nor contradicts Dr. Ferrara's findings, which are objectively corroborated by the published sheet music for TOL.  (Ferrara I Report at Visual Exhibit C).  Hence, for all of its length, there is no disputed issue of material fact presented.  It is an objective unrefuted fact that none of the chord progressions in TOL are the same as the I-

---

‡ ~~Dr. Covach obviously does not mean to use the term "strikingly similar" to express a legal position.~~

iii-IV-V7 (or simplified I-iii-IV-V) chord progression used in LGO and the portions of SAS's experts' reports that it quotes, admit that the chord progressions used in LGO are "variant," *i.e.*, different from LGO.  SAS also admits in its memorandum of law that TOL and LGO feature "two different chord progressions."  (Opp. Mem. at 8).  SAS has also admitted that the LGO chord progression is "very common," "commonplace" and an "unprotectable" element.  (*Infra* ¶¶ 36, 114).

> **34.**    **TOL features multiple, different chord progressions, including:**
>
> - **I5-I6-IV5-Vsus2**
> - **I5-I6-IV5-V5**
> - **I-I6-IV-Vsus2**
> - **I-I6-IV-V**
> - **I-I6-IV-V11**
> - **I-I6-IV-Vsus4**
> - **vi-V-IV-I6-ii7-V-I**

**(*Id.*Ferrara I Report ¶¶ 39, 47).**

*SAS Response: Disputed. The "Id." cite is incorrect. Defendants presumably mean to reference ¶¶ 39 and 47 of the Ferrara Report, not the Covach Report (ECF 179-1). Please see Plaintiff's SAS response to paragraph 33, which is incorporated in full into this SAS response.*

**DEFENDANTS' REPLY:**  While SAS uses the word "disputed," there is no dispute noted as SAS's "Response" to Paragraph 33 does not address the specific findings of Dr. Ferrara cited in Paragraph 34. As such, the Statement in this Paragraph is admitted.

**FOOTNOTE 710:  A "I6" chord also can be written as a "I/3" chord. (Ferrara II Report ¶ 9 n.3).**

**SAS Response:** Undisputed.

35.     A "I6" chord, a major chord, is different from a "iii" chord, a minor chord. (Ferrara II Report ¶¶ 9-15; Ferrara Rebuttal Report ¶¶ 2-5, 7).

*SAS Response: Undisputed that the two chords do not have identical notes, but disputed that these differences have relevance to the musicological analysis at issue here. Please see Plaintiff's ~~SAS~~ response to paragraph 33, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  This fact remains undisputed and SAS's "Response" to Paragraph 33 admits that the chords are different.  "Functionally equivalent" chords by definition are different from one another and the "functionally equivalent" chords referenced by Dr. Covach do not appear in the Deposit Copy.

36.     SAS has admitted that the I-iii-IV-V progression "is a very common progression, used in many songs, and by itself – as an isolated entity – does not constitute an element that one could copyright in most cases." (**Revised** Covach Report ¶ 6; emphasis added; *see also* Original **2020** Everett Report at 4-5).

*SAS Response: Undisputed that the incomplete quote above is from Dr. Covach's report, but disputed that Dr. Covach's views as to what one could or could not <u>copyright</u> has relevance to the musicological analysis at issue here. Indeed, Defendants have criticized SAS's experts from even using language that could be construed as relating to copyright law.*

**DEFENDANTS' REPLY**:  This Response admits that the chord progression is very common, and it is therefore not a disputed issue of material fact.  All else in SAS's Response is irrelevant.

37.     In addition to the admission of Dr. Covach in the **Revised** Covach Report, Defendants have identified at least 52 songs that utilize a I-iii-IV-V or I-I6-IV-V chord

progression. (Ferrara I Report at Visual Exhibit H; Ricigliano Report at 8).

*SAS Response: Undisputed that Dr. Ferrara purports to identify 52 such songs, but disputed that what Dr. Ferrara said is tied to what Dr. Covach said, and disputed that Dr. Covach made an "admission." Please see Plaintiff's ~~SAS~~ response to paragraph 36, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:** This Response admits that the chord progression is very common and admits that Defendants identified at least 52 prior songs using the progression. It is therefore not a disputed issue of material fact. All else in SAS's Response is irrelevant.

**38.** A guitar method book, titled Guitar for Advanced Beginners, states that "dozens of other I-iii-IV-V songs" predated LGO and that the authors of LGO were "simply writing a song using a common progression, just like every other professional songwriter does." (Ferrara I Report at Visual Exhibit E).

*SAS Response: Disputed as the document is inadmissible hearsay. In addition, Plaintiff notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit E.*

**DEFENDANTS' REPLY:** SAS is legally wrong as to experts (Rule 703 of the Federal Rules of Evidence permits experts to testify based on otherwise inadmissible evidence), and while the Response says "disputed," it offers no facts to support any dispute. The twenty-five year statement is entirely irrelevant to any issue. This Statement is therefore undisputed.

**39.** A guitar method book, titled Money Chords, identifies the I-iii-IV-V progression as "a popular chord progression" and one of the "most frequent chord progressions." (Ferrara I Report at Visual Exhibit D).

*SAS Response: Disputed as the document is inadmissible hearsay. In addition, Plaintiff*

*notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit D.*

**DEFENDANTS' REPLY:** SAS is legally wrong as to experts (Rule 703 of the Federal Rules of Evidence permits experts to testify based on otherwise inadmissible evidence), and while the Response says "disputed," it offers no facts to support any dispute. The twenty-five year statement is entirely irrelevant to any issue. This Statement is therefore undisputed.

**40. A piano method book, titled How To Play Rock 'N' Roll Piano, copyrighted in 1967, six years prior to the creation of LGO, identifies the I-iii-IV-V chord progression as one of ten "popular rock 'n' roll progressions." (Original Zakarin Decl. at Exhibit 17).**

*SAS Response: Disputed as the document is inadmissible hearsay.*

**DEFENDANTS' REPLY:** SAS is legally wrong as to experts (Rule 703 of the Federal Rules of Evidence permits experts to testify based on otherwise inadmissible evidence), and while the Response says "disputed," it offers no facts to support any dispute. This Statement is therefore undisputed.

### *Harmonic Rhythms*

**41. SAS alleges that TOL "uses the identical harmonic rhythm as found in" LGO because both songs anticipate (or syncopate) chord changes on the second and fourth chords of the four-chord progressions that SAS places in issue. (TAC ¶ 43; Revised Covach Report ¶¶ 10-11;1011; Revised Everett Report at 14-1513-14).**

*SAS Response: Disputed. Dr. Covach explains that while the two songs are notated using two different time signatures ("fast" and "slow"), their harmonic rhythms are the same:*

> *Gaye and Townsend's "Let's Get It On" sets the I – iii – IV – V chord-bass progression to a distinctivenoteworthy rhythm as shown in example 3a. This rhythm extends over two measures (or bars) according to a "slow" 4/4 time signature (see below), dividing the duration of the first two chord-bass pairingschords unevenly,*

*as represented by the dotted quarter and eight note tied to a half note. The third and fourth ~~chord-bass pairings~~<u>chords</u> divide the second measure in a parallel manner to the first measure. <u>The musical notation of rhythm allows for alternate ways of notating the same rhythm</u>. A second possible notation for this rhythm is notated below as "fast" 4/4. Note that the eighth notes in the "slow" 4/4 are notated as quarter notes in the "fast" 4/4 version.*

*....*



(Deleted) *a (Gaye-Townsend): harmonic rhythm, chord-bass pairing, notated in "slow" 4/4*



*Example 3b (Sheeran-Wadge): harmonic rhythm, chord-bass pairing*

*Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in Gaye's "Let's Get It On~~," and this is shown in example 3b. Played in an A-B comparison, 3a and 3b make the strong similarity between the two songs abundantly clear.~~<u>"</u> It does not require an understanding of standard rhythmic notation to see it in the sheet music and hear it in the music played from it that this rhythm is identical between the two songs.*

<u>Revised</u> Covach Report (ECF ~~179-1~~<u>200-7</u>) ¶¶ 10-11.

Dr. Everett refers to the same phenomenon as "syncopation," explaining that it is an

uncommon feature shared by LGO and TOL:

> *In songs that include the I - iii - IV - V progression class, chords typically change every four beats (a full bar), providing a "harmonic accent" on strong downbeats (the first beat of every bar). Syncopated chord changes, occurring on weak beats, are much less common, but these are heard in both Gaye - Townsend and Sheeran exhibits.*

*Revised Everett Report (ECF ~~179-5~~200-11) ¶ I.D.1.*

Dr. Ferrara takes issues with these conclusions as well, but Dr. Covach explains that Dr. Ferrara is disingenuously elevating form over substance, as the particular notation employed in the sheet music for the two songs has no bearing on whether the harmonic rhythms of the two compositions are similar:

> Dr. Ferrara argues that this difference in notational practice makes the resulting rhythmic pattern "not the same." And again, in a very literal (though not particularly musical) sense, this is true. <u>But these rhythms are identical in sound</u>. This variation in ways one may notate the same rhythmic figure is another type of <u>basic principle we teach musicians routinely.</u> It is as if one would argue that this rebuttal would mean something different if I used 24 pt. font rather than 12 pt. My words would retain all of their meaning, even if the page were twice as big.

*Revised Covach Rebuttal (ECF ~~179-7~~200-9) ¶ 5.*

**DEFENDANTS' REPLY:**  SAS's "Response" does not directly address the Statement in Paragraph 41, which remains undisputed (since it derives directly from the TAC, the Revised Covach Report and the Revised Everett Report).

SAS's assertion that the two songs are notated using different time signatures ("fast" and "slow") is also patently false.  The LGO Deposit Copy is notated in 4/4 time, but it does <u>not</u> indicate whether it is "fast" or "slow" 4/4 time (and, in any event, "fast" or "slow" 4/4 time refers to tempo, and it is undisputed the Deposit Copy does not notate a tempo).  (Original Zakarin Decl. Exhibit 13; ~~56.1 Response~~*supra* ¶ 23).  As notated, the harmonic rhythm in the Deposit Copy is objectively different from TOL, a fact that SAS has not disputed.  (Ferrara Rebuttal Report ¶ 13).

Thus, despite the prolixity of SAS's cutting and pasting passages from its expert reports into its 56.1 Response, there is no disputed issue of material fact identified.

~~Moreover, as Dr. Ferrara illustrates in the Ferrara I Report, the transcription in Example 3a from the Covach Report is objectively erroneous because it ignores the many objective differences~~

~~Dr. Ferrara identified between the harmonic rhythms (as reproduced at Paragraphs 46-50 below),~~ ~~and it otherwise speculates on the placement of the pitches in a chord.  (Ferrara I Report ¶~~ ~~105).  Example 3b from the Covach Report also represents an inaccurate transcription of~~ ~~TOL.  (*Id.*).  Dr. Covach does not address in his Rebuttal Report the fact that his transcriptions in~~ ~~Example 3a and 3b are erroneous.~~

**42.     SAS** ~~admits~~<u>**deleted the admission from the Original Covach Report**</u> **that "the harmonic rhythm common between these two songs occurs in other songs as well" and "can be thought of in terms of stylistic commonplaces." (**~~Covach Report~~<u>**Renewed Zakarin Decl. Exhibit 4**</u> **¶ 18).**

*SAS Response: Disputed<u>. SAS deleted the language in question in compliance with – not in violation of – the Original MIL Opinion. Also disputed</u> as it misstates what Dr. Covach wrote. Dr. Covach wrote "In the case of the present comparison between 'Let's Get It On' and 'Thinking Out Loud,' it is clear that certain aspects of the backing pattern described above can be thought of in terms of stylistic commonplaces." <u>Original</u> Covach Report (ECF 179-1) ¶ 18.*

**DEFENDANTS' REPLY:**  This again is an example of SAS using the word "disputed," where there is no dispute.  SAS identifies no facts in dispute.  Defendants correctly quoted Paragraph 18 of the Covach Report.  <u>Moreover, as detailed in the accompanying Reply Memorandum of Law, SAS deleted the admission in violation of the Daubert Order.</u>

**43.     The rhythmic anticipation of chord changes is an unprotectable musical technique. (Ferrara I Report ¶¶ 16, 61; Ricigliano Report at 9<u>; ECF 197 at 3; Griffin Action ECF 138 at 1-2</u>).**

*SAS Response: Undisputed that the technique, standing alone, is unprotectible. The use of anticipation in LGO and TOL, however, is similar and distinctive. <u>Revised</u> Covach Report (ECF*

*179-1*200-7*)*, passim;  *Revised* Covach Rebuttal (ECF *179-7*200-9*)*, passim;  *Revised* Everett Report (ECF *179-5*200-11*)*, passim.

**DEFENDANTS' REPLY:**  SAS has admitted this Statement is undisputed.  Its further assertion of alleged distinctiveness (an improper and inadmissible expert opinion for the reasons articulated in the ~~accompanying *Daubert*~~memoranda of law submitted in support and further support of the instant motion) is both false and irrelevant.

**44.   The rhythmic anticipation of chord changes is commonplace in popular music. (***Id.***; Revised Covach Rebuttal ~~Report~~(ECF 200-9) ¶ 5).**

*SAS Response: Undisputed that the technique, standing alone, is unprotectible. The use of anticipation in LGO and TOL, however, is similar and distinctive. Revised Covach Report (ECF 179-1200-7), passim;  Revised Covach Rebuttal (ECF 179-7200-9), passim;  Revised Everett Report (ECF 179-5200-11), passim.*

**DEFENDANTS' REPLY:**  SAS admits the cited fact is undisputed.  Defendants otherwise refer the Court to their Reply to Paragraph 43.

**45.   Dr. Covach describes anticipation as "[a] type of syncopation that is common in popular music of the 20th century," and admits that "American popular music of the last 100 years employs a high degree of rhythmic syncopation." (Revised Covach Rebuttal ¶ 5; *see also* Original Covach Report ¶ 18 (anticipation "occurs in other songs as well").**

*SAS Response: Undisputed that the incomplete quotes above are from Dr. Covach's report. Undisputed that the technique, standing alone, is unprotectible. The use of anticipation in LGO and TOL, however, is similar and distinctive. Revised Covach Report (ECF 179-1200-7), passim; Revised Covach Rebuttal (ECF 179-7200-9), passim; Revised Everett Report (ECF 179-5200-11), passim.*

**DEFENDANTS' REPLY:** SAS admits the cited fact is undisputed. Defendants otherwise refer the Court to their Reply to Paragraph 43.

46.     **The technique of syncopation employed in LGO and TOL is different: LGO features a four-bar chord progression with two chords in bar 1, the continuation of the second chord in bar 1 into bar 2, two chords in bar 3, and the continuation of the second chord in bar 3 into bar 4; in contrast, TOL features a two-bar chord progression (not a four-bar chord progression), with two chords in bar 1 and two chords in bar 2. (Ferrara I Report ¶ 49).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46.

47.     **Whereas the second chord in LGO is on beat 4 and anticipates beat 1 of measure 2, the second chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 1. (*Id.* ¶ 50).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed, and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46-47.

48.     **Whereas the fourth chord in LGO is on beat 4 and anticipates beat 1 of measure 4, the fourth chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 2. (*Id.* ¶ 51).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is*

*incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed, and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46-48.

49.    **Anticipation in LGO occurs before beat 1; anticipation in TOL occurs before beat 3. (*Id.* ¶ 52).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed, and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46-49.

50.    **In LGO each anticipated chord has a duration of one quarter note, while each anticipated chord in TOL has the duration of an eighth note. (*Id.* ¶ 53).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed, and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46-50.

51.    **To find equivalence between the harmonic rhythms in each work, one must disregard the objective differences recited above in Paragraphs 46 through 50 and also cut in half the value of the notes and chords in LGO. (*Id.* ¶ 55).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  The cited fact remains undisputed, and SAS's "Response" to Paragraph 41 nowhere addresses the undisputed facts admitted in Paragraph 46-51.

52.    ~~Because~~**As this Court's Daubert Order has found,** Dr. Covach failed to

perform any prior art search and Dr. Everett's prior art ~~search terminated in 1979, years prior to the time period when both Sheeran and Wadge were individually and together creating musical works, they~~ analysis was so "superficial" as to amount to no prior art search, resulting in their being barred from offering any evidence as to prior art; consequently, SAS's experts failed to address the fact that Sheeran used the anticipation technique in at least twenty songs that he wrote or co-wrote prior to TOL; in ten of those twenty songs, anticipation occurs on the second and fourth chords of the chord progression, as in TOL. (Ferrara I Report ¶ 61~~;~~ & Visual Exhibit I; 2020 Everett Report at 4).

*SAS Response:* Disputed. *The quoted and paraphrased language is incomplete and taken out of context, and the Original MIL Opinion makes no mention whatsoever of Sheeran's pre-TOL songs. ECF 197. Furthermore,* Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett ~~concede~~ conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. ~~As such~~ Moreover, the Daubert Order speaks for itself, the Statement is neither incomplete nor taken out of context, and this Statement remains undisputed. Finally, the Statement does not indicate or otherwise suggest that the Daubert Order makes mention of Sheeran's pre-TOL songs.

**53.**    Prior to co-authoring TOL, Wadge authored a composition that includes a I-I6-IV-V chord progression that anticipates chord changes on the second, third, and fourth

chords. (Ferrara I Report ¶ 63; Ricigliano Report at 19).

*SAS Response: Disputed. Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett ~~concede~~concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed.

### *Melodic Elements Placed In Issue By Dr. Covach*

**54.**    At Paragraph 15 of his **Revised** Report, Dr. Covach notates the vocal melodies that he places in issue as follows:

| LGO | 1 | 1 | 1 | *6 | 5 | b3 | 2* | 6 | 5 | *3 | 5 | 6 | 5 | 3* | 3 | 5 | 6 | | |
|-----|---|---|---|----|---|----|----|---|---|----|---|---|---|----|---|---|---|---|---|
| TOL | 3 | 5 | *6 | 3 | 2* | 1 | 2 | 3 | 5 | 1 | *3 | 5 | 6 | 5 | 3* | 3 | 2 | 1 | 1 |

(**Revised** Covach Report ¶ 15).

*SAS Response: Undisputed.*

**55.**    Track 2 of Audio Exhibit 1 to the Ferrara I Report includes performances of the above different melodies.

*SAS Response: Undisputed that Track 2 of Audio Exhibit 1 purports to include such performances.*

**56.**    Dr. Covach's analysis of the vocal melodies omits any analysis of the rhythmic durations and metric placements of the melodies. (Ferrara I Report ¶¶ 131-32).

*SAS Response: Disputed that Dr. Covach "omitted" anything relevant to the*

*musicological analysis.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.

**57.      Differences also exist between the rhythmic durations and metric placements of the melodies in each work. (*Id.* ¶¶ 142-49).**

*SAS Response: Disputed that the "differences" are relevant to the musicological analysis.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.

**58.      The alleged similarity that exists in the pitch sequence of the second segment of the above melodic phrase that Dr. Covach places in issue lines up with greater similarity to the opening pitches of the well-known Stephen Foster song, "Camptown Races," than it does with TOL. (*Id.* ¶ 141).**

*SAS Response: Disputed, as the concept of "greater similarity" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.

**FOOTNOTE 8̶11: The TOL melody is set to the words "When your legs don't work like they used to before, and I can't sweep you off of your feet," and the LGO melody is set to the words "Let's get it on, sugar, let's get it on, ooh."**

*SAS Response: Undisputed.*

**FOOTNOTE 9̶12: The cited Audio Exhibit may be accessed at the following URL: https://pryorcashman.sharefile.com/d-s50fa4146d1ca44b99a08580006581461**

**https://pryorcashman.sharefile.com/share/view/s8130f2e51a0a46cab1f8a0416d3ea0d9**

*SAS Response: Undisputed.*

**FOOTNOTE ~~10~~13: For reference, "Camptown Races" includes the well-known vocal refrain "Oh, doo-dah day!"**

*SAS Response: Undisputed.*

*Melodic Elements Placed In Issue By Dr. Everett*

A.   **Dr. Everett's Third Summary Bullet**

59.   **Dr. Everett compares TOL's opening to the opening two phrases of LGO, through his analysis of what he refers to as the "Upper Voice" melodies. (Revised Everett Report at ~~6-10~~5-10).**

*SAS Response: Undisputed.*

60.   **The 2020 Everett Reports (and the Revised Everett Report) omit any transcription in musical notation of the "Upper Voice" melodies. (Ricigliano Report at 22; see also generally Revised Everett Report).**

*SAS Response: Disputed that Dr. Everett "omitted" anything relevant to the musicological analysis.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed.

61.   **The actual pitch sequences of "Upper Voice" Melody Phrase 1 are:**

| LGO | 3 | 4 | 5 | 4 | b3 | 2 | b3 | 2 | b3 | 2 | 2 | 2 | 1 | 2 |
|-----|---|---|---|---|----|---|----|---|----|---|---|---|---|---|
| TOL | 3 | 5 | 6 | 5 | 3  | 2 | 1  | 2 | 3  | 6 | 1 |   |   |   |

**(Ferrara II Report ¶ 30).**

*SAS Response: Disputed. Revised Everett Report (ECF ~~179-5~~200-11) at 6-10.*

**DEFENDANTS' REPLY:**  Simply repeating a demonstrably false statement does not create a disputed issue of material fact.  Dr. Ferrara's transcriptions are objectively corroborated by the Deposit Copy and the published sheet music for LGO.  (Original Zakarin Decl. Ex. 13; Ferrara I Report at Visual Exhibit C).  Moreover, SAS overlooks it has jettisoned Dr. Everett's opinion regarding the first four notes of LGO and TOL (*infra* ¶ 64) and adopted the opinion of Dr. Covach (which is consistent with Dr. Ferrara's opinion), confirming that it is undisputed.

**62.    Dr. Everett claims that "Upper Voice" Melody Phrase 1 begins with scale-degrees 3-4-5 in each work. (Revised Everett Report at 6-7).**

*SAS Response: Undisputed.*

**63.    As shown above, only because Dr. Everett fails to transcribe TOL can he make this demonstrably false assertion; in fact, it is indisputable that TOL begins with scale-degrees 3-5-6. (Ferrara Report II ¶¶ 30-31, 39-40; *see also* Track 3 Audio Exhibit 1 to the Ferrara II Report).**

*SAS Response: Disputed. Revised Everett Report (ECF ~~179-5~~ 200-11) ¶ B.1-3.*

**DEFENDANTS' REPLY:**  Simply repeating a demonstrably false statement does not create a disputed issue of material fact.  Dr. Ferrara's transcriptions are objectively corroborated by the Deposit Copy and the published sheet music for LGO.  Defendants otherwise refer the Court to their Reply to Paragraph 61.

**64.    In fact, even Dr. Covach's Revised Report refutes Dr. Everett's conclusion regarding the opening scale-degrees of "Upper Voice" Melody Phrase 1. (Revised Covach Report ¶ 15).**

*SAS Response: Disputed that Dr. Covach "refutes" Dr. Everett. Both experts are transcribing from audio recordings and there is no "official" transcription of TOL. To the extent*

*Dr. Covach and Dr. Everett disagree on this minor point, SAS adopts the position of Dr. Covach.*
*Revised Everett Report (ECF ~~179-5~~200-11) ¶ B.1-3; Revised Covach Report (ECF ~~179-1~~200-7) ¶*
*15.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides
not a single fact to show any dispute.  As such, the Statement remains undisputed.   It is undisputed
that Dr. Covach disagrees with Dr. Everett on this point.  Critically, SAS's Response underscores
that its experts were not comparing the Deposit Copy with TOL, as it admits they were
"transcribing from audio recordings."  The LGO Recording is not at issue in this case, and SAS's
experts should have been relying on the LGO Deposit Copy.

65.     **The pitch sequences of "Upper Voice" Melody Phrase 2 are:**

| LGO | b3 | b3 | 2 | b3 | 2 | 2 | 2 | 2 | 1 | 6 | b3 | 2 | 1 | 6 |
|-----|----|----|---|----|---|---|---|---|---|---|----|---|---|---|
| TOL | 3 | 5 | 6 | 5 | 3 | 3 | 2 | 1 | 1 | | | | | |

**(Ferrara II Report ¶ 40).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 64, which is*
*incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides
not a single fact to show any dispute.  As such, the Statement remains undisputed.   Dr. Ferrara's
transcription is consistent with the Deposit Copy and the published sheet music for TOL.  SAS's
purported "dispute" lacks any factual basis given that Dr. Everett failed to transcript TOL into
musical notation.

**FOOTNOTE ~~11~~14: For ease of reference, Dr. Ferrara refers to these melodies in the**
**Ferrara II Report as "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2,**
**which is the terminology Defendants use herein and in the accompanying papers. (Ferrara**

**II Report ¶¶ 30-49).**

> *SAS Response: Undisputed.*

**66.      For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the range of the lowest to the highest pitches is different. (Ferrara II Report ¶¶ 31-34, 42-43).**

> *SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant.

**67.      For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the specific highest and lowest pitches are different. (*Id.*).**

> *SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant.

**68.      For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the melodic motions are different. (*Id.*).**

> *SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here. Also disputed as to the implications of the term "melodic motion," which means nothing more than two notes in sequence.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant.

**69.      For both "Upper Voice Melody" Phrase 1 and "Upper Voice" Melody Phrase**

**2, the metric placements on or within beats and the rhythmic durations of the pitches are different. (***Id.* **¶¶ 28, 37, 45).**

*SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant.

**70.    The 2020 Everett ~~Reports~~Report (and the Revised Everett Report) omit any analysis of the metric placements on or within beats and the rhythmic durations of the pitches for both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2. (***Id.***; *see also* generally Revised Everett Report).**

*SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant.

**71.    The objective differences between "Upper Voice" Melody Phrase 1 in each work can be heard by the naked ear on Track 1 of Audio Exhibit 1 to the Ferrara II Report.**

*SAS Response: Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.   The Audio Exhibits to the Ferrara II Report speak for themselves.

