# 23-905-cv

IN THE

# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤

FOR THE SECOND CIRCUIT

———— ►► ◄◄ ————

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

PARNESS LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD. UK, ATLANTIC RECORDS UK, BDI MUSIC, BUCKS MUSIC GROUP, WARNER MUSIC GROUP CORPORATION, DBA ASYLUM RECORDS, WARNER MUSIC GROUP, LTD. UK, DOES 1-10,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Structured Asset Sales, LLC states that it is a Delaware Limited Liability Company. It has no parent company, and no publicly held company holds more than ten percent of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ...........................................................1

JURISDICTIONAL STATEMENT .....................................................5

ISSUES PRESENTED FOR REVIEW ................................................6

STATEMENT OF THE CASE.............................................................7

STATEMENT OF FACTS ...................................................................9

SUMMARY OF ARGUMENT ..........................................................11

ARGUMENT .....................................................................................12

    I.     STANDARDS OF REVIEW ...........................................12

    II.    THE DISTRICT COURT'S CONCLUSION THAT "THE DEPOSIT COPY IS THE SOLE DEFINITION OF THE ELEMENTS INCLUDED IN THE PROTECTION OF COPYRIGHT" WAS REVERSIBLE ERROR ..........................13

        a.    The District Court's "Deposit Copy" Analysis Lacked Foundation....................................................14

            i.     Copyright Act of 1909 ...................................15

            ii.    *Merrell v. Tice* ..............................................16

            iii.   *Skidmore v. Led Zeppelin* .............................17

            iv.   Compendium of U.S. Copyright Office Practices.......................................................21

        b.    The Supreme Court and Professor Nimmer Specifically Caution Against Limitations On The Scope Of Copyrights Based On Past Practice ........................23

    c.    Deposit Copies Identify – But Are Never Identical To – Underlying Copyrighted Works ......................................26

    d.    Adopting the *Compendium*'s Administrative Approach to Deposit Copies as Law Improperly Would Treat Registrants of Different Types of Works Unequally Under the Copyright Act ...........................28

    e.    The District Court's Approach to Deposit Copies Would Treat Owners of "United States Works" and Foreign Works Differently, in Apparent Violation of the Berne Convention ...........................................32

III.    THE DISTRICT COURT ERRONEOUSLY DENIED APPELLANT'S REQUEST TO AMEND THE COMPLAINT TO ADD AN ADDITIONAL REGISTRATION ...............................................................35

IV.    THE DISTRICT COURT'S IMPLEMENTATION OF ITS "DEPOSIT COPY" RULING TO PROHIBIT APPELLANT'S EXPERTS FROM INTERPETING THE DEPOSIT COPY WAS ERRONEOUS ...............................38

V.    THE DISTRICT COURT'S "SELECTION AND ARRANGEMENT" RULINGS WERE ERRONEOUS...................43

VI.    THE DISTRICT COURT ERRONEOUSLY HELD THAT THE COMBINATION OF ELEMENTS WAS "COMMONPLACE," DESPITE HAVING ALREADY RULED THAT IT WAS A DISPUTED QUESTION OF MATERIAL FACT ...............................................................48

VII.    THE DISTRICT COURT'S CONCERT REVENUE DECISIONS WERE CORRECT, AND ARE UNDISTURBED BY THE FINAL SUMMARY JUDGMENT RULING ...............................................................51

CONCLUSION ........................................................................58

# TABLE OF AUTHORITIES

## CASES

*Betty, Inc. v. Pepsico, Inc.*, 848 F. App'x 43 (2d Cir. 2021) ...................................17

*Bey v. City of New York*, 999 F.3d 157 (2d Cir. 2021) ...........................................12

*Block v. First Blood Assocs.*, 988 F.2d 344 (2d Cir. 1993) ....................................37

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
    257 F.Supp.2d 751 (S.D.N.Y. 2003) ....................................................................55

*DaimlerChrysler Servs. v. Summit Nat.*, 02-cv-71871,
    2006 WL 208787 (E.D. Mich. Jan. 26, 2006)......................................................57

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by*
    *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) ............................... passim

*FireSabre Consulting LLC v. Sheehy*, 11-cv-4719,
    2013 WL 5420977 (S.D.N.Y. Sept. 26, 2013) .....................................................27

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985) .................................................................................57

*Garcia v. Coleman*, C-07-2279, 2009 WL 799393 (N.D. Cal. Mar. 24, 2009) ......56

*Georgia v. Public.Resource.Org, Inc.*, 590 U.S. __, 140 S. Ct. 1498 (2020) .........22

*Golan v. Holder*, 565 U.S. 302 (2012)....................................................................33

*Goldstein v. California*, 412 U.S. 546 (1973)..........................................................24

*Gray v. Perry*, 2017 WL 1240740, 2:15-cv-05642 (C.D. Cal. Apr. 3, 2017) .........52

*Gray v. Perry*, 2019 WL 2992007, 2:15-cv-05642 (C.D. Cal. July 5, 2019)..........52

*Griffin v. Sheeran*, 17-cv-5221, 2018 WL 11222864
    (S.D.N.Y. June 11, 2018), *aff'd*, 767 F. App'x 129 (2d Cir. 2019) ............. passim

*Griffin v. Sheeran*, 17-cv-5221, 2020 WL 5522835 (S.D.N.Y. Mar. 24, 2020) .....18

*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y. 1985),
  *aff'd sub nom.*, MDL No. 381, 818 F.2d 187 (2d Cir. 1987) ..............................41

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  153 F.3d 82 (2d Cir. 1998) ........................................................................32

*La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995)............................15

*Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003 )......56

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)..................................42

*Merrell v. Tice*, 104 U.S. 557 (1881)................................................................ passim

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017) ........................................................55

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*,
  712 F. Supp. 2d 84 (S.D.N.Y. 2010), *reconsid. in part*, 09-cv-2669,
  2010 WL 3958841 (S.D.N.Y. Sept. 27, 2010) ..........................................22

*New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185
  (E.D.N.Y. 2007), *as amended* (Feb. 7, 2008), *vacated and remanded*
  *on other grounds*, 686 F.3d 133 (2d Cir. 2012) ......................................42

*Nicholls v. Tufekian Imp./Exp. Ventures, Inc.*,
  367 F.Supp.2d 514 (S.D.N.Y. 2005) ................................................. 19, 26, 27, 42

*Nwosuocha v. Glover*, 21-cv-04047,
  2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023) ............................................ 46, 47

*Polar Bear Prods. v. Timex*, 384 F.3d 700 (9th Cir. 2004) ......................................52

*Roy Export Estab. v. Columbia Broadcasting*, 672 F.2d 1095 (2d Cir. 1982)........15

*Semerdjian v. Littell*, 641 F. Supp.2d 233 (S.D.N.Y. 2009)....................................52

*Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir.) (*en banc*),
  *cert. denied sub nom.*, 141 S. Ct. 453, *reh'g denied*,
  141 S. Ct. 946 (2020) .................................................................... passim

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ......................................................21

*State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843
(2d Cir. 1981) .................................................................................37

*Structured Asset Sales v. Sheeran*, 20-cv-4329 (S.D.N.Y.).............................. 10, 37

*Super Express USA Publ'g Corp. v. Spring Publ'g Corp.*,
2018 WL 1559764 (E.D.N.Y. Mar. 30, 2018) .....................................34

*Twisted Records v. Rauhofer*, 03-cv-2644, 2005 WL 517328
(S.D.N.Y. Mar. 3, 2005)..................................................................37

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) ...................................12

*United States v. Am. Exp. Co.*, 10-cv-4496, 2014 WL 2879811
(E.D.N.Y. June 24, 2014) ................................................................42

*United States v. BMI*, 207 F. Supp.3d 374 (S.D.N.Y. 2016) ...................................56

*United States v. BMI*, 720 F. App'x 14 (2d Cir. 2017)............................................56

*White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1 (1908)..............................24

*Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) ....................................17

*Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*,
736 F. App'x 274 (2d Cir. 2018)............................................................13

## STATUTES

17 U.S.C. § 10 (1909) .................................................................15

17 U.S.C. § 101 .........................................................................32

17 U.S.C. § 12 (1909) .................................................................15

17 U.S.C. § 408(b) ................................................................. 18, 27

17 U.S.C. § 411(a) .....................................................................32

17 U.S.C. § 501 .........................................................................5

28 U.S.C. § 1291 .................................................................................5

Fed. R. Evid. 702 .............................................................................42

**OTHER AUTHORITIES**

1 Nimmer on Copyright § 2.05 (2023) ..................................................25

Berne Convention for the Protection of Literary and Artistic Works,
  Paris Act of 1971, reprinted in, S. TREATY DOC. NO. 27,
  99th Cong., 2d Sess. 1 (1986)................................................... 32, 33, 35

*Compendium of U.S. Copyright Office Practices* (2017) .......................21

*Compendium of U.S. Copyright Office Practices* (2021) ............................... passim

*Report of the Register of Copyrights on the General Revision
  of the U.S. Copyright Law* (1961) ................................................. 18, 20

## PRELIMINARY STATEMENT

This is an appeal from a series of decisions by the United States District Court for the Southern District of New York, culminating in the District Court's grant of the motion for summary judgment of Defendant-Appellee Edward Christopher "Ed" Sheeran ("Sheeran") and his co-Defendant-Appellees (collectively, "Appellees"), and dismissal of Plaintiff-Appellant Structured Asset Sales, LLC's ("Appellant" or "SAS") Complaint.

The case concerns two extraordinarily successful pieces of popular music: The 1973 Marvin Gaye ("Gaye") hit "Let's Get It On" ("LGIO"), written by Edward Townsend ("Townsend") and Gaye, and the 2014 Sheeran hit "Thinking Out Loud" ("TOL"), purportedly written by Appellees Sheeran and Amy Wadge ("Wadge"). Appellant, one of the owners of the copyright in the LGIO musical composition,[1] maintains that Appellees are liable for copyright infringement by virtue of their recording, distribution and public performance of TOL.

This Appeal presents the Circuit with six critical issues, almost all of which are matters of first impression:

First, whether the scope of copyright registrations for musical compositions are defined and limited by the "deposit copies" filed by the applicants. The District

---

[1] Other owners of the LGIO musical composition were the plaintiffs in *Griffin v. Sheeran*, 17-cv-5221 (S.D.N.Y.) ("*Griffin*"), assigned to the same District Judge.

Court – following the Ninth Circuit's 2020 decision in *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (*en banc*) – ruled that the scope of the LGIO copyright registration was strictly limited by the handwritten sheet music "deposit copy" filed by Townsend in 1973. SPA13-14. This – like the *Skidmore* decision – was error.

Second, even assuming the District Court ruled correctly that the scope of a musical composition copyright registration is limited by the "deposit copy" sheet music from a period when the Copyright Office did not permit sound recordings to be deposited, whether a copyright owner should be permitted to correct for that issue by securing a new copyright registration for the same musical composition, using the sound recording of the composition as a deposit copy, and adding it to the case. Here, the District Court denied Appellant's request to amend the Complaint (SPA11-12) to include such an additional registration that it secured in 2020 (A403-05), and this was error.

Third, even if the scope of copyright is defined and limited by the original "deposit copy," and specifically the scope of the LGIO copyright registration is limited by the handwritten sheet music filed by Townsend, whether musicology experts should be permitted to opine and testify as to how skilled musicians would play that sheet music. The District Court ruled that Appellant's experts could not testify on this subject. SPA15-16. Again, this was error. The direct effect of the District Court's erroneous determination of the first three issues was to severely

narrow the scope of the LGIO copyright and Appellant's infringement claim to two musicological elements.

Fourth, whether the "selection and arrangement" of the remaining two-elements could be pursued as a matter of law. The District Court answered this question in the negative (SPA37-52), and thus ruled that Appellant had failed to state a claim for copyright infringement. This ruling was also made in error.

Fifth, whether the District Court erred in finding that the combination of elements at issue was "commonplace" (SPA49-52), despite having already ruled (SPA18-29) that there was a disputed question of material fact among the parties and their experts as to that very issue.

Sixth, whether in the case of the performance of copyright-infringing music at concerts, the damages "nexus" between the infringing performances and the revenues collected by the parties responsible for the performances is established by the identification of said revenues. Here, the District Court ruled that blanket non-exclusive performance licenses issued by performing rights organizations ("PROs," including ASCAP and BMI) do not excuse copyright infringement (SPA3-5), that "profits from the sale of concert tickets are direct" (SPA31), and that Appellant **had** established a damages "nexus" (SPA1, 5, 33). To the extent that the Appellees may try to construe the District Court's ultimate grant of summary judgment (SPA52) as reversing that decision, that view would be wrong.

- 3 -

The District Court's "deposit copy" decision (SPA13-16) should be reversed in its entirety, along with the District Court's subsequent grant of summary judgment based on its "selection and arrangement" and "commonplace" rulings (SPA37-52), and the case should be remanded to the District Court so that it may proceed to trial, with Appellant's expert reports restored in full, and with the decisions relating to concert revenues intact.

Even if this Court agrees with the District Court's "deposit copy" or "selection and arrangement" decisions, the case should nevertheless be remanded to the District Court with one or both of the following instructions: (i) to permit amendment of the Complaint to include the 2020 copyright registration, and (ii) to permit Appellant's experts to express their opinions as to how skilled musicians would play the "deposit copy," either of which would provide a basis for a jury to decide that the scope of the LGIO copyright extends beyond the two elements to which the District Court restricted it and that Appellees are liable for copyright infringement.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 17 U.S.C. § 501, *et seq*. Final judgment was entered on May 17, 2023. SPA53. Appellant timely noticed its appeal from the judgment on June 16, 2023. A1900. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred when it held that the scope of the LGIO copyright registration was strictly limited by the handwritten sheet music "deposit copy" filed by Townsend in 1973, following the Ninth Circuit's 2020 decision in *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (*en banc*).

2.      Whether, even if the scope of the LGIO copyright registration should be limited by its sheet music "deposit copy," the District Court erred when it prohibited Appellant from addressing that issue by amending the Complaint to include a newly-secured copyright registration for the same musical composition, using a sound recording of the composition as a deposit copy.

3.      Whether, even if the scope of the LGIO copyright registration should be limited by its sheet music "deposit copy," the District Court erred when it prohibited Appellant's musicology experts from opining and testifying as to how skilled musicians would play that sheet music.

4.      Whether, even if the District Court's "deposit copy" rulings were correct, the District Court erred when it ruled that Appellant's "selection and arrangement" copyright claim could not be maintained as a matter of law with only two musicological elements.

5.      Whether the District Court erred when it held that the parties were in agreement that the selection and arrangement at issue was "commonplace,"

notwithstanding its prior ruling that the same issue was the subject of a disputed question of material fact among the parties and their experts.

6.    Whether the District Court's grant of summary judgment reversed its prior rulings that "profits from the sale of concert tickets are direct," and that Appellant had met its "burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed."

## STATEMENT OF THE CASE

Appellant initiated this case on June 28, 2018, after the District Court denied its request to join the *Griffin v. Sheeran* infringement case,[2] and filed the Third Amended Complaint ("Complaint") on May 30, 2019.  A31.  Appellees answered the Complaint on June 8-9, 2023.  A61-80 & ECF 109-114, 118.

On January 15, 2020, the District Court granted Appellant's motion to compel Appellees to produce discovery concerning revenues earned by them from concerts at which Sheeran performed TOL.  A81-291; SPA1-10.

On April 14, 2020, Appellant obtained the new copyright registration for the composition which used a sound recording as its deposit, Registration PA0002238083.  A403-05.  However, on May 13, 2020, the District Court denied

---

[2] *Griffin v. Sheeran*, 17-cv-5221, 2018 WL 11222864 (S.D.N.Y. June 11, 2018), *aff'd*, 767 F. App'x 129 (2d Cir. 2019).

Appellant's request for permission to file a Fourth Amended Complaint to add the 2020 Registration to the Complaint. A302-421; SPA11-12.[3]

On April 5, 2021, Appellees moved *in limine* to preclude Appellant's musicology experts from offering **any** evidence in the case, and separately moved for summary judgment of dismissal. Appellant opposed and cross-moved. A424-1240. On September 9, 2021, the District Court granted Appellees' *in limine* motion in part, rendered its "deposit copy" decision, and directed Appellant to have its experts narrow their reports consistent with the "deposit copy" ruling. SPA13-16. On September 14, 2021, the District Court denied the summary judgment motions without prejudice to renewal after such revision. SPA17.

On November 15, 2021, Appellees filed a second motion for summary judgment regarding copyright infringement, Appellant's musicology experts and the concert revenues issue. Appellant opposed and cross-moved for summary judgment with respect to damages arising from concert revenues. A1246-1860. On September 29, 2022, the District Court denied Appellees' motion on the issue of copyright infringement, granted in part Appellees' motion with respect to Appellant's experts,

---

[3] On April 8, 2020, Appellant asked the District Court for permission to move "for a determination that the scope of the 'Let's Get It On' copyright registrations upon which SAS sued are not limited to what appears on the sheet music deposit copy filed in 1973 and/or that a musicologist may interpret elements from sheet music in his capacity as an expert in the field." A303. The Court denied Appellant's request. ECF 151, 155.

and granted Appellant's cross-motion with respect to damages arising from concert revenues. SPA18-36. On October 13, 2022, Appellees moved for reconsideration of the District Court's denial of their motion regarding copyright infringement or, in the alternative, for leave to appeal to this Court. A1880-82.

In April and May, 2023, a jury trial was held in *Griffin*. The jury returned a verdict for the defendants, finding that "defendant Sheeran establish[ed] by a preponderance of the evidence that he independently created 'Thinking Out Loud' and thus did not infringe the copyright of 'Let's Get it On.'" Jury Verdict, *Griffin*, 17-cv-5221, 2023 WL 3383215 (S.D.N.Y. May 4, 2023) (ECF 276).

