# 23-0905-cv

## United States Court of Appeals
### *for the*
### Second Circuit

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

— v. —

EDWARD CHRISTOPHER SHEERAN, personally known as Ed Sheeran, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA Atlantic Records, BDi MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD. UK, ATLANTIC RECORDS UK, BDi MUSIC, BUCKS MUSIC GROUP, WARNER MUSIC GROUP CORPORATION, DBA Asylum Records, WARNER MUSIC GROUP, LTD UK, DOES 1-10,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## DEFENDANTS-APPELLEES' OPPOSITION TO MOTION FOR LEAVE TO FILE *AMICUS* BRIEF

DONALD S. ZAKARIN
ILENE S. FARKAS
ANDREW M. GOLDSMITH
BRIAN M. MAIDA
PRYOR CASHMAN LLP
*Attorneys for Defendants-Appellees*
Seven Times Square, 40th Floor
New York, New York 10036
(212) 421-4100

CP COUNSEL PRESS    (800) 4-APPEAL • (324715)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

1.     Defendant-Appellee Sony/ATV Music Publishing LLC n/k/a Sony Music Publishing (US) LLC ("SATV") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  SATV is a wholly-owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan.

2.     Defendant-Appellee Atlantic Recording Corporation d/b/a Atlantic Records ("Atlantic") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  Atlantic is a wholly-owned, indirect subsidiary of Warner Music Group Corp. ("WMG"), a Delaware corporation; WMG is a publicly traded company with more than 10% of its stock owned by AI Entertainment Holdings LLC and certain affiliates, which are not publicly traded companies.

3.     Defendant-Appellee Bucks Music Group Ltd. ("Bucks") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  a private individual owns 100% of the stock of Bucks; no public company owns any portion of Bucks.

4.     Defendant-Appellee BDi Music Ltd. ("BDi") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as

follows: Bucks and a private individual (distinct from the one alluded to in paragraph 3 above) each own more than 10% of the stock of BDi; a private individual owns 100% of the stock of Bucks; no public company owns any portion of BDi or Bucks.

5. Defendant-Appellee David Platz Music (USA) Inc. ("DPMI") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows: Bucks owns 100% of the stock of DPMI; a private individual owns 100% of the stock of Bucks; no public company owns any portion of DPMI or Bucks.

6. Defendant-Appellee The Royalty Network, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ......................................................................... ii

  I.  THE MOTION SHOULD BE DENIED BECAUSE
     THE PROPOSED AMICUS BRIEF IS NOT DESIRABLE ............................1

CONCLUSION .......................................................................................11

i

# TABLE OF AUTHORITIES

## CASES                                                    PAGE(s)

*Batjac Prods. Inc. v. GoodTimes Home Video Corp.*,
　160 F.3d 1223 (9th Cir. 1998) ...............................................................6

*Caliga v. Inter Ocean Newspaper Co.*,
　215 U.S. 182 (1909)...............................................................................6

*Fox Film Corp. v. Doyal*,
　286 U.S. 123 (1932)...............................................................................6

*Goldstein v. California*,
　412 U.S. 546 (1973)...............................................................................5

*La Cienega Music Co. v. ZZ Top*,
　53 F.3d 950 (9th Cir. 1995) ...................................................................4

*Michael Skidmore, As Trustee For The Randy Craig Wolfe Trust v.
　Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), *cert. denied* 141 S.
　Ct. 153 (Oct. 5, 2020), *reh'g denied*, 141 S. Ct. 946 (Dec. 7, 2020) ...................3

*Parker v. Hinton*,
　No. 22-5348, 2023 WL 370910 (6th Cir. Jan. 24, 2023) ....................................3

*Rosette v. Rainbo Record Mfg. Corp.*,
　546 F.2d 461 (2d Cir. 1976) ...................................................................8

*Roy Export Co. Estab. of Vaduz v. Columbia Broad. Sys.*,
　672 F.2d 1095 (2d Cir. 1982) ...........................................................3, 4

*Shoptalk, Ltd. v. Concorde-New Horizons Corp.*,
　168 F.3d 586 (2d Cir. 1999) (2d Cir. 1999) ................................................4, 6, 7

*Societe Civile Succession Guino v. Renoir*,
　549 F.3d 1182 (9th Cir. 2008) ...............................................................4

*Wheaton v. Peters*,
　33 U.S. 591 (1834)...............................................................................6, 7

*White-Smith Music Publ'g Co. v. Apollo Co.*,
　209 U.S. 1 (1908)...............................................................................6

## STATUTES AND RULES

17 U.S.C. § 2 (1947) ...................................................................................6

17 U.S.C. § 4 (1947) ................................................................................4, 5

17 U.S.C. § 10 (1947) .................................................................................7

17 U.S.C. § 13 (1956) ..............................................................................7, 8

17 U.S.C. § 20 (1971) .................................................................................7

17 U.S.C. § 101 (1976) ...............................................................................8

17 U.S.C. § 102(a) (1976) ...........................................................................5

17 U.S.C. § 301 (1976) ...............................................................................4

17 U.S.C. § 303(b) (1997) ...........................................................................8

Cal. Civ. Code § 980 ...................................................................................5

FRAP 29(a)(3)(B) .......................................................................................1

## TREATISE

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.02[B] (2023).....................5

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.05[A] (2017).....................3

## CONSTITUTION

U.S. Const. Art. I, § 8..................................................................................5

## LEGISLATIVE HISTORY

House Report on the Copyright Act of 1909, 60th Congress, 2d
    Session ..................................................................................................6

iii

Defendants-Appellees Edward Christopher Sheeran, Sony/ATV Music Publishing LLC (n/k/a Sony Music Publishing (US) LLC), Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., David Platz Music (USA) Inc., Amy Wadge and Jake Gosling (collectively, "Appellees") respectfully oppose the motion of Randy Craig Wolfe Trust (the "Trust") and Sound And Color, LLC ("S&C," together with the Trust, the "Movants") for leave to file an *amicus curiae* brief (the "Motion").

## I. THE MOTION SHOULD BE DENIED BECAUSE THE PROPOSED AMICUS BRIEF IS NOT DESIRABLE

Appellees are mindful that leave to file an amicus brief is commonly permitted. Here, however, the Movants are ill-suited to submit an amicus brief and cannot satisfy the requirement of demonstrating, among other things, "the reason why an amicus brief is desirable." FRAP 29(a)(3)(B).

First, as discussed more fully below, the Trust already has had more than a full and fair opportunity to have its arguments heard. Represented by the same counsel that filed the Motion, the Trust advanced these very same arguments to the Ninth Circuit in *Michael Skidmore, As Trustee For The Randy Craig Wolfe Trust v. Led Zeppelin, et al.*, No. 16-56057 (9th Cir.). (*See* Exhibit 1 to the Declaration of Donald S. Zakarin dated October 16, 2023 ("Zakarin Decl.") at 20, 30-36; *id.* at Exhibit 2 at 13, 16, 17-18). The Trust then sought certiorari, which the United States Supreme Court rejected, and the Supreme Court denied the Trust's subsequent

1

petition for rehearing.  *See* 141 S. Ct. 453 (2020);141 S. Ct. 946 (2020).[1]

Movants are seeking the status of amici in order to present an objectively false argument to this Court, one that has been fully aired and rejected, which confirms that the proposed amicus brief is not "desirable."

In an attempt to establish desirability, Movants contend their "amicus brief is desirable because it explains the history of copyright law and the 1909 Act, as well as history of the 1976 Act … ."  (Motion at 4).  Yet, just as the Trust misrepresented the law to the Ninth Circuit and the Supreme Court, so too does it misrepresent the law here in its Motion and proposed amicus brief.

Specifically, Movants falsely contend that "[t]he common law protected works from the moment they were created as they were created," and that "authors could then federally register the works meaning that the works received <u>additional</u> federal protections under the 1909 Act."  (Motion at 2; emphasis added).[2]  The defendants in *Skidmore* and the United States Department of Justice, on behalf of the Copyright Office, as *amicus curiae*, submitted briefs conclusively refuting the Trust's invented claims regarding common law copyright.  (*See Skidmore* Appellate

---

[1] Plaintiff-Appellant Structured Asset Sales, LLC ("SAS") also had a full opportunity to air its equally unfounded "deposit copy" arguments in that case, as it filed amicus briefs with both the Ninth Circuit and Supreme Court.  (*See* Zakarin Decl. ¶ 6).

[2] SAS offers this same falsehood in its opening brief.  (SAS Br. at 15 n.6).

ECF 29 at 41, Appellate ECF 155 at 14-16 and Appellate ECF 129 at 17-18).[3]

Consistent with the position of the Copyright Office, the plain text of the 1909 Act and the Compendium of U.S. Copyright Office Practices, the Ninth Circuit, *en banc*, held that "to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form." *Michael Skidmore, As Trustee For The Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1062 (9th Cir. 2020) (quoting 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.05[A] (2017)). The Court of Appeals ruled that "under the 1909 Act … the [ ] deposit copy" – corresponding to a visibly perceptible writing, *i.e.*, sheet music – "circumscribes the scope of the copyright." *Id.* at 1063-64; *see also Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023) (endorsing *Skidmore*'s ruling regarding scope of copyright under 1909 Act) (unpublished).

To be clear, the Trust's assertion that the 1909 Act provided "additional protections to common law copyrights once they were published or federally registered" (Proposed Brief at 8), is flatly false. It has long been well-settled that upon securing copyright under the 1909 Act, any preexisting common law rights were <u>extinguished</u>. *See Roy Export Co. Estab. of Vaduz v. Columbia Broad. Sys.*, 672 F.2d 1095, 1101 (2d Cir. 1982) (assessing work copyrighted under 1909 Act

---

[3] To avoid inundating the Court with paper, Appellees have not filed copies of these Briefs, but they can provide them upon request of the Court.

and explaining that "State law protection begins with a work's creation and continues until the work is 'published,' at which point state protection is <u>lost</u>") (emphasis added); *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999) ("the securing of a statutory copyright [under the 1909 Act], either by general publication with a proper notice or by registration of the work, <u>ended</u> the common-law protection") (2d Cir. 1999) (citations omitted; emphasis added); *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1185-86 (9th Cir. 2008) ("When a work was published [under the 1909 Act], it <u>lost</u> common law protection") (citation omitted; emphasis added); *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950, 952 (9th Cir. 1995) (explaining that, under the 1909 Act, a copyright owner could "obtain federal protection for the <u>published</u> work" – not some amorphous common law copyright that could exist entirely in the mind of the author) (citing *Roy Export Co.*, 672 F.2d at 1101; emphasis added).[4]

Moreover, the Constitutional requirement that a work be in "writing" (restated in Section 4 of the 1909 Act, 17 U.S.C. § 4 (1947)) and the fixation requirement set forth in Section 102(a) of the 1976 Act are <u>not</u> "applicable to common law copyright."

---

[4] The 1976 Copyright Act codified this established law in Section 301, which, as of January 1, 1978, provided for preemption of all state laws providing legal or equitable rights equivalent to the rights provided under the Copyright Act. *See* 17 U.S.C. § 301 (1976).

Nimmer § 2.02[B][1].[5]  For example, under California law, common law copyright protection extends to bare ideas, "not fixed in any tangible medium of expression." *See* Cal. Civ. Code § 980 (emphasis added).  Thus, to accept the argument that securing federal copyright merely continued preexisting common law protections would impermissibly allow for federal protection to extend to works that have not been "fixed" in a tangible medium in contravention of the 1976 Act (17 U.S.C. § 102(a)) and to works that have never been reduced to writing in contravention of the intellectual property clause of the Constitution (U.S. Const. art. I, § 8) and Section 4 of the 1909 Act.  17 U.S.C. § 4 (1947).[6]

Further reinforcing the speciousness of Movants' assertion is the fact that "most" "States [did] not" even "grant copyright protection," and "a copyright granted by a particular State has effect only within its boundaries."  *Goldstein v.*

---

[5] In addition to various textual amendments, the section numbers to the 1909 Act, as originally enacted, changed, often by one section number after its 1947 codification (*e.g.*, Section 9 became Section 10).  Unless otherwise noted, all references to the 1909 Act correspond to the codified and amended version in effect in 1973 when the proprietors of the copyrighted work at issue first published written sheet music of the work and deposited "complete copies" of that sheet music with the Copyright Office.  The dates in parentheses that follow each statute section of the 1909 Act correspond to the date of the most recent amendment to such section prior to 1973.  A copy of the 1909 Act, as amended and revised through January 1, 1973, is included in the Addendum to this Opposition and also available at: https://www.copyright.gov/history/1909act-1973.pdf.

[6] To avoid doubt, the meaning of "writings" is broader under the Constitution than it was under the 1909 Act. *See Goldstein v. California*, 412 U.S. 546, 567-68 (1973).  Until amendments passed in 1971, the meaning of "writings" under the 1909 Act did not embrace sound recordings, piano rolls or other phonorecords.  *Id.*

*California*, 412 U.S. 546, 558 (1973).[7]

Even prior to the 1909 Act, the Supreme Court recognized, "it is perfectly well settled that the protection given to copyrights in this country is wholly statutory." *White-Smith Music Publ'g Co. v. Apollo Co.*, 209 U.S. 1, 15 (1908) (citations omitted); *accord Wheaton v. Peters*, 33 U.S. 591, 663-64 (1834) ("This right [in copyright] … does not exist at common law – it originated, if at all, under the acts of congress"); The House Report on the Copyright Act of 1909, 60th Congress, 2d Session, Report No. 2222 (February 1909) ("The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings, for the Supreme Court has held that such rights as he has are purely statutory rights … .").[8]

In enacting the federal copyright laws, "Congress did not sanction an existing right but <u>created a new one</u>." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) (emphasis added); *accord Caliga v. Inter Ocean Newspaper Co.*, 215 U.S. 182, 188

---

[7] Section 2 of the 1909 Act (17 U.S.C. § 2 (1947)), which Movants misleadingly paraphrase (Proposed Brief at 14 n.4), merely clarifies that the 1909 Act did not "annul" rights already existing at common law. As this Court has recognized, Section 2 of the 1909 Act did not address common law copyrights at all (but only "the right of the author or proprietor of an unpublished work, at common law or in equity"), and "the 1909 Act itself appeared clearly to use the term 'copyright' only when it was referring to the statutory copyright." *Shoptalk*, 168 F.3d at 591; *accord Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1235-36 (9th Cir. 1998) (finding author's act of publication without required notices resulted in forfeiture of copyright under 1909 Act, and that Section 2 of the 1909 Act does not act "as a talisman to protect common law copyrights in this situation").

[8] A copy of the 1909 House Report is available at: https://tinyurl.com/4ped2a6w.

(1909) ("The [copyright] statute created a <u>new</u> property right … This statutory right is obtained in a certain way and by the performance of certain acts which the statute points out.  That is, the author, having complied with the statute, and <u>given up his common-law right</u> of exclusive duplication prior to general publication, obtained by the method pointed out in the statute an exclusive right to multiply copies and publish the same for the term of years named in the statute") (citing *Wheaton*, 33 U.S. at 663-64; emphasis added).

In accordance with Section 10 of the 1909 Act, SAS's predecessor-in-interest "secure[d]" – and thus created – "copyright" for the musical composition at issue by "publication thereof with the notice of copyright required by this title" (17 U.S.C. § 10 (1947)), which notice was required to "be applied, in the case of … a musical work either upon its title page or the first page of music."  17 U.S.C. § 20 (1971). Under Section 13 of the 1909 Act, proprietors of musical compositions then were required to register the work and deposit with the Copyright Office "two complete copies" of the "best edition" of the sheet music then published.  17 U.S.C. § 13 (1956).

As this Court has recognized, "the 'copyright' that [Sections 10 and 13] referred to as being 'secured' by publication could <u>not</u> refer to the common law right," and it would be "nonsensical[]" to conclude otherwise.  *Shoptalk*, 168 F.3d at 592 (emphasis added).

7

Prior to the effective date of the 1976 Copyright Act (January 1, 1978), the only way an author of a musical composition could "publish" the work with notice was through sheet music or in another written, printed format. The distribution of phonorecords did not publish the underlying musical composition: "[t]he distribution before January 1, 1978, of a phonorecord shall <u>not</u> for any purpose constitute a publication of any musical work, dramatic work, or literary work embodied therein." 17 U.S.C. § 303(b) (1997);[9] *see also Rosette v. Rainbo Record Mfg. Corp.*, 546 F.2d 461, 463 (2d Cir. 1976).

In this case, the owners of the musical composition *Let's Get It On* – which, at the time, included one of the authors, Ed Townsend (or his publishing company) – published copies of written sheet music with the required copyright notice on the "first page of music," registered the copyright and, in accordance with Section 13 of the 1909 Act, deposited with the Copyright Office "two <u>complete copies</u> of the <u>best edition thereof then published</u>." 17 U.S.C. § 13 (1956) (emphasis added). That published sheet music – the deposit copy – <u>is</u> the copyrighted work.

---

[9] The 1976 Act excludes "phonorecords" from the definition of "copies" and defines "phonorecords" to mean "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101 (1976).

Seeking the status of amici in order to present an objectively false argument to this Court confirms that the proposed amicus brief is not "desirable." The Motion should be denied because the central thesis of the brief is based on an argument that one of these Movants already fully aired before both the Ninth Circuit and the Supreme Court, and that argument, based on a false premise, has been soundly and correctly rejected.[10]

## **CONCLUSION**

For the foregoing reasons, Appellees respectfully submit that the Motion should be denied.

Dated:     New York, New York
           October 13, 2023

                         PRYOR CASHMAN LLP

                         By:*/s/ Donald S. Zakarin*
                            Donald S. Zakarin
                            dzakarin@pryorcashman.com
                            Ilene S. Farkas
                            ifarkas@pryorcashman.com
                            Andrew M. Goldsmith
                            agoldsmith@pryorcashman.com
                            Brian M. Maida
                            bmaida@pryorcashman.com
                         7 Times Square
                         New York, New York 10036-6569
                         Telephone:  (212) 421-4100
                         Facsimile:   (212) 326-0806

                         *Attorneys for Defendants-Appellees*

---

[10] Movants' collateral arguments are equally baseless.

9

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing memorandum of law complies with FRAP 27 and Local Rule 27, because it contains 1,733 words. In preparing this certification, I have relied on the word processing software used to prepare this document.

*/s/ Donald S. Zakarin*
Donald S. Zakarin

# ADDENDUM

# Copyright Law

## OF THE UNITED STATES OF AMERICA

### *United States Code*

### Title 17—Copyrights

(Revised to January 1, 1973)

| Chap. | | Sec. |
|---|---|---|
| 1. Registration of copyrights | | 1 |
| 2. Infringement proceedings | | 101 |
| 3. Copyright Office | | 201 |

## Chapter 1—Registration of Copyrights

§ 1. Exclusive rights as to copyrighted works.

§ 2. Rights of author or proprietor of unpublished work.

§ 3. Protection of component parts of work copyrighted; composite works or periodicals.

§ 4. All writings of author included.

§ 5. Classification of works for registration.

§ 6. Registration of prints and labels.

§ 7. Copyright on compilations of works in public domain or of copyrighted works; subsisting copyrights not affected.

§ 8. Copyright not to subsist in works in public domain, or published prior to July 1, 1909, and not already copyrighted, or Government publications; publication by Government of copyrighted material.

§ 9. Authors or proprietors, entitled; aliens.

§ 10. Publication of work with notice.

§ 11. Registration of claim and issuance of certificate.

§ 12. Works not reproduced for sale.

§ 13. Deposit of copies after publication; action or proceeding for infringement.

§ 14. Same; failure to deposit; demand; penalty.

§ 15. Same; postmaster's receipt; transmission by mail without cost.

§ 16. Mechanical work to be done in United States.

§ 17. Affidavit to accompany copies.

§ 18. Making false affidavit.

§ 19. Notice; form.

1

§ 20. Same; place of application of; one notice in each volume or number of newspaper or periodical.
§ 21. Same; effect of accidental omission from copy or copies.
§ 22. Ad interim protection of book or periodical published abroad.
§ 23. Same; extension to full term.
§ 24. Duration; renewal and extension.
§ 25. Renewal of copyrights registered in Patent Office under repealed law.
§ 26. Terms defined.
§ 27. Copyright distinct from property in object copyrighted; effect of sale of object, and of assignment of copyright.
§ 28. Assignments and bequests.
§ 29. Same; executed in foreign country; acknowledgment and certificate.
§ 30. Same; record.
§ 31. Same; certificate of record.
§ 32. Same; use of name of assignee in notice.

§ 1. EXCLUSIVE RIGHTS AS TO COPYRIGHTED WORKS.—Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

(a) To print, reprint, publish, copy, and vend the copyrighted work;

(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and

(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

Case 23-905, Document 58, 10/13/2023, 3581210, Page20 of 221

(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: *Provided*, That the provisions of this title, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after July 1, 1909, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights. And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the 20th day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the 20th of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit. It shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.

In case of failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand, the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court may, in its discretion, enter judgment therein for any sum

in addition over the amount found to be due as royalty in accordance with the terms of this title, not exceeding three times such amount.

The reproduction or rendition of a musical composition by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs.

(f) [1] To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording: *Provided*, That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording: *Provided further*, That this right does **not extend to the making** or duplication of another sound recording **that is an independent fixation** of other sounds, even though such **sounds imitate** or simulate those in the copyrighted sound recording; **or to reproductions** made by transmitting organizations exclusively for **their own use.**

§ 2. RIGHTS OF AUTHOR OR PROPRIETOR OF UNPUBLISHED WORK.— Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor.

§ 3. PROTECTION OF COMPONENT PARTS OF WORK COPYRIGHTED; COMPOSITE WORKS OR PERIODICALS.—The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title.

§ 4. ALL WRITINGS OF AUTHOR INCLUDED.—The works for which copyright may be secured under this title shall include all the writings of an author.

§ 5. CLASSIFICATION OF WORKS FOR REGISTRATION.—The application for registration shall specify to which of the following classes the work in which copyright is claimed belongs:

---

[1] Section 1(f) was added by the Act of October 15, 1971, Pub. L. 92-140, 85 Stat. 391. This act also added section 5(n), added a sentence at the end of section 19, amended the first sentence of section 20, and added three sentences at the end of section 26. The Act specified that the provisions cited in this footnote shall take effect four months after its enactment, that these provisions "shall apply only to sound recordings fixed, published, and copyrighted on and after the effective date of this Act and before January 1, 1975," and that nothing in title 17, United States Code, as amended by these provisions "shall be applied retrospectively or be construed as affecting in any way rights with respect to sound recordings fixed before the effective date of this Act."

(a) Books, including composite and cyclopedic works, directories, gazetteers, and other compilations.

(b) Periodicals, including newspapers.

(c) Lectures, sermons, addresses (prepared for oral delivery).

(d) Dramatic or dramatico-musical compositions.

(e) Musical compositions.

(f) Maps.

(g) Works of art; models or designs for works of art.

(h) Reproductions of a work of art.

(i) Drawings or plastic works of a scientific or technical character.

(j) Photographs.

(k) Prints and pictorial illustrations including prints or labels used for articles of merchandise.

(l) Motion-picture photoplays.

(m) Motion pictures other than photoplays.

(n)[1] Sound recordings.

The above specifications shall not be held to limit the subject matter of copyright as defined in section 4 of this title, nor shall any error in classification invalidate or impair the copyright protection secured under this title.

§ 6. REGISTRATION OF PRINTS AND LABELS.—Commencing July 1, 1940, the Register of Copyrights is charged with the registration of claims to copyright properly presented, in all prints and labels published in connection with the sale or advertisement of articles of merchandise, including all claims to copyright in prints and labels pending in the Patent Office and uncleared at the close of business June 30, 1940. There shall be paid for registering a claim of copyright in any such print or label not a trade-mark $6, which sum shall cover the expense of furnishing a certificate of such registration, under the seal of the Copyright Office, to the claimant of copyright.

§ 7. COPYRIGHT ON COMPILATIONS OF WORKS IN PUBLIC DOMAIN OR OF COPYRIGHTED WORKS; SUBSISTING COPYRIGHTS NOT AFFECTED.— Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon

---

[1] Section 5(n) was added by the Act of October 15, 1971, Pub. L. 92-140, 85 Stat. 391. See footnote 1, page 4, supra.

the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

§ 8. COPYRIGHT NOT TO SUBSIST IN WORKS IN PUBLIC DOMAIN, OR PUBLISHED PRIOR TO JULY 1, 1909, AND NOT ALREADY COPYRIGHTED, OR GOVERNMENT PUBLICATIONS; PUBLICATION BY GOVERNMENT OF COPYRIGHTED MATERIAL.—No copyright shall subsist in the original text of any work which is in the public domain, or in any work which was published in this country or any foreign country prior to July 1, 1909, and has not been already copyrighted in the United States, or in any publication of the United States Government, or any reprint, in whole or in part, thereof, except that the Postmaster General may secure copyright on behalf of the United States in the whole or any part of the publications authorized by section 2506 of title 39.[1]

The publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor.

§ 9. AUTHORS OR PROPRIETORS, ENTITLED: ALIENS.—The author or proprietor of any work made the subject of copyright by this title, or his executors, administrators, or assigns, shall have copyright for such work under the conditions and for the terms specified in this title: *Provided, however,* That the copyright secured by this title shall extend to the work of an author or proprietor who is a citizen or subject of a foreign state or nation only under the conditions described in subsections (a), (b), or (c) below:

(a) When an alien author or proprietor shall be domiciled within the United States at the time of the first publication of his work; or

(b) When the foreign state or nation of which such author or proprietor is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States the benefit of copyright on substantially the same basis as to its own citizens, or copyright protection, substantially equal to the protection secured to such foreign author under this title or by treaty; or when such foreign state or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States may, at its pleasure, become a party thereto.

---

[1] A further exception was provided by a statute enacted in 1968, Pub. L. 90–396, 82 Stat. 339, 340, amending Title 15 of the United States Code (15 U.S.C. 272), authorizing the Secretary of Commerce, at section 290(e), to secure copyright and renewal thereof on behalf of the United States as author or proprietor "in all or any part of any standard reference data which he prepares or makes available under this chapter."

The existence of the reciprocal conditions aforesaid shall be determined by the President of the United States, by proclamation made from time to time, as the purposes of this title may require: *Provided*, That whenever the President shall find that the authors, copyright owners, or proprietors of works first produced or published abroad and subject to copyright or to renewal of copyright under the laws of the United States, including works subject to ad interim copyright, are or may have been temporarily unable to comply with the conditions and formalities prescribed with respect to such works by the copyright laws of the United States, because of the disruption or suspension of facilities essential for such compliance, he may by proclamation grant such extension of time as he may deem appropriate for the fulfillment of such conditions or formalities by authors, copyright owners, or proprietors who are citizens of the United States or who are nationals of countries which accord substantially equal treatment in this respect to authors, copyright owners, or proprietors who are citizens of the United States: *Provided further*, That no liability shall attach under this title for lawful uses made or acts done prior to the effective date of such proclamation in connection with such works, or in respect to the continuance for one year subsequent to such date of any business undertaking or enterprise lawfully undertaken prior to such date involving expenditure or contractual obligation in connection with the exploitation, production, reproduction, circulation, or performance of any such work.

The President may at any time terminate any proclamation authorized herein or any part thereof or suspend or extend its operation for such period or periods of time as in his judgment the interests of the United States may require.

(c) When the Universal Copyright Convention, signed at Geneva on September 6, 1952, shall be in force[1] between the United States of America and the foreign state or nation of which such author is a citizen or subject, or in which the work was first published. Any work to which copyright is extended pursuant to this subsection shall be exempt from the following provisions of this title: (1) The requirement in section 1 (e) that a foreign state or nation must grant to United States citizens mechanical reproduction rights similar to those specified therein; (2) the obligatory deposit requirements of the first sentence of section 13; (3) the provisions of sections 14, 16, 17, and 18; (4) the import prohibitions of section 107, to the extent that they are related to the manufacturing requirements of section 16; and (5) the require-

---

[1] The Universal Copyright Convention came into force with respect to the United States of America on September 16, 1955. See the notice at the end of this circular, if further information is needed on this subject.

ments of sections 19 and 20: *Provided, however,* That such exemptions shall apply only if from the time of first publication all the copies of the work published with the authority of the author or other copyright proprietor shall bear the symbol © accompanied by the name of the copyright proprietor and the year of first publication placed in such manner and location as to give reasonable notice of claim of copyright.

Upon the coming into force of the Universal Copyright Convention in a foreign state or nation as hereinbefore provided, every book or periodical of a citizen or subject thereof in which ad interim copyright was subsisting on the effective date of said coming into force shall have copyright for twenty-eight years from the date of first publication abroad without the necessity of complying with the further formalities specified in section 23 of this title.

The provisions of this subsection shall not be extended to works of an author who is a citizen of, or domiciled in the United States of America regardless of place of first publication, or to works first published in the United States.

§ 10. PUBLICATION OF WORK WITH NOTICE.—Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 22 of this title.

§ 11. REGISTRATION OF CLAIM AND ISSUANCE OF CERTIFICATE.—Such person may obtain registration of his claim to copyright by complying with the provisions of this title, including the deposit of copies, and upon such compliance the Register of Copyrights shall issue to him the certificates provided for in section 209 of this title.

§ 12. WORKS NOT REPRODUCED FOR SALE.—Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a lecture or similar production or a dramatic, musical, or dramatico-musical composition; of a title and description, with one print taken from each scene or act, if the work be a motion-picture photoplay; of a photographic print if the work be a photograph; of a title and description, with not less than two prints taken from different sections of a complete motion picture, if the work be a motion picture other than a photoplay; or of a photograph or other identifying reproduction thereof, if it be a work of art or a plastic work or drawing. But the privilege of registration of copyright secured hereunder shall not exempt the copyright proprietor from the deposit of copies, under sections 13 and 14 of this title, where the work is later reproduced in copies for sale.

§ 13. DEPOSIT OF COPIES AFTER PUBLICATION; ACTION OR PROCEEDING FOR INFRINGEMENT.—After copyright has been secured by publication of the work with the notice of copyright as provided in section 10 of this title, there shall be promptly deposited in the Copyright Office or in the mail addressed to the Register of Copyrights, Washington, District of Columbia, two complete copies of the best edition thereof then published, or if the work is by an author who is a citizen or subject of a foreign state or nation and has been published in a foreign country, one complete copy of the best edition then published in such foreign country, which copies or copy, if the work be a book or periodical, shall have been produced in accordance with the manufacturing provisions specified in section 16 of this title; or if such work be a contribution to a periodical, for which contribution special registration is requested, one copy of the issue or issues containing such contribution; or if the work belongs to a class specified in subsections (g), (h), (i) or (k) of section 5 of this title, and if the Register of Copyrights determines that it is impracticable to deposit copies because of their size, weight, fragility, or monetary value he may permit the deposit of photographs or other identifying reproductions in lieu of copies of the work as published under such rules and regulations as he may prescribe with the approval of the Librarian of Congress; or if the work is not reproduced in copies for sale there shall be deposited the copy, print, photograph, or other identifying reproduction provided by section 12 of this title, such copies or copy, print, photograph, or other reproduction to be accompanied in each case by a claim of copyright. No action or proceeding shall be maintained for infringement of copyright in any work until the provisions of this title with respect to the deposit of copies and registration of such work shall have been complied with.

§ 14. SAME; FAILURE TO DEPOSIT; DEMAND; PENALTY.—Should the copies called for by section 13 of this title not be promptly deposited as provided in this title, the Register of Copyrights may at any time after the publication of the work, upon actual notice, require the proprietor of the copyright to deposit them, and after the said demand shall have been made, in default of the deposit of copies of the work within three months from any part of the United States, except an outlying territorial possession of the United States, or within six months from any outlying territorial possession of the United States, or from any foreign country, the proprietor of the copyright shall be liable to a fine of $100 and to pay to the Library of Congress twice the amount of the retail price of the best edition of the work, and the copyright shall become void.

§ 15. SAME; POSTMASTER'S RECEIPT; TRANSMISSION BY MAIL WITHOUT COST.—The postmaster to whom are delivered the articles de-

posited as provided in sections 12 and 13 of this title shall, if requested, give a receipt therefor and shall mail them to their destination without cost to the copyright claimant.

§ 16. MECHANICAL WORK TO BE DONE IN UNITED STATES.—Of the printed book or periodical specified in section 5, subsections (a) and (b), of this title, except the original text of a book or periodical of foreign origin in a language or languages other than English, the text of all copies accorded protection under this title, except as below provided, shall be printed from type set within the limits of the United States, either by hand or by the aid of any kind of typesetting machine, or from plates made within the limits of the United States from type set therein, or, if the text be produced by lithographic process, or photoengraving process, then by a process wholly performed within the limits of the United States, and the printing of the text and binding of the said book shall be performed within the limits of the United States; which requirements shall extend also to the illustrations within a book consisting of printed text and illustrations produced by lithographic process, or photoengraving process, and also to separate lithographs or photoengravings, except where in either case the subjects represented are located in a foreign country and illustrate a scientific work or reproduce a work of art: *Provided, however,* That said requirements shall not apply to works in raised characters for the use of the blind, or to books or periodicals of foreign origin in a language or languages other than English, or to works printed or produced in the United States by any other process than those above specified in this section, or to copies of books or periodicals, first published abroad in the English language, imported into the United States within five years after first publication in a foreign state or nation up to the number of fifteen hundred copies of each such book or periodical if said copies shall contain notice of copyright in accordance with sections 10, 19, and 20 of this title and if ad interim copyright in said work shall have been obtained pursuant to section 22 of this title prior to the importation into the United States of any copy except those permitted by the provisions of section 107 of this title: *Provided further,* That the provisions of this section shall not affect the right of importation under the provisions of section 107 of this title.

§ 17. AFFIDAVIT TO ACCOMPANY COPIES.—In the case of the book the copies so deposited shall be accompanied by an affidavit under the official seal of any officer authorized to administer oaths within the United States, duly made by the person claiming copyright or by his duly authorized agent or representative residing in the United States, or by the printer who has printed the book, setting forth that the copies deposited have been printed from type set within the limits of the

Case 23-905, Document 58, 10/13/2023, 3581210, Page28 of 221

United States or from plates made within the limits of the United States from type set therein; or, if the text be produced by lithographic process, or photoengraving process, that such process was wholly performed within the limits of the United States and that the printing of the text and binding of the said book have also been performed within the limits of the United States. Such affidavit shall state also the place where and the establishment or establishments in which such type was set or plates made or lithographic process, or photoengraving process or printing and binding were performed and the date of the completion of the printing of the book or the date of publication.

§ 18. MAKING FALSE AFFIDAVIT.—Any person who, for the purpose of obtaining registration of a claim to copyright, shall knowingly make a false affidavit as to his having complied with the above conditions shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $1,000, and all of his rights and privileges under said copyright shall thereafter be forfeited.

