# 23-0905-cv

# United States Court of Appeals

### *for the*

## Second Circuit

————◆————

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

— v. —

EDWARD CHRISTOPHER SHEERAN, personally known as Ed Sheeran,
SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION, DBA Atlantic Records, BDI MUSIC LTD., BUCKS MUSIC
GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC
(USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE
RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD.
UK, ATLANTIC RECORDS UK, BDI MUSIC, BUCKS MUSIC GROUP,
WARNER MUSIC GROUP CORPORATION, DBA Asylum Records,
WARNER MUSIC GROUP, LTD UK, DOES 1-10,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

DONALD S. ZAKARIN
ILENE S. FARKAS
ANDREW M. GOLDSMITH
BRIAN M. MAIDA
PRYOR CASHMAN LLP
*Attorneys for Defendants-Appellees*
7 Times Square, 41st Floor
New York, New York 10036
(212) 421-4100

COUNSEL PRESS    (800) 4-APPEAL • (324546)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

1.     Defendant-Appellee Sony/ATV Music Publishing LLC n/k/a Sony Music Publishing (US) LLC ("SATV") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  SATV is a wholly-owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan.

2.     Defendant-Appellee Atlantic Recording Corporation d/b/a Atlantic Records ("Atlantic") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  Atlantic is a wholly-owned, indirect subsidiary of Warner Music Group Corp. ("WMG"), a Delaware corporation; WMG is a publicly traded company with more than 10% of its stock owned by AI Entertainment Holdings LLC and certain affiliates, which are not publicly traded companies.

3.     Defendant-Appellee Bucks Music Group Ltd. ("Bucks") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows:  a private individual owns 100% of the stock of Bucks; no public company owns any portion of Bucks.

4.     Defendant-Appellee BDi Music Ltd. ("BDi") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as

i

follows: Bucks and a private individual (distinct from the one alluded to in paragraph 3 above) each own more than 10% of the stock of BDi; a private individual owns 100% of the stock of Bucks; no public company owns any portion of BDi or Bucks.

5.     Defendant-Appellee David Platz Music (USA) Inc. ("DPMI") identifies its parent corporation(s) and any publicly held company that owns 10% or more of its stock as follows: Bucks owns 100% of the stock of DPMI; a private individual owns 100% of the stock of Bucks; no public company owns any portion of DPMI or Bucks.

6.     Defendant-Appellee The Royalty Network, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................vi

ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE.............................................3

   A.  The Registered Copyright At Issue..................................3

   B.  Appellant Never Moved To Amend A Fourth Time, And The Court Never Denied Such Nonexistent Motion............................4

   C.  Appellees' Original Summary Judgment And *Daubert* Motions ................5

      1.  The Chord Progression And Anticipation Technique Are Commonplace............................................6

      2.  Appellant's Deficient Selection-And-Arrangement Claim..................9

   D.  The September 2021 Orders ......................................10

   E.  Appellees' Renewed Summary Judgment And *Daubert* Motions ............12

   F.  Appellees' Reconsideration Motion ...............................14

   G.  The Court's Rulings Regarding Touring And Merchandising Profits ....................................................15

      1.  Motion To Compel Discovery Of Indirect Profits .............................15

      2.  Summary Judgment On Touring Profits ...............................16

SUMMARY OF ARGUMENT ..........................................17

ARGUMENT ....................................................19

   I.  THE DISTRICT COURT CORRECTLY HELD THAT THE DEPOSIT COPY DEFINES THE SCOPE OF COPYRIGHT..................19

      A.  The 1909 Act Required Visibly Perceptible Writings .......................19

         1.  *White-Smith* And The Ensuing 1909 Act ..................................20

         2.  The Plain Text Of The 1909 Act ................................22

            a.  The Publication And Deposit Requirements..........................22

iii

        b. The Notice Requirement ........................................................26

        c. The 1971 Sound Recording Amendment ..............................26

    3. The Copyright Office Compendiums ..........................................27

        a. The 1967 Compendium ..........................................................28

        b. The Current Compendium......................................................28

    4. Appellant And Amici Cannot Use "Common Law" Copyright To Expand The Scope Of Federal Copyright.............30

  B. Appellant And Amici Distort The Deposit Copy Requirement.........33

  C. SAS's Reliance On *Data Gen.*, *Nicholls* And *FireSabre* Is Misplaced ........................................................................................36

  D. Appellant's And Amici's Remaining Deposit Copy Arguments Fail....................................................................................................38

II. THE COURT PROPERLY BARRED EVIDENCE IMPLYING AN UNEXPRESSED BASS-LINE INTO THE DEPOSIT COPY ...........41

III. SUMMARY JUDGMENT SHOULD BE AFFIRMED.............................43

  A. The Copyright Infringement Standard ...............................................43

    1. Unprotectable Musical Elements.................................................43

    2. The Selection-And-Arrangement Standard .................................45

  B. The Court's "Numerous" Ruling Should Be Affirmed......................47

  C. The Judgment May Be Affirmed On Two Independent Grounds: The Selection-And-Arrangement In *Let's Get It On* Is Neither "New" Nor "Original" Nor Are The Combinations The "Same"...................................................................51

  D. Appellant's Argument Regarding The "Commonplace" "Combination" Ruling Should Be Rejected........................................53

IV. APPELLANT DID NOT MOVE TO AMEND, AND THE COURT DID NOT DENY A MOTION THAT APELLANT NEVER MADE..................................................................................................54

iv

V.   APPELLANT'S TOURING PROFITS CLAIM IS MOOT;
     IN THE ALTERNATIVE, IT SHOULD HAVE BEEN
     DISMISSED.................................................................................55

     A.   The Blanket Licenses Negate Any Alleged Infringement ..................55

     B.   Profits From Concert Ticket Sales Are Indirect..................................56

     C.   Even Were Touring Profits "Direct," Appellant Still
          Was Required But Failed To Prove A Causal Nexus .........................58

CONCLUSION ........................................................................................60

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(s)</u>

## <u>CASES</u>

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ..............................................................58

*Aslanidis v. U.S. Lines, Inc.*,
  7 F.3d 1067 (2d Cir. 1993) ................................................................31

*Batjac Prods. Inc. v. GoodTimes Home Video Corp.*,
  160 F.3d 1223 (9th Cir. 1998) ...........................................................32

*Beaudin v. Ben & Jerry's Homemade, Inc.*,
  95 F.3d 1 (2d Cir. 1996) ....................................................................45

*Beyond Blond Prods., LLC v. Heldman*,
  479 F. Supp. 3d 874 (C.D. Cal. 2020), *aff'd sub nom. Beyond Blond
  Prods., LLC v. ComedyMX, LLC*, No. 21-55990, 2022 WL 1101756
  (9th Cir. Apr. 13, 2022) .....................................................................49

*Bong v. Alfred S. Campbell Art Co.*,
  214 U.S. 236 (1909)...........................................................................32

*Burrow-Giles Lithographic Co. v. Sarony*,
  111 U.S. 53 (1884).............................................................................21

*Caliga v. Inter Ocean Newspaper Co.*,
  215 U.S. 182 (1909)...........................................................................31

*Capitol Recs., Inc. v. Mercury Rec. Corp.*,
  221 F.2d 657 (2d Cir. 1955) .........................................................21, 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................58

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
  No. 08-cv-7497 (KBF), 2013 WL 5970065
  (S.D.N.Y. Nov. 8, 2013) ...............................................................56, 58

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
    982 F. 2d 693 (2d Cir. 1992) ...............................................................42

*Cottrill v. Spears*,
    No. 02-cv-3646 (BMS), 2003 WL 21223846 (E.D. Pa. May 22, 2003),
    *aff'd*, 87 F. App'x 803 (3d Cir. 2004)..................................................49

*Cox v. Onondaga Cnty. Sheriff's Dep't*,
    760 F.3d 139 (2d Cir. 2014) ...............................................................51

*Darrell v. Joe Morris Music*,
    113 F.2d 80 (2d Cir. 1940) ..........................................................43, 48

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994)........................................................*passim*

*Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence
    Plantations*,
    643 F.3d 16 (1st Cir. 2011)...................................................................31

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)....................................................................*passim*

*FireSabre Consulting LLC v. Sheehy*,
    No. 11-cv-4719 (CS), 2013 WL 5420977
    (S.D.N.Y. Sept. 26, 2013).....................................................36, 37, 38

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932).............................................................................31

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985) ...............................................................58

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988) .......................................................43, 48

*George v. Starbucks Corp.*,
    857 F. App'x 705 (2d Cir. 2021) .........................................................31

*Goldstein v. California*,
    412 U.S. 546 (1973)......................................................................21, 38

*Gray v. Hudson*, 28 F.4th 87 (9th Cir. 2022) .........................................49

vii

*Gray v. Perry*,
No. 2:15-cv-05642 (CAS), 2020 WL 1275221
(C.D. Cal. Mar. 16, 2020), *aff'd sub nom. Gray v.
Hudson*, 28 F. 4th 87 (9th Cir. 2022).......................................43, 44, 48

*Gray v. Perry*,
No. 2:15-cv-5642 (CAS), 2017 WL 1240740 (C.D. Cal. Apr. 3, 2017)............55

*Griffin v. Sheeran*,
No. 1:17-cv-05221 (LLS) (S.D.N.Y.).......................................7, 9, 35

*Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*,
No. 10-cv-128 (PAC), 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ..............56

*Intersong-USA v. CBS, Inc.*,
757 F. Supp. 274 (S.D.N.Y. 1991) ...................................................44

*Jean v. Bug Music, Inc.*,
No. 00-cv-4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002).................44

*Kodadek v. MTV Networks, Inc.*,
152 F.3d 1209 (9th Cir. 1998) ......................................................34

*Kregos v. Associated Press*,
937 F.2d 700 (2d Cir. 1991) ........................................................47

*Lawton v. Melville Corp.*,
116 F.3d 1472 (2d Cir. 1997) (unpublished opinion).........................58

*Lipton v. Nature Co.*,
71 F.3d 464 (2d Cir. 1995) .........................................................35

*Lorillard v. Pons*,
434 U.S. 575 (1978).................................................................24

*Major League Baseball Props. Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) .......................................................53

*Matthew Bender & Co. v. W. Publ'g Co.*,
158 F.3d 674 (2d Cir. 1998), *cert. denied*, 526 U.S. 1154 (1999) ....................47

*McDonald v. West*,
    138 F. Supp. 3d 448 (S.D.N.Y. 2015), *aff'd*, 669 F. App'x 59
    (2d Cir. 2016) ................................................................................44

*Merrell v. Tice*,
    104 U.S. 557 (1881) ..........................................................33, 36, 38

*Morrill v. Stefani*,
    338 F. Supp. 3d 1051 (C.D. Cal. 2018) ........................................49

*Nat'l Conf. of Bar Examiners v. Multistate Legal Stud., Inc.*,
    692 F.2d 478 (7th Cir. 1982), *cert. denied*, 464 U.S. 814 (1983) ......................35

*Neal v. Thomas Organ Co.*,
    325 F.2d 978 (9th Cir. 1963) ........................................................26

*Nicholls v. Tufenkian Import/Export Ventures, Inc.*,
    367 F. Supp. 2d 514 (S.D.N.Y. 2005) ...................................*passim*

*Nova Design Build, Inc. v. Grace Hotels, LLC*,
    652 F.3d 814 (7th Cir. 2011) ........................................................34

*Nwosuocha v. Glover*,
    No. 21-cv-04047 (VM), 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023) ............50

*Parker v. Hinton*,
    No. 22-5348, 2023 WL 370910 (6th Cir. Jan. 24, 2023)
    (unpublished) ...........................................................................*passim*

*Perry v. Gray*,
    No. 2:15-cv-5642 (CAS), 2019 WL 2992007 (C.D. Cal. Jul. 5, 2019) ............55

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) .....................................................44, 45

*Peters v. West*,
    776 F. Supp. 2d 742 (N.D. Ill. 2011), *aff'd*, 692 F.3d 629
    (7th Cir. 2012) ............................................................................49

*Rosette v. Rainbo Rec. Mfg. Corp.*,
    546 F.2d 461 (2d Cir. 1976) .........................................................23

*Roy Export Co. Establishment of Vaduz v. Columbia Broad. Sys.*,
   672 F.2d 1095 (2d Cir. 1982), *cert. denied*, 459 U.S. 826 (1982) .....................31

*Shoptalk, Ltd. v. Concorde-New Horizons Corp.*,
   168 F.3d 586 (2d Cir. 1999), *cert. denied*, 527 U.S. 1038
   (1999) ........................................................................................19, 31, 32, 56

*Sista v. CDC Ixis N. Am., Inc.*,
   445 F.3d 161 (2d Cir. 2006) ..........................................................................54

*Skidmore for Randy Craig Wolfe Tr. v. Led Zeppelin*,
   905 F.3d 1116 (9th Cir. 2018), *on reh'g en banc sub nom. Skidmore as
   Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051
   (9th Cir. 2020)................................................................................................36

*Skidmore as Trustee For The Randy Craig Wolfe Trust v. Led
   Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 453 (2020),
   *reh'g denied*, 141 S. Ct. 946 (2020) ...........................................................*passim*

*Smith v. Weeknd*,
   No. 19-cv-2507 (PA), 2020 WL 4932074 (C.D. Cal. July 22,
   2020), *aff'd sub nom. Clover v. Tesfaye*, No. 20-55861, 2021 WL
   4705512 (9th Cir. Oct. 8, 2021)......................................................................49

*Stoliarov v. Marshmello Creative, LLC*,
   No. 19-cv-3934 (PSG), 2021 WL 2514167 (C.D. Cal. Apr. 8, 2021),
   *aff'd in part, dismissed in part*, No. 21-55442, 2022 WL 819800
   (9th Cir. Mar. 17, 2022)..........................................................................57, 59

*Structured Asset Sales, LLC v. Sheeran et al.*,
   No. 1:20-cv-04329 (S.D.N.Y.) ..........................................................................5

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2001) ..............38, 49

*Threeline Imports, Inc. v. Vernikov*,
   No. 15-cv–02333 (AMD)(RML), 2016 WL 11472749
   (E.D.N.Y. Oct. 28, 2016).................................................................................47

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
   338 F.3d 127 (2d Cir. 2003) ....................................................................45, 46, 52

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975)..................................................................50

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993) ...............................................35

*Unistrut Corp. v. Power*,
    280 F.2d 18 (1st Cir. 1960)............................................36, 37

*United States v. Diallo*,
    40 F.3d 32 (2d Cir. 1994) ......................................................42

*United States v. Hamilton*,
    583 F.2d 448 (9th Cir. 1978) ................................................46

*Velez v. Sony Discos*,
    No. 05-cv-0615 (PKC), 2007 WL 120686 (S.D.N.Y. Jan. 16, 2007) ...............44

*Washingtonian Publ'g Co. v. Pearson*,
    306 U.S. 30 (1939)..................................................................34

*Well-Made Toy Mfg. v. Goffa Int'l Corp.*,
    354 F.3d 112 (2d Cir. 2003), *abrogated on other grounds by Reed
    Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).................................30

*White-Smith Music Publ'g Co. v. Apollo Co.*,
    209 U.S. 1 (1908).....................................................................20

*Williams v. Bridgeport Music, Inc.*,
    No. 13-cv-6004 (JAK), 2014 WL 7877773 (C.D. Cal. Oct. 30, 2014),
    *aff'd sub nom. Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018)........................42

*Zalewski v. Cicero Builder Dev., Inc.*,
    754 F.3d 95 (2d Cir. 2014) ....................................................44