**72.    The objective differences between "Upper Voice" Melody Phrase 2 in each**

**work can be heard by the naked ear on Track 2 of Audio Exhibit 1 to the Ferrara II Report.**

*SAS Response: Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:**  Defendants respectfully refer the Court to their Reply to Paragraph 71.

**73.      Pages 25 and 27 of the Ricigliano Report also include visual graphs of "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, which further illustrate the objective differences between each melody in each work.**

*SAS Response: Undisputed that the Ricigliano Report includes graphs, but disputed as to the idea of what those graphs do or do not illustrate, which is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant. The visual graphs in the Ricigliano Report speak for themselves, and SAS's experts never contested the accuracy of the visual graphs or the objective differences they illustrate.

**FOOTNOTE ~~12~~15: The cited Audio Exhibit may be accessed at the URL provided in Footnote ~~9~~12.**

*SAS Response: Undisputed.*

**FOOTNOTE ~~13~~16: The cited Audio Exhibit may be accessed at the same URL cited in Footnote ~~9~~12.**

*SAS Response: Undisputed.*

**B.      Dr. Everett's Fourth Summary Bullet**

74.    Dr. ~~Everett~~Everett's Revised Report claims that both songs emphasize certain notes – scale degrees 5 and 3 – over the "iii" chord, and he opines that it would be more "usual" to emphasize scale degree 7 over the "iii" chord. (Revised Everett Report at ~~109~~, ~~20~~17).

SAS Response: *Undisputed.*

75.    With respect to Dr. Everett's claim about TOL not emphasizing scale degree 7 over the "iii" chord, Dr. Ferrara, Mr. Ricigliano and even Dr. Covach all agree that there is no "iii" chord in TOL (Ferrara I Report ¶ 39; Ricigliano Report at 8; Revised Covach Report ¶ 6), so Dr. Everett's assertion regarding the fact that TOL does not emphasize scale degree 7 over a nonexistent "iii" chord has no meaning. (Ferrara II Report ¶ 51).

SAS Response: *Disputed. Defendants and their experts are misreading or misinterpreting Dr. Everett. As he explains on page 10 (¶ B.7), "The Gaye - Townsend composition's upper-voice emphasis on ^5 and ^3 shown throughout the deposit copy is unusual when supported by the iii chord, which is more characteristic with ^7 in the upper voice." The "iii chord" here refers to the second chord of the progression in the songs at issue. The unusual nature of this pairing is further melodic evidence that the iii and I6 are musicologically equivalent chords in LGO and TOL. Revised Everett Report (ECF ~~179-5~~200-11) ¶~~¶~~ B.7 ~~& I~~.*

**DEFENDANTS' REPLY:**  Defendants misread nothing.  In his Revised Report ~~(which SAS pastes into its opposition papers at page 27 of its Memorandum of Law)~~, Dr. Everett specifically opines that it is significant that LGO and TOL are not "interested in the upper-voice ^7," which supposedly marks LGO and TOL as "deviant from the most common vocalization against iii in this specific progression." (Revised Everett Report at 10).  However, as Defendants have shown, Dr. Everett's opinion makes no sense as it is undisputed that:  (i) TOL does not include

a "iii" chord (and thus it does not matter what vocal notes appear in conjunction with a "iii" chord) (*supra* ¶ 33), (ii) avoiding scale degree 7 is consistent with Sheeran's style and earlier works (*infra* ¶ 80), (iii) Defendants identified nearly two-dozen prior songs that use a I-iii chord progression while avoiding scale degree 7 (Ricigliano Report at 29-30), and (iv) it is common for songs that use the basic building block of predominantly pentatonic scales, like TOL and LGO, to avoid scale degree 7.  (*Infra* ¶ 81).

In addition, as Dr. Ferrara has explained (and as Dr. Everett has failed to rebut), Dr. Everett's Report identifies no similarity at all in the pitch sequences, rhythmic durations or metric placements between the objectively dissimilar vocal melodies that are concurrent with a "iii" chord in LGO and a "I6" chord in TOL.  (*Infra* ¶ 78; Ferrara II Report ¶¶ 50-57).

**76.    It is undisputed that TOL does not include a "iii" chord. (Ricigliano Report at** ~~28-20~~**2820; Ferrara II Report ¶ 51).**

*SAS Response: Disputed. Please see Plaintiff's* ~~SAS~~ *response to paragraph 33, which is incorporated in full into this* ~~SAS~~ *response.*

**DEFENDANTS' REPLY:**  SAS's "Response" to Paragraph 33 specifically admits that TOL includes a "I6" chord, not a "iii" chord, and that a "I6" chord is a "variant," *i.e.*, different from, a "iii" chord.  In short, SAS's reference to Paragraph 33 therefore admits that this Statement is undisputed.

**77.    Even if TOL did include a "iii" chord, which it does not, there is nothing unusual about omitting scale-step 7 in songs that use a I-iii chord progression. (Ricigliano Report at 28-29; Ferrara II Report ¶ 51).**

*SAS Response: Disputed. Please see Plaintiff's* ~~SAS~~ *response to paragraph 33, which is incorporated in full into this* ~~SAS~~ *response. Dr. Everett's opinion is that this pairing is in fact*

unusual. _Revised_ Everett Report (ECF ~~179-5~~200-11) ¶¶ B.7 ~~& I~~.

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed. SAS does not dispute the fact in issue with any admissible evidence. Mr. Ricigliano, who identified nearly two-dozen prior songs that use a I-iii chord progression while avoiding scale degree 7, directly contradicted Dr. Everett's naked opinion that the pairing is supposedly "unusual." There was no denial by Dr. Everett. (Ricigliano Report at 29-30).

78.     **The melodies "concurrent" with the second chord of the chord sequence in each song are different. (Ferrara II Report ¶¶ 52-57).**

*SAS Response: Disputed, as the concept of "different" melodies is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed. Consistent with the Deposit Copy and the published sheet music for TOL, Dr. Ferrara demonstrated the melodies concurrent with the second chord in each work to be different, and SAS has not cited any admissible evidence refuting this objective fact. (Ferrara II Report ¶¶ 52-57; *see also id.* ¶¶ 31-32~~,~~.).

79.     **The supposed "similarity" that Dr. Everett claims regarding the absence of scale degree 7 over the non-existent "iii" chord in TOL (which has no "iii" chord) comprises matter that is not expressed rather than what is expressed. (*Id.*)**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 33, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed. Defendants otherwise refer the Court to their Reply to Paragraphs 33 and 76.

**80.    Avoiding scale degree 7 is consistent with Sheeran's general style and his earlier works. (Ricigliano Report at 30-31).**

*SAS Response: Undisputed, but disputed that this has relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant.

**81.    It is common for songs that use the basic building block of a pentatonic scale, like LGO and TOL, to avoid scale-step 7. (*Id.*).**

*SAS Response: Disputed that either TOL or LGO are purely major pentatonic scale compositions. Revised Covach Report (ECF ~~179-1~~200-7) ¶ 15.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed SAS's "Response" is evasive and nonresponsive. Mr. Ricigliano opined that LGO and TOL were "predominantly" pentatonic scales, and that it is common for songs that use "predominantly" pentatonic scales to avoid scale-step 7. (Ricigliano Report at 30-31).

**82.    TOL and LGO express their melodic phrases in different ways. (Ricigliano Report at 35-36).**

*SAS Response: Disputed, as the idea of how two songs "express their melodic phrases," and whether they are "different," is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  At pages 35-36 of his Report, Mr. Ricigliano details the many ways in which the melodic phrases in issue are expressed in different ways.

### C.    Dr. Everett's Fifth Summary Bullet

**83.    Dr. Everett claims that both songs end melodic phrases on the same note – a "non-resolving" scale degree 1. (Revised Everett Report at ~~20~~17).**

*SAS Response: Disputed, and disputed that this has relevance to the musicological analysis at issue here. Defendants and their experts are misreading or misinterpreting Dr. Everett. As he explains on page 8 (¶ B.4.d.), "Perhaps most tellingly, both melodies end with an ornamented ^1 in the vocal despite the fact that all phrases end on V (which is normally most characteristic in withholding ^1), making for the same tension-filled, non-resolving non-chord tones in the phrases' climaxes." A review of the notation clearly shows that ^1 (E-flat) is the last primary note of the melody. Indeed, in the excerpt from the sheet music Dr. Everett annotates "final ^1 is ornamented here with upper neighbor ^2." Revised Everett Report (ECF ~~179-5~~200-11) ¶¶ B.4-5.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  Dr. Everett specifically opines – incorrectly – in his Revised Report that both songs end melodic phrases on the same note – a "non-resolving" scale degree 1.  (*See* Revised Everett Report at ~~20~~17 ("Both songs end cadential phrases on a non-resolving upper-voice ^1")).

**84.    However, as objectively demonstrated in the Ferrara II Report, the phrases do not, in fact, both end on scale degree 1. (Ferrara Report II ¶¶ 59-63; *see also* Ricigliano**

Report at 32-33).

*SAS Response: Disputed, and disputed that this has relevance to the musicological analysis at issue here. Please see Plaintiff's* ~~SAS~~ *response to paragraph 83, which is incorporated in full into this* ~~SAS~~ *response.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed.

85.    **Moreover, the notes and rhythmic values of these melodies are different. (Ferrara II Report ¶¶ 26-47; Ricigliano Report at 22-28).**

*SAS Response: Undisputed that the notes and rhythmic values are not identical. Otherwise disputed, as the idea of whether and how they are "different" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant.

86.    **Countless songs that are totally different end on the same note. (Ricigliano Report at 33).**

*SAS Response: Undisputed.*

87.    **Ending phrases in this manner is a common melodic technique, which Sheeran has employed in his earlier works. (*Id.*).**

*SAS Response: Paragraph 87 is vague as to what "in this manner" refers to, and is therefore disputed. Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition*

*includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara*

*II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:** SAS's "Response" is not responsive to the Statement. It does

not otherwise dispute that ending phrases in this manner is a common melodic technique and that

Sheeran has employed this common technique in his prior works. Hence, this Statement is

undisputed.

### D.   Dr. Everett's ~~Eight~~Eighth Summary Bullet

**88.**   **Dr. Everett opines that both songs begin in a "weak metrical location."**

**(Revised Everett Report at ~~20~~17).**

*SAS Response: Undisputed*

**89.**   **However, Dr. Everett obscures that both songs begin on different beats.**

**(Ferrara II Report II ¶¶ 79-83).**

*SAS Response: Disputed. Dr. Everett obscures nothing, and Dr. Ferrara does not so claim.*

*Revised Everett Report (ECF ~~179-5~~200-11), passim; Ferrara II Report ¶¶ 79-83.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides

not a single fact to show any dispute. As such, the Statement remains undisputed. Dr. Ferrara

specifically concluded, based on the Deposit Copy and published sheet music for TOL, that the

two songs begin on different beats. (Ferrara II Report ¶¶ 79-83).

**90.**   **Moreover, it is commonplace for vocal melodies to begin in weak metrical**

**positions. (*Id.*; Ricigliano Report at 34).**

*SAS Response: Undisputed that the technique, standing alone, is unprotectible. The*

*combination of elements in LGO and TOL, however, is similar and distinctive. Revised Covach*

*Report (ECF ~~179-1~~200-7), passim; Revised Covach Rebuttal (ECF ~~179-7~~200-9), passim; Revised*

*Everett Report (ECF ~~179-5~~200-11), passim.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant and, as to distinctiveness, untrue and beyond the competence of an expert.

> **91.**     **Countless songs begin after a rest on a weak metrical position. (*Id.*).**

*SAS **Response:** Undisputed that the technique, standing alone, is unprotectible. The combination of elements in LGO and TOL, however, is similar and distinctive. Covach Report (ECF 179-1), passim; Covach Rebuttal (ECF 179-7), passim; Everett Report (ECF 179-5), passim.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant.

> **E.**     **Dr. Everett's Ninth Summary Bullet**

> **92.**     **Dr. Everett notes that both songs make use of "melisma." (Revised Everett Report at ~~17, 20~~15-17).**

*SAS **Response:** Undisputed.*

> **93.**     **Melisma (an unprotectable commonplace technique) is a vocal technique that occurs when a vocalist sings a single lyrical syllable over multiple notes (as opposed to one note per syllable). (Ricigliano Report at 34).**

*SAS **Response:** Undisputed.*

> **94.**     **Melisma has been used for centuries and is commonplace in popular music. (Ferrara Report II ¶¶ 85, 90).**

*SAS **Response:** Undisputed that the technique, standing alone, is unprotectible. The combination of elements in LGO and TOL, however, is similar and distinctive. Revised Covach Report (ECF ~~179-1~~200-7), passim; Revised Covach Rebuttal (ECF ~~179-7~~200-9), passim; Revised Everett Report (ECF ~~179-5~~200-11), passim.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant. Defendants otherwise refer the Court to their Reply to Paragraph 90.

95. **Sheeran frequently used melisma in his prior songs. (Ricigliano Report at 34-35).**

*SAS Response: Undisputed. Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant. The undisputed fact that Sheeran frequently used melisma in his prior songs reinforces that Sheeran, in co-authoring TOL, was not copying from LGO but using basic musical building blocks already in his musical toolbox.

96. **The two songs use the technique of melisma in significantly different ways, in different segments of the songs and in connection with different lyrics. (Ferrara II Report ¶¶ 88, 90).**

*SAS Response: Undisputed that the two songs do not have identical segments or identical lyrics, which means – tautologically – that they cannot be said to use melisma in connection with their segments and lyrics in the exact same way. Otherwise disputed, as the concept of "significantly different" use of melisma is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.*

**DEFENDANTS' REPLY:** SAS has admitted that the Statement is undisputed. All else is irrelevant. Melisma is extremely common and used by "almost all vocalists," as Mr. Ricigliano

explained.  (Ferrara II Report ¶¶ 88, 90; Ricigliano Report at 34-35).  Further, as Dr. Ferrara explained (and as SAS fails to address), Dr. Everett did not even attempt to identify similarities in the ways in which melisma is used in both works; Dr. Everett only offered the meaningless observation that both works happen to use the exceedingly common vocal technique.  (Ferrara II Report ¶ 88).

**97.** **As detailed in the ~~accompanying~~ Memorandum of Law submitted in support of the Original Summary Judgment Motion, melisma is so commonplace a technique that case law confirms it is not protectable or copyrightable.  (ECF 181 at 11-12).**

*SAS Response: Disputed, as the paragraph expresses a legal position, not a purported undisputed fact.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.

### *Song Structures*

**98.** **LGO and TOL both incorporate generic structural building blocks of music through the use of verse and chorus sections; yet, beyond the general commonplace musical building blocks of structure used by millions of songs, TOL and LGO are not structurally similar. (Ferrara I Report ¶¶ 26-28; Ricigliano Report at 11).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF ~~179-1) ¶ 8~~200-7), passim. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed. Neither

Paragraph 41 of SAS's 56.1 Response nor ~~Paragraph 8 from~~ the <u>Revised</u> Covach Report addresses the factual statement in question.

**99.    TOL includes two pre-chorus sections; LGO has none. (Ferrara I Report ¶ 27).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. <u>Revised</u> Covach Report (ECF ~~179-1) ¶ 8~~<u>200-7),</u> <u>passim</u>.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  ~~Paragraph 8 from the Covach Report does not address the fact in question; Paragraph 8 addresses the nonexistent bass line in LGO.~~

**100.    LGO includes two bridge sections; TOL has none. (*Id.*).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. <u>Revised</u> Covach Report (ECF ~~179-1) ¶ 8~~<u>200-7),</u> <u>passim</u>.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  ~~Paragraph 8 from the Covach Report does not address the fact in question; Paragraph 8 addresses the nonexistent bass line in LGO.~~

**101.    TOL includes an interlude; LGO has none. (*Id.*).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. <u>Revised</u> Covach Report (ECF ~~179-1) ¶ 8~~<u>200-7),</u> <u>passim</u>.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  ~~Paragraph 8 from the Covach Report does not address the fact in question; Paragraph 8 addresses the nonexistent bass line in LGO.~~

**102.    Even as charted by Dr. Covach, structural differences exist between the two songs. (*Id.* ¶¶ 124-26).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF ~~179-1~~ ¶ ~~8~~200-7), passim.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  ~~Paragraph 8 from the Covach Report does not address the fact in question; Paragraph 8 addresses the nonexistent bass line in LGO.~~

**103.    Looping (i.e., repeating) a chord progression both generally, and in more than one section of a composition, is common in popular music. (Ferrara II Report ¶ 20; Ricigliano Report at 17-19, 35).**

*SAS Response: Undisputed that the technique, standing alone, is unprotectible. The combination of elements in LGO and TOL, however, is similar and distinctive. Revised Covach Report (ECF ~~179-1~~200-7), passim; Revised Covach Rebuttal (ECF ~~179-7~~200-9), passim; Revised Everett Report (ECF ~~179-5~~200-11), passim.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant.

**104.    Sheeran's prior works frequently utilize looping. (Ricigliano Report at 17-19,**

35).

*SAS Response: Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett ~~concede~~conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.

**105.    TOL does not use the same chord progression throughout its choruses. (Ferrara II Report ¶¶ 20-21, 24-25; Ricigliano Report at 17).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ responses to paragraphs 33 and 41, which are incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.   As such, the Statement remains undisputed. SAS's "Response" to Paragraphs 33 and 41 do not address the fact in question; it remains undisputed and unrebutted that TOL does not use the same chord progression throughout its choruses, *i.e.*, the chord progressions in TOL change.  (Ferrara II Report ¶¶ 20-21, 24-25; Ricigliano Report at 17).

**106.    The duration of the "looped" chord progressions is different in each work. (Ferrara II Report ¶¶ 20-21, 24-25).**

*SAS Response: Disputed. Please see Plaintiff's ~~SAS~~ response to paragraph 41, which is incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.   As such, the Statement remains undisputed. SAS's

"Response" to Paragraph 41 does not address the fact in question; it remains undisputed and unrebutted that the duration of the "looped" chord progressions is different in each work.  (Ferrara II Report ¶¶ 20-21, 24-25).

**107.    The final two measures of the TOL choruses use a different chord progression that "breaks away" from the basic I-I6-IV-V progression. (*Id.*).**

*SAS Response: Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed.  All else is irrelevant.

**108.    Dr. Everett's conclusion – that both songs "share the same formal structure at sub-phrase, phrase, section, and multi-section levels" – is demonstrably incorrect. (*Id.* ¶¶ 66-72).**

*SAS Response: Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF ~~179-1) ¶ 8~~200-7), passim.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  ~~Paragraph 8 from the Covach Report does not address the fact in question; Paragraph 8 addresses the nonexistent bass line in LGO.~~  SAS has not disputed, let alone addressed, the facts established at Paragraphs 66-72 of the Ferrara II Report.

*The Alleged "Combination" Or "Backing Pattern"*

**109.    Beyond the foregoing factually baseless attempt to fabricate alleged melodic and structural similarities that do not exist, which are commonplace musical techniques,**

**including techniques which were previously employed by both Sheeran and Wadge in their prior songs and are a part of both Sheeran's and Wadge's musical toolkits, ~~SAS~~SAS's infringement claim is based essentially exclusively on what Dr. Covach alleges is a "backing pattern" that he claims exists in each song. (Revised Covach Report ¶¶ 3, 17-22).**

*SAS Response: Undisputed that the commonalities between LGO and TOL is reflected in the "backing pattern," which forms a part of Dr. Covach's conclusion that the two songs are similar. Disputed as to the remainder of the characterizations in this paragraph, which are nothing more than attorney hyperbole and argument. Revised Covach Report (ECF ~~179-1~~200-7), passim; Revised Covach Rebuttal (ECF ~~179-7~~200-9), passim.*

DEFENDANTS' REPLY: SAS has admitted that the Statement is undisputed. SAS has not disputed (either in its "Response" to Paragraph 109 or in its Memorandum of Law) that SAS's infringement claim is based on Dr. Covach's "backing pattern."

**110. This alleged "backing pattern," as identified by Dr. Covach, is comprised of a "coordination of harmony (chord progression)~~, bass line,~~ and rhythm." (Revised Covach Report ¶ 3).**

*SAS Response: Undisputed.*

**111. Dr. Covach's Original Report specifically ~~requires~~required that the combination include all three elements (including a bass line) and opined that it was the "precise combination" of these three required elements ~~for the alleged infringement claim to exist~~that gave rise to his opinion of copying; without all three elements, Dr. Covach ~~admits~~admitted that his conclusion of copying has no foundation. (~~Id.~~Covach Report ¶¶ 3, 17-22).**

*SAS Response: Disputed. In his Original Report, Dr. Covach ~~identifies~~identified three*

*elements in the "backing pattern," but never ~~states~~stated that all three elements are required for a finding of similarity. Original Covach Report (ECF 179-1), passim; Original Covach Rebuttal (ECF 179-7), passim. As discussed in the accompanying Memorandum of Law, this Court has concluded – in its decision in the Griffin matter that is binding on Defendants – that the disputed material questions of fact concerning purported commonality of <u>two</u> elements requires that the Court deny Defendants' motion for summary judgment of infringement. Griffin ECF 93 (Jan. 3, 2019) at 2, 10-13, 18. Also as discussed in the accompanying Memorandum of Law, Defendants' cases in purported support of the argument that two elements cannot, as a matter of law, support a selection and arrangement argument, provide no such support.*

**DEFENDANTS' REPLY**:  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  Dr. Covach's Original Reports make plain that each of the three elements ~~is~~was, in fact, required for his opinion to exist.  (*See, e.g.*, Original Covach Rebuttal Report ¶ 2 ("My report does not argue that any of these elements taken in isolation is unique.  Rather, I argue that it is the <u>precise</u> combination of these <u>three</u> elements … that constitutes [LGO's] distinctiveness") (emphases added); Original Covach Report ¶ 22 (opining that it is the "combination of three specific elements" in LGO that supposedly renders LGO "distinctive"); *id.* ¶ 19 (opining that "it is the distinctive combination of these elements that forms the basis for a claim of originality"); *id.* ¶ 20 (opining that "the combination" of these three elements in TOL "appropriates distinctive material" from LGO)).  Moreover, as demonstrated in the accompanying Reply Memorandum of Law, Defendants have, in fact, cited authority demonstrating that the combination of two or even three, four or five commonplace elements does not satisfy the "numerous" requirement of the selection and

arrangement test; if the combination of three, four and five commonplace elements do not pass muster, then the combination of but two commonplace elements necessarily does not suffice.

~~112.    It is undisputed – and this Court has already found – that the Deposit Copy does not notate a bass-line, and a bass-line is not part of LGO's copyright. (Ferrara I Report ¶¶ 23-24, 109; Covach Report ¶ 8; Covach Report ¶ 6; *Griffin* v. *Sheeran*, No. 17-cv-5221 (LLS), 2020 U.S. Dist. LEXIS 52908, at \*2-3 (S.D.N.Y. Mar. 24, 2020)).~~

~~*SAS Response: As discussed in the accompanying Memorandum of Law, the "deposit copy" decision in Griffin (Griffin ECF 121) is not binding on Plaintiff. However, this Court has concluded – in its decision in the Griffin matter that is binding on Defendants – that the disputed material questions of fact concerning purported commonality of two elements requires that the Court deny Defendants' motion for summary judgment of infringement. Griffin ECF 93 (Jan. 3, 2019) at 2, 10-13, 18.*~~

~~**DEFENDANTS' REPLY:**  SAS does not dispute that there is no bass line notated in the Deposit Copy, as there plainly is not.  Its argument here is purely one of law and on that, Defendants respectfully refer the Court to their accompanying Reply Memorandum of Law.~~

~~**113.    As a result, the three element alleged "backing pattern," claimed by Dr. Covach, which requires a "bass-line" is not reflected in the Deposit Copy, which does not include any bass-line, much less the specific bass-line claimed by SAS. (*Id.*).**~~

**112.    [Intentionally omitted as resolved by the Court's Daubert Order].**

*SAS Response: [This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]*

**113.    [Intentionally omitted as resolved by the Court's Daubert Order].**

*SAS Response: [This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]*

**Supplemental Statement No. 10. As noted, in its Daubert Order, the Court reaffirmed its prior ruling that the Deposit Copy does not notate a bass-line, and that a bass-line is not part of LGO's copyright. (ECF 197).**

*SAS Response*: Undisputed. This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

**Supplemental Statement No. 11. Despite the Original Covach Report requiring the combination of all three elements, the Revised Covach Report proceeds as if the Court's elimination of the third element (the bass line) that the Original Covach Report previously required, is of no consequence and that now it is the "precise combination" of only two elements, both of which this Court has already held are commonplace and unprotectible, that give rise to his opinion of copying. (Revised Covach Report ¶¶ 3, 17-22).**

*SAS Response:* ~~As discussed in the accompanying Memorandum of Law, the "deposit copy" decision in Griffin (Griffin ECF 121) is not binding on Plaintiff. However, this Court has concluded—in its decision in the Griffin matter that is binding on Defendants—that the disputed material questions of fact concerning purported commonality of~~ two ~~elements requires that the Court deny Defendants' motion for summary judgment of infringement. Griffin ECF 93 (Jan. 3, 2019) at 2, 10-13, 18~~Disputed. The quoted language is incomplete and taken out of context. *Please see Plaintiff's* ~~SAS~~ *response to paragraph* ~~22~~111*, which is incorporated in full into this* ~~SAS~~ *response.*

**DEFENDANTS' REPLY:** ~~Defendants refer the Court to their Reply to Paragraph 112.~~The quoted language is neither incomplete nor taken out of context, the Original Covach Reports and Revised Covach Reports speak for themselves, and this Statement remains undisputed.

114.     As detailed above, Dr. Covach admits that LGO's I-iii-IV-V chord progression and its rhythmic anticipation of chord changes are both commonplace musical elements. (*Supra* ¶¶ 36, 42).