Although the *Griffin* verdict was not binding on Appellant, on May 16, 2023, the District Court granted Appellees' motion for reconsideration and renewed motion for summary judgment (SPA37-52) without specifically referencing the concert revenues issue, entering judgment dismissing the case on May 17, 2023. SPA53.

## STATEMENT OF FACTS

Townsend and Gaye wrote, recorded and released LGIO in 1973. SPA37; A1673 ¶ 17. On July 17, 1973, Townsend applied for copyright protection for the LGIO musical composition with the U.S. Copyright Office. In support of that application, he deposited with the Copyright Office handwritten sheet music in the

"lead sheet" notation style as the "deposit copy," resulting in Registration No. EP314589.[4] SPA38; A569-75; A1674 ¶¶ 20-21. Appellant has an 11.11% beneficial ownership interest in the right to receive royalties from the LGIO copyright and the right to sue on that interest. SPA38; A1673 ¶ 18.

In 2014, Sheeran and Wadge purportedly wrote TOL, and Appellees recorded, produced, and distributed it. SPA38-39; A1675 ¶ 24. TOL enjoyed commercial and critical success, including a Grammy Award for Song of the Year. SPA38. According to publicly-available information, Sheeran performed TOL 456 times in concert between May 24, 2014 and August 28, 2019, and it was Sheeran's fourth-most-frequently-performed song. A146-55. On at least one documented occasion, Sheeran performed a live "mash-up" performance of TOL and LGIO in concert.[5]

On April 14, 2020, Appellant filed a new application with the Copyright Office to register the LGIO composition, submitting a sound recording of LGIO as its deposit copy. Appellant filed in its own name and "on behalf of, and with the

---

[4] Townsend secured a second registration in 1973 for the LGIO composition, Registration No. EU422281. Both were automatically renewed in 2000 under RE 0000848835 and RE 0000840063. A1673 ¶ 19.

[5] *See Griffin v. Sheeran*, 351 F. Supp. 3d 492, 501 (S.D.N.Y. 2019) ("A jury might side with either view; it may be impressed by footage of a Sheeran performance which shows him seamlessly transitioning between LGO and TOL") (referencing *Griffin* ECF 82-2 (copy of video)). Another copy of the video was filed with the Court in *Structured Asset Sales v. Sheeran*, 20-cv-4329 (S.D.N.Y.) at ECF 91-14).

permission of," the plaintiffs in the *Griffin* matter, who together with Appellant comprised 100% of the holders of Townsend's interests in the LGIO musical composition.  The registration was granted on April 24, 2020, effective April 14, 2020, and received Registration No. PA0002238083.  A324-25, 403-05.

## SUMMARY OF ARGUMENT

The District Court erred when it adopted the Ninth Circuit's *Skidmore* ruling and held that the scope of the LGIO copyright registration was strictly limited by the handwritten sheet music "deposit copy" filed by Townsend in 1973.  The District Court erred again when it prohibited Appellant from amending the Complaint to add a copyright registration for the same musical composition based on the LGIO sound recording, and again when it prohibited Appellant's musicology experts from opining and testifying as to how skilled musicians would play that sheet music, either of which would have addressed the problems the District Court created by its "deposit copy" ruling.  Instead, the District Court used its "deposit copy" decisions to constrict the range of musicological elements on which it would allow Appellant to proceed to just two.

Having done so (reversing itself only after the jury verdict in the related *Griffin* matter), the District Court erred when it decided that a two-element "selection and arrangement" claim could not be sustained under any circumstances

- 11 -

as a matter of law, and erred yet again when it held that the parties agreed that the combination of elements was "commonplace," despite its prior ruling that that was a disputed issue of material fact. The District Court's erroneous decisions should be reversed, and Appellant's case restored so that it can proceed to trial.

As a final matter, the District Court's grant of summary judgment to Appellant relating to concert revenues – that "profits from the sale of concert tickets are direct," and that Appellant had met its "burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed" – were not reversed by its subsequent grant of summary judgment to Appellees. To conclude otherwise would be error.

## ARGUMENT

### I. STANDARDS OF REVIEW

The District Court's decisions on the motions for summary judgment (SPA37-52), as well as its decision on Appellee's motion *in limine*, which decided a question of law (SPA13-16), are reviewed *de novo*. *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (citations omitted); *United States v. Aiyer*, 33 F.4th 97, 113-14 (2d Cir. 2022) (citations omitted)

The District Court's denial of Appellant's request for leave to file an amended Complaint that included a new copyright registration (SPA11-12) is reviewed for

abuse of discretion, except to the extent it implicates questions of law, which are reviewed *de novo*. *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 275-76 (2d Cir. 2018) (citation omitted).

## II. THE DISTRICT COURT'S CONCLUSION THAT "THE DEPOSIT COPY IS THE SOLE DEFINITION OF THE ELEMENTS INCLUDED IN THE PROTECTION OF COPYRIGHT" WAS REVERSIBLE ERROR

The fundamental issue on this appeal, a legal issue of first impression in this Circuit, is whether the LGIO "deposit copy" – the handwritten sheet music submitted by Edward Townsend when he applied for copyright protection for the LGIO composition in 1973 – defines and limits the scope of the protection he and his successors received, or not.

The District Court answered this question of law, erroneously, in the affirmative, and then compounded its error twice – first by erroneously denying Appellant's request to amend the Complaint to add the additional copyright registration, and then by erroneously limiting the scope of Appellant's expert evidence. The District Court's erroneous "deposit copy" rulings – both on the legal principle and on their proper application to the facts before the court – then led directly to the court's erroneous rulings on the "selection and arrangement" issue and whether the combination of elements was "commonplace," which were the basis for the court's ultimate grant of summary judgment to Appellees.

### A.    The District Court's "Deposit Copy" Analysis Lacked Foundation

The **entirety** of the District Court's analysis of the "deposit copy" legal question can be found in a single paragraph of its ruling on Appellee's motion *in limine*:

> On July 17, 1973, in compliance with the then-applicable 1909 Copyright Act Sections 9 and 12, 17 U.S.C. §§ 5(e), 9, 10, 12 (1964), Ed Townsend filed with the Copyright Office (through music publishers) the application for registration of the musical composition Let's Get It On, and deposited two copies of the sheet music he had authored. The copyright was registered as No. EP 314589, and the sheet music deposited with the Copyright Office ("Deposit Copy") defines "precisely what was the subject of copyright." *Merrell v. Tice*, 104 U.S. 557, 561, 26 L.Ed. 854 (1881). "[T]he scope of the copyright is limited by the deposit copy." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir. 2020) (*en banc*). The Copyright Office instructs that "a registration for a work of authorship only covers the material that is included in the deposit copy(ies)" and "does not cover authorship that does not appear in the deposit copy(ies), even if the applicant expressly claims that authorship in the application." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 504.2 (3d ed. 2017). As such, the Deposit Copy is the sole definition of the elements included in the protection of copyright, which does not include other embellishments, even if they were added by Townsend himself – because they have not undergone the copyright process.

SPA13-14.  None of the sources cited by the District Court provide support for its decision.

###### i.  Copyright Act of 1909[6]

The sections of 1909 Act cited by the District Court do not say that the deposit copy defines the scope of copyright protection, but rather that deposits are required, and that the deposit requirement is a prerequisite to bringing an infringement case:

> SEC. 10. That such person may obtain registration of his claim to copyright by complying with the provisions of this Act, **including the deposit of copies**, and upon such compliance the register of copyrights shall issue to him the certificate provided for in section fifty-five of this Act.

> SEC. 12. [I]f the work is not reproduced in copies for sale, **there shall be deposited the copy, print, photograph, or other identifying reproduction** provided by section eleven of this Act, such copies or copy, print, photograph, **or other reproduction** to be accompanied in each case by a claim of copyright. No action or proceeding shall be maintained for infringement of copyright in any work until the provisions of this Act **with respect to the deposit** of copies and registration of such work shall have been complied with.

17 U.S.C. §§ 10, 12 (1909) (emphasis added).[7]

---

[6] From 1790 to 1976, works were protected by state common law as they were created and no registration was required. *See Roy Export Estab. v. Columbia Broadcasting*, 672 F.2d 1095, 1101 (2d Cir. 1982) ("[s]tate law protection begins with a work's creation"); *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950, 952-53 (9th Cir. 1995) ("an unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme"). In the case of the LGIO composition, it was protected at common law upon creation, as recorded. The subsequent registration gave the composition **federal** protection, but did not shrink the scope of protection already established at common law.

[7] Available at https://www.copyright.gov/history/1909act.pdf.

###### ii.     *Merrell v. Tice*

The Supreme Court case of *Merrell v. Tice* – **decided in 1881** – does not speak to the proper interpretation of the **Copyright Act of 1909**.[8]  Moreover, the only questions before the Court in that case were whether what Tice had submitted in connection with his 1877 book ("Professor Tice's Almanac") were sufficient to qualify as a proper deposit or not under the Copyright Act of 1790.  Having decided that question in the negative, because Tice had not shown the work was unpublished at the time of registration under then-extant rules that only permitted copyright for unpublished works, the Court, in *dicta*, speculated, without deciding, about what Mr. Tice could have done to satisfy the requirement, adding: "one object no doubt being to enable other authors to inspect them in order to ascertain precisely what was the subject of copyright. But we express no opinion whether such a certificate would be competent or not."  *Merrell v. Tice*, 104 U.S. 557, 561 (1881).

This *dicta* neither asked nor answered the legal question of whether the scope of a copyright registration was limited by the deposit copy (and in any event spoke to the 1790 Act, rather than the 1909 Act).  Placed in its proper context, it is clear that the Supreme Court was not making any legal pronouncement as to the scope of an otherwise valid registration.  Moreover, whether the Court's speculation was **ever**

---

[8] *Skidmore*, 952 F.3d at 1063.

true, today's composers are obviously not visiting the Library of Congress to inspect deposit copies in order to "ascertain precisely what was the subject of copyright" before writing their next hit song. It also makes no sense when applied to the most basic elements of a copyright infringement claim: "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Betty, Inc. v. Pepsico, Inc*., 848 F. App'x 43, 44 (2d Cir. 2021) (*quoting Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996)). The burden on the plaintiff is to prove access and substantial similarity **to the work**, not to the "deposit copy" of the work. Indeed, in this case where access is undisputed (A930, 1400), Sheeran admits that "he had heard the Marvin Gaye **recording** of LGO years before he and Amy Wadge independently wrote TOL." A75, 76 (emphasis added). There is no suggestion by either side that Sheeran or Wadge accessed the "deposit copy" on file with the Copyright Office, and yet access to the work is conceded and undisputed.

### iii. *Skidmore v. Led Zeppelin*

In *Skidmore*, the Ninth Circuit, sitting *en banc*, decided that the scope of the copyright before them was limited to the "deposit copy" submitted to the Copyright Office. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir.) (*en banc*), *cert. denied sub nom*., 141 S. Ct. 453, *reh'g denied*, 141 S. Ct. 946 (2020). Fifteen days

later, the District Court issued its "deposit copy" decision in *Griffin*,[9] and on

September 9, 2021, issued the nearly identical decision at issue here (SPA13-14).

    *Skidmore*, however, is lacking in legal authority to support its conclusion.

After first noting that under the 1909 Act, a registration could be made for an

unpublished work, the Ninth Circuit stated:

> The text [of the 1909 Act] is clear—for unpublished works, the author
> must deposit one *complete copy* of such work. The purpose of the
> deposit is to make a record of the claimed copyright, provide notice to
> third parties, and prevent confusion about the scope of the copyright.
> *See Data Gen. Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147,
> 1161-62 (1st Cir. 1994) (the deposit requirement provides the
> "Copyright Office with sufficient material to identify the work in
> which the registrant claims a copyright ... [and] prevent[s] confusion
> about which work the author is attempting to register"), *abrogated on
> other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130
> S.Ct. 1237, 176 L.Ed.2d 18 (2010); *Report of the Register of
> Copyrights on the General Revision of the U.S. Copyright Law* 71
> (1961) (one of the purposes of the deposit is "to identify the work"
> being registered).

*Id*. at 1062-63.

    The cases *Skidmore* relies on do not support the Ninth Circuit's conclusion.

*Skidmore* quotes selectively from the First Circuit's *Data General* case, but the full

quote is more illuminating:

> Nor do the apparent purposes of the deposit requirement counsel a
> different result. Although related to the deposit requirement in Section
> 407, which is designed to further the acquisitions policy of the Library
> of Congress, the deposit required by Section 408(b) serves the

---

[9] *Griffin v. Sheeran*, 17-cv-5221, 2020 WL 5522835 (S.D.N.Y. Mar. 24, 2020).

separate purpose of providing the Library's Copyright Office with **sufficient material to identify** the work in which the registrant claims a copyright. *See* H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 5 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5766-70; ***see also* 37 C.F.R. § 202.20(c)(2)(vii) (requiring deposit of "identifying portions" of programs that are unpublished or published only in machine-readable form)**. In other words, a key purpose of the Section 408(b) deposit requirement is to prevent confusion about which work the author is attempting to register.

*Data General*, 36 F.3d at 1161-62 (emphasis added).

As discussed below, in 2005 the district court in *Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F.Supp.2d 514, 520 (S.D.N.Y. 2005) quoted *Data General* **to support** its conclusion that courts are free to "interpret" copyright registrations in a manner consistent with what the applicant intended to protect, **even if the materials contained within the deposit copy are more limited, such as the sheet music here**.

The *Data General* court specifically cited – and the *Skidmore* court specifically avoided referencing – the regulations concerning the submission of deposit copies that show that the role of deposit copies is to provide **minimal identifying information**, not to define the maximum bounds of protection, which instead, is governed by what the author actually creates.

The final authority provided by *Skidmore* was a 1961 report by the Register of Copyrights,[10] the relevant portion of which reads as follows (under the heading "Historical Development"):

> A system of copyright registration has been a basic feature of our copyright law from its beginning in 1790, and the **deposit of material to identify the work** being registered has always been required.. . . .

> Until 1909, copyright was secured by a registration made before the work was published. **The deposit of certain material identifying the work** was required for registration. After the work was published, copies of the published edition were required to be deposited.

> The pre-1909 law resulted in the forfeiture of copyright when works were inadvertently published before being registered. To avoid these forfeitures, the act of 1909 inaugurated the present system: copyright is now secured by publication of the work with the copyright notice, and registration is made later when copies of the work as published are deposited. The one **deposit now serves both to identify the work** for the registration record and to enrich the collections of the Library of Congress.

*Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 71 (1961) (emphasis added).  As with the prior sources, what the Report says – and all that it says – is that deposits "identify" the work.  It does not say that they "define," "depict" or "limit" the work.  Hence, the *Data General* court's use of the phrase "**sufficient** material to identify the work" and its reference to "identifying **portions**" of the work.  *Data General*, 36 F.3d at 1161-62 (emphasis added).  None of the authority cited by *Skidmore* states or even suggests that deposit copies limit

---

[10] Available at https://www.copyright.gov/history/1961_registers_report.pdf.

the scope of copyright protection; to the contrary, they strongly suggest that deposit copies serve the administrative role of providing **minimal** indicia.

### iv.    Compendium of U.S. Copyright Office Practices

The District Court's final source is the 2017 edition of the *Compendium of U.S. Copyright Office Practices*.  A few initial observations are appropriate.  First, the 2017 edition of the *Compendium*[11] has been replaced by the 2021 revision.[12]  Second, just as the 1881 *Merrell v. Tice* decision related to the 1790 Act, rather than 1909 Act, the current *Compendium* is intended to elucidate the Copyright Office's view of the now-operative 1976 Act.  *See* 2021 *Compendium* at 5 ("the *Third Edition* generally does not address practices under the Copyright Act of 1909").  Third, the *Compendium* – a 1,396-page "administrative manual"[13] – **is not a legal authority**:

> the Compendium is a **non-binding administrative manual that at most merits deference** under *Skidmore v. Swift & Co*., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). That means we must follow it only to the extent it has the "power to persuade." *Id*., at 140, 65 S.Ct. 161. Because our precedents answer the question before us, we find any competing guidance in the Compendium unpersuasive.

---

[11] Available at
https://www.copyright.gov/comp3/2017version/docs/compendium.pdf ("2017 *Compendium*").

[12] Available at https://www.copyright.gov/comp3/docs/compendium.pdf ("2021 *Compendium*").

[13] 2021 *Compendium* at 1.

*Georgia v. Public.Resource.Org, Inc*., 590 U.S. __, 140 S. Ct. 1498, 1510 (2020) (emphasis added).  Similarly, as one of this Circuit's courts explained it:

> The Copyright Office's Circulars and Compendium II should be afforded this lesser deference, or *Skidmore* deference, **so long as the Copyright Office's interpretations do not conflict with the express statutory language of the Copyright Act**.

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co*., 712 F. Supp.2d 84, 91 (S.D.N.Y. 2010) (emphasis added), *reconsid. in part*, 09-cv-2669, 2010 WL 3958841 (S.D.N.Y. Sept. 27, 2010).

As discussed above, the text of the 1909 Act does not state that deposit copies define and limit the scope of copyright protection.  The *Compendium*, especially the current iteration of the *Compendium*, should either be given "lesser deference," or no deference at all, in view of the express statutory language of the 1909 Act.

Turning to what the District Court actually cites the *Compendium* for, again the excerpted language must be reviewed **in proper context**:

> **Ordinarily**, a registration for a work of authorship only covers the material that is included in the deposit copy(ies). It does not cover authorship that does not appear in the deposit copy(ies), even if the applicant expressly claims that authorship in the application.. . . .
>
> **A work of authorship that is registered with identifying material or based on a grant of special relief may cover the entire copyrightable content of the work, notwithstanding the fact that the applicant did not submit a copy of the entire work.**

2021 *Compendium* § 504.2 (emphasis added).