§ 19. NOTICE; FORM.[1]—The notice of copyright required by section 10 of this title shall consist either of the word "Copyright", the abbreviation "Copr.", or the symbol ©, accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication. In the case, however, of copies of works specified in subsections (f) to (k), inclusive, of section 5 of this title, the notice may consist of the letter C enclosed within a circle, thus ©, accompanied by the initials, monogram, mark, or symbol of the copyright proprietor: *Provided*, That on some accessible portion of such copies or of the margin, back, permanent base, or pedestal, or of the substance on which such copies shall be mounted, his name shall appear. But in the case of works in which copyright was subsisting on July 1, 1909, the notice of copyright may be either in one of the forms prescribed herein or may consist of the following words: "Entered according to Act of Congress, in the year     , by A. B., in the office of the Librarian of Congress, at Washington, D.C.," or, at his option, the word "Copyright", together with the year the copyright was entered and the name of the party by whom it was taken out; thus, "Copyright, 19—, by A. B." In the case of reproductions of works specified in subsection (n) of section 5 of this title, the notice shall consist of the symbol ℗ (the letter P in a circle), the year of first publication of the sound recording, and the name of the owner of copyright in the sound recording, or an abbreviation by which the name can be recognized, or a generally known alternative designation of the owner:

---

[1] The last sentence of section 19 was added by the Act of October 15, 1971, Pub. L. 92–140, 85 Stat. 391. See footnote 1, page 4, *supra*.

*Provided,* That if the producer of the sound recording is named on the labels or containers of the reproduction, and if no other name appears in conjunction with the notice, his name shall be considered a part of the notice.

§ 20. SAME; PLACE OF APPLICATION OF; ONE NOTICE IN EACH VOLUME OR NUMBER OF NEWSPAPER OR PERIODICAL.[1]—The notice of copyright shall be applied, in the case of a book or other printed publication, upon its title page or the page immediately following, or if a periodical either upon the title page or upon the first page of text of each separate number or under the title heading, or if a musical work either upon its title page or the first page of music, or if a sound recording on the surface of reproductions thereof or on the label or container in such manner and location as to give reasonable notice of the claim of copyright. One notice of copyright in each volume or in each number of a newspaper or periodical published shall suffice.

§ 21. SAME; EFFECT OF ACCIDENTAL OMISSION FROM COPY OR COPIES.—Where the copyright proprietor has sought to comply with the provisions of this title with respect to notice, the omission by accident or mistake of the prescribed notice from a particular copy or copies shall not invalidate the copyright or prevent recovery for infringement against any person who, after actual notice of the copyright, begins an undertaking to infringe it, but shall prevent the recovery of damages against an innocent infringer who has been misled by the omission of the notice; and in a suit for infringement no permanent injunction shall be had unless the copyright proprietor shall reimburse to the innocent infringer his reasonable outlay innocently incurred if the court, in its discretion, shall so direct.

§ 22. AD INTERIM PROTECTION OF BOOK OR PERIODICAL PUBLISHED ABROAD.—In the case of a book or periodical first published abroad in the English language, the deposit in the Copyright Office, not later than six months after its publication abroad, of one complete copy of the foreign edition, with a request for the reservation of the copyright and a statement of the name and nationality of the author and of the copyright proprietor and of the date of publication of the said book or periodical, shall secure to the author or proprietor an ad interim copyright therein, which shall have all the force and effect given to copyright by this title, and shall endure until the expiration of five years after the date of first publication abroad.

§ 23. SAME; EXTENSION TO FULL TERM.—Whenever within the period of such ad interim protection an authorized edition of such

---

[1] The first sentence of section 20 was amended by the Act of October 15, 1971, Pub. L. 92–140, 85 Stat. 391. See footnote 1, page 4, *supra.*

Case 23-905, Document 58, 10/13/2023, 3581210, Page30 of 221

books or periodicals shall be published within the United States, in accordance with the manufacturing provisions specified in section 16 of this title, and whenever the provisions of this title as to deposit of copies, registration, filing of affidavits, and the printing of the copyright notice shall have been duly complied with, the copyright shall be extended to endure in such book or periodical for the term provided in this title.

§ 24. DURATION; RENEWAL AND EXTENSION.[1]—The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided*, That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright:[2] *And provided further*, That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

---

[1] Private Law 92–60, enacted December 15, 1971, provides specially for a term of 75 years from that date, or from the later date of first publication, for the various editions of "Science and Health" by Mary Baker Eddy. See the notice at the end of this circular, if further information is needed on this subject.

[2] A series of eight acts, the most recent being the Act of October 25, 1972, Pub. L. 92–566, 86 Stat. 1170, which cites the seven earlier acts, has extended until December 31, 1974, copyrights previously renewed in which the second term would otherwise have expired between September 19, 1962 and December 31, 1974. See the notice at the end of this circular, if further information is needed.

§ 25. RENEWAL OF COPYRIGHTS REGISTERED IN PATENT OFFICE UNDER REPEALED LAW.—Subsisting copyrights originally registered in the Patent Office prior to July 1, 1940, under section 3 of the act of June 18, 1874, shall. be subject to renewal in behalf of the proprietor upon application made to the Register of Copyrights within one year prior to the expiration of the original term of twenty-eight years.

§ 26. TERMS DEFINED.[1]—In the interpretation and construction of this title "the date of publication" shall in the case of a work of which copies are reproduced for sale or distribution be held to be the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority, and the word "author" shall include an employer in the case of works made for hire. For the purposes of this section and sections 10, 11, 13, 14, 21, 101, 106, 109, 209, 215, but not for any other purpose, a reproduction of a work described in subsection 5(n) shall be considered to be a copy thereof. "Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture. "Reproductions of sound recordings" are material objects in which sounds other than those accompanying a motion picture are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, and include the "parts of instruments serving to reproduce mechanically the musical work", "mechanical reproductions", and "interchangeable parts, such as discs or tapes for use in mechanical music-producing machines" referred to in sections 1(e) and 101(e) of this title.

§ 27. COPYRIGHT DISTINCT FROM PROPERTY IN OBJECT COPYRIGHTED; EFFECT OF SALE OF OBJECT, AND OF ASSIGNMENT OF COPYRIGHT.—The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.

§ 28. ASSIGNMENTS AND BEQUESTS.—Copyright secured under this title or previous copyright laws of the United States may be assigned, granted, or mortgaged by an instrument in writing signed by the proprietor of the copyright, or may be bequeathed by will.

---

[1] The last three sentences of section 26 were added by the Act of October 15, 1971, Pub. L. 92-140, 85 Stat. 391. See footnote 1, page 4, supra.

Case 23-905, Document 58, 10/13/2023, 3581210, Page32 of 221

§ 29. SAME; EXECUTED IN FOREIGN COUNTRY; ACKNOWLEDGMENT AND CERTIFICATE.—Every assignment of copyright executed in a foreign country shall be acknowledged by the assignor before a consular officer or secretary of legation of the United States authorized by law to administer oaths or perform notarial acts. The certificate of such acknowledgment under the hand and official seal of such consular officer or secretary of legation shall be prima facie evidence of the execution of the instrument.

§ 30. SAME; RECORD.—Every assignment of copyright shall be recorded in the copyright office within three calendar months after its execution in the United States or within six calendar months after its execution without the limits of the United States, in default of which it shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, whose assignment has been duly recorded.

§ 31. SAME; CERTIFICATE OF RECORD.—The Register of Copyrights shall, upon payment of the prescribed fee, record such assignment, and shall return it to the sender with a certificate of record attached under seal of the copyright office, and upon the payment of the fee prescribed by this title he shall furnish to any person requesting the same a certified copy thereof under the said seal.

§ 32. SAME; USE OF NAME OF ASSIGNEE IN NOTICE.—When an assignment of the copyright in a specified book or other work has been recorded the assignee may substitute his name for that of the assignor in the statutory notice of copyright prescribed by this title.

## Chapter 2—Infringement Proceedings [1]

§ 101. Infringement:
    (a) Injunction.
    (b) Damages and profits; amounts; other remedies.
    (c) Impounding during action.
    (d) Destruction of infringing copies and plates.
    (e) Interchangeable parts for use in mechanical music-producing machines.
§ 104. Willful infringement for profit.
§ 105. Fraudulent notice of copyright, or removal or alteration of notice.
§ 106. Importation of article bearing false notice or piratical copies of copyrighted work.
§ 107. Importation, during existence of copyright, of piratical copies, or of copies not produced in accordance with section 16 of this title.
§ 108. Forfeiture and destruction of articles prohibited importation.
§ 109. Importation of prohibited articles; regulations; proof of deposit of copies by complainants.

---

[1] Sections 101(f), 102, 103, 110, and 111 were repealed by the Act of June 25, 1948, ch. 646, § 39, 62 Stat. 869, at 931, 936, and 996, effective September 1, 1948. However, see sections 1338, 1400, 1498, and 2072, Title 28, United States Code.

§ 112. Injunctions ; service and enforcement.

§ 113. Transmission of certified copies of papers for enforcement of injunction by other court.

§ 114. Review of orders, judgments, or decrees.

§ 115. Limitations.

§ 116. Costs ; attorney's fees.

§ 101. INFRINGEMENT.—If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable :

(a) INJUNCTION.—To an injunction restraining such infringement ;

(b) DAMAGES AND PROFITS; AMOUNT; OTHER REMEDIES.—To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only, and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages and profits, such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but in case of a newspaper reproduction of a copyrighted photograph, such damages shall not exceed the sum of $200 nor be less than the sum of $50, and in the case of the infringement of an undramatized or non-dramatic work by means of motion pictures, where the infringer shall show that he was not aware that he was infringing, and that such infringement could not have been reasonably foreseen, such damages shall not exceed the sum of $100 ; and in the case of an infringement of a copyrighted dramatic or dramatico-musical work by a maker of motion pictures and his agencies for distribution thereof to exhibitors, where such infringer shows that he was not aware that he was infringing a copyrighted work, and that such infringements could not reasonably have been foreseen, the entire sum of such damages recoverable by the copyright proprietor from such infringing maker and his agencies for the distribution to exhibitors of such infringing motion picture shall not exceed the sum of $5,000 nor be less than $250, and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him.

First. In the case of a painting, statue, or sculpture, $10 for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees ;

Second. In the case of any work enumerated in section 5 of this title, except a painting, statue, or sculpture, $1 for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

Third. In the case of a lecture, sermon, or address, $50 for every infringing delivery;

Fourth. In the case of a dramatic or dramatico-musical or a choral or orchestral composition, $100 for the first and $50 for every subsequent infringing performance; in the case of other musical compositions $10 for every infringing performance;

(c) IMPOUNDING DURING ACTION.—To deliver up on oath, to be impounded during the pendency of the action, upon such terms and conditions as the court may prescribe, all articles alleged to infringe a copyright;

(d) DESTRUCTION OF INFRINGING COPIES AND PLATES.—To deliver up on oath for destruction all the infringing copies or devices, as well as all plates, molds, matrices, or other means for making such infringing copies as the court may order.

(e)[1] INTERCHANGEABLE PARTS FOR USE IN MECHANICAL MUSIC-PRODUCING MACHINES.—Interchangeable parts, such as discs or tapes for use in mechanical music-producing machines adapted to reproduce copyrighted musical works, shall be considered copies of the copyrighted musical works which they serve to reproduce mechanically for the purposes of this section 101 and sections 106 and 109 of this title, and the unauthorized manufacture, use, or sale of such interchangeable parts shall constitute an infringement of the copyrighted work rendering the infringer liable in accordance with all provisions of this title dealing with infringements of copyright and, in a case of willful infringement for profit, to criminal prosecution pursuant to section 104 of this title. Whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this title, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice.

[(f)  See footnote 1, page 15, *supra.*]

[§ 102.  See footnote 1, page 15, *supra.*]

[§ 103.  See footnote 1, page 15, *supra.*]

[1] The former section 101(e) was deleted in its entirety and the present language was substituted by the Act of October 15, 1971, Pub. L. 92–140, 85 Stat. 391, effective immediately upon enactment.

§ 104. WILLFUL INFRINGEMENT FOR PROFIT.—Any person who willfully and for profit shall infringe any copyright secured by this title, or who shall knowingly and willfully aid or abet such infringement, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by imprisonment for not exceeding one year or by a fine of not less than $100 nor more than $1,000, or both, in the discretion of the court: *Provided, however*, That nothing in this title shall be so construed as to prevent the performance of religious or secular works such as oratorios, cantatas, masses, or octavo choruses by public schools, church choirs, or vocal societies, rented, borrowed, or obtained from some public library, public school, church choir, school choir, or vocal society, provided the performance is given for charitable or educational purposes and not for profit.

§ 105. FRAUDULENT NOTICE OF COPYRIGHT, OR REMOVAL OR ALTERATION OF NOTICE.—Any person who, with fraudulent intent, shall insert or impress any notice of copyright required by this title, or words of the same purport, in or upon any uncopyrighted article, or with fraudulent intent shall remove or alter the copyright notice upon any article duly copyrighted shall be guilty of a misdemeanor, punishable by a fine of not less than $100 and not more than $1,000. Any person who shall knowingly issue or sell any article bearing a notice of United States copyright which has not been copyrighted in this country, or who shall knowingly import any article bearing such notice or words of the same purport, which has not been copyrighted in this country, shall be liable to a fine of $100.

§ 106. IMPORTATION OF ARTICLE BEARING FALSE NOTICE OR PIRATICAL COPIES OF COPYRIGHTED WORK.—The importation into the United States of any article bearing a false notice of copyright when there is no existing copyright thereon in the United States, or of any piratical copies of any work copyrighted in the United States, is prohibited.

§ 107. IMPORTATION, DURING EXISTENCE OF COPYRIGHT, OF PIRATICAL COPIES, OR OF COPIES NOT PRODUCED IN ACCORDANCE WITH SECTION 16 OF THIS TITLE.—During the existence of the American copyright in any book the importation into the United States of any piratical copies thereof or of any copies thereof (although authorized by the author or proprietor) which have not been produced in accordance with the manufacturing provisions specified in section 16 of this title, or any plates of the same not made from type set within the limits of the United States, or any copies thereof produced by lithographic or photoengraving process not performed within the limits of the United States, in accordance with the provisions of section 16 of this title, is prohibited: *Provided, however*, That, except as regards piratical copies, such prohibition shall not apply:

Case 23-905, Document 58, 10/13/2023, 3581210, Page36 of 221

(a) To works in raised characters for the use of the blind.

(b) To a foreign newspaper or magazine, although containing matter copyrighted in the United States printed or reprinted by authority of the copyright proprietor, unless such newspaper or magazine contains also copyright matter printed or reprinted without such authorization.

(c) To the authorized edition of a book in a foreign language or languages of which only a translation into English has been copyrighted in this country.

(d) To any book published abroad with the authorization of the author or copyright proprietor when imported under the circumstances stated in one of the four subdivisions following, that is to say:

First. When imported, not more than one copy at one time, for individual use and not for sale; but such privilege of importation shall not extend to a foreign reprint of a book by an American author copyrighted in the United States.

Second. When imported by the authority or for the use of the United States.

Third. When imported, for use and not for sale, not more than one copy of any such book in any one invoice, in good faith by or for any society or institution incorporated for educational, literary, philosophical, scientific, or religious purposes, or for the encouragement of the fine arts, or for any college, academy, school, or seminary of learning, or for any State, school, college, university, or free public library in the United States.

Fourth. When such books form parts of libraries or collections purchased en bloc for the use of societies, institutions, or libraries designated in the foregoing paragraph, or form parts of the libraries or personal baggage belonging to persons or families arriving from foreign countries and are not intended for sale: *Provided*, That copies imported as above may not lawfully be used in any way to violate the rights of the proprietor of the American copyright or annul or limit the copyright protection secured by this title, and such unlawful use shall be deemed an infringement of copyright.

§ 108. FORFEITURE AND DESTRUCTION OF ARTICLES PROHIBITED IMPORTATION.—Any and all articles prohibited importation by this title which are brought into the United States from any foreign country (except in the mails) shall be seized and forfeited by like proceedings as those provided by law for the seizure and condemnation of property imported into the United States in violation of the customs revenue laws. Such articles when forfeited shall be destroyed in such manner as the Secretary of the Treasury or the court, as the case may be, shall direct: *Provided, however*, That all copies of authorized editions of

copyright books imported in the mails or otherwise in violation of the
provisions of this title may be exported and returned to the country
of export whenever it is shown to the satisfaction of the Secretary
of the Treasury, in a written application, that such importation does
not involve willful negligence or fraud.

§ 109. IMPORTATION OF PROHIBITED ARTICLES; REGULATIONS; PROOF
OF DEPOSIT OF COPIES BY COMPLAINANTS.—The Secretary of the
Treasury and the Postmaster General are hereby empowered and re-
quired to make and enforce individually or jointly such rules and
regulations as shall prevent the importation into the United States
of articles prohibited importation by this title, and may require, as
conditions precedent to exclusion of any work in which copyright is
claimed, the copyright proprietor or any person claiming actual or
potential injury by reason of actual or contemplated importations of
copies of such work to file with the Post Office Department or the
Treasury Department a certificate of the Register of Copyrights that
the provisions of section 13 of this title have been fully complied with,
and to give notice of such compliance to postmasters or to customs
officers at the ports of entry in the United States in such form and
accompanied by such exhibits as may be deemed necessary for the
practical and efficient administration and enforcement of the provi-
sions of sections 106 and 107 of this title.

[§ 110. See footnote 1, page 15, *supra*.]

[§ 111. See footnote 1, page 15, *supra*.]

§ 112. INJUNCTIONS; SERVICE AND ENFORCEMENT.—Any court men-
tioned in section 1338 of Title 28 or judge thereof shall have power,
upon complaint filed by any party aggrieved, to grant injunctions to
prevent and restrain the violation of any right secured by this title,
according to the course and principles of courts of equity, on such
terms as said court or judge may deem reasonable. Any injunction that
may be granted restraining and enjoining the doing of anything for-
bidden by this title may be served on the parties against whom such
injunction may be granted anywhere in the United States, and shall
be operative throughout the United States and be enforceable by pro-
ceedings in contempt or otherwise by any other court or judge pos-
sessing jurisdiction of the defendants.

§ 113. TRANSMISSION OF CERTIFIED COPIES OF PAPERS FOR ENFORCE-
MENT OF INJUNCTION BY OTHER COURT.—The clerk of the court or
judge granting the injunction, shall, when required so to do by the
court hearing the application to enforce said injunction, transmit with-
out delay to said court a certified copy of all the papers in said cause
that are on file in his office.

§ 114. REVIEW OF ORDERS, JUDGMENTS, OR DECREES.—The orders,
judgments, or decrees of any court mentioned in section 1338 of Title

28 arising under the copyright laws of the United States may be reviewed on appeal in the manner and to the extent now provided by law for the review of cases determined in said courts, respectively.

§ 115. LIMITATIONS.—(a) CRIMINAL PROCEEDINGS.—No criminal proceedings shall be maintained under the provisions of this title unless the same is commenced within three years after the cause of action arose.

(b) CIVIL ACTIONS.—No civil action shall be maintained under the provisions of this title unless the same is commenced within three years after the claim accrued.

§ 116. COSTS; ATTORNEY'S FEES.—In all actions, suits, or proceedings under this title, except when brought by or against the United States or any officer thereof, full costs shall be allowed, and the court may award to the prevailing party a reasonable attorney's fee as part of the costs.

## Chapter 3—Copyright Office

§ 201. Copyright office; preservation of records.
§ 202. Register, assistant register, and subordinates.
§ 203. Same; deposit of moneys received; reports.
§ 204. Same; bond.
§ 205. Same; annual report.
§ 206. Seal of copyright office.
§ 207. Rules for registration of claims.
§ 208. Record books in copyright office.
§ 209. Certificates of registration; effect as evidence; receipt for copies deposited.
§ 210. Catalogs of copyright entries; effect as evidence.
§ 211. Same; distribution and sale; disposal of proceeds.
§ 212. Records and works deposited in copyright office open to public inspection; taking copies of entries.
§ 213. Disposition of articles deposited in office.
§ 214. Destruction of articles deposited in office remaining undisposed of; removal of by author or proprietor; manuscripts of unpublished works.
§ 215. Fees.
§ 216. When the day for taking action falls on Saturday, Sunday, or a holiday.

§ 201. COPYRIGHT OFFICE; PRESERVATION OF RECORDS.—All records and other things relating to copyrights required by law to be preserved shall be kept and preserved in the copyright office, Library of Congress, District of Columbia, and shall be under the control of the register of copyrights, who shall, under the direction and supervision of the Librarian of Congress, perform all the duties relating to the registration of copyrights.

§ 202. REGISTER, ASSISTANT REGISTER, AND SUBORDINATES.—There shall be appointed by the Librarian of Congress a Register of Copyrights, and one Assistant Register of Copyrights, who shall have au-

thority during the absence of the Register of Copyrights to attach the copyright office seal to all papers issued from the said office and to sign such certificates and other papers as may be necessary. There shall also be appointed by the Librarian such subordinate assistants to the register as may from time to time be authorized by law.

§ 203. SAME; DEPOSIT OF MONEYS RECEIVED; REPORTS.—The Register of Copyrights shall make daily deposits in some bank in the District of Columbia, designated for this purpose by the Secretary of the Treasury as a national depository, of all moneys received to be applied as copyright fees, and shall make weekly deposits with the Secretary of the Treasury, in such manner as the latter shall direct, of all copyright fees actually applied under the provisions of this title, and annual deposits of sums received which it has not been possible to apply as copyright fees or to return to the remitters, and shall also make monthly reports to the Secretary of the Treasury and to the Librarian of Congress of the applied copyright fees for each calendar month, together with a statement of all remittances received, trust funds on hand, moneys refunded, and unapplied balances.

§ 204. SAME; BOND.—The Register of Copyrights shall give bond to the United States in the sum of $20,000, in form to be approved by the General Counsel for the Department of the Treasury and with sureties satisfactory to the Secretary of the Treasury, for the faithful discharge of his duties.

§ 205. SAME; ANNUAL REPORT.—The Register of Copyrights shall make an annual report to the Librarian of Congress, to be printed in the annual report on the Library of Congress, of all copyright business for the previous fiscal year, including the number and kind of works which have been deposited in the copyright office during the fiscal year, under the provisions of this title.

§ 206. SEAL OF COPYRIGHT OFFICE.—The seal used in the copyright office on July 1, 1909, shall be the seal of the copyright office, and by it all papers issued from the copyright office requiring authentication shall be authenticated.

§ 207. RULES FOR REGISTRATION OF CLAIMS.[1]—Subject to the approval of the Librarian of Congress, the Register of Copyrights shall be authorized to make rules and regulations for the registration of claims to copyright as provided by this title.

§ 208. RECORD BOOKS IN COPYRIGHT OFFICE.—The Register of Copyrights shall provide and keep such record books in the copyright office as are required to carry out the provisions of this title, and when-

---

[1] Published in the *Federal Register* and Title 37 of the *Code of Federal Regulations.* See the notice at the end of this circular, if further information is needed on this subject.

ever deposit has been made in the copyright office of a copy of any work under the provisions of this title he shall make entry thereof.

§ 209. Certificate of Registration; Effect as Evidence; Receipt for Copies Deposited.—In the case of each entry the person recorded as the claimant of the copyright shall be entitled to a certificate of registration under seal of the copyright office, to contain the name and address of said claimant, the name of the country of which the author of the work is a citizen or subject, and when an alien author domiciled in the United States at the time of said registration, then a statement of that fact, including his place of domicile, the name of the author (when the records of the copyright office shall show the same), the title of the work which is registered for which copyright is claimed, the date of the deposit of the copies of such work, the date of publication if the work has been reproduced in copies for sale, or publicly distributed, and such marks as to class designation and entry number as shall fully identify the entry. In the case of a book, the certificate shall also state the receipt of the affidavit, as provided by section 17 of this title, and the date of the completion of the printing, or the date of the publication of the book, as stated in the said affidavit. The Register of Copyrights shall prepare a printed form for the said certificate, to be filled out in each case as above provided for in the case of all registrations made after July 1, 1909, and in the case of all previous registrations so far as the copyright office record books shall show such facts, which certificate, sealed with the seal of the copyright office, shall, upon payment of the prescribed fee, be given to any person making application for the same. Said certificate shall be admitted in any court as prima facie evidence of the facts stated therein. In addition to such certificate the register of copyrights shall furnish, upon request, without additional fee, a receipt for the copies of the work deposited to complete the registration.

§ 210. Catalog of Copyright Entries; Effect as Evidence.—The Register of Copyrights shall fully index all copyright registrations and assignments and shall print at periodic intervals a catalog of the titles of articles deposited and registered for copyright, together with suitable indexes, and at stated intervals shall print complete and indexed catalog for each class of copyright entries, and may thereupon, if expedient, destroy the original manuscript catalog cards containing the titles included in such printed volumes and representing the entries made during such intervals. The current catalog of copyright entries and the index volumes herein provided for shall be admitted in any court as prima facie evidence of the facts stated therein as regards any copyright registration.

§ 211. Same; Distribution and Sale; Disposal of Proceeds.—The said printed current catalogs as they are issued shall be promptly

distributed by the Superintendent of Documents to the collectors of customs of the United States and to the postmasters of all exchange offices of receipt of foreign mails, in accordance with revised list of such collectors of customs and postmasters prepared by the Secretary of the Treasury and the Postmaster General, and they shall also be furnished in whole or in part to all parties desiring them at a price to be determined by the Register of Copyrights for each part of the catalog not exceeding $75 for the complete yearly catalog of copyright entries. The consolidated catalogs and indexes shall also be supplied to all persons ordering them at such prices as may be fixed by the Register of Copyrights, and all subscriptions for the catalogs shall be received by the Superintendent of Documents, who shall forward the said publications; and the moneys thus received shall be paid into the Treasury of the United States and accounted for under such laws and Treasury regulations as shall be in force at the time.

§ 212. RECORDS AND WORKS DEPOSITED IN COPYRIGHT OFFICE OPEN TO PUBLIC INSPECTION; TAKING COPIES OF ENTRIES.—The record books of the copyright office, together with the indexes to such record books, and all works deposited and retained in the copyright office, shall be open to public inspection; and copies may be taken of the copyright entries actually made in such record books, subject to such safeguards and regulations as shall be prescribed by the Register of Copyrights and approved by the Librarian of Congress.

§ 213. DISPOSITION OF ARTICLES DEPOSITED IN OFFICE.—Of the articles deposited in the copyright office under the provisions of the copyright laws of the United States, the Librarian of Congress shall determine what books and other articles shall be transferred to the permanent collections of the Library of Congress, including the law library, and what other books or articles shall be placed in the reserve collections of the Library of Congress for sale or exchange, or be transferred to other governmental libraries in the District of Columbia for use therein.

§ 214. DESTRUCTION OF ARTICLES DEPOSITED IN OFFICE REMAINING UNDISPOSED OF; REMOVAL OF BY AUTHOR OR PROPRIETOR; MANUSCRIPTS OF UNPUBLISHED WORKS.—Of any articles undisposed of as above provided, together with all titles and correspondence relating thereto, the Librarian of Congress and the Register of Copyrights jointly shall, at suitable intervals, determine what of these received during any period of years it is desirable or useful to preserve in the permanent files of the copyright office, and, after due notice as hereinafter provided, may within their discretion cause the remaining articles and other things to be destroyed: *Provided,* That there shall be printed in the Catalog of Copyright Entries from February to November, inclusive, a statement of the years of receipt of such articles and a notice to permit any author, copyright proprietor, or other lawful claimant to claim and

remove before the expiration of the month of December of that year anything found which relates to any of his productions deposited or registered for copyright within the period of years stated, not reserved or disposed of as provided for in this title. No manuscript of an unpublished work shall be destroyed during its term of copyright without specific notice to the copyright proprietor of record, permitting him to claim and remove it.

§ 215. FEES.—The Register of Copyrights shall receive, and the persons to whom the services designated are rendered shall pay, the following fees:

For the registration of a claim to copyright in any work, including a print or label used for articles of merchandise, $6; for the registration of a claim to renewal of copyright, $4; which fees shall include a certificate for each registration: *Provided*, That only one registration fee shall be required in the case of several volumes of the same book published and deposited at the same time: *And provided further*, That with respect to works of foreign origin, in lieu of payment of the copyright fee of $6 together with one copy of the work and application, the foreign author or proprietor may at any time within six months from the date of first publication abroad deposit in the Copyright Office an application for registration and two copies of the work which shall be accompanied by a catalog card in form and content satisfactory to the Register of Copyrights.

For every additional certificate of registration, $2.

For certifying a copy of an application for registration of copyright, and for all other certifications, $3.

For recording every assignment, agreement, power of attorney or other paper not exceeding six pages, $5; for each additional page or less, 50 cents; for each title over one in the paper recorded, 50 cents additional.

For recording a notice of use, or notice of intention to use, $3, for each notice of not more than five titles; and 50 cents for each additional title.

For any requested search of Copyright Office records, works deposited, or other available material, or services rendered in connection therewith, $5, for each hour of time consumed.

§ 216. WHEN THE DAY FOR TAKING ACTION FALLS ON SATURDAY, SUNDAY, OR A HOLIDAY.—When the last day for making any deposit or application, or for paying any fee, or for delivering any other material to the Copyright Office falls on Saturday, Sunday, or a holiday within the District of Columbia, such action may be taken on the next succeeding business day.

## <u>DECLARATION OF DONALD S. ZAKARIN</u>

I, DONALD S. ZAKARIN, declare under penalty of perjury as follows:

1.      I am a member of Pryor Cashman LLP, counsel for Appellees-Defendants Edward Christopher Sheeran, Sony/ATV Music Publishing LLC (n/k/a Sony Music Publishing (US) LLC), Atlantic Recording Corporation, BDi Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc., David Platz Music (USA) Inc., Amy Wadge and Jake Gosling (collectively, "Appellees").

2.      I have personal knowledge of, and am fully familiar with, the facts set forth in this Declaration, which I respectfully submit in opposition to the motion of Randy Craig Wolfe Trust (the "Trust") and Sound And Color, LLC ("S&C," together with the Trust, the "Movants") for leave to file an amicus curiae brief (the "Motion").

3.      Annexed as **Exhibit 1** is a true copy of the Opening Brief submitted on behalf of the Trust by Francis Alexander, LLC in the appeal captioned *Michael Skidmore, As Trustee For The Randy Craig Wolfe Trust v. Led Zeppelin, et al.*, No. 16-56057 (9th Cir.) ("*Skidmore*").

4.      Annexed as **Exhibit 2** is a true copy of the "Combined Reply Brief And Opening Brief Responding to Defendant's Costs And Fees Appeal" submitted in *Skidmore* on behalf of the Trust by Francis Alexander, LLC.

5.      Plaintiff-Appellant Structured Asset Sales, LLC filed amicus briefs with both the Ninth Circuit and Supreme Court in *Skidmore* in which it aired its "deposit copy" arguments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:        October 13, 2023
              New York, New York

              _____
              DONALD S. ZAKARIN

# EXHIBIT 1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C.A. 16-56057

_____

SKIDMORE ET AL.

*Michael Skidmore, Trustee for the*
*Randy Craig Wolfe Trust*
*Plaintiff-Appellant*

v.