## STATUTES & REGULATIONS

17 U.S.C. § 1(e) (1971)........................................................21

17 U.S.C. § 2 (1947) ...........................................................32

17 U.S.C. § 5 (1971) ...........................................................26

17 U.S.C. § 10 (1947) ...........................................3, 22, 34, 35

17 U.S.C. § 12 (1947) ...................................................................23, 25, 34

17 U.S.C. § 13 (1956) ................................................................................*passim*

17 U.S.C. § 14 (1947) ...........................................................................22, 35

17 U.S.C. § 20 (1971) ...........................................................................3, 22, 26

17 U.S.C. § 26 (1971) ...................................................................................26

17 U.S.C. § 101 ............................................................................................27

17 U.S.C. § 102(a) (1976) .............................................................................22

17 U.S.C. § 207 (1947) .................................................................................29

17 U.S.C. § 301 .......................................................................................32, 33

17 U.S.C. § 303(b) (1997) ............................................................................23

17 U.S.C. § 408(b) ..................................................................................27, 36

17 U.S.C. § 408(c)(1).....................................................................................29

17 U.S.C. § 504(b) ...............................................................................55, 56, 58

37 C.F.R. § 202.8(b) (1959)..........................................................................24

37 C.F.R. § 202.8(b) (1967)..........................................................................24

37 C.F.R. § 202.8(b) (1972)..........................................................................27

37 C.F.R. § 202.15a (1972)...........................................................................27

Pub. L. No. 87-646 (Sept. 7, 1962)...............................................................24

Pub. L. No. 92-140 (Oct. 15, 1971) ..............................................................24

Pub. L. No. 93-573 (Dec. 31, 1974)..............................................................24

## **TREATISES & OTHER SOURCES**

1 Nimmer on Copyright § 2.05[A][1][a] (2023).......................................19

1 Nimmer on Copyright § A.01[D] (2023).................................................56

2 Nimmer on Copyright § 7.16[B][6][c] (2023)......................................................40

Alfred M. Shafter, *Musical Copyright* (1932) ........................................................21

Harry G. Henn, Copyright Office Study No. 5, The Compulsory License
    Provisions Of The U.S. Copyright Law (1956)...................................................20

House Report on the Copyright Act of 1909, 60th Congress, 2d Session,
    Report No. 2222 (February 1909) ..............................................................*passim*

H.R. Rep. No. 94-1476 1976 (Sept. 3, 1976) .............................................29, 32, 36

James E. Hawes and Bernard C. Dietz, *Copyright Registration Practice*
    (Oct. 2023 Update) ........................................................................................30

Merriam-Webster Dictionary (New Edition, 2022).........................................49, 50

*Register's Report on the General Revision of the U.S. Copyright Law*
    (1961)...............................................................................................................23

U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices
    (1st ed. 1967) .......................................................................24, 28, 34

U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices
    (2d ed. 1984) ........................................................................................27

U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices
    (3d. ed 2021) ................................................................................28, 29

## ISSUES PRESENTED FOR REVIEW

1.      Under the 1909 Copyright Act ("1909 Act"), does the "Deposit Copy," reflected by "complete copies of the best edition" of the work "then published," define the scope of copyright protection for a published work?

*The District Court answered this question in the affirmative. Appellees respectfully submit this Court should affirm.*

2.      May experts imply elements not expressed in the Deposit Copy to expand the scope of copyright beyond the Deposit Copy?

*The District Court answered this question in the negative. Appellees respectfully submit this Court should affirm.*

3.      Where an infringement claim alleges a combination of two unprotectable elements – a commonplace chord progression and the commonplace technique of anticipation (the rhythm of how the chord progression is performed) – that effectively constitute a single element, is there an issue of fact whether such combination is sufficiently numerous to warrant protection as a selection-and-arrangement?

*The District Court answered this question in the negative, holding such combination insufficiently numerous to qualify for copyright protection. Appellees respectfully submit this Court should affirm. This Court may also affirm on the grounds that: (i) this combination is unoriginal and not "new" nor "novel," and (ii)*

1

*under thin copyright for combination claims, the two works at issue were not the same or virtually identical.*

4.    Where a "Memorandum to Counsel" granted Appellant leave to move to amend its complaint and Appellant failed to make such motion, may Appellant appeal from the Court's "non-denial" of a motion Appellant never made?

*Appellees respectfully submit this question should be answered in the negative.*

5.    If not mooted by the Court's grant of summary judgment, where Appellant provided no causal nexus evidence, did the Court err in: (i) finding profits from the sale of concert tickets were direct rather than indirect; and (ii) not requiring Appellant to prove a causal nexus between concert ticket sales and the alleged infringement by conflating the burden of proving revenues with the separate burden of proving a causal nexus?

*If not mooted by summary judgment, this Court should reverse the decision regarding concert tickets because such profits are indirect and, even if direct, proof of a causal nexus between the alleged infringement and profits is required, and Appellant did not provide any such evidence.  Further, blanket performance licenses authorized the performance of both works, making any performance non-infringing.*

## STATEMENT OF THE CASE

### A.    The Registered Copyright At Issue

In July 1973, "Let's Get It On" ("LGO"), co-authored by Ed Townsend, was registered with the U.S. Copyright Office by Cherritown Music (Townsend's publishing company) and Stone Diamond Music Corp.   (A569-575; A1732 ¶ 19). As required by Section 13 of the 1909 Act (17 U.S.C. § 13 (1956)),[1] "two complete copies of the best edition [of LGO] then published" (sheet music) were deposited with the Copyright Office – which, in accordance with Section 20 of the 1909 Act (17 U.S.C. § 20 (1971)), included a copyright notice on "the first page of music" (the "Deposit Copy").  (A1732 ¶ 20; A569-575; A840-845).[2]

As a published work, Section 10 of the 1909 Act required publication of LGO "with the notice of copyright required by this title."  17 U.S.C. § 10 (1947).  The Copyright Application identified February 14, 1973, as "the date when copies of this particular version [the deposited sheet music] of [LGO] were first placed on sale, sold or publicly distributed."  (A569).  As memorialized by the Deposit Copy, LGO

---

[1] Congress amended the 1909 Act over time, sometimes changing section numbers (*e.g.*, the 1947 codification changed Section 9 to Section 10).  Unless otherwise noted, all references to the 1909 Act correspond to the Copyright Act in effect in 1973.  The dates in parentheses that follow citations to each statute section correspond to the date of the most recent amendment to such section prior to 1973.  A copy of the 1909 Act in effect as of January 1, 1973 can be accessed at: https://www.copyright.gov/history/1909act-1973.pdf.

[2] Unless otherwise noted, all emphasis in quotations has been added.  Undefined capitalized terms have the meanings in SAS's Opening Brief ("SAS Br.").

was registered under Registration No. EP 314589 (the "EP" signifies that LGO had been registered under class "e," musical compositions, as a published work). (A1733 ¶ 21; A840-845).

Appellant Structured Asset Sales, LLC ("SAS") is not a copyright owner but acquired an 11.11% beneficial interest in LGO from Townsend's son, entitling it to receive royalties only. (A1732 ¶ 18).

In 2018, SAS sued, alleging that "Thinking Out Loud" ("TOL") infringed LGO's registered copyright. (A1721 ¶ 1). SAS's Third Amended Complaint ("Complaint") alleges that TOL copies "various elements" from LGO, including the "harmonies," "drums," "bass line" and "tempo." (A32 ¶ 5). However, LGO's Deposit Copy does not express drums, a bass-line or tempo. (A840-845; A1733-36 ¶¶ 22-23). Rather, such musical elements only appear in a Marvin Gaye sound recording (the "Gaye Recording"), one of many recordings of LGO. (SPA14).

## B. Appellant Never Moved To Amend A Fourth Time, And The Court Never Denied Such Nonexistent Motion

By letter dated May 7, 2020 – after the close of discovery – SAS asked the Court to "set a pre-motion conference to discuss [its] motion to amend the Complaint" a fourth time, based on its 2020 purported registration of LGO as embodied in the Gaye Recording (the "2020 Registration"). (A319). Appellees opposed a fourth amendment, noting, among other problems, that it could not relate back, and that SAS was not a copyright owner, had no authority to file the 2020 Registration and

4

had no knowledge regarding authorship and ownership of elements contained in the Gaye Recording.  (A395-397).

On May 13, 2020, the District Court issued a "Memorandum to Counsel," expressing its preliminary view that the "proposed filing of a fourth Amended Complaint raises serious concerns of trial administration and jury confusion, let alone difficulties of clear presentation and organized resolution of the issues." (SPA11).  Nevertheless, the Memorandum stated SAS could, "without further correspondence or conferences if it wishes, file a formal motion for leave to file [a Fourth Amended Complaint], so the matter may be presented more fully." (SPA12). SAS made no such motion.  Instead, it filed a new action.[3]

## C.    <u>Appellees' Original Summary Judgment And *Daubert* Motions</u>

In April 2021, Appellees moved both for summary judgment and to exclude the reports of SAS's musicologists, Dr. Covach ("Covach") and Dr. Everett ("Everett"), because their reports improperly: compared TOL to the Gaye Recording, relying on elements not expressed in the Deposit Copy (*i.e.*, an "implied" bass-line); offered legal conclusions regarding substantial similarity and whether certain elements could be considered "original" or "protectable"; and offered opinions regarding the alleged "uncommon" or "rare" combination of elements at issue

---

[3] SAS's separate action, filed on June 8, 2020, has been stayed.  *See Structured Asset Sales, LLC v. Sheeran et al.*, No. 1:20-cv-04329 (S.D.N.Y.).

without having conducted a proper prior art search.  (A1382-1413).

Appellees' summary judgment motion showed that SAS's claim addressed only two commonplace, unprotectable elements expressed in the Deposit Copy – the chord progression and harmonic rhythm (*i.e.*, the anticipation of chord changes) – which were insufficiently numerous to support an infringement claim.  (A1251-1282).  Appellees also showed these elements had been used in combination before LGO, and that TOL's combination of elements was indisputably different than LGO's combination, thus failing to satisfy the "selection-and-arrangement" test for infringement.  (*Id.*).[4]

### 1.    The Chord Progression And Anticipation Technique Are Commonplace

LGO's Deposit Copy notates a I-iii-IV-V7 chord progression, which can be called a "basic" chord progression of I-**iii**-IV-V.  (A1740 ¶ 32; A515 ¶ 37).  In contrast, one of TOL's chord progressions (there are several, whereas LGO has only one) is a "basic" I-**I/3**-IV-V (also written as I-I6-IV-V).  (A760).[5]  Appellees' summary judgment motion presented undisputed evidence that both chord progressions are commonplace:

(i)    Covach admitted the I-iii-IV-V chord progression "is a very common

---

[4] Appellees also demonstrated that no actionable melodic similarities existed between LGO and TOL, and SAS abandoned any argument beyond the two elements.

[5] A "triad" is a "basic" chord "that consists of [only] three pitches."  (A510 ¶ 22(b)).

progression, used in many songs … ." (A1447 ¶ 6; A1744 ¶ 36);

(ii)   Dr. Lawrence Ferrara ("Ferrara"), one of Appellees' experts, identified at least <u>52</u> prior songs that utilized the same chord progressions. (A519 ¶ 44; A612-614; A1744-1745 ¶ 37);[6] and

(iii)   Ferrara also identified multiple guitar and piano method books which described the I-iii-IV-V chord progression as "popular," one of the "most frequent progressions," and identified it as one of ten "popular rock 'n' roll progressions." (A594-596; A598-601; A869-870; A1745-1746 ¶¶ 38-40).[7]

SAS also alleged that TOL "use[d] the identical harmonic rhythm as found in" LGO because both songs anticipate (or syncopate) the second and fourth chord changes. (A45-46 ¶ 43; A1746-1748 ¶ 41).[8]  However, it was undisputed that the anticipation of chord changes, in general and as used in LGO and TOL, is commonplace:

---

[6] By the time of trial in the related *Griffin* action, Ferrara had identified <u>101</u> prior songs that utilize the same chord progressions. *See* Transcript of Proceedings at 676:18-680:5, *Griffin v. Sheeran*, No. 1:17-cv-05221 (LLS) (S.D.N.Y. May 12, 2023), ECF 288.  The jury in *Griffin* returned a verdict finding that Sheeran and Amy Wadge independently created TOL and did not copy from LGO.

[7] Everett's initial report admitted LGO used one of the most commonplace chord progressions to begin with a "I" chord, an admission he later removed. (A664-665 ¶ 7).

[8] The anticipation of chord changes involves the iteration of a chord on a weak beat instead of a strong beat. (A504 ¶ 4 n.1).

(i)    Covach admitted that anticipation is "a type of syncopation that is common in popular music of the 20th century," and that "American popular music of the last 100 years employs a high degree of rhythmic syncopation." (A1541 ¶ 5; A1750 ¶ 45);

(ii)    Appellees' experts agreed that anticipation of chord changes is "a centuries-old musical building block" and "technique" (A507 ¶ 16), and "a rhythmic musical device that has been used in music for many centuries." (A761);

(iii)    It is undisputed that Ed Sheeran wrote 20 songs before TOL using anticipation, 10 of which used anticipation in the same manner as in TOL (*i.e.*, on the second and fourth chords). (A527-528 ¶¶ 61-63; A616; A1785 ¶ 118);

(iv)    Even a limited prior art search by Appellees' musicologist Anthony Ricigliano ("Ricigliano") identified dozens of songs "in which the second and fourth chords use anticipation in the same manner as LGO and TOL." (A761-762); and

(v)    Prior to co-authoring TOL with Sheeran, Amy Wadge wrote another song utilizing a I-I/3-IV-V chord progression that anticipated chord changes on the second, third and fourth chords. (A528 ¶ 63; A1753-1754 ¶ 53).

8

### 2.     <u>Appellant's Deficient Selection-And-Arrangement Claim</u>

As detailed in Section III.A.2 below, SAS's selection-and-arrangement claim requires that it establish a combination (i) of <u>numerous</u> unprotectable elements, (ii) arranged in an original or new fashion, and (iii) that TOL used such combination in the <u>same</u> or <u>virtually identical</u> manner. (A1275-1280).

Appellees argued that the combination of LGO's chord progression and anticipation technique was insufficiently numerous. (A1276-1277). Indeed, the anticipation is simply the rhythm at which the chord progression is played. Appellees' experts, Ferrara and Ricigliano, also identified multiple songs, predating and postdating LGO, featuring the same combination of elements: (i) *Since I Lost My Baby* (1966) as recorded by Ray French (A524-527 ¶¶ 56-60); (ii) *Georgy Girl* (1967) as recorded by 101 Strings Orchestra (*id.*); (iii) *I've Got Love On My Mind* (1977) (A554 ¶ 156); and (iv) *Do It To Me* (1992) (A790). (*See also* A1781-1785 ¶ 116). LGO's use was not the first.[9]

Moreover, the chord progressions and harmonic rhythms of TOL and LGO were different – not the same or virtually identical – in significant ways. SAS

---

[9] By the time of trial in *Griffin*, Ferrara had identified at least 8 songs that combined the elements together. *See* Transcript of Proceedings at 746:2-759:4, 768:13-20, 769:1-17, *Griffin*, No. 1:17-cv-05221, ECF 288. Covach's original report admitted there likely were prior songs combining the chord progression and anticipation at issue; thus, Covach claimed it was the "distinct combination of three specific elements," including the nonexistent bass-line, that was "original" to LGO. (A477 ¶ 22). After the Court excluded the bass-line, Covach suddenly found the bass-line meaningless, claiming, without any prior art search, that the combination of the chord progression and anticipation was sufficient. (A1780 ¶ 114).

admitted that the second chord in LGO is a minor chord (a "iii") whereas the second chord in TOL is a major chord (a "I/3" or "I6") (A1744 ¶ 35), a significant harmonic difference. (A718 ¶ 14). Ferrara identified multiple additional undisputed differences between the chord progressions. (A516-518 ¶¶ 38-41; A1740-1743 ¶¶ 33-34).