*SAS Response: Undisputed that each element, standing alone, is unprotectible. The use of the combination of elements in LGO and TOL, however, is similar and distinctive. Revised Covach Report (ECF ~~179-1~~200-7), passim; Revised Covach Rebuttal (ECF ~~179-7~~200-9), passim; Revised Everett Report (ECF ~~179-5~~200-11), passim.*

**DEFENDANTS' REPLY:**   SAS has admitted that the Statement is undisputed and, as Defendants' moving papers demonstrated, a combination of two unprotectable elements does not, as a matter of law, suffice to satisfy the "numerous" requirement under the "selection and arrangement" test.  (Mov. Mem. at ~~20-23~~22-25).  Further, it is indisputable TOL does not use or arrange either of the two unprotectable "backing pattern" elements in LGO in an identical or near identical manner (*a fortiori*, it does not replicate the alleged combination in an identical or near identical manner) – representing an independently dispositive reason why SAS's "selection and arrangement" claim fails as a matter of law.

115.     Indeed, even without having performed any prior art search – itself a flaw that warrants exclusion of Dr. Covach's Reports – Dr. Covach ~~has~~**previously** admitted that there may be songs prior to LGO that employ both of these elements. (**Original** Covach Report ¶ 22).

*SAS Response: Disputed that Dr. Covach was required to conduct a prior art search. Original Everett Report (ECF 179-5), passim. Disputed that "Dr. Covach ~~has~~previously admitted that there may be songs prior to LGO that employ both of these elements." What he actually wrote was "perhaps even two of them together." Original Covach Report (ECF 179-1) ¶ 22.*

**DEFENDANTS' REPLY:** While again invoking the word "disputed," SAS then provides not a single fact to show any dispute. As such, the Statement remains undisputed. It is undisputed that Dr. Covach did not conduct a prior art search, and the pretense that he was relying on Dr. Everett whose report he never mentioned in his report and whose report was dated weeks later is baseless. and irrelevant given that the Court has barred both Dr. Everett and Dr. Covach from opining on prior art. (ECF 197 at 4). As to whether a prior art search is required, the law is clear that it is. *See Johannsongs-Publishing Ltd. v. Rolf Lovland*, No. 18-cv-100009 (AB), 2020 WL 2315805, at *5 (C.D. Cal. Apr. 3, 2020), *aff'd*, No. 20-55552, 2021 WL 5564626 (9th Cir. Nov. 29, 2021); *Smith v. Weeknd*, 19-cv-2507 (PA), 2020 WL 4932074, at *2, *6 (C.D. Cal. July 22, 2020).

**116.     In fact, multiple works exist that use a I-iii-IV-V chord progression (or a I-I6-IV-V chord progression) together with anticipation of chord changes on the second and fourth chords. (Ferrara I Report ¶¶ 56-65, 107;** *see also* **Revised Covach Report ¶¶ 11-13; Ferrara Rebuttal ¶¶ 30-38).**

*SAS Response: Disputed. Dr. Everett explains that based on his study, the sixth most popular chord progression beginning with I is the progression at issue here: "I - iii - IV - V (or its bass-line equivalent, I - I6 - IV - V)." He goes on to explain: "the progression class shared between our exhibits by Marvin Gaye - Edward Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it." Revised Everett Report (ECF 179-5200-11) ¶¶ A.6-7.*

*Dr. Everett identifies 12 songs released before LGO with the same "combined upper voice and chord progression" as LGO and TOL, but then makes the point that LGO and TOL depart in a critical way:*

*Because neither the Gaye - Townsend composition nor Sheeran in his performance are interested in the upper-voice ^7, the melodies in the Gaye - Townsend deposit copy and the Sheeran recording are marked as deviant from the most common vocalization against iii in this specific progression, further supporting the connection of class members I - iii - IV - V and I - I6 - IV - V in these exhibits.*

*Revised Everett Report (ECF ~~179-5~~200-11) ¶ B.7.*

*Dr. Everett also takes note of common but unusual features of TOL and LGO, identifying only one other song that is potentially similar:*

*It is very unusual to repeat the I - iii - IV - V progression as a loop without contrast, and beyond rare to do so throughout the entirety of both verses and choruses; the Commodores' "Easy" is the only such example known to me other than our Gaye - Townsend and Sheeran exhibits.*

*Revised Everett Report (ECF ~~179-5~~200-11) ¶ C.3.*

*On the topic of harmonic rhythm or syncopation, Dr. Everett once again opines that ~~few songs using the same or equivalent chord progression also have~~ "Syncopated chord changes, ~~and only one other song has the same~~ syncopation as LGO and TOL: "Thus, theoccurring on weak beats, are much less common, but these are heard in both Gaye - Townsend and Sheeran exhibits ~~are two of only three songs in our 6,000-song sample using the I - iii - IV - V chord progression class that share the same pattern of syncopated chord changes, the third being 'Georgy Girl.'"~~.*

*Revised Everett Report (ECF ~~179-5~~200-11) ¶ D.1.*

*Dr. Everett summarizes his ~~prior art findings~~overall analysis of the two works as follows:*

*In summary, comparison of the Gaye - Townsend deposit copy with the Sheeran recording yields a number of correspondences: both songs share the same repeated four-chord progression. Both feature melodies based on the same distinctive structural shape, including similar relations between vocal tones and underlying chords, and both display the same rhythmic freedom. Both songs share the same formal structures at all levels, from surface phrases to largest sections. Both are among the only three known songs to share the same syncopation of the repeated four-chord pattern. The sharing of all of these elements strongly evidence copying by Sheeran of Gaye - Townsend.*

*Revised Everett Report (ECF ~~179-5~~200-11) ¶ E.4.*

Dr. Ferrara ~~opines on the topic of prior art, arguing that although~~argues in response that there are many songs that use the I – iii – IV – V chord progression (about which there is no real debate), and ~~claiming~~claims that he found three pre-1973 songs that have the same combination of elements identified by Dr. Covach. Dr. Covach meets Dr. Ferrara with respect to all three songs, explaining why – in his expert opinion – they do not share the combination of elements and are not "prior art" to LGO. Regarding "Downtown" he says that Dr. Ferrara – who did not provide musical transcription to back up his claim – is simply incorrect:

> As indicated by the example, the chord progression moves from I to IV and then to V, with all three harmonies occurring over a repeated D note in the bass (a centuries-old technique called "pedal point"), indicated by the label "tonic pedal" in Example 1. As least as far as concerns the published sheet music, <u>the backing pattern as I have defined it is not present.</u>

*Revised* Covach Rebuttal (ECF ~~179-7~~200-9) ¶ 10 (emphasis added).

As for "Since I Lost My Baby," Dr. Covach points out that Dr. Ferrara chose an obscure version of the song recorded by Ray French, as opposed to the mainstream version recorded by the Temptations that reached Number 17 on the U.S. pop music charts, which – based on the sheet music – does not use the same combination of elements:

> Example 2 provides the opening measures to the verse section as it appears in the published sheet music for "Since I Lost My Baby." Note that while the ~~bass part and~~ harmonic rhythm from the backing pattern ~~are~~is present in "Since I Lost My Baby," the final chord differs: instead of the V chord that is part of the LGO and TOL patterns, a I chord is used here with a C in the bass (traditionally referred to as a "I64 chord").

*Revised* Covach Rebuttal (ECF ~~179-7~~200-9) ¶ 11.

Dr. Covach identifies the same problem with Dr. Ferrara's use of "Georgy Girl" – Dr. Ferrara points an obscure "easy listening" orchestral version of the song, rather than the global hit version recorded by The Seekers. When compared to the mainstream version, Dr. Covach explains, the combination of elements is not there:

> *Note that while the four-chord progression is the same as the one in LGO, ~~and the bass line shares a common underlying structure as that of LGO (though there is some variation),~~ the harmonic rhythm does not match the one found in LGO, since the chords all change directly on the beats one and three, and thus lacking the element of syncopation or "anticipation," as Dr. Ferrara labels it.*

*Revised Covach Rebuttal (ECF ~~179-7~~200-9) ¶ 13.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute but only parrots lengthy portions of its expert reports, which fail to address the specific point.  As such, the Statement remains undisputed.  It is undisputed that Dr. Ferrara identified at least two songs released prior to LGO that feature the same combination of chords and harmonic rhythm:  (i) *Since I Lost My Baby* by Ray French (1966) and (ii) *Georgy Girl* by 101 Strings Orchestra (1967).  (Ferrara I Report ¶¶ 56-65, 107).  Dr. Covach <u>does not dispute</u> that these two songs feature the same combination of unprotectable elements.  (Revised Covach Rebuttal Report ¶¶ 11-13; Ferrara Rebuttal Report ¶¶ 30, 35) but notes that other recordings of these songs do not feature the exact same combination of elements, which is irrelevant. (*Id.*).

As for the prior art example, *Downtown*, Dr. Ferrara was clear in his Report that *Downtown*, while extremely similar to LGO, did <u>not</u> include the same exact combination of elements since anticipation in *Downtown* only occurs on the second chord (whereas it occurs on both the second and fourth chords in LGO).  (Ferrara I Report ¶ 59 n.20).  SAS is plain wrong when it claims that Dr. Ferrara did not transcribe *Downtown*.  (*Compare* <u>Renewed</u> 56.1 Response ¶ 116, *with* Ferrara Rebuttal Report ¶ 29).

In addition, SAS's Response to Statement No. 116 continues to rely on the already-rejected and already-excluded prior art analysis of Dr. Everett.  For example, as the red-lined language above illustrates, while SAS deletes the words "prior art findings" from its Response, it then quotes

the very same "prior art findings" it regurgitated in its 56.1 Response on the Original Summary Judgment Motion.    Finally, SAS also impermissibly continues to cite Dr. Everett's naked, inadmissible *ipse dixit* conclusion that "[s]yncopated chord changes, occurring on weak beats, are much less common," an opinion for which no foundation and no evidence exists given Dr. Everett's inability to opine on prior art.

117.    As noted above, TOL co-author Amy Wadge co-authored a song prior to co-authoring TOL that includes a I-I6-IV-V chord progression that anticipates chord changes on the second, third and fourth chords (i.e., the only difference between TOL and this prior work by Amy Wadge is that the prior work also happens to anticipate the third chord change). (*Supra* ¶ 53).

*SAS Response: Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed and all else is irrelevant.

118.    As noted above, prior to releasing the album x (which includes TOL), Sheeran used anticipation in at least twenty songs that he wrote or co-wrote, and in ten of those twenty songs, anticipation occurs on the second and fourth chords of a chord progression (as in TOL and LGO). (*Supra* ¶ 52).

*SAS Response: Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither*

*Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, passim; Ferrara II Report, passim; Ferrara Rebuttal Report, passim; Ricigliano Report, passim.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed and all else is irrelevant.

~~**119.   In addition to the fact that Dr. Covach's three element backing pattern does not actually exist in the Deposit Copy (because one of the three required elements does not exist), with respect to the two remaining commonplace elements, TOL does not use the two elements in an identical or virtually identical manner to LGO. (Ferrara Rebuttal Report ¶ 26).**~~

**119.   TOL does not use the two commonplace and unprotectible elements in an identical or virtually identical manner to LGO, as even Dr. Covach has admitted through his "functional equivalence" assertion and as shown above in Paragraphs 41-51. (Revised Covach Report ¶ 7 Ferrara Rebuttal Report ¶ 26; *supra* ¶¶ 41-51).**

***SAS Response:*** *Disputed. Please see Plaintiff's ~~SAS~~ responses to paragraphs 22, 33, 41 and 116, which are incorporated in full into this ~~SAS~~ response.*

**DEFENDANTS' REPLY:**  While again invoking the word "disputed," SAS then provides not a single fact to show any dispute.  As such, the Statement remains undisputed.  The cited Paragraphs do not refute that TOL does not replicate the elements in question in an identical or virtually identical manner.  (*Supra* ¶¶ 41, 46-51).

**V.   Indirect Touring And Merchandising Profits**

**120.   SAS has no evidence showing that Sheeran's touring and merchandising profits have any causal nexus to the alleged infringement. (Original Zakarin Decl. ¶¶ 116-120).**

*SAS Response: As discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were* ~~direct infringements~~*separate acts of infringement, giving rise to* direct profits*, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed, and all else is irrelevant.

**121.    SAS did not serve requests for production that bear upon whether a causal nexus exists between Sheeran's touring and merchandising profits and TOL's alleged infringement of LGO. (*Id.* at Exhibit 18).**

*SAS Response: Undisputed, but as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were* ~~direct infringements~~*separate acts of infringement, giving rise to* direct profits*, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed, and all else is irrelevant.

**122.    Defendants served requests for production on SAS seeking documents and other tangible items that support SAS's claim of a causal nexus between Sheeran's touring and merchandising profits and TOL's alleged infringement of LGO. (*Id.* at Exhibit 19, Request Nos. 33, 35, 36, 44, 61, 86).**

*SAS Response: Undisputed, but as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were* ~~direct infringements~~*separate acts of infringement, giving rise to* direct profits*, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed, and all else is irrelevant.

**123.    SAS has not produced any documents or tangible items responsive to the above-mentioned requests. (Original Zakarin Decl. ¶ 119).**

*SAS Response: Undisputed, but, as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were* ~~direct infringements~~*separate acts of infringement, giving rise to* direct profits*, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits. Moreover, SAS would not have access to any such documents, which – if they exist – would be in the exclusive possession of Defendants.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed, and all else is irrelevant.  ~~.~~

**124.    Instead, SAS produced a total of 403 pages of documents, which fall under the following seven categories: (1) documents from and correspondence with ASCAP, BMI, SoundExchange and The Harry Fox Agency concerning public performance income, interactive streaming income and mechanical royalties; (2) hearsay articles from print**

publications and the Internet; (3) probate records for the Estate of Ed Townsend; (4) sheet music; (5) excerpts from a book on Marvin Gaye's "Greatest Hits"; (6) email correspondence between SAS's principal and others regarding this matter and other music infringement cases; and (7) royalty statements for LGO. (*Id.*).

*SAS Response: Undisputed but, as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were ~~direct infringements~~separate acts of infringement, giving rise to direct profits, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits. Moreover, SAS would not have access to any such documents, which – if they exist – would be in the exclusive possession of Defendants.*

**DEFENDANTS' REPLY:**  SAS has admitted that the Statement is undisputed, and all else is irrelevant.

### PART III: DEFENDANTS' REPLY TO SAS'S COUNTER-STATEMENT OF FACTS

125.    On May 31, 2020, Plaintiff served the Expert Report on Damages and Profits, authored by Gary Cohen, CPA ("Cohen Report"), on Defendants. Parness Cert. ¶ 3 & Ex. 1.

*Defendants' Reply*:  *Undisputed.*

126.    On July 7, 2020, Defendants served the Amended Expert Report of Barry M. Massarsky ("Massarsky Report"), on Plaintiff. Parness Cert. ¶ 4 & Ex. 2.

*Defendants' Reply*:  *Undisputed.*

127.    According to Plaintiff, a proper apportionment of the profits arising from Mr. Sheeran's 94 concert performances of TOL on or after June 28, 2015 ranged from 13.13% (based on Chartmasters Spotify data) to 23.97% (using Recording Industry Association of America

certified sales data). Cohen Report (Parness Cert. Ex. 1) at 9-10.

    ***Defendants' Reply***:  *Undisputed that the Cohen Report includes the cited statements, but dispute that the cited statements are proper and accurate, or that they have any evidentiary or foundational basis.  Further, SAS has admitted that it has no evidence of a causal nexus, which precludes it from recovering touring and merchandising profits as a matter of law.*

    128.   Defendants admit that if TOL infringes LGO, sales of multi-track albums containing single recordings of TOL are ~~direct infringements~~<u>separate acts of infringement</u>. Massarsky Report (Parness Cert. Ex. 2) at 4-5.

    ***Defendants' Reply****:  Disputed.  The cited evidence does not support the cited proposition.  Whether or not an act is a "direct" infringement (as opposed to vicarious or contributory infringement) is a legal question.  Further, SAS conflates the concept of "direct infringement" with "direct profits."  Whether or not an act amounts to a "direct infringement" has nothing to do with whether profits derived from such an act constitute "direct profits" or "indirect profits."*

    129.   Defendants admit that if TOL infringes LGO, profits arising from sales of record albums containing recordings of TOL are direct profits. Massarsky Report (Parness Cert. Ex. 2) at 4-5.

    ***Defendants' Reply***:  *Disputed.  The cited evidence does not support the cited proposition.  Whether or not profits derived from an infringing activity represent "direct" profits (as opposed to "indirect" profits) is a legal question.  Further, where a recording appears on a physical album or a digital album, the purchase of the physical or digital album necessarily includes the recording that is allegedly infringing.  Thus, an allocable share of the album's profits are properly considered in connection with the infringement.  The measure of the allocable share depends on factors which may reduce the share below a straight line.*

130.    Defendants admit that if TOL infringes LGO, there is a causal nexus between the infringing TOL, and the profits arising from sales of record albums containing recordings of TOL. Massarsky Report (Parness Cert. Ex. 2) at 4-5.

**Defendants' Reply**:  *Disputed.  The cited evidence does not support the cited proposition. Nevertheless, Defendants do not dispute that if TOL infringes LGO, then SAS may recover a portion of the profits arising from sales of record albums containing recordings of TOL.*

131.    Defendants argue that if TOL infringes LGO, the profits arising from sales of record albums containing recordings of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of tracks on the album. Massarsky Report (Parness Cert. Ex. 2) at 4-5.

**Defendants' Reply**:  *Undisputed; however, Defendants clarify that various configurations of the album X (the album containing TOL) exist, with different numbers of tracks on each, and that one must divide by the weighted average of the various configurations of the album sold to calculate the appropriate figure.  And, in addition, a less than straight line allocation may also be proper depending on the success of other singles from the album and whether the allegedly infringing work was the first or a later single.*

132.    Defendants argue that if TOL infringes LGO, the profits arising from live performances of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of songs performed. Massarsky Report (Parness Cert. Ex. 2) at 21.

**Defendants' Reply**:  *Disputed.  SAS misrepresents the Massarsky Report.  Massarsky specifically and repeatedly stated that he put forth a straight-line analysis solely to counter the massively inflated and baseless Cohen Report, but that he disagreed that any basis existed for SAS to recover any touring or merchandise income because nothing connected ticket or merchandise*

*sales to TOL.  (ECF 186-3 at 6, 15, 18, 22).  Thus, contrary to SAS's misrepresentation of the*

*Massarsky Report, only in the event that SAS could establish such nexus (and it cannot because it*

*has no such evidence, produced none in discovery and waived the right to provide any evidence if*

*it had any by failing to oppose this motion with any admissible evidence), then, and only then, was*

*it Massarsky's view that the only proper basis to apportion touring profits would be on a straight-*

*line basis.  (Id. at 21, 23, 29-32).*

Dated: New York, New York
         January 14, 2022

PRYOR CASHMAN LLP

By: */s/ Donald S. Zakarin*
     Donald S. Zakarin
     Ilene S. Farkas
     Andrew M. Goldsmith
7 Times Square
New York, NY 10036
(212) 421-4100

*Attorneys for Defendants Edward
Christopher Sheeran, Sony/ATV Music
Publishing LLC, Atlantic Recording
Corporation, BDi Music Ltd., Bucks Music
Group Ltd., The Royalty Network, Inc.,
David Platz Music (USA) Inc., Amy Wadge
and Jake Gosling*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                  :
STRUCTURED ASSET SALES, LLC,     :
                  :  Index No. 1:18-cv-5839 (LLS)
       Plaintiff,       :
                  :
       v.            :  **SUPPLEMENTAL**
                  :  **CERTIFICATION OF**
EDWARD CHRISTOPHER SHEERAN, p/k/a  :  **HILLEL I. PARNESS**
ED SHEERAN, SONY/ATV MUSIC    :
PUBLISHING, LLC, ATLANTIC     :
RECORDING CORPORATION d/b/a    :
ATLANTIC RECORDS, BDI MUSIC LTD.,  :
BUCKS MUSIC GROUP LTD., THE    :
ROYALTY NETWORK, INC., DAVID PLATZ :
MUSIC (USA) INC., AMY WADGE, JAKE  :
GOSLING and DOES 1 THROUGH 10,   :
                  :
       Defendants,     :
-------------------------------------------------------------- X

Hillel I. Parness, being of full age, hereby certifies and states:

1.    I am counsel for Plaintiff Structured Asset Sales ("SAS" or "Plaintiff") in the above-referenced action.

2.    I submit this supplemental certification on behalf of Plaintiff, pursuant to Local Civil Rule 56.1(b), in further support of Plaintiff's Renewed Cross-Motion for Summary Judgment.

3.    Attached hereto as **Exhibit 4** are true and correct copies of excerpts from the summary judgment briefs submitted by the parties in *Stoliarov v. Marshmello Creative, LLC*, 2:19-cv-03934-PSG (C.D. Cal.) (*Stoliarov* ECF 89, 95, 125).

4.    Attached hereto as **Exhibit 5** are true and correct copy of excerpts from the appeal briefs submitted by the parties in *Stoliarov v. Marshmello Creative, LLC*, No. 21-55442 (9th Cir) (*Stoliarov* ECF 18, 27, 38).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2022 in Englewood, New Jersey.

___/s/ Hillel I. Parness_____
Hillel I. Parness

# EXHIBIT 4
# TO SUPPLEMENTAL CERTIFICATION OF
# HILLEL I. PARNESS

MANATT, PHELPS & PHILLIPS, LLP
ROBERT A. JACOBS (Bar No. CA 160350)
E-mail: rjacobs@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail: epetrossian@manatt.com
MAURA K. GIERL (Bar No. CA 287430)
E-mail: mgierl@manatt.com
NORO MEJLUMYAN (Bar No. CA 324145)
E-mail: nmejlumyan@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Defendants*
MARSHMELLO CREATIVE, LLC;
THE ARTIST P/K/A MARSHMELLO;
JOYTIME COLLECTIVE, LLC; DANIEL
CAMPBELL SMITH; STEVEN MCCUTCHEON;
MARSHMELLO MUSIC LLC; ROKSTONE
MUSIC LIMITED; WWKD LIMITED; KOBALT
MUSIC PUBLISHING AMERICA, INC.; and
POLYGRAM PUBLISHING, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTEM STOLIAROV p/k/a ARTY,<br><br>Plaintiff,<br><br>v.<br><br>MARSHMELLO CREATIVE, LLC et al.,<br><br>Defendants. | No. 2:19-cv-03934-PSG (JPRx)<br><br>Hon. Philip S. Gutierrez<br>Courtroom 6A<br><br>**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:   April 12, 2021<br>Hearing Time:   1:30 p.m.<br><br>Am. Compl. Filed:   Aug. 9, 2019<br>Discovery Cutoff:   Jan. 13, 2021<br>Final Pretrial Conf.:   Apr. 19, 2021<br>Trial Date:   Apr. 27, 2021 |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Bouchat v. Baltimore Ravens, Inc.,*
    215 F. Supp. 2d 611 (D. Md. 2002) ................................................. 18, 21, 22, 23

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................... 13, 14

*Davis v. The Gap, Inc.,*
    246 F.3d 152 (2d Cir. 2001) ................................................................ 18, 21

*Gray v. Perry,*
    No. 15-cv-5642, 2019 WL 2992007 (C.D. Cal. July 5, 2019) ......................... 18

*Gray v. Perry,*
    No. CV 15-05642, 2017 WL 1240740 (C.D. Cal. Apr. 3, 2017) ..... 14, 15, 16, 17

*Mackie v. Rieser,*
    296 F.3d 909 (9th Cir. 2002) ...................................................................passim

*Peer Int'l Corp. v. Pausa Records, Inc.,*
    909 F.2d 1332 (9th Cir. 1990) ........................................................................ 14

*Polar Bear Prods., Inc. v. Timex Corp.,*
    384 F.3d 700 (9th Cir. 2004) ...................................................................passim

*Sierra Med. Servs. Alliance v. Kent,*
    883 F.3d 1216 (9th Cir. 2018) ........................................................................ 14

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ...................................................................................... 14

*Structured Asset Sales, LLC v. Sheeran,*
    433 F. Supp. 3d 608 (S.D.N.Y. 2020) ...................................................... 16, 17

*Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.,*
    197 F.3d 1366 (Fed. Cir. 1999) ...................................................................... 18

**STATUTES**

17 U.S.C. § 504(b) ................................................................................passim

**RULES**

Fed. R. Civ. P. 56 ................................................................................ 13, 25

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

ii

DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

1   or otherwise" songs from the ASCAP repertory.  (SUF 13)  So long as a venue or

2   promoter has secured one of the ASCAP Blanket Licenses, then *any* artist

3   performing at the licensed event is authorized to perform *any* song within ASCAP's

4   repertory without infringing ASCAP's members' public performance rights in the

5   song.  (SUF 14-15)  Thus, with respect to any of the Live Shows for which the

6   venue or promoter obtained a Blanket License (SUF 35), Moving Defendants had

7   an unequivocal right to perform the Remix Composition – on its own or as part of

8   *Happier* – without infringing Plaintiff's copyright (if any) in the Remix

9   Composition.  In other words, just as the court found in *Gray*, the unambiguous

10   language of the Blanket Licenses confirms Moving Defendants were authorized to

11   perform both *Happier* and the Remix Composition at the licensed Concerts, and

12   "***said performance could not have infringed [Plaintiff's] performance rights***" in

13   the Remix Composition, even if *Happier* is derivative of the Remix Composition.

14   *Gray*, 2017 WL 1240740 at *10 (emphasis added).