A plain reading of the foregoing is clear: under the current **administrative** policy of the Copyright Office, it will accept less-than-whole deposit copies, but nevertheless provide registrants with protection **beyond** the four corners of the deposits in at least some circumstances. Thus, even if the Court were to accept the 2021 *Compendium*'s statement that current Copyright Office policy is to provide unequal treatment to different types of registrants, it does not speak to the Copyright Office policies of 1973 when Edward Townsend filed the deposit copy at issue in this case.

The District Court attempted to justify its ruling by noting that the elements of the LGIO musical composition that it did not see on the handwritten sheet music were excluded "because they have not undergone the copyright process." SPA14. That logic falls apart immediately and completely when one realizes that the Copyright Office accepts "identifying material," rather than complete copies, in connection with numerous types of copyrighted works, and protects the entire works, even though portions of the material, in the District Court's view, have obviously not "undergone the copyright process."

**B.** **The Supreme Court And Professor Nimmer Specifically Caution Against Limitations On The Scope Of Copyrights Based On Past Practice**

In 1973 (the same year Edward Townsend applied for copyright protection), the Supreme Court wrote the following about the 1909 Copyright Act:

To interpret accurately Congress' intended purpose in passing the 1909 Act and the meaning of the House Report petitioners cite, we must remember that our modern technology differs greatly from that which existed in 1909. **The Act and the report should not be read as if they were written today, for to do so would inevitably distort their intended meaning**; rather, we must read them against the background of 1909, in which they were written.

In 1831, Congress first extended federal copyright protection to original musical compositions. **An individual who possessed such a copyright had the exclusive authority to sell copies of the musical score [*i.e.*, the sheet music]**; individuals who purchased such a copy did so for the most part to play the composition at home on a piano or other instrument. Between 1831 and 1909, **numerous machines were invented which allowed the composition to be reproduced mechanically**….It is against this background that Congress passed the 1909 statute. After pointedly waiting for the Court's decision in *White-Smith Music Publishing Co*., Congress determined that the copyright statutes should be amended to insure that composers of original musical works received adequate protection to encourage further artistic and creative effort.

*Goldstein v. California*, 412 U.S. 546, 564 (1973) (emphasis added) (*citing White-Smith Music Pub. Co. v. Apollo Co*., 209 U.S. 1 (1908)).

That the Copyright Office only accepted sheet music as deposit copies (and not sound recordings) under the 1909 Act is entirely consistent with the historical framework *Goldstein* provides, for just as it had not yet dawned on copyright owners to consider nascent or unborn technology to be a "copy" of music for protection purposes, the Copyright Office was not accepting piano rolls and the like as deposit copies for musical compositions. Today (and since the enactment of the 1976 Act) it is beyond question that musical recordings can serve as deposit copies for

- 24 -

registrations of both recordings and compositions, and the Copyright Office changed its regulations effective January 1, 1978 to permit such recordings to be used for purposes of deposit copies. *Skidmore*, *supra*, 952 F.3d at 1062.

It would be unfair to creators of earlier musical works, however, to limit the manner in which musical compositions can be represented as deposit copies to sheet music for earlier works, but to include recordings for later ones. Nothing in the Act supports giving later-created works greater protection that those registered before.

Professor Nimmer explains that the Copyright Office's sheet music requirement was tied directly to the twin historical (and now out-of-date) views that registration required written notice, and that musical compositions could not be protected unless reduced to written sheet music:

> Because, under the 1909 Act, copyright protection required the placement of notice on copies (and likewise the deposit of copies ancillary to registration), **it followed that a musical work could not claim copyright unless the notice and deposit requirements were satisfied with respect to an object that constituted a visibly intelligible notation**. Therefore, in order to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form.

1 Nimmer on Copyright § 2.05 (2023) (emphasis added).

Thereafter, Professor Nimmer explains, both of those views changed radically:

> In contrast to the strictures just described, the 1976 Act conveys copyright protection to a musical work, as soon as it is "fixed in any tangible medium of expression," **regardless of the nature of that medium. Specifically, it is no longer necessary that the medium be visibly intelligible**. The fact that the grooves on a phonograph record

> may not be "read" therefore serves as no bar to the copyrighting of a musical work by fixing it in record form. Thus, it is possible to obtain statutory copyright over a work merely by recording it, without reducing it to written form in conventional musical notation. This sweeping departure from the 1909 Act represents an intentional overruling of *White-Smith*.

*Id.* (emphasis added).

Professor Nimmer is thus consistent with the incorrectness of any prior policy of the U.S. Copyright Office to accept only sheet music or equivalent written notational forms as deposit copies. It would be inconsistent and inequitable to limit the scope of rights of copyright holders for works first registered under the 1909 Act on this basis as well.

### C. Deposit Copies Identify – But Are Never Identical To – Underlying Copyrighted Works

By contrast to the out-of-context or incorrect authorities relied on by the District Court, a decision from within this Circuit sets forth the correct rule that applies here. In *Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F.Supp.2d 514 (S.D.N.Y. 2005), the District Court rejected defendant's argument that the scope of plaintiff's copyright should be limited to its deposit copy:

> The force of this argument must be assessed in light of the dual purposes of the deposit requirement, which are: (1) to provide the Copyright Office with "sufficient material to identify the work in which the registrant claims a copyright" and (2) "to furnish the Copyright Office with an opportunity to assess the copyrightability of the applicant's work."

*Id*. at 520 (*quoting Data General*, 36 F.3d at 1161-62 *and citing* 17 U.S.C. § 408(b)). The court went on – **correctly** – to find that the scope of plaintiff's copyright **was not limited** by its deposit copy:

> These goals are not undermined by **interpreting the copyright here to include any color way consistent with the Prado design** as defined by the wire frame diagram, even though an example of only one such color way was deposited with the Copyright Office.

*Id*. (emphasis added); *see also FireSabre Consulting LLC v. Sheehy*, 11-cv-4719, 2013 WL 5420977, at *6 (S.D.N.Y. Sept. 26, 2013) (endorsing *Nicholls'* approach to deposit copies).

Musical compositions – like dance and other forms of art – are by their nature somewhat ephemeral, even when fixed in acceptable industry-wide form. Musical notation is a way of trying to capture the ephemeral in the physical, but it is and has always been limited in its ability to capture every nuance of the work. Even musical recordings have their limitations, and the different types of recording technology have their respective advantages and disadvantages (*e.g*., vinyl records versus Internet streaming). Deposit copies do not, **and were never meant to be**, a limitation on the scope of the copyright they represent. They serve an identifying function, but **nothing in the statute (whether the 1909 Act or the 1976 Act)** says that the deposit copy takes the place of the underlying creation.

    **D.**    **Adopting the *Compendium*'s Administrative Approach to Deposit Copies as Law Improperly Would Treat Registrants of Different Types of Works Unequally Under the Copyright Act**

As noted, the Copyright Office's refusal until 1978 to accept sound recordings as deposit copies for underlying musical compositions was wrong as a matter of law. But even if the Court affords the current *Compendium* some measure of lesser deference, other sections of the *Compendium* further support **Appellant's** position, in contravention of the District Court's conclusion. The *Compendium* definition of "identifying material" is:

> **Identifying material ("ID material"):** An alternative deposit copy permitted or required under U.S. Copyright Office regulations for registration...**is material that adequately represents the authorship claimed** in an unpublished or published work, whether the regulations permit a substitute or whether it is a required substitute for the actual work...

2021 *Compendium* Glossary at 10 (emphasis added). "Adequately represents the authorship claimed," in the words of the *Compendium*, is inconsistent with – indeed it is directly contrary to – the conjecture in *Merrell v. Tice* ("enable other authors to inspect them"), and instead hews closer to the approach in *Data General* concerning the 1909 Act ("sufficient material to identify").

The 2021 *Compendium* then devotes significant space to 20 different types of works for which applicants can satisfy the deposit requirement with "identifying material," including "[m]usical works published in motion pictures":

- Computer programs

- Databases

- Compilations or other types of literary works fixed or published solely in machine-readable copies

- GATT Literary Works

- Musical works published in motion pictures

- Audiovisual works that have not been fixed on CD-ROM

- Unpublished motion pictures

- Audiovisual works, musical compositions, or sound recordings fixed or published solely in machine-readable copies

- GATT Works of the Performing Arts

- Unpublished pictorial or graphic works

- Pictorial or graphic works published in a limited edition

- Pictorial or graphic works reproduced in sheet-like material

- Prints, labels, and other advertising matter that is inseparable from a three-dimensional object

- Pictorial or graphic works reproduced on three-dimensional containers or holders

- Three-dimensional visual arts works

- Two- or three-dimensional holograms

- Architectural works

- Pictorial or graphic works fixed or published solely in machine-readable copies

- GATT Visual Arts Works

- Any work that is more than ninety-six inches in any dimension

*See* 2021 *Compendium* § 1506.

Assuming, *arguendo*, that there are valid **administrative** reasons for the Copyright Office to allow the submission of "identifying materials" – "material that adequately represents the authorship claimed" – rather than complete copies of the works being registered for some works rather than others, and that by extension there are valid **administrative** reasons to provide rules for the form of registration for authors of works other than the 20 enumerated categories,  it is impermissible to apply the Copyright Act to registrants of different types of works inequitably, and the Copyright Office does not have the statutory authority to do so through its administrative policies and procedures.

For example, in the cases of "redacted versions of secure tests" and "portions of computer source code" (two of the *Compendium*'s examples provided in its definition of "identifying material"), the Copyright Office has administratively decided to value the need to protect registrants' competitive information and trade secrets from discovery by competitors above the need of authors (who may also be competitors) to inspect the full versions of the registered works, **even if it means they will not know whether certain content is or is not protected**.  To be clear, the Copyright Office has also administratively permitted "identifying material" even in the absence of any competing trade secret concerns. *See*, *e.g.*, 2021 *Compendium* § 1509.1(F)(3) (with respect to "Source Code That Does Not Contain Trade Secret

Material," "applicant should submit one copy of the first twenty-five pages and the last twenty-five pages of the source code for that version" or "fifty pages that represent the specific version").

Similarly, when it comes to "three-dimensional visual arts works," *i.e.*, sculptures, the Copyright Office obviously does not require (or even allow) the submission of the actual works as deposits, but rather requires the deposit of two-dimensional representations, *i.e.*, photographs:

> When registering statues, carvings, ceramics, moldings, constructions, models, maquettes, dolls, toys, stuffed animals, puppets, or other three-dimensional sculptural works, the applicant generally **must** submit **identifying material instead of submitting an actual copy of the work**, regardless of whether the work is published or unpublished. 37 C.F.R. § 202.20(c)(2)(xi)(A)(1). Likewise, the applicant generally **must** submit **identifying material instead of submitting an actual copy of the work** when registering jewelry or when registering any three-dimensional work that is embodied in a useful article. *Id.* § 202.20(c)(2)(xi)(A)(2).

2021 *Compendium* § 1509.3(B)(1). In *Nicholls*, *supra*, the court protected the copyrighted work in all color permutations, and not just the color of the deposit copy. Likewise, the Copyright Office does not limit the scope of protection for three-dimensional objects to the two-dimensional identifying material submitted as deposits, and does not restrict the zone of protection for **any** such work to its identifying material.

Likewise, no musical notation format can truly capture the complexity and nuance of a musical composition when played or copied by a would-be infringer

who listens to the sound recording, as here.  Simply put, sheet music is never **the same as** the music it depicts, but is merely an approximation of it.  Indeed, in the parlance of the Copyright Office, sheet music is "identifying material" with respect to the musical composition it attempts to represent, no more and no less than all the other types of identifying material that the Copyright Office accepts for myriad reasons.

In view of the foregoing, both the *Merrell v. Tice* formulation from 1881 ("enable other authors to inspect them") and the District Court's formulation from 2022 ("because they have not undergone the copyright process") are simply wrong, and neither can possibly be a correct recitation of the law, as it would only harm the very people the Copyright Act and the Copyright Office are tasked with protecting.

### E. The District Court's Approach to Deposit Copies Would Treat Owners of "United States Works" and Foreign Works Differently, in Apparent Violation of the Berne Convention

The Copyright Act requires that federal registration is a prerequisite to bringing an infringement action for "any United States work."  17 U.S.C. § 411(a). "United States work" is defined based on where it was first published, or (if it was not published), the nationality of the authors.  17 U.S.C. § 101.  Works that do not qualify as "United States works" are "foreign works," and they are **also** eligible for protection under the Copyright Act.  In *Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82 (2d Cir. 1998), this Court recognized that the Copyright

Act – through applicable international treaties – allows the owners of foreign works to bring actions for copyright infringement in the United States.  Under Article 5(2) of the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"), "enjoyment and the exercise of these rights shall not be subject to any formality…the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."[14]  The need for equal treatment was recognized by the Supreme Court in 2012:

> Congress determined that U.S. interests were best served by our full participation in the dominant system of international copyright protection. Those interests include ensuring exemplary compliance with our international obligations, securing greater protection for U.S. authors abroad, and remedying unequal treatment of foreign authors.

*Golan v. Holder*, 565 U.S. 302, 335 (2012) (affirming decision restoring copyright protection to certain foreign works that would have fallen (or had already fallen) into public domain).

When the foreign copyright law applicable to the work at issue does not require registration, the Copyright Act and the Berne Convention instruct that the plaintiff can bring claims for copyright infringement in the United States without

---

[14] Berne Convention for the Protection of Literary and Artistic Works, Paris Act of 1971, reprinted in, S. TREATY DOC. NO. 27, 99th Cong., 2d Sess. 1 (1986) (available at https://www.law.cornell.edu/treaties/berne/5.html).

securing a federal registration.  *Super Express USA Publ'g Corp. v. Spring Publ'g Corp.*, 2018 WL 1559764, at *3 (E.D.N.Y. Mar. 30, 2018).  In such circumstances, where the plaintiff need not file a federal registration as a prerequisite for bringing a copyright infringement claim, there is self-evidently no deposit copy on file with the Copyright Office, and thus no deposit copy to theoretically define or limit the scope of the plaintiff's copyright.  Rather, the scope of such a plaintiff's copyright will be determined by evidence, such as testimony and documents (including audio and video recordings) that speak to the nature and scope of the copyright.

This creates a serious problem under the District Court's "deposit copy" formulation, in that the plaintiff in a copyright infringement action based on the infringement of a United States work would be limited by the deposit copy on file with the Copyright Office, but an equivalent plaintiff in an equivalent copyright infringement action based on a foreign work would not be so limited.  Thus, if LGIO had been a foreign work, rather than United States work, Appellant would have been able to maintain the full scope of its infringement claim, and would have been able to introduce the LGIO sound recording as evidence of the scope of the LGIO copyright.  The District Court's position – that "Deposit Copy is the sole definition of the elements included in the protection of copyright" (SPA14) – has the effect of penalizing owners of United States works, and making it more difficult for them to

- 34 -

bring copyright infringement claims, than for their counterpart owners of foreign works.

Once again, the District Court's justification for excluding "embellishments" not found in the deposit copy – "because they have not undergone the copyright process" (SPA14) – falls apart. Foreign works have no deposit copies, which in the District Court's view would mean that **the entirety of those works** "have not undergone the copyright process." And yet the Copyright Act, implementing the Berne Convention, gives those works complete protection.

The District Court's "deposit copy" decision is error, and should be reversed.

## III. THE DISTRICT COURT ERRONEOUSLY DENIED APPELLANT'S REQUEST TO AMEND THE COMPLAINT TO ADD AN ADDITIONAL REGISTRATION

In April and May 2020, shortly after the Ninth Circuit's *en banc* decision in *Skidmore*, but long before the District Court's "deposit copy" decision, Appellant began writing to the Court regarding its plan to address the "deposit copy" issue by securing an additional LGIO copyright registration using a sound recording of LGIO as deposit copy, ultimately advising the Court that the additional registration had been secured, and seeking leave to amend the Complaint to include it. A302-03, 319-94, 398-421.[15]

---

[15] Appellant's request at that time for permission to move for determination of the "deposit copy" issues (A303) was also denied. ECF 151, 155.

On May 13, 2020, however, 16 months before it even issued its "deposit copy" decision, the District Court said that it would "deny permission to file the Fourth Amended Complaint." SPA11-12. Had the District Court allowed for the amendment of the Complaint and the inclusion of the 2020 Registration, Appellant would have been able to include musical elements that the District Court otherwise excluded, as discussed below (such as the bass line), which is unequivocally included within the deposit copy for the 2020 registration.

The denial of the amendment was error. Although such an amendment may not "relate back" to the original filing under Rule 15, it was entirely appropriate with respect to ongoing damages, as Appellees continue to exploit TOL and infringe LGIO. The amendment was thus necessary to the fair administration of justice. When Townsend filed the 1973 registration, the Copyright Office would not permit the use of the 1973 sound recording as part of the deposit copy. And, prior to *Skidmore*, no Court had ever ruled that a sound recording could not provide evidence of the scope of the copyright in a pre-1978 musical composition. Thus, there was no reason for Appellant (or the other Townsend successors) to file a new registration including the sound recording until after *Skidmore* was decided. Adding the new registration would not have changed the scope of fact discovery, which was already concluded, and would have only required minimal amendments to any already-

issued expert reports.[16]  The amendment was first proposed **three years** before the related *Griffin* case went to trial, and thus Appellees would not have been prejudiced by its timing.  By contrast, even if the District Court's interpretation of the 1973 deposit copy as including only the sheet music were correct, not permitting the amendment severely prejudiced Appellant, as reflected by the series of decisions that followed.  *Twisted Records v. Rauhofer*, 03-cv-2644, 2005 WL 517328, at *6 (S.D.N.Y. Mar. 3, 2005) ("[m]ere delay, absent a showing of bad faith or undue prejudice, does not provide a basis for denying a motion to amend") (*citing Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (*quoting State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).[17]

---

[16] Indeed, Appellant's experts' original reports, which were written before the deposit copy rulings, **included** the sound recording in the analysis.  A400, 453-501, 623-659, 698-711.