LED ZEPPELIN *ET AL.*

*Defendants-Appellees*

_____

# APPELLANT'S OPENING BRIEF

_____

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California.  The case was docketed in the Central District at 15-cv-03462)

_____

FRANCIS ALEXANDER, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Appellant Skidmore*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... 7

INTRODUCTION ................................................................. 10

STATEMENT OF JURISDICTION ............................................ 12

REQUEST FOR ORAL ARGUMENT ......................................... 12

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................. 13

PERTINENT LEGAL AUTHORITY ........................................ 13

STATEMENT OF THE CASE ................................................ 14

SUMMARY OF ARGUMENT ................................................ 19

ARGUMENT .................................................................. 28

    1.    The Full Composition of "Taurus" as embodied in the Album Recording
           Should Have Been Admitted at Trial for the Substantial
           Similarity Comparison; The Archival Deposit Lead Sheet Does Not Limit the
           Scope of Protectability in a 1909 Act Musical Work ............................ 28

        a.    Standard of Review ......................................................... 28

        b.    Objection Raised Below .................................................... 28

        c.    Argument - The Trial Court Erroneously Failed to Admit
            the Sound Recordings of "Taurus", and the Composition Thereof,
            for the Substantial Similarity Comparison; the Jury Was
            Made to Compare an Artificial, Inaccurate Version of "Taurus" to
            "Stairway to Heaven", Resulting in a Defense Verdict of
            Substantial Similarity ....................................................... 29

            i.    The Scope of Protection for Musical Works Under
                the 1909 Copyright Act Extends to the Compositional
                Parts of the Work Consistently Played the Same
                from Performance to Performance .............................. 30

            ii.    The Deposit Copy Lead Sheet Does Not Limit the
                Scope of Copyright in a Musical Work Created by

Common Law and Defined in 1909 Act, §1(e) ................. 32

    iii.    Despite the Case Law and 1909 Act Being Clear that the Deposit Copy Does Not Limit the Scope of Protection in a Musical Work, The Court Ruled that Plaintiff Could only Compare the Exact Notes of the "Taurus" Deposit Copy to the "Stairway to Heaven" Album Recordings and Could Not Play Sound Recordings of the Song ........... 37

    iv.    At a Minimum the District Court Should Have Ruled that Composition in the Sound Recording is Admissible to the Extent Represented in the Deposit Copy ............... 39

    v.    The Substantial Similarity Comparison Mandated by the Trial Court was Completely Artificial and Highly Prejudicial ...................................................... 40

    vi.    The Implications of the District Court's Rulings are Wide Ranging and Unprecedented ............................ 42

        a.    An Affirmance of the Court's Ruling Means that A Sound Recording of An Underlying Song Can Never Be Played to a Jury in a Copyright Infringement Case ...................................... 42

        b.    Vast Amounts of Musical Expression would Lose Protection, Exactly the Opposite of the Purpose of the Copyright Acts, if the Trial Court's Rulings are Upheld ......................... 43

        c.    The Copyright Office Does Not Keep the Deposit Copies Indefinitely; What Happens to those Works for Which the Deposit Copies Have Been Lost? ........ 44

        d.    Submitting 100% Accurate Deposit Copies of Musical Works would Have Been Prohibitively Expensive for Artists ............................ 45

  2.    The Trial Court Erroneously Precluded the Sound Recordings of "Taurus" Despite the Fact that the Court Itself Admitted They were Relevant to Prove Access, Which was Disputed by Defendants ................ 46

    a.    **Standard of Review** …………………………………………… 46

    b.    **Objection Raised Below** ………………………………… 47

    c.    **Argument**……………………………………………………… 47

3.    **The Lower Court Failed to Give the Standard, Black-Letter Law Inverse Ratio Rule Instruction and Erroneously Failed to Tell the Jury that the Burden of Proof for Substantial Similarity is Dependent on the Degree of Access Proven** …………………………… 53

    a.    **Standard of Review** …………………………………………… 53

    b.    **Objection Raised Below** ………………………………… 54

    c.    **Argument** ……………………………………………………… 54

4.    **The Court Erroneously Instructed the Jury on How to Perform the Extrinsic Test, Completely Omitting the Crucial Instruction that Combinations of Unprotected Elements are Themselves Afforded Protectability** ………………………………………………55

    a.    **Standard of Review** …………………………………………… 55

    b.    **Objection Raised Below** …………………………………56

    c.    **Argument** ………………………………………………………56

        i.    **Legal Standard** ………………………………………57

        ii.    **This Basic Instruction Was Not Given Despite Being Requested by Plaintiff and Plaintiff's Musicological Expert Testifying that the Combination of Musical Elements in "Taurus" Gave the Song Protection** ………… 57

5.    **The Trial Court Erroneously Instructed the Jury on Originality and the Scope of Protectability of Musical Elements; The Erroneous Instructions are in Direct Contravention of This Circuit's <u>Swirsky</u> Decision and Constitute Reversible Error** …………………………………………… 59

    a.    **Standard of Review** …………………………………………… 59

    b.    **Objection Raised Below** ………………………………… 59

    c.    **Argument** …………………………………………………… 60

        i.    The Court Seriously Erred when Defining Originality ...... 60

        ii.   The Court Erroneously told the Jury, Without Any Legal Support, that Certain Key Musical Elements in "Taurus" Do Not Have Copyright Protection ............................ 62

6.    **The Trial Court Erroneously Disregarded a Juror's Request to Hear the Requested and Correct of the "Taurus" Deposit Copy During Deliberations** ................................................................ 65

    a.   **Standard of Review** ............................................... 65

    b.   **Objection Raised Below** ....................................... 66

    c.   **Argument** ............................................................. 66

7.    **The Trial Court's Order Limiting Plaintiff's Trial Time to 10 Hours Violated Due Process and was Not Even Close to An Adequate Amount of Time to Try this Case** ......................................... 67

    a.   **Standard of Review** ............................................... 67

    b.   **Objection Raised Below** ....................................... 68

    c.   **Argument** ............................................................. 68

        i.    Legal Standard ............................................... 68

        ii.   The Court Imposed Clearly Inadequate, Inflexible Time Limits on Plaintiff which were Highly Unreasonable and Clearly Erroneous............................................. 69

        iii.  The Court's Time Limits were Severely Prejudicial and Especially Harmed Plaintiff's Efforts to Prove Substantial Similarity ....................................... 75

8.    **The Court Committed Reversible Error by Erroneously Refusing to Preclude the Testimony of Defense Musicologist Dr. Ferrara, or Grant a Negative Inference, Because Ferrara Had a Conflict of Interest which was Deliberately Concealed by Defense Counsel** ....................... 78

    a.   **Standard of Review** ............................................... 78

    b.   **Objection Raised Below** ....................................... 78

  **c.**   **Argument** …………………………………………………… 79

    **i.**   **Legal Standard**……………………………………………… 79

    **ii.**   **Dr. Ferrara's Testimony Should Never Have Been Allowed,**
      **or a Negative Inference Granted**……………………………… 80


CONCLUSION ………………………………………………………… 86

STATEMENT OF RELATED CASES …………………………………… 87

CERTIFICATE OF COMPLIANCE ……………………………………… 88

# Table of Authorities

## Cases

<u>Advanced Display Sys., Inc. v. Kent State Univ.</u>, 212 F.3d 1272, 1275 (Fed. Cir. 2000) ...... 28

<u>American Empire Surplus Lines v. Care Centers</u>, 484 F. Supp. 2d 855 (ND Ill. 2007) . 80, 84

<u>Bridgeport Music, Inc. v. UMG Recordings, Inc.</u>, 585 F.3d 267, 276 (6th Cir. 2009) .....37, 44

<u>Benay v. Warner Bros. Entm't, Inc.</u>, 607 F.3d 620, 625 (9th Cir.2010) ......................... 54

<u>Campbell Industries v. Gemini</u>, 619 F.2d 24 (9th Cir. 1980)....................................78, 79

<u>Cleveland v. Southern Pac. Co.</u>, 436 F.2d 77, 80-81 (9th Cir. 1970) ............... 53, 56, 59, 66

<u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 US 752, 762-63 ( 1984) ............... 34

<u>Cosmetic Ideas, Inc. v. IAC/lnteractivecorp.</u>, 606 F.3d 612, 618 (9th Cir. 2010) ...............31

<u>English Feedlot v Norden Labs., Inc.</u>, 833 F.Supp. 1498, 1504 (D. Col. 1993) .................. 79

<u>Feist Publications, Inc. v. Rural Telephone Service Co., Inc.</u>, 499 U.S. 340,
345-46 (1991) ...................................................................................... 60, 61, 64

<u>Flaminio v. Honda Motor Co.</u>, 733 F.2d 463 (7th Cir. 1984) ...................................69, 72

<u>Graver Mfg. Co. v. Linde Co.</u>, 339 US 605, 607 (1950) ............................................ 34

<u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197, 206-208 (9th Cir. 1989) .... 28, 46

<u>KnowledgePlex v. Placebase, Inc.</u>, No. C 08-4267, 2008 U.S. Dist. LEXIS 103915, at 29–30
(N.D. Cal. Dec. 17, 2008) .......................................................................... 35, 36

<u>MCI Commc'ns Corp. v. American Tel. & Tel. Co.</u>, 708 F.2d 1081, 1171 (7th Cir. 1983) 68-70

<u>Mc-Knight v. General Motors Corp.</u>, 908 F.2d 104, 115 (7th Cir. 1990) ....................... 69

<u>Murphy v. City of Long Beach</u>, 914 F. 2d 183 (9th Cir. 1990) ........................... 53, 56, 59

<u>Monotype Corp., PLC v. Int'l Typeface Corp.</u>, 43 F.3d 443, 451 (9th Cir.1994) ......... 67-69

<u>National Conference of Bar Examiners v. Multistate Legal Studies</u>, 692 F. 2d 478 (7th Cir.
1982)................................................................................................... 32, 33

<u>Newton v. Diamond</u>, 204 F. Supp. 2d 1244, 1259 (C.D. Cal. 2002) .................... 31, 37, 45

Oviatt By and Through Waugh v. Pearce, 954 F. 2d 1470 (9th Cir. 1992) ................... 53, 65

Pinal Creek Group v. Newmont Mining Corp., 312 F. Supp. 2d 1212 (D. Ariz. 2004) ........79

Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 157–69 (2010) ................................ 33, 35

Rinker v. County of Napa, 831 F.2d 829, 832 (9th Cir. 1987) ....................... 53, 56, 59, 66

Ruvalcaba v. City of Los Angeles, 64 F. 3d 1323 (9th Cir. 1995) ............................ 28, 46

Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) ............................................................................................................... 78

Scentsy, Inc. v. B.R. Chase, LLC, 942 F. Supp. 2d 1045, 1051 (D. Idaho 2013) ............... 34

Sec'y of Labor v. DeSisto, 929 F.2d 789, 795 (1st Cir. 1991) ........................................67

Sells v. Wamser, 158 F.R.D. 390 (S.D.Ohio 1994) .................................................... 80

Shadow Traffic Network v. Superior Court, 24 Cal. App. 4th 1067, 1084-85 (Court of Appeal 1994) ......................................................................................................79

Societe Civile Succession Guino v. Renoir, S49 F .3d 1182, 1185 (9th Cir. 2008) ......... 31, 32

Swirsky v. Carey, 376 F.3d 841, 849 (9th Cir. 2004) ............................................. et seq.

Sylvestre v. Oswald, No. 91 Civ. 5060, 1993 U.S. Dist. LEXIS 7002 at *4 (S.D.N.Y. May 18, 1993) .................................................................................................................35

Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000) ........................... et seq.

Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988) ...................................53, 55, 59, 65

United Housing Foundation, Inc. v. Forman, 421 US 837, 848 (1975) ......................... 34

United States v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992) ................... 28, 46

US v. Hinkson, 585 F. 3d 1247, 1260 (9th Cir. 2009) .......................................... 28, 46

US v. WR Grace, 504 F.3d 745 (2007) ..................................................... 46, 51-52

Villiarimo v. Aloha Island Air, Inc., 281 F. 3d 1054, 1061 (9th Cir. 2002) ...................... 28

Washingtonian Publ'g Co. v. Pearson, 306 U.S. 30, 41 (1939) ..................................35, 44

White-Smith Music Publ'g Co. v. Apollo Co., 209 U.S. 1, 10-11 (1908) ......................... 30

Williams v. Bridgeport Music, Inc., No. LA CV13-06004, 2014 WL 7877773, at *8 (C.D. Cal. Oct. 30, 2014) ..................................................................................................31

Williams v. Fenix & Scisson, Inc., 608 F.2d 1205, 1209 (9th Cir. 1979) ........................ 78

Woody v. Woody, 127 N.C. App. 626, 492 S.E.2d 382 (1997) ..................................... 69

## Statutes and Rules

Copyright Act of 1909, 35 Stat. 1075 (1909) (repealed 1978), §§ 1(e), 12 .................. et seq.

Copyright Act of 1831 (repealed 1909) ................................................................. 30

FRAP 4 ................................................................................................................12

Fed. Rule of Evidence 403...................................................................46, 49, 50-53

## Other Authorities

Ninth Circuit Model Instruction 17,16 supp. ......................................................... 54

2 NIMMER ON COPYRIGHT §7.17[A] (2016) .................................................32, 44

John E. Rumel, "The Hourglass and Due Process: The Propriety of Time Limits on Civil Trials," UNIVERSITY OF SAN FRANCISCO LAW REVIEW, at p.253 (Winter 1992) ... 69

# Introduction

This case is a copyright infringement action over the iconic rock and roll song, ""Stairway to Heaven"" by Led Zeppelin. Plaintiff Michael Skidmore alleges that the creator of the famous introduction to ""Stairway to Heaven"" was not Led Zeppelin guitarist Jimmy Page, but actually guitar prodigy Randy California (aka Randy Wolfe) of the band Spirit. The alleged copying by Led Zeppelin was of Mr. Wolfe's composition ""Taurus"," on Spirit's eponymous first album from 1968—which Mr. Page admits to possessing. Plaintiff Michael Skidmore is the trustee of the trust that was created to preserve the late Randy California's memory.

A quick listen to the composition of ""Taurus"" on Spirit's first album and ""Stairway to Heaven"" makes it quite clear that Mr. Page undoubtedly relied upon ""Taurus"" to create the nearly identical introduction to ""Stairway to Heaven"." Led Zeppelin not only opened for Spirit in 1968, played several shows with them, covered a Spirit song, and owned several Spirit albums, but Mr. Page also extensively praised Spirit in interviews before and after he created ""Stairway to Heaven"" in 1971. Despite Led Zeppelin's denials, the jury was unequivocally clear that Led Zeppelin had access to ""Taurus"," one of the key elements in a copyright infringement case.

Yet, the jury did not find that the songs were substantially similar, the other

key element for finding copyright infringement, finding against Plaintiff on the extrinsic analysis test.

The reason for this is because the lower court made several evidentiary errors and also erroneously instructed the jury on how to perform the extrinsic analysis. The most important of these errors was that the trial court refused to let the jury hear the full and complete composition of "Taurus" embodied in the sound recordings that Jimmy Page possessed, instead limiting the comparison to an outline of the "Taurus" composition in the deposit copy lead sheet. The jury was not allowed to compare the complete "Taurus" composition that defendant James Patrick Page possess and allegedly copied, but instead was forced to make an artificial comparison between an inaccurate version of "Taurus" more dissimilar to "Stairway to Heaven". This was highly prejudicial and requires reversal.

Furthermore, although the "Taurus" deposit copy and "Stairway to Heaven" are substantially similar, the trial court gave a series of erroneous instructions on the scope of copyright protection and the extrinsic test which told the jury that virtually none of the protected expression in the "Taurus" was protected and could not be substantially similar to "Stairway to Heaven" as a matter of law.

These errors, and several others, resulted in a trial verdict for the defense on

substantial similarity that was unfounded. The trial verdict should be reversed, vacated, and remanded for a new trial.

## Statement of Jurisdiction

This appeal arises from a music copyright infringement trial in the Central District of California. Pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., the District Court had federal question jurisdiction over the copyright claims pursuant to 28 U.S.C. § 1331. The Ninth Circuit Court of Appeals has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, as Plaintiffs-Appellant are appealing the final order of the District Court entered on June 23, 2016. Appellant's notice of appeal of the final order was timely filed on July 23, 2016, within the 30-day deadline prescribed by FRAP 4.

## Request for Oral Argument

Appellant affirms that he believes that oral argument would be beneficial to resolving this appeal and the issues raised herein as they are not only complicated but the resulting Appellate court decision could affect many copyrighted works under the 1909 Copyright Act.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1)      Whether the trial court erroneously precluded the composition of "Taurus" as embodied in the sound recordings of "Taurus", artificially limiting the substantial similarity comparison to an outline of "Taurus's" composition submitted to the Copyright Office.

2)      Whether the trial court committed reversible error by failing to admit the sound recording of "Taurus" to prove access.

3)      Whether the trial court committed reversible error by refusing to give an instruction on the inverse ratio rule without any explanation or justification for the exclusion.

4)      Whether the trial court committed reversible error by failing to instruct the jury that combinations and arrangements of unprotectable musical elements are protectable.

5)      Whether the trial court committed reversible error by erroneously instructing the jury on originality and the scope of protection for certain musical elements.

6)      Whether the trial court erroneously failed to play requested and correct version of the "Taurus" deposit copy for the jury during deliberations.

7)      Whether the trial court committed reversible error and violated Plaintiff's due process rights by inflexibly limiting plaintiff's time to present his case to ten hours, inclusive of direct exam, cross exam, and rebuttal.

8)      Whether the trial court committed reversible error by erroneously refusing to preclude the testimony of defense musicologist Dr. Lawrence Ferrara who concealed his prior employment by Plaintiff's publisher to analyze "Taurus" and "Stairway to Heaven".

# PERTINENT LEGAL AUTHORITY

The 1909 Copyright Act, specifically sections 1(e) and 12, is attached as an

addendum to this brief.

# Statement of the Case

## Writing of "Taurus" and "Stairway to Heaven"

Randy Wolfe was a musical genius. (Excerpt 281). In early 1966, at age 15, his family moved to New York where in June, he met Jimi Hendrix. (Excerpt 283). While playing many shows with Hendrix, Hendrix nicknamed Wolfe "Randy California." (Excerpt 284). Hendrix invited Wolfe to play with The Jimi Hendrix Experience in London, however, Randy's mother thought he was too young so Randy's family moved back to California in September 1966. (Excerpt 285).

In late 1966, Wolfe met a girl named Robin whom he fell in love with and later married. (Excerpt 285-86). Her astrological sign was "Taurus", so Randy named a new song he wrote "Taurus". (Excerpt 286). In late 1966 through the summer of 1967 Wolfe's band Spirit played every week in Hollywood at a club called the Ash Grove. (Excerpt 287-88). One of the songs they played every night was "Taurus". (Excerpt 288). The recordings of Spirit playing the Ash Grove show that the composition of "Taurus" was in a concrete, definite, and final form in early to mid-1967. (Audio Exhibits 32-39).[1] Later in early 1967, Wolfe met a producer named Lou Adler who signed the band to a recording contract on August 29, 1967. (Excerpt 289-

---

[1] All referenced audio exhibits and trial exhibits were submitted by way of a concurrently filed Motion to Transmit to Physical Exhibits.

90). The first Spirit album was released in late 1967. (Excerpt 317). Hollenbeck then filed a copyright for *"Taurus"* that listed Randy California as the author. (Excerpt 2639, 2754). The composition of "Taurus" on the album recording was the same as the earlier shows played at the Ash Grove. As part of the registration packet, a deposit copy lead sheet was transcribed by "B. Hansen." (Trial Exhibit 2058; Excerpt 2642).

The band later embarked that same year on a lengthy tour in support of the album, which features, among other cuts, "Taurus" and another song called "Fresh Garbage." (Excerpt 289). The new group Led Zeppelin, consisting of Page, Plant, bassist John Paul Jones, and drummer John Bonham (now deceased), was at that time just starting. (Excerpt 309). On December 26, 1968, Led Zeppelin performed its first show in the United States in Denver, Colorado. Zeppelin was the opening act that night for Spirit and covered a Spirit song named "Fresh Garbage." (Excerpt 309, 484-87) (Trial Exhibit 313).

Led Zeppelin and Spirit continued to play shows together (Excerpt 314), and even when the members of Led Zeppelin were not performing, they came to Spirit shows to watch. (Excerpt 360-61; Trial Exhibit 321). In interviews at the time, Page expressed his affection for Spirit, their music, and their performances, stating that Spirit struck him on an "emotional level." (Trial Exhibits 157, 160). In homage to

Spirit, Led Zeppelin had been performing the Spirit song *Fresh Garbage* at its own shows even before Zeppelin opened for Spirit on December 26, 1968. (Excerpt 484-87)

Led Zeppelin wrote "Stairway to Heaven" in 1970 and 1971, as part of the unnamed album commonly known as Led Zeppelin IV. (Excerpt 650). Defendants Page and Plant have writing credit for "Stairway to Heaven," which is one of the most successful songs in history. (Excerpt 694). A former Spirit band member, Larry Knight, testified that in 1973 he spoke with defendant Page in 1973 at an after party for a Spirit show, where Page gushed how much he liked the band. (Excerpt 711-12). Knight also testified that he saw Randy California and defendant Page interacting at the after party. (Excerpt 713-14)

### Filing of Lawsuit, Litigation, and Trial

After Randy Wolfe's drowning death in 1997, his mother set up the Randy Craig Wolfe Trust. (Excerpt 293-94). All of Randy California's intellectual property, including his ownership in "Taurus", was transferred to the Trust. (Excerpt 846). After the decision in <u>Petrella v. MGM</u> stating that copyright infringement lawsuits could be filed for infringement within the last three years, the Trust filed suit against Led Zeppelin for infringing Wolfe's song "Taurus" in the famous song "Stairway to Heaven." (Excerpt 2713). The specific musical expression at issue were the iconic

opening notes of "Stairway to Heaven" which Plaintiff alleges are substantially similar to "Stairway to Heaven's" opening notes.

Defendants disputed ownership, access, and substantial similarity, and also alleged several affirmative defenses such as unclean hands and independent creation. (Excerpt 2645, 2681, 1868). After discovery, Defendants filed for summary judgment alleging, *inter alia*, that the songs were not substantially similar, and also that the only protectable expression in Taurus was in the deposit copy lead sheet. (Excerpt 2598). Plaintiff responded in opposition to the motion, noting that his experts had found that the protectable composition in the Taurus copyright was nearly identical to Stairway to Heaven's iconic opening notes. (Excerpt 2412, 2504, 2180, 2199, 2231; Audio Exhibits 7-11 [Taurus/Stairway Comparison], 40-44 [same but temp synced]).

The Court denied summary judgment and found that there were triable issues of fact on ownership, access, and substantial similarity. (Excerpt 117). However, at summary judgment, over Plaintiff's opposition (Excerpt 2436-37), the court stated that the protected composition of "Taurus" was limited to the deposit copy lead sheet of "Taurus." (Excerpt 133).

After motions in limine were filed, the Court further ruled (again over Plaintiff's objections) that only the exact notes on the deposit copy of "Taurus" had

protection under the 1909 Act and that no sound recordings of "Taurus" could be admitted. (Excerpt 73-74, 1865, 1866-67). The Court also precluded any sound recording of "Taurus" to prove access, and also precluded any and all expert testimony on access by comparing the sonic landscapes and production techniques utilized in "Taurus" and "Stairway to Heaven." Id. Plaintiff contended the sound recordings, even if precluded (erroneously) for substantial similarity, nevertheless demonstrated striking similarity for proving access and lack of independent creation. (Excerpt 1831, 2101, 2114).

At trial, the Court imposed rigid, inflexible time limits on the parties, stating that Plaintiff would only be entitled to 10 hours of trial time for all direct, cross, and rebuttal examination---and erroneously refused to meaningfully extend the limits. (Excerpt 89, 1064-65). An approximately five day jury trial then took place. Plaintiff's experts were musicologist Dr. Alexander Stewart (Excerpt 771) and master guitarist Kevin Hanson (Excerpt 726). Defendant's experts were Dr. Lawrence Ferrara (Excerpt 929), and master guitarist Robert Mathes (Excerpt 1090).

Following the trial, the court instructed the jury. (Excerpt 11-44, 1372). Plaintiff's contends that the Court gave several erroneous or inadequate instructions, including a misleading and confusing description of the extrinsic test

and the scope of protection in copyright law. The jury returned a defense verdict, finding that Plaintiff had proven ownership of "Taurus" and that Defendants had in fact had access had access to "Taurus", but that Plaintiff had not satisfied the extrinsic test for substantial similarity. (Excerpt 3-6).

This appeal timely followed.

## Summary of Argument

1.  **The Court Erroneously Precluded the Composition of "Taurus" as Embodied in the Sound Recordings of "Taurus", Artificially Limiting the Substantial Similarity Comparison to an Outline of "Taurus's" Composition Submitted to the Copyright Office**

The first reversible error of the trial court was its refusal to allow the jury to consider the actual composition of "Taurus" by Randy California and recordings which evidenced the same. The jury never heard "Taurus" as *Jimmy Page (and the rest of the public) heard the song* in 1967-68 and in which Plaintiff had protection. The jury was made to artificially compare a version of "Taurus" more dissimilar to "Stairway to Heaven" than the complete composition.

The lower court incorrectly held that the composition of "Taurus" was strictly limited to *the exact notes* indicated on a simplistic archival lead sheet of "Taurus" that had been submitted to the Copyright Office in 1967 as part of the registration packet, but which had never been performed or seen by anyone other

than the transcriptionist. The Court precluded any and all evidence regarding the actual album recording and composition of "Taurus" which Defendants had heard and copied and in which Plaintiff had copyright protection.

These rulings were plainly incorrect. For works created prior to the Copyright Act of 1976, and governed by the 1909 Copyright Act, a work had common law copyright protection for its composition in the song's final version at the moment of creation. Upon registration with the Copyright Office, the common law copyright protection then became a federal copyright. The 1909 Copyright Act specifically defines the scope of protectable compositional expression in a musical work as "any system of notation or any form of record in which the thought of an author might be recorded and from which it may be read or reproduced." 1909 Act, § 1(e). This includes piano rolls, recordings, sheet music, and any other form of expression. The 1909 Act was specifically enacted to open up the scope of protected expression beyond merely sheet music. There is no indication that federally registering the common law copyright could in anyway result in the limitation of the scope of the copyright.

The lower court based its decision on an erroneous belief that only written sheet music has compositional protection. The court thus thought that when the 1909 Act required that "complete copy" of the work being copyrighted be

submitted to the Copyright office with the registration application, that such copy delimited the scope of protection in the work. See 1909 Act, § 12. But, nowhere in the case law or the 1909 Act, is it contemplated that this purely archival requirement governs the scope of the composition in the work. The Seventh and Ninth Circuit Courts, who have examined this deposit requirement, both hold that the substantial similarity comparison is not limited to the notes on the deposit copy lead sheet and that sound recordings are admissible to prove that protected expression was copied.

The result at trial was that Plaintiff and his experts were forced to compare a more dissimilar and inaccurate version of "Taurus" to "Stairway to Heaven", instead of the correct and complete composition in the album version of "Taurus" which is practically identical to "Stairway to Heaven". This was highly prejudicial, unprecedented, and requires vacation, reversal and remand.

## 2. The Trial Court Committed Reversible Error by Failing to Admit the Sound Recording of "Taurus" to Prove Access

The court also precluded the sound recordings of "Taurus" to prove access, despite admitting that it was relevant for this purpose. In this case, Led Zeppelin was disputing that they had access to "Taurus" or had ever heard it prior to creating "Stairway to Heaven". Plaintiff presented much evidence of access, including that Led Zeppelin opened for Spirit, extensively praised Spirit, and owned Spirit albums (including one with "Taurus" on it). However, the centerpiece of the access case

was the fact that the sonic landscapes of "Taurus's" album recording and "Stairway to Heaven's" album recording are practically identical and preclude independent creation.

Plaintiff therefore intended to play the "Taurus" album version that Jimmy Page admits to owning for Page, and ask if Page and Plant heard "Taurus" before creating "Stairway to Heaven". It would be up to the jury to evaluate Page and Plant's credibility. Plaintiff also intended to demonstrate through expert testimony that the sonic landscape of the two songs was strikingly similar and precluded independent creation. Yet, the trial court simply refused to let the jury hear the sound recording that Page had listened to and used to create the infringing song "Stairway to Heaven", finding that it would be "unduly prejudicial" to the substantial similarity comparison.

It was Defendants' choice to contest access. Their contest of access made the album recording of "Taurus" relevant. It was not for the court to preclude the jury from hearing this highly relevant evidence, and to prevent expert testimony on this topic, when Plaintiff had to prove this element. This is an example of the Court bending over backwards to preclude evidence that damaged Defendants' case. The court's ruling that the album recording is "unduly prejudicial" to the substantial similarity comparison is a de facto admission that the album version of "Taurus"

that was improperly precluded for both access and substantial similarity was nearly identical to "Stairway to Heaven".

Plaintiff notes that although the jury found that he did prove access, the court's decision to preclude the sound recording prevented Plaintiff from otherwise establishing a higher a degree of access. The degree of access is important under the Inverse Ratio Rule.

### 3. The Court Committed Reversible Error by Refusing to Give an Instruction on the Inverse Ratio Rule Without Any Explanation or Justification for the Exclusion

The lower court's third reversible error was that the trial failed to give an instruction on the Inverse Ratio Rule, which states that the higher degree of access proven by the plaintiff requires the jury to concomitantly lower the burden of proof for the plaintiff on proving substantial similarity.

Plaintiff spent a great deal of its case proving access (and was successful in doing so) relying on the fact that the Inverse Ratio Rule has been the law in the Ninth Circuit for decades. The inverse ratio rule provides that the higher the degree of access proven by Plaintiff lowers Plaintiff's burden to prove substantial similarity.

The failure to give this important instruction enervated a huge part of Plaintiff's trial strategy and was reversible error. It is impossible that the jury reached an informed decision on substantial similarity when it was never instructed by the trial court on how to determine the appropriate burden for substantial similarity.

Access and substantial similarity are inextricably linked, yet the jury was asked to render a verdict without a key instruction that describes this relationship.

**4. The Trial Court Committed Reversible Error by Failing to Instruct the Jury that Combinations and Arrangements of Unprotectable Musical Elements are Protectable**

The Court erroneously told the jury how to conduct the extrinsic substantial similarity test. The jury was never told that combinations of otherwise unprotectable elements can themselves be afforded protection. This is a key concept to understanding the protectability of compositions and the extrinsic test and was a large basis for Plaintiff's expert musicologist's opinion.

Despite Plaintiff *and Defendants* both asking for this standard instruction, the trial court simply failed to give the instruction at all, without explanation. The failure to give this instruction failed to inform the jury about a key copyright concept without which the jury's conclusion, that the extrinsic test was not satisfied, could not have been based on an informed understanding of what expression is protectable and capable of being copied.  This was highly prejudicial, reversible error.

**5. The Court Committed Reversible Error by Erroneously Instructing the Jury on Originality and the Scope of Protection for Certain Musical Elements**

The trial court erroneously instructed the jury on originality, stating that if a musical element or device appeared in the prior art, it was unprotectable. This is, in fact, not true under binding Ninth Circuit precedent. As long as the element in

question was independently created by the artist, it is original and protectable.

In addition, the jury was told by the lower court that certain musical elements, such as descending chromatic scales, are not protectable as a matter of law. This was actually incorrect and unsupported by any case law; the expert testimony made it clear that the way the descending chord was used in "Taurus", and copied in "Stairway to Heaven", was in fact unique and protectable.

Thus, the jury was erroneously told that a vast swath of musical expression in "Taurus" was not protected under copyright law as a matter of law. This instruction compounded the court's error in not instructing the jury that combinations and arrangements of protected and unprotected elements are protectable and was reversible error

### 6. The Trial Court Erroneously Failed to Play Requested and Correct Version of the "Taurus" Deposit Copy During Deliberations

The jury requested that Plaintiff's guitar version of the "Taurus" deposit copy be played during deliberations, along with "Stairway to Heaven". Plaintiff argued that the jury obviously meant the bass clef of the "Taurus" deposition, which is similar to "Stairway to Heaven" and was played throughout trial---not the version of the "Taurus" deposit copy which combined the bass and treble clef which Defendants advocated for (the two clefs are supposed to be played separately and this version was only played once during trial). Upon being asked by the court, one

juror told the court that he wanted the bass clef played as Plaintiff had argued, while another stated that it wanted the version Defendants advocated for.

The court erroneously only played the version more favorable to Defendants, after which the jury found in favor of defendants on substantial similarity. This was highly prejudicial reversible error.

### 7. The Trial Court Committed Reversible Error and Violated Plaintiff's Due Process Rights by Inflexibly Limiting Plaintiff's Time to Present His Case to Ten Hours, Inclusive of Direct Exam, Cross Exam, and Rebuttal

The trial court stated at the beginning of the case that it was limiting Plaintiff to ten hours to try the entire case, including direct, cross, and rebuttal witnesses. This extremely short time limit to try a very complicated case is unjustifiable and arbitrary. In this case, nearly every element of the copyright claims were in dispute and there were multiple affirmative defenses to contend with. Plaintiff had the burden of establishing at trial the elements of ownership, access, and substantial similarity, yet was only allotted approximately 5 to 6 hours by the trial court to do so.

Moreover, the Court was incredibly inflexible in adjusting these time limits as necessary, which severely harmed Plaintiff's substantial similarity case in particular. The court allowed Plaintiff's counsel just minutes to cross examine the main defense musicologist, and refused to allow any rebuttal witnesses on substantial similarity. Plaintiff lost this case on substantial similarity.

These extremely short time restrictions are unprecedented in a trial of this complexity, where Defendants contested nearly every element of the claim. Plaintiff is entitled to a sufficient amount of time to carry his burden and dispute Defendants' evidence; a ten hour limitation on a case of this complexity is arbitrary, clearly erroneous, and is reversible error.

**8. The Trial Court Committed Reversible Error by Erroneously Refusing to Preclude the Testimony of Defense Musicologist Dr. Lawrence Ferrara who Concealed His Prior Employment by Plaintiff's Publisher**

The court should have precluded the appearance and testimony of defense expert musicologist Dr. Lawrence Ferrara in its entirety, or granted a negative inference against him. Shortly before the case went to trial, Plaintiff discovered that Defendants and defense counsel were concealing the fact that their lead musicological expert, Dr. Lawrence Ferrara, had previously conducted a musicological analysis of "Taurus" and "Stairway to Heaven" for Plaintiff's publisher and fiduciary. Plaintiff has asked for any and all such information and reports in discovery, but this was never produced or disclosed.

Although Plaintiff both filed a motion for sanctions and raised this objection at trial, the Court improperly failed to preclude Dr. Ferrara's testimony despite the fact that there was an undeniable conflict of interest which was improperly hidden.

# ARGUMENT

1. **The Full Composition of "Taurus" as embodied in the Album Recording Should Have Been Admitted at Trial for the Substantial Similarity Comparison; The Archival Deposit Lead Sheet Does Not Limit the Scope of Protectability in a 1909 Act Musical Work**

   a. **Standard of Review**

   Rulings at summary judgment are reviewed *de novo*. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F. 3d 1054, 1061 (9th Cir. 2002).

   Erroneous evidentiary rulings can be the basis to reverse a jury verdict and order a new trial. <u>Ruvalcaba v. City of Los Angeles</u>, 64 F. 3d 1323 (9th Cir. 1995) (citing <u>United States v. 99.66 Acres of Land</u>, 970 F.2d 651, 658 (9th Cir. 1992)); <u>see also</u> <u>Advanced Display Sys., Inc. v. Kent State Univ.</u>, 212 F.3d 1272, 1275 (Fed. Cir. 2000); <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197, 206-208 (9th Cir. 1989).

   Evidentiary rulings based on legal errors are reviewed *de novo*. <u>US v. Hinkson</u>, 585 F. 3d 1247, 1260 (9th Cir. 2009). This erroneous evidentiary ruling is legal in nature and should be reviewed *de novo*.

   b. **Objection Raised Below**

   The trial court ruled over Plaintiff's objection at summary judgment and on motions in limine that only the exact notes on the deposit copy lead sheet constitute the protectable composition of "Taurus". (Excerpt 73, 613-14, 635, 736). The jury

instructions erroneously told the jury "plaintiff has no rights in any sound recording of "Taurus", and claims rights only in the musical composition "Taurus" as transcribed in the deposit copy." (Excerpt 29). Plaintiff opposed this argument and ruling at, inter alia, summary judgment (Excerpt 2149-52, 2436-38, 2516), motions in limine (Excerpt 2115-17, 2122-23, 2095-2097), in the disputed jury instructions (Excerpt 2015-16), and at trial. (Excerpt 597-98, 734-36).

    **c.    Argument - The Trial Court Erroneously Failed to Admit the Sound Recordings of "Taurus", and the Composition Thereof, for the Substantial Similarity Comparison; the Jury Was Made to Compare an Artificial, Inaccurate Version of "Taurus" to "Stairway to Heaven", Resulting in a Defense Verdict of Substantial Similarity**

The Court improperly did not admit the correct and complete composition of "Taurus". The correct and complete composition of "Taurus" was that embodied in the album recording of "Taurus" released to the public in 1967-68. (Excerpt 2122, Audio Exhibit 32 - "Taurus" [submitted by way of Motion to Transmit Physical Exhibit]). This was the version of "Taurus" that Jimmy Page owned, heard from the album, heard live in concert, and copied. (Excerpt 493, 462, 553-56). The composition contained and represented in the "Taurus" album recording (and other live "Taurus" recordings) was the best evidence for the substantial similarity comparison between "Taurus" and "Stairway to Heaven".

However, the trial court erroneously ruled that the only composition of "Taurus" that was admissible for the substantial similarity comparison were the exact notes on the archival deposit copy of "Taurus" submitted to the Copyright Office in 1967 for the song's federal copyright registration. (Excerpt 73, 613-14, 635, 736). The ruling by the court, that only the *exact notes* on the archival lead sheet constituted the protected expression in "Taurus", was clearly erroneous as a matter of law. The Court's ruling was unprecedented and directly contradicts Ninth Circuit precedent.

This was an unduly prejudicial evidentiary ruling which prevented Plaintiff from using the composition of "Taurus" most similar to "Stairway to Heaven".

### i. The Scope of Protection for Musical Works Under the 1909 Copyright Act Extends to the Compositional Parts of the Work Consistently Played the Same from Performance to Performance

The 1909 Act was implemented because Congress believed that limiting copyright protection to sheet music alone was too restrictive with the advent of new ways of recording music such as piano player rolls. Compare Copyright Act of 1909, 35 Stat. 1075 (1909) (repealed 1978) with White-Smith Music Publ'g Co. v. Apollo Co., 209 U.S. 1, 10-11 (1908) (holding that the only musical expression protected under 1831 Copyright Act was sheet music and inviting Congress to expand scope of

protection). Thus, Congress moved to *expand* the scope of copyright protection in the 1909 Act by defining the scope of protection in musical works as:

> any system of notation or any form of record in which the thought of an author might be recorded and from which it may be read or reproduced.