Appellees also identified significant differences between the harmonic rhythms, set forth in Paragraphs 46-50 of their Rule 56.1 Statement: (i) the anticipated chords have different durations, (ii) occur on different beats, (iii) anticipate different beats of different measures, and (iv) LGO features a four-bar chord progression while TOL features a two-bar chord progression. (A1751-1752 ¶¶ 46-50). SAS's Response to these paragraphs (in Paragraph 41 of its 56.1 Statement) did not dispute these differences. (A1746-1748 ¶ 41).

## D. **The September 2021 Orders**

On September 9, 2021, the District Court issued five *in limine* rulings.

*First*, the Court held that the Deposit Copy "defines precisely what [is] the subject of copyright," and that "the scope of copyright is limited by the deposit copy." (SPA13-14; citations, quotations & brackets omitted). The Court held that "the field of protected elements" is <u>not</u> "enlarged on the theory that they are consistent, and harmonize with the work as articulated in the Deposit Copy, and are implied by the way the articulated elements are expressed" because "[i]f what is implied is not in

10

the Deposit Copy, it does not have the protection of copyright." (SPA14).

*Second*, while not barring use of the Gaye Recording, the Court held that "the Gaye sound recording is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright." (SPA15).

*Third*, the Court held that "[t]here is no genuine question that there is no notation or specification of a bass line in the Deposit Copy," which "is apparent from a visual inspection, and is beyond dispute." (SPA15; *see also* A840-845). The Court rejected SAS's attempt to "imply" a bass-line into the Deposit Copy by "string[ing] together the lowest notes in the Deposit Copy" (*i.e.*, the lowest notes in each chord), holding that "copyright law protects only that which is literally expressed, not that which might be inferred or possibly derived from what is expressed." (SPA15; citation & quotation omitted). The Court, thus, barred SAS's experts' attempt to imply a nonexistent bass-line. (*Id.*). Consistent with undisputed evidence (including Covach's admission), the Court also held that "the chord progression" and "the harmonic anticipation of chord changes" at issue were "both" "commonplace and unprotectable." (*Id.*).

*Fourth*, the Court ruled that "the proof as to the existence of prior art shall be only that submitted by defendants" because "[o]ne of plaintiff's experts [Covach] … ignored the issue of prior art, and the other [Everett] … only made inquiries so superficial as to amount to no research at all." (SPA16). SAS did not appeal this

11

ruling.

*Fifth*, the Court allowed SAS's experts to cure their reports, requiring that the "corrected reports and testimony … eschew opinions unsupported by facts, or suggesting legal conclusions." (SPA16).

Because it afforded SAS's experts the opportunity to correct their defective reports, on September 14, 2021, the Court denied Appellees' summary judgment motion "without prejudice to renewal." (SPA17).

## E.  **Appellees' Renewed Summary Judgment And _Daubert_ Motions**

After SAS submitted revised expert reports, Appellees renewed their motion for summary judgment and moved to exclude SAS's experts for failure to comply with the Court's September 9, 2021 Order.

On September 29, 2022, the Court issued an Order reiterating that SAS's experts' "[r]eferences to prior art will <u>not</u> be accepted when used to prove that an element of LGO is unusual or similar to that of TOL," and denying Appellees' summary judgment motion. (SPA18-36).  In denying summary judgment, the Court disregarded the dictionary definition of "numerous" and case law holding combinations of four or five elements insufficiently numerous, ruling there was no "bright-line rule that the combination of two unprotectable elements is insufficiently numerous to constitute an original work." (SPA23; citations omitted).

Despite barring SAS's experts from opining that any element of LGO was

original or unusual – thus making Appellees' evidence that the two-element combination was neither new nor original undisputed – the Court denied summary judgment, finding that the experts supposedly disagreed whether the combination was "commonplace before LGO." (SPA25).

There was no such disagreement. The Court overlooked that it barred Covach and Everett from opining on this issue, making Appellees' evidence undisputed. The "disagreement" referenced by the Court related only to the chord progression (*i.e.*, the sequence of chords), not the combination, and even as to the chords, there was no disagreement. (A1567-1568). Covach and Everett did not dispute that works identified by Appellees used the same combination of elements, only noting that other versions of those works did not use the same combination. (SPA25; A1543-1546 ¶¶ 10-13). On reconsideration, the Court recognized and corrected its error. (SPA50 n.4).

Finally, the Court cited a purported "disagreement" between the experts about whether the combination in each work was the same or virtually identical. (SPA26-27). There was no such dispute. SAS's experts (i) admitted the chord progressions are different (*supra* at 9-10) and (ii) did not dispute there are significant differences between the harmonic rhythms. (*Supra* at 10).

13

**F.**     **Appellees' Reconsideration Motion**

Appellees moved for reconsideration.  (A1880-1882).  On May 16, 2023, citing its "inherent power to reconsider" and "the need to correct a clear error" and "prevent manifest injustice," the Court granted summary judgment to Appellees and denied SAS's summary judgment motion.  (SPA37-53; citations & quotations omitted).

On numerosity, the Court reiterated that "no bright-line rule" exists but acknowledged that it "improperly disregarded" and "declined to grapple with whether a numerosity requirement should be imposed."  (SPA 44-45).  The Court held that "common sense dictates that in the context of a musical composition, 'numerous' requires more than just a commonplace chord progression and harmonic rhythm to warrant protecting their combination," especially given that, here, "the chord progression and the harmonic rhythm (how the chord progression is played) … do not form a pattern, but instead essentially merge into one element."  (SPA47-48; citations omitted).  Accordingly, the Court granted summary judgment to Appellees.  (SPA52-53).[10]

---

[10] The Court did not reach the further requirement that the combination be the same or virtually identical.

14

**G.** **The Court's Rulings Regarding Touring And Merchandising Profits**

**1.** **Motion To Compel Discovery Of Indirect Profits**

During fact discovery, SAS sought to compel Sheeran and other Appellees "to produce certain documents relating to [their] 'indirect profits,'" focusing on Sheeran's revenues and expenses from "touring" and "merchandise." (A113; A126). SAS did not seek any information concerning any causal nexus. (*Id.*). SAS admitted that concert revenues were "indirect" (A81; A113; A184), but argued its Complaint sufficiently alleged "a nexus between [the alleged] infringement and the[] indirect profits." (A81-82; ECF 130 at 1, 7-16).

Appellees argued that SAS's Complaint offered only a conclusion that Sheeran "experienced a sharp and sudden rise" "as a direct result" of TOL (A39 ¶ 29; *see also* A33 ¶ 11; A34 ¶ 17; A54 ¶ 62; A56 ¶ 70), whereas the undisputed evidence established that Sheeran's success predated TOL (and that TOL's release was unconnected to any concerts). (A210-214 ¶¶ 4-23; A215-216 ¶ 35). Appellees also submitted undisputed evidence from ASCAP and BMI ("PROs") that the concert venues held blanket licenses authorizing the public performance of both TOL and LGO, and thus the performance of TOL in concert could not infringe LGO. (A225-227 ¶¶ 3-10; A234-235 ¶¶ 4-7).

On January 15, 2020, the Court partially granted SAS's motion, requiring production of touring profits and merchandise sold at concerts. (SPA1-10). The

Court found that "SAS <u>plausibly allege[d]</u> that each of Sheeran's live performances of TOL infringed [LGO]." (SPA1). The Court rejected the argument that the PROs' blanket-licenses immunized any alleged infringement. (SPA3-5).[11]

## 2. <u>Summary Judgment On Touring Profits</u>

Appellees' summary judgment motion separately sought dismissal of SAS's claim for indirect touring and merchandising profits, arguing SAS failed to prove any causal nexus between ticket purchases and TOL. (A424-425; A1786-1789 ¶¶ 120-124). SAS cross-moved for summary judgment, claiming that "no showing of nexus is required, or if required has already been satisfied and/or is 'obvious.'" (A1786-1789 ¶¶ 120-124). The Court held concert revenues were direct, overlooking SAS's admission that concert revenues were "indirect," that concert tickets are distinct from the performance of songs in concert and that SAS failed to prove any causal nexus. (SPA29-36).

On reconsideration, the Court expressly denied SAS's cross-motion for summary judgment, mooting its prior determination. (SPA52).

---

[11] Contrary to SAS's claim on appeal, the Court did not find any causal nexus between ticket sales and the alleged infringement.

## SUMMARY OF ARGUMENT

Under the 1909 Act, "complete copies" of the "best edition" of a musical composition as published were required to be deposited with the Copyright Office. The deposit copies were required to be in sheet music or other visibly perceptible form. Mechanical reproductions, whether piano rolls or later phonorecords, were not visibly perceptible, did not publish the underlying composition and were not "copies."

Consistent with the plain language of the 1909 Act, case authority, the Copyright Office Compendiums and leading treatises, the District Court ruled that copyright protection extends only to the musical composition as expressed in the Deposit Copy. The Court correctly rejected SAS's attempt to imply a bass-line nowhere expressed in the Deposit Copy, barring SAS from claiming infringement of elements not expressed in the Deposit Copy. Here, the elements expressed in LGO's deposit copy allegedly infringed by TOL were limited to an unprotectable commonplace chord progression and the unprotectable commonplace technique of anticipation, both of which, alone and in combination, had been used before LGO.

SAS claimed TOL infringed a combination of two unprotectable musical building blocks – a "selection-and-arrangement" claim – requiring SAS to prove the combination had numerous elements, was original or new and that TOL used the "same" or a virtually identical combination. On reconsideration, the Court correctly

17

granted summary judgment because it found, whether there were two elements or, as it concluded, the two elements merged into one element, the combination was not sufficiently numerous to warrant copyright protection. The Court did not determine whether the combination was original or new to LGO (it was not), nor whether TOL used the same or a virtually identical combination (the evidence established they were different).[12]

Contrary to SAS's assertion, SAS did not file a motion to amend, and the Court did not deny such motion. Instead, in a Memorandum to Counsel questioning the merits of such a motion, the Court granted SAS leave to file a motion to amend; SAS did not do so. Had there been a denial, SAS has not shown any abuse of discretion.

Finally, in denying SAS's summary judgment motion, the Court mooted its earlier ruling that profits from the sale of concert tickets were "direct," and that SAS did not need to prove a causal nexus. Were it not mooted, the Court would have erred. Profits from the sale of concert tickets are indirect, and SAS's failure to prove a causal nexus barred its claim.

---

[12] As discussed below, the Complaint alleged no common law claim, and SAS did not raise any such argument below.

## **ARGUMENT**

## I. **THE DISTRICT COURT CORRECTLY HELD THAT THE DEPOSIT COPY DEFINES THE SCOPE OF COPYRIGHT**

SAS argues there is no support for the Court's determination that LGO's copyright is limited to what is expressed in the Deposit Copy. SAS ignores the plain text of the 1909 Act, the Ninth Circuit's *en banc* decision in *Skidmore as Trustee For The Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1061-64 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 453 (2020), *reh'g denied*, 141 S. Ct. 946 (2020), the amicus brief submitted in *Skidmore* by the Department of Justice on behalf of the Copyright Office, the Copyright Office Compendiums and the leading treatises on copyright law. The District Court's determination was fully supported and correct. It is SAS's argument that lacks support.

### A. **The 1909 Act Required Visibly Perceptible Writings**

Because LGO was registered in 1973, the 1909 Act, as amended and in effect in 1973, determines the scope of LGO's copyright. *See Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999), *cert. denied*, 527 U.S. 1038 (1999).

Under the 1909 Act, to claim copyright protection, "the work had to be reduced to sheet music or other manuscript form." 1 *Nimmer on Copyright* § 2.05[A][1][a] (2023) ("Nimmer"); *accord Skidmore*, 952 F.3d at 1061-64; *Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *4 (6th Cir. Jan. 24, 2023) (endorsing

19

*Skidmore*) (unpublished).

## 1.     *White-Smith* And The Ensuing 1909 Act

The 1909 Act was enacted following the Supreme Court's 1908 decision in *White-Smith Music Publ'g Co. v. Apollo Co.*, which held that a "copy" of a musical composition required "a written or printed record of it in intelligible notation," and that piano rolls, therefore, were not "copies" and could not infringe a musical composition copyright.  209 U.S. 1, 17, 18 (1908).

The 1909 Act did not grant copyright protection to mechanical reproductions of musical compositions or make them "copies" of the composition.  Amici's assertion that the 1909 Act expanded "copyright protection beyond sheet music" is false.  (Amici Br. at 9; emphasis omitted).[13]  Rather, as stated in the House Report on the Copyright Act of 1909, 60th Congress, 2d Session, Report No. 2222 (February 1909) ("1909 House Report"): "[I]t is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such devices;"[14] *see also* Harry G. Henn, Copyright Office Study No. 5, *The Compulsory License Provisions Of The*

---

[13] "Amici" refers to the amici that submitted an amicus brief in support of SAS (the "Amici Br.," available at Appellate ECF 48-2).  One of the amici was the plaintiff in *Skidmore*.

[14] A copy of the 1909 House Report is available at: https://tinyurl.com/4ped2a6w.

*U.S. Copyright Law* (1956) at 19 ("While the copyright law since 1909 has protected … musical compositions against recording and mechanical reproduction, [the 1909 Act] has not changed the ruling in [*White-Smith*] that recordings were not 'copies' of the musical composition or 'writings' of an author within the scope of the existing copyright statute.");[15] Alfred M. Shafter, *Musical Copyright* (1932) at 27 (under the 1909 Act, "music must appear on music paper, or ruled paper, so that it may be read.  <u>Without this visible manifestation, the music cannot be granted protection</u> … the present statute insists on a form that is 'intelligible.'").[16]

Instead, Section 1(e) of the 1909 Act prescribed that "one who had copyrighted a musical composition by publishing <u>written</u> copies thereof with the copyright notice had the exclusive right to make records thereof."  *Capitol Recs., Inc. v. Mercury Rec. Corp.*, 221 F.2d 657, 660 (2d Cir. 1955).  Thus, subject to a compulsory licensing regime, the 1909 Act granted copyright owners of compositions the right to enjoin unauthorized mechanical reproductions.  17 U.S.C. § 1(e) (1971).  "Nothing in the [1909] Act indicates an intention that the record shall

---

[15] In *Goldstein v. California,* 412 U.S. 546 (1973), the Supreme Court's reference to phonorecords being considered "as copies" under the 1909 Act simply reflected that the use of compositions in phonorecords had to be licensed.  The Court observed that the 1909 House Report considered phonorecords as a "component part of a machine, capable of reproducing an original composition."

[16] The 1909 House Report explains that under Section 4 of the 1909 Act, the use of the word "writings" of an author was "not intended … to change in any way the construction which the courts have given to it," and the Supreme Court had interpreted the term "writings" to be limited to "the ideas in the mind of the author [which] are given <u>visible</u> expression."  *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884).

21

be the 'copyrighted work.'" *Capitol Recs.*, 221 F.2d at 660 (footnote omitted).

*Accord Skidmore*, 952 F.3d at 1061 ("Although the 1909 Act extended copyright

protection against infringement beyond the mere reproduction of the sheet music,

Congress did not provide that copyrighted works could be anything other than sheet

music").