15       Based on prior briefing, Moving Defendants expect that Plaintiff will rely on

16   *Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608 (S.D.N.Y. 2020) for

17   the proposition that there is a fact issue concerning whether ASCAP's "licenses (if

18   they exist) would . . . preclude a finding of infringement."  (Dkt. 74-1 at 12:5-8)

19   Both Plaintiff and the court in *Structured Asset* are incorrect.

20       As a threshold matter, *Structured Asset* analyzed whether defendants

21   properly withheld from discovery certain live performance documents, including

22   documents concerning concert revenues, based on blanket licenses that ASCAP

23   granted to venues at which defendant performed an allegedly infringing song.  433

24   F. Supp. 3d at 609.  Here, there is no discovery issue before this Court, because

25   Moving Defendants produced all required documents concerning the Live Shows

26   (subject to a reservation of their right to file this motion).  In any event, in

27   analyzing the substantive discovery issue in *Structured Asset*, the court incorrectly

28   concluded that although "ASCAP's blanket licenses conveyed to licensees the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

1 authors' right to perform their songs", "[t]hey did not convey the consent of any
2 author to play music which infringed his songs [because] the licenses do not
3 transform an infringing work into one that" is not infringing.  *Id.* at 611.

4     The *Structured Asset* analysis is wrong because it ignores the fact that the
5 question of whether the derivative song is *itself* infringing is a different inquiry than
6 the question of whether the *performance* of that song is infringing.  The court's
7 conclusion that "ASCAP's blanket licenses conveyed to licensees the authors' right
8 to perform their songs" unequivocally answers the latter question.  *See id.* at 611.
9 But unlike the court in *Structured Asset*, Judge Snyder's analysis in *Gray* properly
10 identifies the distinction, concluding that *regardless* of whether *Dark Horse*
11 infringed *Joyful Noise*, defendants' public performance of *Dark Horse* at ASCAP-
12 licensed events was not actionable.  *Gray*, 2017 WL 1240740 at *10.  In other
13 words, the ASCAP Blanket Licenses do not immunize an underlying infringement
14 in a derivative work; they *only* preclude a finding of infringement based on the
15 public performance of that work at an ASCAP-licensed concert or event.  *See id.*

16     That is precisely the issue before the Court now.  Indeed, the Court need not
17 decide whether *Happier* infringes Plaintiff's supposed copyright in the Remix
18 Composition (and it does not).  To the contrary, *regardless* of whether *Happier*
19 infringes the Remix Composition (and again, it does not), Moving Defendants' live
20 performances of *Happier* at the Concerts for which there are ASCAP Blanket
21 Licenses cannot, as a matter of law, constitute infringement.  *Gray*, 2017 WL
22 1240740 at *10.  Accordingly, Moving Defendants are entitled to partial summary
23 judgment in their favor with respect to Plaintiff's infringement claim as it applies to
24 their live performance of *Happier* at each of the ASCAP-licensed Concerts.

25     **B.**    **The Court Should Dismiss Plaintiff's Damages Claim With**
26     **Respect To Moving Defendants' Live Performance Profits Because**
27     **He Has Not Adduced Any Evidence Of A Causal Connection**
    **Between Such Profits And Their Performances Of *Happier***

28 Because Moving Defendants' live performances of *Happier* could not have

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

17

DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

1     Richard S. Busch (SBN 319881)
      Brittney R. Dobbins (SBN 299768)
2     E-Mail: *rbusch@kingballow.com*
      E-Mail: *bdobbins@kingballow.com*
3
      **KING & BALLOW**
4     1999 Avenue of the Stars, Suite 1100
      Century City, CA 90067
5     Telephone: (424) 253-1255
6     Facsimile: (888) 688-0482
7     *Attorney for Plaintiff*

8             **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10   ARTEM STOLIAROV p/k/a ARTY, an individual. | Case No.: 2:19-cv-03934-PSG (JPRx) |
| 11 | |
| 12           PLAINTIFF, | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 13   vs. | |
| 14   MARSHMELLO CREATIVE, LLC, a Delaware Limited Liability Company; | |
| 15   CHRISTOPHER COMSTOCK p/k/a MARSHMELLO, an individual; | Assigned to: Hon. Philip S. Gutierrez |
| 16   DANIEL CAMPBELL SMITH, an individual; STEVEN MCCUTCHEON | Hearing Date: April 12, 2021 Hearing Time: 1:30 p.m. |
| 17   p/k/a STEVE MAC, an individual; MARSHMELLO MUSIC LLC, a | Complaint Filed: May 6, 2019 |
| 18   Delaware Limited Liability Company; ROKSTONE MUSIC LIMITED, a | Am. Compl. Filed: August 9, 2019 Discovery Cutoff: January 13, 2021 |
| 19   United Kingdom Private Limited Company; WWKD LIMITED, a | Final Pretrial Conf.: July 19, 2021 Trial Date: July 27, 2021 |
| 20   United Kingdom Private Limited Company; KOBALT MUSIC | |
| 21   PUBLISHING AMERICA, INC., a Delaware Corporation; POLYGRAM | |
| 22   PUBLISHING, INC. d/b/a UNIVERSAL POLYGRAM | |
| 23   INTERNATIONAL PUBLISHING, a Delaware Corporation. | |
| 24          DEFENDANTS. | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

*Brach v. Newsom*, No. 2:20-cv-06472, 2020 U.S. Dist. LEXIS 232008 (C.D. Cal. December 1, 2020) .................................................................3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...................................................3, 23

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826 (9th Cir. 1985)....13

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994).........................................................13, 17, 23, 24

*Dwyer Instruments, Inc. v. Sensocon, Inc.,*
873 F. Supp. 2d 1015 (N.D. Ind. 2012) .........................................................23, 24

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* 886 F.2d 1545, 1550 (9th Cir. 1989) ("*Frank Music II*") .................................................................14

*Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505 (9th Cir. 1985)...............13, 14, 16

*Gray v. Perry,* No. 2:15-cv-05642-CAS (JCx),
2017 U.S.Dist.LEXIS 50803 (C.D.Cal. Apr. 3, 2017) ................................. passim

*Interstellar Starship Servs. v. Epix, Inc*., 125 F. Supp. 2d 1269 (D. Or. 2001).......13

*Johnson v. Hix Wrecker Service, Inc*., 651 F3d 658 (7th Cir. 2011)......................23

*Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002) .....................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...............3

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587.........................................................3

*Polar Bear Prods. v. Timex Corp.* 384 F.3d 700 (9th Cir. 2004)...............13, 14, 17

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992) ..............................................................................23

*Structured Asset Sales, LLC v. Sheeran*,
433 F. Supp. 3d 608 (S.D.N.Y. 2020) ..............................................................6, 7

*Transgo, Inc. v. Ajac Transmission Parts Corp.,*
768 F.2d 1001 (9th Cir. 1985) ...........................................................................13

**A1802**

Thus, here, even if this Court were to determine that Plaintiff granted ASCAP the right to license his work to Defendants for their public performances, which he did not, Defendants' conclusion that Plaintiff is therefore not entitled to live performance revenue simply does not follow, and is contradicted by the holding in the very case they cite. The issue before this Court is not one of apportionment, or even infringement, but of Plaintiff's right to seek recovery of concert revenue. Accordingly, Defendants' contentions are moot in this instance.

**B.      Defendants Did Not Have A License to Perform an Unauthorized Derivative of Plaintiff's Work**

Defendants suggest that the ASCAP Concert License and ASCAP Concert Promoters License (individually and collectively, the "Concert License") provides a blanket license for all songs "listed in the ASCAP repertory." But the Concert License clearly states that it only licenses songs that are listed in the ASCAP repertory **and** "*of which ASCAP has the right to license.*" Concert License §1(e)

Contrary to Defendants' contention, the Court in *Gray v. Perry* did not squarely address the substantive question of whether ASCAP was ever really authorized by the song's owner to license the public performance of the infringed song. The Court in that case did not need to substantively broach that question, because plaintiffs in that case never "aver[red] that ASCAP lacked authority to issue a performance license for [the infringed song]." *Gray*, 2017 U.S. Dist. LEXIS 50803 at *15. Since the plaintiffs "failed to 'set out specific facts' entitl[ing] them to a trial" on that issue, the *Gray* Court simply concluded there was "no material issue of disputed fact regarding ASCAP's authority" to issue the performance license. *Id*. at *16. Whatever may have been the consequences of that ruling in that case, it was not a ruling on the merits of what Plaintiff avers in this case: that ASCAP lacked the authority to issue a performance license for the infringed song.

**A1803**

1    The question before this Court was not substantively addressed until it came

2    before the Court in *Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608

3    (S.D.N.Y. 2020), where it rejected the very argument Defendants now advance,

4    correctly holding: "ASCAP's blanket licenses conveyed to licensees the authors'

5    rights to perform their songs. They did not convey the consent of any author to

6    play music which infringes his songs." *Structured Asset*, 433 F. Supp. 3d at 611.

7    This Court should adopt that correct ruling, since Defendants' position is

8    untenable, in that it suggests ASCAP has the right to license the public

9    performance of unauthorized copies of works in its repertory. Under the Copyright

10   Act, a copyright owner has the exclusive right to authorize preparation of

11   derivative works. 17 U.S.C. §106(2). Implicitly, a member of ASCAP, as a

12   copyright owner, reserves all rights not granted to ASCAP, which includes their

13   exclusive right to authorize the preparation of derivate works under 17 U.S.C

14   §106(2). To interpret the ASCAP agreements with its songwriter and music

15   publisher members as authorizing ASCAP to license public performances

16   facilitated by infringing copies of their music would come as a great surprise to

17   those members. AUF ¶1.

18   Defendants suggest that although an infringer may not have been authorized

19   by the copyright owner to *reproduce* the copy or *prepare* the derivate work, they

20   no less can perform the song, using the infringing copy, at will under the Concert

21   License. As the court in *Structured Asset* found, there is no basis in the ASCAP

22   Membership Agreement (the "Membership Agreement") for this reading, because

23   "[t]he blanket license can grant no more rights than the PRO is assigned by the

24   author." *Structured Asset Sales, LLC*, 433 F. Supp. 3d at 612. Defendants'

25   argument "lacks a foundation: there is no 'right' to infringe." *Id.* at 610.

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

Plaintiff never granted ASCAP the authority to license his work for performances of *Happier*. Nor could ASCAP have licensed the work, because it licenses only those works "of which it has a license to do so." Moreover, any public performance license that ASCAP purportedly provided was ineffective as to *Happier*. As stated above, the courts have long recognized that the blanket license from a performing rights organization "does not necessarily confer a right of immediate public performance." *BMI 2.*, 720 F.App'x at 17. A performance rights society might license performances of a composition without sufficient legal right to do so, or under a worthless or invalid copyright. *BMI 1*, 207 F.Supp. 3d at 376. In such cases, the "[p]erformance of a composition under an ineffective license may infringe an author's rights under copyright law." *Id*. Accordingly, ASCAP did not have the authority to license *Happier* for public performance and no license it issued would have effectuated such a license. At best, there are a serious number of triable issues of fact as to this issue.

### D. Defendants' Concert Revenue Constitutes Direct Profits as a Result of Infringing Live Performances

The Copyright Act provides that a copyright owner is entitled to recover actual damages as well as those "profits of the infringer that are attributable to the infringement[…]."17 U.S.C. §504(b); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1023 (9th Cir. 1985). "[T]he plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues *are entirely attributable to the infringement*." *Interstellar Starship Servs. v. Epix, Inc*., 125 F. Supp. 2d 1269, 1272 (D. Or. 2001) (emphasis added); *see also* 17 U.S.C. §504(b); *Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828 (9th Cir. 1985); *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**A1805**

1   F.3d 1147, 1173 (1st Cir. 1994). Once a plaintiff meets this minimal burden of

2   proof, "*the burden then shifts to the defendant to demonstrate what portion of its*

3   *revenues represent profits, and what portion of its profits are not traceable to the*

4   *infringement.*" *Interstellar Starship Servs.*, 125 F. Supp. 2d at 1272 (emphasis

5   added). Thus, an award may be made so long as the jury "can reasonably interpret

6   [the defendant's] records as indicating the receipt of profits that can then be

7   allocated to the infringed material as the jury rationally deems appropriate." *TVT*

8   *Records v. Island Def Jam Music Group*, 262 F.Supp.2d 188, 191 (S.D.N.Y. 2003);

9   *see also 4 Nimmer on Copyright* § 14.03 [b][2][a] (2020).

10      Whether the claim is seeking direct or indirect profits is "an important

11  ingredient in § 504(b)'s burden- shifting mechanism in the Ninth Circuit." *Polar*

12  *Bear Prods. v. Timex Corp.* 384 F.3d 700, 711 (9th Cir. 2004) (quoting *4 Nimmer*

13  *on Copyright* § 14.03[B]). This is because "causation in indirect profit claims is

14  often more attenuated than claims for actual damages or direct profits. It is

15  therefore particularly important for the plaintiff in indirect profit action to

16  demonstrate the alleged causal link between the infringement and profits sought."

17  *Polar Bear Prods.*, 384 F.3d at 703.

18      In *Frank Music I*, plaintiffs wrote and copyrighted a musical play entitled

19  *Kismet. Frank Music Corp.*, 772 F.2d at 509 ("*Frank Music I*"). Subsequently, the

20  MGM Grand Hotel premiered a musical revue entitled *Hallelujah Hollywood*

21  featuring ten acts of various types of performances; one of those acts was entitled

22  "*Kismet*" and contained portions of plaintiffs' copyrighted play. *Frank Music I*,

23  772 F.2d at 509. Of the one-hundred minutes of the *Hallelujah Hollywood* show,

24  approximately six minutes of infringing music were performed. *Id*. There, the

25  Ninth Circuit drew a distinction between direct profits generated through ticket

26  sales for *Hallelujah Hollywood*, and indirect profits garnered through "the hotel's

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

**A1806**

1  guest accommodations, restaurants, cocktail lounges . . . the casino itself,
2  convention and banquet facilities, tennis courts, swimming pools, [and the] gym
3  and sauna." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* 886 F.2d 1545,
4  1550 (9th Cir. 1989) ("*Frank Music II*").

5        Like in *Frank Music I* and *II*, profits attributable to the actual performances
6  of *Happier* are *direct* profits, and are distinguishable from profits so removed as to
7  be considered *indirect* profits, such as the "hotel guest accommodations, restaurant,
8  cocktail lounges […] gym and sauna," as was the case in *Frank Music I* and *II*, at
9  the MGM Grand Hotel. Here, whether Defendants were paid flat fees, and not
10 portions of ticket sales, does not change the fact that these are still *direct* profits
11 from the performances. Defendants are still being paid to perform.

12       In *Bergt v. McDougal Littell,* an artist brought an action for copyright
13 infringement arising out of the unauthorized reproduction of his painting in a
14 textbook. 661 F.Supp.2d 916, 920 (N.D. Ill. 2009) There, the court rejected
15 defendant's argument that plaintiff's request for disgorgements of profits was an
16 indirect one. The court held: "[defendant] attempts to characterize this case as one
17 for indirect profits because [plaintiff] cannot demonstrate that the textbook was
18 purchased solely because the painting was included in it, *this is not the proper test*
19 *for distinguishing between direct and indirect profits*." *Bergt*, 661 F. Supp. 2d at
20 927. "Instead, the court must determine whether the profits derived from the sale
21 of a product containing the copyrighted work or from the use of the copyrighted
22 work to promote sales of another product." *Id.* at 927.

23       The *Bergt* court drew distinctions between the issues in *Mackie*, where "the
24 infringed work formed part of a brochure used to promote the sale of season tickets
25 to the symphony. [citation omitted.]" *Id.* (citing to *Mackie v. Rieser*, 296 F.3d 909,
26 912-13 (9th Cir. 2002)). And the issues in *Andreas*, where "plaintiff sought to

27
28

---

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

**A1807**

1   recover Audi's revenue from sales of the TT coupe, where Audi had used the

2   copyrighted work in a television commercial for that car. *Id.* (citing to *Andreas v.*

3   *Volkswagen of Am., Inc.*, 336 F.3d 789, 791-92 (8th Cir. 2003)). And ultimately

4   held that "the painting was not used separately in an attempt to promote the sale of

5   the textbook, *but instead forms an integrated component of the textbook.*" *Id.*

6   (emphasis added.) Thus,  "[Plaintiff] only need establish [defendant]'s gross

7   revenue from sales of the textbook. *Id.* at 928. "Requiring the plaintiff to show

8   more would be contrary to § 504(b)'s intent and would confuse the parties'

9   respective burdens." *Id.* at 927.

10      Here, like in *Frank Music I*, Defendants are profiting from their

11  performances that include *infringing performances*. Just like in *Bergt*, Defendants

12  are attempting to mischaracterize this case as one for *indirect* profits. Much like it

13  did not matter if the textbook in *Bergt* was purchased for the infringing

14  reproduction of the painting, or whether the purchaser even knew that the textbook

15  included the infringing reproduction; here, it is of no consequence whether the

16  payments made for these performances were solely for the infringing work, or even

17  if the payor had knowledge that the infringing work would be included in the

18  performance; it is still a *direct* profit from the performances.

19      Accordingly, Plaintiff only needs to establish gross revenue from the

20  performances. *Bergt*, 661 F.Supp.2d at 928. Requiring Plaintiff's "to show more

21  would be contrary to § 504(b)'s intent and would confuse the parties' respective

22  burdens." *Id.* at 927. It is undisputed that Plaintiffs have demonstrated evidence of

23  Defendants' gross revenue; and thus, Defendants' proffering of other factors is

24  merely an argument as to the a*pportionment* of the revenue, which is a triable issue

25  of fact for the jury.

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

MANATT, PHELPS & PHILLIPS, LLP
ROBERT A. JACOBS (Bar No. CA 160350)
E-mail: rjacobs@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail: epetrossian@manatt.com
MAURA K. GIERL (Bar No. CA 287430)
E-mail: mgierl@manatt.com
NORO MEJLUMYAN (Bar No. CA 324145)
E-mail: nmejlumyan@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

*Attorneys for Defendants*
MARSHMELLO CREATIVE, LLC;
THE ARTIST P/K/A MARSHMELLO;
JOYTIME COLLECTIVE, LLC; DANIEL
CAMPBELL SMITH; STEVEN MCCUTCHEON;
MARSHMELLO MUSIC LLC; ROKSTONE
MUSIC LIMITED; WWKD LIMITED; KOBALT
MUSIC PUBLISHING AMERICA, INC.; and
POLYGRAM PUBLISHING, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTEM STOLIAROV p/k/a ARTY, <br><br> Plaintiff, <br><br> v. <br><br> MARSHMELLO CREATIVE, LLC et al., <br><br> Defendants. | No. 2:19-cv-03934-PSG (JPRx) <br><br> Hon. Philip S. Gutierrez <br> Courtroom 6A <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing Date:  April 12, 2021 <br> Hearing Time:  1:30 p.m. <br><br> Am. Compl. Filed:  Aug. 9, 2019 <br> Discovery Cutoff:  Jan. 13, 2021 <br> Final Pretrial Conf.:  July 19, 2021 <br> Trial Date:  July 27, 2021 |

*PMI Mortg. Ins. v. Am. Int'l Specialty Lines Ins.*,
   291 F. App'x 40 (9th Cir. 2008) .......................................................... 5

*Polar Bear Prods., Inc. v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ................................................... passim

*Stephens v. Union Pac. R.R. Co.*,
   935 F.3d 852 (9th Cir. 2019) ....................................................... 6, 12

*Structured Asset Sales, LLC v. Sheeran*,
   433 F. Supp. 3d 608 (S.D.N.Y. 2020) .............................................. 8

*Twelve Sixty LLC v. Extreme Music Library Ltd.*,
   No. 17-cv-1479, 2020 WL 2749708 (S.D.N.Y. May 26, 2020) ..................... 3, 7

*United States v. Broad. Music Inc.*,
   207 F. Supp. 3d 374 (S.D.N.Y. 2016) ............................................. 8

*United States v. Broad. Music, Inc.*,
   720 F. App'x 14 (2d Cir. 2017) ..................................................... 8

**RULES**

Fed. R. Evid. 702 ................................................................. 1, 2

**A1810**

Snyder expressly noted that her "summary judgment order forecloses plaintiffs' contention that they may be entitled to concert revenues reflecting the performance of 'Dark Horse.'" *Id.* She also confirmed that "any licensed performances by defendants of 'Dark Horse' could not have infringed plaintiffs' performance rights in 'Joyful Noise' and that profits from those performances are therefore not relevant." *Id.* Because the identical circumstances are present here, this Court should reach the same conclusion with respect to the Live Shows.

The other cases that Plaintiff cites do not compel a different result. Plaintiff asserts that this Court should adopt the holding of *Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608 (S.D.N.Y. 2020), but ignores Moving Defendants' analysis of it and why its holding – which conflicts with Judge Snyder's decisions – is incorrect. Plaintiff's reliance on *United States v. Broad. Music, Inc.*, 720 F. App'x 14, 17 (2d Cir. 2017) and *United States v. Broad. Music Inc.*, 207 F. Supp. 3d 374, 376 (S.D.N.Y. 2016) is misplaced because they are inapposite. Both cases concerned fractional licensing, and held that, when a PRO does not control all shares of a composition, it can only license the share(s) it controls. Neither touched on the circumstances before the Court here, or held that ASCAP cannot license compositions within its repertory. Here, there is no question that both *Happier* and the Remix Composition are within ASCAP's repertory. (SUF 8, 100)

Plaintiff's attempt to fit *Happier* within the ASCAP Blanket Licenses' exclusion for "special orchestral arrangements or transcriptions" is baseless.[3] (*See* Opp. 7:16-12:14) *First*, because "orchestral" modifies "arrangements" and "transcriptions", and "orchestral" means "connected with or involving an orchestra (a large group of musicians who play many different instruments together)", *see* https://dictionary.cambridge.org/us/dictionary/english/orchestral (last accessed Mar. 25, 2021), Plaintiff has no good faith basis to argue that *Happier* – which neither is "connected with" nor involves an orchestra – is within the exclusion. *Second*, as set

[3] Before now, Plaintiff did not characterize *Happier* in this fashion. (*See* Dkt. 24)

# EXHIBIT 5
# TO SUPPLEMENTAL CERTIFICATION OF HILLEL I. PARNESS

## Docket No. 21-55442

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

ARTEM STOLIAROV, PKA Arty,

*Plaintiff-Appellant,*

v.

MARSHMELLO CREATIVE, LLC, a Delaware Limited Liability Company, CHRISTOPHER COMSTOCK, PKA Marshmello, STEVEN MCCUTCHEON, PKA Steve Mac, MARSHMELLO MUSIC, LLC, a Delaware Limited Liability Company, ROKSTONE MUSIC LIMITED, a United Kingdom Private Limited Company, WWKD LIMITED, a United Kingdom Private Limited Company, KOBALT MUSIC PUBLISHING AMERICA, INC., a Delaware Corporation, POLYGRAM PUBLISHING, INC. d/b/a UNIVERSAL POLYGRAM INTERNATIONAL PUBLISHING, a Delaware Corporation, DANIEL CAMPBELL SMITH and JOYTIME COLLECTIVE, LLC, a Delaware Limited Liability Company,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the Central District of California, No. 2:19-cv-03934-PSG-JPR · Honorable Philip S. Gutierrez*

# APPELLANT'S OPENING BRIEF

MARTY GLICK, ESQ.
SKAGGS FAUCETTE LAW FIRM
107 Silver Oak Terrace
Orinda, California 94563
(415) 215-5224 Telephone
Marty@skaggsfaucette.com

RICHARD S. BUSCH, ESQ.
ANDREW H. DAVIS, ESQ.
MAX D. FABRICANT, ESQ.
KING & BALLOW
1999 Avenue of the Stars, Suite 1100
Century City, California 90067
(424) 253-1255 Telephone
rbusch@kingballow.com
ddavis@kingballow.com
mfabricant@kingballow.com

*Attorneys for Appellant Artem Stoliarov*

 

*Polar Bear Prods. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ................................................................*passim*

*Renfrew v. Hartford Accident & Indem. Co. (In re W. Asbestos Co.)*,
    416 B.R. 670 (N.D. Cal. 2009) ......................................................................16

*Roth v. Garcia Marquez*,
    942 F.2d 617 (9th Cir. 1991) ........................................................................48

*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*
    172 Cal.App.3d 914 (1985) ....................................................................23, 24

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ..................................................................49, 51

*Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC*,
    733 F.3d 1251 (9th Cir. 2013) ......................................................................34

*Singh v. Am. Honda Fin. Corp.*,
    925 F.3d 1053 (9th Cir. 2019) ................................................................20, 23

*Structured Asset Sales, LLC v. Sheeran*,
    433 F. Supp. 3d 608 (S.D.N.Y. 2020) ................................................45, 46, 47

*Unicolors, Inc. v. Myth Clothing Co.*,
    No. CV15-9419, 2016 U.S. Dist. LEXIS 21968
    (C.D. Cal. Feb 22, 2016) ..............................................................................55

*Walden v. Fiore*,
    571 U.S. 277 (2014)......................................................................................49

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012) ........................................................................51

*Williams v. Yamaha Motor Co.*,
    851 F.3d 1015 (9th Cir. 2017) ......................................................................54

*Wolf v. Superior Court*,
    114 Cal. App. 4th 1343 (2004) ....................................................................13

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)......................................................................................49

    2.    <u>The Live Performances of Happier created "Direct Profits"
attributable to the Infringement.</u>

Unauthorized performance of an infringing work involves direct profits, and
as such, the causal nexus is obvious. *Frank Music Corp. v. Metro-Goldwyn-Mayer,
Inc.* 886 F.2d 1545, 1550 n.3 (9th Cir. 1989) ("*Frank Music II*").[23]

In *Frank Music II*, the plaintiff was the rights holder of the musical *Kismet*,
which was incorporated by defendant MGM into one act of a ten-act review entitled
*Hallelujah Hollywood*. *Frank Music II*, 886 F.2d at 1547. Notwithstanding that the
other nine acts involved other music (which presumably also brought fans to the
MGM showroom), the Court focused on the fact that the songs from *Kismet* were
performed without authority in the MGM production. Thus, the owners of Kismet
were entitled to recover "Direct Profits" as profits derived from the production of
*Hallelujah Hollywood*. *Id.* at 1548. Damages were determined to be a proportion of
the proceeds from the show. *Id.*[24]

---

[23] *See also*, *Interstellar Starship Servs. v. Epix, Inc.*, 125 F. Supp. 2d 1269, 1272 (D.
Or. 2001); *Garcia v. Coleman*, No. C-07-2279 EMC, 2009 U.S. Dist. LEXIS 29458,
at *4-5 (N.D. Cal. Mar. 24, 2009) (direct profits come from the sale or performance
of copyrighted material).