[17] As Appellees will likely point out, after the District Court denied Appellant's application to amend the Complaint, Appellant filed a new copyright infringement lawsuit based on the 1973 and 2020 Registrations.  Complaint, *Structured Asset Sales, LLC v. Sheeran*, 1:20-cv-04329 (S.D.N.Y.) ECF 1 (June 8, 2020).  That case is now stayed, pending the outcome of this Appeal.  *Id*. ECF 101 (May 24, 2023).  Appellant only filed that case, however, because the District Court denied its request to amend.  Had that request been granted, or if its denial is reversed through this appeal, Appellant will have no need to proceed with the new lawsuit.

IV.  **THE DISTRICT COURT'S IMPLEMENTATION OF ITS "DEPOSIT COPY" RULING TO PROHIBIT APPELLANT'S EXPERTS FROM INTERPETING THE DEPOSIT COPY WAS ERRONEOUS**

Even if the 1973 sound recording cannot be considered as within the scope under either the 1973 or 2020 registrations as discussed above, the District Court also erroneously prohibited Appellant from introducing expert evidence regarding the proper **interpretation** of the LGIO 1973 deposit copy, writing:

> Nor is the field of protected elements enlarged on the theory that they are consistent, and harmonize with the work as articulated in the Deposit Copy, and are implied by the way the articulated elements are expressed. **If what is implied is not in the Deposit Copy**, it does not have the protection of copyright.
>
> ….
>
> Plaintiffs experts' produced opinions basing infringement on an asserted similarity between Thinking Out Loud and a combination of three elements in LGO called the 'backing pattern.' It consisted of the chord progression, the harmonic anticipation of chord changes (both of which are commonplace and unprotectable), and a bass line. **There is no bass line in the LGO Deposit Copy**. This led to the concoction of remedial theories – *e.g.* that if you string together the lowest notes in the Deposit Copy you will "find" a bass line; that the remaining two elements are its "functional equivalence" – which have serious analytic problems.
>
> The present point is that **none of that could be discerned by examining** the Deposit Copy.

SPA14-15 (emphasis added).  With respect, the District Court erroneously used its own layperson views as to what could be "discerned" from "examining" the sheet music deposit copy with those of Appellant's expert musicologists, ordering the

- 38 -

removal of significant portions of Appellant's expert reports and the improper narrowing of Appellant's selection and arrangement claim from "many" elements[18] to (after the elimination of, *inter alia*, the bass line) just two.

What the District Court did with respect to Appellant's experts would be the equivalent of a court prohibiting a qualified French linguistics expert from testifying as to the proper interpretation or pronunciation of written French words, and substituting instead the court's layperson estimation.

An examples of expert opinion that were removed from the case as a result of the ruling are the following analyses from Dr. John Covach's opening and rebuttal reports regarding his expert opinion as to the bass line indicated by the deposit copy sheet music:

> 8. It should be noted that the sheet music of "Let's Get It On" does not notate a separate bass part. This sheet music deposit copy is in "lead sheet" format—a form of notation that is extremely common in the notation of popular music. A lead sheet typically provides the melody notated on the treble clef, with lyrics below and chord symbols above. Example 2c shows the first four measures of the "deposit copy" sheet music for "Let's Get It On." But even though a bass part is not specified here, any performer must play a bass line of some kind in order to realize the content of the lead sheet. After all, there must be a lowest-sounding note in any musical realization. **The most direct and basic practice is for the bass line to be formed from the roots of each the chords specified above the melody in the lead sheet.**

---

[18] "The Gaye sound recording contains many elements: percussion/drums, bass-guitar, guitars, Gaye's vocal performances, horns, flutes, etc., which do not appear in the simple melody of the Deposit Copy." SPA 14.

*Example 2c (Gaye-Townsend): lead sheet showing melody, lyrics, and chord symbols*



**Since the chords specified are Eb – G minor – Ab – Bb₇, the most obvious bass line is simply a succession of the notes Eb – G – Ab – Bb, and this is precisely what musicians would understand the lead sheet to be specifying. Thus, a specific bass line is indicated by the chord symbols on the lead sheet, even though it is not notated separately.**

A1495-96 (emphasis added).

### III. The Bass Part: Is It the Bass Line?

6. The deposit copy of LGO consists of the melody, the lyrics, and precisely placed chord symbols; this type of format is called a "lead sheet." **This deposit copy of LGO does not include a notated bass part. In the sense that I use it in my report, a "bass part" is that which is empirically and logically derived from the lead sheet itself. It is the simplest and most obvious bass line that one versed in reading music would play if asked to play what is on the page.** When a song is played from reading a lead sheet, a bass part must be derived from the chord symbols. Once it is derived and is played by the left hand in the piano, or by a bass guitar, even by a tuba or a low voice in an a cappella setting, a "bass line" is created. This is entirely in the nature of lead-sheet realization. In fact, since only chord symbols are provided, there are any number of ways in which these chords could be played in performance as well. **In my report, I posit the bass part that is the most obvious one. If presented with the chord progression I – iii – IV – V and asked to provide the simplest and most obvious bass part, musicians would overwhelmingly posit the one I provide in my report.** . . . [Appellees' expert] argues that other variants are possible, but **the one I provide is the most simple and direct one that a musician or musicologist would play from that lead sheet.**

7. …**If one posited the simplest and most obvious bass part for TOL based only on this progression, it would be 1 − 1 − 4 − 5**; there is no reason whatsoever to think that the second note in the bass part would change from repeating 1 before moving to 4. But TOL uses the 1 − 3 − 4 − 5 bass part to create the chord progression I − i6 − IV − V. Of the vast possibility of variants Sheeran and Wadge could have used (following precisely the argument [Appellees' expert] employs in his discussion of bass lines), they chose the very one, 1 − 3 − 4 − 5, that duplicates the bass part found in LGO.

A1554-55 (emphasis added).

Appellant's expert musicologists prepared expert reports that included, *inter alia*, a bass line as part of the scope of the LGIO composition, and provided expert opinion as to how experienced musicians would understand that the bass line was present even in the sheet music filed with the Copyright Office in 1973. The District Court disregarded that testimony entirely and ordered that Appellant's experts reports excise from their reports any and all references to the bass line and any other elements that the District Court felt could not be "discerned" from the District Court's own reading of the sheet music. The District Court "should not, however, have substituted its own views of 'reasonable reliance' for those of the experts." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1244 (E.D.N.Y. 1985), *aff'd sub nom.*, MDL No. 381, 818 F.2d 187 (2d Cir. 1987).

Appellant's experts explained how skilled and trained musicians, such as themselves, would read the LGIO sheet music and what bass line they would most likely play, based on their training. Predictions as to how a certain class of persons

will behave under certain circumstances is something that fits comfortably in the zone of topics upon which our Courts allow experts to testify. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("Woolley's background and practical experience qualify as 'specialized knowledge' gained through 'experience, training, or education,' and his testimony was properly admitted") (*quoting* Fed. R. Evid. 702); *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 288 (E.D.N.Y. 2007), *as amended* (Feb. 7, 2008) ("The fact that these require some level of prediction about future human behavior, and that reasonable minds can differ regarding a particular assumption by an expert, does not mean that the testimony is useless"), *vacated and remanded on other grounds*, 686 F.3d 133 (2d Cir. 2012); *United States v. Am. Exp. Co.*, 10-cv-4496, 2014 WL 2879811, at *16 (E.D.N.Y. June 24, 2014) (reserving decision as to whether expert could "predict how merchants would likely alter their practices in the absence of [] contractual restraints" until *void dire* at trial).

In this way, the District Court erred in its restriction of Appellant's experts from rendering their interpretations of the deposit copy, rather than waiting for *voir dire* or cross examination of the experts at trial. *Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514, 520 (S.D.N.Y. 2005) (finding goals of deposit copy "are **not undermined by interpreting** the copyright here") (emphasis added).

The impact of this ruling was particularly harsh here, as it not only limited the scope of Appellant's experts' reports, but then the District Court used that ruling to

first narrow, and then dismiss, Appellant's entire case. The **direct result** of the District Court's overbroad deposit copy ruling was to limit Appellant's "selection and arrangement" infringement theory to one that comprised only two such elements. As discussed below, this led directly to additional errors by the District Court.

## V. THE DISTRICT COURT'S "SELECTION AND ARRANGEMENT" RULINGS WERE ERRONEOUS

The District Court's erroneous "deposit copy" ruling, coupled with its own interpretation of the 1973 sheet music (and, *inter alia*, its perceived lack of a bass line), had the direct effect of narrowing the allowed scope of Appellant's copyright infringement claim to two elements:

> SAS's infringement claim is based on Sheeran's alleged copying of the combination of two elements from LGO's Deposit Copy into TOL: (1) the chord progression; and (2) the particular way in which anticipation is used in connection with the chord progression ("Harmonic Rhythm") (collectively the "Backing Pattern").

SPA23. The District Court initially held that each of the two elements was not protectible on their own, but that there was a disputed question of material fact as to the combination of the elements:

> The parties' experts **disagree** as to whether the combination of the chord progression and harmonic rhythm present in both compositions is original and thus protectable. They **squarely dispute** whether that combination was commonplace before LGO:
>
> ….

- 43 -

The experts' **disagreement** on whether the backing pattern is sufficiently uncommon to warrant copyright protection is a genuine dispute as to a material fact, preventing summary judgment.

SPA24-25 (emphasis added).

The District Court also found that there were disputed questions of material fact as to whether that combination made LGIO and TOL substantially similar:

Although the two musical compositions are not identical, a jury could find that the overlap between the songs' combination of chord progression and harmonic rhythm is very close. Accordingly, questions remain that are not resolvable by summary judgment, but require trial.

….

As evidenced by the **differences in opinions of the parties' experts**, the question of whether TOL is substantially similar to LGO cannot be resolved summarily and is left for trial.

SPA27, 29 (emphasis added).

Appellees had argued that, notwithstanding the conflicting opinions of the parties' experts, Appellant could not prevail – **as a matter of law** – because "the combination of two unprotectable elements is not sufficiently numerous or original to constitute an original work entitled to copyright protection under the 'selection and arrangement' theory of liability." SPA23. The District Court initially ruled – **as a matter of law** – that Appellees were incorrect, writing:

The law does not support Sheeran's contention that the combination of LGO's chord progression and harmonic rhythm is insufficiently original to warrant it copyrightable. There is no bright-line rule that

the combination of two unprotectable elements is insufficiently numerous to constitute an original work.

SPA23.

Having found no basis in law on which to side with Appellees on the numerosity issue, the District Court ruled that all of the questions surrounding the protectability of the LGIO selection and arrangement must be left to the jury. SPA24. The District Court was correct in its legal conclusion regarding numerosity. There was and remains no case **anywhere** that supports Appellees' argument that two elements cannot qualify for a selection and arrangement-based infringement claim. The District Court should have left its initial selection and arrangement ruling intact, rather than granting re-argument and reversing its position.

In May 2023, perhaps influenced by the outcome of the non-binding *Griffin* trial, the District Court granted Appellees' motion for reargument (which had been pending for over six months) and reversed its initial ruling on selection and arrangement. SPA37-52. The District Court did not, however, revise its prior holding that "[t]here is no bright-line rule that the combination of two unprotectable elements is insufficiently numerous to constitute an original work" (SPA23). Indeed, it repeated it:

> There is no bright-line rule dictating the threshold over which a specific number of unprotectable elements in a work must pass to become sufficiently numerous to protect the aesthetic decision to select and arrange them in an original way.

- 45 -

SPA45.  Yet, the District Court strangely characterized its prior decision as having "declined to grapple" with the ultimate question.  SPA44.  To the contrary, and with all due respect, the District Court had grappled with it and ruled in favor of Appellant.  The District Court then wrote that after its September 2022 ruling, "courts in this Circuit have started to weigh the numerosity of the elements when deciding whether their combination should be protected."  SPA44-45.  The District Court then cited a **single district court case** with non-analogous facts to support its statement regarding what "courts in this Circuit" have done, namely *Nwosuocha v. Glover*, 21-cv-04047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023).

Any reliance on *Nwosuocha*, however, is flawed.  First, *Nwosuocha* is another district court decision with no binding authority on the District Court (or, certainly, this Court).  Second, *Nwosuocha* neither asked nor answered the question of whether there is a minimum number of elements sufficient to make out a "selection and arrangement claim."  Third, the District Court's characterization of the case's holding is incorrect.  The District Court claimed that the *Nwosuocha* decision "implied a high threshold for numerosity when it found that a combination of eight unprotected musical elements was 'categorically ineligible for copyright protection.'"  SPA45 (*quoting Nwosuocha*, 2023 WL 2632158 at *7).  But what the *Nwosuocha* opinion actually says is the following:

> The Court finds that the "distinct and unique vocal cadence, delivery, rhythm, timing, phrasing, meter and/or pattern" or "flow" as well as

the "lyrical theme" and "structure" of the chorus in Plaintiff's Composition lack sufficient originality alone, or as combined, to merit compositional copyright protection **or are categorically ineligible for copyright protection.** (Complaint ¶ 39.) For instance, Nwosuocha asserts copyright over the "lyrical theme" of Plaintiff's Composition, but a **lyrical theme is simply an idea**, and ideas are not protectable. Moreover, the **idea of a boastful rapper is certainly not original** to Nwosuocha.

*Nwosuocha v. Glover*, 21-cv-04047, 2023 WL 2632158, at *7 (S.D.N.Y. Mar. 24, 2023) (emphasis added).    The elements at issue in the way the plaintiff in *Nwosuocha* framed its claim were amorphous ideas, as opposed to the specific alleged musicological similarities between LGIO and TOL as set out in the expert musicologist reports of both sides.   The "categorically ineligible for copyright protection," as reflected in the full quote above, was not a commentary on the "selection and arrangement" claim, and was certainly not a holding or legal pronouncement on the "numerosity" issue.   It was merely an observation that the plaintiff's argument in that case was based on elements that can never be protected under copyright law, either because they are ideas, or because they are *scenes-a-faire* lacking in originality.[19]    The District Court's conclusion that a "selection and

---

[19] Besides *Nwosuocha*, the District Court's only further support for reversing its position on the test for numerosity appears to be a 2003 dictionary definition, which certainly was not a new development during the period after September 2022 and before May 2023.  SPA47.

arrangement" claim cannot be sustained **as a matter of law** with only two elements is clear error.

## VI. THE DISTRICT COURT ERRONEOUSLY HELD THAT THE COMBINATION OF ELEMENTS WAS "COMMONPLACE," DESPITE HAVING ALREADY RULED THAT IT WAS A DISPUTED QUESTION OF MATERIAL FACT

The District Court then committed additional clear error by misstating the record, in direct conflict with statements it had made previously. As discussed above, in its September 2022 decision, the District Court observed that "[t]he parties' experts disagree as to whether the combination of the chord progression and harmonic rhythm present in both compositions is **original** and thus protectable," and that "[t]he experts' **disagreement** on whether the backing pattern is sufficiently **uncommon** to warrant copyright protection is a genuine dispute as to a material fact, preventing summary judgment. They **squarely dispute** whether that combination was **commonplace** before LGO:" SPA24-25 (emphasis added).

Toward the end of its May 2023 decision, however, the District Court made the following statements, despite the conflicting views of each sides' experts that the District Court had previously acknowledged:

> It is an unassailable reality that the chord progression and harmonic rhythm in "Let's Get It On" are so commonplace, **in isolation and in combination**, that to protect their combination would give "Let's Get It On" an impermissible monopoly over a basic musical building block.
>
> ….

- 48 -

> The **combination is commonplace**.
>
> ….
>
> Defendants' experts also identified, **undisputed by SAS's expert**, at least four songs that were released prior to "Let's Get It On" that used virtually the same combination.
>
> ….
>
> The selection and arrangement of these two musical elements in "Let's Get It On" is now **commonplace** and thus their combination is unprotectable.

SPA49-51 (emphasis added).

The District Court then improperly resolved in Appellees' favor what it had previously identified as a material factual dispute that precluded summary judgment:

> **As a matter of law**, the combination of the chord progression and harmonic rhythm in "Let's Get It On" is **too commonplace** to merit copyright protection.

 SPA52 (emphasis added).

Each of the foregoing statements by the District Court in May 2023 directly contradicts the District Court's findings from September 2022, and none are supported by the record. The District Court's "unassailable reality" statement is followed by a paragraph focusing on each element **in isolation**, providing no support for the purported commonality of the elements **in combination**. For its claim that "[t]he combination is commonplace," the District Court cites a single song authored by Appellee Wadge that it recognized **is materially different** than the works at issue.

SPA50. For its claim that the existence of four instances of prior art that purportedly use the combination was "undisputed," the District Court again acknowledges that Appellant's expert in fact **disputed the commonality** of the combination, as the examples were obscure outliers, and the District Court also acknowledged they were not identical. SPA50-51 & n. 4; *see also* A1543-47 (Appellant's expert explaining why the musical compositions identified by Appellee's expert did **not** share the same combination of elements as LGIO and TOL, demonstrating the core disputed issue of material fact among the experts and the parties).

It is a mystery how the District Court – in a matter of months with no additional facts submitted in this case – moved from recognizing a **disputed issue of material fact** among the parties' experts that prevented summary judgment, to finding **as a matter of law** that Appellant cannot make out a claim for copyright infringement. The obvious intervening factor – indeed the District Court references it – was the *Griffin* jury trial in May 2023 that ended in a defense verdict on vastly different evidence. Any factual findings from that case are not binding on Appellant, but even if the were, the jury in *Griffin* made no factual findings with respect to any of the musical elements, whether taken in isolation or in combination.