1909 Act, § 1(e). The composition of a musical work is defined as those parts of a work consistently played the same. Newton v. Diamond, 204 F. Supp. 2d 1244, 1259 (C.D. Cal. 2002) ("A musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece.").[2] (See also Excerpt 2122, 2095-99).

"Under the 1909 Act, a work was protected by common law copyright from the moment of its creation." Summary Judgment Opinion (Excerpt 126) (citing Societe Civile Succession Guino v. Renoir, S49 F .3d 1182, 1185 (9th Cir. 2008)). However, common law copyright protection was divested, and federal copyright protection began, when the work was published and/or registered with the Copyright Office. Id. (citing Williams v. Bridgeport Music, Inc., No. LA CV13-06004, 2014 WL 7877773, at *8 (C.D. Cal. Oct. 30, 2014); Cosmetic Ideas, Inc. v. IAC/lnteractivecorp., 606 F.3d 612, 618 (9th Cir. 2010)).

---

[2] Plaintiff wanted to introduce multiple recordings of "Taurus", both live and in the studio, to illustrate what compositional elements of "Taurus" necessarily resulted from any rendition of the piece, *excluding any performance related aspects which do not deserve protection*. (Excerpt 2095-99 - Declaration of Erik Johnson).

### ii. The Deposit Copy Lead Sheet Does Not Limit the Scope of Copyright in a Musical Work Created by Common Law and Defined in 1909 Act, §1(e)

As part of the registration process another section of the 1909 Act requires that a "complete" copy of the work being copyrighted be submitted with the copyright office. 1909 Act, §12. However, this deposit requirement has always been purely archival in nature and was never intended to affect the scope of copyright protection provided for in §1(e). 2 NIMMER ON COPYRIGHT §7.17[A] (2016). There is no case law anywhere which states that the scope of common law copyright protection that works obtain once created, <u>Societe Civile Succession</u>, S49 F .3d at 1185, could somehow be limited by registering the copyright with the Copyright Office. The very notion is absurd.

The Seventh Circuit noted that the 1976 Copyright Act (substantively identical, in this respect, to the corresponding predecessor sections of the 1909 Act) does not require a deposit copy be submitted for the purpose of disclosing and establishing any claimed scope of copyright protection:

> [the Copyright Act] when viewed as a whole negates the notion that deposit requirements are for the purpose of delineating the scope of a copyright through public disclosure.

<u>National Conference of Bar Examiners v. Multistate Legal Studies</u>, 692 F. 2d 478 (7th Cir. 1982). Indeed, nowhere does the 1909 Act state that the deposit copy

submitted pursuant to §12 governs the scope of copyright protection, nor does any appellate case law. Instead, registration (which includes the deposit copy requirement) is simply a "precondition" to filing a copyright infringement lawsuit. See Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 157–69 (2010). It is not substantive.

Ninth Circuit precedent conforms with the Seventh Circuit's National Conference of Bar Examiners opinion that the deposit copy lead sheet does not define the scope of copyright. In Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000), the Ninth Circuit was confronted with what a "complete copy" means for a musical work under the 1909 Act. The Court held that

> Although the 1909 Copyright Act requires the owner to deposit a ``complete copy'' of the work with the copyright office, our definition of a ``complete copy'' is broad and deferential: ``Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'' Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th Cir.1984) (citations omitted).

Id. at 486-87. The Ninth Circuit then permitted an extensive analysis in Three Boys Music of the composition of the album recording of the underlying song and this Circuit **did not limit the comparison to the deposit lead sheet or preclude the sound recordings**. Id. at 485-86. In that case the defendants were making a highly similar argument to the one in this case, that the inaccurate/incomplete deposit copy

lead sheet should have controlled the litigation. Id. at 486-87 ("[defendants] claimed that the deposit copy does not include the majority of the musical elements that were part of the infringement claim").

The Ninth Circuit's holding simply noted that when an incomplete or inaccurate deposit copy had been submitted for a nonfraudulent reason, and all the parties were well aware of the underlying work that was alleged to have been copied, it is simply not prejudicial to focus the case on the actual composition of the musical work embodied in the album version of the song, instead of an inaccurate version of the deposit lead sheet. Id. at 486-87. The Three Boys Music approach not only comports with the entire purpose and language of the 1909 Act, but avoids elevating form over substance, something decried by the Supreme Court. See Copperweld Corp. v. Independence Tube Corp., 467 US 752, 762-63 ( 1984) (disapproving of legal doctrine that "'makes but an artificial distinction' at the expense of substance"); United Housing Foundation, Inc. v. Forman, 421 US 837, 848 (1975); Graver Mfg. Co. v. Linde Co., 339 US 605, 607 (1950).

Numerous other cases confronted with more or less the same question have held that the deposit copy does not control what the work is: Scentsy, Inc. v. B.R. Chase, LLC, 942 F. Supp. 2d 1045, 1051 (D. Idaho 2013), *aff'd in part & rev'd in part on other grounds sub nom.*, Scentsy, Inc. v. Harmony Brands, LLC, 585 F. App'x 621

(9th Cir. 2014); <u>Sylvestre v. Oswald</u>, No. 91 Civ. 5060, 1993 U.S. Dist. LEXIS 7002 at *4 (S.D.N.Y. May 18, 1993); <u>KnowledgePlex v. Placebase, Inc.</u>, No. C 08-4267, 2008 U.S. Dist. LEXIS 103915, at 29–30 (N.D. Cal. Dec. 17, 2008);[3] <u>see also</u> <u>Washingtonian Publ'g Co. v. Pearson</u>, 306 U.S. 30, 41 (1939) ("the requirement for deposit is not for the purpose of a permanent record of copyrighted publications and . . . such record is not indispensable to the existence of the copyright").

The defense expert himself, Dr. Lawrence Ferrara, testified in his deposition that "Stairway to Heaven's" "finished composition" is embodied in the *album recording* of that song not the deposit copy. (Excerpt 1650). Indeed, the trial court allowed the full composition of "Stairway to Heaven" to be played ad nauseam.

Note that deposit copy lead sheets submitted to the Copyright Office are almost always outlines of the registered work and almost never represent the entirety

---

[3] The trial court stated that <u>Three Boy Music</u> and <u>KnowledgePlex</u>'s rulings are distinguishable because the deposit copy requirement is jurisdictional in nature. (Excerpt 132). **First,** this is not accurate. The Supreme Court ruled in <u>Reed Elsevier</u>, 559 U.S. at 157–69 (that registration requirements are not jurisdictional, but simply are preconditions to suit. **Second**, regardless whether the requirement is jurisdictional, a precondition, or substantive, it is a distinction without a difference. There is no reason to distinguish between jurisdictional or substantive reasons what "complete" means under the 1909 Act. Clearly, under the 1909 Act, the common law, and the applicable case law, **the deposit copy was never intended to define the scope of the composition of a copyright. Third,** if the registration deposit requirement is jurisdictional or a precondition, this actually supports Plaintiff's point. A jurisdictional requirement of the 1909 Act should not be used to delimit the scope of copyright protection in a work.

of the protected composition covered by §1(e). (Excerpt 2515-16 - Plaintiff's Expert Report); KnowledgePlex, C 08-4267 JF (RS), 2008 WL 5245484, at *9. For example, the lead sheet deposit copy submitted for "Stairway to Heaven" is significantly incomplete when compared to the actual composition of the song in the album recording. (Excerpt 1649-51). The "Stairway to Heaven" deposit copy does not even include the iconic opening notes, and defense musicological expert Dr. Lawrence Ferrara admitted that the transcription he made of "Stairway to Heaven's" "finished composition" in the album recording was around 11,000 notes, while the "Stairway" deposit copy was just 400. (Excerpt 1649-51).

All of the foregoing illustrates that neither Congress, the courts, nor the music community ever intended or thought that the deposit copy being submitted to the Copyright Office (as a simple prerequisite to obtain federal copyright) in anyway could limit the common law copyright that vested in the song at the time of creation.

iii. **Despite the Case Law and 1909 Act Being Clear that the Deposit Copy Does Not Limit the Scope of Protection in a Musical Work, The Court Ruled that Plaintiff Could only Compare the Exact Notes of the "Taurus" Deposit Copy to the "Stairway to Heaven" Album Recordings and Could Not Play Sound Recordings of the Song**

The trial court badly misunderstood basic copyright law principles leading to the erroneous ruling. This is illustrated by how the court chose to instruct the jury on musical compositions:

> A musical composition consists of rhythm, harmony and melody as transcribed in written form. The performance of a musical composition can be recorded, but under the law musical composition and sound recordings are different works with different potential copyrights.

(Excerpt 29). It is flat wrong to state that a musical composition only exists as transcribed in written form and explicitly contradicts 1909 Act, §1(e). There is no case law to support such a statement. It contradicts black letter copyright law and binding Ninth Circuit precedent. Swirsky v. Carey, 376 F.3d 841, 849 (9th Cir. 2004); Three Boys Music, 212 F.3d at 485; see also Newton, 204 F. Supp. 2d at 1259. A protected musical composition can *obviously* exist wholly independent of written sheet music in a piano roll, a sound recording, or a video. Id. In Bridgeport Music, Inc. v. UMG Recordings, Inc., the Sixth Circuit observed that a song's composition could be "embedded in the sound recording," independent of any sheet music. 585 F.3d 267, 276 (6th Cir. 2009).

Because of this failure to understand basic copyright principals, the trial court ruled that the scope of copyright protection in a work is strictly limited to **only the exact notes on the written deposit copy lead sheet**. (Excerpt 73, 613-14, 635, 736) (stating to Plaintiff's expert Kevin Hanson: "You can play notes of the deposit copy only.").

This was the first time in history such a restrictive ruling had been made and there was no support for it in the 1909 Act, the common law, or the case law applying the same. The Court even prevented Plaintiff from presenting evidence on the tempo and genre of "Taurus", clearly protectable compositional elements under the 1909 Act, because they were not written on the deposit copy. (Excerpt 512, 1048-49). All of this can be connected to the court's erroneous belief that a musical composition only exists in written form.

The Court erroneously imported into §12 of the 1909 Act a meaning and purpose it was never intended to have (to limit the scope of copyright), which was instead a task explicitly addressed by §1(e) and the common law. Indeed, in the last century, *no court has ever so limited a copyright infringement substantial similarity comparison* as this court did. The trial court's decisions were based on a thoroughly erroneous view of basic copyright law principles.

### iv. At a Minimum the District Court Should Have Ruled that Composition in the Sound Recording is Admissible to the Extent Represented in the Deposit Copy

After the court erroneously ruled at summary judgment that the deposit copy limited the scope of copyright protection in "Taurus" from the protection it was originally afforded under common law and section 1(e), Plaintiff also argued that the court should adopt the approach of the court in the <u>Williams v. Bridgeport</u> case (Blurred Lines). <u>See</u> (Excerpt 2115-17) [Plaintiff's Response to Defense MIL 3] (citing <u>Williams v. Bridgeport</u>, Order Denying Post-Trial Motions, 13-cv-6004 (Doc. No. 423), at p7. (7/14/2015) ("I think [the Gaye Parties' expert] testimony is going to have to be based on the deposit copy. It's not to say they can't have listened to the sound recording as part of their analysis. They simply can't present to the jury an opinion that says, '[b]ecause I listened to the sound recording, I've reached this conclusion.'")).

The trial court in that case held that as long as there was expert testimony that the composition in the sound recordings were represented in some way in the deposit copy, that the compositions in the recordings were admissible to the extent embodied in the deposit copy. <u>Id.</u> Plaintiff made the same argument as Bridgeport at motions in limine <u>Id.</u> Plaintiff's experts opined that all pertinent elements of "Taurus", especially the guitar melody central to the case, are represented on the

deposit copy and that those compositional elements are also present in the "Taurus" sound recording. (Excerpt 2122-23). Plaintiff's argument was disregarded by the trial court. (Excerpt 73-74).

These incredibly restrictive rulings are clearly a result of the court's erroneous belief that only written sheet music can constitute musical composition. Even if this Circuit holds that the deposit copy can in some way limit the scope of copyright protection, it should reverse the trial verdict because Plaintiff was not allowed to produce evidence of what compositional elements from the "Taurus" album version were embodied and represented in the deposit copy.

### v. The Substantial Similarity Comparison Mandated by the Trial Court was Completely Artificial and Highly Prejudicial

Plaintiff, the experts, and the jury were made to compare a version of "Taurus" which had never been heard or played by anyone (the deposit copy), including Randy Wolfe and defendant Jimmy Page. Consider, how can a defendant copy a work he has not seen and did not have access to? How can a piece of paper the defendant never saw be the basis of the substantial similarity comparison? The district court's ruling creates a nonsensical, artificial comparison.

The artificial, highly prejudicial comparison in this case resulted in a comparison between a version of "Taurus" more dissimilar to "Stairway to Heaven" than the actual composition from the album version of "Taurus",

something noted by both Plaintiff's expert and defense expert Robert Mathes. See Declarations of Experts (Excerpts 2515, 2359, 2192, 2204-07, 2122-23, 2096-99).

Indeed, Plaintiff's experts stated that the compositions of the album versions of both "Taurus" and Stairway are nearly identical. (Excerpts 2515, 2359, 2192). Furthermore, Plaintiff's expert Brian Bricklin took defense expert Mathes's performance of the compositions in the "Taurus" album version and the "Stairway to Heaven" album version and overlaid them on top of each other. Mr. Bricklin observed that the two compositions are indistinguishable and are the same "underlying composition." (Excerpt 2192, Audio Exhibits 45-47 [Submitted by Motion to Transmit Physical Exhibits]). However, due to the trial court's erroneous rulings precluding the "Taurus" sound recordings and compositions, the jury never heard any of this highly probative evidence.

Should the district court's decision be affirmed, in approximately 100% of pre-1976 Act cases the substantial similarity comparison will be between a deposit copy the defendant will have never seen or heard, and the allegedl infringing song. Artists simply do not go into the Copyright Office's archives to see what someone wrote down on paper. They *listen* to the underlying source song that is publicly available. Page admitted that he had never asked the Copyright Office for the lead sheet of "Taurus". (Excerpt 507-08). It is therefore ridiculous and artificial to base the

substantial similarity comparison on the deposit copy that no defendant will have ever seen.

It is important not to lose the forest for the trees. The purpose of the copyright infringement comparison is to protect the rights of creators and originators of original expression by cracking down on those who steal another's work. The artificial comparison the lower court instructed the jury to undertake was not the comparison mandated by law or the underlying purpose of copyright law. The substantial similarity comparison in this trial was artificial, highly prejudicial, and must be redone.

### vi. The Implications of the District Court's Rulings are Wide Ranging and Unprecedented

There are many, many works made prior to the 1976 Act which would be affected by the ruling of this court: that only the exact notes in the deposit copy are protectable.

### A. An Affirmance of the Court's Ruling Means that A Sound Recording of An Underlying Song Can Never Be Played to a Jury in a Copyright Infringement Case

The district court's ruling in effect means that a sound recording of a pre-1978 composition can never be played to the jury in a copyright infringement case and that the only relevant evidence to prove a composition of a 1909 Act song is the deposit copy. ***This is absurd and has never been the law.*** Copyright infringement trials

routinely play the songs in question to the jury and then use experts to identify what parts of the composition of the song are protectable and copied. See Three Boys Music, *supra*. The notion that a recording of the composition at issue cannot be played and instead only the deposit copy must be relied upon is bizarre. It is vital and crucial to the future of copyright law that this Circuit overturn the district court's clearly erroneous ruling and remand for a new, unfettered trial.

### B. Vast Amounts of Musical Expression would Lose Protection, Exactly the Opposite of the Purpose of the Copyright Acts, if the Trial Court's Rulings are Upheld

Many songs were and are not composed on paper and are instead composed on musical instruments. Their lead sheets, made after the songs were composed solely for purpose of registering the copyright, were never intended to represent the totality of the song's protection, only to satisfy the archival function of the Copyright Act.

This was the case of "Taurus", where Randy California composed it on his guitar and did not write the deposit copy lead sheet. (Excerpt 2642 - "Taurus" Deposit Transcribed by "B. Hansen 1967"; Trial Exhibit 2058). This was the case for "Stairway to Heaven", where the song was composed by Led Zeppelin over several different takes without utilizing sheet music. (Excerpt 651-52). This was the case in the Blurred Lines case, again because Marvin Gaye composed music in the

studio. <u>Williams v. Bridgeport</u>, 13-06004, Doc. No. 232-1, at p.15 of 29. This was the case in <u>UMG Recordings, Inc.</u>, where the Sixth Circuit observed that the artist wrote the songs in the studio. 585 F.3d at 276.

Affirming the district court's ruling that the deposit copy requirement limits the scope of copyright would divest copyright protection from massive amounts of expression and completely upend a century of case law interpreting the 1909 Act.

### C. The Copyright Office Does Not Keep the Deposit Copies Indefinitely; What Happens to those Works for Which the Deposit Copies Have Been Lost?

If the district court's rulings are affirmed, what happens if the deposit copy no longer exists? The Library of Congress need not add all deposited works to its collection and their retention is purely discretionary, "for the longest period considered practical and desirable by the Register of Copyrights and the Librarian of Congress." Nimmer on Copyright, § 7.17[a] (1981). Moreover, at least one Circuit court has observed that the deposit copy is not indispensable to the existence of the copyright. <u>Pearson</u>, 306 U.S. 30, 41 (1939) ("the requirement for deposit is not for the purpose of a permanent record of copyrighted publications and . . . such record is not indispensable to the existence of the copyright").

If this Circuit affirms the district court's ruling that all protectable expression is embodied in the deposit copy, then what happens to the scope of protectability of

a work when there is no longer a deposit copy? The district court held that ***no other***

***evidence*** was admissible to prove the composition of a song. Plaintiff does not have

an answer to this question, except to note that it has always been up to experts to

discern and ascertain what is the protected compositional expression in a musical

work by looking at the best evidence, usually sound recordings of the song. See Three

Boys Music, *supra*; Newton, *supra*.

### D. Submitting 100% Accurate Deposit Copies of Musical Works would Have Been Prohibitively Expensive for Artists

Retaining someone to score a 100% accurate copy of a sound recording would

be an incredibly expensive endeavor, especially when many artists had little

resources and the deposit copy requirement was widely considered to be an archival

formality. Dr. Ferrara himself charges $395.00 dollars per hour to transcribe songs.

(Excerpt 1034). To accurately transcribe all 11,000 notes of "Stairway to Heaven",

as opposed to just the 400 in the "Stairway to Heaven" deposit copy (Excerpt 2404-

07), defense expert Dr. Ferrara charged thousands of dollars. In fact, it would be so

expensive that it would make copyrighting music nearly impossible for an individual

who was not wealth or did not read and expertly write music.

Thus, an affirmance of the district court's ruling would divest a large body of

work from copyright protection simply because (1) no one understood the deposit

copy requirement to be substantive at that time, and (2) because it would be extremely expensive to score music in such a manner. There is no indication that the 1909 Congress intended musical copyright registration to be reserve for the elite and wealthy.

**2.** **The Trial Court Erroneously Precluded the Sound Recordings of "Taurus" Despite the Fact that the Court Itself Admitted They were Relevant to Prove Access, Which was Disputed by Defendants**

### a. Scope of Review

Erroneous evidentiary rulings can be the basis for a new trial. Ruvalcaba v., 64 F. 3d 1323 (citing 99.66 Acres of Land, 970 F.2d at 658); see also Advanced Display Sys., Inc, 212 F.3d at 1275; Harper House, Inc. v, 889 F.2d at 206-08.

Evidentiary rulings based on the application of facts to law are reviewed *de novo*. Hinkson, 585 F. 3d 1247. Evidentiary ruling solely based in fact are reviewed under an abuse of discretion standard. Ruvalcaba, 64 F. 3d at 1323. When a court uses the wrong standard to analyze the admissibility of evidence, that is also a legal error reviewed de novo. US v. WR Grace, 504 F.3d 745 (2007). Plaintiff contends that this error was an erroneous evidentiary ruling that is legal in nature and should be reviewed *de novo*.

In a copyright case, the song that the Defendants had access to and allegedly copied must be admitted to prove access. The Court's use of Rule 403 to preclude

the album recording of "Taurus" was erroneous as a matter of law.

### b.     Objection Raised Below

The court initially ruled over Plaintiff's opposition (Excerpt 2118-19, 2104-05, 1536, 1563) that the sound recordings of "Taurus" were not relevant to prove access, and that expert testimony on the similarities of the sonic landscapes/production between "Taurus" and "Stairway to Heaven" to prove access and lack of independent creation was not admissible. (Excerpt 73-74). During trial, the court partially reconsidered and admitted that the sound recording was relevant to access, but did not admit it into evidence or allow expert testimony on the similarities of the production techniques in the two songs. (Excerpt 67-68).

### c.     Argument

The sound recordings of "Taurus" should also have been admitted to prove access, even if they were properly precluded from the substantial similarity comparison (although they were not). The lower court repeatedly refused to permit plaintiff to play the sound recording to the jury, or admit it into evidence, for purposes of establishing access---despite ***admitting that the sound recording was relevant to prove access***.

At the motion in limine stage, and during trial, Plaintiff argued that the sound recordings were admissible so that Plaintiff could ask defendant Page if he had heard

and copied the songs, and also to show that the recordings' sonic landscapes and
production techniques were so similar that they precluded independent creation of
"Stairway to Heaven":

> the sonic landscape in the sound recording of "Taurus" and its
> similarity to "Stairway to Heaven", although not copyrightable
> under the 1909 Act, is evidence that Defendants had access to
> "Taurus". Even though the Court discounted striking similarity in
> the summary judgment opinion based *on the compositions of the
> song*, the fact that the sound recordings of the songs use a nearly
> identical sonic landscape and techniques—as attested to by
> Brian Bricklin, Stewart, and Erik Johnson—are admissible to raise
> the question of fact of whether the similarities between two
> songs are the result of coincidence or not.

(Excerpt 2118). The trial court erroneously ruled against Plaintiff on this issue at
MILs, but during the trial reconsidered. When Plaintiff argued that he should be
allowed to play the sound recordings of "Taurus" and ask defendant Page if he ever
heard them before, the trial court ruled that the recorded versions of "Taurus"
could be played for Page:

> Hearing the performance and testifying whether he [defendant
> Page] has ever heard it or not, [plaintiff's] counsel's right, that
> can come in for access . . . .

(Excerpt 67-68). However, despite admitting the clear relevance of the sound
recording to access, the Court ruled that the sound recording should not be admitted
and refused to let the jury hear the version of "Taurus" that Page copied.  The court
stated:

> We will play the performance here in court, **not in front of the jury**, but have the witness here, and **then when we bring the jury in, you can ask him**, have we just played the performance for you, have you listened to it, is it similar or not? The Court finds it is much too prejudicial for the jury [under Rule 403] to hear that composition, **so we're not going to allow the jury to hear that composition**, but you can have the witness hear that composition, and then you can ask him questions in front of the jury about it.

(Excerpt 67-68) (emphasis added). This ruling does not make any sense. A trial is put on for the jury. How can the jury evaluate the credibility of defendant Page's answer if it does not have the opportunity to listen to the song that Page is being asked about?[4]

Plaintiff's counsel raised this issue with the Court:

| MR. KULIK: | I understand the Court's ruling this morning, but how can the jury assess the witness's credibility when you ask him, okay, now -- the question, the ultimate question -- after the jury comes back into the courtroom -- |
| --- | --- |
| THE COURT: | Okay. |
| MR. KULIK: | -- and Mr. Page is on the stand, for example, and we ask him a question, how can the jury assess his credibility -- |
| THE COURT: | He may not be, then, Counsel. Then my ruling would be, if we don't do it this way, it is much |

---

[4] Note that the Court's ruling that playing the "Taurus" album recording would be unduly prejudicial for the substantial similarity comparison is an admission of sorts that the album recording of "Taurus" is ***nearly identical*** to "Stairway to Heaven". This is nothing less than an inadvertent admission by the Court that the album recording of "Taurus" would have proven that Page had access to "Taurus" and wrote "Stairway to Heaven" using "Taurus".

> more prejudicial than it is probative, and it doesn't come in at all. Because there's no question in the Court's mind that that would confuse the jury and they may very well be comparing the production to the infringing -- or alleged infringing composition.

MR. KULIK: But Your Honor, don't you think the production itself can be highly relevant to the question of access? For example, if there are certain elements --

THE COURT: Counsel, your minute is long gone. We can sit here and debate this forever on it, but there's no question in my mind that it is much more prejudicial under 403, and I'm telling you right now, I would keep out the jury hearing the production.

(Excerpt 605).

The Court's ruling is incorrect. **First**, playing the album recording outside of the presence of the jury, then asking Page if he had heard the album recording in the presence of the jury, is nonsensical. There is no possible way for the jury to evaluate the truthfulness of Page's answer when they have not heard the recording he is being asked about. The Court's choices contradict the purpose of a *jury* trial.

**Second**, the Court's refusal to allow Plaintiff's experts to analyze the production of the "Taurus" album version and compare it to "Stairway to Heaven", so that access could be established, was erroneous in light of the Court's admission that the sound recording of "Taurus" was relevant to prove access. Note that this

analysis of the production and sonic landscapes of the songs should have been allowed *regardless of whether the sound recordings were admitted or not*. WR Grace, 504 F.3d at 763 (stating that experts "may rely on inadmissible evidence in forming an opinion or delivering testimony"). Plaintiff's experts would have testified that the production and sonic landscape of "Taurus" and "Stairway to Heaven" was so strikingly similar that it precluded independent creation. (Excerpt 2188-92, 2205, 1831 [Bricklin stating "by comparing the sound recordings and sonic landscape, production techniques, and engineering methods, . . . there is no possibility STH was created independently from T."]).

**Third**, the trial court's ruling that the sound recording was relevant to access, but could nevertheless be precluded because it was unduly prejudicial under Fed. RE 403 to the substantial similarity comparison, is unfounded and erroneous as a matter of law. It was also clearly erroneous and abused the court's discretion.

There were, *inter alia*, two elements in dispute at trial: access and substantial similarity. It is the very foundation of copyright law that the ***most*** relevant evidence for access is the song that was allegedly copied by Defendants (and which Jimmy Page admits to possessing). (Excerpt 2188-92, 2205, 1831). In a copyright case, as a matter of law, the court simply cannot keep the jury from hearing the song that was copied and comparing it to the allegedly infringing song *if access is in dispute*. The

Court's ruling essentially tied Plaintiff's hand behind his back to prove a contested element. When the Court improperly analyzes the admissible of evidence governed by one rule of law (plaintiff entitle to prove dispute of access) with an inapplicable Rule 403 analysis, that is an error of law. Cf. WR Grace, 504 F.3d at 765 (holding that preclusion of evidence pursuant to Rule 403 erroneous because Rule 703 should have been used).

Moreover, even if this ruling is viewed under the abuse of discretion standard, it was clearly erroneous. The probative value of using the very song that defendant Page owns, and had access to, to establish access is extraordinarily high under Rule 403. The probative value of admitting the song to prove access far outweighed any confusion that could have affected the substantial similarity comparison. Note that the court issued limiting instructions repeatedly and told the jury: "plaintiff has no rights in any sound recording of "Taurus", and claims rights only in the musical composition "Taurus" as transcribed in the deposit copy." (Excerpt 29). This Circuit is clear that a court cannot preclude probative evidence without taking into account less extreme remedies to correct any prejudice. See WR Grace, 504 F.3d at 765 (stating "the court substantially underestimated the capacity of jury instructions to distinguish these relationships, and the potential efficacy of a limiting instruction"). The preclusion of the sound recordings because of Fed. Rule of Evid.

403 were clearly erroneous, abused the court's discretion, and severely damaged Plaintiff's attempt to prove a high degree of access.

Plaintiff notes that even though Plaintiff did successfully prove that defendants had a reasonable degree of access to "Taurus" at trial, the erroneous preclusion of the sound recordings severely hindered Plaintiff's attempts to prove a *higher degree* of access, which is critically important to the inverse ratio rule addressed immediately *infra*. The jury was deprived of the ability to decide what was mere inspiration and what crossed the line into impermissible copying.

**3. The Lower Court Failed to Give the Standard, Black-Letter Law Inverse Ratio Rule Instruction and Erroneously Failed to Tell the Jury that the Burden of Proof for Substantial Similarity is Dependent on the Degree of Access Proven**

### a. Scope of Review

"The reviewing court's inquiry is 'whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading.'" <u>Oviatt By and Through Waugh</u>, 954 F. 2d 1470 (quoting <u>Thorsted v. Kelly</u>, 858 F.2d at 573 (9th Cir. 1988)). A new trial has been permitted where the Court's evidentiary rulings and jury instructions are erroneous or inadequate. <u>Murphy</u>, 914 F.2d 183) (stating "erroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial"); <u>Rinker v</u>, 831 F.2d at 832 (erroneous instructions); <u>Cleveland</u>, 436 F.2d

at 80-81 (inadequate instructions).

### b.  Objection Raised Below

Plaintiff repeatedly asked for an instruction on the inverse ratio rule, which not even Defendants substantively objected to. (Excerpt 1974-76, 50-51). However, the court refused to give the instruction without explanation.

### c.  Argument

"In the Ninth Circuit, the access and substantial similarity elements of infringement are 'inextricably linked' by an inverse ratio rule." Ninth Circuit Model Instruction 17,16 supp. (quoting Benay v. Warner Bros. Entm't, Inc., 607 F.3d 620, 625 (9th Cir.2010)). Simply stated the rule provides that the higher degree of access Plaintiff proves, the lower the burden to prove substantial similarity. Id.

Plaintiff based a large portion of his trial strategy on the inverse ratio rule. As access was disputed, and Defendants were claiming independent creation, Plaintiff devoted much trial time to proving a high degree of access, which should have concomitantly lowered Plaintiff's burden to prove substantial similarity.[5]

---

[5] Plaintiff maintains he did show a high degree of access given that Led Zeppelin and defendant Page opened for Spirit, attended their shows, praised them in newspaper interviews, covered their songs, and owned many Spirit albums including the one that "Taurus" is on, but it is impossible to know how much access the jury thought there was.

However, despite Plaintiff repeatedly asking for this instruction, the court pointedly refused to instruct the jury on the inverse ratio rule. (Excerpt 50-51). Defendants did not even dispute that the inverse ratio rule is a legitimate instruction and only quibbled with the wording. (Excerpt 1974-76).

The prejudice that resulted from the failure to give this instruction was high and requires a new trial. **First**, there is no possible way the jury knew the correct standard to apply to substantial similarity, and that access and substantial similarity are inextricably intertwined. The jury's substantial similarity analysis could not have been done correctly without knowing the correct burden to apply. **Second**, Plaintiff contends that he proved a high degree of access and that the jury's verdict would have been different if the jury had known that the more access Plaintiff proved, the burden was concomitantly lowered to prove substantial similarity.

The failure to give this instruction requires a new trial.

## 4. The Court Erroneously Instructed the Jury on How to Perform the Extrinsic Test, Completely Omitting the Crucial Instruction that Combinations of Unprotected Elements are Themselves Afforded Protectability

### a. Scope of Review

"The reviewing court's inquiry is 'whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading.'" <u>Pearce</u>, 954 F. 2d 1470 (quoting Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988)). A new trial has been permitted

where the Court's evidentiary rulings and jury instructions are erroneous or inadequate. <u>Murphy</u>, 914 F. 2d 183 (stating "erroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial"); <u>Rinker</u>, 831 F.2d at 832 (erroneous instructions); <u>Cleveland</u>, 436 F.2d at 80-81 (inadequate instructions).

### b.  Objection Raised Below

Plaintiff's proposed jury instructions specifically and repeatedly asked that that the jury be instructed on this important part of the Extrinsic Test. (Excerpt 1956-57, 1961, 1968).

### c.  Argument - The Jury Instructions Erroneously Described the Extrinsic Test by Omitting that Unprotectable Elements, when Used Together, are Copyrightable

The trial court's instructions failed to tell the jury that the arrangement of unprotectable and protectable elements, if used in combination with each other, can itself be protectable. Such was the case, for instance, in <u>Three Boys Music</u>. <u>See Swirsky</u>, 376 F.3d at 849. Such an instruction is so standard to the extrinsic substantial similarity test that even Defendants proposed an instruction on this point of law. (Excerpt 2032). Nevertheless, the Court inexplicably failed to instruct the jury on this crucial component of the extrinsic test. As a result there is no possible way the jury performed the extrinsic test correctly, especially considering the other

erroneous instructions identified in this appeal. Given that the jury found against

Plaintiff on the extrinsic test, the trial verdict must be vacated.

### i. Legal Standard

The Ninth Circuit has held:

> There is no one magical combination of these factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique. So long as the plaintiff can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was "substantial" and to "protected elements" of the copyrighted work, the extrinsic test is satisfied.

> For example, in *Three Boys* we upheld a jury finding of substantial similarity based on the combination of five otherwise unprotectable elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending.

Swirsky, 376 F.3d at 849.

### ii. This Basic Instruction Was Not Given Despite Being Requested by Plaintiff and Plaintiff's Musicological Expert Testifying that the Combination of Musical Elements in "Taurus" Gave the Song Protection

This instruction is a crucial component of the extrinsic analysis the jury was

supposed to perform. Even Defendants proposed that the jury should have been

given an instruction on this part of the extrinsic test (albeit erroneously modified).

(Excerpt 2032). This is the very core of the analytical extrinsic test and the failure to

tell the jury how to perform the extrinsic test requires that the jury's defense verdict on substantial similarity be overturned.

Plaintiff's expert's opinion were substantially based on the fact that the arrangement of protectable and unprotectable elements is afforded copyright protection. (Excerpt 748, 763, 781-82, 834-36). Dr. Alexander Stewart specifically opined that there were as a combination of five elements in "Taurus" that were protectable and had been copied in "Stairway to Heaven": (1) "minor chromatic line and associated chords," (Trial Exhibit 501-1, 502-1, 503-1) (2) durations of pitches of minor chromatic line, (3) melody placed over the descending chromatic line consisting of combination of arpeggios and two-note pairs (Trial Exhibit 506-1), (4) rhythm of steady 8th note beats, and (5) pitch collection (Trial Exhibit 511-1). (Excerpt 779-80). Dr. Stewart testified that none of the prior art had these five characteristics, and that they were unique "in combination." (Excerpt 780-82) (Trial Exhibit 501-1). Dr. Stewart reaffirmed this point later in his testimony. (Excerpt 835). This was a central element of Plaintiff's substantial similarity case. Yet, the jury was never given an instruction on this basic part of the substantial similarity test.

The Court's failure to give any instruction on this important part of the extrinsic test completely negated Dr. Stewart's opinions and conclusions and was

highly prejudicial. The jury could not have come to the correct conclusion without knowing about this crucial part of the extrinsic test. The failure to give this important instruction was reversible error, especially when taking into account the other erroneous instructions complained of immediately *infra*.