### 2. The Plain Text Of The 1909 Act

### a. The Publication And Deposit Requirements

Under the 1976 Copyright Act (as amended, the "Current Act"), "[c]opyright

protection subsists" automatically upon a work being "fixed in any tangible medium

of expression." 17 U.S.C. § 102(a) (1976). In contrast, securing copyright

protection under the 1909 Act required adherence to specific formalities. As

relevant here, if published, the 1909 Act required publication in visibly perceptible

form with a copyright notice. 17 U.S.C. §§ 10, 20. Registration required the deposit

of "two complete copies" of the "best edition" of the sheet music as published. 17

U.S.C. § 13.

Specifically, Section 13 of the 1909 Act provided:

> After copyright has been <u>secured by publication</u> of the work <u>with the
> notice of copyright</u> as provided in section 10 of this title, there shall be
> promptly <u>deposited</u> in the Copyright Office … two <u>complete copies</u> of
> the <u>best edition thereof then published</u> … .

17 U.S.C. § 13 (1956). A copyright owner's failure to deposit "the copies called for

by section 13" could result in the copyright becoming "void." 17 U.S.C. § 14

(1947).[17]

The deposit copy requirement for published works – by its express terms requiring "complete copies of the best edition thereof then published" – necessarily required that the deposit copies correspond to the as-published sheet music for which copyright had been secured. *See Skidmore*, 952 F.3d at 1063 (citing *Register's Report on the General Revision of the U.S. Copyright Law* (1961) ("the act of 1909 inaugurated the present system: copyright is now secured by publication of the work with the copyright notice, and registration is made later when copies of the work as published are deposited")); *accord* 17 U.S.C. § 13 (1956) (subject to inapplicable exceptions, deposit copies must correspond to "the work as published").

That authors could "secure copyright" by "publication" under the 1909 Act is significant because, prior to the effective date of the 1976 Act (January 1, 1978), the only way an author of a musical composition could "publish" the composition with notice was through sheet music or in another written, printed format. "The distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of any musical work, dramatic work, or literary work embodied therein." 17 U.S.C. § 303(b) (1997); *see also Rosette v. Rainbo Rec. Mfg. Corp.*, 546 F.2d 461, 463 (2d Cir. 1976).

---

[17] Copyright for an unpublished work could be obtained "by the deposit, with claim of copyright, of one complete copy of such work … ." 17 U.S.C. § 12 (1947). As discussed below, under the 1909 Act, common law rights ceased to exist when statutory copyright was obtained.

Amici's assertion that "paper sheet music deposit[s]" were only required because "accepting piano rolls" would have been "impracticable" (Amici Br. at 22), is a fabrication. As discussed above, phonorecords were not "copies" of compositions. *See* 37 C.F.R. § 202.8(b) (1959) ("A phonograph record or other sound recording is <u>not</u> considered a 'copy' of the compositions recorded on it, and is <u>not</u> acceptable for copyright registration"); 37 C.F.R. § 202.8(b) (1967) (same). *See also* U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices § 2.6.2.II (1st ed. 1967) ("1967 Compendium") ("When a sound recording is deposited, the Office will reject the claim but point out to the applicant the possibility of <u>writing out the composition in manuscript form</u> and then making registration on the basis of the manuscript.").[18]

Congress amended the 1909 Act three times after the Register promulgated the 1959 Regulations without change to the publication and deposit requirements for musical compositions. *See* PL 87-646 (Sept. 7, 1962); PL 92-140 (Oct. 15, 1971); PL 93-573 (Dec. 31, 1974). Congress thus adopted the Register's interpretation of the 1909 Act. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change") (citations

---

[18] The 1967 Compendium is available at: www.copyright.gov/comp3/1967version/Compendium-I-1967.pdf.

omitted).

SAS asserts, out of whole cloth, that deposit copies only provide "minimal indicia" of the copyrighted work and that the 1909 Act does not limit copyright protection to the Deposit Copy. (SAS Br. at 15, 19). The plain text of the 1909 Act required "complete copies" of musical compositions, not "identifying" material. While Section 13 of the 1909 Act itemized certain narrow classes of works for which the Register of Copyrights could, due to "their size, weight, fragility, or monetary value," authorize the deposit of "photographs" or "identifying reproductions" in lieu of "complete copies," class "e" musical compositions were <u>not</u> included in that abbreviated list. 17 U.S.C. § 13 (1956). Similarly, for unpublished works, Section 12 exempted certain classes of works from the "complete copy" requirement – *e.g.*, "motion-picture photoplay[s]" – but it did <u>not</u> exempt musical compositions. 17 U.S.C. § 12 (1947). Even Amici concede the Deposit Copy only published "the notes on the sheet music," <u>not</u> elements allegedly expressed elsewhere, such as in the Gaye Recording (or any other recording of LGO). (Appellate ECF 61 at 10 n.6).

LGO was registered as a published musical work, and "two <u>complete copies</u> of the <u>best edition thereof then published</u>" were deposited with and registered by the Copyright Office. (A569-575; A840-845). The published sheet music – the Deposit

Copy – <u>is</u> the copyrighted work.[19]

### b.    <u>The Notice Requirement</u>

Section 20 of the 1909 Act provides that the "notice of copyright shall be applied, in the case of … a musical work either <u>upon its title page or the first page of music</u> … ."  17 U.S.C. § 20 (1971).  Phonorecords do not include a "title page" or any "page[s] of music."  *See Neal v. Thomas Organ Co.*, 325 F.2d 978, 983 (9th Cir. 1963) (citing *Capitol Recs.*, 221 F.2d at 660-61), *abrogated on other grounds by Lone Ranger Television, Inc. v. Program Radio Corp*., 740 F.2d 718, 723 (9th Cir. 1984); *see also* 1909 House Report (at discussion of Sections 18 and 19 of 1909 Act, as originally enacted).

### c.    <u>The 1971 Sound Recording Amendment</u>

In 1971, Congress amended the 1909 Act to extend copyright protection to sound recordings under class "n," prohibiting only actual duplication of the sound recording.  17 U.S.C. § 5 (1971).  Phonorecords could then serve as deposit copies for sound recordings <u>but not for any other class of work</u>.  *See* 17 U.S.C. § 26 (1971) ("For the purposes of this section [*i.e.*, Section 26], and sections 10, 11, 13, 14, 21, 101, 106, 109, 209, 215, <u>but not for any other purpose</u>, a reproduction of a work described in subsection 5(n) [*i.e.*, "Sound recordings"] shall be considered to be <u>a</u>

---

[19] Amici's speculation that sheet music for LGO may have never been published ignores the Copyright Application, which certifies the deposited sheet music had been published.  (A569-570).

copy thereof … .").  Sheet music continued to be required as the deposit copy for compositions.[20]

Phonorecords could not serve as deposit copies for compositions until the effective date of the Current Act, which distinguishes between copies and phonorecords.  *See* 17 U.S.C. § 408(b)(2) (permitting the deposit of "copies <u>or</u> phonorecords"); 17 U.S.C. § 101 (defining "copies" as "material objects <u>other than</u> phonorecords" and defining "phonorecords" as "material objects in which sounds … are fixed").  *See also* U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices §§ 405.01, 405.01(a), 405.03 (2d ed. 1984).

### 3.    The Copyright Office Compendiums

While disparaging the authorities relied on by the Court, SAS admits the Copyright Office Compendiums are entitled to "deference" "so long as the Copyright Office's interpretations do not conflict with the express statutory language of the Copyright Act."  (SAS Br. at 22; citation, quotation & emphasis omitted).  SAS and Amici identify no such conflict.

---

[20] Upon passage of the 1971 amendments, the Register promulgated amended Regulations which reiterated that phonorecords did not qualify as "copies" of musical compositions and which made clear that "Registration for a sound recording in Class N does <u>not</u> cover the musical composition … ."  37 C.F.R. §§ 202.8(b), 202.15a (1972).

### a.     The 1967 Compendium

The 1967 Compendium, applicable when LGO was registered, states that "protection extends *only* to the material actually deposited," thus encouraging the submission of complete works.  § 2.6.1.II.a.  This applies equally to published and unpublished works (particularly given that, for published works, the 1909 Act required the deposit of complete copies of the "best edition" published).

### b.     The Current Compendium

The Current Compendium, in a section cited by the Court (SPA14), explains that: "[o]rdinarily, a registration for a work of authorship only covers the material that is included in the deposit copy(ies).  It does not cover authorship that does not appear in the deposit copy(ies) … ."  U.S. Copyright Office, Compendium Of U.S. Copyright Office Practices § 504.2 (3d. ed 2021) (the "Current Compendium").[21]

SAS selectively quotes Section 504.2, straining to support its argument that the deposit copy "identifies" but does not define the work, stating that "[a] work of authorship that is registered with identifying material … may cover the entire copyrightable content of the work, notwithstanding the fact that the applicant did not submit a copy of the entire work."  (*Id.*; emphasis omitted; ellipsis inserted by SAS). SAS omits mentioning that "identifying material" is permitted only in two limited

---

[21] The Copyright Office published the Current Compendium in 2017 and issued revisions in 2021. The 2021 revisions left Section 504.2 unchanged.

exceptions, neither of which applies to musical compositions. *See id.* §§ 1506, 1508.8.[22]

Misrepresenting the Current Compendium, SAS argues that proprietors of "[m]usical works published in motion pictures," may "submit identifying material instead of submitting a copy of the actual motion picture." (SAS Br. at 28-29). SAS omits mentioning the applicant must submit "[a] transcription of the entire musical work," or "[a] reproduction of the entire musical work on a phonorecord." Current Compendium § 1509.2(A)(2)(d).

Inconsistent with its own argument, SAS then complains that the "two limited exceptions" permitting "identifying material" in lieu of "complete copies" (inapplicable to musical compositions) (*id.* § 504.2) unfairly "treat[s] registrants of different types of works unequally," and that "the Copyright Office does not have the statutory authority to do so." (SAS Br. at 28, 30; capitalization altered). This "equal protection" argument is fatuous. Both the 1909 Act and Current Act expressly authorize the Register of Copyrights to do exactly what SAS claims it lacks authority to do. *See* 17 U.S.C. § 207 (1947); 17 U.S.C. § 408(c)(1) (1976); *see*

---

[22] The Current Act authorizes the Copyright Office to issue regulations for "particular classes" of works allowing "the deposit of identifying material instead of copies or phonorecords." 17 U.S.C. § 408(c)(1); *see also* H.R. Rep. No. 94-1476 1976 (Sept. 3, 1976) at *153-54 (hereafter the "1976 House Report") (identifying material permitted where "the copies or phonorecords are bulky, unwieldy, easily broken, or otherwise impractical to file"). This is consistent with Section 13 of the 1909 Act with respect to bulky or fragile material. Sheet music did not and does not fall into any of these categories.

*also* 17 U.S.C. § 13 (1956).

Finally, Amici assert there is a supposed contradiction between the Current Act protecting a work at the moment of fixation and the Current Compendium's statement that a registration only covers the material deposited. (Amici Br. at 24). The argument is irrelevant and wrong. This lawsuit is not based on the Current Act but on LGO's 1973 registration under the 1909 Act and the content of the Deposit Copy submitted with that registration. (A569-575). And there is no contradiction. While works created on and after January 1, 1978 are protected upon fixation, registration is required to sue, and a registration only covers the specific <u>version</u> of the work deposited. *See Well-Made Toy Mfg. v. Goffa Int'l Corp.*, 354 F.3d 112, 115-16 (2d Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161-69 (2010); James E. Hawes and Bernard C. Dietz, *Copyright Registration Practice* § 23:7, n.39 (Oct. 2023 Update) ("Any suit for copyright infringement will be limited to that material actually included in the copyright registration").

### 4. Appellant And Amici Cannot Use "Common Law" Copyright To Expand The Scope Of Federal Copyright

While Amici and SAS claim musical elements nowhere expressed in the Deposit Copy (but supposedly in the Gaye Recording) are protected by common law (Amici Br. at 12-16; SAS Br. at 15 n.6), there is no common law claim in the Complaint, and SAS has no copyright interest in the Gaye Recording. (A38-39 ¶ 27;

30

A56-58 ¶¶ 70-76).   Also, because SAS could have, but never made any such argument below (A1300-06), it is waived.  *See, e.g.*, *George v. Starbucks Corp.*, 857 F. App'x 705, 707 (2d Cir. 2021) ("Where a 'line of argument was not developed below,' we consider it forfeited"); *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) ("party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal").[23]

Amici and SAS ignore that it is undisputed that LGO's publication in sheet music with copyright notice invested it with statutory copyright in 1973 and divested LGO of all common law rights.  *See Shoptalk*, 168 F.3d at 590; *Roy Export Co. Establishment of Vaduz v. Columbia Broad. Sys*., 672 F.2d 1095, 1101 (2d Cir. 1982), *cert. denied*, 459 U.S. 826 (1982).  Having secured federal copyright protection for LGO, by publication with a copyright notice and registration of the sheet music as expressed in the Deposit Copy, the copyright owners of LGO no longer had common law protection.

In enacting the federal copyright laws, "Congress did not sanction an existing right, but underlined created a new one."  *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932); *accord Caliga v. Inter Ocean Newspaper Co*., 215 U.S. 182, 188 (1909).  As the

---

[23] Nor may Amici advance an argument SAS failed to make below.  *See Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 28 (1st Cir. 2011).

Supreme Court stated in *Bong v. Alfred S. Campbell Art Co.*, 214 U.S. 236, 247 (1909), "it is not necessary to consider what right plaintiff might have had under the common law before he sought his Federal copyright and published the [work]." (Citation & quotation omitted).[24]

Purporting to invoke the carve-out to preemption in Section 301(b)(1) of the Current Act, Amici argue that "works prior to 1976 were protected as created by the common law." (Amici Br. at 18-19). But the carve-out merely clarifies that "works of authorship not fixed in any tangible medium of expression" are "not affected by the preemption of section 301." 1976 House Report at *131. LGO's Deposit Copy is sheet music, a tangible medium of expression, and it was registered for statutory copyright protection. The carve-out is inapplicable.[25]

If it is Amici's contention that the Gaye Recording itself was entitled to common law protection, it is wrong for at least three reasons. *First*, SAS has no copyright interest in the Gaye Recording, only the LGO composition. (A38-39 ¶ 27). *Second*, and following from the first point, the Complaint alleges infringement

---

[24] In *Bong*, plaintiff argued that, because he had a common law right prior to registration, he should not be non-suited after registration because the author was not entitled to a statutory copyright.

[25] Amici also misrepresents Section 2 of the 1909 Act (17 U.S.C. § 2 (1947)), which merely clarifies that the enactment of the 1909 Act did not "annul" rights already existing at common law. Section 2 of the 1909 Act did not address common law copyrights at all, and "the 1909 Act itself appeared clearly to use the term 'copyright' only when it was referring to the statutory copyright." *Shoptalk*, 168 F.3d at 591; *see also Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1235-36 (9th Cir. 1998) (making clear that Section 2 does not protect against a divesting publication). Section 2 is inapplicable here, as LGO obtained statutory copyright.

of the LGO composition, not the Gaye Recording (which is only protected against actual duplication of the recording itself). (A56-58 ¶¶ 70-76). *Third*, on January 1, 1978, any common law copyright protection that allegedly existed for the Gaye Recording was preempted pursuant to Section 301 of the Current Act.

### B. Appellant And Amici Distort The Deposit Copy Requirement

SAS proposes copyright protection not for what is expressed but for anything any expert might imply, gutting a central purpose of the deposit requirement.