[24] The Court also weighed the sufficiency of the apportionment of the total revenue
and weighed what percentage actually derived from the infringement. This is an
issue for the jury or trier of fact (*Polar Bear*, 384 F.3d at 712), and Arty has secured
and disclosed expert testimony on this fact to present to the jury upon successful
appeal.

In the opinion below, the District Court correctly stated that the Copyright Act permits a plaintiff to recover both direct and indirect damages and notes the lesser showing required if damages are classified as direct citing *Frank Music I*[25] and noting that in *Frank Music*, "profits from the show itself were recoverable as direct profits." 1-ER-7. Despite that, the District Court, without analysis, wrote:

> Plaintiff's claim for a portion of profits from Defendants' show does not fall neatly into either category. However, the Court concludes that the profits Plaintiff seeks are indirect.

*Id.* Plaintiff here seeks only an appropriate apportionment of the amounts received by Defendants *from shows where they infringed* by appropriating wholesale the Arty Elements into the hook of their song *Happier*.[26] This was error as it does not square with *Frank Music II* and merits reversal without needing to reach a discussion of the application of the principles that relate to "indirect damages." [27]

---

[25] 772 F.2d 505 (9th Cir. 1985).

[26] Of course, but worth recalling here, the issue of damages arises only if and when a jury verdict of infringement has been rendered.

[27] The District Court limited its analysis to the criteria relevant to indirect damages and then focused in that context on whether or not Marshmello and Bastille were "required" to perform *Happier* at their shows. 1-ER-7. This, however, is not the standard set by this Court in *Frank Music II* and its progeny. *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 920-27 (N.D. Ill. 2009) (requiring a plaintiff to establish profits sought resulted "solely because the [infringed] painting was included in [the textbook]" was "not the proper test for distinguishing between direct and indirect profits"). Even if, as Defendant asserts, lack of a requirement to perform the infringing song could weigh in assessing which of the direct or indirect profits

- 38 -

As *Frank Music II* provides, the more minimal nexus required to establish direct damages is satisfied when the damages sought are a portion of the money received by the infringers from their concert performances.

        3.    <u>Plaintiff Has Established Entitlement to Damages for "Indirect" Profits.</u>

Even if the profits sought here were to be categorized as "indirect", even though they are clearly "direct," Arty still has met his burden to establish Defendants' liability for profits from infringing performances.

Defendants argue that the profits from these live performances are not attributable to the infringement because: (1) Defendants was often paid a flat fee for these performances or that the performances were done pursuant to his artist residency contracts; (2) that contracts for some of the performances were prior to *Happier'*s release; and (3) none of the contracts at issue *required* performance of "Happier" at these shows. The District Court appeared convinced by the latter (1-

---

analysis is appropriate (it does not), there is no legitimate argument that an artist can escape liability for actually infringing with the excuse that the entity booking their event did not *require* them to do so. Just as MGM elected to perform copyrighted portions of *Kismet* in *Hallelujah Hollywood* improperly and incurred liability for its apportioned profits, the Defendants' choice here to perform their infringing hit song at 95% of the shows in the relevant time frame subjects them to damages for properly apportioned revenues made from their infringing performances.

- 39 -

As discussed below, this point is untenable as it places reliance on misguided reading of *Gray v. Perry*,[30] because the ASCAP blanket licenses do not grant licenses to perform infringing works, and because another court has directly rejected this argument, which this Court should respectfully follow. *Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608 (S.D.N.Y. 2020).

     a.    *Defendants misconstrue the holding of* Grey v. Perry.

Defendants spent much of their brief explaining *Grey v. Perry*, comparing it to the issue at bar. 7-ER-1543-1546. In *Perry*, after losing on a motion to compel the production of information regarding tour revenue, defendants filed a motion for partial summary judgement proffering a similar argument to that at issue here—namely that assuming *arguendo* that there was an infringement of plaintiffs' work, that performances at venues with ASCAP blanket licenses were authorized under the auspices of those blanket licenses. *Perry*, 2017 WL 1240740 at *4. However, *Perry* was expressly limited to the underlying discovery dispute. *Id*. at 27. The Honorable Judge Snyder expressly wrote:

> By this ruling, the Court does not suggest a finding that there are no circumstances under which concert revenues from the Tour might be relevant if a trier of fact determines that defendants infringed upon "Joyful Noise." Some portion of Tour revenues may be attributable to infringements that allegedly preceded the performances themselves.

---

[30] No. CV 15-05642, 2017 WL 1240740 (C.D. Cal. Apr. 3, 2017)

*Id*.   I.e., Judge Snyder bifurcated discovery unless and until a finding of infringement. *Id*.

Further, the plaintiffs in *Perry* never "aver[red] that ASCAP lacked authority to issue a performance license for [the infringed song]" or set forth "specific facts entitl[ing] them to a trial" on the issue. *Gray v. Perry*, 2017 WL 1240740 at *16. That is not the case here. Arty has expressly disputed whether ASCAP had the authority to license public performance of the Arty Elements as incorporated into *Happier*, and thus has created a triable issue for the jury.

      b.   <u>*ASCAP Blanket Licenses do not provide for the creation*</u>
              <u>*of unauthorized derivative works.*</u>

The Honorable Judge Stanton, U.S. District Judge for the Southern District of New York, substantively addressed the issue of ASCAP and BMI blanket licenses and their effect on public performances of allegedly infringing works. *Sheeran*, 433 F. Supp. 3d at 610. In *Sheeran*, the defendants proffered identical arguments as in *Perry*. *Id*. Judge Stanton summarily dismissed Sheeran's arguments:

> [T]he defendants' argument lacks a foundation: there is no "right" to infringe. BMI's and ASCAP's blanket and venue licenses could not grant a right to infringe, for there never was one.
>
> Absent inapplicable exceptions, neither the author nor any licensee of an infringing work has the right to perform it publicly. The author cannot assign, to BMI or ASCAP, the ability to include such a right in their blanket licenses, for the author has no right to infringe, and neither BMI nor ASCAP can create one.

Indeed, BMI's and ASCAP's forms of licenses recognize that, for their blanket licenses stipulate that what they grant are only rights to perform works of "which BMI [ASCAP] shall have the right to grant public performance licenses [license non-dramatic public performances]."

*Id.*[31]

### D. The District Court Erred in Finding It Lacked Personal Jurisdiction over Steven McCutcheon and Rokstone Music Limited.

The evidentiary record supports more than the required *prima facie* case for the District Court to exercise specific personal jurisdiction over Defendant Steven McCutcheon ("Mac") and Rokstone Music Limited ("Rokstone") (collectively, the "Mac Parties").

Mac is a credited co-writer of *Happier* and solely owns Rokstone. 7-ER-1492-1509. Mac, through Rokstone, which has no employees, negotiated and entered into a music publishing administration agreement with Universal Music Publishing ("UMP") that obligated UMP's sister company, California-based Polygram Music Publishing ("Polygram"), to collect royalties on behalf of Mac's musical works,

---

[31] Further, *even if* these blanket licenses covered performances of infringing works, the creation of *Happier* still constitutes a violation of the applicable ASCAP Member Agreement. Section 2(e) of the ASCAP Agreement provides an express exception preventing ASCAP from granting licenses for "any special orchestral arrangements or transcriptions of any musical composition in the ASCAP repertory." 5-ER-939-944. As admitted at his deposition, Marshmello created a MIDI transcription when creating *Happier*. 5-ER-941-942. Such a MIDI transcription would have been expressly excluded from the ASCAP blanket licenses, even if they were applicable regarding the performances of *Happier*. 5-ER-941-942.

- 47 -

**No. 21-55442**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

ARTEM STOLIAROV,
*Plaintiff-Appellant*,

v.

MARSHMELLO CREATIVE, LLC ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:19-cv-03934-PSG-JPR
Hon. Philip S. Gutierrez

---

**APPELLEES' ANSWERING BRIEF**

---

Robert A. Jacobs, Emil Petrossian
Benjamin G. Shatz, Noro Mejlumyan
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067-3119
T:  (310) 312-4000 | F:  (310) 312-4224

*Attorneys for Appellees*
The Artist p/k/a Marshmello,
Marshmello Creative, LLC, Marshmello
Music LLC, Joytime Collective, LLC,
Daniel Smith, WWKD Limited, Steven
McCutcheon, Rokstone Music Limited,
Kobalt Music Publishing America, Inc.,
and Polygram Publishing, Inc.

*Perez v. United States,*
    103 F. Supp. 3d 1180 (S.D. Cal. 2015).................................................56

*Peterson v. Highland Music, Inc.,*
    140 F.3d 1313 (9th Cir. 1998).............................................................55

*Picot v. Weston,*
    780 F.3d 1206 (9th Cir. 2015).............................................................56

*Platt v. Moore,*
    15 F. 4th 895 (9th Cir. 2021) ..............................................................35

*PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Inc. Co.,*
    291 F. App'x 40 (9th Cir. 2008)...........................................................35

*Polar Bear Prods., Inc. v. Timex Corp.,*
    384 F.3d 700 (9th Cir. 2004)........................................... 40, 44, 48, 49

*Schrock v. Learning Curve Int'l, Inc.,*
    586 F.3d 513 (7th Cir. 2009)................................................................12

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004)..........................................................55, 65

*Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC,*
    733 F.3d 1252 (9th Cir. 2013)..............................................................38

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984)........................................................................51, 52

*Stephens v. Union Pac. R.R. Co.,*
    935 F.3d 852 (9th Cir. 2019)................................................................51

*Structured Asset Sales, LLC v. Sheeran,*
    433 F. Supp. 3d 608 (S.D.N.Y. 2020)..............................................53, 54

*Suzuki Motor Corp. v. Consumers Union, Inc.,*
    330 F.3d 1110 (9th Cir. 2003)..............................................................10

*Transam. Ins. Co. v. Sayble,*
    193 Cal. App. 3d 1562 (1987).........................................................13, 17

unauthorized derivative of the plaintiff's work. *Gray v. Perry*, No. CV 15-05642, 2017 WL 1240740, at *10 (C.D. Cal. Apr. 3, 2017). Plaintiff's attempts to distinguish *Perry* are unavailing. He quotes a portion of the decision that is irrelevant and does not conflict with the court's holding. AOB-45. And he claims that the plaintiff in *Perry* did not challenge ASCAP's authority to issue the blanket license, as Plaintiff purports to have done here. *See* AOB-46. But Plaintiff has offered no evidentiary basis to challenge ASCAP's blanket licenses, which are clearly authorized under Plaintiff's member agreement with ASCAP. 11-ER-2494-¶10. And Plaintiff's mere act of "expressly disput[ing]" that authorization cannot create a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Finally, Plaintiff's reliance on *Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608 (S.D.N.Y. 2020), which reached the opposite conclusion of, but did not consider, *Perry*, is misplaced. *Sheeran* conflated the distinct acts of — and the distinct rights recognized by the Copyright Act, 17 U.S.C. §§ 106(2), (4), with respect to — preparing derivative works, on the one hand, and publicly performing such works, on the one other hand. *Sheeran* incorrectly concluded that although ASCAP's blanket licenses "conveyed to licensees the authors' rights to perform their songs", they "did not convey the consent of any author to play music which infringe[d] his songs . . . [because] the licenses do not transform an infringing work

into one that" is not infringing.  *Id.* at 611.  But this analysis ignores the fact that whether a derivative song is ***itself*** infringing is a different inquiry than whether the ***public performance*** of that song is infringing.  *Perry* properly acknowledged and applied this distinction, concluding that ***regardless*** of whether the defendants' song infringed the plaintiff's song, the defendants' public performance of their song at ASCAP-licensed events was not actionable because of the blanket licenses.  2017 WL 1240740 at *10.[12]

## VI.  THE COURT SHOULD AFFIRM THE DISTRICT COURT'S DECISION GRANTING THE PERSONAL JURISDICTION MOTION.

The district court correctly held that it lacked both general and specific personal jurisdiction over U.K.-based Mac and Rokstone. Plaintiff does not challenge the district court's general jurisdiction holding, *see* AOB-47 (referencing only "specific personal jurisdiction"), and his specific personal jurisdiction arguments are meritless.[13]

[12] In a footnote, Plaintiff argues that ASCAP's blanket licenses do not apply to *Happier* because the song is a "special orchestral arrangement or transcription" that falls outside their scope.  This argument is groundless because its premise is false (by definition, *Happier* is not an orchestral work), and because the only proffered support for it is Kohn's inadmissible *ipse dixit*.  AOB-47 n.31.

[13] In a footnote at the end of his brief, Plaintiff halfheartedly argues that Mac and Rokstone waived their personal jurisdiction affirmative defense.  AOB-56 n.32.  This argument is baseless.  As the district court correctly found, Mac and Rokstone complied with the requirements of

## Docket No. 21-55442

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

ARTEM STOLIAROV, PKA Arty,

*Plaintiff-Appellant,*

v.

MARSHMELLO CREATIVE, LLC, a Delaware Limited Liability Company, CHRISTOPHER COMSTOCK, PKA Marshmello, STEVEN MCCUTCHEON, PKA Steve Mac, MARSHMELLO MUSIC, LLC, a Delaware Limited Liability Company, ROKSTONE MUSIC LIMITED, a United Kingdom Private Limited Company, WWKD LIMITED, a United Kingdom Private Limited Company, KOBALT MUSIC PUBLISHING AMERICA, INC., a Delaware Corporation, POLYGRAM PUBLISHING, INC. d/b/a UNIVERSAL POLYGRAM INTERNATIONAL PUBLISHING, a Delaware Corporation, DANIEL CAMPBELL SMITH and JOYTIME COLLECTIVE, LLC, a Delaware Limited Liability Company,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the Central District of California, No. 2:19-cv-03934-PSG-JPR · Honorable Philip S. Gutierrez*

# APPELLANT'S REPLY BRIEF

MARTY GLICK, ESQ.
SKAGGS FAUCETTE LAW FIRM
107 Silver Oak Terrace
Orinda, California 94563
(415) 215-5224 Telephone
Marty@skaggsfaucette.com

RICHARD S. BUSCH, ESQ.
ANDREW H. DAVIS, ESQ.
MAX D. FABRICANT, ESQ.
KING & BALLOW
1999 Avenue of the Stars, Suite 1100
Century City, California 90067
(424) 253-1255 Telephone
rbusch@kingballow.com
ddavis@kingballow.com
mfabricant@kingballow.com

*Attorneys for Appellant Artem Stoliarov*

 

## TABLE OF AUTHORITIES

**CASES**

*A&M Records v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......................................................................9

*Bergt v. McDougal Littell*,
661 F. Supp. 2d 916 (N.D. Ill. 2009)............................................................23

*Brophy v. Almanzar*,
No. SACV 17-01885-CJC(JPRx), 2019 U.S. Dist. LEXIS 233894
(C.D. Cal. Aug. 22, 2019)..............................................................................27

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ........................................................................23

*Elred v Ashcroft*,
537 U.S. 186 (2004)........................................................................................19

*Hamilton v. TBC Corp.*,
821 F. App'x 720 (9th Cir. 2020)...................................................................24

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) .......................................................................27

*Polar Bear Prods. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004)..........................................................................23

*Rearden LLC v. Walt Disney Co.*,
Case No. 17-cv-04006, 2021 U.S. Dist. LEXIS 172679
(N.D. Cal. Aug. 16, 2021) .............................................................................23

*Singh v. Am. Honda Fin. Corp.*,
925 F.3d 1053 (9th Cir. 2019) ................................................................15, 16

*Stephens v. Union Pac. R.R. Co.*,
935 F.3d 852 (9th Cir. 2019) .........................................................................24

*Structured Asset Sales, LLC v. Sheeran*,
433 F. Supp. 3d 608 (S.D.N.Y. 2020) ...........................................................25

the sponsor of the contract - "*the party that caused the uncertainty to exist.*" *See* Cal. Civ. Code § 1654.

There are numerous hypothetical ways the Underlying Musical Composition language in the declaration could have been drafted by Interscope to make its meaning clearer. On the one hand, as Plaintiff has pointed out, it could have said "music furnished by Remixer" or recited, "if any" if it was to forfeit rights to any Remixer-added music composition. Defendants suggest in their brief it could have been written as "the underlying *original* musical composition" to cover the composition to be remixed.[15] (AAB-15). But neither of these alternatives actually appear. Defendants, related to and relying upon the sponsor of the form, do not get to impose their hypothetical alternative. Ambiguity is resolved "strongly" against them. If the term is found to be ambiguous, Plaintiff's prevail here and the judgment below against them should be reversed.

## II.    LIVE PERFORMANCE PROFITS ARE A PROPER ELEMENT OF DAMAGES

The parties agree that a successful plaintiff in a copyright infringement action is entitled to recover profits that are attributable to the infringement (AAB-40), but

---

[15] Defendants also argue that it is somehow significant that Plaintiff has, in the past, entered into other remixer contracts with other record companies whose forms have differing terms or definitions. (AAB-25). But the fact that other versions exist that were used in other deals provides nothing at all relevant to interpretation of the language found in the Interscope form actually used here.

they do not agree on the applicable and crucial standard to be applied to determine causal connection. Virtually without discussion, the District Court ruled that a significantly stricter burden on Plaintiff should apply- one for "indirect" profits. (AOB-38). As Plaintiff elaborated in his Opening Brief, *Frank Music II* establishes that the requisite nexus for "direct" profits is fully met when the music at issue is performed in a show at a venue. (AOB-39). In that case, music from *Kismet* was actually performed on stage at the MGM in Las Vegas (AOB-39). Damages were a percentage of the proceeds of the show and the court ruled that the amount was a jury question. (AOB-37). Here, Marshmello and Bastille performed *Happier*, their top hit ever recorded, in all but a very few of their shows (AOB-39), making damages "direct" with the amount a jury question. Defendants' attempts to distinguish *Frank Music II* based on pre-negotiated fees or a claim that the use at MGM of the infringing songs in one of ten acts (AOB-49) was somehow significantly more than the performance of *Happier* by Marshmello at almost all his shows are unavailing.

### A. Having Demonstrated a Causal Nexus, Profits Attributable Should Be Reserved for the Trier of Fact.

The District Court relied on the fact that *Happier* was not required to be performed at any of the shows at issue (1-ER-7-8), an argument Defendants proffer again to this Court. (*See* AA-43). This argument, as noted above, applies the wrong

legal standard,[16] and it ignores the undisputed fact that *Happier* was, in-fact, performed at nearly all of the dozens of shows at issue. 9-ER-1927.

The issue of apportionment of profits is one expressly reserved for the trier of fact. *See Rearden LLC v. Walt Disney Co.*, Case No. 17-cv-04006, 2021 U.S. Dist. LEXIS 172679 (N.D. Cal. Aug. 16, 2021). "[T]he plaintiff is not required at [summary judgment] to show that the infringement was the primary cause of the defendants' revenues, and a fair degree of inference is allowed." *Id.* (quoting *Dash v. Mayweather,* 731 F.3d 303, 330 (4th Cir. 2013)). "[A] copyright plaintiff is bound to no more and no less than [] to demonstrate a casual nexus between the infringement and the profits sought." *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 712 (9th Cir. 2004). That burden has been met.

The record is replete with direct evidence to support the requisite causal nexus. It is undisputed that *Happier* was Marshmello's biggest hit to-date, as none of his previous singles cracked the top 10 charts. 6-ER-1059-1061. It is also undisputed that *after Happier's* release and achieving RIAA Gold Certification, Marshmello was able to demand eight million more dollars for services to the Palms Casino. 10-ER-2189; 6-ER-1061. The infringing Marshmello and Bastille mega-hit was performed at the shows and infringement will have been established when and

---

[16] *See* AOB-38 n.27 (citing *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 920-27 (N.D. Ill. 2009)).

if a damages determination is reached by the jury. Further, Defendants admit that some portion of the revenue from live performances of *Happier* by Bastille was driven by ticket sales and merchandise. (AAB-43). It was error to deny Plaintiff the opportunity to proffer these arguments and evidence to the trier of fact.[17]

**B.    Performance of *Happier* Would Not Be Covered by ASCAP Licenses.**

*Perry* involves a *discovery dispute,* and its prospective impact should be equally limited. *See generally, id.* Given that there was bifurcated discovery, Judge Snyder in her opinion made very clear the narrow scope of her holding, noting, "some portion of Tour revenues may be attributable to infringements." *Id*. at *25-26. *Perry* does not stand for the proposition that PRO blanket licenses must be a bar to finding a causal nexus between alleged infringement and performance revenues.

---

[17] Defendants cite two cases to support their argument that Plaintiff's industry experts Casson and Kohn's opinions regarding custom and usage should be ignored. (AAB-51). Neither applies. In *Hamilton v. TBC Corp.*, the court found insufficient the plaintiff's expert opinion that the allegedly defective tires "must have been defective" because they had a higher warranty return rate than Firestone tires. 821 F. App'x 720-722 (9th Cir. 2020). In *Stephens v. Union Pac. R.R. Co.*, the court found unavailing expert opinions on plaintiff's second-hand exposure to asbestos stemming from the plaintiff's father's workplace because neither expert had knowledge of the father's exposure to asbestos. 935 F.3d 852, 856-7 (9th Cir. 2019). Unlike in *Stephens* and *Hamilton*, Casson and Kohn relied upon decades of industry experience applied to the facts specific to tour revenues, including as to blanket licenses. *See* n.14, *supra* page 19.

24

The *Sheeran* court's reasoning is more apt to the issue at bar. *See Structured Asset Sales, LLC v. Sheeran*, 433 F. Supp. 3d 608, 610-12 (S.D.N.Y. 2020). Specifically, as noted in *Sheeran*:

> BMI's and ASCAP's blanket licenses. . . did not convey the consent of any author to play music which infringes his songs. And the licenses do not transform an infringing work into one that "could not, as a matter of law, be infringing."

*Id.* at 611.

The amount of damages is a jury issue where Defendants can make their apportionment and other arguments about fixed fees and guarantees. Plaintiff met his burden by showing direct damages and is entitled to the opportunity to proffer evidence to the trier of fact.

## III.   THE COURT HAS JURISDICTION OVER ROKSTONE AND MAC

Defendants' brief does not dispute Plaintiff's assertion of the applicable standards applied to determine personal jurisdiction over the Mac Parties. Rather, they claim Plaintiff relies on facts not supported by the Summary judgment record, ignoring proper inferences from facts they cannot dispute and appropriate agency principles that apply. Defendants contend that Plaintiff did not submit any evidence to meet the elements of the "effects test". (AAB-56-57). Defendants advocate that this Court view deliberate business decisions by the Mac Parties as only coincidentally intertwined with the conduct of their California-resident co-

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Case No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **DEFENDANTS' NOTICE OF** |
| | **SUPPLEMENTAL AUTHORITY** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10, | |
| Defendants. | |

Defendants respectfully submit this Notice of Supplemental Authority in further support of their renewed motion for summary judgment (ECF 199-202, 206-208) to place before the Court the recent decision of the United States Court of Appeals for the Ninth Circuit in *Gray v. Hudson*, No. 20-55401, issued on March 10, 2022, a copy of which is annexed as **Exhibit A**.

In *Gray*, the District Court had granted a post-trial motion to set aside a jury finding of infringement, holding that where a copyright plaintiff claims infringement in the combination of otherwise unprotectable musical elements, the plaintiff must prove: (i) a combination of numerous unprotectable elements, (ii) that such elements have been arranged in an original and new fashion, and (iii) identical, or near identical, copying by the defendant. *See Gray v. Perry*, No. 15-cv-5642 (CAS), 2020 WL 1275221, at \*3 (C.D. Cal. Mar. 16, 2020). The District Court found, as a matter of law, that the plaintiffs had failed to present sufficient evidence to satisfy the selection-and-arrangement test cited above. *Id.* at \*18. The District Court also noted that "courts in musical

1

copyright cases have a significant obligation to strike a balance between the First Amendment and the Copyright Act – to encourage others to build freely upon the ideas and information conveyed by a work, and at the same time motivate creative activity – by carefully limiting the scope of copyright protection to truly original expression only." *Id.* at *4 (citations, quotations & brackets omitted).

Last week, the Ninth Circuit affirmed the District Court's determination. The Ninth Circuit, while observing that the plaintiff's expert identified five or six claimed similarities in the eight note ostinatos, with the first six notes being identical, nevertheless agreed with the District Court that the plaintiffs had failed to present sufficient evidence to show that their combination of unprotectable musical building blocks was sufficiently "original." (Exhibit A at 22-24). Critically, both the District Court and the Ninth Circuit noted that the plaintiff's expert had conceded that many of the individual elements he claimed were similar were commonplace, and the Courts concluded there was nothing about the combination of those commonplace elements, freely available to all to use, that was sufficiently original to warrant protection. The Ninth Circuit also reiterated that chord progressions are not individually protectable because they are basic musical building blocks.

Defendants respectfully submit that the Ninth Circuit's ruling in *Gray* further reinforces that summary judgment should be granted in their favor. In *Gray*, the Ninth Circuit found that a combination of five or six commonplace elements, including several that were substantially identical, were insufficient to constitute protectable original expression. Here, not only are there only two claimed commonplace elements that are allegedly "similar," one of them is a chord progression that SAS's expert, Dr. Covach, has already admitted are different, and the second is a harmonic rhythm that Dr. Covach admits has been used for more than a hundred years. Again, as

already shown in Defendants' motion, the combination of two unprotectable elements does not

satisfy the "numerosity" requirement, and *Thinking Out Loud* does not replicate the combination

of the two unprotectable elements in an identical or near identical manner.