In summary, the District Court erred in its determination that a two-element "selection and arrangement" claim cannot stand as a **matter of law**, and further erred, by resolving disputed material factual issues in the non-movant's favor regarding

the commonality of the particular selection and arrangement at issue, which were unsupported by the record and are contradicted by the District Court's own findings in September 2022 that these were material issues of disputed fact.

## VII. THE DISTRICT COURT'S CONCERT REVENUE DECISIONS WERE CORRECT, AND ARE UNDISTURBED BY THE FINAL SUMMARY JUDGMENT RULING

On January 15, 2020, the District Court granted Appellant's motion to compel production of "documents containing information about Sheeran's live performances of TOL on or after June 28, 2015." SPA1. In reaching this conclusion, the District Court found that Appellant had met its burden of demonstrating a nexus between concert revenues and infringement, "[b]ecause SAS plausibly alleges that each of Sheeran's live performances of TOL infringed SAS's copyright in 'Let's Get It On' ('LGO')." SPA1. The District Court also found that the ASCAP and BMI member agreements (A256-279) undermined Appellees' arguments because licenses granted by ASCAP and BMI are for the owners of the copyrighted works performed, not infringers:

> But the defendants' argument lacks a foundation: there is no "right" to infringe. BMI's and ASCAP's blanket and venue licenses could not grant a right to infringe, for there never was one.
>
> ….
>
> BMI's and ASCAP's blanket licenses conveyed to licensees the authors' rights to perform their songs. They did not convey the consent of any author to play music which infringes his songs. And

- 51 -

the licenses do not transform an infringing work into one that "could
not, as a matter of law, be infringing."

SPA3-5 (*quoting* Appellees' brief).[20] Having concluded that infringing concert

performances of TOL are acts of copyright infringements driving direct profits, the

District Court correctly held that there was no need to establish any additional "nexus"

between those performances and the revenue they generate. Indeed, there is no need

to put the defendant's "customers on the witness stand to testify that they purchased"

a concert ticket because of TOL. *Polar Bear Prods. v. Timex*, 384 F.3d 700, 715 (9th

Cir. 2004); *see also Semerdjian v. Littell*, 641 F. Supp.2d 233, 247 (S.D.N.Y. 2009)

("even in indirect profits cases, not all courts require proof that the infringing use

caused consumers to buy") (*citing Polar Bear Prods.*).

After the discovery ruling, Appellees nevertheless continued to press – in both

of their motions for summary judgment – for the exclusion of any evidence regarding

concert revenues at trial, arguing in both motions that Appellant had failed to

---

[20] Although the District Court did not specifically address the case, Appellees
relied heavily on *Gray v. Perry*, 2017 WL 1240740, 2:15-cv-05642 (C.D. Cal. Apr.
3, 2017), in which a California district court found that the ASCAP and BMI
blanket licenses **might** provide a defense to the public performance of a song that
infringed another song within the repertory, and ordered plaintiffs to find evidence
that "[s]ome portion of Tour revenues may be attributable to infringements that
allegedly preceded the performances themselves."). In its next decision, the *Gray*
court observed that plaintiffs had "misunderst[ood] this order," and had thus
missed or failed to exercise the opportunity to present such evidence. *Gray v.
Perry*, 2019 WL 2992007, *21, 2:15-cv-05642 (C.D. Cal. July 5, 2019).

establish, and could not establish, a nexus between Sheeran's allegedly-infringing

concert performances of TOL and the massive profits Appellees earned from those

performances.

On September 22, 2022, the Court denied Appellees' motion for summary

judgment and granted Appellant's cross-motion on the concert revenues issue:

> Profits that arise from the performance of a song are direct whereas profits that may have come about because the performance acted as a draw for other profit centers are indirect. **Accordingly, profits from the sale of concert tickets are direct.** The profit is arising because the artist was paid to perform songs and there is an expectation, although not a guarantee, that an artist will play their most popular ballads.
>
> ….
>
> SAS has the burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed. **SAS put forward such evidence** in the form of an expert report, which calculated that the portion of concert ticket revenue attributable to the live performance of TOL ranged from 13.3%, based on a method of calculating according to the Spotify streaming statistics, to 23.97%, based on calculating according to the RIAA certified sales.
>
> ….
>
> **SAS's summary judgment motion** for a finding that if the jury finds TOL infringes LGO, SAS has established a link between the infringing concert performances of TOL and profits arising from concert ticket sales is **granted**.

SPA31, 33-34, 36 (emphasis added).

On October 13, 2022, Appellees moved for reconsideration of "the portion of

the Court's Order…**addressing liability** and, upon granting reconsideration, grant

summary judgment to Defendants." A1880 (emphasis added). Appellees moved for reconsideration of the selection and arrangement issue and concert revenue rulings only in the alternative, "[i]n the event this case is not dismissed." A1881. As discussed at length above, over six months later – and two weeks after the jury verdict in the *Griffin* case – the District Court granted Appellees' motion for reconsideration on liability (by reversing itself on the selection and arrangement issue), and granted summary judgment to Appellees. SPA37-52. The District Court did not make any mention of the concert revenue decision, making clear its view that it was taking up only the liability/numerosity issue. SPA40, 43. The District Court concluded, however, with the following:

> The Complaint is dismissed with prejudice. Plaintiff's renewed cross-motion for Summary Judgment is denied.

SPA52.[21] As noted above, Appellant's cross-motion for summary judgment had already been granted in part, and was outside the scope of the District Court's reconsideration, as it granted Defendants' motion on liability and thus did not reach the damages issue on the merits in its reconsideration decision.

Thus, the District Court did not intend, and in fact did not, disturb its earlier partial grant of Appellant's cross-motion for summary judgment. The District Court

---

[21] Appellant only ever cross-moved for summary judgment on issues relating to damages, and the District Court had already **granted** Appellant's motion in September 2022. SPA36.

- 54 -

decided – under Rule 56 – that in the context of this case there was no question that ticket sales constitute direct revenues, and that the nexus between those ticket sales and the allegedly infringing musical performances has been established. *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 571 (S.D.N.Y. 2017) (finding that law-of-the-case can be established even by a **denial** of a motion for summary judgement) (*citing Cary Oil Co., Inc. v. MG Refining & Marketing, Inc*., 257 F.Supp.2d 751, 765 (S.D.N.Y. 2003)). Out of an abundance of caution, however, in case Appellees or the Court are inclined to construe the situation otherwise, Appellant includes this issue in its appeal, and seeks reversal of the denial of Appellant's subsequent cross-motion concerning concert revenues which only responded to Appellee's alternative requested relief that the District Court did not reach.[22]

The District Court reached the correct legal conclusions earlier in the case: that "BMI's and ASCAP's blanket and venue licenses could not grant a right to infringe," (SPA3-4), that "profits from the sale of concert tickets are direct" (SPA31), and that Appellant had met its "burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed." SPA33. The

---

[22] For the same reason, to the extent that the District Court's grant of summary judgment (SPA52) could be read to eviscerate the District Court's allowance of Appellant's expert reports on damages (SPA35-36), that would be error and should be reversed.

District Court's conclusion regarding the ASCAP and BMI licenses correctly cited the ASCAP and BMI licenses placed into evidence by Appellant, as well as *United States v. BMI*, 207 F. Supp.3d 374, 376 (S.D.N.Y. 2016) for the proposition that the mere presence of a PRO license does not prevent copyright infringement, and *United States v. BMI*, 720 F. App'x 14, 17 (2d Cir. 2017) for the proposition that the PRO blanket licenses only convey the rights conveyed to the PRO by the members (*i.e.*, not for infringing performances).

The District Court's subsequent conclusions regarding the linkage between concert revenues and concert performances, and Appellant's satisfaction of its burden with respect to same, correctly relied on, *inter alia*, *Lowry's Reps., Inc. v. Legg Mason, Inc*., 271 F. Supp.2d 737, 751 (D. Md. 2003) ("[i]n the case of 'direct profits,' such as result from the sale or **performance of copyrighted material, the nexus is obvious**") (emphasis added); *Data Gen. Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147, 1173 (1st Cir. 1994) ("In the context of infringer's profits, the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement"), *abrogated on other grounds by*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). *See also Garcia v. Coleman*, C-07-2279, 2009 WL 799393, at *2 (N.D. Cal. Mar. 24, 2009) ("a causal nexus is typically more easily shown in a direct profits case") (*citing and quoting Lowry's*); *DaimlerChrysler Servs. v. Summit*

*Nat.*, 02-cv-71871, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006) (*citing and quoting Lowry's* in support of holding "the Court is persuaded by those cases placing a heightened initial burden on the copyright holder where profits are indirect.").

The well-known *Frank Music* case illustrates this point very nicely. In that case, defendants publicly performed five of plaintiffs' songs, comprising a total of six minutes, in a 100-minute live music show. The district court found that defendants had infringed plaintiffs' copyrights, and awarded $22,000 in damages to plaintiffs, representing "less than one percent of MGM Grand's profits from the show, or roughly $13 for each of the 1700 infringing performances," which the Ninth Circuit found to be "grossly inadequate," remanding the case for a reapportionment of damages. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985). The decision, however, turned on the fact that the district court had failed to consider **indirect** profits, explaining: "we conclude indirect profits from the hotel and gaming operations, as well as **direct profits from the show itself**, are recoverable if ascertainable." *Id*. at 517 (emphasis added). Direct profits arising from the show itself were – of course – always included in the consideration and were never in doubt.[23]

---

[23] The Ninth Circuit also found the district court to have "clearly erroneous[ly]" reduced revenues by all of defendants' purported overhead without requiring defendants to show "that the categories of overhead actually contributed to sales of the infringing work." *Id*. at 516.

## CONCLUSION

The District Court's "deposit copy" ruling (SPA13-14) should be reversed, as should its decision not to permit the amendment to add the 2020 registration (SPA11-12), and its decision to bar Appellant's expert musicologists from providing evidence as to how skilled musicians would play the sheet music at issue in this case (SPA15-16), either of which would have at least partially corrected for the deposit copy ruling. The District Court's subsequent selection and arrangement decisions (SPA37-52) regarding "numerosity" and whether the combination of elements at issue was "commonplace," which flowed directly from its erroneous deposit copy decisions, and which the District Court used as the basis for its ultimate grant of summary judgment to Appellees, should also be reversed as they have no legal foundation or factual basis in this case's record.

All of these decisions should be reversed, and the case should be remanded to the District Court with instructions to have the case proceed to trial, with Appellant's expert reports restored in full, and with the decisions relating to concert revenues intact. In the alternative, the case should nevertheless be remanded to the District Court with one or both of the following instructions: (i) to permit Appellant's experts to express in their opinions their interpretations as to how skilled musicians would play the composition reflected in the "deposit copy" and (ii) to permit amendment of the Complaint to include the 2020 copyright registration. The District Court

evaded the province of the finder of fact, and the case should be remanded to give

Appellant his right to a trial by jury.

September 29, 2023                    Respectfully submitted,

                                              /s/
                _____

HILLEL I. PARNESS
PARNESS LAW FIRM, PLLC
136 Madison Ave., 6th Floor
New York, New York 10016
(212) 447-5299
hip@hiplaw.com
*Counsel for Appellant*
  *Structured Asset Sales, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 13,952 words.



/s/

Hillel I. Parness

# SPECIAL APPENDIX

# **Table of Contents**

**Page**

Opinion & Order of the Honorable Louis L. Stanton,
dated January 15, 2020 ................................................................. SPA1

Memorandum to Counsel by the Honorable Louis L. Stanton
Denying Request to Amend Complaint, dated May 13, 2020 ... SPA11

Opinion and Order of the Honorable Louis L. Stanton,
dated September 9, 2021 ............................................................. SPA13

Opinion and Order of the Honorable Louis L. Stanton,
dated September 14, 2021 ........................................................... SPA17

Opinion and Order of the Honorable Louis L. Stanton,
dated September 29, 2022 ........................................................... SPA18

Opinion and Order of the Honorable Louis L. Stanton,
dated May 16, 2023 .................................................................... SPA37

Judgment of the United States District Court,
Southern District of New York, entered May 17, 2023 ............. SPA53

RIGINAL



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _1/15/20_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STRUCTURED ASSET SALES, LLC,

                    Plaintiff,

          - against -

EDWARD CHRISTOPHER SHEERAN p/k/a ED
SHEERAN, SONY/ATV MUSIC PUBLISHING,
LLC, ATLANTIC RECORDING CORPORATION
d/b/a ATLANTIC RECORDS, BDI MUSIC
LTD., BUCKS MUSIC GROUP LTD., THE
ROYALTY NETWORK, INC., DAVID PLATZ
MUSIC (USA) INC., AMY WADGE, JAKE
GOSLING and DOES 1 THROUGH 10,

                    Defendants.

18 Civ. 5839 (LLS)

OPINION & ORDER

     To be decided on this motion to compel document production

is whether this Court should compel defendants to produce

documents containing financial information about defendant

Edward Sheeran's live performances of "Thinking Out Loud"

("TOL") -- including expenses and revenues related to ticket,

merchandise sales and endorsements from such performances, and

Sheeran's tour schedules and set lists.

     Because SAS plausibly alleges that each of Sheeran's live

performances of TOL infringed SAS's copyright in "Let's Get It

On" ("LGO"), SAS's motion to compel is granted as to documents

containing information about Sheeran's live performances of TOL

on or after June 28, 2015.

**SPA2**

## BACKGROUND

On June 28, 2018, SAS brought this action for copyright infringement, alleging that the musical composition TOL infringes its copyright in LGO.  SAS asserts that Sheeran has repeatedly performed TOL live without the right to do so.  SAS also asserts that defendants profited from those performances in the form of ticket sales, merchandising, and endorsements.

SAS seeks from defendants Sheeran, Sony/ATV Music Publishing, LLC, Atlantic Recording Corporation, and The Royalty Network, Inc. the production of documents containing information about Sheeran's live performances of TOL, including expenses and revenues related to ticket sales and merchandise sold at such performances, as well as Sheeran's tour schedules and set lists. It also seeks documents detailing expenses and revenues related to endorsements and merchandising more distantly related to TOL.

Defendants object that those requests have no causal relationship to the alleged infringement.  They also, and more fundamentally, contend that ASCAP and BMI's blanket licenses prevent Sheeran's live performances of TOL from infringing the copyright in LGO.

### DISCUSSION

### Live Performances

### *Sheeran's Asserted Right to Perform TOL*

Defendants argue that "as a matter of law, the public performances of either or both TOL or LGO at any or all of the Sheeran concerts in the United States were licensed performances and were, as a matter of law, non-infringing." Def.'s Mem. Opp'n 9. They support this argument with declarations from the Vice Presidents of both Performing Rights Organizations ASCAP and BMI stating that "each of the concert venues at which Sheeran performed TOL in the United States, or the concert promoters, held valid blanket licenses from the PROs, which authorized the public performance of any or all compositions within the repertories of the PROs." Id. at 8-9; Gonzalez Decl. ¶¶ 4-7; Reimer Decl. ¶¶ 3-7. They state that "It is undisputed that both TOL and LGO are within the repertories of the PROs." Def.'s Mem. Opp'n 9. They also further claim that for that reason

> . . . it is indisputable that, regardless of whether SAS will ultimately be able to prove that TOL infringed LGO – and Defendants submit that they will not be able to do so – the public performances of TOL at Sheeran's concerts in the United States could not, as a matter of law, be infringing.

Id. at 9 n.6.

But the defendants' argument lacks a foundation: there is no "right" to infringe. BMI's and ASCAP's blanket and venue

licenses could not grant a right to infringe, for there never was one.

Absent inapplicable exceptions,[1] neither the author nor any licensee of an infringing work has the right to perform it publicly.  The author cannot assign, to BMI or ASCAP, the ability to include such a right in their blanket licenses, for the author has no right to infringe, and neither BMI nor ASCAP can create one.

Indeed BMI's and ASCAP's forms of licenses recognize that, for their blanket licenses stipulate that what they grant are only rights to perform works of "which BMI [ASCAP] shall have the right to grant public performance licenses [license non-dramatic public performances]."  Gonzalez Decl. Ex. 2 (BMI); Reimer Decl. Ex. 2 (ASCAP).

As stated in United States v. BMI, 207 F. Supp. 374, 376 (S.D.N.Y. 2016), under the governing Consent Decree there is always the prospect that BMI "might license performances of a composition without sufficient legal right to do so, or under a worthless or invalid copyright . . . [which] may infringe an author's rights under copyright, contract or other law."

The blanket license can grant no more rights than the PRO is assigned by the author.  As the Court of Appeals stated in

---

[1] Such as "fair use," for example.  They have no part in this discussion.

<u>United States v. BMI</u>, 720 F. App'x 14, 17 (2d Cir. 2017)

(summary order),

> the blanket license itself does not necessarily confer
> a right of immediate public performance: the license
> covers all the rights held by the PRO regardless of
> whether those rights are valid or invalid, exclusive
> or shared, complete or incomplete.

Any applicant may attack "the validity of the copyright of

any of the compositions in defendant's repertory . . . ."

<u>Id.</u>

BMI's and ASCAP's blanket licenses conveyed to

licensees the authors' rights to perform their songs.  They

did not convey the consent of any author to play music

which infringes his songs.  And the licenses do not

transform an infringing work into one that "could not, as a

matter of law, be infringing."

### *Statute of Limitations*

The Copyright Act states that "No civil action shall be

maintained under the provisions of this title unless it is

commenced within three years after the claim accrued."  17

U.S.C. § 507(b).  A copyright infringement claim accrues when

the copyright holder "discovers, or with due diligence should

have discovered, the infringement."  <u>Psihoyos v. John Wiley &

Sons, Inc.</u>, 748 F.3d 120, 124-25 (2d Cir. 2014).