**5. The Trial Court Erroneously Instructed the Jury on Originality and the Scope of Protectability of Musical Elements; The Erroneous Instructions are in Direct Contravention of This Circuit's <u>Swirsky</u> Decision and Constitute Reversible Error**

    **a. Scope of Review**

"The reviewing court's inquiry is 'whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading.'" <u>Pearce</u>, 954 F. 2d 1470 (quoting <u>Thorsted</u>, 858 F.2d at 573)). A new trial has been permitted where the Court's evidentiary rulings and jury instructions are erroneous or inadequate. <u>Murphy</u>, 914 F. 2d 183 (stating "erroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial"); <u>Rinker</u>, 831 F.2d at 832 (erroneous instructions); <u>Cleveland</u>, 436 F.2d at 80-81 (inadequate instructions).

    **b. Objection Raised Below**

Plaintiff asked the court to correctly instruct the jury on originality. (Excerpt 1946). Plaintiff also objected to Defendants' incorrect instruction on originality. (Excerpt 2030).

In addition to asking that the jury be correctly instructed on originality, Plaintiff also objected to the entirety of Defendants' proposed instruction on Introduction to a Copyright Claim, which incorrectly told the jury that specific musical elements, like descending chromatic scales and short sequences of notes, can never be afforded copyright protection. (Excerpt 2009). This was not the standard instruction and should not have been given.

### c.    Argument

The court seriously misled the jury on the scope of what can be considered protected expression. Specifically the Court misdefined originality, and baselessly instructed the jury that certain musical elements (such as descending chromatic scales) could never be given protection as a matter of law.

### i.  The Court Seriously Erred when Defining Originality

"Original, as the term is used in copyright, means only that the work was independently created by the author, as opposed to copied from other works, and that it possesses at least some minimal degree of creativity." Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345-46 (1991). "In this circuit, the definition of originality is broad, and originality means little more than a prohibition of actual copying." Swirsky, 376 F.3d at 851 (quotation marks omitted).

The trial incorrectly instructed the jury on originality, in contravention of

<u>Feist</u> and <u>Swirsky</u>. Specifically, the erroneous instruction states:

> "An original work may include or incorporate elements taken from prior works or works from the public domain. *However, any elements from prior works or the public domain are not considered original parts and not protected by copyright*."

(Excerpt 31) (emphasis added). The bolded sentence directly conflicts with <u>Feist</u> and <u>Swirsky</u>. This sentence was a custom addition by defendants and, in addition to being vague and ambiguous, has no support in the law.

Compounding the impact of the erroneous instruction, the Court also deleted at Defendants' behest a standard part of the instruction which accurately described originality for the jury. The deleted section of the standard instruction reads:

> "In copyright law, the 'original' part of a work need not be new or novel."

(Excerpt 2029-30). This deleted section directly comports with <u>Feist</u> and <u>Swirsky</u>. For some unexplained reason the court did not give this part of the instruction, and instead gave a definition at odds with binding Supreme Court and Ninth Circuit precedent.

The prejudice caused by this instruction cannot be overstated. The originality and protectability of the expression in "Taurus", as copied in "Stairway to Heaven", was hotly contested throughout the trial. Dr. Stewart addressed this at length at trial and opined that Randy Wolfe's use of a specific descending chromatic scale in "Taurus" was an original compositional element and was copied in

"Stairway to Heaven". (Excerpt 753, 786-87). On the other hand, defense expert Dr. Lawrence Ferrara testified that because chromatic scales had allegedly been used in the prior art it was unoriginal and not protectable at all (there was no evidence introduced by Defendants that Randy Wolfe had copied this musical element from another work). (Excerpt 963-64). There was therefore a dispute of fact on the originality and protectability of this key compositional element.

Yet, the jury was given a thoroughly erroneous definition of originality. The erroneous instruction essentially told the jury that Dr. Ferrara was correct and Dr. Stewart was wrong and that the descending chromatic scale was not protectable as a matter of law. At a minimum, the custom defense language included by the court, with the deletion of the standard language, was extremely confusing for any juror. As a result there is simply no way the jury could have correctly conducted the extrinsic test analysis.

This instruction on originality was a serious misstatement of the law and requires a reversal of the defense verdict on substantial similarity.

ii. **The Court Erroneously told the Jury, Without Any Legal Support, that Certain Key Musical Elements in "Taurus" Do Not Have Copyright Protection**

The court's "Introduction to Copyright" instruction incorrectly described what can constitute protected musical elements. The court selected a custom jury

instruction, proffered by Defendants, which erroneously states that copyright law does not ever protect the very musical elements at issue in this case:

> "such as descending chromatic scales, arpeggios or short sequences of three notes."

(Excerpt 28). These are the exact musical elements in dispute in this case and this instruction essentially told the jury, erroneously, that "Taurus" was unprotectable expression. This instruction constitutes reversible error for several reasons.

**First**, the instruction contradicts binding precedent. The Ninth Circuit stated in <u>Swirsky</u>:

> Although it is true that a single musical note would be too small a unit to attract copyright protection (one would not want to give the first author a monopoly over the note of B-flat for example), ***an arrangement of a limited number of notes can garner copyright protection***.

<u>Swirsky</u>, at 849 (emphases added).

**Second**, as the trial court was well aware, Plaintiff's expert had testified that the notes and chords in "Taurus", and copied in "Stairway to Heaven", were in fact used in a unique way that was protectable:

> MR. MALOFIY:     Okay. Let's go to the minor chromatic line. You identified this as one thing that's unique and memorable. Can you share why the minor chromatic line is used in a unique and memorable way?
>
> DR. STEWART:     You know, the minor chromatic line is something that's been used in music for quite a long time, and like a lot of the building blocks of music, **the**

challenge for any composer is to use it in a new and creative way, an original and creative way.

And I think that in both of these works, ""Taurus"" and "Stairway," the composers -- at least in ""Taurus"," the composer found a way to use it in a way that is unlike other works that use this line.

And one of the things that's very different is instead of going through all six pitches of the chromatic line, all the way to the E ....

So one of the important ways that I think that you see this similarity between these two works is that they both do this very unusual thing. In fact, I don't know any other pieces that do it, and the defense hasn't come up with any that do treat this line the way that they ["Taurus" and Stairway] do.

(Excerpt 786-87) (Trial Exhibit 501-1, 502-1, 503-1). Plaintiff's expert Kevin Hanson also testified the descending chromatic line was used in an original and creative way in "Taurus". (Excerpt 748, 753, 755).

Plainly, any musical element, including a descending chromatic scale or arpeggio, used in an original and creative way, can be protectable---as Plaintiff's experts testified at trial. Note that it is black letter law that copyright protection attaches upon a showing of a modicum of creativity; it is not a high bar. Feist, *supra*; Swirsky, *supra*. Yet, the Court's extremely confusing instruction singled out ***the specific elements at issue in this case*** and falsely told the jury they were not ever protectable. This is unduly prejudicial reversible error.

**Second**, the specific language and examples in this instruction given by the

Court (e.g, the reference to descending chromatic scales being unprotectable) are based only on Copyright Office Compendiums, which have no force of law. (Excerpt 2007-08). In fact, the Compendiums' statement of the law is incorrect. See Swirsky, *supra*.

When the Court's erroneous instructions on originality are looked at in conjunction with the failure to give an instruction telling the jury that a combination of elements can be protectable, **the instructions excluded massive amounts of protected material from the extrinsic test analysis**. The Court basically instructed the jury to rule against Plaintiff on the extrinsic test and the jury instructions therefore constitute highly prejudicial, reversible error.

### 6. The Trial Court Erroneously Disregarded a Juror's Request to Hear the Requested and Correct Version of the "Taurus" Deposit Copy During Deliberations

#### a. Scope of Review

"The reviewing court's inquiry is 'whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading.'" Oviatt By and Through Waugh, 954 F. 2d 1470 (9th Cir. 1992) (quoting Thorsted, 858 F.2d 571, 573 (9th Cir.1988)).A new trial has been permitted where the Court's evidentiary rulings and jury instructions are erroneous or inadequate. Murphy, 914 F. 2d 183 (stating "erroneous jury instructions, as well as the failure to give adequate instructions, are

also bases for a new trial"); <u>Rinker</u>, 831 F.2d at 832 (erroneous instructions); <u>Cleveland v</u>, 436 F.2d at 80-81 (inadequate instructions).

### b.  Objection Raised Below

During deliberations, the jury asked to hear the guitar version of "Taurus" and then "Stairway to Heaven." Plaintiff argued to the Court that the jury obviously meant the bass clef version of "Taurus" (Trial Exhibit 527V), as that was what was used throughout trial. (Excerpt 1405-10). Defendants wanted a version of the "Taurus" deposit copy played one time at trial where both the bass and treble clefs were artificially played together on one guitar (which Plaintiff's guitar expert testified would never normally be done as the bass and treble clef lines were "two distinct melodies occurring simultaneously" - Excerpt 739-42) (Trial Exhibit 525V).

When the court asked the jury what version of "Taurus" they wanted played one juror stated the "bass clef," while another stated they wanted 525V. (Excerpt 1411). The Court however only played 525V, the defense favorable and artificial "Taurus" version, for the jury.

### c.  Argument

Plaintiff lost this case on substantial similarity. Before the jury's verdict a note was submitted asking to listen to "Plaintiff's audio of 'Taurus' (guitar)." (Excerpt 1496). Plaintiff argued to the Court that the jury was obviously requesting to hear

Trial Exhibit 527V, the bass clef of "Taurus" which was played on the guitar repeatedly throughout trial. (Excerpt 1405-10). The defense argued that the jury wanted to hear a version of the "Taurus" deposit copy which had been played just one time, and which did not accurately reflect how "Taurus" would sound. (Excerpt 739-42) (Trial Exhibit 525V).

When asked, two jurors gave conflicting answers. One juror stated they wanted to hear 527V, the bass clef. (Excerpt 1411). Another stated they wanted to hear the 525V. Id. However, the court then only played the 525V version more favorable to defendants. Shortly thereafter, the jury ruled against Plaintiff on substantial similarity.

This was a highly prejudicial error which requires a new trial. Listening to 527V as compared to "Stairway to Heaven", as compared to 525V as compared to "Stairway to Heaven" makes clear the prejudice.

**7.    The Trial Court's Order Limiting Plaintiff's Trial Time to 10 Hours Violated Due Process and was Not Even Close to An Adequate Amount of Time to Try this Case**

### a.  Scope of Review

The Ninth Circuit has held that time limits on a trial are reviewed for abuses of discretion. Monotype Corp., PLC v. Int'l Typeface Corp., 43 F.3d 443, 451 (9th Cir.1994); see also Sec'y of Labor v. DeSisto, 929 F.2d 789, 795 (1st Cir. 1991) (citing

MCI Commc'ns Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1171 (7th Cir. 1983)).

### b.    Objection Raised Below

Plaintiff's objection to this trial time limits were discussed extensively with the trial court and the trial court repeatedly acknowledged that Plaintiff had preserved his objection. See, e.g., (Excerpt 850).

### c.    Argument

The impossibly short trial time limits allotted by the trial court bore no relation to the time that was actually needed to try this complicated case. Plaintiff does not dispute that courts have the inherent power to set trial time limits; however, the limits in this case were imposed inflexibly and prevented the fair adjudication of this case.

#### i.    Legal Standard

"A crowded docket does not justify an infringement on the right to reasonably develop a case." Monotype Corp., 43 F.3d at 451. "[T]he time limits should be sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive." MCI Commc'ns Corp., 708 F.2d at 1171.

Judge Posner noted that "to impose arbitrary limitations, enforce them inflexibly and by these means turn a federal trial into a relay race is to sacrifice too

much of one good-accuracy of factual determination-to obtain another-minimization of the time and expense of litigation." Mc-Knight v. General Motors Corp., 908 F.2d 104, 115 (7th Cir. 1990), *cert. denied*, 111 S. Ct. 1306 (1991); Flaminio v. Honda Motor Co., 733 F.2d 463 (7th Cir. 1984) (discouraging an "unhealthy preoccupation" with the trial clock); see also John E. Rumel, "The Hourglass and Due Process: The Propriety of Time Limits on Civil Trials," UNIVERSITY OF SAN FRANCISCO LAW REVIEW, at p.253 (Winter 1992).

Precluding a rebuttal witness on a key issue, solely because of time limits, is highly prejudicial and reflects an impermissible inflexibility. Woody v. Woody, 127 N.C. App. 626, 492 S.E.2d 382 (1997).[6] "The objecting party must show there was harm incurred as a result." Monotype Corp., 43 F.3d at 451.

> ii. **The Court Imposed Clearly Inadequate, Inflexible Time Limits on Plaintiff which were Highly Unreasonable and Clearly Erroneous**

At the pre-trial conference, the court imposed on Plaintiff and Defendants a ten-hour time limit to conduct direct, cross, and rebuttal examinations. (Excerpt 89-91). The trial court incorrectly assessed the time needed to try this case at the outset of the trial: "even if you spend a couple of hours on copyright and a couple of hours

---

[6] Here, Plaintiff intended to call musicologist Dr. Alexander Stewart on rebuttal to refute defense expert Dr. Ferrara's testimony, but such a request was summarily denied by the trial court, as discussed *infra*.

on access, three or four hours on similarities between the songs, couple hours in damages, you're looking at about ten hours on this case." Pre-Trial Conference Hearing Transcript, at p.5.

Yet, the Court's logic, that Plaintiff's case in chief could be presented in ten hours, does not pass even cursory muster; it does not account for the fact that the ten hour limit also included all cross and rebuttal examination. Thus, in reality, Plaintiff had to attempt to somehow present an incredibly complicated case in chief in 5 or 6 hours.

The Court stated that in 14 years of imposing trial time limits on every case before him, he had adjusted the time limits just one time during the case. (Excerpt 91). This reflects, at the outset, an impermissible inflexibility in the Court's approach to trial time limits disapproved of by the appellate courts. MCI Commc'ns Corp., 708 F.2d at 1171. This inflexibility was borne out at trial when the Court severely limited Plaintiff's time to try the case on the merits.

With all due respect, this was not a slip and fall case. This was a case for which the taking of depositions had spanned the entire United States and the Atlantic, and one in which there were approximately 60,000 pages of discovery. Both sides spent hundreds of thousands of dollars preparing the case for trial. Witnesses testified at trial from all over the United States and the world. It was also a case where every

element was disputed and there were several affirmative defenses. Note that at the outset of the case nearly every element of the copyright claims were in dispute, and Defendants were also advancing multiple affirmative defenses. To allot 5 or six hours for Plaintiff's case in chief was completely unreasonable.

Consider, to make out just a prima facie copyright case Plaintiff needed to establish:

- Ownership of the Copyright and Validity of the Trust
- Song Creation of "Taurus" and "Stairway to Heaven"
- Access (hotly contested, extremely important to prove high degree of access for the inverse ratio rule)
- Substantial Similarity (at least two experts)
- Damages

(Excerpt 1868-1897). In addition, Defendants were making numerous affirmative defenses for which Plaintiff had to present witnesses in its case in chief given the high probability he would not have time for rebuttal or that it would not be allowed, including:

- Independent Creation of "Stairway to Heaven"
- Innocence
- Fair Use
- Unclean Hands

<u>Id.</u> Despite the extensive prima facie case it was incumbent on Plaintiff to make out, the Court essentially kept a countdown on Plaintiff's case in chief, repeatedly

reminding counsel that the clock was ticking on the exceedingly short limits. (Excerpts_567, 849); see also Flaminio, 733 F.2d 463 (decrying "an unhealthy preoccupation with the clock").

The court disapproved of much testimony Plaintiff saw as crucial, and instead took an extremely antiseptic, theoretical view of trial strategy and refused to expand the time limits because of such testimony. (Excerpts 567, 849-51). For instance, Plaintiff introduced testimony from Randy Wolfe's sister, Janet Wolfe, which the Court considered unnecessary. Ms. Wolfe's testimony was presented to establish that (1) "Taurus" was written by Randy Wolfe in 1966, (2) that "Taurus" was played extensively live in the late 1960s (the frequency with which "Taurus" was played live and in concert was a key issue in dispute), (3) to establish that Randy Wolfe was a guitar prodigy recognized by Jimi Hendrix (Defendants had been disparaging Wolfe's stature as a guitarist and the likelihood he could have produced significant music), (4) to establish what happened to Randy Wolfe's estate and intellectual property after he died in 1997, (5) the modification of the Trust over the years, and (6) Mr. Skidmore's validity as Trustee of the Trust. (Excerpt 279-299).

In addition, Led Zeppelin's members denied knowing much of anything about Spirit or its music and said they did not have access to the song. (Excerpt 666, 1216-17, 1231-32). However, contrary to this denial, it was reported in newspaper articles

in early 1971 that defendant Robert Plant was involved in a car accident when returning from a Spirit concert, thus objectively establishing that Plant knew of Spirit and had heard its music before "Stairway to Heaven" was written. (Excerpt 2409) (Trial Exhibit 321). This corroborated testimony by a Sprit's member, Mark Andes, that they played snooker and drank with defendant Plant that evening. (Excerpt 417-18).

The Court disagreed that any of this about Ms. Wolfe or the accident was relevant and explicitly stated on the record that it would not allow Plaintiff any significant additional time to develop its case, or cross examine defense witnesses, because the court thought that Plaintiff had wasted his time with Janet Wolfe and with questions on the accident:

> MR. KULIK:  We don't think ten hours, including cross-examination, in a case like this is fair or reasonable.
>
> ....
>
> THE COURT:  **We have gotten into all kinds of background information and things that really aren't relevant to this case**. And that's okay if you want to do it, but it's not necessary for the presentation of this case.
>
> ....
>
> MR. KULIK:  I just -- I feel that the Court may not be fully grasping some of the subtleties and complexities of the case. I believe -- we've only had two days of testimony.
>
> ....

| | |
|---|---|
| THE COURT: | Anyway, so those are the things that -- is it -- how relevant is it that there was a traffic accident and somebody [Robert Plant] got hurt during the traffic accident? ... |
| | So go ahead, counsel. I'm sorry. |
| MR. KULIK: | **You know, the fact that Mr. Plant was in an unfortunate accident on his way back from a Spirit show I think is relevant, Your Honor.** |
| THE COURT: | **Well, I don't**. |
| MR. KULIK: | That Janet Wolfe was able to testify that she attended a lot of shows at which ""Taurus"" was played, we had to lay a foundation for her doing that and -- |
| THE COURT: | **Counsel, you could have done that in one or two questions**, but it just went on and on and on. As I said, this thing could have been presented much more efficiently than it was presented. |
| .... | |
| MR. KULIK: | Your Honor, again, in a case where access is incredibly contested or independent creation is an issue, I just think some of the subtleties may not be clear to the Court. |

(Excerpt 850-53). To be clear, the testimony elicited from Ms. Wolfe was not superfluous, went directly to how "Taurus" was created by Randy Wolfe, and was highly relevant. The testimony regarding Mr. Plant's accident was likely some of the most important evidence of access in the entire case (especially because the sound recording was precluded). The Court was focused more on having the case tried within its arbitrary time limits than on letting Plaintiff try the case on the merits.

It was not as if Plaintiff was given two weeks and did not use that time wisely; he was given just 5-6 hours to put on a case in chief!

###### iii. The Court's Time Limits were Severely Prejudicial and Especially Harmed Plaintiff's Efforts to Prove Substantial Similarity

The real harm from the Court's time limits and refusal to extend the limits occurred during Defendants' case in chief, and rebuttal, when it did not allow Plaintiff to fully develop and address substantial similarity. Remember, the jury ruled against Plaintiff on the extrinsic test. It is therefore significant that the trial court severely limited Plaintiff's attempt to cross examine Dr. Ferrara on substantial similarity, and also precluded Plaintiff from calling an expert musicological witness on rebuttal.

The defense musicologist, Dr. Ferrara, had testified at length for Defendants. (Excerpt 929-1038). After just a few minutes on cross examination of Dr. Ferrara, Trial Transcript, at p.1038-57), the Court abruptly stopped the trial and told the jury that Plaintiff's counsel was violating his time limits. Id. at 1057 ("At this time, we have a serious time problem as far as conforming to the Court rules on it."). The Court told Plaintiff's counsel that because Plaintiff had gone over his time limit, he was limiting the rest of Plaintiff's questioning of the most important defense witness to *__just two additional minutes__*. (Excerpt 1064-65). The Court also informed Plaintiff he would only be entitled to cross examine any other defense witness for just ten minutes. Id. Plaintiff was also told there would be no rebuttal witnesses on substantial

similarity (despite the fact that the defense case in chief was not complete and it was unknown what rebuttal testimony might be needed). <u>Id.</u> It must be noted again that Plaintiff lost the trial on substantial similarity, the very issue where he was precluded, ***because of the court's inflexible time limits***, from crossing the defense musicological expert and presenting a rebuttal witness to refute the defense musicological expert's claims.

This is an astounding restriction given how short the initial time limits were and requires reversal. This caused real prejudice. Despite the Court's prior ruling that no rebuttal witnesses would be allowed (a ruling made before the defense case in chief had even been fully put on), Plaintiff asked the court for permission to put on two rebuttal witnesses, including Plaintiff's musicologist Dr. Alexander Stewart. (Excerpt 1268-69). This was summarily denied. <u>Id.</u> Stewart was going to testify in rebuttal that:

- His opinion was unchanged after reading Dr. Ferrara's testimony and that none of the prior art examples were as similar to "Taurus" and Stairway as "Taurus" and Stairway are to each other

- Dr. Ferrara had failed to address all five characteristics that Dr. Stewart opined were shared by "Taurus" and "Stairway to Heaven".

- Dr. Stewart disagreed with Dr. Ferrara's assessment of his pitch collection. He would have testified that while pitch collections do not by themselves prove substantial similarity, they are highly probative. None of the prior art Dr. Ferrara refers to has the same pitch collection, except one, which means the prior art cannot spell the melodic and harmonic expression shared by "Taurus" and "Stairway to Heaven".

- The one song in the prior art that shares the same pitch collection as "Taurus" and "Stairway to Heaven", To Catch a Shad, occurs in a brief interlude for just a few seconds. Dr. Ferrara focused on this song as being significant.

- To Catch a Shad is in a very different genre than Stairway and "Taurus" (it is folk and jazz) and is also in a different key with different instrumentation.

- Dr. Ferrara's analysis of To Catch a Shad fails to note key and tempo, and he misidentifies a banjo as a guitar. It also fails to accurately transcribe the chromatic line, obscuring that it is different than "Taurus" and "Stairway to Heaven". Shad also has different two note pairs, and a different melody. The only 2 actual similarities out of the 5 Dr. Stewart identified are the steady eighth note rhythms and the pitch collection.

- Dr. Ferrara selectively analyzed the data, and he ignores more than 55% of the notes in the deposit copy.

- Dr. Ferrara's note pair analysis stated that these were the most creative and memorable parts in Stairway. Yet, Dr. Ferrara cannot dispute that most of the note pairs are exactly the same both rhythmically and metrically.

- Dr. Ferrara mentioned a book he published called Keyboard Harmony. It appears it is 30 years old and out of print. In addition, nowhere in Dr. Ferrara's book does he discuss minor chromatic lines.

Plaintiff's counsel would have crossed Dr. Ferrara on substantially the same topics and material had he been permitted the time to do so.

Note that the prior order precluding any rebuttal witnesses was made just part way through the defense case in chief. A trial court must be flexible with time limits under the law and not impose them rigidly. By ruling that rebuttal witnesses were not necessary, before it could even be known what rebuttal was needed to refute the

defense case in chief, the court showed that it was too inflexibly applying its already very short time limits. The time limits abused the Court's discretion and were reversible error as they prohibited Plaintiff from addressing significant aspects of the substantial similarity analysis, the subject he lost on.

**8.  The Court Committed Reversible Error by Erroneously Refusing to Preclude the Testimony of Defense Musicologist Dr. Ferrara, or Grant a Negative Inference, Because Ferrara Had a Conflict of Interest which was Deliberately Concealed by Defense Counsel**

### a.  Scope of Review

It is within a court's discretion to exclude or admit expert testimony. Campbell Industries v. Gemini, 619 F.2d 24 (9th Cir. 1980) (citing Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); Williams v. Fenix & Scisson, Inc., 608 F.2d 1205, 1209 (9th Cir. 1979). Furthermore, a court has the power to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice an opposing party. Id. (citing Clark v. Pennsylvania R.R. Co., 328 F.2d at 594-95). Courts should not tolerate flagrant abuses of the discovery process. Id.

### b.  Objection Raised Below

Plaintiff filed an extensive motion for sanctions shortly after learning of the conflict of interest, which was that Dr. Ferrara had been hired by Plaintiff's publisher and fiduciary to perform a musicological analysis of "Taurus" and "Stairway to

Heaven" for potential litigation. (Excerpt 1575). This prior report and analysis for Plaintiff's publisher was never disclosed by Defendants or Dr. Ferrara.

However, when Plaintiff asked for disqualification and/or a negative inference at trial the Court summarily denied the motion without explanation. (Excerpt 927).

### c. Argument

#### i. Legal Standard

This Court has the inherent authority to disqualify experts. See Campbell Ind. v. M/V Gemini, 619 F.2d 24, 27 (9th Cir. 1980). A "court can disqualify an expert based on the fundamental unfairness such expert's conflict of interest creates." Pinal Creek Group v. Newmont Mining Corp., 312 F. Supp. 2d 1212 (D. Ariz. 2004). "The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process." Koch, 85 F.3d at 1182. (quoting English Feedlot v Norden Labs., Inc., 833 F.Supp. 1498, 1504 (D. Col. 1993)). Conflicts must be affirmatively disclosed. See Shadow Traffic Network v. Superior Court, 24 Cal. App. 4th 1067, 1084-85 (Court of Appeal 1994). When looking at disqualification, there are three main considerations:

> (1) the existence or reasonable expectation of a confidential relationship between the movant and the expert; and (2) whether the movant in fact disclosed confidential information to the expert.... as a third element, the public's interest in preserving judicial integrity and fairness as balanced against the party's right to the assistance of experts who possess specialized knowledge ...

Auto-Kaps, Llc v. Clorox Company, Dist. Court, ED New York 2016 (citations omitted).

Courts, however, have precluded experts based on conflicts of interest even when they did not have the ability to disclose confidential information. Sells v. Wamser, 158 F.R.D. 390 (S.D.Ohio 1994). "Many courts have recognized their inherent power to disqualify experts on the basis of the expert's past relationship with an adversary in the litigation." American Empire Surplus Lines v. Care Centers, 484 F. Supp. 2d 855 (ND Ill. 2007) (precluding expert because "unfair and unseemly to allow an expert to be used in such a way.").

### ii. Dr. Ferrara's Testimony Should Never Have Been Allowed, or a Negative Inference Granted

The Court should never have allowed the defense expert musicologist, Dr. Lawrence Ferrara, to testify. Shortly before trial, during Dr. Ferrara's deposition, Plaintiff discovered that Dr. Ferrara had previously been hired to analyze "Taurus" and "Stairway to Heaven" for Plaintiff's fiduciary and publisher, Hollenbeck Music. What is more, defense counsel and Dr. Ferrara knew about this conflict and deliberately attempted to conceal the conflict from Plaintiff, including by violating their affirmative disclosure obligations under FRCP 26(a), and their discovery obligations to produce Dr. Ferrara's prior invoices for work performed and money

received, and Dr. Ferrara's prior reports, and the facts and information he relied upon and did not rely upon.

During Dr. Ferrara's deposition the witness was asked if he had ever heard the song ""Taurus"" before:

| MR. MALOFIY: | Were you familiar with the work ""Taurus"" prior to becoming involved in this litigation? |
| DR. FERRARA: | No. |
| MR. MALOFIY: | Was your first -- |
| DR. FERRARA: | Actually, not no. I was aware of ""Taurus"" before this litigation. |
| MR. MALOFIY: | Why is that? |
| DR. FERRARA: | I think around three years ago, I was asked to complete an analysis -- it was preliminary -- of the ""Taurus"" studio version, not the ""Taurus"" deposit copy, and ""Stairway to Heaven"." And, so, if the question was ""Taurus"," then the answer is yes. Prior to this the ""Taurus"" deposit copy, the answer would be no. |

(Excerpt 1626). This was news to Plaintiff's counsel as such information had not been disclosed in the Rule 26 disclosures, in any discovery answers, in any of Ferrara's expert reports and declaration, nor by defense counsel.

Plaintiff's counsel inquired whether Ferrara was retained by Lou Adler, the owner of Hollenbeck Music and Plaintiff's fiduciary and publisher. Hollenbeck administers the "Taurus" copyright on Plaintiff's behalf. Ferrara stated, "No." (Excerpt 1627). Plaintiff, however, as this motion explains, **later learned that Ferrara had indeed been hired by entities working on behalf of Adler** as defense

counsel knew.

Defense counsel asserted during the deposition that any conflict had been waived (an impossibility as Plaintiff was not even aware of the conflict before the deposition *and was the only party that could waive any conflict*), implying that defense counsel indeed knew the company who had hired Ferrara:

| MR. MALOFIY: | Did you clear any conflicts prior to being retained in this case? |
| MR. ANDERSON: | I already told you any conflict was waived. The question really, Francis, is if you want to keep burning time on this or you want to let him -- |
| MR. MALOFIY: | It's a serious, serious issue. The conflict was waived, you said, Mr. Anderson? |
| MR. ANDERSON: | Waived. |
| MR. MALOFIY: | Waived. |
| MR. ANDERSON: | Waived. |
| MR. MALOFIY: | By who? |
| MR. ANDERSON: | **I am as uncomfortable as him**. |

(Excerpt 1630) (emphasis added).

Eventually, Dr. Ferrara finally revealed his mystery employer as "Rondor Music, which I understand is a division of Universal Music Publishing Group." (Excerpt 1632)  Finally, after nearly an hour of filibustering it was revealed that defense counsel had in fact communicated with Rondor and Hollenbeck about Dr. Ferrara's previously undisclosed conflict of interest. (Excerpt 1635).

Rondor/Universal was in fact working for Plaintiff's publisher, Hollenbeck Music (Lou Adler's company). This is known because Hollenbeck Music turned over documents in discovery indicating that it had recently hired Universal/Rondor to attempt to make changes to the "Taurus" copyright. (Excerpt 1712).

Basically, Dr. Ferrara had been previously hired by Plaintiff's publisher to assess the success of a lawsuit against Led Zeppelin over "Stairway to Heaven" and produced a report. Defendants then hired Dr. Ferrara to testify against Plaintiff, despite him having previously worked for Plaintiff's publisher and fiduciary, and concealed all of this from plaintiff--including Ferrara's prior analysis of "Taurus" and "Stairway to Heaven". This unseemly conduct alone should preclude his testimony as against public policy.

Dr. Ferrara was paid over $80,000 and is professional expert for the industry. (Excerpt 1034-35). He hires himself out to the highest bidder, usually the industry. The fact that Dr. Ferrara never disclosed his prior employment and his prior invoices, or how much he was paid, or the content of his analysis goes directly to his biases, the soundness of his opinions, and whether or not there was material for impeachment within his prior reports for Plaintiff's publisher. The failure to disclose this conflict and prior analysis of the very two songs in dispute reflects a lack of candor with the tribunal.

Not only was their an affirmative disclosure obligation of a known conflict under FRCP 26, and basic lawyerly ethics, but Defendants never disclosed any of this information despite repeated discovery requests by Plaintiff directly on point:

> All material and communications you have concerning Lou Adler (including by not limited to his entities such as Hollenbeck Music and Ode Records) . . . regarding "Stairway to Heaven" . . . "Taurus" . . . including after the filing of this lawsuit---this includes communications between Defendants' attorneys and agents and Lou Adler's attorneys and agents.

See, e.g., (Excerpt 1744). Note that defense counsel admitted to communications with Lou Adler's entities and agents about this case, but failed to produce these communications. Plaintiff also requested such things from Dr. Ferrara in his deposition, but they were never disclosed or produced. (Excerpt 1758-59).

The fact that Dr. Ferrara's prior analysis of the two songs in dispute was never disclosed is an extreme violation of Defendants' discovery obligations that goes to the heart of this case. Their failure to turn over this information means that a negative inference must be drawn that the information they withheld would have been damaging to Defendants' case and would have been favorable to Plaintiff's.

Disqualification, given the manifest unseemliness of Defendants and Dr. Ferrara's deception, was warranted. American Empire Surplus Lines, 484 F. Supp. 2d 855. It is entirely possible that Dr. Ferrara concluded in his prior that "Taurus" and "Stairway to Heaven" were similar in key respects, something which would

totally undermine his testimony in court. At a minimum, a negative inference should have been granted.

Plaintiff notes that although the disqualification analysis should normally consider an analysis of what confidences there were or could be breached, Defendants' conduct, in concealing any and all information related to Dr. Ferrara's prior employment with Plaintiff's publisher and of his prior comparison of "Taurus" and "Stairway to Heaven", had made conducting this analysis impossible.

Note that when Plaintiff attempted to cross examine Dr. Ferrara on these issues, he was prevented from doing so by the court on relevance grounds despite the fact that there was no way to know what was in Dr. Ferrara's prior analysis without seeing it:

| MR. MALOFIY: | Sir, in your report, did you ever disclose the fact that you initially looked at the ""Taurus"" sound recording? |
| MR. ANDERSON: | Objection. |
| THE COURT: | Sustained. |

(Excerpt 1044).

Defendants' conduct was nothing less than a deliberate effort to perpetrate a fraud on Plaintiff, one which the court's failure to entertain the sanctions motion and request for preclusion ultimately rewarded. The presumption must be that

Defendants concealed this conflict and prior analysis because it hurt their case.

The failure to preclude Dr. Ferrara or grant a negative inference requires reversal.

## Conclusion

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Honorable Court reverse, vacate, and remand for a new trial, including striking the bill of costs. The issues complained of, both when considered individually and as a whole, demonstrate that there were many serious errors that unduly prejudiced Plaintiff's ability to prove substantial similarity.

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC

/s/ Francis Malofiy
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Rd. | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com

*Law Firm / Lawyers for Appellant Skidmore*

*/d/ March 15, 2017*

# STATEMENT OF RELATED CASES

There are two related cases:

- The district court denied Defendants' requests for costs and fees and Defendants' appealed at 16-56287.

- In <u>Williams v. Bridgeport Music</u>, (15-56880, 16-55089, 16-55626) there are many of the same legal issues in dispute concerning the admissibility of sound recordings and their compositions as it relates to the deposit copy requirement of the 1909 Act.

# Statement of Length Compliance

See attached form.

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Appellant's Opening Brief and Excerpts of the Record have been served upon all counsel of record via electronic filing:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

*****

*Respectfully submitted,*

Francis Alexander, LLC
/s/ Francis Malofiy
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Rd. | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*Law Firm / Lawyers for Appellant Skidmore*

*/d/ March 15, 2017*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>16-56057</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☒ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is <u>17634</u> words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | /s/ Francis Malofiy | Date | 03/17/2017 |

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

# EXHIBIT 2

# United States Court of Appeals
# For the Ninth Circuit

No. 16-56057; 16-56287

---

Skidmore et al.

*Michael Skidmore, Trustee for the
Randy Craig Wolfe Trust
Plaintiff-Appellant/Cross Appellee*

v.