In *Merrell v. Tice*, cited by the District Court (SPA13), the Supreme Court held the deposit requirement provides notice and clarifies "precisely what [is] the subject of copyright." 104 U.S. 557, 561 (1881). SAS attempts to distinguish *Merrell* by arguing it did not address the 1909 Act, and that the Supreme Court merely "decided" that "what Tice had submitted" to the Copyright Office – the deposit copy – was not "sufficient." (SAS Br. at 16). Both proffered "distinctions" lack merit.

*First*, Tice's submission was not "sufficient" because Tice failed to present any evidence "show[ing] that any copy or copies of the book had been deposited." *Merrell*, 104 U.S. at 559. Such "copy or copies of the book" would have secured Tice's copyright and defined "precisely" "the subject of copyright." *Id.* at 559, 561.

*Second*, while *Merrell* was decided under an earlier Copyright Act, the purpose of the deposit requirement did not change. *See Skidmore*, 952 F.3d at 1062

33

("The purpose of the deposit is to make a record of the claimed copyright, provide notice to third parties, and prevent confusion about the scope of the copyright") (citations omitted); *see also Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F. Supp. 2d 514, 520 (S.D.N.Y. 2005); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161-62 (1st Cir. 1994); 1967 Compendium §§ 2.6.2-2.6.3, 5.2.2, 5.3.1-5.3.2, 5.4.1.

SAS's attempt to imply non-expressed elements into the Deposit Copy is an attempted end-run around the text of the 1909 Act, the Compendiums and the express position of the Copyright Office. It is contrary to *Skidmore* and *Parker*, but not only them. In assessing whether a registration itself is valid, several Circuits require the "copy submitted [to] be a <u>bona fide</u> copy – that is, 'virtually identical to the original … .'" *Nova Design Build, Inc. v. Grace Hotels, LLC*, 652 F.3d 814, 817 (7th Cir. 2011) (citation & quotation omitted); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (underscoring "limitless" "possibilities for fraud") (citation & quotation omitted).

Amici also misrepresent *Washingtonian Publ'g Co. v. Pearson*, 306 U.S. 30, 41 (1939), arguing that the 1909 Act supposedly "does not address and is not meant to address the creation of copyright or its scope." Amici Br. at 14. However, the 1909 Act expressly addresses the "secur[ing]" of copyright (17 U.S.C. §§ 10, 12), and the Deposit Copy defines its scope. While the deposit of copies was not

"indispensable to the existence of copyright" for published works (306 U.S. at 41), publication with notice was, and the 1909 Act required the deposit of "complete copies" of the "best edition" of the work as published to identify the copyright which had been "secure[d]." 17 U.S.C. §§ 10, 13. The failure to do so could "void" the copyright. 17 U.S.C. § 14.

Conflating "access" with the scope of copyright, SAS argues that "today's composers" do not "visit[] the Library of Congress to inspect deposit copies," implying Sheeran copied LGO from the Gaye Recording. (SAS Br. at 17).[26] While copying can be proved by access to a distinct work that incorporates elements of the copyrighted work, that has nothing to do with what is copyrighted nor expand the scope of copyright of the original work. *See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993); *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995). Moreover, SAS's "access" argument is nonsensical because the LGO Deposit Copy was the "best edition" of the published sheet music, meaning it is publicly available.

Amici's citation to *Nat'l Conf. of Bar Examiners v. Multistate Legal Stud., Inc.*, 692 F.2d 478, 487 (7th Cir. 1982), *cert. denied*, 464 U.S. 814 (1983) is dually misplaced: it addresses the deposit requirement under the Current Act, not the 1909 Act, and the Court addressed only whether the deposit requirement implicates public

---

[26] Again, the *Griffin* jury found that Sheeran copied nothing, independently creating TOL.

35

disclosure of what is copyrighted, not whether the deposit copy defines the scope of copyright. Scope of copyright is what *Merrell*, *Skidmore*, *Parker* and the Court below specifically addressed. As the Supreme Court held in *Merrell*: the deposit copy enables courts and litigants "to ascertain precisely what [is] the subject of copyright." 104 U.S. at 561.[27]

## C. SAS's Reliance On *Data Gen.*, *Nicholls* And *FireSabre* Is Misplaced

SAS cites *Data Gen.*, 36 F.3d at 1147, *Nicholls*, 367 F. Supp. 2d at 514, and *FireSabre Consulting LLC v. Sheehy*, No. 11-cv-4719 (CS), 2013 WL 5420977 (S.D.N.Y. Sept. 26, 2013), for the supposed proposition that deposit copies "identify – but are never identical to – underlying copyrighted works." (SAS Br. at 26-27). These cases actually refute SAS's argument.

In *Data Gen.*, the issue was whether inadvertent errors in deposited computer code <u>invalidated</u> the copyright under the Current Act. 36 F.3d at 1161-62. SAS seizes on the Court's reference to Section 408(b) of the Current Act serving the purpose of "providing the Library's Copyright Office with sufficient material to identify the work in which the registrant claims a copyright." *Id.* SAS ignores that the issue in *Data General* was invalidation of the copyright – a different inquiry than

---

[27] *Skidmore's* observation that "[t]he deposit copy carries less importance for published works" (905 F.3d 1116, 1133 (9th Cir. 2018) (citation omitted)), reflects that there were storage limitations. *See, e.g.*, 1976 House Report at *171. By definition, published works provide publicly available evidence of the scope of the copyrighted work. *Id.* However, courts have looked to deposit copies as record evidence. *Unistrut Corp. v. Power*, 280 F.2d 18, 23 (1st Cir. 1960). Here, the Deposit Copy was retained by, and obtained from, the Copyright Office.

scope of copyright in an infringement action – and involved computer code, a class of work, unlike compositions, where the Copyright Office permits "identifying material."

The *Data Gen.* Court also carefully distinguished its decision from an earlier First Circuit opinion in which the Court barred a claimant under the 1909 Act from claiming ownership over elements <u>not</u> included in its deposit copy (consistent with *Skidmore*). *Id.* at 1163 n.27 (citing *Unistrut Corp.*, 280 F.2d at 23 ("insufficient proof of infringement" where "there was no proof" that allegedly copied material "was contained" in the "edition" "deposited with the Copyright Office")).

*Nicholls* held that a copyrighted carpet design extended to "any color" of the design where the deposit copy did "not designate [any] specific colors" for the design but identified "where each of four <u>generically-designated</u> colors should appear." 367 F. Supp. 2d at 520. As applicable to this case, the Court noted that color schemes that deviated from the generic "pattern" deposited with the Copyright Office were "<u>not</u> protected by the copyright at issue in this lawsuit," holding that "a copyright does <u>not</u> encompass designs that <u>vary in essential respects</u> from what was presented to the Copyright Office. <u>Otherwise, the purposes of the deposit requirement would be nullified.</u>" *Id.* (citation omitted).

Finally, in *FireSabre*, the Court found "no reason to exclude from the scope of the copyright any component Plaintiff created that <u>is</u> visible in the deposit

37

materials." 2013 WL 5420977, at *6. In other words, protection extended to visible material actually deposited with the Copyright Office; it did <u>not</u> extend to matter not visible in the deposited materials.

These cases are consistent with the Court's decision, which is fully in accord with *Merrell*, *Skidmore*, *Parker* and, as noted above, *Unistrut*. It is undisputed that the LGO Deposit Copy does not notate a bass part or a drum pattern. (A840-45). Nor does it include horns, flute, guitar, other string instruments or a specific tempo. Such elements, which may appear in the Gaye Recording or other recordings, deviate from "what was presented to the Copyright Office." *Nicholls*, 367 F. Supp. 2d at 520. If the scope of copyright encompassed elements not expressed but which anyone might imply, it would undermine a central purpose of the deposit requirement.[28]

### D. Appellant's And Amici's Remaining Deposit Copy Arguments Fail

SAS's remaining attacks on the Court's Deposit Copy ruling underscore the lack of merit of its appeal.

*First*, SAS tries to convert the Supreme Court's observation in *Goldstein* that the 1909 Act and House Report "should not be read as if they were written today,

---

[28] Amici's claim that the "*Three Boys Music* prejudice analysis should be applied" (Amici Br. at 24), ignores that, like *Data Gen.*, *Three Boys Music* involved whether "minor" "inaccuracies" invalidated the copyright. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486-87 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2001). Invalidation is a different inquiry than what is protected by copyright.

for to do so would inevitably distort their intended meaning" (412 U.S. at 564), into a general proposition that the Supreme Court (and Professor Nimmer) supposedly "caution against limitations on the scope of copyrights based on past practice." (SAS Br. at 23; capitalization altered). This "proposition" has no footing in *Goldstein*, a preemption case having nothing to do with deposit copies or the scope of copyright. SAS's assertion that, upon passage of the 1909 Act, "it had not yet dawned on copyright owners" whether "piano rolls and the like" could "be a 'copy' of music for protection purposes" (SAS Br. at 24), is belied by *White-Smith* and the 1909 House Report. (*Supra* § I.A.1).

Further, Nimmer's observation, quoted by SAS, that "[i]n contrast to the strictures [of the 1909 Act]," under the 1976 Act, "it is no longer necessary that the medium be visibly intelligible" (SAS Br. at 25-26 (quoting Nimmer § 2.05[A][2][a] (2023; emphasis added by SAS)), simply acknowledges the undisputed fact that the Current Act differs from the 1909 Act. It has nothing to do with the Deposit Copy requirements of the 1909 Act.

*Second*, SAS advances another "equal protection" argument, raised for the first time on appeal, complaining about the alleged disparate treatment of US and foreign authors, arguing the Deposit Copy ruling represents an "apparent violation" of the Berne Convention. (SAS Br. at 32-35, capitalization altered). It does not, and the argument completely ignores that, upon the United States acceding to Berne in

39

1988, it was recognized that Berne would "disadvantage[]" American authors in certain respects. Nimmer § 7.16[B][6][c]. SAS distorts the "need for equal treatment," which addressed the need for US authors to receive the same treatment in Berne countries that foreign authors receive here (it has nothing to do with the deposit requirements).

*Third*, theorizing that many composers failed to notate "common elements" on sheet music, Amici speculate that the Deposit Copy ruling "divest[s] hundreds of thousands of 1909 Act copyright owners of ownership in their works." (Amici Br. at 26, 28). But this assumes that songwriters ignored the explicit requirement of the 1909 Act and failed to deposit the "best edition" of their published sheet music. In fact, as Amici ultimately admit, songwriters and publishers were required, and had every incentive, to make their deposit copies "as complete as possible." (Amici Br. at 23).

The District Court's Deposit Copy decision is supported by the plain language of the 1909 Act, its legislative history, the Copyright Office Compendiums, treatises and more than a century of jurisprudence – including the recent *Parker* and *Skidmore* decisions from the Sixth and Ninth Circuits. It should be affirmed.

## II.  THE COURT PROPERLY BARRED EVIDENCE IMPLYING AN UNEXPRESSED BASS-LINE INTO THE DEPOSIT COPY

Ignoring the evidence (including Covach's admission that a bass-line is "not literally notated in the deposit copy") (A699-700 ¶ 2), SAS pretends lay people cannot discern if the Deposit Copy contains a bass-line, and that it should have been permitted to offer "expert evidence regarding the proper interpretation" of the Deposit Copy.  (SAS Br. at 38; emphasis omitted).  This is a euphemism for allowing an expert to "imply" elements into the Deposit Copy that are not expressed.[29]

Having admitted no bass-line is expressed in the Deposit Copy, Covach proposed implying "the simplest and most obvious bass line" that musicians supposedly would "posit," corresponding to the lowest note of each chord, because "any performer must play a bass line of some kind in order to realize the [Deposit Copy]."  (A703-704 ¶ 6; A462 ¶ 8; *see also* A699-700 ¶ 2).

But Covach admitted "many possibilities" for a bass-line "exist," and that the bass-line he "posited" was simply one example.  (A703-704 ¶¶ 6-7).  In fact, dozens of theoretical bass-lines could be implied.  (A534 ¶ 90, A540 ¶ 109; A830-831 ¶¶ 18-20).   And that underscores the problem created by allowing elements not expressed in a deposit copy to be implied: it expands the scope of copyright in almost

---

[29] SAS also proposes its experts should be allowed to imply into the Deposit Copy "many" other elements of the Gaye Recording.  (*Id.* at 38-39).

41

limitless ways, opening the door to fraud.[30]

The scope of copyright is a legal question to be decided by the Court. It is not the province of an expert to opine on the scope of copyright. *See, e.g.*, *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F. 2d 693, 707 (2d Cir. 1992); *Williams v. Bridgeport Music, Inc.*, No. 13-cv-6004 (JAK), 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014), *aff'd sub nom. Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018).

In contrast to SAS's attempt to imply elements not expressed in the Deposit Copy, the District Court held that the Deposit Copy – as a matter of empirical verifiable fact – does <u>not</u> notate a bass-line. (SPA15; A840-845). The decision to admit expert testimony is left to the broad discretion of the trial judge and will not be overturned unless "manifestly erroneous." *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994). The Court's decision is manifestly correct.

SAS has not cited a single case permitting elements not expressed in a deposit copy to be implied by an expert. Instead, SAS cites only the basic *Daubert* standard – whether the opinion is based on "reliable" methods and principles – and then offers that an expert may opine on how "certain classes of persons will behave under certain circumstances." (SAS Br. at 41-42; citations omitted).[31] In *Nicholls*,

---

[30] The bass-line "posited" by Covach is not even the bass-line performed on the Gaye Recording.

[31] SAS presumably offers this to undergird Covach's speculation regarding how some musicians might perform LGO, which still has nothing to do with the scope of copyright.

invoked by SAS, the Court, not an expert, determined the scope of copyright.  367

F. Supp 2d at 520.

The decision below, that "copyright law protects only that which is literally

expressed, not that which might be inferred or possibly derived from what is

expressed," was correct.  (SPA15; citation & quotation omitted).[32]

## III.    SUMMARY JUDGMENT SHOULD BE AFFIRMED

### A.    The Copyright Infringement Standard

#### 1.    Unprotectable Musical Elements

This Court has observed that "while there are an enormous number of possible

permutations of the musical notes of the scale, only a few are pleasing; and much

fewer still suit the infantile demands of the popular ear.  Recurrence is not therefore

an inevitable badge of plagiarism." *Darrell v. Joe Morris Music*, 113 F.2d 80, 80

(2d Cir. 1940); *accord Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988).

Thus, "[a]lthough there is generally a low bar for originality in copyright,

given the limited number of notes and chords available to composers, and because

common themes frequently reappear in various compositions, many if not most of

the elements that appear in popular music are not individually protectable." *Gray v.*

*Perry*, No. 2:15-cv-05642 (CAS), 2020 WL 1275221, at *4 (C.D. Cal. Mar. 16, 2020)

---

[32] In any event, implying a bass-line consisting of the lowest notes in each chord is redundant of the chord progression, not a separate element.  (A542-543 ¶¶ 114-116).  And whether two or three elements, it would not satisfy the numerosity requirement.  *See infra* § III.A.2.

43

(citations & quotations omitted), *aff'd sub nom. Gray v. Hudson*, 28 F.4th 87 (9th Cir. 2022).   As explained in *Gray*, "courts in musical copyright cases have a significant obligation … to encourage others to build freely upon the ideas and information conveyed by a work, and at the same time motivate creative activity, by carefully limiting the scope of copyright protection to truly original expression only." 2020 WL 1275221, at *4.  *See also McDonald v. West*, 138 F. Supp. 3d 448, 454 (S.D.N.Y. 2015), *aff'd*, 669 F. App'x 59 (2d Cir. 2016); *Velez v. Sony Discos*, No. 05-cv-0615 (PKC), 2007 WL 120686, at *12 (S.D.N.Y. Jan. 16, 2007); *Jean v. Bug Music, Inc.*, No. 00-cv-4022 (DC), 2002 WL 287786, at *6 (S.D.N.Y. Feb. 27, 2002); *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 282 (S.D.N.Y. 1991).