Dated: New York, New York
      March 14, 2022

              PRYOR CASHMAN LLP

              By: */s/ Donald S. Zakarin*
                Donald S. Zakarin
                Ilene S. Farkas
                Andrew M. Goldsmith
              7 Times Square
              New York, NY 10036
              (212) 421-4100

              *Attorneys for Defendants*

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| Marcus Gray, PKA Flame; EMANUEL LAMBERT; CHIKE OJUKWU, *Plaintiffs-Appellants*, v. KATHERYN ELIZABETH HUDSON, PKA Katy Perry; JORDAN HOUSTON, PKA Juicy J; LUKASZ GOTTWALD, PKA Dr. Luke; SARAH THERESA HUDSON; KARL MARTIN SANDBERG, PKA Max Martin; HENRY RUSSELL WALTER, PKA Cirkut; KASZ MONEY, INC.; CAPITOL RECORDS, LLC; WB MUSIC CORP.; KOBALT MUSIC PUBLISHING AMERICA, INC., *Defendants-Appellees.* | No. 20-55401 D.C. No. 2:15-cv-05642-CAS-JC OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted January 11, 2022
Pasadena, California

Filed March 10, 2022

Before:  RICHARD R. CLIFTON, MILAN D. SMITH, JR., and PAUL J. WATFORD, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Copyright

The panel affirmed the district court's order vacating a jury's award of damages for copyright infringement and granting judgment as a matter of law to Katheryn Hudson (pka Katy Perry) and other defendants.

Christian hip-hop artists Marcus Gray (pka Flame), Emanuel Lambert, and Chike Ojukwu claimed that an ostinato, or repeating instrumental figure, in Hudson's song "Dark Horse" copied a similar ostinato in plaintiffs' song "Joyful Noise."

The panel held that copyright law protects musical works only to the extent that they are "original works of authorship."  The panel concluded that the ostinatos at issue here consisted entirely of commonplace musical elements, and the similarities between them did not arise out of an original combination of these elements.  Consequently, the jury's verdict finding defendants liable for copyright infringement was unsupported by the evidence because plaintiffs failed to put forward legally sufficient evidence

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that Joyful Noise and Dark Horse were extrinsically similar works with respect to any musical features protectible under copyright law.

---

## COUNSEL

Michael A. Kahn (argued), Capes Sokol, Clayton, Missouri, for Plaintiffs-Appellants.

Vincent H. Chieffo (argued), Greenberg Traurig LLP, California, for Defendant-Appellee Katheryn Elizabeth Hudson.

Christine Lepera (argued), Jeffrey M. Movit, Jacob D. Albertson, and J. Matthew Williams, Mitchell Silberberg & Knupp LLP, New York, New York; Aaron M. Wais and Gabriella A. Nourafchan, Mitchell Silberberg & Knupp LLP, Los Angeles, California; for Defendants-Appellants Lukasz Gottwald, Sarah Theresa Hudson, Karl Martin Sandberg, Henry Russell Walter, Kasz Money Inc., Capitol Records LLC, WB Music Corp., and Kobalt Music Publishing America Inc.

John G. Snow, King Holmes Paterno & Soriano LLP, Los Angeles, California, for Defendant-Appellee Jordan Houston.

Eugene Volokh, Los Angeles, California, for Amici Curiae Recording Industry Association of America Inc., and National Music Publishers' Association.

Anjani Mandavia and David L. Burg, Mandavia Ephraim & Burg LLP, Los Angeles, California, for Amicus Curiae Motion Picture Association Inc.

Kenneth D. Freundlich, Freundlich Law, Encino, California, for Amicus Curiae Musicologists.

Edwin F. McPherson, McPherson LLP, Los Angeles, California, for Amici Curiae 110 Individual Songwriters, Composers, Musicians, Producers, Music Publishers, and Other Music Industry Professionals; Nashville Songwriters Association International; and Music Artists Coalition.

---

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs Marcus Gray (pka Flame), Emanuel Lambert, and Chike Ojukwu are Christian hip-hop artists who have sued Katheryn Hudson (pka Katy Perry), Capitol Records LLC, and several other defendants for copyright infringement. They claim that a repeating instrumental figure—in musical terms, an ostinato—in Hudson's song "Dark Horse" copied a similar ostinato in plaintiffs' song "Joyful Noise." After a trial centering around the testimony of musical experts, a jury found defendants liable for copyright infringement and awarded $2.8 million in damages. The district court vacated the jury award and granted judgment as a matter of law to defendants, concluding principally that the evidence at trial was legally insufficient to show that the Joyful Noise ostinato was copyrightable original expression.

We affirm.  Copyright law protects "musical works" only to the extent that they are "original works of authorship."  17 U.S.C. § 102(a).  The trial record compels us to conclude that the ostinatos at issue here consist entirely of commonplace musical elements, and that the similarities between them do not arise out of an original combination of these elements.  Consequently, the jury's verdict finding defendants liable for copyright infringement was unsupported by the evidence.[1]

## BACKGROUND

### I.  Musical Background

We begin by briefly explaining some vocabulary that we rely on throughout this opinion.  A musical scale is essentially a sequence of musical notes or tones ordered by pitch (i.e., how "low" or "high" each note is).  To illustrate this concept, a standard piano or keyboard instrument has white and black keys organized in a twelve-key repeating pattern.  If one starts with any key on the piano and plays twelve white and black keys in order from left to right, she will have played all the notes of the "chromatic" scale in ascending order.  That ordered sequence of twelve notes— which repeats itself at higher and lower registers across the

---

[1] We accept the amicus briefs submitted by (1) the Recording Industry Association of America and the National Music Publishers' Association, (2) the Motion Picture Association, (3) a group of 110 individual songwriters and other music industry professionals, along with Nashville Songwriters Association International and Music Arts Coalition, and (4) a group of musicologists.  *See* Dkt. Nos. 51, 54, 56, 58.  We deny as moot defendants' motion to strike material from plaintiffs' opening brief, Dkt. No. 29, because we conclude that even if we were to consider the purportedly improper material, we would still decide this case in defendants' favor for the same reasons given in this opinion.

keyboard—can be thought of as the musical equivalent of an artist's coloring palette, as one can rearrange these notes into more complex sequences and add rhythmic (i.e., durational) variety to create memorable tunes.

In practice, many songs are based on scales that use only a smaller subset of the twelve notes in the chromatic scale. These scales have different names depending on which notes are chosen. The scale we are primarily concerned with today has seven notes and is called the "minor" scale.[2]

As with other scales, the notes in the minor scale can be referred to with alphabetic names (A, B, C, etc.), but the parties have generally opted to refer to them with numerical degrees indicating each note's ordered position in the scale. We agree that is the more convenient approach here. The image below, taken from the beginning of defendants' answering brief, illustrates how numerical scale degrees correspond to different keys on a piano in the minor scale[3] (the image begins with the third note of the scale on the far left rather than the first note—as discussed, the notes on a piano repeat themselves every twelve keys in different pitch registers):

---

[2] Our discussion here is slightly oversimplified, as the minor scale comes in three distinct forms. However, the differences between those versions are not material to resolving this case. Likewise, we do not find it necessary for present purposes to distinguish between the concept of a "scale" and the related concept of a "mode," which is also mentioned in the parties' briefing.

[3] Specifically, the image corresponds to the natural minor scale in the key of A, which uses only the white keys on a keyboard.



## II. Factual Background

In 2007, plaintiff Ojukwu recorded a simple tune using a free music website. He later sold it to plaintiff Gray, who used it as an ostinato (i.e., a repeating musical figure) for Joyful Noise. A recording of Joyful Noise first appeared in the album *Our World Redeemed* in 2008. While Joyful Noise did not achieve significant commercial success or playtime on the radio, it received millions of views on YouTube and Gray's MySpace page. *Our World Redeemed* was also nominated for a Grammy award in the "Best Rock or Rap Gospel Album" category in 2009.

Defendants created Dark Horse in 2013. Hudson's trial testimony was that she met with two of her co-defendants at a recording studio and sampled several short musical fragments to consider using in a new song. The segment Hudson responded to most positively became the ostinato for Dark Horse. Dark Horse was first released on the album *Prism* along with several other tracks. It was a hit, resulting in a music video and a performance by Hudson at the Super Bowl halftime show in 2015.

The following features of the two ostinatos are undisputed. Both ostinatos are based on the minor scale (although they are in different keys, meaning that they treat

different notes—i.e., keys on a piano—as the first note of the scale). The Dark Horse ostinato is made up of eight notes (sixteen, when repeated) which correspond to the minor scale degrees 3-3-3-3-2-2-*1-5*, while the Joyful Noise ostinato is made up of two slightly different eight-note figures (sixteen notes when combined) that correspond to the minor scale degrees 3-3-3-3-2-2-*2-1/6* (in other words, 3-3-3-3-2-2-*2-1* for the first eight notes, and 3-3-3-3-2-2-*2-6* for the second eight notes). So, while each eight-note pattern begins with 3-3-3-3-2-2, they differ in the last two notes. Leaving aside some stylistic embellishment in Joyful Noise (specifically, the use of portamento, or "sliding" between different notes), both ostinatos also rely on a completely uniform rhythm, meaning each note is of equal duration in time.

## III.   Trial Proceedings

Plaintiffs filed their operative complaint for copyright infringement against Hudson and her co-defendants in November 2016. The case proceeded to a bifurcated jury trial taking place from July 17, 2019, to August 1, 2019, with separate phases to determine liability and damages. Rather than putting forward direct evidence that defendants had copied elements of Joyful Noise, plaintiffs focused on circumstantial evidence that defendants had a reasonable opportunity to access Joyful Noise and that the ostinatos in both songs were substantially similar. For the latter point, in addition to testimony from Hudson and other witnesses, the liability phase of the trial turned largely on testimony by plaintiffs' expert musicologist, Dr. Todd Decker.

The heart of Dr. Decker's testimony concerned which specific elements of the ostinatos in Dark Horse and Joyful Noise were similar. Dr. Decker testified that:

> The length of [each] ostinato is similar, eight notes.  The rhythm of the ostinato is similar.  The melodic content, the scale degrees present.  The melodic shape so the—the way the melody moves through musical space.  Similar, the [timbre] or the quality and color of the sound is similar, and the use of the—the placement of this material, this ostinato, in the musical space of the recording in the mix[,] that is also similar.  So that's five or six points of similarity between the two ostinatos.[4]

However, Dr. Decker also said that there was "no one single . . . element" that caused him to believe the ostinatos at issue were "substantially similar" when viewed "in isolation." Rather, while "[a]ny single one of those [elements] would not have been enough," it was "the combination of them" that led Dr. Decker to conclude that Joyful Noise and Dark Horse had substantially similar ostinatos.  He also admitted that the ostinatos were different in some respects, though he clarified that he did not think this negated the similarities between them.

   The jury also heard testimony from defendants' expert, Dr. Lawrence Ferrara, who disagreed with Dr. Decker's assessment that the ostinatos were substantially similar.  He noted the use of different scale degrees at the end of each ostinato, pointing out that Dark Horse has a "leap" from 1 to 5 while Joyful Noise uses "step-wise" motion from 2 to 1 at the corresponding point in time.  In addition, Dr. Ferrara explained that two well-known songs—"Jolly Old Saint

---

[4] Dr. Decker also testified that the ostinatos in Joyful Noise and Dark Horse both used notes that were rhythmically "even in value."

Nicholas" and "Merrily We Roll Along" (which, as Dr.
Ferrara noted, has the same tune as "Mary Had a Little
Lamb")—also use the 3-3-3-3-2-2 pitch sequence that the
Dark Horse and Joyful Noise ostinatos share (or a similar 3-
3-3-3-2-2 sequence for Merrily We Roll Along, with the third
3 doubled in duration).   This testimony was not refuted
(though Dr. Decker dismissed its importance to the
similarity inquiry), nor was Dr. Ferrara's testimony that
three other pieces of music predating Joyful Noise also used
pitch progressions proceeding from 3 to 2 to 1 played in an
even rhythm: "Love Me Or Hate Me" (which was composed
by defendant Lukasz Gottwald, pka Dr. Luke), "Brainchild,"
and "Choosing Life."

For each phase of the trial, the jury was instructed on the
law and given a special verdict form.   Among other
conclusions, the jury found specifically that Dark Horse used
protected material from Joyful Noise, that the two songs
contained substantially similar copyrightable expression,
that defendants had a reasonable opportunity to hear Joyful
Noise before composing Dark Horse, and that plaintiffs were
entitled to 22.5% of defendants' net profits from Dark Horse,
resulting in a total verdict of about $2.8 million in damages.

## IV.    Post-Trial Motions

After the trial, defendants moved for judgment as a
matter of law (JMOL) or, alternatively, for a new trial
pursuant to Federal Rule of Civil Procedure 50(b).   Plaintiffs
also moved for an award of prejudgment interest.   The
district court considered these motions simultaneously.

The district court vacated the jury's verdict and granted
defendants' JMOL motion.   It denied the parties' remaining
motions as moot, but conditionally granted a new trial and
denied prejudgment interest in the alternative.   *See* Fed. R.

Civ. P. 50(c) (allowing this procedure). As relevant here, the district court's 32-page decision rejected all of defendants' challenges to the jury verdict except their argument that the ostinatos were not substantially similar. Citing Dr. Decker's testimony, the district court reasoned that none of the individual points of similarity the expert identified between Dark Horse and Joyful Noise constituted copyrightable original expression. The district court also did not believe that the combination of these elements constituted original expression. Alternatively, the district court concluded that this combination merited no more than a "thin" copyright, which is infringed only by "virtually identical" works. The district court determined that there were enough objective distinctions between the ostinatos such that they were not virtually identical.

Plaintiffs timely appealed. We review de novo the district court's grant of JMOL. *Zamalloa v. Hart*, 31 F.3d 911, 913 (9th Cir. 1994).

## ANALYSIS

The operative question is whether a "reasonable jury" would have had "a legally sufficient evidentiary basis" to conclude that defendants engaged in copyright infringement. Fed. R. Civ. P. 50(a)(1). The applicable standards are essentially "the same" as those for a summary judgment motion, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)), meaning that we "must draw all reasonable inferences" in plaintiffs' favor, *id.* Along these lines, we "must disregard all evidence favorable to [defendants] that the jury is not required to believe," but we should also "give credence to . . . evidence supporting [defendants] that is uncontradicted and unimpeached, at least

to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (cleaned up).

Copyright protection extends only to works that contain original expression.  17 U.S.C. § 102(a); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).  "Original, as the term is used in copyright, means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity."  *Feist*, 499 U.S. at 345.  "To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work *that are original*."  *Id.* at 361 (emphasis added).

We agree with the district court that plaintiffs failed to establish copying of any original—and, consequently, protected—elements of Joyful Noise.  For that reason, we affirm its decision to vacate the jury award and grant JMOL to defendants.  We need not reach any other issue in this case.

## I.  Legal Framework for Copyright Infringement

Because plaintiffs did not present any direct evidence that defendants copied Joyful Noise's ostinato, they were required to show that (1) defendants had "access" to their work and (2) the ostinatos in Joyful Noise and Dark Horse "are substantially similar."  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012), *abrogated on other grounds as recognized by Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194, 1198 (9th Cir. 2020); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (copying may be shown through "circumstantial evidence of access and substantial similarity").  We need not address the access prong because we may resolve this case based on the

"substantially similar" prong.  For that requirement, we have "traditionally determined whether copying sufficient to constitute infringement has taken place under a two-part test having 'extrinsic' and 'intrinsic' components." *Apple*, 35 F.3d at 1442.  "Both tests must be satisfied for the works to be deemed substantially similar." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc).

"The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria.  The extrinsic test requires . . . breaking the works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity.  Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (cleaned up); *accord Skidmore*, 952 F.3d at 1064.  The intrinsic test focuses on "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Apple*, 35 F.3d at 1442.

At oral argument and in their briefing, plaintiffs argued that we are required to defer to the jury's determination that the Joyful Noise and Dark Horse ostinatos are substantially similar.  But even when juries serve as the factfinders, judges retain an important gatekeeping role in applying the law.  To be sure, the intrinsic test for substantial similarity is "uniquely suited for determination by the trier of fact" because of its focus on the lay listener, and so "this court must be reluctant to reverse" a jury's finding that two works are intrinsically similar. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th

Cir. 1977), *overruled on other grounds by Skidmore*, 952 F.3d 1051;[5] *accord Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (quoting same, and adding, "We will not second-guess the jury's application of the intrinsic test."). Crucially, however, the extrinsic test is objective and is often resolved as a matter of law. *See Benay v. Warner Bros. Ent.*, 607 F.3d 620, 624 (9th Cir. 2010), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (noting summary judgment is often granted on this issue). So, while we must refrain from usurping the jury's traditional role of evaluating witness credibility and weighing the evidence, the extrinsic test requires us as a court to ensure that whatever objective similarities the evidence establishes between two works are legally sufficient to serve as the basis of a copyright infringement claim regardless of the jury's views.

## II.  Protected Elements Contained in Joyful Noise

Because the extrinsic test for substantial similarity requires us to distinguish between "protected and unprotected material in a plaintiff's work," *Swirsky*, 376 F.3d at 845, the threshold issue is what—if anything—about the Joyful Noise ostinato qualifies as original expression that can serve as the basis for a copyright infringement claim. *See Feist*, 499 U.S. at 361 (infringement requires "copying of constituent elements of [a] work that are original"); *Skidmore*, 952 F.3d at 1070 (substantial similarity test

[5] This case and others cited in this opinion with the same subsequent procedural history indication were overruled by *Skidmore* only to the extent they suggested that a weaker showing of substantial similarity is required when a high degree of access to a copyrighted work has been shown.  *See Skidmore*, 952 F.3d at 1065–69 (calling this the "inverse-ratio rule").  These cases otherwise remain binding on us.

focuses on "the protectible elements, standing alone, . . . and disregard[s] the non-protectible elements" (cleaned up)).

"Although copyright protects only original expression, it is not difficult to meet the famously low bar for originality." *Skidmore*, 952 F.3d at 1069. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345 (citation and internal quotation marks omitted).

But "[e]ven in the face of this low threshold, copyright *does* require at least a modicum of creativity and does not protect every aspect of a work; ideas, concepts, and common elements are excluded. Nor does copyright extend to common or trite musical elements, or commonplace elements that are firmly rooted in the genre's tradition. These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author." *Skidmore*, 952 F.3d at 1069 (cleaned up); *see also Swirsky*, 376 F.3d at 850 ("Under the scenes a faire doctrine, when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright.").

The trial record here requires us to conclude that no single point of similarity between Joyful Noise and Dark Horse arises out of a protectible form of expression. For this issue, it is arguably sufficient that plaintiffs' expert musicologist, Dr. Decker, candidly testified that "[a]ny single one of those [elements] would not have been enough" for him to conclude that substantial similarity existed, and that only "the combination" of those elements led him to this conclusion. Nonetheless, Dr. Decker testified as an expert

musicologist, not as an expert on copyright law. For that reason, we provide a brief overview of the individual musical elements identified by plaintiffs as original, and explain why those elements are not individually entitled to copyright protection. We address whether copyright law protects the combination of these unprotectible elements in the next section.

To reiterate, Dr. Decker drew attention to the following musical elements in support of his opinion that the Joyful Noise and Dark Horse ostinatos are substantially similar:

> The length of [each] ostinato is similar, eight notes. The rhythm of the ostinato is similar. The melodic content, the scale degrees present. The melodic shape so the—the way the melody moves through musical space. Similar, the [timbre] or the quality and color of the sound is similar, and the use of the— the placement of this material, this ostinato, in the musical space of the recording in the mix[,] that is also similar. So that's five or six points of similarity between the two ostinatos.

Though it used slightly different terminology, plaintiffs' opening brief focused on essentially the same musical elements, adding that both ostinatos were based on the minor scale.

The evidence at trial was legally insufficient to establish that these musical elements are individually copyrightable. We note that Dr. Decker himself acknowledged that many of these elements are commonplace in the musical world, even if some aspects of the Joyful Noise and Dark Horse ostinatos were unusual for their respective genres. For example, apart

from conceding that "there are many" songs "predating the
creation of Joyful Noise that have ostinatos," Dr. Decker
explained that it is "characteristic" for musical phrases
playing a role similar to the ostinatos at issue here "to last
for eight beats."  And while Dr. Decker opined that it is
uncommon to use completely even rhythms in popular
music, he also testified that the use of such a rhythm in Joyful
Noise and Dark Horse was a "relatively simple rhythmic
choice" that "no composer's entitled to monopolize."[6]
Plaintiffs adduced no evidence at trial contradicting their
own expert's testimony suggesting that these shared
elements of the two ostinatos are merely common musical
"building blocks" belonging to the public domain.  *See
Skidmore*, 952 F.3d at 1069; *Swirsky*, 376 F.3d at 850.

Even leaving aside these admissions, our precedents and
other persuasive decisions make clear that no element
identified by plaintiffs or Dr. Decker is individually
copyrightable.  Plainly, no person may copyright the minor
scale, as such scales are common musical building blocks
belonging to the public.  *See Skidmore*, 952 F.3d at 1070–
71.  The fact that Joyful Noise and Dark Horse both make
use of "sequence[s] of eight notes" played in an even rhythm
is a similarly "trite" musical choice outside the protection of
copyright law.  *Darrell v. Joe Morris Music Co.*, 113 F.2d
80, 80 (2d Cir. 1940) (per curiam).  Along somewhat
different lines, the fact that Joyful Noise and Dark Horse
arguably have similar textures[7] is far too abstract of a

---

[6] Plaintiffs conceded this element was not individually protectible in
their district court briefing.

[7] Dr. Decker explained that texture refers to the way different
musical elements—such as parts played by different instruments—are
mixed together.  He commented that both Joyful Noise and Dark Horse

similarity to be legally cognizable. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (explaining that copyright law protects expression, not ideas); *cf. Morrill v. Stefani*, 338 F. Supp. 3d 1051, 1060 (C.D. Cal. 2018) ("the use of a long-short-long rhythm is too general to be protectable").

Dr. Decker's remark that the ostinatos have a similar timbre also does not help plaintiffs. Dr. Decker explained that timbre is a way of describing a sound's quality: for example, a clarinet and a piano playing the same notes will sound noticeably different. Dr. Decker testified that the synthesizers used to play the Joyful Noise and Dark Horse ostinatos have similar timbres because they both use sounds that are "artificial," are in a "high" register, and seem "pingy," among other similar descriptors. But a copyright to a musical work does not give one the right to assert ownership over the sound of a synthesizer any more than the sound of a trombone or a banjo.

For one, plaintiffs have sued only for infringement of their copyright in Joyful Noise as a musical composition. In contrast, the choice of a particular instrument (whether acoustic or electronic) to play a tune relates to the performance or recording of a work, which are protected by distinct copyrights. *See, e.g.*, *Williams v. Gaye*, 895 F.3d 1106, 1121 (9th Cir. 2018) ("It is well settled that sound recordings and musical compositions are separate works with their own distinct copyrights." (cleaned up)); *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1258 (C.D. Cal. 2002), *aff'd*, 388 F.3d 1189 (9th Cir. 2004) (distinguishing between "elements protected by [the plaintiff's] copyright over the

have relatively "empty" textures, with the ostinatos beginning "in relative isolation."

musical composition" at issue and "those attributable to his performance of the piece or the sound recording").

More generally, the use of synthesizers to accompany vocal performers has long been commonplace in popular music. *See, e.g.*, *Batiste v. Najm*, 28 F. Supp. 3d 595, 623 (E.D. La. 2014). Along these lines, Dr. Decker conceded that timbre "is one of the very difficult things to monopolize."

That leaves us with plaintiffs' contention that the pitch sequence utilized by the Joyful Noise ostinato is copyrightable, and with Dr. Decker's related comments that the two ostinatos use similar "scale degrees" and have the same "melodic content [and] shape." At this point, it is necessary to distinguish between an abstract sequence of pitches and a melody (or, more colloquially, a tune). Though the concepts are sometimes equated, creating a melody involves more than writing down a sequence of pitches; at a minimum, that sequence must also be "rhythmically organized" so as to form an "esthetic whole." *Melody*, Webster's Third New International Dictionary (2002); *cf. Swirsky*, 376 F.3d at 848 (distinguishing between non-copyrightable "chord progressions" standing alone and a copyrightable "chorus," which involves these progressions "in combination with rhythm and pitch sequence[s]"). While an eight-note *melody* may be copyrightable, the abstract eight-note *pitch sequence* that is a component of the melody is not. *See* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 313.4(C) (3d ed. 2021)[8]

---

[8] *Available at* https://www.copyright.gov/comp3/chap300/ch300-copyrightable-authorship.pdf. Our court has drawn upon the Compendium for guidance on what qualifies as copyrightable expression. *See Skidmore*, 952 F.3d at 1070–71. The Supreme Court

(citing 37 C.F.R. § 202.1(a)) (advising that "short musical phrases consisting of only a few musical notes standing alone are not copyrightable . . . even if the phrase is novel or distinctive," and giving an eight-note pitch sequence as an example).

We note that this conclusion is consistent with the rule that "chord progressions may not be individually protected" because they are basic musical building blocks. *Swirsky*, 376 F.3d at 848. Chords are ultimately just a combination of pitches played simultaneously, *Skidmore*, 952 F.3d at 1070, so a chord progression itself consists of multiple pitch sequences playing out at the same time. If the chord progression cannot be protected, the individual pitch sequences forming the progression cannot be either.

Turning finally to the ostinatos' "melodic shape," Dr. Decker described this as "the way the melody moves through musical space." He explained that "scale degrees have in them tendencies . . . . There are scale degrees that want to go somewhere . . . and scale degrees that say you're home like 1." Later in his testimony, he elaborated that "3 wants to go to 2, [and] the 2 wants to go to 1 because 1 is our home note." Applying this concept to the Joyful Noise and Dark Horse ostinatos, he testified that the repetition of scale degree 3 in both songs created "tension that wants to be released and it's released to [scale degree 2] on a particularly strong beat."