Initially, SAS contends that its May 10, 2018 motion to

intervene in the <u>Griffin</u> case, <u>Griffin v. Sheeran</u>, 17 Civ. 5221,

**SPA6**

put each of these Defendants on notice of SAS's claims, and hence should be treated as the equivalent of filing a complaint.

But even if it were, the

> . . . denial of a motion to intervene is analogous to dismissal of a complaint without prejudice, which does not toll the statutory filing period.

In re Napster, Inc. Copyright Litig., 04 Civ. 3004, 2005 WL 289977, at *4-5 (N.D. Cal. Feb. 3, 2005). As stated in Wilson v. Grumman Ohio Corp., 815 F.2d 26, 27 (6th Cir. 1987),

> It is generally accepted that a dismissal without prejudice leaves the situation the same as if the suit had never been brought, and that in the absence of a statute to the contrary a party cannot deduct from the period of the statute of limitations the time during which the action so dismissed was pending.

Since the denial of SAS's motion to intervene in Griffin left it equally free to litigate its claim (with the Court specifically noting that "SAS also does not identify any prejudice that it would face should the motion be denied"), the limitation statute ran until SAS commenced this action, and the only claims for which it may recover are those that accrued within three years prior to filing its complaint on June 28, 2018. Thus the information to which it is entitled is that concerning those non-time-barred claims.

### Proportionality

To the extent each live performance of TOL was a separate, unauthorized act infringing SAS's copyright interest in LGO, a

-6-

schedule of such infringing acts, as well as the revenues and
expenses attributable to each, are proportional to the needs of
the case.  Defendants have unrivaled access to the requested
information, it has likely already been categorized and used for
defendants' own business purposes, it is germane to profits (if
sufficiently causally related to an infringing performance), and
the amount in controversy is many millions of dollars.  Fed. R.
Civ. P. 26(b)(1).

To the extent that defendants have already produced some
requested documents,[2] they need not duplicate those efforts.

### Revenue Unrelated to Live Performances

SAS asserts entitlement to "the production of documents
relating to Defendants' revenues and expenses associated with
merchandise revenue, touring revenue, and endorsement revenue
linked to 'Thinking Out Loud,'" Pl.'s Mem 7, claiming that it
has "alleged facts sufficient to support an argument for a nexus
between Defendants' infringement and their indirect profits,"
id. at 9, and that

>    The most explicit statement of SAS's theory comes
>    in paragraphs 29 and 62 of the TAC:

---

[2] See, e.g., Camp Decl. Ex. 1 (Sheeran's U.S. concerts between 2014 and 2019);
Zakarin Decl. ¶2 n.3 ("Assuming that SAS could establish that TOL infringed
LGO, it has already been provided with full disclosure from defendants as
well as ASCAP and BMI of the performance income paid with respect to all of
Sheeran's concerts in the United States.").

> 29. Mr. Sheeran experienced a sharp and
> sudden rise as an international music star
> in less than eighteen (18) months as a
> direct result of the commercial success of
> the release of 'Thinking Out Loud', the lead
> single in the United States from Sheeran's
> debut album, 'X', of which 'Thinking Out
> Loud' was the hit.
>
> 62. In 2015, 'Thinking Out Loud' was a top-
> three song as measured by performance income
> in the world. Revenue derived and/or related
> to 'Thinking Out Loud,' including but not
> limited to record sales, performance tour
> income, merchandising, synchronization and
> licensing are in the hundreds of millions of
> dollars.

Id.

What SAS has not done is to allege facts adequate to state

a causal relationship between the particular song TOL and those

profits.  Thus it is not entitled to documents detailing

expenses and revenues unrelated to the live performances. In

Graham vs. Prince, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017),

Judge Stein found that the plaintiff

> adequately pled a causal nexus between the alleged
> infringement and indirect profits by alleging facts—
> such as the selection of Untitled [the allegedly
> infringing work] to appear in a catalog for the New
> Portraits exhibition and in a billboard displaying
> Prince[the alleged infringer]'s works—from which it
> can be reasonably inferred that the infringing
> photograph generated profits beyond those earned from
> the direct sale of Untitled.

Here, SAS alleges no such facts.

SAS has not identified any non-concert merchandise or any

endorsements for which profits are clearly attributable to TOL.

**SPA9**

Sheeran's manager, Stuart Camp, stated that "there is no TOL branded merchandise." He also stated that Sheeran has had only two endorsements in the decade he has represented Sheeran: an advertisement for "Beats Headphones" that was synchronized with Sheeran's song "Don't" before TOL's release, and a recent endorsement for Heinz Ketchup that involved no Sheeran music. Camp Decl. ¶¶ 39, 41-43. SAS has not disputed either of these assertions.

SAS's motion to compel production of documents unconnected with the live performances is denied.

<strong>CONCLUSION</strong>

Plaintiff SAS's motion to compel document production (Dkt. No. 129) is granted as to Document Requests 15-18 insofar as they request documents reflecting revenues received or earned, and expenses incurred or paid, in connection with live performances and merchandise sold at concerts where TOL was performed on or after June 28, 2015, including revenues received or earned and expenses incurred or paid in connection with multiple musical works; and Requests 27-28 seeking schedules and set lists for performances on or after June 28, 2015.

The motion to compel (Dkt. No. 129) is denied as to Document Requests 15-20, and 27, 28 insofar as they request information about performances prior to June 28, 2015, or merchandise sold before June 28, 2015, or not connected to live performances of TOL on or after June 28, 2015.

So ordered.

Dated:      January 15, 2020
            New York, New York

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.

# SPA11

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  5/13/2c

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

STRUCTURED ASSET SALES, LLC,

                              Plaintiff,                    18 Civ. 5839 (LLS)

        -against-

EDWARD CHRISTOPHER SHEERAN
Personally Known as ED SHEERAN, et al.,

                              Defendants.

-------------------------------------------------------------X

### Memorandum to Counsel

    Structured Asset Sales LLC's proposed filing of a fourth Amended Complaint raises

serious concerns of trial administration and jury confusion, let alone difficulties of clear

presentation and organized resolutions of the issues.

    The new registration, Exhibit A to Mr. Parness's May 7, 2020 letter to the Court, includes

the "music and lyrics not reflected on deposit copy for 1973 registrations", and specifically

excludes those earlier deposit copy lyrics and music.  That presents the jury with two

components, which for some purposes merge into a single claim as components of "the

composition", and for other purposes are separate, having been registered 47 years apart.  The

"Composition" had several musical components.  Some were protected in 1973; others not until

2020.  Claims of infringement of material comprising the work in the first deposit copy run from

1973; claims of infringement of the other components second run from their registration in 2020

(and not more than three years back, to 2017).  By their nature, the musicological analyses of the

first deposit's music is different from those when the newly registered lyrics and music (although

they were part of the body of the sound recording) are added, although perhaps they merge from

2017 forward.

Plaintiff's expert treats the two components separately. He sees the music and lyrics registered in 2020 as reinforcing the conclusions he reached "when considering the lead-sheet deposit copy alone." (Everett report, Ex. C to May 7 letter, p. 18).

Relation-back is a counter-factual concept. Before the 2020 registration (of separate, previously excluded elements) plaintiff could not sue on performances of material not contained in the 1973 deposit copy. Did these performances become infringing retroactively? Respectable precedents hold they had no copyright protection. If not, the newly registered material's role in the evaluation of 1973-2020 performances which did not infringe the deposit copy becomes problematic. It is what was excluded in <u>Skidmore v. Led Zeppelin</u>, No. 16-56057 March 9, 2020 (9th Cir. 2020) (en banc).

In this situation at present, if the Fourth Amended Complaint were filed in this case, I would incline towards severing its claims under the 1973 deposit copy and proceeding with preparing and trying them separately, with a separate trial of claims including the 2020 registration, for the reasons expressed in the order on defendants' first motion in limine. Indeed, it might be better prosecuted as a separate action.

That being so, it is better to deny permission to file the Fourth Amended Complaint. Plaintiff may, without further correspondence or conferences if it wishes, file a formal motion for leave to file it, so the matter may be presented more fully.

Dated: New York, New York
       May 13, 2020

                                                      *Louis L. Stanton*
                                                  LOUIS L. STANTON
                                                    U.S.D.J.

SPA13

ORIGINAL

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:_____         │
│ DATE FILED:  9/9/21         │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STRUCTURED ASSET SALES, LLC,

                   Plaintiff,

   - against -

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

18 Civ. 5839 (LLS)

OPINION & ORDER
ON DEFENDANTS'
MOTION IN LIMINE

     The issues raised by defendants' application for in limine rulings are disposed of as follows.

1.

The Deposit Copy

     On July 17, 1973, in compliance with the then - applicable 1909 Copyright Act Sections 9 and 12, 17 U.S.C. §§ 5(e), 9, 10, 12 (1964), Ed Townsend filed with the Copyright Office (through music publishers) the application for registration of the musical composition Let's Get It On, and deposited two copies of the sheet music he had authored.  The copyright was registered as No. EP 314589, and the sheet music deposited with the Copyright Office ("Deposit Copy") defines "precisely what was the subject of copyright." Merrell v. Tice, 104 U.S. 557, 561 (1881).  "[T]he scope of the copyright is limited by the deposit copy." Skidmore v. Led

Zeppelin, No. 16-56057, March 9, 2020 p. 20 (9th Cir. 2020) (en banc). The Copyright Office instructs that "a registration for a work of authorship only covers the material that is included in the deposit copy(ies)" and "does not cover authorship that does not appear in the deposit copy(ies), even if the applicant expressly claims that authorship in the application." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices. §504.2 (3d ed. 2017). As such, the Deposit Copy is the sole definition of the elements included in the protection of copyright, which does not include other embellishments, even if they were added by Townsend himself - because they have not undergone the copyright process.

Nor is the field of protected elements enlarged on the theory that they are consistent, and harmonize with the work as articulated in the Deposit Copy, and are implied by the way the articulated elements are expressed. If what is implied is not in the Deposit Copy, it does not have the protection of copyright.

2.
The Sound Recording

A clear understanding that only the Deposit Copy has copyright protection is important in this case because Marvin Gaye, who co-wrote Let's Get It On ("LGO") with Townsend, recorded the song for its first commercially released sound recording on March 22, 1973. The Gaye sound recording contains many elements: percussion/drums, bass-guitar, guitars, Gaye's vocal performances, horns, flutes, etc., which do not appear in the simple melody of the Deposit Copy. These additional elements - at least some of which appear in Thinking Out Loud ("TOL") in more or less similar form - are not protected by copyright, because they are not in the Deposit Copy.

Thus the Gaye sound recording is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright. For example, comparisons of elements in Thinking Out Loud which are similar to elements in the Gaye sound recording (but not the Deposit Copy) will not be allowed.

3.

A clear example is the bass line issue. There is no genuine question that there is no notation or specification of a bass line in the Deposit Copy. That has been accepted by both sides and is apparent from a visual inspection, and is beyond dispute.

Plaintiff's experts' produced opinions basing infringement on an asserted similarity between Thinking Out Loud and a combination of three elements in LGO called the "backing pattern." It consisted of the chord progression, the harmonic anticipation of chord changes (both of which are commonplace and unprotectable), and a bass line. There is no bass line in the LGO Deposit Copy. This led to the concoction of remedial theories – e.g. that if you string together the lowest notes in the Deposit Copy you will "find" a bass line; that the remaining two elements are its "functional equivalence" – which have serious analytic problems.

The present point is that none of that could be discerned by examining the Deposit Copy. The waste and confusion came from comparing TOL with the Gaye sound recording rather than the Deposit Copy, and failing to take seriously the understanding that "copyright law protects only that which is literally expressed, not that which might be inferred or possibly derived from what is expressed." (Defts' Reply Memo., pp. 3-4).

To prevent the jury from any such confusion, plaintiff's expert reports must delete all references to the Gaye sound recording, and its experts shall not mention it in their testimony

**SPA16**

without prior approval by the Court.

Within the next 30 days plaintiff shall furnish defendants with final copies of its experts' reports, as so amended.

4.

One of plaintiff's experts having ignored the issue of prior art, and the other having only made inquiries so superficial as to amount to no research at all, the proof as to the existence of prior art shall be only that submitted by defendants.

5.

Plaintiff's experts' corrected reports and testimony are to eschew opinions unsupported by facts, or suggesting legal conclusions.

So Ordered.

Dated: New York, New York
      September 9 , 2021

_____
Louis L. Stanton
U.S.D.J

-4-

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

STRUCTURED ASSET SALES, LLC,

                    Plaintiff,

          - against -

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

                    Defendants.
- - - - - - - - - - - - - - - X

18 Civ. 5839 (LLS)

OPINION & ORDER
ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/14/21

    In light of the rulings in the September 9, 2021 Opinion

and Order on Defendants' Motion in Limine, the parties' motions

for summary judgment are dismissed without prejudice to renewal

after submission of Plaintiff's experts' final reports,

addressing only claimed infringement of the Deposit Copy.


    So Ordered.


Dated: New York, New York
       September 14, 2021


                                   Louis L. Stanton
                              _____
                                   Louis L. Stanton
                                        U.S.D.J

SPA18

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

STRUCTURED ASSET SALES, LLC,

             Plaintiff,                 18 Civ. 5839 (LLS)

  - against -                   ORDER

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

             Defendants.
- - - - - - - - - - - - - - - X

**BACKGROUND**

The Court assumes the parties' familiarity with the facts

and prior proceedings, including Structured Asset Sales, LLC v.

Sheeran, 433 F. Supp. 3d 608, 609 (S.D.N.Y. 2020) (granting in

part and denying in part plaintiff's motion to compel) (Dkt. No.

144); Structured Asset Sales, LLC v. Sheeran, 559 F. Supp. 3d

172, 173 (S.D.N.Y. 2021) (Opinion & Order on defendants' Motion

in limine) (Dkt. No. 197); and Griffin v. Sheeran, 351 F. Supp.

3d 492, 494 (S.D.N.Y. 2019) (asserting a claim that TOL

infringes the copyright in LGO).

In response to this Court's September 9, 2021 Order, SAS's

expert musicologists, Dr. Covach and Dr. Everett, filed amended

reports: (1) a Revised Covach Report, (2) a Revised Covach

- 1 -

SPA19

Rebuttal Report, and (3) a Revised Everett Report (collectively, the "Revised Reports"). Dkt. No. 200 Exs. 3, 5, & 7. The September 9th Order held that "the Deposit Copy is the sole definition of the elements included in the protection of copyright" and, consequently, the LGO Sound Recording "is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright." Dkt. No. 197 at 2-3. The Order directed the experts to delete "all references to the Gaye sound recording," all references to prior art, as "the proof as to the existence of prior art shall be only that submitted by defendants," and all "opinions unsupported by facts, or suggesting legal conclusions." Id. at 3-4.

**DISCUSSION**

A. **Renewed Motion to Exclude SAS's Experts Dr. Covach and Dr. Everett**

Issues raised in Sheeran's renewed application for in limine rulings are disposed of as follows.

1. The Revised Reports may use the terms "common," "uncommon," "noteworthy," and "stylistically commonplace." These are not legal conclusions but epithets characterizing a work's place on a scale of originality.

2. The term "appropriates" is stricken from Paragraph 20 of the Revised Covach Report because the term has a legal meaning in

- 2 -

**SPA20**

the copyright field. An unlawful appropriation is one where
"the second work bears 'substantial similarity' to protected
expression in the earlier work." <u>Castle Rock Ent., Inc. v.
Carol Pub. Grp., Inc.</u>, 150 F.3d 132, 137 (2d Cir. 1998). An
expert may not opine that a defendant's work is substantially
similar to that of the plaintiff. That is for the jury to
decide.

3. All references to the Gaye sound recording are to be stricken
   because they violate the Court's Order that SAS "must delete
   all references to the Gaye sound recording" as "comparisons of
   elements in Thinking Out Loud which are similar to elements in
   the Gaye sound recording (but not the Deposit Copy) will not
   be allowed." Dkt. No. 197 at 3. There is no ambiguity in that
   direction, and it is the lawyer's responsibility to see that
   his client, and retained experts, comply with it. A report
   containing such references will be excluded.

4. Sheeran raises several issues alleging that SAS's experts did
   not remove all references to prior art in compliance with the
   Court's Order that "[o]ne of plaintiffs experts having ignored
   the issue of prior art, and the other having only made
   inquiries so superficial as to amount to no research at all,
   the proof as to the existence of prior art shall be only that
   submitted by defendants." Dkt. No. 197 at 4.

SPA21

References to prior art will not be accepted when used to prove that an element of LGO is unusual or similar to that of TOL. Thus, the prior art examples listed on Pages 9-10, Paragraph 7 of the Revised Everett Report, are stricken, except for "Hurdy Gurdy Man" by Donovan, which is admissible because it is offered into evidence by Sheeran's expert.

References to prior art are acceptable when they are used to illustrate general principles of musicology. The Revised Everett Report can mention the prior art on Pages 12-13, Paragraph 3 because the songs are being used as examples of the different functions a chord progression may have within the formal structure of the song. The only song that is used to show the similarity between LGO and TOL is the Commodores' "Easy," which is introduced by Sheeran's expert and may thus also be discussed in the Revised Everett Report.

The study on Pages 3-4, Paragraphs 6-7 of the Everett Report is acceptable, for it describes chord progressions, not prior art.

**B. Motion for Summary Judgment**

**1) General Legal Standards**

Summary judgment is warranted if, based upon admissible evidence, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v.

- 4 -

SPA22

Catrett, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, a Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

**2) Legal Standard Applied to Copyright Infringement**

To establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010). The issue of substantial similarity "is frequently a fact issue for jury resolution." Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 239 (2d Cir. 1983). Even so, on a motion for summary judgment, a court may determine non-infringement as a matter of law, "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Id. at 240 (citations omitted).