Led Zeppelin *et al.*

*Defendants-Appellees*

and

Warner/Chappell Music, Inc.
*Defendant, Cross Appellant*

---

# Skidmore's Combined Reply Brief and Opening Brief Responding to Defendant's Costs and Fees Appeal

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California.  The case was docketed in the Central District at 15-cv-03462)

---

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Michael Skidmore*

# Table of Contents

Table of Authorities ............................................................. 5

Introduction and Summary of the Argument ......................... 7

Request for Oral Argument .................................................. 12

Part I - Argument on Reply ................................................. 13

   1.   The 1909 Copyright Act and the Case Law Do Not Limit the Scope of a Musical Copyright's Composition to Written Sheet Music ............... 13

      a.   Plaintiff's Opening Argument and Defendants' Response ............... 13

      b.   Plaintiff's Reply on Why Recordings of a Song May Be Used to Establish the Composition of Songs and Why The 1909 Copyright Act Does Not Limit the Protected Composition of a Song to Sheet Music .............................................. 17

         i.   Defendants' Response Fails to Explain why Recordings of a Song Cannot be Used to Establish the Composition of the Song Under the 1909 Act ......................... 17

         ii.   Plaintiff Has Clearly Shown Why Sections 11-12 Do Not Control or Define the Scope of Protected Expression in a Musical Composition ............... 21

      c.   The Ninth Circuit and Sixth Circuit Have Previously Ruled That Album Recordings May Be Used to Establish the Composition of a Song Copyrighted under the 1909 Act ................... 24

      d.   Plaintiff and Future Litigants Will Suffer Severe Consequences if the Lower Court's Decision Restricting the Substantial Similarity Comparison is Affirmed ................................ 28

   2.   The Court Should have Permitted Plaintiff to Present Expert Testimony that the Composition in the "Taurus" Album Recording was Embodied in the Deposit Sheet Music Composition of "Taurus", as the Plaintiff was Allowed to Do in Williams ....................... 29

   3.   Plaintiff Demonstrated in His Opening Brief Through Expert Testimony, Expert Reports, and Audio Exhibits that the Album Composition of "Taurus" was "Identical" to "Stairway to Heaven" Whereas the Deposit Copy was Merely "Substantially Similar" ............................ 31

   4.   Plaintiff Has Never Attempted to Claim a Sound Recording Copyright Exists or was Copied; Defendants' Argument to the

Contrary is Nonsensical .................................................................. 36

5.  Plaintiff Proved a High Degree of Access at Trial and Requested an
    Inverse Ratio Rule Instruction; The Lower Court Erroneously Refused
    to Give the Instruction and Caused Plaintiff Severe Prejudice .................. 38

    a.  The Jury Found that Defendants had Access to "Taurus" Because
        Plaintiff Proved a High Degree of Access with both Direct
        and Circumstantial Evidence ......................................... 39

    b.  There is No Case Which Limits the Applicability of an Inverse Ratio Rule
        Jury Instruction to Cases with "High Degrees" of Access ................ 41

6.  Plaintiff Explicitly Complied with Central District L.R. 51, the
    Prescribed Method for Preserving Exceptions to Jury Instructions, and
    the Trial Court Acknowledged that All Exceptions and Objections
    were Preserved; Defendants' Argument that Plaintiff Waived these
    Objections is Disingenuous .............................................. 43

7.  Plaintiff Did Not Waive Any Claim of Error Regarding the Court's
    Failure to Instruct the Jury that Combinations and Arrangements of
    Musical Elements are Copyrightable; This Erroneous Omission was
    Highly Prejudicial ...................................................... 45

8.  The Originality Instruction Given by the Court was Inadequate, Not
    Legally Correct, and Severely Harmed Plaintiff's Case; Plaintiff Did
    Not Waive this Objection as Defendants Erroneously Claim ................ 49

    a.  Plaintiff Suffered Severe Harm Due to the Incorrect
        Instruction on Originality ............................................ 49

    b.  Plaintiff Did Not Waive any Objection to the Erroneous
        Originality Instruction and In Fact Explicitly Preserved that
        Objection in Writing ................................................ 50

9.  During Jury Deliberations the Jury's Final Question was to Hear
    Plaintiff's Audio of "Taurus"—The Court Ordered An Irrelevant
    Version of "Taurus" To Be Played, Which Seriously Prejudiced
    Plaintiff By Ending the Case; Plaintiff Specifically Objected and
    Did Not Waive this Error ............................................... 53

10. The Ten-Hour Time Limit Placed on Plaintiff Severely Hindered His
    Ability to Prove Substantial Similarity and Abused the Court's
    Discretion; This Objection was Explicitly Preserved and Not Waived ....... 56

11. **Dr. Lawrence Ferrara's Testimony Should Have Been Precluded for Failing to Disclose that He Had Been Previously Hired by Plaintiff's Publisher to Compare "Taurus" and "Stairway to Heaven"** .................. 59

**Part II - Plaintiff's Response Brief to Defendant's Costs and Fees Appeal** ................................................................. 63

1. **Defendant Erroneously and Disingenuously Claims the Trial Court Failed to Consider the Purpose of the Copyright Act when Denying their Costs and Fees Motion** ................................................. 63

2. **The District Court's Opinion was Correct and Did Not Abuse Its Discretion** ........................................................................ 65

3. **Defendants Spuriously Argue that the Trial Court Erred Because, In their Mind, the Musical Expression in "Taurus" was Unprotected and the Lawsuit was Unreasonable; This Argument Fails Because Defendants Failed to Preserve this Claim of Error and are Improperly Asking this Circuit to Resolve a Dispute of Fact between Musical Experts** ......................................................................... 69

   a. **The Court Properly Found that there was a Dispute of Fact Between the Opposing Experts Over the Protectability of "Taurus" and its Substantial Similarity to "Stairway to Heaven"** ................. 70

   b. **Defendants Ignore that There Were Novel Issues of Law At Play Which Precluded a Finding that Plaintiff's Lawsuit was Unreasonable or Frivolous** .................................... 72

   c. **Defendant Waived any Reasonableness/Frivolousness Argument by Failing to Appeal the Underlying Rulings, Failing to Develop this Point in the Costs and Fees Motion, and By Failing to Develop this Argument in its Opening Brief** ........ 75

4. **Defendant's Litigation Misconduct Argument Does Not Make Sense** ....... 78

**Conclusion** ........................................................................... 81

**Statement of Related Cases** ................................................ 82

**Certificate of Compliance** .................................................. 83

# Table of Authorities

## Cases

ABKCO Music, Inc. v. LaVere, 217 F. 3d 684 (9th Cir. 2000) ............................... 17, 19

Berkla v. Corel Corp., 302 F.3d 909, 922 (9th Cir. 2002) ............................................65

Bridgeport Music, Inc. v. UMG Recordings, Inc., 585 F.3d 267, 276
(6th Cir. 2009) ................................................................................ 1, 20-28, 37

Chaidez v. US, 133 S. Ct. 1103, 1108 (2013) ........................................................ 80

Chambers v. Mississippi, 410 US 284, 304 (1973) ..............................................76-77

Fantasy, Inc. v. Fogerty, 94 F.3d 553, 558 (9th Cir. 1996) ........................................ 66

Fogerty v. Fantasy, Inc., 510 US 517, 526 (1994) ............................................... 64-66

Goldstein v. California, 412 US 546 (1973) ............................................... 14, 20-23, 37

Inhale, Inc. v. Starbuzz Tobacco, Inc., 75 F.3d 1038, 1042-43 (9th Cir. 2014) .................67

Kensington Rock Island Ltd. Partnership v. American Eagle Historic Partners, 921
F.2d 122, 124-25, n. 1 (7th Cir.1990) ...................................................................77

Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979, 1989 (2016) .................65, 69, 79-80

Lieb v. Topstone Indus., 788 F.2d 151, 156 (3d. Cir. 1986) ........................................ 66

Los Angeles Memorial Coliseum Com'n v. NFL, 726 F. 2d 1381, 1398 (9th Cir. 1984).. 48, 50

Lotus Development Corp. v. Borland International, 140 F.3d 70, 75 (1st Cir. 1998)............67

Montclair v. Ramsdell, 107 U. S. 147, 152 (1883) ..................................................... 23

Monotype Corp., PLC v. Int'l Typeface Corp., 43 F.3d 443, 451 (9th Cir.1994) .............. 80

National Conference of Bar Examiners v. Multistate Legal Studies, 692 F. 2d 478 (7th Cir.
1982)................................................................................................ 17, 21, 22

Newton v. Diamond, 204 F. Supp. 2d 1244, 1259 (C.D. Cal. 2002) .........................24, 38

Perfect 10, Inc. v. Visa Int'l Ass'n, Inc., 2005 WL 2007932 at *4
(N.D. Cal. Aug. 12, 2005) ...............................................................................67

Perfect 10, Inc. v. Ccbill LLC, 488 F.3d 1102, 1120 (9th Cir. 2007) ..............................67

Rice v. Fox Broadcasting Co., 330 F. 3d 1170 (9th Cir. 2003) ..................................41, 42

Seltzer v. Green Day, 725 F.3d 1170, 1180 (9th Cir. 1980) ...............................65-67, 70

Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999) .................................................. 78

Smith v. Barry, 502 U.S. 244, 248, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992) .....................76

SOFA Entm't, Inc. v. Dodger Prods., Inc., 709 F.3d 1273, 1280 (9th Cir. 2013) .......... 70-75

Swirsky v. Carey, 376 F.3d 841, 849 (9th Cir. 2004) ..............................................et seq.

Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000) ...........................et seq.

United States v. Menasche, 348 US 528, 538-39 (1955) ............................................. 23

US v. WR Grace, 504 F.3d 745 (2007) ......................................................................21

Viva Video, Inc. v. Cabrera, 9 Fed.Appx. 77, 80 (C.A.2 2001) ....................................79

Washingtonian Publ'g Co. v. Pearson, 306 U.S. 30, 41 (1939) ....................................15

White-Smith Music Publ'g Co. v. Apollo Co., 209 U.S. 1, 10-11 (1908) ....................14, 29

## STATUTES AND RULES

Copyright Act of 1909, 35 Stat. 1075 (1909) (repealed 1978), §§ 1(e), 3, 11, 12................et seq.

Copyright Act of 1831 (repealed 1909) ....................................................................13, 14, 18

FRCP 51 ................................................................................................................ 43

FRCP 61................................................................................................................ 80

Fed. Rule of Evidence 403................................................................................ 20

FRAP 3................................................................................................................ 76

Central Dist. Of Cali. L.R. 51 ...............................................................43-45, 51-52

# Introduction and Summary of Arguments

Plaintiff-Appellant[1], Michael Skidmore, submits this Combined Reply Brief and Opening Brief Responding to Defendant's Costs and Fees Appeal.

- Part I – is Plaintiff Reply Brief in support of his appeal of the jury verdict in favor of Defendants and against Plaintiff.
- Part II – is Plaintiff Response Brief opposing Defendant Warner/Chappell's claim that the trial court erred in denying the defendant its attorney's fees and costs.

**First,** Plaintiff Skidmore's primary argument on appeal is that a recording of a song, which contains and embodies the composition of the song, is admissible to prove the protected composition of a musical work under the 1909 Copyright Act. Plaintiff also argues that nothing in the 1909 Act limits the **scope of protected expression** in a musical copyright to sheet music alone. In the underlying case, the district court limited the substantial similarity comparison to between the incomplete deposit copy sheet music of "Taurus" and "Stairway to Heaven"—to the exclusion of all other evidence of the composition in the original, full "Taurus" album composition which was owned and possessed by Defendant James Patrick Page in his record collection.

---

[1] For purposes of clarity, because this Brief is both a Plaintiff-Appellant's Reply Brief and a Plaintiff-Cross Appellee's Response Brief to Defendant-Appellant's Appeal, counsel has chosen to primarily identify the parties according to their respective position in the district court: "Plaintiff" or "Defendant."

Plaintiff's Reply demonstrates that Defendants' argument claiming that the district court was correct to limit the scope of protected expression to only the exact notes on the deposit copy lead sheet—to the exclusion of all other relevant and competent evidence such as the "Taurus" album composition and recording—is an egregious error of substantive and evidentiary law that warrants reversal. There is **no case in 108 years** since 1909 Act became law which holds that the deposit copy lead sheet substantively governs the scope of protected scope of expression in a musical work (except the Central District of California Williams v. Bridgeport case in 2014, a ruling which is currently on appeal). Further, there is no case in history that has held that a recording of a song—which contains a copy of the song's composition—cannot be used as evidence to establish the composition of a musical work under the 1909 Act.

Plaintiff's Reply further demonstrates that Defendant's Response is fundamentally flawed in alleging that no harm resulted from the use of the incomplete deposit copy composition versus the complete album composition of "Taurus" that was kept in defendant Jimmy Page's record collection. Plaintiff demonstrated severe prejudice in the opening brief by identifying the key compositional element shared by "Taurus" and "Stairway to Heaven" (guitar melody) which only partially appears in the "Taurus" deposit copy lead sheet; by

presenting recordings of all the compositions at issue to this circuit for comparison; and by presenting Plaintiff's expert opinions that the composition of the album version of "Taurus" is "identical" to "Stairway to Heaven," while the deposit copy is merely "substantially similar."

Lastly, contrary to Defendants' silly, unsupported, and blatantly false argument that Plaintiff is attempting to sue over a "sound recording copyright," Plaintiff has ***never*** made nor lodged a claim over any "sound recording copyright."

**Second,** Plaintiff correctly argues that the Court's failure to give an inverse ratio rule instruction was reversible error—especially in light of the fact that Plaintiff proved direct access and presented abundant evidence at trial to support this factual position. It was highly prejudicial that the jury did not know that Plaintiff's burden to prove substantial similarity should have been lowered by the amount of access he could prove. Defendants' response claims that the court properly declined to give an inverse ratio instruction because it was necessary for Plaintiff to provide a "high degree" of access—*something Plaintiff did.* Plaintiff's reply details how he proved a high degree of access with direct and circumstantial evidence, namely demonstrating that defendant James Patrick Page owns "Taurus" in his record collection. Furthermore, there is no legal requirement that there must be a "high degree" of access proven before an inverse ratio instruction is given; it should be given

whenever there is a triable issue of fact on access and substantial similarity.

**Third**, Plaintiff argues that the court failed to instruct the jury on the protectability of combinations of musical elements, and also misdefined originality in the jury instructions. Plaintiff argues that these errors seriously prejudiced his case because the Court erroneously instructed the jury that much of his experts' testimony on what was protectable in "Taurus", and similar to "Stairway to Heaven," could be disregarded. Defendants disingenuously respond that Plaintiff waived the issues and that he suffered no harmful error. Plaintiff's reply clearly demonstrates that he preserved his claims of error by complying with L.R. 51 and the Court's on-the-record verbal instructions. Moreover, Plaintiff detailed the exact expert testimony and musical elements that were undermined by the Court's deficient instructions.

## Plaintiff's Response in Opposition to Defendant's Cost and Fees Appeal

An award or denial of costs and fees is reviewed for an abuse of discretion. Here, Defendant Warner/Chappell has not identified any valid reasons why the Court's decision to deny costs and fees was an abuse of discretion or that any errors, if committed, constitute harmful error. The trial court denied Defendant's motion because this was a "hard-fought" case indisputably "motivated by a desire to recognize Randy California's musical contribution." Supp. Excerpt 7.

**First,** Defendant erroneously and disingenuously claims that the trial court failed to consider the purpose of the Copyright Act when denying its costs and fees motion. This contradicts the fact that the Court analyzed every factor under the Fogerty test (and also took into account additional considerations suggested by Defendants), which is designed to help courts evaluate whether litigation comported with the Copyright Act's goals. Moreover, the trial court's opinion explicitly stated that it was rendered "in light of the Copyright Act's essential goals."

**Second**, the district court was correct in its denial of its award of costs and fees as the opinion was well reasoned, legally correct, and did not abuse its discretion. Defendant spuriously argues that Plaintiff's lawsuit was frivolous and objectively unreasonable on substantial similarity. The district court's opinion, however, explained that Plaintiff's substantial similarity arguments were reasonable and that this was the reason the court **denied Defendants' summary judgment motion** and allowed a jury trial in the first place. In addition, **Defendants' waived this issue** at every stage of the litigation. Defendants did not appeal the summary judgment ruling which they now claim was incorrect, which held that there was a dispute of fact for the jury on substantial similarity. That summary judgment ruling is law of the case and cannot be disturbed. Moreover, Defendant never made or developed these

arguments in its motion for costs and fees; Defendant cannot make an argument to this Circuit they did not develop below.

**Third**, Defendants wrongly claim that the Court somehow erred in weighing the argument that Plaintiff's counsel, not Plaintiff, had allegedly committed litigation misconduct. What Defendant ignores is that the Court counted this factor in favor of Defendant (which Plaintiff vehemently disagrees with), but ***still found*** that fees were ***not*** appropriate. The Supreme Court and Ninth Circuit have explicitly held that a district court may weigh a broad range of considerations when determining whether assessing costs and fees are warranted and that there is no precise formula to be followed. Here, the district court's opinion methodically steps through each of Defendant's arguments and reasonably concludes that an award of costs and fees does not satisfy the goals of the Copyright Act. There was no abuse of discretion.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument from this Honorable Court and affirms that he believes that oral argument would prove helpful in resolving these appeals and the issues raised herein because they are not only complicated, but the resulting appellate court decision could affect many copyrighted works under the 1909 Copyright Act and future litigants.

Plaintiff observes that oral argument is scheduled for <u>Williams v. Bridgeport Music</u> (15-56880) on October 7, 2017. As the deposit copy issue is front-and-center, and the main issue on appeal in both matters, and because a decision in the <u>Williams</u> case will have a substantial effect on Plaintiff's appeal and on copyright law moving forward, Plaintiff respectfully requests that this Circuit withhold its decision on <u>Williams</u> until oral argument has been heard on both cases.

# Part I - Reply Arguments

**1.     The 1909 Copyright Act and the Case Law Do Not Limit the Scope of a Musical Copyright's Composition to Written Sheet Music**

### a.     Plaintiff's Opening Argument and Defendants' Response

Plaintiff's opening brief advocated that the 1909 Copyright Act does not limit the scope of protected musical expression in a work to only written sheet music. Plt. Brief, at p.28-42. Plaintiff's brief explained that a musical work under the 1909 Act first obtained common law copyright protection the moment it was created and then became a federal copyright once published or registered. <u>Id.</u> at 31. Plaintiff also provided key background showing that the 1909 Act was enacted in a push by Congress to expand the protections of musical works beyond sheet music. <u>Id.</u> at p.30-31.

The Supreme Court ruled in 1908 that the 1831 Copyright Act only allowed

an author to protect from copying a musical composition placed in sheet music, not musical compositions placed on piano rolls. See White-Smith Music Publ'g Co. v. Apollo Co., 209 U.S. 1, 10-11 (1908) (holding that the only musical expression protected under 1831 Copyright Act was sheet music and inviting Congress to expand scope of protection). It should be noted that in 1831 there was no way, other than sheet music, to fix a musical composition in tangible form, nor was there any real way to introduce evidence of a song's musical composition other than sheet music.[2]

Thus, given the advancements in technology since 1831, in 1909 Congress accepted the Supreme Court's invitation and made it clear in section 1(e) of the 1909 Copyright Act that an author would be able to protect a musical composition fixed by mechanical reproduction (like piano roll or record), in addition to sheet music:

> [a musical composition may be fixed in] any system of notation or any form of record in which the thought of an author might be recorded and from which it may be read or reproduced.

1909 Act, § 1(e).

This meant the author/owner could now protect compositions contained on piano rolls and records from copying, as well as sheet music. Goldstein v. California, 412 US 546 (1973) (stating that "under § 1 (e), records and piano rolls were to be

---

[2] The piano roll was not invented until, at the earliest, 1863, and the phonograph/gramophone was not invented until 1877.

considered as 'copies' of the original composition they were capable of reproducing"). Consequently, it necessarily follows that because piano rolls and recordings are copies of musical compositions, they are evidence of a song's composition. See Plt. Brief, at p.37.

All of this indicates that Congress intended, and the Courts understood, that the scope of copyright protection in a musical composition was not limited to sheet music under the 1909 Act. Many, many songs, including "Taurus" and "Stairway to Heaven", were composed under the 1909 Act independent of sheet music. Id.

As an archival and record keeping requirement for songs being copyrighted, the 1909 Act required a sheet music copy be deposited with the copyright office. 1909 Copyright Act, at §11-12. The Supreme Court stated in 1939 that the deposit copy requirement under the 1909 Act is not connected to the "subject matter of protected works" and that "the requirement for deposit is not for the purpose of a permanent record of copyright publications and . . . such a record is not indispensable to the existence of the copyright." See Washingtonian Publ'g Co. v. Pearson, 306 U.S. 30, 39-41 (1939).

No court has ever held that sections 11-12 of the 1909 Act substantively define the scope of protected expression in a musical work (except two Central District of Cali. courts in 2014 (Williams) and 2016 (this case), and both decisions are being

appealed). Moreover, no court has ever held or observed that the scope of common law protection a copyright acquired upon creation could be somehow limited by federal registration. See 1909 Act, §3.

The district court nevertheless erroneously held that under the 1909 Act only the written deposit copy controlled the scope of protection of the composition in a song—to the exclusion of all other evidence of the song's composition. (Excerpt 73-74, 1865, 1866-67).

Plaintiff demonstrated in the opening brief on pages 37-38 that, contrary to the District Court's decision, that there are several appellate cases from across the nation, including the Ninth Circuit, where the Circuit courts have allowed the protected composition of a song copyrighted under the 1909 Act to be established by reference to recordings of the song which contain a copy of the underlying musical composition. The defendants in those cases contended that only the written deposit lead sheet should be used. See Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000); Bridgeport Music, Inc. v. UMG Recordings, Inc., 585 F.3d 267, 276 (6th Cir. 2009) (observing that deposit copy sheet music could be disregarded when the song's composition was "embedded in the sound recording" and the composition was created long before the deposit copy lead sheet); see also Pearson, 306 U.S. at 39-41; National Conference of Bar Examiners v. Multistate Legal Studies, 692 F. 2d

478 (7th Cir. 1982).

Defendants contend in response, in support of the trial court's erroneous decisions, that only the deposit copy sheet music is protectable composition under the 1909 Act because sections 11-12 state that a "complete" copy of the song should be submitted to the Copyright Office. Def. Brief, at p.43. Defendants also contend that the cases presented by Plaintiff showing that sections 11-12 do not prohibit recordings from being admissible to prove the composition of a song are distinguishable, specifically Three Boys Music, because they allegedly are only about jurisdiction. Def. Brief at p.45-46, 50. Defendants further claim that Plaintiff has not demonstrated that the incomplete composition on the deposit copy differs from the full album composition of "Taurus" owned by Jimmy Page. Id. at 36.

**b. Plaintiff's Reply on Why Recordings of a Song May Be Used to Establish the Composition of Songs and Why The 1909 Copyright Act Does Not Limit the Protected Composition of a Song to Sheet Music**

**i. Defendants' Response Fails to Explain why Recordings of a Song Cannot be Used to Establish the Composition of the Song Under the 1909 Act**

Plaintiff made the point on page 31 of his opening brief that "Under the 1909 Act, an unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme." See ABKCO Music, Inc. v. LaVere, 217 F. 3d

684 (9th Cir. 2000). The full "Taurus" composition was created and in a final concrete form independent of sheet music in 1966 and was soon after included on Spirit's first album (which defendant Page owns). <u>See</u> Excerpt 2515; Excerpt 286; Audio Exhibits 32-39; Plaintiff's Brief at p.14. The deposit lead sheet of Taurus was later created in 1967 when the song was registered with the Copyright Office. Excerpt 2642.

There is no indication, anywhere, that the copyright protection an original composition received under common law, such as a musical composition placed on a record, was limited or circumscribed by conversion to federal copyright. In fact, the 1909 Act specifically states that "the copyright provided by this Act shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope such copyright." <u>See</u> 1909 Act, §3. The very idea that common law copyright could be shrunk by federal copyright is risible.

Defendants maintain in their response that section 1(e) only identified new technical forms in which compositions could be reproduced and protected, not that it expanded the scope of copyright protection. Def. Brief at, p.38-39. But this misses the point. When the 1831 Act was enacted, which preceded the 1909 Act, there was no way to fix or prove a musical composition—other than in or with sheet music.

Before the 1909 Act, the Supreme Court had taken the view that mechanical reproductions like piano rolls "did not constitute a 'copy' of a copyrighted musical composition because they were not written or printed in tangible form." ABKCO, 217 F. 3d at 688. Specifically, the Supreme Court believed "A musical composition is an intellectual creation which first exists in the mind of the composer; he may play it for the first time upon an instrument. It is not susceptible of being copied until it had been put in a form which others can see and read," which in its view was only sheet music not piano rolls. See White-Smith Music, 209 U.S. at 17. Thus, persons were free to reproduce the rolls and the author could do nothing because only compositions on sheet music were protected.

With the 1909 Act, Congress expanded the rights of authors/owners to prohibit the unauthorized copying of compositions included on records and piano rolls. Section 1(e) specifically states that an original musical composition can exist in "*any system of notation or any form of record* in which the thought of an author might be recorded and from which it may be read or reproduced," making it clear that evidence of the content of a musical composition can and will extend beyond sheet music. 1909 Act, §1(e) (emphasis added). The 1909 Act thus made it clear that original compositions of songs could be embodied in mechanical records. See Goldstein, 412 U.S. at 564 (stating that records and piano rolls were to be considered

"'copies' of the original composition they were capable of reproducing.").

By acknowledging technological progression and providing that copies of musical composition could be embodied in mechanical reproductions like records, Congress definitively moved copyright law beyond sheet music. Note that many, many compositions were written under the 1909 Act completely independent of sheet music, including "Taurus" and "Stairway to Heaven." UMG Recordings, 585 F.3d at 276. Nothing in the act or case law states that a recording is not evidence of a song's composition, nor do they state the scope of composition is limited to sheet music.

**Logically, evidence of a musical composition can come from anywhere, especially a mechanical reproduction which contains a copy of the composition**. See Goldstein, 412 U.S. at 564. Indeed, the courts have routinely allowed recordings of songs, which contain the compositions of the songs, to prove the compositions of the songs. See Three Boys Music, supra; UMG Recordings, 585 F.3d at 276.[3]

---

[3] Defendants attempt to argue that it was proper to preclude the album recording because it could confuse and mislead the jury under FRE 403. Def. Brief at p.52-53. But the court *legally* erred when it precluded any evidence of "Taurus's" composition outside the deposit copy as inadmissible; it was not an evidentiary determination at the court's discretion. Whether the actual "Taurus" album recording itself should be played to the jury, as opposed to a re-recording of only the compositional elements in the "Taurus" album version, is a FRE 403 question to be addressed on remand. Moreover, the composition of "Taurus" in the recordings could have been admitted without admitting the actual sound recordings themselves.

Defendants are forced to admit that should a deposit copy be lost, then a court could use a recording to establish the composition of a song. <u>See</u> Def. Brief, at p.54. Yet, Defendants fail to acknowledge that if a recording is a copy of a song's composition in some instances, it must be considered evidence of a song's composition in other instances.[4] They cannot pick or chose.

> ii. **Plaintiff Has Clearly Shown Why Sections 11-12 Do Not Control or Define the Scope of Protected Expression in a Musical Composition**

Defendants argue that archival sections 11-12, which require a "complete" copy of a song to be submitted to the Copyright Office, control the substantive scope

---

<u>US v. WR Grace</u>, 504 F.3d 745, 763 (2007) (stating that experts "may rely on inadmissible evidence in forming an opinion or delivering testimony").

[4] Defendants claim that the deposit copy is "best evidence" of a song's composition and that recordings are secondary evidence. Def. Brief, at p.54. Setting aside that Defendants cite no case law for this proposition whatsoever, this argument begs the question in multiple respects. **First**, nothing in the 1909 Act or the century of following case law says that the deposit copy is best evidence of a song's composition. Many cases contradict such a notion. <u>See</u> <u>Three Boys Music</u>, *supra*; <u>UMG Recording</u>, *supra*; <u>National Conference of Bar Examiners</u>, *supra*. **Second**, the Supreme Court has held that a musical composition fixed in a record under section 1(e) is indeed a copy of a song's composition, placing it at least on equal status with the deposit copy. <u>See</u> <u>Goldstein</u>, *supra*. **Third**, the deposit copy is usually not complete as Plaintiff's expert observed (Excerpt 2516, 1788) and therefore may **not** be the best evidence a song's composition, especially when the song was composed without sheet music and the defendant did not hear the deposit copy—which is exactly the situation in this case. Jimmy Page indisputably only had access to the "Taurus" album recording, which contains the full composition of "Taurus"; he did not hear or see the incomplete deposit copy sitting in the Copyright Office.

of copyright protection under the 1909 Act. Def. Brief, at p.43. Defendants argue, and the District Court held, that because sections 11-12 state that a complete copy of a song must be submitted, that therefore this is the only protected expression in a song. Def. Brief, at p.43. However, Defendants never explain how sections 11-12, which have always been read by the courts as an non-substantive, jurisdictional, and archival requirement, can be read in a substantive manner.

**First**, Defendants have not cited any cases whatsoever where sections 11-12 are treated as having anything other than a jurisdictional and/or archival effect. Plt. Brief at p.35 n.3. This is a glaring omission. There are no cases (except the lower court's decision and the <u>Williams</u> decision in 2016 and 2014) where sections 11-12 are held to have any bearing on the **substantive** scope of protected expression in a music composition copyright. In contrast, there are many cases where the deposit copy has not limited the scope of protected expression in a musical composition. <u>See Three Boys Music</u>, 212 F.3d at 486-87; <u>Bridgeport Music, Inc.</u>, 585 F.3d at 276 (observing that a song's composition could be "embedded in the sound recording," independent of any sheet music); <u>see also</u> <u>Pearson</u>, 306 U.S. at 39-41; <u>National Conference of Bar Examiners</u>, 692 F. 2d at 487.

**Second**, to hold that sections 11-12 define the scope of copyright protection in a work effectively negates the language in section 1(e). It is a basic premise of

statutory interpretation that a statute must be read to give effect to all sections the law. United States v. Menasche, 348 US 528, 538-39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' Montclair v. Ramsdell, 107 U. S. 147, 152, rather than to emasculate an entire section, as the Government's interpretation requires."). Section 1(e), taking into account the advances in technology, states that a copy of original musical composition can exist in "any system of notation." Given the advances in technology many musical works were written and fixed under the 1909 Act independent of sheet music. See, e.g., UMG Recordings, supra. To limit the scope of composition to a deposit copy contradicts the basic purpose of section 1(e) to recognize the changing technology.

The Supreme Court has held that musical compositions, which section 1(e) authorizes to be mechanically fixed on a record, are protected copies of the song's composition. Goldstein, supra. Yet, the District Court's holding is stating that these mechanical reproductions are in fact not copies of the compositions because it believes that the only protected musical composition is on the deposit copy sheet music. This is an impermissible contradiction.

If a mechanical reproduction like a piano roll or recording contains a protected copy of the musical composition at issue, then it inexorably follows that the roll or recording is also admissible evidence of the protected expression in the musical

composition.

### c. The Ninth Circuit and Sixth Circuit Have Previously Ruled That Album Recordings May Be Used to Establish the Composition of a Song Copyrighted under the 1909 Act

Plaintiff noted in the opening brief that the Ninth Circuit has already de facto ruled that when a music composition copyright was challenged over an incomplete deposit copy that recordings may be used to establish the composition of the song. Three Boys Music, 212 F.3d at 486-87.[5] Other circuits have also made similar rulings. UMG Recordings, 585 F.3d at 276 (observing that a deposit lead sheet does not control scope of protected expression when the song's composition was "embedded in the sound recording" independent of any sheet music).

Defendants, and the lower court, claim that because the defendant in Three Boys Music made no objection to recordings being used to establish the composition

---

[5] Defendants claim that Plaintiff wants an amalgam of recorded versions of "Taurus" admitted to prove the song's composition. Def. Brief, at p.42. But this is not true; all of these recordings show that "Taurus" has ***just one real composition***. Plaintiff wants to use the album composition, which Jimmy Page admitted he owned, plus several other live recordings, to prove to the jury what the protected composition of "Taurus" was, i.e., those parts of the song that appear consistently every time the song is played. See Newton v. Diamond, 204 F. Supp. 2d 1244, 1259 (C.D. Cal. 2002); Plaintiff Brief at p.14, 29 (stating that recordings show "Taurus" in concrete and final form in early 1967, before deposit sheet music created and submitted to Copyright Office); Excerpt 2515 (stating that early 1967 live recordings of "Taurus" show composition already finalized; that composition was later fixed in the album version).

of the songs, and because the case was focused on jurisdiction, that the result must be different in this case. Def. Brief, at p.50; Excerpt 132. But this conclusory assertion is never developed—because it does not make sense.

**First**, Defendants tellingly ignore <u>UMG Recordings</u>, which explicitly addressed and easily rejected Defendants' position that the deposit sheet music limits or defines the scope of protected expression in a musical composition copyright.

**Second**, the defendant in <u>Three Boys Music</u> posed exactly the same objection/argument Defendants now raise:

> Bolton and Goldmark argue that in 1964 the Isley Brothers deposited sheet music ("deposit copy") of "Love is a Wonderful Thing" that differed from the recorded version of the song. Furthermore, **they claimed that the deposit copy does not include the majority of the musical elements that were part of the infringement claim**.

<u>See</u> <u>Three Boys</u>, 212 F.3d at 486 (emphasis added). The Court observed that:

> Although the 1909 Copyright Act requires the owner to deposit a ``complete copy'' of the work with the copyright office, our definition of a ``complete copy'' is broad and deferential: ``Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'' <u>Harris v. Emus Records Corp.</u>, 734 F.2d 1329, 1335 (9th Cir.1984) (citations omitted).

<u>Id.</u> at 486-87.

The Ninth Circuit then allowed the recording of "Love is a Wonderful Thing" to be admitted ***as evidence of the musical composition of the song***; this recording was used by the expert musicologists on both sides to compare the songs. The fact of the matter is that in over 100 years of application of the 1909 Act, no one has seriously believed that sections 11-12 can restrict the substantial similarity comparison despite several defendants attempting to unsuccessfully raise the issue.

Setting aside that <u>Three Boys Music</u> is more proof that the deposit copy requirement has never been contemplated as substantive as opposed to jurisdictional by litigants or the courts, why should the jurisdictional analysis of the completeness of the deposit copy differ from the substantive analysis? Why should a recording of a song's composition not be used as evidence to establish the song's composition?

Plaintiff argued this to the district court at summary judgment and in the opening brief. Excerpt 2437 (stating "If the differences [between deposit copy and recorded version of "Taurus"] do not result in prejudice and are not the result of fraudulent intent, then the consideration of the composition in the sound recording is appropriate. Here, there is no prejudice and no fraud." [citation omitted]); Plt. Brief at p.35 n.3 (stating "regardless whether the requirement is jurisdictional, a precondition, or substantive, it is a distinction without a difference). Defendants have never explained why the deposit copy analysis in <u>Three Boys Music</u> should not

be applied here.