Within this framework, infringement plaintiffs must prove that "the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (citation & quotation omitted).  Because "[n]ot every portion or aspect of a copyrighted work is given copyright law's protection," "[c]opying [unprotected] aspects of a work is not wrongful, and thus not all copying is wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014) (emphasis in original).  As such, "the term 'substantial similarity' is properly reserved for similarity that exists between the protected elements of a work and another work." *Id.* at 101.

Where the works "have both protectible and unprotectible elements, [the] analysis must be more discerning," the Court "must attempt to extract the unprotectible elements," and the question of wrongful copying turns on "whether the protectible elements, standing alone, are substantially similar." *Gaito*, 602 F.3d at 66 (citations & quotations omitted).

Here, SAS admitted that, "standing alone," "each element" at issue in this case – the commonplace chord progression and the commonplace anticipation technique – "is unprotectible." (A1780 ¶ 114). Because the only two allegedly infringed elements are unprotectable, SAS asserted a selection-and-arrangement claim, which is subject to more stringent requirements.

## 2. The Selection-And-Arrangement Standard

In *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349, 362 (1991), the Supreme Court held that a selection-and-arrangement of unprotected elements is not entitled to copyright protection when it is "so mechanical or routine as to require no creativity whatsoever." Further, to avoid according a monopoly over unprotectable elements, infringement of a selection-and-arrangement will not be found unless "the competing work" features "the same selection and arrangement." *Id.* at 362; *accord Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 136 (2d Cir. 2003); *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996) ("Where the quantum of originality is slight and the resulting

45

copyright is 'thin,' infringement will be established only by <u>very close copying</u> because the majority of the work is unprotectable") (citation omitted, emphasis added).  The Ninth Circuit's formulation of this latter principle requires that the combination be "virtually identical."  *Skidmore*, 952 F.3d at 1080 (citations & quotations omitted).

Consistent with *Feist*, the Ninth Circuit's articulation of the selection-and-arrangement test also requires that (i) the combined elements be sufficiently "numerous," and (ii) the combination be "new" and "novel."  *Id.* at 1074 (elements must be "numerous enough") (citation & quotation omitted); *id.* at 1075 ("only the '<u>new</u> combination,' that is the '<u>novel</u> arrangement,' and not '<u>any</u> combination of unprotectable elements qualifies for copyright protection.'") (emphasis in original; citations, quotations & ellipsis omitted).  "Trivial elements of compilation and arrangement … fall below the threshold of originality."  *United States v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978).

While the Ninth Circuit's "numerous," "new" and "virtually identical" formulation may not have been expressed *in haec verba* by this Court, they are consistent with *Feist* and this Court's selection-and-arrangement jurisprudence.  *See, e.g.*, *Feist*, 499 U.S. at 349, 362; *Tufenkian*, 338 F.3d at 136 (infringement found where the "<u>number</u> of motifs present" in the selection-and-arrangements were "<u>overwhelming</u>" and the defendant's rug-design "mirror[ed]" the plaintiff's);

46

*Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 674, 682-83 (2d Cir. 1998), *cert. denied*, 526 U.S. 1154 (1999) ("creativity in selection and arrangement [ ] is a function of (i) the total number of options available, (ii) external factors that limit the viability of certain options and render others non-creative, and (iii) prior uses that render certain selections 'garden variety'") (citation omitted); *Kregos v. Associated Press*, 937 F.2d 700, 704-05 (2d Cir. 1991). In *Threeline Imports, Inc. v. Vernikov*, No. 15-cv–02333 (AMD)(RML), 2016 WL 11472749, at *13 (E.D.N.Y. Oct. 28, 2016), the Eastern District endorsed the Ninth Circuit formulation.[33]

## B. The Court's "Numerous" Ruling Should Be Affirmed

In granting summary judgment, the Court held that while "no bright-line rule" exists, "common sense dictates that in the context of a musical composition, 'numerous' requires more than just a commonplace chord progression and harmonic rhythm to warrant protecting their combination," especially given that, here, "the chord progression and the harmonic rhythm (how the chord progression is played) in [LGO] do not form a pattern, but instead essentially merge into one element." (SPA47-48; citations omitted).

As analyzed by the Court, "a protectable mosaic" needs more than "one or

---

[33] The Ninth Circuit's "new" or "novel" requirement can be viewed as an enhanced originality standard for selection-and-arrangement claims, enforcing *Feist's* requirement that protection not be afforded to combinations that are mechanical or routine (as may be evidenced by prior art). The Second Circuit has never adopted a "new" or "novel" requirement, yet *Bender's* examination of prior art to determine if the combination is "garden variety" involves much the same inquiry as the Ninth Circuit's "new" or "novel" standard.

47

two" elements because "[o]therwise, the arrangement is devoid of any contribution from the author," and "is nothing more than an impermissible attempt to copyright what is already in the public domain." (SPA46). The Court found that "[r]equiring numerous unprotected elements" "reinforces the constitutional requisite that a copyrighted work, or a piece of a work, be original enough to warrant protection." (*Id.*).

Consistent with *Darrell*, *Gaste*, and *Gray*, the Court noted that "a songwriter only has finite options for playing a commonplace chord progression," and "that to protect the[] combination" – which appeared in multiple works before and after LGO – would give SAS "an impermissible monopoly" and undermine the express "goal of copyright law." (SPA49; SPA51). And in accord with *Bender*, the Court noted the numerosity requirement ensures copyright law "is not being used to protect combinations that occur routinely without any minimal creative contribution attributable to the author." (SPA46-47).

Having reiterated that no bright-line test exists for numerosity – refuting SAS's assertion that the Court ruled as a matter of law that two elements are never sufficient (SAS Br. at 47-48) – the Court examined cases finding three or four "common musical elements" insufficient. (SPA47-48; citations omitted). The Court's finding that the two commonplace elements here failed the numerosity test is consistent with the overwhelming weight of authority requiring <u>at least</u> four or

48

five distinct elements. *See Gray*, 28 F.4th at 102 ("two-note snippet of a descending minor scale, with some notes repeated" did <u>not</u> qualify); *Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 883 (C.D. Cal. 2020), *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC*, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) (two elements did <u>not</u> qualify);[34] *Smith v. Weeknd*, No. 19-cv-2507 (PA), 2020 WL 4932074, at *7 (C.D. Cal. July 22, 2020), *aff'd sub nom. Clover v. Tesfaye*, No. 20-55861, 2021 WL 4705512 (9th Cir. Oct. 8, 2021) (three elements did <u>not</u> qualify);[35] *Peters v. West*, 776 F. Supp. 2d 742, 751 (N.D. Ill. 2011), *aff'd*, 692 F.3d 629 (7th Cir. 2012) (three elements did <u>not</u> qualify); *Cottrill v. Spears*, No. 02-cv-3646 (BMS), 2003 WL 21223846, at *9 (E.D. Pa. May 22, 2003), *aff'd*, 87 F. App'x 803 (3d Cir. 2004) (four elements did <u>not</u> qualify); *Three Boys*, 212 F.3d at 485 (five elements qualified); *Morrill v. Stefani*, 338 F. Supp. 3d 1051, 1061 (C.D. Cal. 2018) (five elements did <u>not</u> qualify).

As the Court observed, its holding is consistent with the dictionary definition of "numerous:" "many; great in number." (SPA47; citation omitted). *Merriam-Webster* also identifies "few" as an antonym of "numerous" and correspondingly defines "few" to mean "a small number of units or individuals." *See*

---

[34] SAS's claim that there is "no case <u>anywhere</u>" holding two elements cannot qualify for selection-and-arrangement protection (SAS Br. at 45; emphasis in original), is thus untrue.

[35] That the plaintiff sought to combine three elements in *Smith* is confirmed by the district court docket in that case. *See* ECF 131 at 19-20.

https://www.merriam-webster.com/thesaurus/numerous; www.merriam-webster.com/dictionary/few, last accessed December 26, 2023.  Two elements are not "great in number" but instead "few," the opposite of numerous.

In effort to deflect attention from the foregoing authorities and undisputed facts, SAS argues that *Nwosuocha v. Glover*, No. 21-cv-04047 (VM), 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023), cited by the District Court, has "non-analogous facts."  (SAS Br. at 46).  *Nwosuocha's* "facts" are irrelevant.  The Court cited *Nwosuocha* as a case in this Circuit that approved the numerosity requirement.

It is undisputed that there are only two unprotectable elements at issue in this case and, as the Court found, they effectively merge into one element that had been used multiple times before and after LGO.  The Court correctly concluded that granting one user a monopoly over such unprotectable elements would deprive future songwriters of the ability to use basic musical building blocks, contrary to the purpose of the Copyright Act, which, as Justice Stewart observed in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)), is "to stimulate artistic creativity for the general public good."

**C.     The Judgment May Be Affirmed On Two Independent Grounds: The Selection-And-Arrangement In *Let's Get It On* Is Neither "New" Nor "Original" Nor Are The Combinations The "Same"**

While affirmance of the Judgment is fully warranted for all of the foregoing reasons, this Court may "affirm on any ground with support in the record." *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (citation omitted). SAS's failure to satisfy the "new" and "same" requirements also warrant affirmance.[36]

*First*, having failed to perform proper prior art analyses, SAS's experts were barred from opining on prior art. (SPA16; SPA20-21).  SAS thus had no affirmative evidence that LGO's two-element combination was new or original, and its experts admitted it was not.

In contrast, the undisputed evidence established there are multiple songs, both predating and postdating LGO, that combine the same or virtually identical elements. (SPA50-51; *supra* at 9).  Covach admitted *Since I Lost My Baby* (by Ray French) and *Georgy Girl* (by 101 Strings Orchestra) used the same combination.  (SPA50 n.4; A1544-1547 ¶¶ 11-13; A1781-1785 ¶ 116).  Everett admitted that *Georgy Girl* and *Since I Lost My Baby* (as recorded by The Temptations) "us[e] the I-iii-IV-V

---

[36] The Court never reached the "same" or "close copying" requirement.  As for the "new" requirement, although the Court acknowledged that undisputed prior art evidence established prior use of the same combination as LGO, it held such evidence "has no bearing on whether [the combination] is original in [LGO]." (SPA51).  Appellees submit that, while not necessary to affirm the Judgment, consistent with *Feist* and both the Ninth Circuit and *Bender*, it does have bearing. *See Skidmore*, 952 F.3d at 1075.

chord progression" and "share the same pattern of syncopated [*i.e.*, anticipated] chord changes." (A373).[37]

SAS falsely asserts that Covach "explain[ed]" that the prior songs "did not share the same combination of elements." (SAS Br. at 50). Actually, Covach admitted they were the same, only noting <u>other</u> versions were not identical. (A1544-1547 ¶¶ 11-13).[38] SAS also falsely asserts that Amy Wadge's earlier song, which used a nearly identical combination, was the "single song" cited by the Court. (SAS Br. at 49). It was not, and the Court said no such thing.

Thus, not only did SAS not prove that LGO's two-element combination was "new" or "original," the undisputed evidence established it was not.

*Second*, the undisputed evidence shows that TOL's chord progression and harmonic rhythm are both different from LGO in several significant ways. (*Supra* at 9-10). SAS thus also failed to satisfy the requirement that the selection-and-arrangement be the "same" or "virtually identical" in both works. *Feist*, 499 U.S. at 362; *Tufenkian*, 338 F.3d at 136.

---

[37] Everett, who made several material changes in his expert reports, subsequently deleted his admission regarding The Temptations version (A679), but he never disputed Ferrara's findings.

[38] Covach's assertion that the "final chord" was different in *Since I Lost My Baby* was mistaken because his "Example 2" used sheet music for The Temptations version, <u>not</u> the Ray French version. (A1545-1546 ¶ 11). It is undisputed that the final chord in the Ray French version is a "V" chord, the same as LGO and TOL. (A826 ¶ 6; A835 ¶¶ 30-31). Covach also used the wrong sheet music for *Georgy Girl*. (A1546-5147 ¶ 13; A837 ¶ 35). He <u>never</u> disputed that the Ray French and 101 Strings Orchestra versions use the same combination.

### D. Appellant's Argument Regarding The "Commonplace" "Combination" Ruling Should Be Rejected

SAS contends the Court erred in finding that LGO's two elements, individually and in combination, were "commonplace" because it had previously found the experts disagreed whether the combination was "sufficiently uncommon." (SAS Br. at 48). This is a non-issue because the Court based its ruling on the lack of numerosity.

However, the combination <u>is</u> commonplace, and it was the Court's original finding that was in error. Even without conducting any prior art search, Covach admitted that songs prior to LGO likely combined the two elements. (*Supra* at 9, 13). Moreover, because the Court barred Covach and Everett from opining on whether "an element of LGO is unusual" (SPA21), in finding a "disagreement," the Court overlooked its own ruling and relied on expert "evidence" it had barred as lacking foundation. *See, e.g.*, *Major League Baseball Props. Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Further, the evidence the Court originally referenced pertained only to the chord progression in isolation (*i.e.*, the sequence of chords) (SPA24-25; citing A1566-1568 ¶¶ 6-7), and there was no "disagreement" even as to that, as SAS admitted the chord progression was "very common." (A1447 ¶ 6).

Thus, the Court correctly observed, as an "unassailable reality," the undisputed evidence established that multiple prior songs share the same

53

combination as LGO.  (SPA49-51; A524-527 ¶¶ 56-60; *supra* at 9).

## IV.   APPELLANT DID NOT MOVE TO AMEND, AND THE COURT DID NOT DENY A MOTION THAT APPELLANT NEVER MADE

SAS never filed a motion to amend its complaint a fourth time, and the Court never denied the nonexistent motion.  Instead, the Court issued a "Memorandum to Counsel," expressing its negative preliminary view of SAS's proposed amendment, but granting SAS leave to file a formal motion.  (SPA11-12).  The "Memorandum to Counsel" was not a mislabeled ruling or Order determining a motion.  Instead, no different than a Court's expression of its views at a conference, the Memorandum to Counsel identified the Court's doubt such a motion would be successful but granted SAS leave to file the motion, so it could be determined on a full record.  SAS spurned that opportunity and, thus, has no basis for appeal.

But even if there were an appealable order, the Court did not abuse its discretion.  *See, e.g.*, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006). The Court's Memorandum noted "serious concerns of trial administration and jury confusion, let alone difficulties of clear presentation and organized resolution of the issues."  (SPA11; *see also* A395-397).  SAS does not address any of those issues. (SAS Br. at 35-37).

SAS offers only its *ipse dixit* that the amendment would not have "changed the scope of fact discovery, which was already concluded."  (SAS Br. at 36).  In fact, as Appellees explained below, the amendment would have required different expert

54

reports and reopening discovery into, among other things, SAS's 2020 Registration of the Gaye Recording and who authored (and owned) the musical elements in the Gaye Recording that are not in the Deposit Copy.  (A395-397).

## V.  APPELLANT'S TOURING PROFITS CLAIM IS MOOT; IN THE ALTERNATIVE, IT SHOULD HAVE BEEN DISMISSED

In granting summary judgment on reconsideration, the Court also denied SAS's cross motion for summary judgment, thereby mooting the Court's prior ruling regarding SAS's claim for touring profits.  To the extent it were not moot, the Court's prior ruling was in error.