As with musical texture, it could be argued that the overall "shape" of a melody as described by Dr. Decker is nothing more than an abstraction outside the protection of

has done the same. *See Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1014 (2017).

copyright law.  *See Harper & Row*, 471 U.S. at 556.  In any event, as the district court recognized, Dr. Decker's explanation that the two ostinatos moved "through musical space" in similar ways simply reflects "rules of consonance common in popular music."  Just as films often rely on tropes to tell a compelling story, music uses standard tools to build and resolve dramatic tension.  In this vein, courts have recognized that "while there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing."  *Darrell*, 113 F.2d at 80; *see also Skidmore*, 952 F.3d at 1079–80 (Watford, J., concurring) (recognizing "the constraints of particular musical conventions and styles").  This is also underscored by the fact that uncontradicted evidence at trial showed that two songs predating Joyful Noise—Merrily We Roll Along and Jolly Old Saint Nicholas—used the same pitch sequence (albeit in the "major" scale rather than the minor scale) and melodic shape.  *Cf. Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976) ("Evidence of similar musical phrases appearing in prior works . . . demonstrates that the musical language was of such ordinary and common occurrence that the probability of independent, coincidental production was great.").

Because the use of similar pitch sequences in the Joyful Noise and Dark Horse ostinatos results only from the use of commonplace, unoriginal musical principles, it cannot be the basis for a copyright infringement claim on its own.  *See Swirsky*, 376 F.3d at 850 (expression that is "naturally associated with the treatment of a given idea" is not copyrightable).

### III.     Protection of the Unprotectible Musical Elements in Combination

Although no individual musical component of the Joyful Noise ostinato is copyrightable, we still must consider whether the Joyful Noise ostinato is protectible as a "combination of unprotectable elements." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003); *see also Swirsky*, 376 F.3d at 848 ("[A] substantial similarity can be found in a combination of elements, even if those elements are individually unprotected."). That is the case only if the "selection and arrangement" of those elements is original in some way. *Satava*, 323 F.3d at 811.

We begin this analysis with some guiding principles. To start, the fact that the ostinatos here are only eight notes long does not foreclose the possibility of a protected arrangement of commonplace musical elements. *See Swirsky*, 376 F.3d at 852 ("It cannot be said as a matter of law that seven notes is too short a length to garner copyright protection."). "Each note in a scale . . . is not protectable, but a pattern of notes in a tune *may* earn copyright protection." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (emphasis added). On the other hand, despite "the famously low bar for originality," *Skidmore*, 952 F.3d at 1069, "[t]rivial elements of compilation and arrangement . . . fall below the threshold of originality." *United States v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978); *accord Satava*, 323 F.3d at 811–12.

One circumstance where an arrangement of individual elements lacks enough creativity to garner copyright protection is when that arrangement is "practically inevitable" or in keeping with "an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course." *Feist*, 499 U.S. at 363.

"For example, it is well-settled that copyright of a map does not give the author an exclusive right to the coloring, symbols, and key used in delineating boundaries of and locations within the territory depicted." *Hamilton*, 583 F.2d at 451 (9th Cir. 1978). The same is true for an alphabetical arrangement of numbers in a phonebook. *Feist*, 499 U.S. at 363. These are all utterly conventional ways of arranging information, and so they cannot be called "original" under copyright law.

To provide an example in the artistic context, we have held that lifelike glass "jellyfish sculptures" enclosed in a clear outer layer of glass did not combine public-domain elements in an original way. *Satava*, 323 F.3d at 811. We did not dispute that the sculptures were "beautiful," but we determined that elements such as the "selection of clear glass, oblong shroud, bright colors, proportion, vertical orientation, and stereotyped jellyfish form, considered together, lack[ed] the quantum of originality needed to merit copyright protection." *Id.* This was because "[t]hese elements are so commonplace in glass-in-glass sculpture and so typical of jellyfish physiology that to recognize copyright protection in their combination effectively would give [the artist] a monopoly" over this artform. *Id.* at 812.

Likewise, the portion of the Joyful Noise ostinato that overlaps with the Dark Horse ostinato consists of a manifestly conventional arrangement of musical building blocks. Joyful Noise and Dark Horse contain similar arrangements of basic musical features mainly in that both employ the pitch progression 3-3-3-3-2-2 played in a completely flat rhythm. This combination is unoriginal because it is really nothing more than a two-note snippet of a descending minor scale, with some notes repeated. *See Skidmore*, 952 F.3d at 1070 (holding that descending scales

are not copyrightable). Allowing a copyright over this material would essentially amount to allowing an improper monopoly over two-note pitch sequences or even the minor scale itself, especially in light of the limited number of expressive choices available when it comes to an eight-note repeated musical figure. *See Satava*, 323 F.3d at 812 & n.5 (expressing concerns over monopolization when limited creative choices are available); *see also Skidmore*, 952 F.3d at 1079–80 (Watford, J., concurring) ("There are relatively few ways to express a combination of five basic elements in just four measures, especially given the constraints of particular musical conventions and styles . . . . [O]nce [the artist] settled on using a descending chromatic scale in A minor, there were a limited number of chord progressions that could reasonably accompany that bass line (while still sounding pleasant to the ear)."); *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002) (per curiam) (recognizing "the limited number of musical notes (as opposed to words in a language), the combination of those notes[,] and their phrasing"); *Darrell*, 113 F.2d at 80.

Consequently, insofar as it combines musical building blocks in the same way that the Dark Horse ostinato does, the Joyful Noise ostinato lacks "the quantum of originality needed to merit copyright protection." *Satava*, 323 F.3d at 811. If we were to hold otherwise, "it is hard to believe that any collection" of pitches arranged in a flat rhythm "could fail" to meet the originality threshold. *Feist*, 499 U.S. at 364–65 (recognizing that "some works must fail" the originality requirement).[9]

---

[9] As in *Satava*, we certainly do not suggest that Joyful Noise as a whole is lacking in original expression. *See* 323 F.3d at 812 ("We do not mean to suggest that [the artist] has added nothing copyrightable to his

## IV.    Plaintiffs' Remaining Arguments

Two other issues warrant brief commentary.    First, plaintiffs' opening brief contended that the district court improperly relied on evidence outside the record submitted by amici after trial, namely amici's representation that they had found many tunes similar to the ostinatos at issue here in musical databases.    Why that might be relevant to our de novo review is not entirely clear, as neither defendants nor amici have brought this material to our attention on appeal. Regardless, the district court referred to this material only in a single "*see also*" cite following a lengthy string cite to the trial record.    Striking this from the court's order would have no noticeable effect on its thorough 32-page analysis.

Second, we reject plaintiffs' suggestion that it was improper for the district court to grant JMOL after previously having denied summary judgment on the issue of extrinsic similarity, which is unsupported by any authority. A trial judge has had the benefit of hearing testimony and a full presentation of the evidence when ruling on a post-trial JMOL motion, which may occasionally give her new insights into the legal sufficiency of the evidence.  *See, e.g.*, *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981). While JMOL and summary judgment are procedurally similar, there is no rule preventing a trial judge from reconsidering her views on a case's merits.

---

jellyfish sculptures.").    But once we "disregard the non-protectible elements" in Joyful Noise, *Skidmore*, 952 F.3d at 1070, we are left with no objective similarities between Joyful Noise and Dark Horse that may serve as the basis for plaintiffs' copyright claims, *see, e.g.*, *Benay*, 607 F.3d at 624 (extrinsic test requires "articulable similarities" between works).

## CONCLUSION

Plaintiffs failed to put forward legally sufficient evidence that Joyful Noise and Dark Horse are extrinsically similar works with respect to any musical features protectible under copyright law. Consequently, we affirm the district court's order vacating the jury award and granting JMOL to defendants.

**AFFIRMED.**

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/29/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

STRUCTURED ASSET SALES, LLC,

               Plaintiff,

   - against -

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

               Defendants.
- - - - - - - - - - - - - - X

18 Civ. 5839 (LLS)

ORDER

**BACKGROUND**

The Court assumes the parties' familiarity with the facts and prior proceedings, including Structured Asset Sales, LLC v. Sheeran, 433 F. Supp. 3d 608, 609 (S.D.N.Y. 2020) (granting in part and denying in part plaintiff's motion to compel) (Dkt. No. 144); Structured Asset Sales, LLC v. Sheeran, 559 F. Supp. 3d 172, 173 (S.D.N.Y. 2021) (Opinion & Order on defendants' Motion in limine) (Dkt. No. 197); and Griffin v. Sheeran, 351 F. Supp. 3d 492, 494 (S.D.N.Y. 2019) (asserting a claim that TOL infringes the copyright in LGO).

In response to this Court's September 9, 2021 Order, SAS's expert musicologists, Dr. Covach and Dr. Everett, filed amended reports: (1) a Revised Covach Report, (2) a Revised Covach

- 1 -

Rebuttal Report, and (3) a Revised Everett Report (collectively, the "Revised Reports"). Dkt. No. 200 Exs. 3, 5, & 7. The September 9th Order held that "the Deposit Copy is the sole definition of the elements included in the protection of copyright" and, consequently, the LGO Sound Recording "is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright." Dkt. No. 197 at 2-3. The Order directed the experts to delete "all references to the Gaye sound recording," all references to prior art, as "the proof as to the existence of prior art shall be only that submitted by defendants," and all "opinions unsupported by facts, or suggesting legal conclusions." Id. at 3-4.

**DISCUSSION**

**A. Renewed Motion to Exclude SAS's Experts Dr. Covach and Dr. Everett**

Issues raised in Sheeran's renewed application for in limine rulings are disposed of as follows.

1. The Revised Reports may use the terms "common," "uncommon," "noteworthy," and "stylistically commonplace." These are not legal conclusions but epithets characterizing a work's place on a scale of originality.

2. The term "appropriates" is stricken from Paragraph 20 of the Revised Covach Report because the term has a legal meaning in

the copyright field. An unlawful appropriation is one where "the second work bears 'substantial similarity' to protected expression in the earlier work." Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998). An expert may not opine that a defendant's work is substantially similar to that of the plaintiff. That is for the jury to decide.

3. All references to the Gaye sound recording are to be stricken because they violate the Court's Order that SAS "must delete all references to the Gaye sound recording" as "comparisons of elements in Thinking Out Loud which are similar to elements in the Gaye sound recording (but not the Deposit Copy) will not be allowed." Dkt. No. 197 at 3. There is no ambiguity in that direction, and it is the lawyer's responsibility to see that his client, and retained experts, comply with it. A report containing such references will be excluded.

4. Sheeran raises several issues alleging that SAS's experts did not remove all references to prior art in compliance with the Court's Order that "[o]ne of plaintiffs experts having ignored the issue of prior art, and the other having only made inquiries so superficial as to amount to no research at all, the proof as to the existence of prior art shall be only that submitted by defendants." Dkt. No. 197 at 4.

References to prior art will not be accepted when used to prove that an element of LGO is unusual or similar to that of TOL. Thus, the prior art examples listed on Pages 9-10, Paragraph 7 of the Revised Everett Report, are stricken, except for "Hurdy Gurdy Man" by Donovan, which is admissible because it is offered into evidence by Sheeran's expert.

References to prior art are acceptable when they are used to illustrate general principles of musicology. The Revised Everett Report can mention the prior art on Pages 12-13, Paragraph 3 because the songs are being used as examples of the different functions a chord progression may have within the formal structure of the song. The only song that is used to show the similarity between LGO and TOL is the Commodores' "Easy," which is introduced by Sheeran's expert and may thus also be discussed in the Revised Everett Report.

The study on Pages 3-4, Paragraphs 6-7 of the Everett Report is acceptable, for it describes chord progressions, not prior art.

**B. Motion for Summary Judgment**

**1) General Legal Standards**

Summary judgment is warranted if, based upon admissible evidence, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, a Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

### 2) Legal Standard Applied to Copyright Infringement

To establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010). The issue of substantial similarity "is frequently a fact issue for jury resolution." Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 239 (2d Cir. 1983). Even so, on a motion for summary judgment, a court may determine non-infringement as a matter of law, "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Id. at 240 (citations omitted).

### 3) Copyright Infringement

SAS's infringement claim is based on Sheeran's alleged copying of the combination of two elements from LGO's Deposit Copy into TOL: (1) the chord progression; and (2) the particular way in which anticipation is used in connection with the chord progression ("Harmonic Rhythm") (collectively the "Backing Pattern"). The parties agree that those elements, standing alone, are commonplace and unprotectable. Accordingly, Sheeran argues that summary judgment dismissing the claim is appropriate as a matter of law because (i) the combination of two unprotectable elements is not sufficiently numerous or original to constitute an original work entitled to copyright protection under the "selection and arrangement" theory of liability; and (ii) LGO's backing pattern is not identical or nearly identical to that in TOL.

### i)   Copyrightability of the combination of the chord progression and harmonic rhythm

The law does not support Sheeran's contention that the combination of LGO's chord progression and harmonic rhythm is insufficiently original to warrant it copyrightable. There is no bright-line rule that the combination of two unprotectable elements is insufficiently numerous to constitute an original work. Cf. Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1003-04 (2d Cir. 1995) ("a work may be copyrightable even though it is entirely a compilation of unprotectable elements. What is protectable then is 'the author's original contributions'-the

original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." (citations omitted)); <u>Rose v. Hewson</u>, No. 17 CV 1471, 2018 WL 626350, at *3 (S.D.N.Y. Jan. 30, 2018) ("compilations of generally unprotectable elements can be afforded copyright protection."). Moreover, Courts "treat the question whether particular elements of a work demonstrate sufficient originality and creativity to warrant copyright protection as a question for the factfinder." <u>Matthew Bender & Co. v. W. Pub. Co.</u>, 158 F.3d 674, 681 (2d Cir. 1998). Therefore, "the question whether those elements in LGO demonstrate 'sufficient originality and creativity to warrant copyright protection' is a factual question to be determined at trial." <u>Griffin v. Sheeran</u>, 351 F. Supp. 3d 492, 497 (S.D.N.Y. 2019).

Moreover, where, as here, the parties' experts disagree as to whether a particular musical element is original, summary judgment is inappropriate. <u>See</u> <u>Ulloa v. Universal Music & Video Distribution Corp.</u>, 303 F. Supp. 2d 409, 413-14 (S.D.N.Y. 2004) ("It would be improper for this Court, on a motion for summary judgment, to draw its own conclusions from this competing evidence regarding the originality of the Vocal Phrase."). The parties' experts disagree as to whether the combination of the chord progression and harmonic rhythm present in both compositions is original and thus protectable. They squarely

dispute whether that combination was commonplace before LGO: SAS's experts opined that "the progression class shared between [the songs] is uncommon," Dkt. No. 200 Ex. 7 ¶¶ A.6-7, whereas Sheeran's expert opined "that the combination of commonplace elements in LGO . . . is found in prior art," Dkt. No. 179 Ex. 10 ¶ 26.

Sheeran's expert alleges the existence of three prior works—"Downtown," "Since I Lost My Baby," and "Georgy Girl"—that use the chord progression in LGO, a I-iii-IV-V chord progression, together with the same anticipation of chord changes on the second and fourth chords as used in LGO. Dkt. No. 179 Ex. 10 ¶¶ 26-38. SAS's expert opposes the characterization of those songs as prior art of LGO. He argues that LGO's backing pattern is not present in "Downtown," its chord progression is different from that in "Since I Lost My Baby," and its harmonic rhythm is on an alternative beat compared to the one in "Georgy Girl." Dkt. No. 200 Ex. 5 ¶¶ 10-12. The experts' disagreement on whether the backing pattern is sufficiently uncommon to warrant copyright protection is a genuine dispute as to a material fact, preventing summary judgment. Fed. R. Civ. P. 56(a)

ii)  **Substantial Similarity between LGO and TOL**

When a copyright claim is "limited to the particular selection or arrangement" of elements, the "protection given is

- 8 -

'thin,'" becuase a "'subsequent [author] remains free to use [the public domain elements] to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." <u>Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.</u>, 338 F.3d 127, 136 (2d Cir. 2003) (quoting <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 349 (1991)) (alteration in original). Thus, substantial similarity in selection and arrangement cases "will be established only by very close copying" of the plaintiff's work. <u>Beaudin v. Ben & Jerry's Homemade, Inc.</u>, 95 F.3d 1, 2 (2d Cir. 1996); <u>Zalewski v. Cicero Builder Dev., Inc.</u>, 754 F.3d 95, 107 (2d Cir. 2014). In determining the substantial similarity of works that have both protectable and unprotectable elements, the Court's analysis must be "discerning" and we "must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." <u>Knitwaves, Inc.</u>, 71 F.3d at 1002. Even so, the Court is principally guided "by comparing the contested design's 'total concept and overall feel' with that of the allegedly infringed work," <u>Tufenkian Import/Export Ventures, Inc.</u>, 338 F.3d at 133; <u>Knitwaves, Inc.</u>, 71 F.3d at 1003.

The parties' expert musicologists have opined on the similarity between the musical elements in LGO's and TOL's backing patterns and have come to competing conclusions. SAS's

experts opine that the backing patterns are "harmonically equivalent," Dkt. No. 200 Ex. 3 ¶ 6, whereas Sheeran's expert maintains that they are objectively different, Dkt. No. 179 Ex. 8 ¶ 14. Although the two musical compositions are not identical, a jury could find that the overlap between the songs' combination of chord progression and harmonic rhythm is very close. Accordingly, questions remain that are not resolvable by summary judgment, but require trial.

**Chord Progression**

The LGO Deposit Copy features a I-iii-IV-V7 (or a 1-3-4-5) chord progression. Dkt. No. 208 (Defendants' Rule 56.1 Reply to Plaintiff's Rule 56.1 Response) ¶ 32. TOL features a I-I6-IV-V7 chord progression. Id. ¶ 33. The "I6" chord is a major chord and the "iii" chord is a minor chord. Id. ¶ 35.

The parties dispute the effect of that slight adjustment between the chord patterns. SAS alleges that these chord progressions are harmonically equivalent because, as illustrated by music textbooks, the "I6" chord may substitute for the "iii" chord "without affecting the function of the progression." Id. ¶ 33; Dkt. No. 200 Ex. 5 ¶ 6; Dkt. No. 200 Ex. 7 ¶ 4. Sheeran maintains that the chord progressions are different and none of the chord progressions in TOL are I-iii-IV-V7. Dkt. No. 208 ¶ 33; Dkt. No. 179 Ex. 2 ¶ 39.

Sheeran also argues that there is a significant harmonic difference between the chord progressions because the "I6" chord is a major chord, and the "iii" chord is a minor chord. Dkt. No. 208 ¶ 35; Dkt. No. 179 Ex. 8 ¶ 14. But SAS's expert Dr. Everett contends that the minor "iii" chord could be equivalent to the major "I6" because of the "interchangeability of the two triads." Dkt. No. 200 Ex. 7 ¶¶ A.4-5.

**Harmonic Anticipation of Chord Changes**

The LGO Deposit Copy sets the I-iii-IV-V7 chord progression to extend over two measures (or bars) according to a "slow" 4/4 time signature. Dkt. No. 208 ¶ 41. TOL sets the I-I6-IV-V7 chord progression to a "fast" 4/4 time signature. Id.

The parties dispute whether the songs' harmonic rhythms, the timing of the chord changes in the songs, are substantially similar. SAS claims that the harmonic rhythms are the same but are notated using two different time signatures. Id.; Dkt. No. 3 ¶¶ 10-11.  In Sheeran's view, the harmonic rhythms are different because the chord progression in LGO is played over four bars as compared to two bars in TOL and LGO's Deposit Copy does not notate a fast or slow 4/4 time, which refers to the tempo of the song. Dkt. No. 179 Ex. 2 ¶ 49.  SAS dismisses any arguments that the difference in notation makes the rhythmic pattern dissimilar because, it claims, the rhythms are identical in sound. Dkt. No. 200 Ex. 5 ¶ 5. It also argues that syncopated chord changes,

occurring on a weak beat, are in both songs. Dkt. No. 200 Ex. 7
¶ D.1.

As evidenced by the differences in opinions of the parties'
experts, the question of whether TOL is substantially similar to
LGO cannot be resolved summarily and is left for trial.

### 4) Touring Profits Damages

As a remedy for infringement, a copyright owner is entitled
to recover statutory damages or "actual damages and any
additional profits of the infringer." 17 U.S.C.A. § 504(a)
(2018). SAS seeks a damages award in the amount of actual
damages plus profits, including all profits relating to touring
revenue, such as concert ticket and concert merchandise sales.
Dkt. No. 102 (Third Amended Complaint).

In the event that the complaint is not dismissed, both
parties seek partial summary judgment on various issues related
to profits. Sheeran moves for summary judgment to dismiss SAS's
claim that the damages award can include touring profits. SAS
opposes the motion and cross moves for summary judgment that

> (i) to the extent there is any burden on Plaintiff to
> establish a link between the separate acts of
> infringement that arose when Sheeran performed TOL at
> concerts and the direct profits from the concerts,
> that burden has been satisfied;
> (ii) the numerous references throughout Mr.
> Massarsky's report to Plaintiff's purported failure to
> meet its causal burden should be struck as

inappropriate (as Mr. Massarsky is not a legal expert) and wrong;[1] and
(iii) if Plaintiff prevails on its copyright infringement claim, it will be entitled – at a minimum – to the "straight-line" apportionment of direct profits arising from the direct infringements advanced by Mr. Massarsky, based on the number of songs Mr. Sheeran performed at each Ed Sheeran concert.

In other words, if TOL is found to infringe LGO, the parties disagree over whether touring profits—the sale of concert tickets and concert merchandise—can be recovered and in what amount. SAS alleges that it can recover revenue generated from concert tickets and merchandise because they are direct profits. SAS argues it does not need to prove a causal nexus between the separate acts of infringing public performances and the direct revenues collected from them. Rather, the burden is on Sheeran to prove the proper apportionment of those direct profits to the TOL infringements.

Sheeran contends that all the touring profits are indirect profits. Nonetheless, regardless of how the profits are classified, Sheeran argues SAS must prove a causal nexus between the infringement and the profits and SAS has not adduced any evidence that shows TOL specifically caused concertgoers to purchase Sheeran concert tickets and merchandise sold at his concerts.

---

[1] SAS's motion to strike is denied. There is nothing improper about Massarsky opining that there is no evidence of a causal link between tour profits and the alleged infringement.

**1) Classification of Profits**

Depending on how attenuated profits are from the infringing act, an infringer's profits may be direct or indirect. Complex Sys., Inc. v. ABN Ambro Bank N.V., No. 08 CIV. 7497 KBF, 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013). Direct profits arise from the sale of the infringing good. Cohen v. G & M Realty L.P., 320 F. Supp. 3d 421, 446 (E.D.N.Y. 2018), aff'd sub nom. Castillo v. G&M Realty L.P., 950 F.3d 155 (2d Cir. 2020); Garcia v. Coleman, No. C-07-2279 EMC, 2009 WL 799393, at *2 (N.D. Cal. Mar. 24, 2009) (quoting Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits are "derived from the use of the copyrighted work to promote sales of other products." Graham v. Prince, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017).

Profits that arise from the performance of a song are direct whereas profits that may have come about because the performance acted as a draw for other profit centers are indirect. Accordingly, profits from the sale of concert tickets are direct. The profit is arising because the artist was paid to perform songs and there is an expectation, although not a guarantee, that an artist will play their most popular ballads. In comparison, profits from the sale of concert merchandise are indirect because the source of profits is from the sale of another good separate from the infringing performance.

**2) Causal Nexus**

A copyright owner is entitled to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504 (2018). The Copyright Act goes on to describe a burden-shifting analysis: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id.

A plaintiff thus has the burden of showing a causal nexus between the infringement and the gross revenue. Lawton v. Melville Corp., 116 F.3d 1472 (2d Cir. 1997) (Because "only those profits attributable to the use of the infringed work" can be awarded, a copyright owner "must show some nexus between the gross revenues and the infringement."); Viktor v. Top Dawg Ent. LLC, No. 18 CIV. 1554, 2018 WL 5282886, at *1 (S.D.N.Y. Oct. 24, 2018) ("Significant here, before the burden shifts to the infringer, a plaintiff must first demonstrate a causal relationship between the infringement and the defendants' revenues."). It is insufficient for a copyright owner to "simply show gross revenues from the sale of everything the defendant sells." Id. "[T]he term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not

unrelated revenues." <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 160 (2d Cir. 2001) (holding plaintiff failed to discharge its burden by submitting evidence of the defendant's gross revenues when the revenue included sales that were in no way promoted by the infringing advertisement). In cases of direct profits, the burden to satisfy the nexus requirement is minimal and may be obvious. <u>See</u> <u>Lowry's Reps., Inc. v. Legg Mason, Inc.</u>, 271 F. Supp. 2d 737, 751 (D. Md. 2003) ("In the case of 'direct profits,' such as result from the sale or performance of copyrighted material, the nexus is obvious."); <u>Data Gen. Corp. v. Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1173 (1st Cir. 1994), <u>abrogated on other grounds by</u> <u>Reed Elsevier, Inc. v. Muchnick</u>, 559 U.S. 154 (2010) ("In the context of infringer's profits, the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement.").

**Concert Tickets**

SAS has the burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed. SAS put forward such evidence in the form of an expert report, which calculated that the portion of concert ticket revenue attributable to the live performance of TOL ranged from 13.3%, based on a method of calculating according to the Spotify

streaming statistics, to 23.97%, based on calculating according to the RIAA certified sales. Dkt. No. 205 Ex. 1 at 9-10.

Sheeran disputes this method of calculation. They put forward a competing expert report that calculates TOL's share of the profits by dividing the Adjusted Show Profits (a figure provided by them that subtracts expenses from the total live income) by the number of songs performed by Ed Sheeran, or, in the alternative, by the number of songs performed by Mr. Sheeran and by the opening act(s). Dkt. No. 205 Ex. 2 at 6, 15-20.