**3) Copyright Infringement**

SPA23

SAS's infringement claim is based on Sheeran's alleged copying of the combination of two elements from LGO's Deposit Copy into TOL: (1) the chord progression; and (2) the particular way in which anticipation is used in connection with the chord progression ("Harmonic Rhythm") (collectively the "Backing Pattern"). The parties agree that those elements, standing alone, are commonplace and unprotectable. Accordingly, Sheeran argues that summary judgment dismissing the claim is appropriate as a matter of law because (i) the combination of two unprotectable elements is not sufficiently numerous or original to constitute an original work entitled to copyright protection under the "selection and arrangement" theory of liability; and (ii) LGO's backing pattern is not identical or nearly identical to that in TOL.

> **i)   Copyrightability of the combination of the chord progression and harmonic rhythm**

The law does not support Sheeran's contention that the combination of LGO's chord progression and harmonic rhythm is insufficiently original to warrant it copyrightable. There is no bright-line rule that the combination of two unprotectable elements is insufficiently numerous to constitute an original work. Cf. Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1003-04 (2d Cir. 1995) ("a work may be copyrightable even though it is entirely a compilation of unprotectable elements. What is protectable then is 'the author's original contributions'-the

original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." (citations omitted)); Rose v. Hewson, No. 17 CV 1471, 2018 WL 626350, at *3 (S.D.N.Y. Jan. 30, 2018) ("compilations of generally unprotectable elements can be afforded copyright protection."). Moreover, Courts "treat the question whether particular elements of a work demonstrate sufficient originality and creativity to warrant copyright protection as a question for the factfinder." Matthew Bender & Co. v. W. Pub. Co., 158 F.3d 674, 681 (2d Cir. 1998). Therefore, "the question whether those elements in LGO demonstrate 'sufficient originality and creativity to warrant copyright protection' is a factual question to be determined at trial." Griffin v. Sheeran, 351 F. Supp. 3d 492, 497 (S.D.N.Y. 2019).

Moreover, where, as here, the parties' experts disagree as to whether a particular musical element is original, summary judgment is inappropriate. See Ulloa v. Universal Music & Video Distribution Corp., 303 F. Supp. 2d 409, 413-14 (S.D.N.Y. 2004) ("It would be improper for this Court, on a motion for summary judgment, to draw its own conclusions from this competing evidence regarding the originality of the Vocal Phrase."). The parties' experts disagree as to whether the combination of the chord progression and harmonic rhythm present in both compositions is original and thus protectable. They squarely

dispute whether that combination was commonplace before LGO:
SAS's experts opined that "the progression class shared between
[the songs] is uncommon," Dkt. No. 200 Ex. 7 ¶¶ A.6-7, whereas
Sheeran's expert opined "that the combination of commonplace
elements in LGO . . . is found in prior art," Dkt. No. 179 Ex.
10 ¶ 26.

Sheeran's expert alleges the existence of three prior
works—"Downtown," "Since I Lost My Baby," and "Georgy Girl"—that
use the chord progression in LGO, a I-iii-IV-V chord
progression, together with the same anticipation of chord
changes on the second and fourth chords as used in LGO.  Dkt.
No. 179 Ex. 10 ¶¶ 26-38. SAS's expert opposes the
characterization of those songs as prior art of LGO. He argues
that LGO's backing pattern is not present in "Downtown," its
chord progression is different from that in "Since I Lost My
Baby," and its harmonic rhythm is on an alternative beat
compared to the one in "Georgy Girl." Dkt. No. 200 Ex. 5 ¶¶ 10-
12. The experts' disagreement on whether the backing pattern is
sufficiently uncommon to warrant copyright protection is a
genuine dispute as to a material fact, preventing summary
judgment. Fed. R. Civ. P. 56(a)

   ii)  **Substantial Similarity between LGO and TOL**

   When a copyright claim is "limited to the particular
selection or arrangement" of elements, the "protection given is

**SPA26**

'thin,'" becuase a "'subsequent [author] remains free to use [the public domain elements] to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 136 (2d Cir. 2003) (quoting Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991)) (alteration in original). Thus, substantial similarity in selection and arrangement cases "will be established only by very close copying" of the plaintiff's work. Beaudin v. Ben & Jerry's Homemade, Inc., 95 F.3d 1, 2 (2d Cir. 1996); Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 107 (2d Cir. 2014). In determining the substantial similarity of works that have both protectable and unprotectable elements, the Court's analysis must be "discerning" and we "must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." Knitwaves, Inc., 71 F.3d at 1002. Even so, the Court is principally guided "by comparing the contested design's 'total concept and overall feel' with that of the allegedly infringed work," Tufenkian Import/Export Ventures, Inc., 338 F.3d at 133; Knitwaves, Inc., 71 F.3d at 1003.

The parties' expert musicologists have opined on the similarity between the musical elements in LGO's and TOL's backing patterns and have come to competing conclusions. SAS's

SPA27

experts opine that the backing patterns are "harmonically equivalent," Dkt. No. 200 Ex. 3 ¶ 6, whereas Sheeran's expert maintains that they are objectively different, Dkt. No. 179 Ex. 8 ¶ 14. Although the two musical compositions are not identical, a jury could find that the overlap between the songs' combination of chord progression and harmonic rhythm is very close. Accordingly, questions remain that are not resolvable by summary judgment, but require trial.

**Chord Progression**

The LGO Deposit Copy features a I-iii-IV-V7 (or a 1-3-4-5) chord progression. Dkt. No. 208 (Defendants' Rule 56.1 Reply to Plaintiff's Rule 56.1 Response) ¶ 32. TOL features a I-I6-IV-V7 chord progression. Id. ¶ 33. The "I6" chord is a major chord and the "iii" chord is a minor chord. Id. ¶ 35.

The parties dispute the effect of that slight adjustment between the chord patterns. SAS alleges that these chord progressions are harmonically equivalent because, as illustrated by music textbooks, the "I6" chord may substitute for the "iii" chord "without affecting the function of the progression." Id. ¶ 33; Dkt. No. 200 Ex. 5 ¶ 6; Dkt. No. 200 Ex. 7 ¶ 4.  Sheeran maintains that the chord progressions are different and none of the chord progressions in TOL are I-iii-IV-V7. Dkt. No. 208 ¶ 33; Dkt. No. 179 Ex. 2 ¶ 39.

**SPA28**

Sheeran also argues that there is a significant harmonic difference between the chord progressions because the "I6" chord is a major chord, and the "iii" chord is a minor chord. Dkt. No. 208 ¶ 35; Dkt. No. 179 Ex. 8 ¶ 14. But SAS's expert Dr. Everett contends that the minor "iii" chord could be equivalent to the major "I6" because of the "interchangeability of the two triads." Dkt. No. 200 Ex. 7 ¶¶ A.4-5.

**Harmonic Anticipation of Chord Changes**

The LGO Deposit Copy sets the I-iii-IV-V7 chord progression to extend over two measures (or bars) according to a "slow" 4/4 time signature. Dkt. No. 208 ¶ 41. TOL sets the I-I6-IV-V7 chord progression to a "fast" 4/4 time signature. Id.

The parties dispute whether the songs' harmonic rhythms, the timing of the chord changes in the songs, are substantially similar. SAS claims that the harmonic rhythms are the same but are notated using two different time signatures. Id.; Dkt. No. 3 ¶¶ 10-11.  In Sheeran's view, the harmonic rhythms are different because the chord progression in LGO is played over four bars as compared to two bars in TOL and LGO's Deposit Copy does not notate a fast or slow 4/4 time, which refers to the tempo of the song. Dkt. No. 179 Ex. 2 ¶ 49.  SAS dismisses any arguments that the difference in notation makes the rhythmic pattern dissimilar because, it claims, the rhythms are identical in sound. Dkt. No. 200 Ex. 5 ¶ 5. It also argues that syncopated chord changes,

- 11 -

occurring on a weak beat, are in both songs. Dkt. No. 200 Ex. 7
¶ D.1.

As evidenced by the differences in opinions of the parties'
experts, the question of whether TOL is substantially similar to
LGO cannot be resolved summarily and is left for trial.

**4) Touring Profits Damages**

As a remedy for infringement, a copyright owner is entitled
to recover statutory damages or "actual damages and any
additional profits of the infringer." 17 U.S.C.A. § 504(a)
(2018). SAS seeks a damages award in the amount of actual
damages plus profits, including all profits relating to touring
revenue, such as concert ticket and concert merchandise sales.
Dkt. No. 102 (Third Amended Complaint).

In the event that the complaint is not dismissed, both
parties seek partial summary judgment on various issues related
to profits. Sheeran moves for summary judgment to dismiss SAS's
claim that the damages award can include touring profits. SAS
opposes the motion and cross moves for summary judgment that

> (i) to the extent there is any burden on Plaintiff to
> establish a link between the separate acts of
> infringement that arose when Sheeran performed TOL at
> concerts and the direct profits from the concerts,
> that burden has been satisfied;
> (ii) the numerous references throughout Mr.
> Massarsky's report to Plaintiff's purported failure to
> meet its causal burden should be struck as

> inappropriate (as Mr. Massarsky is not a legal expert)
> and wrong;[1] and
> (iii) if Plaintiff prevails on its copyright
> infringement claim, it will be entitled – at a minimum
> – to the "straight-line" apportionment of direct
> profits arising from the direct infringements advanced
> by Mr. Massarsky, based on the number of songs Mr.
> Sheeran performed at each Ed Sheeran concert.

In other words, if TOL is found to infringe LGO, the

parties disagree over whether touring profits—the sale of

concert tickets and concert merchandise—can be recovered and in

what amount. SAS alleges that it can recover revenue generated

from concert tickets and merchandise because they are direct

profits. SAS argues it does not need to prove a causal nexus

between the separate acts of infringing public performances and

the direct revenues collected from them. Rather, the burden is

on Sheeran to prove the proper apportionment of those direct

profits to the TOL infringements.

Sheeran contends that all the touring profits are indirect

profits. Nonetheless, regardless of how the profits are

classified, Sheeran argues SAS must prove a causal nexus between

the infringement and the profits and SAS has not adduced any

evidence that shows TOL specifically caused concertgoers to

purchase Sheeran concert tickets and merchandise sold at his

concerts.

---

[1] SAS's motion to strike is denied. There is nothing improper about
Massarsky opining that there is no evidence of a causal link between
tour profits and the alleged infringement.

**SPA31**

**1) Classification of Profits**

Depending on how attenuated profits are from the infringing act, an infringer's profits may be direct or indirect. Complex Sys., Inc. v. ABN Ambro Bank N.V., No. 08 CIV. 7497 KBF, 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013). Direct profits arise from the sale of the infringing good. Cohen v. G & M Realty L.P., 320 F. Supp. 3d 421, 446 (E.D.N.Y. 2018), aff'd sub nom. Castillo v. G&M Realty L.P., 950 F.3d 155 (2d Cir. 2020); Garcia v. Coleman, No. C-07-2279 EMC, 2009 WL 799393, at *2 (N.D. Cal. Mar. 24, 2009) (quoting Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits are "derived from the use of the copyrighted work to promote sales of other products." Graham v. Prince, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017).

Profits that arise from the performance of a song are direct whereas profits that may have come about because the performance acted as a draw for other profit centers are indirect. Accordingly, profits from the sale of concert tickets are direct. The profit is arising because the artist was paid to perform songs and there is an expectation, although not a guarantee, that an artist will play their most popular ballads. In comparison, profits from the sale of concert merchandise are indirect because the source of profits is from the sale of another good separate from the infringing performance.

**2) Causal Nexus**

**SPA32**

A copyright owner is entitled to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504 (2018). The Copyright Act goes on to describe a burden-shifting analysis: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id.

A plaintiff thus has the burden of showing a causal nexus between the infringement and the gross revenue. Lawton v. Melville Corp., 116 F.3d 1472 (2d Cir. 1997) (Because "only those profits attributable to the use of the infringed work" can be awarded, a copyright owner "must show some nexus between the gross revenues and the infringement."); Viktor v. Top Dawg Ent. LLC, No. 18 CIV. 1554, 2018 WL 5282886, at *1 (S.D.N.Y. Oct. 24, 2018) ("Significant here, before the burden shifts to the infringer, a plaintiff must first demonstrate a causal relationship between the infringement and the defendants' revenues."). It is insufficient for a copyright owner to "simply show gross revenues from the sale of everything the defendant sells." Id. "[T]he term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not

- 15 -

**SPA33**

unrelated revenues." On Davis v. The Gap, Inc., 246 F.3d 152, 160 (2d Cir. 2001) (holding plaintiff failed to discharge its burden by submitting evidence of the defendant's gross revenues when the revenue included sales that were in no way promoted by the infringing advertisement). In cases of direct profits, the burden to satisfy the nexus requirement is minimal and may be obvious. See Lowry's Reps., Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 751 (D. Md. 2003) ("In the case of 'direct profits,' such as result from the sale or performance of copyrighted material, the nexus is obvious."); Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1173 (1st Cir. 1994), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010) ("In the context of infringer's profits, the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement.").

**Concert Tickets**

SAS has the burden of producing evidence that shows revenue from the sale of tickets to concerts where TOL was performed. SAS put forward such evidence in the form of an expert report, which calculated that the portion of concert ticket revenue attributable to the live performance of TOL ranged from 13.3%, based on a method of calculating according to the Spotify

streaming statistics, to 23.97%, based on calculating according to the RIAA certified sales. Dkt. No. 205 Ex. 1 at 9-10.

Sheeran disputes this method of calculation. They put forward a competing expert report that calculates TOL's share of the profits by dividing the Adjusted Show Profits (a figure provided by them that subtracts expenses from the total live income) by the number of songs performed by Ed Sheeran, or, in the alternative, by the number of songs performed by Mr. Sheeran and by the opening act(s). Dkt. No. 205 Ex. 2 at 6, 15-20.

SAS disputes Sheeran's method of calculation and Sheeran's deduction of business management fees, management commissions, and UK taxes from the Adjusted Gross Profits figure on the grounds that those items are not directly attributable to TOL. Dkt. No. 205 Ex. 1 at 8.

In light of the dispute between the parties, the proper calculation of damages should be determined by trial rather than on summary judgment.

**Concert Merchandise**

SAS has not identified any admissible evidence that ties the alleged infringement, the live performance of TOL, to the revenues generated by the sale of concert merchandise.

Without a showing of "any causal connection between the infringement and the defendant's profits," it is only speculative whether the revenue is reasonably related to the

- 17 -

**SPA35**

infringement. <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 159 (2d Cir. 2001). Copyright law does not allow for speculative recovery, and we can surmise a myriad of reasons why a concertgoer would purchase concert merchandise, reasons that have nothing to do with the live performance of TOL.

Accordingly, if TOL is found to be an infringement of LGO, the jury cannot take into account the revenue from concert merchandise sales when making the damages calculation. <u>See</u> <u>Bayoh v. Afropunk LLC</u>, No. 18 CV 5820, 2020 WL 6269300, at *7 (S.D.N.Y. Oct. 26, 2020) ("In cases that involve indirect profit claims, the district court opinions have underscored that "the decision to 'send[ ] such claims to a jury should be extremely rare.'" (alteration in original)).

**CONCLUSION**

Sheeran's motion for summary judgment dismissing SAS's claim for infringement is denied. Sheeran's motion in the alternative to dismiss SAS's claim to include concert merchandise revenue in a calculation of damages is granted, but its motion to dismiss the inclusion of concert ticket sales is denied.

Sheeran's motion to exclude Dr. Covach's and Dr. Everett's Revised Reports and testimony is granted conditionally on their present submissions. If, within thirty days from the date of entry of this Order, they submit reports which comply strictly

**SPA36**

with this Order and the September 9, 2021 Order, their reports will be received in evidence and they may testify. Those of Sheeran's objections and disputes with their reports which have not been specifically addressed by the Court are left to be dealt with on cross-examination.

SAS's summary judgment motion for a finding that if the jury finds TOL infringes LGO, SAS has established a link between the infringing concert performances of TOL and profits arising from concert ticket sales is granted. It is denied in all other respects.

So Ordered.

Dated:  New York, New York
        September 29, 2022

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.

ORIGINAL

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __5/16/23__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

STRUCTURED ASSET SALES, LLC,

                Plaintiff,              18 Civ. 5839 (LLS)

   - against -               OPINION & ORDER

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

                Defendants.
- - - - - - - - - - - - - - - X

     This case presents the question of whether the song "Thinking Out Loud" infringes the copyright of "Let's Get It On." On September 29, 2022, the Court denied defendants' Renewed Motion for Summary Judgment dismissing the case. Defendants now move for reconsideration of that Order.

     For the following reasons, defendants' Motion for Reconsideration is granted and the complaint is dismissed.

**Background**

     The Court assumes the parties' familiarity with this case and recounts only what is necessary to decide defendants' Motion for Reconsideration.

     Ed Townsend and Marvin Gaye Jr. wrote and internationally released the song "Let's Get It On" in 1973. Dkt. No. 102

("Third Amended Complaint") ¶ 1; Dkt. No. 201 ("Defendants' Rule 56.1 Statement") ¶ 17.  On July 17, 1973, Townsend applied to copyright the song with the U.S. Copyright Office. Dkt. No. 201 ¶ 19. In support of that application, he deposited with the Copyright Office a copy of the sheet music. Id. ¶ 20. The sheet music, which is known as the "Deposit Copy," was subsequently registered under Registration No. EP 314589.[1] Id. ¶ 21. Plaintiff, Structured Assets Sales, LLC ("SAS") has an 11.11% beneficial interest in the right to receive royalties from the copyright of "Let's Get It On."  Dkt. No. 102 ¶ 18; Dkt. No. 201 ¶ 18.