If there was no prejudice to Defendants—and Defendants have presented no evidence they would be prejudiced in any way by the consideration of the composition in the album recording of "Taurus" (which Jimmy Paged owned) as opposed to a deposit copy Page admittedly never knew existed—then the compositions as reflected on the "Taurus" album recording should have been admitted after a finding that Defendants suffered no prejudice.

Defendants also argue that Three Boys Music differs because the plaintiff's expert in that case testified that some of the elements in the recorded composition were embodied the deposit copy; Defendants claim Plaintiff has not presented such evidence. Def. Brief, at p.50. Defendants ignore that Plaintiff's experts in this case presented that **same exact opinion** to the Court repeatedly, (see, e.g., Excerpt 2122-23, 2099, 1788, 2516), but were nevertheless precluded from offering any testimony about anything other than the exact notes on the deposit copy. (Excerpt 73, 613-14, 635, 736). Plaintiff explicitly asked the district court to allow such testimony, and raised this issue in his opening brief. Plt. Brief, at p.39.

### d. Plaintiff and Future Litigants Will Suffer Severe Consequences if the Lower Court's Decision Restricting the Substantial Similarity Comparison is Affirmed

Entirely undisputed by Defendants is that under the district court's ruling no recording could ever be admitted as part of a 1909 Copyright Act case to establish a song's composition. This means that every music infringement case would only analyze a dusty deposit copy that no one had ever heard, instead of the actual song the defendants listened to and allegedly copied. The comparison would be reduced to something artificial and pointless. This consequence illustrates the absurdity of restricting the comparison of 1909 Act musical composition to only the deposit copy transcription.

Moreover, if this was truly the law for 108 years, then why in <u>Three Boys Music</u> and <u>UMG Recordings</u> did the comparison utilize recordings? If this is the law, then why in 108 years of case law is there no indication that any litigant argued and no court held that a recording of song's composition is inadmissible to prove a song's composition in a music copyright case?

The answer is because it is ridiculous to believe that a recording of a song, which is a copy of the composition of a song, cannot be used to prove the composition of a song. The extreme rigidity in the lower court's opinion was not even adopted by

the Williams court, the only other court in history to tie (erroneously) the scope of copyright protection to the deposit copy.

**2. The Court Should have Permitted Plaintiff to Present Expert Testimony that the Composition in the "Taurus" Album Recording was Embodied in the Deposit Sheet Music Composition of "Taurus," as the Plaintiff was Allowed to Do in Williams**

Plaintiff explicitly asked the district court, if it was going to find that sections 11-12 were substantive, to adopt the approach of the Williams court (Blurred Lines). (Excerpt 2102-04).

The Williams court—the only other court in history to apply the deposit copy requirement substantively—found that the recordings of the composition released to the public were in fact evidence that could establish the composition of the song, as long as experts testified that the compositions in the recordings were connected to and embodied in the deposit copy. Williams v. Bridgeport, Order Denying Post-Trial Motions, 13-cv-6004 (Doc. No. 423), at p7. (7/14/2015) ("I think [the Gaye Parties' expert] testimony is going to have to be based on the deposit copy. It's not to say they can't have listened to the sound recording as part of their analysis. They simply can't present to the jury an opinion that says, '[b]ecause I listened to the sound recording, I've reached this conclusion.'"). Namely, that evidence consisted of testimony by the plaintiff's experts that the compositional elements in the sound recording were embodied in the deposit copy, even if not with every note.

As Plaintiff argued in his opening brief, he should have been allowed to present such testimony in accordance with <u>Williams</u>—if the district court was going to hold that the deposit copy requirement was substantive. <u>See</u> Plaintiff's Brief at p.30, 40. Plaintiff's experts opined that compositional expression from the "Taurus" Album recording was embodied in the deposit sheet music, (Excerpt 2122-23, 2099, 734-36), but were nevertheless precluded from offering any testimony about anything other than ***the exact notes on the deposit copy***. Excerpt 735-36 (the Court stated when Plaintiff's expert tried to play the album composition of "Taurus" embodied on the deposit lead sheet, "You can play notes of the deposit copy only" and that any and all notes not on the deposit copy "are not protected"); Excerpt 73, 613-14, 635.

Defendants' only response in their opening brief is to weakly claim that the Williams' court's opinion is "suspect" and that Plaintiff did not present any such expert evidence. Def. 50-51. However, Plaintiff did present such expert evidence (Excerpts 2122-23, 2099, 2109-10, 1788), and indeed even submitted arguments to the court explicitly using such evidence. (Excerpt 2115-16). Dr. Alexander Stewart stated that lead sheets are usually incomplete, "the 'missing' notes [in the deposit copy] are not really missing and can be easily referenced in the numerous recordings of ["Taurus"]," and "any competent performer might be expected to fill in the missing parts." <u>See</u> Excerpt 1788.

Moreover, Defendants' statement that the <u>Williams's</u> court's opinion is "suspect" lacks self-awareness. The position advocated for by Defendants, and accepted by the lower court in this case (that all evidence of a song's composition other than the deposit copy must be excluded), has never been endorsed by a court in the 108 years since the 1909 Act became law.

### 3. Plaintiff Demonstrated in His Opening Brief Through Expert Testimony, Expert Reports, and Audio Exhibits that the Album Composition of "Taurus" was "Identical" to "Stairway to Heaven" Whereas the Deposit Copy was Merely "Substantially Similar"

Defendants argue that Plaintiff has not provided evidence to this court that the album recording of "Taurus" and the deposit copy differed compositionally and that Plaintiff has not shown that any prejudice was suffered by excluding the full composition of "Taurus" present in the album recording. This is not only erroneous, because Plaintiff took great care to preserve this issue, but it also fails to take into account that the District Court refused to allow Plaintiff to place such evidence on the record when it held that only the exact notes of the deposit copy were admissible.

**First**, Plaintiff identified the exact compositional element omitted by the deposit copy, the guitar melody, in his opening brief: "Plaintiff's experts opined that all pertinent elements of 'Taurus,' **especially the guitar melody central to the case**, are represented on the deposit copy and those compositional elements are also

present in the '"Taurus"' sound recording." Plaintiff's Brief, at p.39 (emphasis added) (citing to Dr. Stewart's report at Excerpt 2122-23). The guitar melody only partially appears on the deposit copy. Dr. Stewart observed, in the report cited by Plaintiff's opening brief, that defense expert Dr. Ferrara agreed with him that only half the notes in the guitar melody appear on the deposit copy of "Taurus". Excerpt 2123.[6] This report alone was cited at least five times in Plaintiff's opening brief.

**Second**, in Plaintiff's opening brief he provided this Circuit with the deposit copy of "Taurus," a recording of the deposit copy being played on guitar, a recording of the composition in the album version of "Taurus", and the composition in the album version of "Stairway to Heaven". See Plaintiff's Brief at p.14, 17 (citing Audio Exhibits 7-11 ["Taurus"/Stairway Comparison], 40-44 [same but temp synced], and 32-39 [Ash Grove Concerts of "Taurus"]);[7] see also Trial Exhibit 527V; Audio

---

[6] Dr. Alexander Stewart also submitted a different report, which in Part I analyzed the deposit copy of "Taurus" versus "Stairway to Heaven" (See Excerpt 1776), and then in Part II analyzed the composition in the "Taurus" album recording/deposit copy versus "Stairway to Heaven". (See Excerpt 1788). Stewart explicitly analyzed the compositional differences between each version of "Taurus", namely the "prominent guitar melody in section A that is only partially represented in the '"Taurus"' deposit copy lead sheet." See Excerpt 1788. Stewart's conclusion regarding the "Taurus" album version's composition was that "During the first 18 notes [the] basic melodic sequence is virtually the same" as compared to "Stairway to Heaven", and that the songs are so striking similar it precludes "the possibility of coincidence or independent creation." (See Excerpt 1789, 1791). He did not offer such a strong opinion in his conclusion regarding the deposit copy. See Excerpt 1787.

Exhibit 12, 22, 40-44. These exhibits were physically transmitted to the Circuit Court. This Circuit can listen to the songs for themselves and easily determine that the deposit copy of "Taurus" is far more dissimilar to "Stairway to Heaven" than the album version of "Taurus" which is identical. See the fourth point in this section for an even more detailed explanation.

**Third**, Plaintiff also identified for this Circuit the reports of Plaintiff's experts which explicitly stated that the "Taurus" album composition and "Stairway to Heaven" were identical, (Excerpts 2515, 2359, 2192), an opinion they **_never_** stated concerning the deposit copy. See Plaintiff's Brief, at p.17 (citing Excerpt 2412, 2504, 2180, 2199, 2231). Furthermore, Plaintiff's expert Brian Bricklin took defense expert Mathes's performance of the compositions in the ""Taurus"" album version and his performance of the composition in the "Stairway to Heaven" album version and overlaid them on top of each other. Mr. Bricklin observed that the two compositions, played by the **_defense expert_**, are indistinguishable and are the same "underlying composition." See Plaintiff's Brief, at p.41 (Excerpt 2192, Audio Exhibits 45-47 [Submitted by Motion to Transmit Physical Exhibits]).[8] Again, this is not the case

---

[8] Defendants' response claims that Plaintiff's expert said that the deposit copy was more similar to Stairway than the album version. Def. Brief at p.57. This is nonsense and takes one sentence of an extensive report out of context. The expert said the deposit copy contained certain elements that strengthen the claim of copying, not that the "Taurus" album composition was less similar to Stairway than the

with the deposit copy. The fact that Plaintiff could not show the jury that the true and full composition of "Taurus" is identical to "Stairway to Heaven", and was instead forced to use the less similar, incomplete deposit copy, was devastatingly prejudicial.

**Fourth**, the Trial Court erroneously precluded the Plaintiff from playing for the jury the album composition recording of Taurus in comparison of Stairway to Heaven. Plaintiff's experts submitted many re-recordings at summary judgment comparing the Taurus album composition to Stairway to Heaven which were precluded by the Court's orders. See 2521-25; 2181; Transmitted Audio Exhibits.

The relevant sections to compare of the Stairway to Heaven and Taurus album recordings, which clearly indicate the strikingly similar musical compositions, are the first 25 seconds of Stairway to Heaven (Audio Exhibit 7) as compared Taurus (Audio Exhibit 8) starting at 45 seconds to 1 minute, 13 seconds). See Excerpt 2505-06 (Stewart comparing musical expressions in Audio Exhibits 7 and 8); Excerpt 2182, 2191 (Bricklin comparing musical expression in Audio Exhibits 7 and 8). Plaintiff was not allowed show this comparison to the jury and this seriously prejudiced and undermined Plaintiff's case.

---

incomplete deposit copy. The report explicitly notes that that if the album composition is used for the comparison instead of the deposit copy, "Taurus" is strikingly similar to "Stairway to Heaven". (Excerpt 1789, 1791).

Audio Exhibit 7:   Stairway to Heaven (0-25 seconds)
Audio Exhibit 8:   Taurus (45 seconds – 1 minute, 13 seconds)

The Trial Court also refused to allow Plaintiff to use demonstrative Audio Exhibits which isolated the relevant musical expression of the acoustic guitar melody in both Stairway to Heaven and the Taurus album composition so that a comparison of the relevant expression could be conducted by the experts and the jury.

Audio Exhibit 9 is a re-creation of the isolated guitar melody and relevant musical expression of Stairway to Heaven. Audio Exhibit 10 is a similar re-creation of the isolated guitar melody and relevant musical expression in Taurus. Audio Exhibit 11 is Audio Exhibit 9 and 10 and it isolates the musical expression at issue in both songs—the guitar melody—and plays them together for comparison purposes. This comparison shows that it is without question that the musical expression at issue—the guitar melody—was substantially similar, strikingly similar, and are identical. Plaintiff was seriously prejudiced in the Court not allowing Plaintiff to play this for the jury.

Other similar comparisons which Plaintiff was precluded from playing are Audio Exhibits 40-44, all similarly comparing the relevant expression at issue which was isolated for the benefit of the jury.

Audio Exhibit 9:   8 measures of the acoustic guitar of Stairway, repeated.
Audio Exhibit 10:  8 measures of the acoustic guitar of Taurus, repeated.
Audio Exhibit 11:  Audio Exhibit 9 and 10 played together.

The Trial Court also refused to allow Plaintiff from introducing any of the isolated acoustic guitar re-recordings of either Stairway to Heaven (Audio Exhibit 12) or Taurus album recordings (Audio Exhibit 22). These tracks were highly relevant because they isolated the relevant guitar passage in question. Plaintiff was severely prejudiced in that the jury was not afforded the opportunity to compare the musical expression at issue in isolation:

> Audio Exhibit 12: Acoustic Guitar [Stairway Re-Recording]
> Audio Exhibit 22: Acoustic Guitar [Taurus Re-Recording]

**Fifth**, the Court itself held that using the composition of the album recording at trial was highly prejudicial and should be precluded, an irrefutable indication that the album composition of "Taurus" was far more similar to "Stairway to Heaven" than the deposit copy of "Taurus". See Excerpt 605. Moreover, Defendants would not have fought so hard to preclude the "Taurus" album version if it did not contain more similarity to "Stairway to Heaven" than the deposit copy.

The notion that Plaintiff has not given this Circuit enough basis in the record to conclude that restricting the comparison to the "Taurus" deposit copy was reversible, harmful error beggars belief.

4. **Plaintiff Has Never Attempted to Claim a Sound Recording Copyright Exists or was Copied; Defendants' Argument to the Contrary is Nonsensical**

Defendants make the straw man argument that the 1909 Act did not permit

sound recordings to be copyrighted. Def. Brief at, p.37. Defendants also argue Plaintiff's appeal must fail because Congress did not "extend the right of copyright to the mechanical reproductions themselves," which would more or less be what is known today as a sound recording copyright under the 1976 Act. Def. Brief at, p.39.

But Plaintiff does not dispute that the mechanical reproductions themselves, such as sound recordings, are not protectable under the 1909 Act. Plaintiff is focused on the musical ***compositions* embodied in** the recordings. Defendants are arguing against a straw man. Plaintiff's sole argument has always been that the composition of songs under the 1909 Act can be established by referring to recordings in which that composition is embodied, and that the composition of the song is not limited by sections 11-12. Indeed, the Supreme Court has long acknowledged that section 1(e) of the 1909 Act's purpose was to make it clear that copies of original musical composition could exist in mechanical recordings. See Goldstein, *supra*. Furthermore, many songs under the 1909 Act, like "Taurus" and "Stairway to Heaven", were composed on the guitar and recorded well before deposit lead sheets were created and submitted for a subsequent registration. See UMG Recordings, *supra*.

The inescapable conclusion avoided by Defendants is that if a record is capable of containing original musical composition, and a song can be composed independent

of sheet music, then the protected musical composition of a song indeed extends beyond only the sheet music deposited with the copyright office.

The 1909 Act in no way prohibited the use of recordings to prove the protected compositional elements of a song, nor have Defendants identified a single case from 1909 onwards which precludes the use of recordings to prove the composition of a copyright under the 1909 Act. The composition of a song are simply those elements of the song that always appear each time the song is played. Newton v. Diamond, *supra*.

Defendants are ignoring that every recording of a song contains the song's underlying composition. Merely using a recording to prove the composition of a song is not the same as claiming that the sound recording itself is copyrighted or has been infringed.

**5.    Plaintiff Proved a High Degree of Access at Trial and Requested an Inverse Ratio Rule Instruction; The Lower Court Erroneously Refused to Give the Instruction and Caused Plaintiff Severe Prejudice**

Defendants claim that the District Court did not have to give an inverse ratio instruction because Plaintiff had not presented any evidence of a "high degree" of access. Not only is the contention that Plaintiff did not present a high degree of access inaccurate—Plaintiff presented undisputed evidence of direct access—but Defendants have to torture the case law to arrive at the conclusion that an inverse

ratio instruction is only given when there is a "high degree" of access.

### a. The Jury Found that Defendants had Access to "Taurus" Because Plaintiff Proved a High Degree of Access with both Direct and Circumstantial Evidence

There was undisputed evidence of a high degree of access in the record. The jury found that there was access—over Defendants' vehement (if not very credible) denials. Why did the jury find Defendants had access to "Taurus?"

**First**, there was direct access: at trial it came out that defendant Page owned or possessed five Spirit albums, including the one that contained "Taurus". Excerpt 495-97. **Second**, not only did Page own the critical album, but Led Zeppelin covered a Spirit song named Fresh Garbage, which was off the same side of the Spirit album that also had "Taurus" on it. Excerpt 537.

**Third**, Spirit was the only rock band that Led Zeppelin ever covered. Excerpts 1230-31. **Fourth**, Led Zeppelin opened for Spirit during their first US show on December 26, 1968, in Denver. Excerpt 309. Mark Andes testified that Spirit played "Taurus" at that show. Excerpt 404-05. Yet, defendant Page incredibly claimed he was never aware that Spirit played that show—despite the fact that Led Zeppelin was covering Spirit's song at the time. Excerpt 554-55 ("I didn't know they were on the bill."). **Fifth**, Mr. Page, however, told the Richmond News Leader in 1969, just a few months after the Denver show, that Led Zeppelin had played with Spirit on

Led Zeppelin's first US tour:

> Page reflected on Zeppelin's success. "It's kind of funny. On our first tour around, we played second fiddle to other groups. Last time we were the second group and Spirit was the Third. Now we've each gone up one notch."

(Trial Exhibit 100158). Defendant Page's testimony that he did not know Spirit was at the Denver show does not appear to have been candid.

**Sixth**, there were several other moments that called into question defendant Page's candor, such as where he categorically told the jury that he had never seen the band Spirit play a live show. Excerpt 531 (Q: "You don't remember seeing Spirit live?" A: "I didn't see Spirit live."). Defendant Page was clear that this was not a question of memory. But, again, Page's past words from an April 1970 interview—before "Stairway to Heaven" was written—showed that Page had in fact attended many Spirit shows:

> Spirit do some really nice things on albums. They give a really nice atmosphere when they play and I always enjoy seeing them.

(Trial Exhibit 159). **Seventh**, Page again reaffirmed this in a 1972 interview when he said, "I saw Spirit a couple of times and thought they were very good" and that they struck him on an "emotional level." (Trial Exhibit 157). **Eighth**, this is not to mention that an eyewitness, former Spirit bass player Larry Knight, testified at trial that Page attended a Spirit show in 1973, had spoken to him at the after party, and that Page had also met Randy Wolfe at that party. Excerpt 711-12.

**Ninth**, Defendant Plant's testimony was also less than candid regarding his familiarity with Spirit. He claimed he did not remember attending a Spirit show in 1970 in Birmingham, England, but also claimed that he would have been in the back of the club not paying attention to the music with friends. Excerpt 1212-1216. Yet, an eyewitness came forward, Michael Ware, who testified that he saw Robert Plant in the front row of the Spirit show enjoying himself immensely. **Tenth**, this is not to mention that Mark Andes has a vivid and distinct memory of playing snooker and hanging out with Plant and many of the members of Spirit that night after the show. Excerpt 415. After the show, Mr. Plant left the bar and was involved in a serious car accident, which fixed that night in Mr. Andes's memory. Excerpt 418.

Plainly, the jury found that there was access because of the direct access in the record: **Jimmy Page admitted that he owned the album and song in question, "Taurus," in his record collection**. This alone establishes a high degree of access.

> **b.  There is No Case Which Limits the Applicability of an Inverse Ratio Rule Jury Instruction to Cases with "High Degrees" of Access**

As a matter of law, the inverse ratio instruction is a basic component of copyright law and was required to be given. Defendants claim it should only be given in cases of high degrees of access and cite to just one case, Rice v. Fox Broadcasting Co., 330 F. 3d 1170 (9th Cir. 2003), for this rule. See Def. Brief, at p.60. Yet, Rice

does not stand for this proposition.

**First**, Rice was a decision of this Circuit reviewing the dismissal of a dramatic work copyright case at summary judgment. It did not deal with jury instructions for a music copyright case after the trial court had already held there were triable issues of fact for the jury. **Second**, Rice held that, even construing all facts in the plaintiff's favor, that the only evidence of access was "purely" speculative and inferential. See Rice, 330 F. 3d at 1179. The plaintiff invoked the inverse ratio rule to try to save the case. This Circuit held that "Rice's evidence as to proof of access is insufficient to trigger the inverse ratio rule." Id. at 1178. In rejecting Rice's argument, this Circuit held that the rule was not "triggered" ***not*** because a "high degree" of access was lacking, but because ***there was no evidence of access*** even when construing every fact in the plaintiff's favor. Id. at 1178-79.

A holding only applies to those circumstances before the court issuing the opinion; the nostrum that the Ninth Circuit held in Rice that a jury instruction on the inverse ratio rule is only proper when high access is present—when there was _no_ evidence of access present in Rice and the case was dismissed at summary judgment—is a borderline frivolous position.

The failure to give an inverse ratio instruction in this case prevented the jury from properly conducting the substantial similarity comparison. When there is a

dispute of fact on access and substantial similarity, this is an appropriate jury instruction. Either on an individual basis, or in combination with the other incorrect or omitted jury instructions, the failure to give this instruction constituted highly prejudicial reversible error.

**6.**    **Plaintiff Explicitly Complied with Central District L.R. 51, the Prescribed Method for Preserving Exceptions to Jury Instructions, and <u>the Trial Court Acknowledged that All Exceptions and Objections were Preserved;</u> Defendants' Argument that Plaintiff Waived these Objections are Disingenuous**

Defendants have generally claimed that Plaintiff failed to preserve claims of error for several erroneous or omitted jury instructions. Def. Brief at p.63-64 (stating that Plaintiff is attempting to "sandbag" the trial court). Plaintiff addresses the general waiver argument by Defendants in this section, and then addresses the specific claims of waiver in the following sections.

Defendants claim that Plaintiff was required to lodge an oral objection to these instructions after the Court finalized the instructions—even though Plaintiff had lodged written objections and proposed instructions. Excerpt 1898-1982, 1983-2063. In doing so, Plaintiff followed the exact instructions provided by the Central District of California in L.R. 51 to comply with FRCP 51 "preserving a claim or error," and also the Court's oral instructions at trial.[9]

----

[9] The district court local rules require that the parties confer before submitting jury instructions. <u>See</u> L.R. 51-1. The parties came up with a list of joint jury

**First**, Plaintiff served and filed his proposed jury instructions (Excerpts 1898-1982) and written objections to Defendants' proposed instructions (Excerpts 1983-2062) pursuant to L.R. 51-1 and L.R. 51-5. This method for preserving claims of error, provided for by the Central District of California Local Rules, is well known by defense counsel.

**Second**, the District Court made it explicitly clear when orally delivering the instructions to the parties on the record that it had considered all proposed instructions and objections and that it would not entertain any oral argument or objections:

> THE COURT: Counsel, I'm going to be talking about the instructions that the Court is going to be giving, and a little preparation on this so that you'll understand. **This is not to discuss with counsel what instructions are going to be given and which aren't. Both sides have fully briefed this on the instructions, their objections, their replies, et cetera, that I am confident that I can just come out and give the**

---

instructions they agreed on. For those instructions that the parties did not agree on, Plaintiff submitted proposed jury instructions and Defendants submitted objections pursuant to L.R. 51-1 (stating "each party shall submit separately those proposed instructions as to which all parties do not agree"). Excerpt 1898-1982. Pursuant to L.R. 51-1 and 5, Defendants also submitted proposed instructions and Plaintiff submitted objections. Excerpt 1898-1982, 1983-2063. The objections submitted by Plaintiff were submitted pursuant to L.R. 51-5, which states "Objections shall be filed and served on or before the first day of trial unless the Court permits oral objections." L.R. 51 specifically provides that the submission of proposed instructions and written objections is the correct process for "preserving a claim of error." Moreover, the court did not allow oral objections. Excerpt 1284-85.

> **instructions**, but I want to let you know what they are so you can use them in your [closing] argument.

See Excerpt 1284-85 (emphasis added). How can Defendants make such a plainly disingenuous waiver argument to this Circuit? They know for a fact that the Court had assured the parties on the record that it would **not allow oral objections**, that there was no waiver, and that the Court had fully considered the written L.R. 51 documents.

There was plainly no waiver because Plaintiff explicitly complied with the Court's instructions for preserving errors; such a claim is belied by the record.

**7.     Plaintiff Did Not Waive Any Claim of Error Regarding the Court's Failure to Instruct the Jury that Combinations and Arrangements of Musical Elements are Copyrightable; This Erroneous Omission was Highly Prejudicial**

Defendants claim in their response brief that Plaintiff never preserved a claim of error that the Court should have instructed the jury that combinations of unprotectable musical elements are themselves protectable. Def. Brief, at p.30-31, 63. Defendants' argument is false and is designed to mislead this Circuit.

Plaintiff made this argument to the Court repeatedly in his proposed instructions (and also objections to Defendants' instructions):

**PLT. JURY INSTRUCTION NO. 35**

**SUBSTANTIAL SIMILARITY (MODIFIED)**

. . . .

The first test is an objective one called the extrinsic test. Here, the analyses and conclusions of the expert witnesses may be of assistance to you. There is no uniform set of factors for you to analyze. Music is not capable of ready classification in only five or six constituent elements; **music is comprised of a large array of elements, some combination of which is protectable by copyright**. **A combination of individually otherwise unprotected elements can be infringed upon**. . . . There is no one magical combination of these factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique. So long as Plaintiff can demonstrate, through expert testimony that addresses some or all of these copyrighted elements and supports its employment of them, that the similarity is substantial and to protected elements of the copyrighted work, the objective test is satisfied.

See, e.g., Excerpt 1956-57 (emphases added); see also Excerpts 1948, 1961, 1963, 1968 ("Plt. Jury Instruction No. 38 Combination of Unprotectable Elements"), 1970, 1973,

As Plaintiff's opening brief observed, Defendants had actually also requested a similar instruction on combinations of unprotectable elements, see Excerpt 2032.[10] Plaintiff objected to Defendants' proposed instruction because *it did not go far enough* in describing the protectability of combinations of musical elements as delineated by Swirsky v. Carey, 376 F.3d 841, 849 (9th Cir. 2004). See Excerpt 2033.

Defendants replied to the objection and agreed with Plaintiff that "**since**

---

[10] The correct description was included in Plaintiff's proposed instruction at Excerpt 1956-57). Thus, Plaintiff made doubly sure in both his proposed instructions and in his objections that the Court was well aware of his position.

**plaintiff relies on selection and arrangement it is crucial that the jury be instructed**" on the protectability of combinations of musical elements (albeit with Defendants' defective version). See Excerpt 2034. Yet, Defendants now disingenuously argue in their brief that "Skidmore Neither Claimed nor Presented Evidence of a Copyrightable Selection and Arrangement." Def. Brief, at p.64.

Moreover, the failure to give this instruction was harmful, reversible error. This instruction provides the conceptual basis for a jury to determine what expression is protected and what is not protected. All music is an arrangement of protected and unprotected elements which, in combination, can be protected. Swirsky, *supra*. Without this instruction, the jury cannot even begin making the predicate determination about what constitutes protected expression before *then* conducting the extrinsic substantial similarity comparison to determine if protected expression was copied. The Court's instruction not only failed to tell the jury how to do its job, but it also implicitly told the jury that combinations of elements are not protectable thereby negating much Plaintiff's expert's testimony.

Defendants' response brief repeatedly claims that Plaintiff introduced no evidence that protectable combinations and arrangements were copied, but this conclusory assertion is wrong given that Dr. Stewart testified extensively that a protectable arrangement in "Taurus" was copied by "Stairway to Heaven" (as

explained in the opening brief):

> Plaintiff's expert's opinion were substantially based on the fact that the arrangement of protectable and unprotectable elements is afforded copyright protection. (Excerpt 748, 763, 781-82, 834-36). Dr. Alexander Stewart specifically opined that there were as a combination of five elements in "Taurus" that were protectable and had been copied in "Stairway to Heaven"

See Plaintiff Brief, at 58. The brief then went on to explicitly list the five elements which comprised Dr. Stewart's opinion.

The Ninth Circuit states "The question, then, is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues." Los Angeles Memorial Coliseum Com'n v. NFL, 726 F. 2d 1381, 1398 (9th Cir. 1984). It is without question that if the jury does not know how to determine what expression is protectable, and thus does not know how to conduct the extrinsic substantial similarity test, that the Court could not have given adequate instructions on the extrinsic substantial similarity test—the key element in any copyright case. This error was especially prejudicial when considered with the failure to give the inverse ratio instruction and the erroneous definition of originality.

The failure to give this instruction, which was requested by all parties, was therefore reversible error both individually and in combination with the other jury instruction errors.

8. **The Originality Instruction Given by the Court was Inadequate, Not Legally Correct, and Severely Harmed Plaintiff's Case; Plaintiff Did Not Waive this Objection as Defendants Erroneously Claim**

   a. **Plaintiff Suffered Severe Harm Due to the Incorrect Instruction on Originality**

Defendants' response brief conclusorily asserts that Plaintiff suffered no harm from the incorrect originality instruction, but does not develop this assertion in anyway. Def. Brief at p.70. As Plaintiff's opening brief argued, this instruction was highly prejudicial because originality was hotly contested during the trial. Plt. Brief, at 59-65. For instance, Plaintiff's experts, including Dr. Stewart, argued that Randy Wolfe's particular use of a descending chromatic scale in "Taurus" was original (Excerpt 753, 786-87), while defense expert Ferrara argued that it was not because types of descending chromatic scales appeared elsewhere in the prior art (Excerpt 963-64). Notably, no evidence was introduced by Defendants that Randy Wolfe had copied any of the musical expression in "Taurus" from anything in the prior art. Thus, it was undisputed as a matter of law (regardless of Ferrara's statements) that Randy Wolfe's expression in "Taurus" was original because it was not copied.

However, despite there being no facts in evidence to dispute that "Taurus" was original uncopied expression, the Defense/Court instruction on originality erroneously told the jury that the descending chromatic scale, as a matter of law, was not original because types of descending chromatic scales have appeared in the prior

art. It is hard to imagine a more direct and obvious example of prejudicial error emanating from an incorrect jury instruction.

The Ninth Circuit states "The question, then, is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues." <u>Los Angeles Memorial Coliseum</u>, 726 F. 2d at 1398. Here, the Court failed to accurately explain to the jury when expression is "original" and "protectable," thus preventing the jury from accurately conducting the extrinsic test. Note that, in conjunction with the failure to give an instruction on combination and arrangement, the court's jury instructions made it impossible for the jury to adequately analyze the evidence and determine what was protectable expression in "Taurus" and what was not. The court's errors, moreover, always skewed toward divesting "Taurus" of protection for the expression contained in the song, thereby heavily damaging Plaintiff's case.

Plainly, the errors made by failing to include an inverse ratio burden instruction, failing to include a combination and arrangement instruction, and misstating originality made it impossible for the jury to conduct their task correctly.

### b. Plaintiff Did Not Waive any Objection to the Erroneous Originality Instruction and In Fact Explicitly Preserved that Objection in Writing

Defendants' claim of wavier is based solely on its erroneous contention that

Plaintiff, after already submitting proposed instructions and objecting to Defendants' proposed instruction that was adopted by the court, was required to yet again object orally. As noted above, Plaintiff complied with L.R. 51's instructions on how to preserve a claim of error for jury instructions and the District Court explicitly stated that all written proposed instructions and objections had been considered and that oral objections would not be permitted. <u>See</u> Excerpt 1284-85.

Defendants made the following unsupported modifications to the standard instruction: they added language which read "any elements from prior works or the public domain are not considered original parts and not protected by copyright" and they deleted language which read "the 'original' part of a work need not be new or novel." Excerpt 2029.

In the written proposed instructions and objections Plaintiff asked the court to correctly instruct the jury on originality, (Excerpt 1946), and Plaintiff also specifically objected to Defendants' "unsupported modifications" of the originality instruction (which were adopted by the Court). (Excerpt 2030). As can be seen from Plaintiff's written objection to Defendants' Proposed Instruction No. 28, reproduced here in full, Plaintiff objected explicitly to the ***exact modification and deletion made by Defendants and adopted by the Court***:

> The modifications to this instruction are highly confusing, unduly prejudicial, **and even contradict part of the standard**

**instruction which Defendants have struck though at the bottom**. Namely, **the contention that "<u>any elements from prior works or the public domain are not considered original parts and not protected by copyright</u>" would lead a jury to believe that parts of song that are in some way generally similar to prior art cannot be accorded protection.** This narrow interpretation is, of course, not accurate. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 345-46 (1991). All that is required is that the work cannot have been copied and that it has to have some minimal creativity. <u>Id.</u> The Ninth Circuit has held

> In this circuit, the definition of originality is broad, and originality means "little more than a prohibition of actual copying." *Three Boys*, 212 F.3d at 489(quoting *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033(9th Cir.1992)).

> *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004). Even then, if a work incorporates elements from the public domain or prior art and uses them uniquely in combination with other elements it would still be afforded protection. *Swirsky*, 376 F.3d at 849. Plaintiff's instruction No. 32 is far more faithful to the law and less confusing than Defendants' unsupportable modifications and should be favored.

<u>See</u> Excerpt 2030 (bold added). The notion that Plaintiff's objection was not before the Court, or that the court was sandbagged in any way, is a falsehood. Plaintiff explicitly complied with L.R. 51 and the Court's verbal instructions at trial.

Defendants attempt to claim that the District Court's language in the disputed instruction was actually legally correct because, in their view, it is accurate to state that: "elements from prior works or the public domain are not considered original parts and not protected by copyright." Def. Brief at p.69-70. But this is the whole

point of Plaintiff's claim of error: this is not the legal definition of originality, which focuses only on whether the work was created independently. This addition would leave jurors hopelessly confused about how to address musical elements used in prior works but that were not copied. It is certain that the erroneous addition would lead any reasonable juror to wrongly conclude that much original expression was not protected merely because it may have appeared in the prior art.

Compounding this error, Defendants and the court removed a key part of the standard instruction which reads: "the 'original' part of a work need not be new or novel." Plaintiff's objection notes that removing this sentence is unjustifiable, especially with the erroneous addition. Defendants removed this sentence solely because it contradicted the erroneous addition by Defendants.

That the Court chose to give the jury this legally unsupportable modified instruction, which directly contradicts the standard instruction on originality, is plain reversible error.

**9.** **During Jury Deliberations the Jury's Final Question was to Hear Plaintiff's Audio of "Taurus"—The Court Ordered An Irrelevant Version of "Taurus" To Be Played, Which Seriously Prejudiced Plaintiff By Ending the Case; Plaintiff Specifically Objected and Did Not Waive this Error**

During deliberations, the jury's final question before rendering a verdict in favor of Defendants, was to hear: "plaintiff's audio of 'Taurus' guitar." Excerpt

1405. During the trial Plaintiff's guitar expert, Kevin Hanson, had played the bass clef of "Taurus" many times and this was plainly the version being requested by the jury. See Excerpt 738, 743, 757, 758, 1066; Trial Exhibit 527V.