### A.    The Blanket Licenses Negate Any Alleged Infringement

Every Sheeran concert venue had blanket licenses from the PROs authorizing TOL and LGO to be publicly performed.  (*Supra* at 15).  Because both songs were licensed, the profits derived from the sale of tickets to Sheeran's concerts cannot be deemed "attributable to [any] infringement" of LGO under 17 U.S.C. § 504(b).  *See Gray v. Perry*, No. 2:15-cv-5642 (CAS), 2017 WL 1240740, at *9-10 (C.D. Cal. Apr. 3, 2017) ("the [ASCAP] License authorized the Perry defendants to perform both 'Dark Horse' and 'Joyful Noise' and said performance could not have infringed plaintiffs' performance rights in Joyful Noise'"); *Perry v. Gray*, No. 2:15-cv-5642 (CAS), 2019 WL 2992007, at *21 (C.D. Cal. Jul. 5, 2019) (due to blanket license, defendants "could not have infringed plaintiffs' performance rights").

Under the PROs' blanket licenses, Sheeran was entitled to perform both songs.

Assuming TOL incorporated LGO, with or without authorization, while LGO's authors and publisher would be entitled to a share of the performance income paid by the venues to the PROs (to the extent of LGO's alleged use), Sheeran's performance was licensed and not infringing. The Court's conclusion that the blanket licenses do not confer a "right to infringe" overlooks this point. (SPA3-5).

## B.  Profits From Concert Ticket Sales Are Indirect

Under the Current Act, a plaintiff may seek "profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b).[39] Courts have drawn a clear distinction between "direct" and "indirect" profits, requiring a higher showing for "indirect" profits. *See, e.g.*, *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08-cv-7497 (KBF), 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013). "Because of the at-best highly speculative nature of all indirect profits claims ... the decision to send such claims to a jury should be extremely rare." *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10-cv-128 (PAC), 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) (citations, quotations & brackets omitted).

Here, the Court stated that "[p]rofits that arise from the performance of a song are direct whereas profits that may have come about because the performance acted as a draw for other profit centers are indirect." (SPA31). Consistent with its own

---

[39] Infringement actions arising after 1977 are governed by the Current Act; for works registered prior to 1978, the scope of copyright continues to be determined under the 1909 Act. *See* Nimmer § A.01[D]; *Shoptalk*, 168 F.3d at 590.

formulation, the Court overlooked that the performance of TOL directly generated performance income (payable by PROs) whereas the possible performance of the song in concert would only have acted as a draw for the potential sale of concert tickets, a distinct good.

The Court also overlooked that when SAS moved for discovery of touring profits, it repeatedly admitted that such profits were "indirect," and that it needed to prove a "causal nexus." (*Supra* at 15-16).[40] And contrary to SAS's assertion that the Court found that SAS had met its burden of demonstrating a nexus on the discovery motion, the Court merely found that SAS had "plausibly allege[d]" that "Sheeran's live performances of TOL infringed SAS's copyright" in LGO, not that SAS had proved a causal nexus. (SPA1).

In holding that ticket sales are "indirect," *Stoliarov v. Marshmello Creative, LLC*, No. 19-cv-3934 (PSG), 2021 WL 2514167, at *3 (C.D. Cal. Apr. 8, 2021), *aff'd in part, dismissed in part*, No. 21-55442, 2022 WL 819800 (9th Cir. Mar. 17, 2022), noted that one "can surmise virtually endless permutations to account for an individual's decision' to attend one of Defendants' shows ... many of which have nothing to do with [the allegedly infringing song]." (Quoting *Mackie v. Rieser*, 296

---

[40] On summary judgment, SAS about-faced, claiming such profits were "direct" or "obvious." (A1786-1789 ¶¶ 120-124).

F.3d 909, 916 (9th Cir. 2002)).[41]

On the summary judgment motion, SAS provided no evidence of a causal nexus linking the sale of a single concert ticket to the performance of TOL. (A1786-1789 ¶¶ 120-124). Absent such evidence, summary judgment dismissing any claim to touring profits should have been granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[42]

### C. Even Were Touring Profits "Direct," Appellant Still Was Required But Failed To Prove A Causal Nexus

17 U.S.C. § 504(b) requires a causal nexus for both direct and indirect profits. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (citation omitted); *accord Lawton v. Melville Corp.*, 116 F.3d 1472 (2d Cir. 1997) (unpublished opinion); *Complex Sys.*, 2013 WL 5970065, at *3 ("The requirement of a 'causal' nexus … is rooted in the text of the statute itself"). While the Court recognized "a plaintiff must meet only a minimal burden of proof" where profits are "direct" (SPA33 (citations omitted)), there must still be some proof of a causal nexus. *See, e.g., Data Gen.*, 36 F.3d at 1173.

Here, SAS offered no evidence linking the purchase of a single concert ticket

---

[41] On appeal in *Stoliarov*, the Ninth Circuit "dismiss[ed] as moot" the appeal from the touring profits ruling. 2022 WL 819800, at *2.

[42] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985), is not to the contrary. The Ninth Circuit found profits from the sale of tickets "direct" because the revue had fixed and identified musical numbers, and the ASCAP license was not applicable because "visual representations" exceeded the license. *Id.* at 510, 512.

to the performance of TOL at concerts.[43]  There is nothing "obvious" about why concertgoers purchased tickets or whether the purchases were connected to the future, possible performance of TOL in concert.  Nor is there anything in the record that addresses the "virtually endless permutations to account for an individual's decision to attend" a concert.  *Stoliarov*, 2021 WL 2514167, at *3.

Instead, the Court mistakenly conflated how "profits" from infringement are computed – where a plaintiff must prove gross revenues and a defendant must prove deductible expenses and apportionment attributable to non-infringing elements – with the separate causal nexus requirement, thereby completely eliminating any causal nexus requirement.  (SPA33-34).  But whether profits are direct or indirect, a causal nexus between the infringement and the profits must still be shown.

SAS's touring profits claim should have been dismissed because SAS did not offer <u>any</u> evidence to support a causal nexus.

---

[43] SAS's expert assumed the existence of such nexus and merely offered a method for allocating profits.  (A953-957).

59

## **CONCLUSION**

It is respectfully submitted that the judgment should be affirmed.

Dated:      New York, New York
             December 26, 2023

PRYOR CASHMAN LLP

By:_____
    Donald S. Zakarin
    dzakarin@pryorcashman.com
    Ilene S. Farkas
    ifarkas@pryorcashman.com
    Andrew M. Goldsmith
    agoldsmith@pryorcashman.com
    Brian M. Maida
    bmaida@pryorcashman.com
7 Times Square, 41st Floor
New York, New York 10036
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806
*Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the type-volume limitation of FRAP 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 13,942 words.

I further certify that this document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

_____

Donald S. Zakarin

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

Excerpts of 37 C.F.R. 201, et seq. (1959)............................................................. A-1

Excerpts of 37 C.F.R. 201, et seq. (1967)............................................................. A-2

Excerpts of 37 C.F.R. 201, et seq. (1972)............................................................. A-3

# A-1

# Title 37—PATENTS, TRADE-MARKS, AND COPYRIGHTS

## Chapter II—Copyright Office, Library of Congress

### PART 201—GENERAL PROVISIONS
### PART 202—REGISTRATION OF CLAIMS TO COPYRIGHT

Notice of proposed rule making was published in the FEDERAL REGISTER of May 2, 1959, at page 3545. Interested persons were invited to submit written comments, suggestions, or objections with respect to the proposed revision within thirty days of the date of publication in the FEDERAL REGISTER. After consideration of the responses received, Parts 201 and 202 of the regulations are adopted as set forth below, effective upon publication in the FEDERAL REGISTER.

Dated: June 12, 1959.

[SEAL]          ARTHUR FISHER,
          *Register of Copyrights.*

Approved:

L. QUINCY MUMFORD,
          *Librarian of Congress.*

## PART 201—GENERAL PROVISIONS

Sec.
201.1  Communications with the Copyright Office.
201.2  Information given by the Copyright Office.
201.3  Catalog of Copyright Entries.
201.4  Assignments of copyright and other papers.
201.5  Amendments to completed Copyright Office registrations and other records.
201.6  Payment and refund of Copyright Office fees.
201.7  Preparation of catalog card.
201.8  Import statements.

AUTHORITY: §§ 201.1 to 201.8 issued under sec. 207.61 Stat. 666; 17 U.S.C. 207.

### § 201.1  Communications with the Copyright Office.

Mail and other communications shall be addressed to the Register of Copyrights, Library of Congress, Washington 25, D.C.

### § 201.2  Information given by the Copyright Office.

(a) *In general.* (1) Information relative to the operations of the Copyright Office is supplied without charge. A search of the records, indexes and deposits will be made for such information as they may contain relative to copyright claims upon application and payment of the statutory fee. The Copyright Office, however, does not undertake the making of comparisons of copyright deposits to determine similarity between works, nor does it give legal opinions or advice on such matters as:

(i) The validity or status of any copyright other than the facts shown in the records of the Office;

(ii) The rights of persons, whether in connection with cases of alleged copyright infringement, contracts between authors and publishers or other matters of a similar nature;

(iii) The scope and extent of protection of works in foreign countries or interpretation of foreign copyright laws or court opinions;

(iv) The sufficiency, extent or scope of compliance with the copyright law.

(2) In addition, the Office cannot undertake to furnish the names of copyright attorneys, publishers, agents, or other similar information.

(b) *Inspection and copying or records.* (1) Inspection and copying of completed records and indexes relating to a registration or a recorded document, and inspection of copies deposited in connection with a completed copyright registration, may be undertaken at such times as will not result in interference with or delay in the work of the Copyright Office.

(2) The copying from the Copyright Office records of names and addresses for the purpose of compiling mailing lists and other similar uses is expressly prohibited.

(c) *Correspondence.* (1) Official correspondence, including preliminary applications, between copyright claimants or their agents and the Copyright Office, and directly relating to a completed registration or to a recorded document, is made available for inspection by persons properly and directly concerned. Requests for photocopies of the correspondence shall be made pursuant to paragraph (d) of this section.

(2) (i) Correspondence, application forms and any accompanying material forming a part of a pending or rejected application are not records which are open to public inspection under paragraph (b) of this section.

(ii) Inspection of such files may be afforded upon presentation of written authorization of the claimant or his agent, or upon submission to the Register of Copyrights, Library of Congress, Washington 25, D.C., of a written request which is deemed by him to show good cause for such access and which establishes that the person making the request is one properly and directly concerned.

(iii) Where such access is authorized and photocopies of the official file are subsequently requested, the conditions and procedures of paragraph (d) of this section are controlling.

(3) Correspondence, memoranda, reports, opinions, and similar material relating to internal management, office administration, security matters, and general policy and decisional material, including the work product of an attorney, are not open to public inspection.

(4) The Copyright Office will return unanswered any abusive or scurrilous correspondence.

(d) *Requests for copies.* (1) Requests for additional certificates of registration should be sent to the Copyright Office, and the accompanying fees should be made payable to the Register of Copyrights.

(2) Requests for photocopies of copyright deposits, official correspondence, and Copyright Office records (other than additional certificates of registration) should be sent to the Chief, Photoduplication Service, Library of Congress, Washington 25, D.C., the accompanying fees in payment of such services being made payable to that official. When the

photocopy is to be certified by the Copyright Office, the additional certification fee should be made payable to the Register of Copyrights and both remittances together with the transmittal letter are to be sent to the Copyright Office.

(3) Requests for photocopies of official correspondence shall identify the specific material desired and shall contain a statement enabling the Copyright Office to determine if the writer is properly and directly concerned.

(4) Requests for photocopies of copyright deposits will be granted when one or more of the following conditions are fulfilled:

(i) *Authorization by owner.* When authorized in writing by the copyright owner or his designated agent.

(ii) *Request by attorney.* When required in connection with litigation, actual or prospective, in which the copyrighted work is involved; but in all such cases the attorney representing the actual or prospective plaintiff or defendant for whom the request is made shall give in writing: (a) The names of the parties and the nature of the controversy; (b) the name of the court where the action is pending, or, in the case of a prospective proceeding, a full statement of the facts of the controversy in which the copyrighted work is involved; and (c) satisfactory assurances that the requested copy will be used only in connection with the specified litigation.

(iii) *Court order.* When an order to have the copy made is issued by a court having jurisdiction of a case in which the copy is to be submitted as evidence.

### § 201.3  Catalog of Copyright Entries.

The current subscription price for all parts of the complete yearly Catalog of Copyright Entries is $20.00. Each part of the Catalog is published in two semiannual numbers covering, respectively, the periods January–June and July–December. The prices given in the list below are for each semiannual number. The Catalog may be obtained, upon payment of the established price, from the Register of Copyrights, Library of Congress, Washington 25, D.C., to whom requests for copies should be addressed and to whom the remittance should be made payable.

Part 1—Books and Pamphlets including Serials and Contributions to Periodicals, $2.50.

Part 2—Periodicals, $1.00.

Parts 3–4—Dramas and Works Prepared for Oral Delivery, $1.00.

Part 5—Music, $3.50.

Part 6—Maps and Atlases, $0.50.

Parts 7–11A—Works of Art, Reproductions of Works of Art, Scientific and Technical Drawings, Photographic Works, Prints and Pictorial Illustrations, $1.00.

Part 11B—Commercial Prints and Labels, $1.00.

Part 12–13—Motion Pictures and Filmstrips, $0.50.

### § 201.4  Assignments of copyright and other papers.

Assignments of copyright and other papers relative to copyrights will be recorded in the Copyright Office upon payment of the statutory fee. Examples of such papers include powers of attorney, licenses to use a copyrighted work, agreements between authors and publishers

No. 110——2

States of America are made on Form BB. Application for registration of claims to copyright in contributions to periodicals, which contributions are prints submitted in connection with the sale or advertisement of an article or articles of merchandise, are made on Form KK.

## § 202.6 Lectures or similar productions prepared for oral delivery (Class C).

This class includes the scripts of unpublished works prepared in the first instance for oral delivery, such as lectures, sermons, addresses, monologs, panel discussions, and variety programs prepared for radio or television. The script submitted for registration in Class C should consist of the actual text of the work to be presented orally. Formats, outlines, brochures, synopses, or general descriptions of radio and television programs are not registrable in unpublished form. When published with notice as prescribed by law, such works may be considered for registration as "books" in Class A.

## § 202.7 Dramatic and dramatico-musical compositions (Class D).

This class includes published or unpublished works dramatic in character such as the acting version of plays for the stage, motion pictures, radio, television and the like, operas, operettas, musical comedies and similar productions, and pantomimes. Choreographic works of a dramatic character, whether the story or theme be expressed by music and action combined or by actions alone, are subject to registration in Class D. However, descriptions of dance steps and other physical gestures, including ballroom and social dances or choreographic works which do not tell a story, develop a character or emotion, or otherwise convey a dramatic concept or idea, are not subject to registration in Class D.

## § 202.8 Musical compositions (Class E).

(a) This class includes published or unpublished musical compositions in the form of visible notation (other than dramatico-musical compositions), with or without words, as well as new versions of musical compositions, such as adaptations or arrangements, and editing when such editing is the writing of an author. The words of a song, when unaccompanied by music, are not registrable in Class E.

(b) A phonograph record or other sound recording is not considered a "copy" of the compositions recorded on it, and is not acceptable for copyright registration. Likewise, the Copyright Office does not register claims to exclusive rights in mechanical recordings themselves, or in the performances they reproduce.