SAS disputes Sheeran's method of calculation and Sheeran's deduction of business management fees, management commissions, and UK taxes from the Adjusted Gross Profits figure on the grounds that those items are not directly attributable to TOL. Dkt. No. 205 Ex. 1 at 8.

In light of the dispute between the parties, the proper calculation of damages should be determined by trial rather than on summary judgment.

### Concert Merchandise

SAS has not identified any admissible evidence that ties the alleged infringement, the live performance of TOL, to the revenues generated by the sale of concert merchandise.

Without a showing of "any causal connection between the infringement and the defendant's profits," it is only speculative whether the revenue is reasonably related to the

infringement. <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 159 (2d Cir. 2001). Copyright law does not allow for speculative recovery, and we can surmise a myriad of reasons why a concertgoer would purchase concert merchandise, reasons that have nothing to do with the live performance of TOL.

Accordingly, if TOL is found to be an infringement of LGO, the jury cannot take into account the revenue from concert merchandise sales when making the damages calculation. <u>See</u> <u>Bayoh v. Afropunk LLC</u>, No. 18 CV 5820, 2020 WL 6269300, at *7 (S.D.N.Y. Oct. 26, 2020) ("In cases that involve indirect profit claims, the district court opinions have underscored that "the decision to 'send[ ] such claims to a jury should be extremely rare.'" (alteration in original)).

CONCLUSION

Sheeran's motion for summary judgment dismissing SAS's claim for infringement is denied. Sheeran's motion in the alternative to dismiss SAS's claim to include concert merchandise revenue in a calculation of damages is granted, but its motion to dismiss the inclusion of concert ticket sales is denied.

Sheeran's motion to exclude Dr. Covach's and Dr. Everett's Revised Reports and testimony is granted conditionally on their present submissions. If, within thirty days from the date of entry of this Order, they submit reports which comply strictly

with this Order and the September 9, 2021 Order, their reports will be received in evidence and they may testify. Those of Sheeran's objections and disputes with their reports which have not been specifically addressed by the Court are left to be dealt with on cross-examination.

SAS's summary judgment motion for a finding that if the jury finds TOL infringes LGO, SAS has established a link between the infringing concert performances of TOL and profits arising from concert ticket sales is granted. It is denied in all other respects.

So Ordered.

Dated:  New York, New York
      September **29**, 2022

                                   *Louis L. Stanton*
                               LOUIS L. STANTON
                                 U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STRUCTURED ASSET SALES, LLC, | Case No. 1:18-cv-5839 (LLS) |
| Plaintiff, | |
| v. | **NOTICE OF MOTION** |
| EDWARD CHRISTOPHER SHEERAN, *p/k/a* ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION *d/b/a* ATLANTIC RECORDS, BDI MUSIC LTD., BUCK MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING and DOES 1 THROUGH 10, | |
| Defendants. | |

**PLEASE TAKE NOTICE,** that upon the accompanying Memorandum of Law and all prior proceedings had herein, defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., David Platz Music (USA) Inc., Amy Wadge and Jake Gosling (collectively, "Defendants") shall move this Court, before the Honorable Louis L. Stanton at the Daniel Patrick Moynihan United States Courthouse, Courtroom 21C, 500 Pearl Street, New York, New York 10007, on a date and time to be determined by the Court, for an Order:

(i)     Pursuant to Local Civil Rule 6.3, granting reconsideration of the portion of the Court's Order dated September 29, 2022 (the "Order") addressing liability and, upon granting reconsideration, grant summary judgment to Defendants;

(ii)    In the alternative, pursuant 28 U.S.C. § 1292(b), certifying an interlocutory appeal to the Court of Appeals for the Second Circuit to determine whether the combination of only

1

two admittedly commonplace musical elements – a chord progression and harmonic rhythm – can suffice, as a matter of law, to satisfy the "numerous" requirement under the selection and arrangement test;

(iii) In the event this case is not dismissed, pursuant to Local Civil Rule 6.3, granting reconsideration of the portion of the Order addressing the expert report of Dr. Everett and, upon granting reconsideration, consistent with its September 9, 2021 Order, excluding all references to the "study" conducted by Dr. Everett which is, in fact, an improper and noncompliant "prior art" study; and

(iv) In the event this case is not dismissed, pursuant to Local Civil Rule 6.3, granting reconsideration of the portion of the Order addressing profits from the sale of concert tickets and, upon granting reconsideration, ruling that: (a) profits arising from concert ticket sales are <u>not</u> direct, but indirect, and that summary judgment dismissing SAS's claim for touring profits is appropriate because SAS has not offered any evidence to support a causal nexus; (b) in the alternative, if the Court adheres to its ruling that profits arising from concert ticket sales are direct, SAS still failed to satisfy its burden of proving that a causal nexus exists, which entitles Defendants to summary judgment dismissing SAS's claim for touring profits; or (c) in the alternative, if the Court adheres to its ruling that profits arising from concert ticket sales are direct and that SAS satisfied its burden of proving a causal nexus, Defendants still may <u>rebut</u> that any causal nexus exists.

The reasons and grounds for this motion are more fully described in the accompanying memorandum of law.

Oral argument, if any shall be directed by the Court, and shall be held on a date and at a time designated by the Court.

Dated: New York, New York
October 13, 2022

PRYOR CASHMAN LLP

By: */s/ Donald S. Zakarin*
    Donald S. Zakarin
    Ilene S. Farkas
    Andrew M. Goldsmith
7 Times Square
New York, NY 10036
(212) 421-4100

*Attorneys for Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC, Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., David Platz Music (USA) Inc., Amy Wadge and Jake Gosling*

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/16/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

STRUCTURED ASSET SALES, LLC,

              Plaintiff,                  18 Civ. 5839 (LLS)

   - against -                       OPINION & ORDER

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

              Defendants.
- - - - - - - - - - - - - - - X

     This case presents the question of whether the song "Thinking Out Loud" infringes the copyright of "Let's Get It On." On September 29, 2022, the Court denied defendants' Renewed Motion for Summary Judgment dismissing the case. Defendants now move for reconsideration of that Order.

     For the following reasons, defendants' Motion for Reconsideration is granted and the complaint is dismissed.

### Background

     The Court assumes the parties' familiarity with this case and recounts only what is necessary to decide defendants' Motion for Reconsideration.

     Ed Townsend and Marvin Gaye Jr. wrote and internationally released the song "Let's Get It On" in 1973. Dkt. No. 102

1

("Third Amended Complaint") ¶ 1; Dkt. No. 201 ("Defendants' Rule 56.1 Statement") ¶ 17.  On July 17, 1973, Townsend applied to copyright the song with the U.S. Copyright Office. Dkt. No. 201 ¶ 19. In support of that application, he deposited with the Copyright Office a copy of the sheet music. Id. ¶ 20. The sheet music, which is known as the "Deposit Copy," was subsequently registered under Registration No. EP 314589.[1] Id. ¶ 21. Plaintiff, Structured Assets Sales, LLC ("SAS") has an 11.11% beneficial interest in the right to receive royalties from the copyright of "Let's Get It On."  Dkt. No. 102 ¶ 18; Dkt. No. 201 ¶ 18.

In February 2014, defendants Ed Sheeran and Amy Wadge co-authored the song "Thinking Out Loud." Dkt. No. 201 ¶ 24. Days later, Sheeran recorded, and co-defendant Jack Gosling produced, what would become the commercially released version of the song. Id. ¶ 26; Dkt. No. 102 ¶ 25. "Thinking Out Loud" was released to great commercial and critical success, including a Grammy Award for Song of the Year. Dkt. No. 102 ¶ 17. Co-defendants SONY/ATV Music Publishing, Atlantic Recording Company d/b/a Atlantic Records, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., and David Platz Music (USA) Inc., as

---

[1] Marvin Gaye Jr. created a Sound Recording of "Let's Get It On," which was commercially released. The Sound Recording was never copyrighted and is not at issue in this dispute.

2

publishers and distributors of "Thinking Out Loud," facilitated and assisted with its distribution, promotion, and sales.

SAS alleges that "Thinking Out Loud" infringes on the copyright of the sheet music of "Let's Get It On." Defendants moved for Summary Judgment dismissing the case and SAS cross-moved for Summary Judgment granting it profits from Sheeran's live performance of "Thinking Out Loud."[2] Dkt. No. 202; Dkt. No. 205.

In its Order denying defendant's Motion for Summary Judgment, the Court recognized that this Circuit treats the question of whether "particular elements of a work demonstrate sufficient originality and creativity to warrant copyright protection as a question for the factfinder." Matthew Bender & Co. v. W. Pub. Co., 158 F.3d 67, 681 (2d Cir. 1998). With this in mind, the Court held that the parties' dispute over the originality of the selection and arrangement of the combination of two commonplace musical building blocks—the chord progression and harmonic rhythm—in "Let's Get It On" was a genuine dispute necessitating denial of defendants' motion.

---

[2] The parties' initial motions for summary judgment were denied with leave to renew after SAS amended its Experts' Reports. Dkt. No. 198. The parties thereafter filed Renewed Motions for Summary Judgment, which the Court denied in part and granted in part. Dkt. No. 211. It is that denial which defendants urge the Court to reconsider.

Defendants filed a motion for reconsideration urging the
Court to reconsider its findings on liability and grant Summary
Judgment dismissing the case, or in the alternative to certify
the question of how to satisfy the numerosity requirement under
the selection and arrangement test for infringement. Dkt. No.
212. SAS promptly opposed the Motion for Reconsideration. Dkt.
No. 214.

### Legal Standards

#### 1. Motion for Reconsideration

Under Rule 54 of the Federal Rules of Civil Procedure, the
Court has the inherent power to reconsider any of its decisions
prior to the entry of a final judgment adjudicating all claims
at issue. Fed. R. Civ. P. 54(b). A motion for reconsideration is
"an extraordinary remedy to be employed sparingly in the
interests of finality." Drapkin v. Mafco Consol. Grp., Inc., 818
F. Supp. 2d 678, 695 (S.D.N.Y. 2011). Reconsideration is
warranted where there is an "intervening change of controlling
law, the availability of new evidence, or the need to correct a
clear error or prevent manifest injustice." DiLaura v. Power
Auth. of New York, 982 F.2d 73, 76 (2d Cir. 1992). The decision
as to whether to grant a motion for reconsideration lies
squarely within the court's discretion. Analytical Survs., Inc.
v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

#### 2. Copyright Infringement

4

To establish a claim of copyright infringement, "a
plaintiff with a valid copyright must demonstrate that: (1) the
defendant has actually copied the plaintiff's work; and (2) the
copying is illegal because a substantial similarity exists
between the defendant's work and the protectable elements of
plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev.
Corp., 602 F.3d 57, 63 (2d Cir. 2010).  The Court can decide as
a matter of law that there is no substantial similarity between
the works because "the similarity between two works concerns
only non-copyrightable elements of the plaintiff's work." Warner
Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983).

The test for substantial similarity in music infringement
cases is whether a plaintiff can prove that "defendant took from
plaintiff's works so much of what is pleasing to the ears of lay
listeners, who comprise the audience for whom such . . . music
is composed, that defendant wrongfully appropriated something
which belongs to the plaintiff." Repp v. Webber, 132 F.3d 882,
889 (2d Cir. 1997) (alteration in original). When, as here, the
song's aesthetic appeal is due largely to unprotectable
elements, the Court's analysis of substantial similarity "must
be more discerning, and ignore those aspects of a work that are
unprotectable ... lest [courts] conflate mere copying with
wrongful copying." Zalewski v. Cicero Builder Dev., Inc., 754
F.3d 95, 102 (2d Cir. 2014).

In doing so, the Court is not required to "compare only those elements which are themselves copyrightable." Peter F. Gaito Architecture, LLC, 602 F.3d at 66. Instead, the court is "'principally guided by comparing the contested work's total concept and overall feel with that of the allegedly infringed work.'" Nwosuocha v. Glover, No. 21 CIV. 04047, 2023 WL 2632158, at *4 (S.D.N.Y. Mar. 24, 2023) (quoting Peter F. Gaito Architecture, LLC, 602 F.3d at 66). "This is so because 'the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of unprotectible components—are considered in relation to one another.'" Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (quoting Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003)); see also McDonald v. West, 138 F. Supp. 3d 448, 456 (S.D.N.Y. 2015), aff'd, 669 F. App'x 59 (2d Cir. 2016) (same). "[W]here a work relies on the compilation or arrangement of unprotectible elements, it is only eligible for copyright protection 'if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.'" Threeline Imports, Inc. v. Vernikov, No. 15 Civ. 02333, 2016 WL 11472749, at *13

(E.D.N.Y. Oct. 28, 2016) (quoting <u>Satava v. Lowry</u>, 323 F.3d 805, 811 (9th Cir. 2003)).

## Analysis

### 1. Reconsideration is Warranted

Defendants argue that reconsideration is proper to avoid clear error because the Court overlooked the numerosity requirement for selection and arrangement claims of infringement. Dkt. No. 213 at 5. SAS responds that defendants have not identified any controlling decisions that the Court has overlooked or any intervening change of controlling law. Dkt. No. 214 at 1.

The Court denied Defendant's Renewed Motion for Summary Judgment, in part, because its sister action <u>Griffin v. Sheeran</u>, which arose from the same nucleus of facts and asserted the same claim of infringement, was proceeding to trial. Summary Judgment dismissing the claim was denied in <u>Griffin</u> in January 2019. <u>Griffin v. Sheeran</u>, 351 F. Supp. 3d 492, 494 (S.D.N.Y. 2019). Afterward, the Ninth Circuit decided <u>Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin</u>, 952 F.3d 1051, 1064 (9th Cir. 2020), which is one of the clearest articulations of how copyright law applies to musical compositions. This Court has already adopted and applied to this case one holding of <u>Skidmore</u>: that the scope of copyright protection only extends to the Deposit Copy, here the sheet music of "Let's Get It On."

**A1890**

Skidmore also expressly laid out a numerosity requirement for selection and arrangement copyright claims holding that protection applies to "a combination of unprotectable elements ... only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Id. at 1074.

The numerosity requirement has been alluded to, but not strictly followed, in the Second Circuit. Compare Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (finding infringement when "numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] ...—are considered in relation to one another") with Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1004 (2d Cir. 1995) ("What is protectible then is the author's original contributions, the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work."). There have been few opportunities to apply the principle of numerosity to musical compositions. In its Order denying Summary Judgment dismissing the claim, this Court declined to grapple with whether a numerosity requirement should be imposed and instead found that there is no bright-line rule requiring it. Dkt. No. 211.

Since then, courts in this Circuit have started to weigh the numerosity of the elements when deciding whether their

8

combination should be protected. In <u>Nwosuocha v. Glover</u>, 21 Civ. 04047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023), the Court implied a high threshold for numerosity when it found that a combination of eight unprotected musical elements was "categorically ineligible for copyright protection." <u>Id.</u> at *7. Having previously disdained the issue of numerosity, the Court finds that it improperly disregarded it in denying defendants' motion to dismiss without weighing whether and how to apply the requirement.

   2. **Defendants' Renewed Motion for Summary Judgment is Granted**

   SAS alleges that the combination of the chord progression and the harmonic rhythm used in "Thinking Out Loud" is substantially similar to that in "Let's Get It On," and thus infringes the work. SAS acknowledges, and the Court concurs, that the chord progression and harmonic rhythm, in isolation, are not individually protected. The question then is whether two common elements are numerous enough to make their combination eligible for copyright protection.

   Unprotected musical elements might be so selected and arranged that they form a whole whose patterns and effects are protectable. <u>See</u> <u>Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.</u>, 338 F.3d 127, 134 (2d Cir. 2003). The scope of that protection is limited to the particular way in which the unprotected elements form the coherent pattern or design and

does not extend to the underlying elements themselves. See id. at 136. Thus, a protectable mosaic may be formed from unprotected chips, but it needs a number of them: not one or two. Otherwise, the arrangement is devoid of any contribution from the author. It is nothing more than an impermissible attempt to copyright what is already in the public domain and capture what is freely available to all to use. Deciphering what constitutes a protectable, original selection and arrangement from a combination of unprotected properties has long vexed the courts.

The numerosity requirement springs from the nature of that postulate. Requiring numerous unprotected elements to be present before determining whether their selection and arrangement is protectable reinforces the constitutional requisite that a copyrighted work, or piece of a work, be original enough to warrant protection. See Peter F. Gaito Architecture, LLC, 602 F.3d at 66.  That is "the *sine qua non* of copyright." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346 (1991). The selection and arrangement of unprotected musical elements "cannot be so mechanical or routine as to require no creativity whatsoever." Id. at 358. Requiring numerous elements prevents the misapplication of copyright law and ensures it is not being used to protect combinations that occur routinely

without any minimal creative contribution attributable to the author.

Numerous means "many; great in number." Numerous, Oxford English Dictionary (3d. ed. 2003). There is no bright-line rule dictating the threshold over which a specific number of unprotectable elements in a work must pass to become sufficiently numerous to protect the aesthetic decision to select and arrange them in an original way. Nonetheless, common sense dictates that in the context of a musical composition, "numerous" requires more than just a commonplace chord progression and harmonic rhythm to warrant protecting their combination.[3] See Nwosuocha v. Glover, 21 Civ. 04047, 2023 WL 2632158, at *7 (S.D.N.Y. Mar. 24, 2023) (holding that the eight musical elements in plaintiff's song "lack sufficient originality alone, or as combined, to merit compositional copyright protection or are categorically ineligible for copyright protection"). To protect an arrangement with few parts may be to read the numerosity requirement out of the law. That is especially true here where the chord progression and the

_____

[3] Outside of the musical context, the "combination of two unprotectable elements" has been found to be "not sufficiently numerous or original to constitute original work entitled to copyright protection." Beyond Blond Prods., LLC v. Heldman, 479 F. Supp. 3d 874, 883 (C.D. Cal. 2020), aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022).

11

harmonic rhythm (how the chord progression is played) in "Let's Get It On" do not form a pattern, but instead essentially merge into one element.

This Court is not aware of any case upholding a selection and arrangement claim based on the combination of two commonplace, unprotectable musical elements. Courts often evaluate combinations of at least three common musical elements and still find their selection and arrangement to be unoriginal. See Gray v. Hudson, 28 F.4th 87, 102 (9th Cir. 2022) ("This combination is unoriginal because it is really nothing more than a two-note snippet of a descending minor scale, with some notes repeated."); Peters v. West, 776 F. Supp. 2d 742, 751 (N.D. Ill. 2011), aff'd, 692 F.3d 629 (7th Cir. 2012) (holding the combination of three unprotected elements is not protectable); Cottrill v. Spears, No. 02-3646, 2003 WL 21223846, at *9 (E.D. Pa. May 22, 2003), aff'd, 87 F. App'x 803 (3d Cir. 2004), as amended on reh'g (June 2, 2004) (holding four commonplace musical elements are not numerous enough to warrant protection). In Satava, a case not about music but about glass jellyfish sculptures, the court dismissed a selection and arrangement claim of infringement because the combination of six commonplace elements "lacks the quantum of originality needed to merit copyright protection." Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003).

At some level, every work is the selection and arrangement of unprotectable elements. Musical compositions chiefly adhere to this template. All songs, after all, are made up of the "limited number of notes and chords available to composers." Gaste v. Kaiserman, 863 F.2d 1061, 1068 (2d Cir. 1988). Within that limited number, there are even fewer ways to combine the elements in a manner that is pleasing to the ears. That means a songwriter only has finite options for playing a commonplace chord progression. The options are so few that many combinations have themselves become commonplace, especially in popular music. If the selection and arrangement of unprotectable elements, in their combination, is "so commonplace that it has come to be expected as a matter of course," then it lacks the "minimal creative spark required by the Copyright Act and the Constitution" to be original and thus protectable. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 363 (1991).

It is an unassailable reality that the chord progression and harmonic rhythm in "Let's Get It On" are so commonplace, in isolation and in combination, that to protect their combination would give "Let's Get It On" an impermissible monopoly over a basic musical building block. "Let's Get It On's" chord progression was used at least twenty-nine times before appearing in "Let's Get It On" and was in another twenty-three songs

13

before "Thinking Out Loud" was released. <u>See</u> Dkt. No. 179 Ex. 2
("Defendants' Expert's Report") at Visual Exhibit H. It is so
ubiquitous that it has been taught for many years (the issue of
this publication in the exhibit was dated as 2000) as a popular
chord progression in introductory books on how to play guitar
and piano. <u>See</u> <u>id.</u> at ¶¶ 34-36 (citing <u>Money Chords: A</u>
<u>Songwriter's Sourcebook of Popular Chord Progressions</u> and <u>Guitar</u>
<u>for Advanced Beginners</u>). The harmonic rhythm was used in at
least eight other songs before "Let's Get It On" and in another
fifteen before the release of "Thinking Out Loud." Dkt. No. 179
Ex. 9 ("Defendants' Expert's Report") at 9-10. It is so common
that Mr. Sheeran himself used it, or a similar version, in at
least twenty additional songs he wrote before writing "Thinking
Out Loud." Dkt. No. 179 Ex. 2 at Visual Exhibit I.

The combination is commonplace. Amy Wadge, who co-wrote
"Thinking Out Loud," used a nearly identical combination in one
of her prior songs, "Better Than Me." <u>Id.</u> at ¶ 63 (the only
difference between "Thinking Out Loud" and this prior work by
Wadge is that the prior work also happens to anticipate the
third chord change). Defendants' experts also identified,
undisputed by SAS's expert,[4] at least four songs that were

---

[4] SAS's expert, Dr. Covach, did not dispute that the songs used
the same combination of elements. Rather, he argued that other,
potentially more popular, versions of the songs did not use the
combination. Dkt. No. 200 Ex. 9 ¶¶ 10-13.

released prior to "Let's Get It On" that used virtually the same combination. Id. at ¶¶ 43-46, 56-60; 107 (discussing examples of prior art, including the songs "Georgy Girl," "Since I Lost My Baby," "Downtown," and "Get Off Of My Cloud"); Dkt. No. 179 Ex. 20 ("Defendants' Expert's Rebuttal Report") ¶¶ 26-38. The combination has also been used in songs that were released after "Let's Get It On" but before "Thinking Out Loud." Dkt. No. 179 Ex. 2 ¶ 4 (discussing "I've Got Love On My Mind"); Id. Ex. 9 at 38 (discussing "Do It To Me"). While the appearance of the combination in other songs has no bearing on whether it is original in "Let's Get It On," it does illustrate how multiple songwriters have combined the two commonplace elements in the same manner for years.

The selection and arrangement of these two musical elements in "Let's Get It On" is now commonplace and thus their combination is unprotectable. If their combination were protected and not freely available to songwriters, the goal of copyright law "[t]o promote the Progress of Science and useful Arts" would be thwarted. U.S. Const. art. I § 8. The Copyright Act envisioned that there will be unprotectable elements-based works "in which the selection, coordination, and arrangement are not sufficiently original to trigger copyright protection." Feist Publications, Inc., 499 U.S. at 358.

As a matter of law, the combination of the chord progression and harmonic rhythm in "Let's Get It On" is too commonplace to merit copyright protection.

### Conclusion

To prevent manifest injustice, defendants' Motion for Reconsideration is granted. Dkt. No. 212. There is no genuine issue of material fact as to whether defendants infringed the protected elements of "Let's Get It On." The answer is that they did not. Accordingly, their Motion for Summary Judgment is granted. The Complaint is dismissed with prejudice.

Plaintiff's renewed cross-motion for Summary Judgment is denied.

The Clerk of the Court is directed to close the case.

So Ordered.

Dated: New York, New York
       May 16, 2023

                                    Louis L. Stanton
                              LOUIS L. STANTON
                                   U.S.D.J.

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC
DATE FILED: 5/17/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X
STRUCTURED ASSET SALES, LLC,

              Plaintiff,              18 Civ. 5839 (LLS)

  - against -              CLERK'S JUDGMENT


EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

              Defendants.
- - - - - - - - - - - - - - - X


    It is hereby **ORDERED, ADJUDGED AND DECREED**:  That for the

reasons stated in the Court's Opinion and Order dated May 16,

2023, defendants' Motion for Reconsideration is granted.  Their

Motion for Summary Judgment is granted. The Complaint is

dismissed with prejudice. Plaintiff's renewed cross-motion for

Summary Judgment is denied and the case is closed.

**Dated:**  New York, New York
       May 17, 2023
                           **RUBY J. KRAJICK**

                              **Clerk of Court**

           **BY:**

                             **Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- **X**
STRUCTURED ASSET SALES, LLC,                   :
                                      :
         Plaintiff,                           :
                                        :   Index No. 1:18-cv-5839 (LLS)
         v.                                   :
                                        :
EDWARD CHRISTOPHER SHEERAN, p/k/a      :   **NOTICE OF APPEAL**
ED SHEERAN, SONY/ATV MUSIC             :
PUBLISHING, LLC, ATLANTIC              :
RECORDING CORPORATION d/b/a            :
ATLANTIC RECORDS, BDI MUSIC LTD.,      :
BUCKS MUSIC GROUP LTD., THE            :
ROYALTY NETWORK, INC., DAVID PLATZ     :
MUSIC (USA) INC., AMY WADGE, JAKE      :
GOSLING and DOES 1 THROUGH 10,         :
                                        :
         Defendants,                          :
-------------------------------------------------------- **X**

         Notice is hereby given that Plaintiff Structured Asset Sales, LLC hereby appeals to the

United States Court of Appeals for the Second Circuit from the May 17, 2023 Judgment (ECF

218).[1]

 Dated: New York, New York            Respectfully submitted,
         June 16, 2023

                                                /s/ Hillel I. Parness
                                          Hillel I. Parness
                                          PARNESS LAW FIRM, PLLC
                                          136 Madison Ave., 6th Floor
                                          New York, New York  10016
                                          212-447-5299
                                          hip@hiplaw.com
                                          *Attorneys for Plaintiff*

---

[1] "The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal."  Fed. R. App. P. 3(c)(4).