In February 2014, defendants Ed Sheeran and Amy Wadge co-authored the song "Thinking Out Loud." Dkt. No. 201 ¶ 24. Days later, Sheeran recorded, and co-defendant Jack Gosling produced, what would become the commercially released version of the song. Id. ¶ 26; Dkt. No. 102 ¶ 25. "Thinking Out Loud" was released to great commercial and critical success, including a Grammy Award for Song of the Year. Dkt. No. 102 ¶ 17. Co-defendants SONY/ATV Music Publishing, Atlantic Recording Company d/b/a Atlantic Records, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., and David Platz Music (USA) Inc., as

---

[1] Marvin Gaye Jr. created a Sound Recording of "Let's Get It On," which was commercially released. The Sound Recording was never copyrighted and is not at issue in this dispute.

publishers and distributors of "Thinking Out Loud," facilitated
and assisted with its distribution, promotion, and sales.

SAS alleges that "Thinking Out Loud" infringes on the
copyright of the sheet music of "Let's Get It On." Defendants
moved for Summary Judgment dismissing the case and SAS cross-
moved for Summary Judgment granting it profits from Sheeran's
live performance of "Thinking Out Loud."[2] Dkt. No. 202; Dkt. No.
205.

In its Order denying defendant's Motion for Summary
Judgment, the Court recognized that this Circuit treats the
question of whether "particular elements of a work demonstrate
sufficient originality and creativity to warrant copyright
protection as a question for the factfinder." Matthew Bender &
Co. v. W. Pub. Co., 158 F.3d 67, 681 (2d Cir. 1998). With this
in mind, the Court held that the parties' dispute over the
originality of the selection and arrangement of the combination
of two commonplace musical building blocks—the chord progression
and harmonic rhythm-in "Let's Get It On" was a genuine dispute
necessitating denial of defendants' motion.

---

[2] The parties' initial motions for summary judgment were denied
with leave to renew after SAS amended its Experts' Reports. Dkt.
No. 198. The parties thereafter filed Renewed Motions for
Summary Judgment, which the Court denied in part and granted in
part. Dkt. No. 211. It is that denial which defendants urge the
Court to reconsider.

**SPA40**

Defendants filed a motion for reconsideration urging the Court to reconsider its findings on liability and grant Summary Judgment dismissing the case, or in the alternative to certify the question of how to satisfy the numerosity requirement under the selection and arrangement test for infringement. Dkt. No. 212. SAS promptly opposed the Motion for Reconsideration. Dkt. No. 214.

## Legal Standards

### 1. Motion for Reconsideration

Under Rule 54 of the Federal Rules of Civil Procedure, the Court has the inherent power to reconsider any of its decisions prior to the entry of a final judgment adjudicating all claims at issue. Fed. R. Civ. P. 54(b). A motion for reconsideration is "an extraordinary remedy to be employed sparingly in the interests of finality." Drapkin v. Mafco Consol. Grp., Inc., 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011). Reconsideration is warranted where there is an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." DiLaura v. Power Auth. of New York, 982 F.2d 73, 76 (2d Cir. 1992). The decision as to whether to grant a motion for reconsideration lies squarely within the court's discretion. Analytical Survs., Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

### 2. Copyright Infringement

4

To establish a claim of copyright infringement, "a
plaintiff with a valid copyright must demonstrate that: (1) the
defendant has actually copied the plaintiff's work; and (2) the
copying is illegal because a substantial similarity exists
between the defendant's work and the protectable elements of
plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev.
Corp., 602 F.3d 57, 63 (2d Cir. 2010).  The Court can decide as
a matter of law that there is no substantial similarity between
the works because "the similarity between two works concerns
only non-copyrightable elements of the plaintiff's work." Warner
Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983).

The test for substantial similarity in music infringement
cases is whether a plaintiff can prove that "defendant took from
plaintiff's works so much of what is pleasing to the ears of lay
listeners, who comprise the audience for whom such . . . music
is composed, that defendant wrongfully appropriated something
which belongs to the plaintiff." Repp v. Webber, 132 F.3d 882,
889 (2d Cir. 1997) (alteration in original). When, as here, the
song's aesthetic appeal is due largely to unprotectable
elements, the Court's analysis of substantial similarity "must
be more discerning, and ignore those aspects of a work that are
unprotectable ... lest [courts] conflate mere copying with
wrongful copying." Zalewski v. Cicero Builder Dev., Inc., 754
F.3d 95, 102 (2d Cir. 2014).

5

In doing so, the Court is not required to "compare only those elements which are themselves copyrightable." Peter F. Gaito Architecture, LLC, 602 F.3d at 66. Instead, the court is "'principally guided by comparing the contested work's total concept and overall feel with that of the allegedly infringed work.'" Nwosuocha v. Glover, No. 21 CIV. 04047, 2023 WL 2632158, at *4 (S.D.N.Y. Mar. 24, 2023) (quoting Peter F. Gaito Architecture, LLC, 602 F.3d at 66). "This is so because 'the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of unprotectible components—are considered in relation to one another.'" Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (quoting Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003)); see also McDonald v. West, 138 F. Supp. 3d 448, 456 (S.D.N.Y. 2015), aff'd, 669 F. App'x 59 (2d Cir. 2016) (same). "[W]here a work relies on the compilation or arrangement of unprotectible elements, it is only eligible for copyright protection 'if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.'" Threeline Imports, Inc. v. Vernikov, No. 15 Civ. 02333, 2016 WL 11472749, at *13

**SPA43**

(E.D.N.Y. Oct. 28, 2016) (quoting <u>Satava v. Lowry</u>, 323 F.3d 805, 811 (9th Cir. 2003)).

**Analysis**

**1. Reconsideration is Warranted**

Defendants argue that reconsideration is proper to avoid clear error because the Court overlooked the numerosity requirement for selection and arrangement claims of infringement. Dkt. No. 213 at 5. SAS responds that defendants have not identified any controlling decisions that the Court has overlooked or any intervening change of controlling law. Dkt. No. 214 at 1.

The Court denied Defendant's Renewed Motion for Summary Judgment, in part, because its sister action <u>Griffin v. Sheeran</u>, which arose from the same nucleus of facts and asserted the same claim of infringement, was proceeding to trial. Summary Judgment dismissing the claim was denied in <u>Griffin</u> in January 2019. <u>Griffin v. Sheeran</u>, 351 F. Supp. 3d 492, 494 (S.D.N.Y. 2019). Afterward, the Ninth Circuit decided <u>Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin</u>, 952 F.3d 1051, 1064 (9th Cir. 2020), which is one of the clearest articulations of how copyright law applies to musical compositions. This Court has already adopted and applied to this case one holding of <u>Skidmore</u>: that the scope of copyright protection only extends to the Deposit Copy, here the sheet music of "Let's Get It On."

7

**SPA44**

Skidmore also expressly laid out a numerosity requirement for selection and arrangement copyright claims holding that protection applies to "a combination of unprotectable elements ... only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Id. at 1074.

The numerosity requirement has been alluded to, but not strictly followed, in the Second Circuit. Compare Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (finding infringement when "numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] ...—are considered in relation to one another") with Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1004 (2d Cir. 1995) ("What is protectible then is the author's original contributions, the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work."). There have been few opportunities to apply the principle of numerosity to musical compositions. In its Order denying Summary Judgment dismissing the claim, this Court declined to grapple with whether a numerosity requirement should be imposed and instead found that there is no bright-line rule requiring it. Dkt. No. 211.

Since then, courts in this Circuit have started to weigh the numerosity of the elements when deciding whether their

8

combination should be protected. In Nwosuocha v. Glover, 21 Civ.
04047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023), the Court
implied a high threshold for numerosity when it found that a
combination of eight unprotected musical elements was
"categorically ineligible for copyright protection." Id. at *7.
Having previously disdained the issue of numerosity, the Court
finds that it improperly disregarded it in denying defendants'
motion to dismiss without weighing whether and how to apply the
requirement.

   2. **Defendants' Renewed Motion for Summary Judgment is Granted**

   SAS alleges that the combination of the chord progression
and the harmonic rhythm used in "Thinking Out Loud" is
substantially similar to that in "Let's Get It On," and thus
infringes the work. SAS acknowledges, and the Court concurs,
that the chord progression and harmonic rhythm, in isolation,
are not individually protected. The question then is whether two
common elements are numerous enough to make their combination
eligible for copyright protection.

   Unprotected musical elements might be so selected and
arranged that they form a whole whose patterns and effects are
protectable. See Tufenkian Imp./Exp. Ventures, Inc. v. Einstein
Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003). The scope of
that protection is limited to the particular way in which the
unprotected elements form the coherent pattern or design and

does not extend to the underlying elements themselves. See id.
at 136. Thus, a protectable mosaic may be formed from
unprotected chips, but it needs a number of them: not one or
two. Otherwise, the arrangement is devoid of any contribution
from the author. It is nothing more than an impermissible
attempt to copyright what is already in the public domain and
capture what is freely available to all to use. Deciphering what
constitutes a protectable, original selection and arrangement
from a combination of unprotected properties has long vexed the
courts.

The numerosity requirement springs from the nature of that
postulate. Requiring numerous unprotected elements to be present
before determining whether their selection and arrangement is
protectable reinforces the constitutional requisite that a
copyrighted work, or piece of a work, be original enough to
warrant protection. See Peter F. Gaito Architecture, LLC, 602
F.3d at 66.  That is "the sine qua non of copyright." Feist
Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346
(1991). The selection and arrangement of unprotected musical
elements "cannot be so mechanical or routine as to require no
creativity whatsoever." Id. at 358. Requiring numerous elements
prevents the misapplication of copyright law and ensures it is
not being used to protect combinations that occur routinely

**SPA47**

without any minimal creative contribution attributable to the author.

Numerous means "many; great in number." Numerous, Oxford English Dictionary (3d. ed. 2003). There is no bright-line rule dictating the threshold over which a specific number of unprotectable elements in a work must pass to become sufficiently numerous to protect the aesthetic decision to select and arrange them in an original way. Nonetheless, common sense dictates that in the context of a musical composition, "numerous" requires more than just a commonplace chord progression and harmonic rhythm to warrant protecting their combination.[3] See Nwosuocha v. Glover, 21 Civ. 04047, 2023 WL 2632158, at *7 (S.D.N.Y. Mar. 24, 2023) (holding that the eight musical elements in plaintiff's song "lack sufficient originality alone, or as combined, to merit compositional copyright protection or are categorically ineligible for copyright protection"). To protect an arrangement with few parts may be to read the numerosity requirement out of the law. That is especially true here where the chord progression and the

_____

[3] Outside of the musical context, the "combination of two unprotectable elements" has been found to be "not sufficiently numerous or original to constitute original work entitled to copyright protection." Beyond Blond Prods., LLC v. Heldman, 479 F. Supp. 3d 874, 883 (C.D. Cal. 2020), aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022).

harmonic rhythm (how the chord progression is played) in "Let's Get It On" do not form a pattern, but instead essentially merge into one element.

This Court is not aware of any case upholding a selection and arrangement claim based on the combination of two commonplace, unprotectable musical elements. Courts often evaluate combinations of at least three common musical elements and still find their selection and arrangement to be unoriginal. See Gray v. Hudson, 28 F.4th 87, 102 (9th Cir. 2022) ("This combination is unoriginal because it is really nothing more than a two-note snippet of a descending minor scale, with some notes repeated."); Peters v. West, 776 F. Supp. 2d 742, 751 (N.D. Ill. 2011), aff'd, 692 F.3d 629 (7th Cir. 2012) (holding the combination of three unprotected elements is not protectable); Cottrill v. Spears, No. 02-3646, 2003 WL 21223846, at *9 (E.D. Pa. May 22, 2003), aff'd, 87 F. App'x 803 (3d Cir. 2004), as amended on reh'g (June 2, 2004) (holding four commonplace musical elements are not numerous enough to warrant protection). In Satava, a case not about music but about glass jellyfish sculptures, the court dismissed a selection and arrangement claim of infringement because the combination of six commonplace elements "lacks the quantum of originality needed to merit copyright protection." Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003).

**SPA49**

At some level, every work is the selection and arrangement of unprotectable elements. Musical compositions chiefly adhere to this template. All songs, after all, are made up of the "limited number of notes and chords available to composers." Gaste v. Kaiserman, 863 F.2d 1061, 1068 (2d Cir. 1988). Within that limited number, there are even fewer ways to combine the elements in a manner that is pleasing to the ears. That means a songwriter only has finite options for playing a commonplace chord progression. The options are so few that many combinations have themselves become commonplace, especially in popular music. If the selection and arrangement of unprotectable elements, in their combination, is "so commonplace that it has come to be expected as a matter of course," then it lacks the "minimal creative spark required by the Copyright Act and the Constitution" to be original and thus protectable. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 363 (1991).

It is an unassailable reality that the chord progression and harmonic rhythm in "Let's Get It On" are so commonplace, in isolation and in combination, that to protect their combination would give "Let's Get It On" an impermissible monopoly over a basic musical building block. "Let's Get It On's" chord progression was used at least twenty-nine times before appearing in "Let's Get It On" and was in another twenty-three songs

13

before "Thinking Out Loud" was released. See Dkt. No. 179 Ex. 2

("Defendants' Expert's Report") at Visual Exhibit H. It is so

ubiquitous that it has been taught for many years (the issue of

this publication in the exhibit was dated as 2000) as a popular

chord progression in introductory books on how to play guitar

and piano. See id. at ¶¶ 34-36 (citing Money Chords: A

Songwriter's Sourcebook of Popular Chord Progressions and Guitar

for Advanced Beginners). The harmonic rhythm was used in at

least eight other songs before "Let's Get It On" and in another

fifteen before the release of "Thinking Out Loud." Dkt. No. 179

Ex. 9 ("Defendants' Expert's Report") at 9-10. It is so common

that Mr. Sheeran himself used it, or a similar version, in at

least twenty additional songs he wrote before writing "Thinking

Out Loud." Dkt. No. 179 Ex. 2 at Visual Exhibit I.

    The combination is commonplace. Amy Wadge, who co-wrote

"Thinking Out Loud," used a nearly identical combination in one

of her prior songs, "Better Than Me." Id. at ¶ 63 (the only

difference between "Thinking Out Loud" and this prior work by

Wadge is that the prior work also happens to anticipate the

third chord change). Defendants' experts also identified,

undisputed by SAS's expert,[4] at least four songs that were

_____

[4] SAS's expert, Dr. Covach, did not dispute that the songs used
the same combination of elements. Rather, he argued that other,
potentially more popular, versions of the songs did not use the
combination. Dkt. No. 200 Ex. 9 ¶¶ 10-13.

14

released prior to "Let's Get It On" that used virtually the same combination. Id. at ¶¶ 43-46, 56-60; 107 (discussing examples of prior art, including the songs "Georgy Girl," "Since I Lost My Baby," "Downtown," and "Get Off Of My Cloud"); Dkt. No. 179 Ex. 20 ("Defendants' Expert's Rebuttal Report") ¶¶ 26-38. The combination has also been used in songs that were released after "Let's Get It On" but before "Thinking Out Loud." Dkt. No. 179 Ex. 2 ¶ 4 (discussing "I've Got Love On My Mind"); Id. Ex. 9 at 38 (discussing "Do It To Me"). While the appearance of the combination in other songs has no bearing on whether it is original in "Let's Get It On," it does illustrate how multiple songwriters have combined the two commonplace elements in the same manner for years.

The selection and arrangement of these two musical elements in "Let's Get It On" is now commonplace and thus their combination is unprotectable. If their combination were protected and not freely available to songwriters, the goal of copyright law "[t]o promote the Progress of Science and useful Arts" would be thwarted. U.S. Const. art. I § 8. The Copyright Act envisioned that there will be unprotectable elements-based works "in which the selection, coordination, and arrangement are not sufficiently original to trigger copyright protection." Feist Publications, Inc., 499 U.S. at 358.

15

As a matter of law, the combination of the chord progression and harmonic rhythm in "Let's Get It On" is too commonplace to merit copyright protection.

### Conclusion

To prevent manifest injustice, defendants' Motion for Reconsideration is granted. Dkt. No. 212. There is no genuine issue of material fact as to whether defendants infringed the protected elements of "Let's Get It On." The answer is that they did not. Accordingly, their Motion for Summary Judgment is granted. The Complaint is dismissed with prejudice.

Plaintiff's renewed cross-motion for Summary Judgment is denied.

The Clerk of the Court is directed to close the case.

So Ordered.

Dated:  New York, New York
        May 16, 2023

_____
LOUIS L. STANTON
U.S.D.J.

**SPA53**

ORIGINAL

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC
DATE FILED:   5/17/23
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X
STRUCTURED ASSET SALES, LLC,

          Plaintiff,

  - against -

EDWARD CHRISTOPHER SHEERAN, p/k/a
ED SHEERAN, SONY/ATV MUSIC
PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION d/b/a ATLANTIC RECORDS,
BDI MUSIC LTD., BUCKS MUSIC GROUP LTD.,
THE ROYALTY NETWORK, INC., DAVID
PLATZ MUSIC (USA) INC., AMY WADGE,
JAKE GOSLING and DOES 1 THROUGH 10,

          Defendants.
- - - - - - - - - - - - - - - X

18 Civ. 5839 (LLS)

CLERK'S JUDGMENT

    It is hereby **ORDERED, ADJUDGED AND DECREED**:  That for the
reasons stated in the Court's Opinion and Order dated May 16,
2023, defendants' Motion for Reconsideration is granted.  Their
Motion for Summary Judgment is granted. The Complaint is
dismissed with prejudice. Plaintiff's renewed cross-motion for
Summary Judgment is denied and the case is closed.

**Dated:**  New York, New York
       May 17, 2023

                        **RUBY J. KRAJICK**

                            **Clerk of Court**

          **BY:**

                            **Deputy Clerk**