Plaintiff explicitly argued to the court that the jury obviously meant the bass clef version which they had heard many times. (Excerpt 1405-10) ("The "Taurus" deposit that we played over and over in court was 527V, and that was Mr. Hanson playing the "Taurus" deposit copy bass clef, and that's what we used in this court as an audio exhibit through the trial and also the comparison."). Defendants, however, argued that the jury wanted to hear a version of the "Taurus" deposit copy that Hanson had never addressed in his testimony at trial and that had been played one time for a fact witness on the first day of trial for a couple of seconds. See Trial Exhibit 525V. Plaintiff's counsel forgot that this exhibit had even been used.

The Court should have never let the 525V version be played, and it should have disregarded Defendants' arguments, because this version was not relevant to the substantial similarity comparison or the jury's question. Plaintiff's expert Kevin Hanson testified that the "Taurus" deposit copy as written would never have been played with the treble[11] and bass clef together (as on 525V), and that the bass and

---

[11] The bass clef was the relevant guitar melody being compared to "Stairway to Heaven". The treble clef was a harpsichord accompaniment never meant to be played on guitar with the bass clef.

treble clefs would have to be played separately as on 527V, something that was not even disputed by Defendants' experts. See Excerpt 753-54. The bass clef on 527V is the guitar melody and compositional expression alleged to have been infringed by "Stairway to Heaven". The 527V version obscures, distorts, and confuses for the jury the relevant guitar melody comparison at issue.

The Court asked the jury what version it wanted to hear and disregarded one juror stating that the jury wanted to hear the correct bass clef version, in favor of the other juror stating it wanted to hear the other version. The Court played the erroneous exhibit 527V. Excerpt 1411. Plaintiff did everything he could to preserve this error, explaining repeatedly that 525V was not part of the comparison, but the Court played the wrong version over Plaintiff's objection. At the very least the Court should have also played the version that Plaintiff advocated for and one juror asked for. There was no waiver as Defendants are claiming.

Defendants advocated for a version of "Taurus" which was not analyzed by the experts for the jury, which did not compare the relevant guitar melody at issue, and which is barely even possible to play on guitar in the first place. After the incorrect version of "Taurus" was played for the jury, they immediately came back within minutes and returned a defense verdict. The prejudice to Plaintiff's case caused by playing this version cannot be overstated. It effectively ended the case

within minutes.

Plaintiff notes that should the Court reverse the jury verdict on another basis, this claim of error would be moot.

**10. The Ten-Hour Time Limit Placed on Plaintiff Severely Hindered His Ability to Prove Substantial Similarity and Abused the Court's Discretion; This Objection was Explicitly Preserved and Not Waived**

Defendants attempt to claim that Plaintiff did not timely object to the time limits imposed by the Court, Def. Brief at p.73-74, but this is a frivolous argument, the same as Defendants' argument that Plaintiff failed to preserve objections to the erroneous jury instructions. The Court itself acknowledged that Plaintiff preserved this objection at trial:

> MR. KULIK:  Your Honor, just for the record, you have been very, very clear and we all understand exactly what you're saying. But for the record, obviously, we have to interpose our objection.
>
> THE COURT:  I understand.
>
> MR. KULIK:  We don't think ten hours, including cross-examination, in a case like this is fair or reasonable.
>
> THE COURT:  **I understand that, counsel, and that position is on the record and I appreciate that you have to put that on the record**.

See Excerpt 850 (emphasis added).[12]

---

[12] Defendants claim that Plaintiff should have objected at the pre-trial conference when the time limits were first announced. However, at this point the motions in limine were not decided, the logistics of witness availability and testimony had not been determined, and the elements and defenses in dispute had not been finalized; it

Defendants further maintain that Plaintiff's counsel—when the Court was castigating Plaintiff's counsel for going over the ten hour time limit—agreed that the time limits were "fair." Def. Brief at p.73-74. This is an absurd falsehood, devoid of context, which ignores the Court's explicit statement (just a minute or two before the quote highlighted by Defendants) that the objection was in fact preserved:

> THE COURT: And I know there is an objection and I want to give -- counsel, I want to give you the chance to put your objection on the record.
>
> MR. MALOFIY: The objection is that when this case opened up, there was many issues to be covered because there was an issue of access, which was hotly disputed. There was the issue of ownership. There was also the issue of the validity of the Trust, unclean hands, and those issues made it absolutely necessary to spend time on that, to establish that the trustee was proper, that the Trust was valid, that the ownership was owned by the Trust. . . . It's our position that ten hours is very difficult to put on a complicated case, and we're doing the best we can. . . . The case-in-chief, we did get in in ten hours. I'm doing the best we can.

See Excerpt 1057-59. This objection was not made in a vacuum, but followed and built on Mr. Kulik's objection to the Court's time limits earlier in the trial. See

---

would have been impossible for Plaintiff to make an informed objection at this point in time. Furthermore, Defendants have presented no case law to this Circuit establishing that time limits must be objected to at a pre-trial conference. Requiring plaintiff to object to a time limit, before being given even a moment to evaluate the adequacy of the limit, has no basis in logic or law.

Excerpt 850.

The truth is that Plaintiff's counsel was supplicating himself before the Court, asking for any additional time to cross examine defense witnesses, so that Defendants' case in chief would not go in unrebutted—an alarming notion to be sure. Thus, when the Court gave Plaintiff a meagre ten minutes to cross examine each witness in this complicated, contested trial Plaintiff counsel's only recourse was to state "that's fair" so he could get the time. However, this statement was only made given that the Court has already acknowledged that Plaintiff had preserved his vigorous objection to the time limits. It should be noted that the Court did not permit Plaintiff any actual time to finish cross examining the main defense expert witness, Dr. Ferrara, on substantial similarity. See Excerpt 1065.

Plaintiff took great care to preserve this argument at all stages, as acknowledged by the lower court at all stages. The complexity of this case, and what plaintiff needed to prove, makes 10 hours of total trial time manifestly unreasonable and the minor additional time provided inflexible. The Court's restriction of cross examination of Lawrence Ferrara (with whom Plaintiff was not provided with sufficient time to cross examine), the defenses' expert witnesses, and the categorical summary refusal to allow expert rebuttal testimony, are particularly egregious errors which severely harmed Plaintiff's case.

11.  **Dr. Lawrence Ferrara's Testimony Should Have Been Precluded for Failing to Disclose that He Had Been Previously Hired by Plaintiff's Publisher to Compare "Taurus" and "Stairway to Heaven"**

Defendants claim that Plaintiff failed to preserve this objection to Dr. Ferrara's testimony because the court struck the motion for sanctions on timeliness grounds.[13] Def. Brief, at p.77.

Again, Defendants disingenuously ignore the lower court's own words which make clear the objection was preserved. The lower court was very clear at trial that the motion to preclude Dr. Ferrara's testimony was in fact before the court and that he was "overruling" plaintiff's objections to Ferrara testifying and as to a negative inference:

| | |
|---|---|
| THE COURT: | I don't know who the next witness will be. Let's find out. |
| MR. ANDERSON: | Dr. Lawrence Ferrara. |
| THE COURT: | Okay. And you want what, Counsel? |
| MR. MALOFIY: | We filed an extensive sanctions motion against defendants and Dr. Ferrara. |
| MR. ANDERSON: | Your Honor -- |
| MR. MALOFIY: | -- for being -- |
| THE COURT: | Okay. Okay. Counsel, I understand, and **I have your motion**. It's not something that should be coming in in front of the jury. |
| MR. MALOFIY: | I'm sorry. |
| THE COURT: | **And your objection is to his testifying?** |

---

[13] Plaintiff notes that the Court's attempt to procedurally strike his initial motion for sanctions was based on timeliness, because the motion was filed after the motion deadline. Yet, the issues described in the motion only arose *after* the motion deadline and thus it was impossible to file the motion before the deadline.

| MR. MALOFIY: | **Yes.** |
| THE COURT: | **Overruled.** |
| MR. MALOFIY: | **As to a negative inference.** |
| THE COURT: | **Overruled.** |

<u>See</u> Excerpt 927.

On the merits of the issue, it is undisputed that Dr. Ferrara previously compared "Stairway to Heaven" and "Taurus," a fact which was never previously disclosed in discovery by Defendants nor was any documentation turned over concerning this revelation—despite numerous and voluminous applicable requests. This is a monumental and deliberate omission.

Defendants have never produced a single piece of evidence regarding this evaluation, involving Ferrara's retention, consultation, or recommendations. This is extremely troubling. Furthermore, Defendants also colluded during the litigation to attempt to falsely change the "Taurus" copyright to revoke Plaintiff's ownership, and hid the fact that Dr. Ferrara had a conflict of interest as described in Plaintiff's appeal. <u>See</u> Supp. Excerpts 37-38. This attempt to falsely change the copyright, while litigation was pending, was illegal. <u>Id.</u>

Defendants attempt to argue that Ferrara stated that he gave his consultation "by telephone" and that there are no written records, but their citation of Excerpt 1632-33 does not establish such a fact. Ferrara only stated, in vague and ambiguous terms, that "most often" he usually only gives a preliminary analysis over the

telephone. <u>See</u> Excerpt 1633. However, despite a request from Plaintiff's counsel to "let's not talk about most scenarios" and instead to talk about the scenario "Before us right now," Ferrara did not specify his actions in this case. <u>Id.</u> Moreover, when Plaintiff's counsel pressed Ferrara if there were written communications concerning his prior undisclosed analysis of "Taurus" and "Stairway to Heaven" he coyly stated, "I don't recall," indicating that they most likely exist and were not produced. Excerpt 1634 (Q: "Do you have any communications by and between this individual about your analysis?" A. "No that I recall not -- I just don't recall.").

Plaintiff notes that Defendants disingenuously attempt to claim that Plaintiff's publisher, Hollenbeck Music, never consulted Dr. Ferrara about "Stairway to Heaven" and "Taurus," and that instead a company named Rondor (a division of Universal Music) did so. Def. Brief, at p.78. What Defendants omit, as is their wont and habit, is that Hollenbeck Music had retained Universal to administer its copyright interests, even filing documents with the copyright office concerning "Taurus." <u>See</u> Excerpts 1711-12 (copyright form stating that Universal Music is acting as an agent for Hollenbeck Music with respect to "Taurus").

The bottom line is that Defendants' expert previously analyzed the songs in question, at the behest of Plaintiff's publisher, but never provided or disclosed any documents concerning this interaction. The failure to disclose this conflict of

interest, and the failure to comply with discovery requests, is highly prejudicial and should have resulted in sanctions against Ferrara and Defendants including Ferrara preclusion. The fact that the Court summarily brushed aside Defendants' unconscionable litigation tactics is reversible error.

*****

# PART II - PLAINTIFF'S RESPONSE BRIEF TO DEFENDANT'S COSTS AND FEES APPEAL

Defendant Warner/Chappell's argument that the Court's decision denying costs and fees should be reversed is based on three meritless contentions: (1) that the Court did not consider "whether its ruling furthered the purposes of the Copyright Act," (2) that Plaintiff's lawsuit was unreasonable because the expression at issue was allegedly in the public domain, and (3) that the Court did not give enough weight to the allegations that Plaintiff committed litigation misconduct.

Defendant's conclusory arguments all fail; indeed, this appeal is plainly frivolous and the Court did not abuse its discretion in denying costs and fees. Perfect 10, Inc. v. Giganews, Inc., 847 F.3d 657, 665 (9th Cir. 2017) (stating that district court only abuses its discretion when decision "based on inaccurate view of the law or a clearly erroneous finding of fact"). The trial court denied Defendant's motion because this was a "hard-fought" case indisputably "motivated by a desire to recognize Randy California's musical contribution." Supp. Excerpt 7.

1. **Defendant Erroneously and Disingenuously Claims the Trial Court Failed to Consider the Purpose of the Copyright Act when Denying their Costs and Fees Motion**

The trial court explicitly considered the purpose of the Copyright Act in denying Defendant's costs and fees motion, contrary to Defendants' argument in this appeal.

A hallmark of Defendants' waiver arguments in the substantive appeal is their predilection for conclusorily asserting a claim of error was waived by Plaintiff, while omitting from their brief any mention that the trial court had in fact explicitly stated on the record that Plaintiff's objection was preserved. This is, obviously, not legitimate argumentation and wastes Plaintiff and this Circuit's time.

Defendant now continues to use such illegitimate argumentation in its costs and fees appeal. The factors in <u>Fogerty</u> were explicitly created and meant to help the trial courts evaluate whether an award of fees would advance the purposes of the Copyright Act. <u>See</u> <u>Fogerty v. Fantasy, Inc.</u>, 510 US 517, 526 (1994) (stating that Supreme Court's factors based upon "the policies served by the Copyright Act"). Yet, at the very beginning of Defendant's opening appellate brief they state:

> The District Court—**without considering whether its ruling furthered the purposes of the Copyright Act**—identified the following *Fogerty* factors: "(1) 'the degree of success obtained on the claim'; (2) 'frivolousness'; (3) 'motivation'; (4) 'objective reasonableness of factual and legal arguments'; and (5) 'need for compensation and deterrence.'"

<u>See</u> Def. Opening Brief, at p.83 (emphasis added).

**First**, this argument is invalid because, as noted, the factors in <u>Fogerty</u> were explicitly created and meant to help the trial courts evaluate whether an award of fees would advance the purposes of the Copyright Act. The district court undertook a detailed look at the <u>Fogerty</u> factors, and other considerations at Defendants'

request, yet, in its discretion, did not find that costs and fees were warranted for the purposes of the Copyright Act.

**Second**, contrary to Defendant's argument, the trial court explicitly stated that the entire opinion on costs and fees had taken into account the goals of the Copyright Act:

> "Viewing 'all the circumstances of [this] case on their own terms, ***in light of the Copyright Act's essential goals***,' this Court concludes that attorney's fees are not appropriate."

Supp. Excerpt 7 (emphasis added) (quoting <u>Kirtsaeng v. John Wiley & Sons, Inc.</u>, 136 S. Ct. 1979, 1989 (2016)). Defendant's argument that the Court's opinion ignored and did not consider the goals of the Copyright Act is wrong and should be rejected.

## 2. The District Court's Opinion was Correct and Did Not Abuse Its Discretion

### a. Legal Standard

"The Supreme Court has adopted the 'evenhanded' approach to the award of attorney's fees in copyright cases." <u>Berkla v. Corel Corp.</u>, 302 F.3d 909, 922 (9th Cir. 2002) (quoting <u>Fogerty v. Fantasy, Inc.</u>, 510 US 517, 534 (1994)). "Prevailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." <u>Fogerty</u>, 510 U.S. at 534; <u>see also</u> <u>Seltzer v. Green Day</u>, 725 F.3d 1170, 1180 (9th Cir. 1980)

(citing Fogerty, 510 U.S. at 533) (noting that "the Supreme Court rejected the so-called British Rule where the loser pays; rather, attorney's fees are left up to the discretion of the district court").

In exercising their discretion, "courts deciding whether to award attorney's fees can look to five non-exclusive factors: (1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence." Seltzer, 725 F.3d at 1180-81. These five "Lieb factors" are nonexclusive.[14] Fantasy, Inc. v. Fogerty, 94 F.3d 553, 558 (9th Cir. 1996). "[C]ourts may not rely on the Lieb factors if they are not 'faithful to the purposes of the Copyright Act.' Faithfulness to the purposes of the Copyright Act is, therefore, the pivotal criterion." Id. at 558. "The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public." Fogerty, 510 U.S. at 524.

"Granting attorneys' fees is disfavored when a plaintiff pursues an action in good faith in an unsettled area of law and the parties have *alike financial resources*."[15]

---

[14] The Lieb (or Fogerty) factors are found in Lieb v. Topstone Indus., 788 F.2d 151, 156 (3d. Cir. 1986).

[15] Defendant is a multi-billion dollar entertainment company while Plaintiff is a charitable trust that provides what little funds it has to buy instruments for school children.

Perfect 10, Inc. v. Visa Int'l Ass'n, Inc., 2005 WL 2007932 at *4 (N.D. Cal. Aug. 12, 2005) (emphasis added) (citing Lotus Development Corp. v. Borland International, 140 F.3d 70, 75 (1st Cir. 1998)).

In Seltzer, the Ninth Circuit vacated the district court's award of fees to the prevailing defendant where the plaintiff was not objectively unreasonable, and it was a "close and difficult case." 725 F.3d at 1181. Frivolousness, bad faith motivation, and objective unreasonableness are important factors. Courts consistently award fees where the losing party's contentions were frivolous or objectively unreasonable[16] and deny fees where the losing party's contentions were not frivolous or objectively unreasonable.[17]

### b. Application - The District Court's Costs and Fees Opinion was Well Reasoned, Legally Correct, and Did Not Abuse Its Discretion

The district court's opinion was detailed and well-reasoned. There is no reason to disturb that opinion and find that the Court abused its discretion. The Court took into account the non-exclusive Fogerty factors, and all other factors and considerations suggested by Defendant. Those considerations were: degree of success, frivolousness, motivation, objective reasonableness of factual and legal

---

[16] See, e.g., Inhale, Inc. v. Starbuzz Tobacco, Inc., 75 F.3d 1038, 1042-43 (9th Cir. 2014) (awarding fees where the plaintiff's claims were frivolous).

[17] See, e.g., Perfect 10, Inc. v. Ccbill LLC, 488 F.3d 1102, 1120 (9th Cir. 2007) (affirming denial of fees where the plaintiff's claims were not objectively unreasonable or frivolous).

arguments, the need for compensation and deterrence, and also alleged litigation misconduct.

The court found that:

> Overall, two factors (litigation misconduct and degree of success) swing solidly in Defendant's direction, and a third factor (need for compensation) slightly favors Defendant. On the other hand, three factors (motivation, frivolousness, and objective reasonableness) weigh strongly in Plaintiff's favor.

Court Opinion, at p.4.

The court stated, regarding the lack of frivolousness and unreasonableness, that:

> Plaintiff survived a motion for summary judgment, meaning that this Court considered the merits of the claim and determined that sufficient evidence existed to proceed to trial. . . . Accordingly, because Plaintiff's claim was not frivolous or objectively unreasonable, these two factors militate against an award of attorney's fees.

See Court Opinion, at p.2. Note that these two factors are arguably the most important as they speak directly to whether the goals of the Copyright Act were served by the litigation. The Court stated as to motivation that there was no evidence of improper motive:

> Throughout the course of litigation, Plaintiff has maintained that the purpose of the lawsuit was to secure credit for Randy California, the author of *"Taurus"*, whose musical composition was allegedly stolen by Defendants. . . .
>
> **Defendant, however, has failed to provide any evidence that**

> **Plaintiff harbored nefarious motives in bringing this suit.** . . .
>
> Therefore, the motivation factor weighs in favor of Plaintiff and militates against granting fees.

See Court Opinion at p.3 (emphasis added).

Thus, after weighing all the considerations that it was asked to by Defendants, the district court found that an award of fees would not be appropriate:

> Once the media hype and tangential distractions are stripped away, **what remains is an objectively reasonable claim motivated by a desire to recognize Randy California's musical contribution**. . . . Viewing "all the circumstances of [this] case on their own terms, in light of the Copyright Act's essential goals," this Court concludes that attorney's fees are not appropriate. *Kirtsaeng*, 136 S. Ct. at 1989.

See Court Opinion at p.5.

Defendants have raised no reason in this appeal explaining how the district court could have possibly abused its discretion.

**3. Defendants Spuriously Argue that the Trial Court Erred Because, In their Mind, the Musical Expression in "Taurus" was Unprotected and the Lawsuit was Unreasonable; This Argument Fails Because Defendants Failed to Preserve this Claim of Error and are Improperly Asking this Circuit to Resolve a Dispute of Fact between Musical Experts**

Defendants argue in their opening brief that Plaintiff's song, "Taurus," only consists of unprotected expression. Def. Brief, at p.84-86. Defendants therefore argue that Plaintiff's lawsuit is unreasonable and that the Court's opinion denying costs and fees, which found that Plaintiff's lawsuit was reasonable, should be

reversed. These arguments are factually and legally incorrect, fail to take into account the novel issues of law present, and have been, in any case, waived.

That a party lost does not, in itself, show that its claim was objectively unreasonable. <u>Seltzer</u>, 725 F.3d at 1181. Rather, "a claim is objectively unreasonable when the party advancing it 'should have known from the outset that its chances of success in the case were ***slim to none***.'" <u>Giganews, Inc.</u>, 2015 WL 1746484 at *11 (emphasis added) (quoting <u>SOFA Entm't, Inc. v. Dodger Prods., Inc.</u>, 709 F.3d 1273, 1280 (9th Cir. 2013)). In <u>Seltzer</u>, the Ninth Circuit held that the plaintiff was not objectively unreasonable where it was a close and difficult case, and the defendant's transformative fair use "was far from obvious." <u>Id.</u> ("There is simply no reason to believe that *Seltzer* 'should have known from the outset that [his] chance of success in this case was slim to none[.]'") (citing <u>SOFA Entm't</u>, 709 F.3d at 1280).

>    a.   **The Court Properly Found that there was a Dispute of Fact Between the Opposing Experts Over the Protectability of "Taurus" and its Substantial Similarity to "Stairway to Heaven"**

Plaintiff's expert musicologist Dr. Alexander Stewart (and all of Plaintiff's experts) testified that "Taurus" consists of five elements which individually and in combination constituted protected expression; he testified that this protected expression was copied in "Stairway to Heaven". <u>See</u> Excerpt 834-36. Dr. Stewart also testified that the unique combination of musical elements in "Taurus" is found

nowhere in the prior art as of 1971 except in "Taurus" and "Stairway to Heaven". Id. The defense expert, Dr. Lawrence, disagreed and thought that "Taurus"'s expression was not protected.

The district court, having evaluated Plaintiff's expert's and defense expert's contentions at summary judgment, at motions in limine, and at trial, repeatedly rejected the defense argument that there was no triable issue of fact for the jury on substantial similarity. The district court explicitly noted this in its opinion denying costs and fees, observing "the jury did not determine that Plaintiff's claim impermissibly relied on public domain elements or performance aspects of the musical composition." Supp. Excerpt 4.[18]

Defendant now comes to this Circuit essentially asking it to evaluate and credit its expert Dr. Ferrara over Dr. Stewart (without even developing the argument) on substantial similarity and whether Dr. Stewart's opinion has merit. It is simply not the role of an appellate court to make findings of fact such as this. This issue was a dispute of fact for the jury, as the district court held repeatedly. There was no abuse of discretion in the trial court finding that this lawsuit was reasonable

---

[18] Defendants try to claim that because summary judgment was granted for three defendants that therefore a fee award is appropriate. Def. Brief, at p.85. The dismissal of these three defendants does not affect the overall reasonableness of the lawsuit or the other factors, they did not ask for costs and fees, and, in any case, such a contention was not argued below and is waived.

and not frivolous given there were legitimate disputes of fact on substantial similarity.

Defendants also ridiculously argue "as a matter of law, the jury's verdict that the works are not extrinsically substantially similar necessarily means it found Skidmore's claimed similarities are not protected expression." <u>See</u> Def. Brief at p.84. This does not make sense. The jury's verdict did not state that Skidmore's claimed similarities were not protected expression; it stated that that the expression Plaintiff claimed was copied was not similar enough under the extrinsic test (Plaintiff, of course, contends in his appeal the Court improperly instructed the jury on what to compare and how to perform the test).

### b. Defendants Ignore that There Were Novel Issues of Law At Play Which Precluded a Finding that Plaintiff's Lawsuit was Unreasonable or Frivolous

Defendants ignore that novel issues of law were at play which substantially affected this case, and which warranted denying fees. "A claim is objectively unreasonable when the party advancing it 'should have known from the outset that its chances of success in the case were **slim to none**.'" <u>Giganews, Inc.</u>, 2015 WL 1746484 at *11 (emphasis added) (quoting <u>SOFA</u>, 709 F.3d at 1280).

There is no indication whatsoever that Plaintiff should have known from the outset that he would not prevail on substantial similarity, much less that his chances

were slim to none. Indeed, the Court concluded in denying summary judgment that reasonable minds could differ on the subject—even when restricting the substantial similarity comparison to strictly the notes on the deposit transcription of "Taurus". See Excerpt 2144; Supp. Excerpt 4, 7.

Plaintiff also notes that the Court's rulings on the scope of protected expression with respect to the deposit copy are completely novel; these holdings are new issues that have not been significantly litigated.[19] Plaintiff reasonably relied on the Williams v. Bridgeport Music case decided in the Central District of California in 2014, see Excerpt 2115-16, which held that it was permissible to look at the composition contained within the recording of a song as long as it was represented in some way in the deposit copy. See Williams v. Bridgeport Music, 13-cv-6004 (April 12, 2016) (ECF No. 554), at p.5.[20] The Blurred Lines court allowed the experts to interpret the deposit copy and create re-recordings of the composition in the album recording; those re-recordings focused only on the protectable compositional elements in the album recordings which were represented/embodied in the deposit

---

[19] Indeed, prior courts have permitted the sound recordings to be played in cases applying the 1909 Act.

[20] Plaintiff it should be noted always made clear that his argument regard the Williams case was made in the alternative given that his argument that the deposit copy does not control the scope of the musical composition under the 1909 Act was denied.

copy (excluding performance elements). <u>Id.</u> These re-recordings were admissible in the <u>Williams</u> case and resulted in a verdict for the claimant. It should be noted that Plaintiff tried to introduce such re-recordings in this case but they were ruled inadmissible.

The lower court did not agree with the <u>Williams</u> court, and instead restricted the comparison to solely the exact notes in the deposit copy of "Taurus." Excerpt 734-35. The lower court's ruling was the only time in history that a court has precluded recordings of the song at issue from being played in music copyright infringement case. Indeed, Plaintiff's substantive appeal argues this limitation is plain reversible error.

Setting aside Plaintiff's disagreement with that ruling, there was no way for Plaintiff to know that this would be the ruling of the Court on that critical issue when this suit was filed. <u>SOFA Entm't.</u>, 709 F.3d at 1280 (stating objective unreasonableness is determined if a party knew that at the "outset that its chances of success in the case were slim to none").

Plaintiff also had no way of knowing that the Court would select the jury instructions that it did, which had a large effect on the outcome of the case. The Court, for instance, completely excluded any instruction on the inverse ratio rule, on the protectability of combinations and arrangements of musical elements, and

misdefined originality. <u>See</u> Plaintiff Brief, at p.53, 55, 59 [incorporated here by reference]

Defendants' claims of frivolousness and objective unreasonableness are baseless and use hindsight to make it seem like their prevailing in this case on substantial similarity was inevitable. The fact of the matter is that there is nothing in the record that shows that Plaintiff "should have known from the outset that its chances of success in the case were slim to none." <u>SOFA Entm't.</u>, 709 F.3d at 1280.

### c. Defendant Waived any Reasonableness/Frivolousness Argument by Failing to Appeal the Underlying Rulings, Failing to Develop this Point in the Costs and Fees Motion, and By Failing to Develop this Argument in its Opening Brief

Defendant has waived every aspect of the reasonableness and frivolousness argument many times over.

**First**, Defendant is essentially arguing that there is no evidence to support a substantial similarity comparison, that summary judgment should have been granted in their favor, and that therefore this lawsuit was unreasonable. Def. Brief, at p.86 ("Summary judgment should have been granted to all defendants."). But the Court ruled that there was a triable issue of fact on substantial similarity and rejected their summary judgment motion. <u>See generally</u> Excerpt 117.

Because Defendant never appealed that summary judgment order, it is law of the case and cannot be disputed here. FRAP 3(c)(1)(B) (requiring that a notice of

appeal "designate the judgment, order, or part therefore being appealed"). The notice of appeal only states:

> **PLEASE TAKE NOTICE** that defendant Warner/Chappell Music, Inc., hereby appeals to the United States Court of Appeals for the Ninth Circuit from the Order (Document 312) entered in this action on August 8, 2016, **denying defendant Warner/Chappell Music, Inc.'s Motion for Award of Attorneys' Fees and Motion for Award of Additional Costs**. A copy of the foregoing Order and the Representation Statement required by Circuit Rule 3-2 are attached to this Notice of Appeal.

See Def. Notice of Appeal (first emphasis in original); see also Smith v. Barry, 502 U.S. 244, 248, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992) (notice afforded by a document determines the document's sufficiency as a notice of appeal).

Defendant also failed to even raise in their costs and fees motion in the lower court that the summary judgment order was erroneous, which is a waiver of the issue. Chambers v. Mississippi, 410 US 284, 304 (1973) (stating "questions not raised in the trial court cannot be raised for the first time on appeal").

As the Court itself noted in its opinion denying costs and fees:

> Defendant maintains that the lawsuit was frivolous and objectively unreasonable from its inception because Plaintiff "relied on public domain material and performance elements not protected by the *"Taurus"* copyright." (Def.'s Reply ISO Mot. Atty. Fees 8:10-11, ECF No. 306.) The Court disagrees. **Plaintiff survived a motion for summary judgment, meaning that this Court considered the merits of the claim and determined that sufficient evidence existed to proceed to trial**.

Supp. Excerpt 4 (emphasis added). The Trial Court told Defendant it would have to appeal the summary opinion and other adverse orders on this issue which are the law of the case—even then, Defendant did not do so.

As far as this costs and fees appeal is concerned, the summary judgment order is final and cannot be disturbed.

**Second**, Defendant waived this argument because their underlying motion for costs and fees only conclusorily applied this unprotectability argument *in a single sentence;* in addition, as noted above, that motion did not challenge the summary judgment and trial orders of the district court. See Def. Fees Brief at p.13-14; Kensington Rock Island Ltd. Partnership v. American Eagle Historic Partners, 921 F.2d 122, 124-25, n. 1 (7th Cir.1990) (holding that "[a]rguments raised in the District Court in a 'perfunctory and underdeveloped ... manner' are waived on appeal," where the party's "argument to the District Court on this issue consisted of a single, poorly worded statement""").

Defendant cannot now argue the district court failed to take into account arguments that Defendants never properly raised below. Chambers, 410 US at 304 (stating "questions not raised in the trial court cannot be raised for the first time on appeal").

**Third**, this argument was further waived because Defendant's opening brief

fails to develop its argument on unprotectability and why, exactly, the court's summary judgment opinion was wrong. <u>Smith v. Marsh</u>, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

By claiming that Plaintiff's expert's opinion was unreasonable and frivolous, yet failing to actually develop *why*, Defendant has waived the issue.

**4.      Defendant's Litigation Misconduct Argument Does Not Make Sense**

Defendant bases a large part of its fee request, and appeal, on alleged litigation misconduct that they think Plaintiff committed. Plaintiff denies that any litigation misconduct occurred and also notes that Plaintiff himself was in any case blameless as Defendants made the accusations against his attorneys, not him. Plaintiff refers this Circuit to his brief opposing costs and fees which details his side of the story. <u>See</u> Supp. Excerpts 38-44. Plaintiff notes that no sanctions were ordered, and that Defendants acted in a thoroughly underhanded manner which far eclipsed anything they accused Plaintiff's counsel of.[21]

---

[21] Plaintiff refers this Circuit to his underlying brief opposing the costs and fees motion where he details how Defendants frivolously contested access and ownership. <u>See</u> Supp. Excerpts 29-33. Furthermore, Defendants also colluded during the litigation to attempt to falsely change the "Taurus" copyright to revoke Plaintiff's ownership, and hid the fact that Dr. Ferrara had a conflict of interest as described in Plaintiff's appeal. <u>See</u> Supp. Excerpts 37-38. The district court did not

However, crucially, the district court counted this factor in Defendant's favor, *but still found against awarding costs and fees*. In light of the fact that the Court duly considered everything placed before it by Defendant, there is simply no reason to believe that any abuse of discretion took place on the part of the trial judge.

Defendant, lacking any real basis for an appeal on this issue, complains that the trial judge treated "litigation misconduct" as a "sixth Fogerty factor," when according to Defendants it should have somehow been considered as an "independent basis." See Def. Brief, at p.89.

However, Defendant cites no case law to support their confusing position and its argument in fact contradicts the Kirtsaeng case they rely on. The Supreme Court has held that the five Fogerty Factors are non-exclusive guidelines and that a trial court has "broad discretion" to "take into account a range of considerations." Kirtsaeng, 136 S. Ct. at 1985, 1988-89. One of those considerations is litigation misconduct:

> For example, a court may order fee-shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses. See, e.g., Viva Video, Inc. v. Cabrera, 9 Fed.Appx. 77, 80 (C.A.2 2001). . . . **Although objective reasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals**.

mention or consider this evidence in denying the fees, although it is further support for denial of fees.

Id. at 1988-89 (emphasis added).

Contrary to Defendant's position, the Supreme Court could not have been clearer in Kirtsaeng that the considerations in Fogerty, including alleged misconduct, are to be considered in relation to each other "in light of the Copyright Act's essential goals." Id. at 1989. Moreover, "There is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the considerations we have identified." See Fogerty, 510 US at 534 (quotation marks omitted). No one consideration is to be dispositive, contrary to Defendant's argument. Defendant's position, that the district court somehow erroneously evaluated litigation misconduct under Kirtsaeng by evaluating all the considerations, is baseless.

Moreover, even if the alleged misconduct had been somehow been considered incorrectly, Defendant does not establish or explain how such an alleged error would have changed the Court's cost and fees decision. Defendant's failure to establish harmful error constitutes a waiver of this critical issue. See Chaidez v. US, 133 S. Ct. 1103, 1108 (2013) (stating failure to allege or establish prejudice requires denial of appeal); Monotype Corp. PLC v. Int'l Typeface Corp., 43 F.3d 443, 451 (9th Cir. 1994) (stating that litigant must establish that lower decision harmed it); FRCP 61.

# Conclusion

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Honorable Court reverse and vacate the judgment, and remand for a new trial; and also strike the judgment for the bill of costs. The issues complained of, both when considered individually, and as a whole, demonstrate that there were many serious errors that unduly prejudiced Plaintiff's ability to prove substantial similarity. Plaintiff-Appellee also respectfully requests that the cost and fees appeal by Defendant Warner/Chappell be denied as moot if Plaintiff's appeal is successful— or that the appeal be denied as meritless.

*****

*Respectfully submitted,*

Francis Alexander, LLC

/s/ Francis Malofiy
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Rd. | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com

*Law Firm / Lawyers for Michael Skidmore*

*/d/ August 16, 2017*

# Statement of Related Cases

There is one related case:

- In <u>Williams v. Bridgeport Music,</u> (15-56880, 16-55089, 16-55626) there are many of the same legal issues in dispute concerning the admissibility of sound recordings and their compositions as it relates to the deposit copy requirement of the 1909 Act.

# Statement of Length Compliance

See attached form.

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Appellant's Combined Reply Brief and Opening Brief Responding to Defendant's Costs and Fees Appeal have been served upon all counsel of record via electronic filing:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

\*\*\*\*\*

*Respectfully submitted,*

Francis Alexander, llc

/s/ Francis Malofiy

Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Rd. | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*Law Firm / Lawyers for Michael Skidmore*

*/d/ August 16, 2017*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-56057; 16-56287

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☒ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is 17,746 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant    /s/ Francis Malofiy    Date  8/16/2017

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*