## § 202.9 Maps (Class F).

This class includes all published cartographic representations of area, such as terrestrial maps and atlases, marine charts, celestial maps and such three-dimensional works as globes and relief models.

## § 202.10 Works of art (Class G).

(a) *General:* This class includes published or unpublished works of artistic craftsmanship, insofar as their form but not their mechanical or utilitarian aspects are concerned, such as artistic jewelry, enamels, glassware, and tapestries, as well as works belonging to the fine arts, such as paintings, drawings and sculpture.

(b) In order to be acceptable as a work of art, the work must embody some creative authorship in its delineation or form. The registrability of a work of art is not affected by the intention of the author as to the use of the work, the number of copies reproduced, or the fact that it appears on a textile material or textile product. The potential availability of protection under the design patent law will not affect the registrability of a work of art, but a copyright claim in a patented design or in the drawings or photographs in a patent application will not be registered after the patent has been issued.

(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration.

## § 202.11 Reproductions of works of art (Class H).

This class includes published reproductions of existing works of art in the same or a different medium, such as a lithograph, photoengraving, etching or drawing of a painting, sculpture or other work of art.

## § 202.12 Drawings or plastic works of a scientific or technical character (Class I).

(a) This class includes published or unpublished two-dimensional drawings and three-dimensional plastic works which have been designed for a scientific or technical use and which contain copyrightable graphic, pictorial, or sculptured material. Works registrable in Class I include diagrams or models illustrating scientific or technical works or formulating scientific or technical information in linear or plastic form, such as, for example: a mechanical drawing, an astronomical chart, an architect's blueprint, an anatomical model, or an engineering diagram.

(b) A work is not eligible for registration as a "plastic" work in Class I merely because it is formed from one of the commonly known synthetic chemical derivatives such as styrenes, vinyl compounds, or acrylic resins. The term "plastic work" as used in this context refers to a three-dimensional work giving the effect of that which is molded or sculptured. Examples of such works include statues of animals or plants used for scientific or educational purposes, and engineers' scale models.

(c) A claim to copyright in a scientific or technical drawing, otherwise regis-

trable in Class I, will not be refused registration solely by reason of the fact that it is known to form a part of a pending patent application. Where the patent has been issued, however, the claim to copyright in the drawing will be denied copyright registration.

## § 202.13 Photographs (Class J).

This class includes published or unpublished photographic prints and filmstrips, slide films and individual slides. Photoengravings and other photomechanical reproductions of photographs are registered in Class K or Form KK.

## § 202.14 Prints, pictorial illustrations and commercial prints or labels (Class K).

(a) This class includes prints or pictorial illustrations, greeting cards, picture postcards and similar prints, produced by means of lithography, photoengraving or other methods of reproduction. These works when published are registered on Form K.

(b) A print or label, not a trademark, containing copyrightable pictorial matter, text, or both, published in connection with the sale or advertisement of an article or articles of merchandise is also registered in this class on Form KK. In the case of a print which is published in a periodical, use Form KK if the print is used in connection with the sale or advertisement of an article of merchandise, Form BB if it is not. Multipage works are more appropriately classified in Class A than in Class K.

(c) A claim to copyright cannot be registered in a print or label consisting solely of trademark subject matter and lacking copyrightable matter. While the Copyright Office will not investigate whether the matter has been or can be registered at the Patent Office, it will register a properly filed copyright claim in a print or label that contains the requisite qualifications for copyright even though there is a trademark on it. However, registration of a claim to copyright does not give the claimant rights available by trademark registrations at the Patent Office.

## § 202.15 Motion pictures (Classes L–M).

A single application Form L–M is available for registration of works in Classes L (Motion Picture Photoplays) and M (Motion Pictures other than Photoplays).

(a) *Photoplays (Class L).* This class includes published or unpublished motion pictures that are dramatic in character and tell a connected story, such as feature films, filmed television plays, short subjects and animated cartoons having a plot.

(b) *Other than photoplays (Class M).* This class includes published or unpublished nondramatic films such as newsreels, travelogs, training or promotional films, nature studies, and filmed television programs having no plot.

## § 202.16 Deposit of photographs or other identifying reproductions in lieu of copies.

(a) *Availability of option.* In the case of a published work which is reproduced in copies for sale, classified in Classes

A-2

# Regulations

# of the

# Copyright Office

INF. & PUB. SECTION
RECEIVED

REFERENCE DIVISION
COPYRIGHT OFFICE



Library of Congress
Washington, D.C.
Circular 96

# Regulations of the Copyright Office [1]

### As amended through July 4, 1967

## PART 201—GENERAL PROVISIONS

Sec.

201.1 Communications with the Copyright Office.
201.2 Information given by the Copyright Office.
201.3 Catalog of Copyright Entries.
201.4 Assignments of copyright and other papers.
201.5 Amendments to completed Copyright Office registrations and other records.
201.6 Payment and refund of Copyright Office fees.
201.7 Preparation of catalog card.
201.8 Import statements.

AUTHORITY: §§ 201.1 to 201.8 issued under sec. 207, 61 Stat. 666; 17 U.S.C. 207.

### § *201.1  Communications with the Copyright Office.*

Mail and other communications shall be addressed to the Register of Copyrights, Library of Congress, Washington, D.C. 20540.

### § *201.2  Information given by the Copyright Office.*

(a) *In general.* (1) Information relative to the operations of the Copyright Office is supplied without charge. A search of the records, indexes and deposits will be made for such information as they may contain relative to copyright claims upon application and payment of the statutory fee. The Copyright Office, however, does not undertake the making of comparisons of copyright deposits to determine similarity between works, nor does it give legal opinions or advice on such matters as:

(i) The validity or status of any copyright other than the facts shown in the records of the Office;

(ii) The rights of persons, whether in connection with cases of alleged copyright infringement, contracts between authors and publishers or other matters of a similar nature;

(iii) The scope and extent of protection of works in foreign countries or interpretation of foreign copyright laws or court opinions;

---

[1] *Code of Federal Regulations,* Title 37, Chapter II (*Federal Register,* volume 24, page 4955, June 18, 1959). Section 201.3 as amended, *Federal Register,* volume 31, page 6119, April 21, 1966. Section 201.2 as amended, *Federal Register,* volume 32, pages 9314-9315, June 30, 1967, effective July 4, 1967.

1

interim provisions of the copyright law, on Form A–B Ad Interim. Applications for registration of claims to copyright in contributions to periodicals manufactured in the United States of America are made on Form BB. Applications for registration of claims to copyright in contributions to periodicals, which contributions are prints published in connection with the sale or advertisement of an article or articles of merchandise, are made on Form KK.

### § 202.6  *Lectures or similar productions prepared for oral delivery (Class C).*

This class includes the scripts of unpublished works prepared in the first instance for oral delivery, such as lectures, sermons, addresses, monologs, panel discussions, and variety programs prepared for radio or television. The script submitted for registration in Class C should consist of the actual text of the works to be presented orally. Formats, outlines, brochures, synopses, or general descriptions of radio and television programs are not registrable in unpublished form. When published with notice as prescribed by law, such works may be considered for registration as "books" in Class A.

### § 202.7  *Dramatic and dramatico-musical compositions (Class D).*

This class includes published or unpublished works dramatic in character such as the acting version of plays for the stage, motion pictures, radio, television and the like, operas, operettas, musical comedies and similar productions, and pantomimes. Choreographic works of a dramatic character, whether the story or theme be expressed by music and action combined or by actions alone, are subject to registration in Class D. However, descriptions of dance steps and other physical gestures, including ballroom and social dances or choreographic works which do not tell a story, develop a character or emotion, or otherwise convey a dramatic concept or idea, are not subject to registration in Class D.

### § 202.8  *Musical compositions (Class E).*

(a) This class includes published or unpublished musical compositions in the form of visible notation (other than dramatico-musical compositions), with or without words, as well as new versions of musical compositions, such as adaptations or arrangements, and editing when such editing is the writing of an author. The words of a song, when unaccompanied by music, are not registrable in Class E.

(b) A phonograph record or other sound recording is not considered a "copy" of the compositions recorded on it, and is not acceptable for copyright registration. Likewise, the Copyright Office does not register claims to exclusive rights in mechanical recordings themselves, or in the performances they reproduce.

### § 202.9   Maps (Class F).

This class includes all published cartographic representations of area, such as terrestrial maps and atlases, marine charts, celestial maps and such three-dimensional works as globes and relief models.

### § 202.10   Works of art (Class G).

(a) *General.* This class includes published or unpublished works of artistic craftsmanship, insofar as their form but not their mechanical or utilitarian aspects are concerned, such as artistic jewelry, enamels, glassware, and tapestries, as well as works belonging to the fine arts, such as paintings, drawings and sculpture.

(b) In order to be acceptable as a work of art, the work must embody some creative authorship in its delineation or form. The registrability of a work of art is not affected by the intention of the author as to the use of the work, the number of copies reproduced, or the fact that it appears on a textile material or textile product. The potential availability of protection under the design patent law will not affect the registrability of a work of art, but a copyright claim in a patented design or in the drawings or photographs in a patent application will not be registered after the patent has been issued.

(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration.

### § 202.11   Reproductions of works of art (Class H).

This class includes published reproductions of existing works of art in the same or a different medium, such as a lithograph, photo-engraving, etching or drawing of a painting, sculpture or other work of art.

# A-3

Section 1910.178 of Title 29, Code of Federal Regulations, is hereby amended as indicated below:

1. Section 1910.178 is amended by clarifying the effective date statement in subparagraph (2) of paragraph (a) thereof, by clarifying the application of subparagraph (3) thereof in relation to subparagraph (2), and by revising subparagraph (7) thereof. As amended, § 1910.178 reads as follows:

§ 1910.178  Powered industrial trucks.

(a) * * *

(2) All new powered industrial trucks acquired and used by an employer after the effective date specified in paragraph (b) of § 1910.182 shall meet the design and construction requirements for powered industrial trucks established in the "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1–1969", except for vehicles intended primarily for earth moving or over-the-road hauling.

(3) Approved trucks shall bear a label or some other identifying mark indicating approval by the testing laboratory. See subparagraph (7) of this paragraph and paragraph 405 of "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1–1969", which is incorporated by reference in subparagraph (2) of this paragraph and which provides that if the powered industrial truck is accepted by a nationally recognized testing laboratory it should be so marked.

*        *        *        *        *

(7) Definition: As used in this section, "approved" means labeled by a nationally recognized testing laboratory; i.e., a laboratory qualified and equipped to conduct the necessary tests required under "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1–1969", in accordance with the requirements of section 405 thereof.

*        *        *        *        *

2. Paragraph (b) of § 1910.182 is amended in order to reflect the effective date change discussed above. As amended, § 1910.182 reads as follows:

§ 1910.182  Effective dates.

*        *        *        *        *

(b) The following provisions shall become effective on February 15, 1972:

§ 1910.177 (d) and (f).
§ 1910.178 (a) (2) and (3), (c), (e), and (m) (11).
§ 1910.179 (b) (6), (c), (d), (e), (f), (g), and (h).
§ 1910.180 (c).

*        *        *        *        *

(Secs. 6(a), 8(g), 84 Stat. 1553, 1600; 29 U.S.C. 657, 659)

Signed at Washington, D.C., this 8th day of February, 1972.

G. C. GUENTHER,
*Assistant Secretary of Labor.*

[FR Doc.72–2100 Filed 2–10–72;8:51 am]

# Title 37—PATENTS, TRADE-MARKS, AND COPYRIGHTS

## Chapter II—Copyright Office, Library of Congress

## PART 202—REGISTRATION OF CLAIMS TO COPYRIGHT

### Registration for Sound Recordings

Effective February 15, 1972, Part 202 Of Chapter II of Title 37 of the Code of Federal Regulations is amended as follows:

1. In § 202.2, paragraph (b) is amended by revising subparagraphs (1), (2), and (10) to read as follows:

§ 202.2  Copyright notice.

*        *        *        *        *

(b) *Defects in notice.* Where the copyright notice does not meet the requirements of the law, the Copyright Office will reject an application for copyright registration. Common defects in the notice include, among others, the following:

(1) The notice lacks one or more of the necessary elements (i.e., the word "Copyright," the abbreviation "Copr.", or the symbol ©, or, in the case of a sound recording, the symbol ℗; the name of the copyright proprietor, or, in the case of a sound recording, the name, a recognizable abbreviation of the name, or a generally known alternative designation, of the copyright owner; and, when required, the year date of publication);

(2) The elements of the notice are so dispersed that a necessary element is not identified as a part of the notice; in the case of a sound recording, however, if the producer is named on the label or container, and if no other name appears in conjunction with the notice, his name will be considered a part of the notice;

*        *        *        *        *

(10) A notice is on the wrapper or container which is not a part of the work and which will eventually be removed and discarded when the work is put to use; the notice may be on a container which is designed and can be expected to remain with the work;

*        *        *        *        *

2. Section 202.3 is revised as follows:

a. Paragraph (a) is revised to read as set forth below.

b. In paragraph (c) of § 202.3, the list of application forms for the registration of claims to copyright is amended by inserting, after the item "Form L–M— Motion picture (Classes L–M)," the new item "Form N—Sound recording (Class N)."

§ 202.3  Application forms.

(a) *In general.* Section 5 of title 17 of the United States Code provides fourteen classes (Class A through Class N) of works in which copyright may be claimed. Examples of certain works falling within these classes are given in §§ 202.4 to 202.15a inclusive, for the pur-

pose of assisting persons who desire to obtain registration of a claim to copyright, to select the correct application form.

*        *        *        *        *

3. In § 202.8, paragraph (b) is revised to read as follows:

§ 202.8  Musical compositions (Class E).

*        *        *        *        *

(b) A phonorecord, such as a disc, tape, or other reproduction of a sound recording, is not considered a "copy" of the musical composition or the literary or dramatic work recorded on it, and is not acceptable as a deposit copy for copyright registration of the musical composition or the literary or dramatic work. Concerning the registration of copyright claims in sound recordings as works in themselves (as distinct from the musical compositions or the literary or dramatic works recorded), see § 202.15a.

4. Part 202 is amended by adding a new § 202.15a, reading as follows:

§ 202.15a  Sound recordings (Class N).

(a) This class includes published sound recordings, i.e., works that result from the fixation of a series of musical, spoken, or other sounds. Common examples include recordings of music, drama, narration, or other sounds, as published in the form of phonorecords such as discs, tapes, cartridges, cassettes, player piano rolls, or similar material objects from which the sounds can be reproduced either directly or with the aid of a machine or device. Registration for sound recordings is made in Class N.

(b) Only those sound recordings fixed and published on or after February 15, 1972, are eligible for registration. A sound recording is "fixed" when the complete series of sounds constituting the work is first produced on a final master recording that is later reproduced in published copies.

(c) Sound recordings registrable in Class N do not include a sound track that is an integrated part of a motion picture. Registration for motion pictures, of which a sound track may be an integrated part, is made in Class L or M; see § 202.15.

(d) Registration for a sound recording in Class N does not cover the musical composition or the literary or dramatic work of which a rendition is recorded. A claim of copyright in the recorded musical composition is to be registered separately in Class E; see § 202.8. A claim of copyright in the recorded literary or dramatic work is to be registered separately in Class A, B, C, or D, whichever is appropriate; see §§ 202.4, 202.5, 202.6, and 202.7.

(Sec. 207, 61 Stat. 666; 17 U.S.C. 207)

Dated: February 8, 1972.

GEORGE D. CARY,
*Register of Copyrights.*

Approved:

L. QUINCY MUMFORD,
*Librarian of Congress.*

[FR Doc.72–2052 Filed 2–10–72;8:46 am]