# 23-905-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA ATLANTIC RECORDS, BDi MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

PARNESS LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299

---

ED SHEERAN LIMITED, GINGERBREAD MAN RECORDS, AMY WADGE RECORDS, STICKY STUDIOS, SONY/ATV MUSIC PUBLISHING, LTD. UK, ATLANTIC RECORDS UK, BDI MUSIC, BUCKS MUSIC GROUP, WARNER MUSIC GROUP CORPORATION, DBA ASYLUM RECORDS, WARNER MUSIC GROUP, LTD. UK, DOES 1-10,

*Defendants.*

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ..........................................................1

ARGUMENT ......................................................................................3

I. THE DEPOSIT COPY DOES NOT DEFINE OR LIMIT THE SCOPE OF COPYRIGHT PROTECTION, AND THE JURY SHOULD HAVE BEEN PERMITTED TO HEAR THE EXPERTS' FULL ANALYSIS OF THE DEPOSIT COPY ..............................................................3

II. THERE IS A MATERIAL QUESTION OF FACT – THAT SHOULD HAVE GONE TO THE JURY – AS TO WHETHER THE TWO ELEMENTS AT ISSUE (DUE TO THE DEPOSIT COPY RULINGS) CONSTITUTE A PROTECTIBLE SELECTION AND ARRANGEMENT ................18

III. THERE IS A MATERIAL QUESTION OF FACT – THAT SHOULD HAVE GONE TO THE JURY – AS TO WHETHER THE COMBINATION OF ELEMENTS AT ISSUE WAS "COMMONPLACE" BEFORE THE RELEASE OF LGIO IN 1973 ..........................................19

IV. THE DISTRICT COURT'S RULINGS REGARDING CONCERT REVENUES WERE CORRECT, AND SHOULD BE PRESERVED ............................................23

A. Performing Rights Organizations' Blanket Public Performance Licenses Do Not Immunize Parties Against Copyright-Infringing Performances of Musical Compositions in the PROs' Repertories ...................25

B. The Profits Derived from Copyright Infringement, Including the Public Performance of Copyright-Infringing Songs, Are Direct Profits .......................................27

C. The Nexus Between Copyright-Infringing Public Performances and the Direct Profits Received for

Such Performances is Obvious and Satisfied in this
Case ............................................................................................28

CONCLUSION ...................................................................................29

CERTIFICATION OF COMPLIANCE ................................................ 31

ADDENDUM ................................................................................ADD1

# TABLE OF AUTHORITIES

C<small>ASES</small>

*Behnam Jewelry Corp. v. Aron Basha Corp.*, 1997 WL 639037 (S.D.N.Y. Oct. 14, 1997).........................................................................................................16

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)....9

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)................................................................................ 10, 14, 15, 16

*FireSabre Consulting LLC v. Sheehy*, No. 11-CV-4719 (CS), 2013 WL 5420977 (S.D.N.Y. Sep. 26, 2013)................................................................ 15, 16

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9ᵗʰ Cir. 1985) .28

*Gray v. Perry*, No. 2:15-cv-5642 (CAS), 2017 WL 1240740 (C.D. Cal. Apr. 3, 2017).........................................................................................................25

*Gray v. Perry*, No. 2:15-cv-5642 (CAS), 2019 WL 2992007 (C.D. Cal. Jul. 5, 2019).........................................................................................................25

*Griffin v. Sheeran*, 17-cv-5221 (S.D.N.Y.)...................................................... passim

*Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F . 3d 996 (2d Cir. 1995) .............................19

*Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003 )28, 29

*Martinez v. Agway Energy Servs., LLC*, 88 F. 4th 401 (2d Cir. 2023).............. 2, 24

*Master Sound Int'l, Inc. v. Polygram Latino U.S.*, No. 98 CIV. 8468 (DLC), 1999 WL 595661 (S.D.N.Y. Aug. 6, 1999) ...................................................17

*Merrell v. Tice*, 104 U.S. 557 (1881).................................................................. 8, 11

*Nicholls v. Tufenkian Imp./Export Ventures, Inc.*, 367 F. Supp. 2d 514 (S.D.N.Y. 2005).........................................................................................................16

*Nwosuocha v. Glover*, 21-cv-04047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023) ..............................................................................................................19

*Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008) .......... 2, 24

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F. 3d 57 (2d Cir. 2010) ................................................................................................... 19

*Rubio v. Cty. of Suffolk*, 328 F. App'x 36 (2d Cir. 2009) .................................. 2, 24

*Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir.) (*en banc*), *cert. denied sub nom.*, 141 S. Ct. 453, *reh'g denied*, 141 S. Ct. 946 (2020) .................. passim

*Stoliarov v. Marshmello Creative, LLC*, No. 19-cv-3934 (PSG), 2021 WL 2514167 (C.D. Cal. Apr. 8, 2021), *aff'd in part, dismissed in part*, No. 21-55442, 2022 WL 819800 (9th Cir. Mar. 17, 2022) ........................................................ 25, 27

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000)........................ 16

*Unistrut Corp. v. Power*, 280 F.2d 18 (1st Cir. 1960)........................................ 15

STATUTES

17 U.S.C. § 12 (1964) ........................................................................................ 6

17 U.S.C. § 13 (1956) ...................................................................................... 14

17 U.S.C. § 13 (1964) ........................................................................................ 6

17 U.S.C. § 101 ................................................................................................. 5

17 U.S.C. § 106 ............................................................................................... 25

17 U.S.C. § 207 (1947) .................................................................................... 14

17 U.S.C. § 303(b) ............................................................................................. 5

17 U.S.C. § 408(b) ........................................................................................... 15

17 U.S.C. § 408(c)(1) (1976) ........................................................................... 14

17 U.S.C. § 501(a) ........................................................................................... 25

## OTHER AUTHORITIES

1 Nimmer on Copyright § 3.06 (2019) ....................................................................25

*Compendium of U.S. Copyright Office Practices* ........................................... passim

Hawes and Dietz, *Copyright Registration Practice* (Oct. 2023) ...........................15

*Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* (1961) ...........................................................................................................10

Shafter, *Musical Copyright* (1932) ........................................................... 7, 8, 9, 14

## PRELIMINARY STATEMENT

This Court should reverse the District Court's "deposit copy" rulings, its "selection and arrangement" rulings, and its ruling that the combination of musical elements at issue was "commonplace" before the release of "Let's Get It On" ("LGIO") in 1973. No statutory or caselaw authority supports the District Court's decision or *Skidmore*[1] regarding "deposit copy," and the administrative position of the *Compendium*[2] based on an "arbitrary" policy, is not entitled to even "lesser deference," in view of the multiple problems that would arise were the position to be adopted broadly, problems that Congress would never have intended.

With respect to the "selection and arrangement" and "commonplace" issues, Appellees contort the record to explain how the District Court found disputed issues of material fact six months **before** the *Griffin*[3] trial, but then changed its mind two weeks **after** the *Griffin* trial. The parties and their experts fundamentally disagree as to the significance of a handful of songs Appellees termed "prior art," and whether the existence of any of those songs makes the "selection and arrangement" at issue

---

[1] *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir.) (*en banc*), *cert. denied sub nom.*, 141 S. Ct. 453, *reh'g denied*, 141 S. Ct. 946 (2020), conclusions

[2] *Compendium of U.S. Copyright Office Practices*.

[3] *Griffin v. Sheeran*, 17-cv-5221 (S.D.N.Y.). References to electronic filings in the *Griffin* case will be referred to as "*Griffin* ECF," and in the *Structured Asset Sales* case as "*SAS* ECF."

in the case "commonplace" before the release of LGIO in 1973. The jury – and not the District Court – should be allowed to resolve those core disputed questions of fact.

Finally, although Appellees seek reversal of the District Court's rulings regarding concert revenues, they did not file a cross-appeal, and their request should be denied.[4] The District Court's decisions regarding concert revenues were sound, and this Court should confirm that those decisions were not abrogated by the May 2023 grant of summary judgment to Appellees, because: (i) performing rights organization ("PRO") blanket licenses do not cover copyright-infringing public performances; (ii) monies received for performing copyright-infringing works publicly constitute direct profits; and (iii) the nexus between copyright-infringing public performances and the monies received for such performances is established and obvious.

---

[4] *Martinez v. Agway Energy Servs., LLC*, 88 F. 4th 401, 418 n. 13 (2d Cir. 2023); *Rubio v. Cty. of Suffolk*, 328 F. App'x 36, 38 (2d Cir. 2009); *Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 349 (2d Cir. 2008).

# ARGUMENT

**I.    THE DEPOSIT COPY DOES NOT DEFINE OR LIMIT THE SCOPE OF COPYRIGHT PROTECTION, AND THE JURY SHOULD HAVE BEEN PERMITTED TO HEAR THE EXPERTS' FULL ANALYSIS OF THE DEPOSIT COPY**

The fundamental question of law in this appeal, and a matter of first impression in this Circuit, is whether the "deposit copy" submitted to the Copyright Office works as a limitation on the legal scope of protection afforded by the Copyright Act. The District Court answered that question in the affirmative, and Appellant seeks reversal of that decision, and of the improper limitations the District Court placed on Appellant and its musicology experts. The Copyright Act of 1909 **does not say** that the deposit copy defines and limits the scope of what is protected, and there was **no authority** prior to (and other than) *Skidmore* or the *Compendium* that said otherwise.

Appellees assert that "LGO was registered as a published musical work, and 'two complete copies of the best edition thereof then published' were deposited with and registered by the Copyright Office." Appellees Br. 25 (*citing* A569-575; A840-845). That statement is incorrect, or at least incomplete, as LGO was actually registered **twice** in 1973, on July 17, 1973 as a **published** work (Reg. No. EP314589),

and then again on July 30, 1973 as an **unpublished** work (Reg. No. EU422281). Both were renewed in 2000 (RE848835 and RE840063).[5]

Appellant pointed this out in its opening brief (Appellant Br. 10 n. 4 (*citing* A1673 ¶ 19)), and the fact of the **two** registrations can be found throughout the record. A38-39 ¶ 27; A335 ¶ 27; A454; A873; A1042-43 ¶¶ 19-21; A1093-94 ¶¶ 19-21; A1444; A1487; A1673-64 ¶¶ 19-21; A1732-33 ¶¶ 19-21. *See also SAS* ECF 8, 46 (Form AO 121, listing both registrations and both renewals). That Appellees continue to ignore the **unpublished** registration, even after Appellant pointed out its existence, speaks volumes. The deposit copy – handwritten sheet music in the "lead sheet" style (A1094 ¶ 20) – was self-evidently never actually distributed or sold.[6] It looks nothing like other examples in the record of commercially-available sheet music. *See*, *e.g.*, A582; A744; A821. The record does not reveal why Townsend filed two registrations, approximately two weeks apart, for LGIO as a published, and then unpublished, work, but it stands to reason that Townsend either came to realize

---

[5] The Index for the Appendix incorrectly states that the date of the first application (A568) was February 14, 1973. It was July 17, 1973. A1673-74 ¶ 19.

[6] There is no evidence in the record of distribution of LGIO sheet music "to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101 ("Publication").

on his own, or was told by the Copyright Office, that LGIO was in fact an **unpublished** work that had to be registered in a manner consistent with that reality.[7]

Appellees argue that "SAS's 'access' argument is nonsensical because the LGO Deposit Copy was the 'best edition' of the published sheet music, meaning it is publicly available." Appellees Br. 35. Leaving aside whether the supposed publication of LGIO sheet music in 1973 means that it would be publicly available in 2014 (when Sheeran claims to have written "Thinking Out Loud" ("TOL")), Townsend re-filed LGIO as an **unpublished** work some two weeks after filing the initial application, suggesting that it was not publicly available, or representing a disputed issue of material fact that should have gone to the jury.

Appellees spend pages arguing an entirely undisputed point: that under the 1909 Act, when one sought copyright protection for a musical composition, the composition had to be reduced to writing, and that writing had to be deposited with the Copyright Office, in order for the Copyright Office to accept the application.

---

[7] The February 14, 1973 "publication" date in the application – a month before the creation of the Marvin Gaye recording (SPA14), and five months before the two copyright applications were filed (A1673 ¶ 19), is most likely the date Townsend composed the work, and not any "publication" date for purposes of the Copyright Act. *See* 17 U.S.C. §§ 101 ("'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."), 303(b) (retroactively defining in 1997 what could or could not constitute "publication")).

The 1909 Copyright Act[8] does not say, however, that the copies of sheet music (unpublished or published) deposited with the Copyright Office define or limit the scope of the protection afforded the underlying musical compositions. Looking at it another way, the Copyright Act does not say that the scope of protection afforded a musical composition is limited to the manner in which it is annotated on sheet music. The relevant sections from the 1909 Act read as follows, with respect to unpublished, and then published, musical compositions:

> § 12. WORKS NOT REPRODUCED FOR SALE. – Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a lecture or similar production or a dramatic, musical, or dramatico-musical composition;….
>
> § 13. DEPOSIT OF COPIES AFTER PUBLICATION; ACTION OR PROCEEDING FOR INFRINGEMENT. – After copyright has been secured by publication of the work with the notice of copyright as provided in section 10 of this title, there shall be promptly deposited …two complete copies of the best edition thereof then published….

17 U.S.C. §§ 12-13 (1964).

Appellees argue that the language above from Section 13 (without even addressing Section 12 regarding **unpublished** works) means that "[t]he published

---

[8] Appellant's opening memorandum quoted from the original 1909 Act. A copy of the 1909 Act in effect as of January 1, 1973 can be accessed at https://www.copyright.gov/history/1909act-1973.pdf. The relevant language – "one complete copy of such work" and "two complete copies of the best edition thereof then published" – is unchanged between the 1909 and 1973 versions.

- 6 -

sheet music – the Deposit Copy – **is** the copyrighted work." Appellees Br. 25-26 (emphasis in original). That is fundamentally incorrect, especially as it concerns unpublished works. Appellees' basic error is that they conflate the copyrighted work itself – the musical composition – with the physical sheet music on which it is written. Section 13 says that copyright is secured "by publication." The moment that a writer "publishes" his or her composition, copyright is secured for the composition. Registration occurs later, only "[a]fter copyright has been secured." Registration requires filing two copies of the "best edition," but that does not mean that what is filed is "the work." The work remains the musical composition as composed, especially if the composition was never published in the first place.[9] A 1932 treatise that Appellees cite explicitly supports this approach:

> But, lest the reader labor under a delusion as to precisely *what* copyright is, let it be known at once that **the mere physical accessories of composition – paper, ink and so forth – are not in themselves the subject of copyright**. They are the "physical manifestation of original thought."

Shafter, *Musical Copyright* (1932) at 26 (emphasis added) (citations omitted) (*see* Addendum ("ADD") 2). As to the portion actually cited by Appellees, it suffers from too-clever editing, as it leaves out critical language:

> *Form*, the first requirement under the law, **is regarded as an arbitrary regulation** in that it requires "visibility"….It is obvious that "audible" music – a phonograph record, or a piano roll – is **as**

---

[9] *See* Amici Br. (ECF 48-2) 12-13.

> **faithful a transcript of a musical idea** as a "visible" recording on paper….

*Id*. at 27 (emphasis added) (citations omitted) (ADD3).  Shafter recognized that the deposit requirement was "arbitrary," and that the true subject of copyright protection is not the sheet music, but the underlying musical composition, not to be limited by the paper deposit.

In its opening brief, Appellant worked through the District Court's "deposit copy" analysis, demonstrating that none of the District Court's cited sources supported its conclusion.  Although the Copyright Act of 1909 **did** require (in the case of unpublished works) submission of "one complete copy of such work," and (in the case of published works), "two complete copies of the best edition thereof then published," it absolutely did not say that materials deposited defined or limited the scope of what was protected.  The 1881 case of *Merrell v. Tice*, 104 U.S. 557, 561 (1881) contains a snippet of *dicta* in which the Court speculated upon the role of deposit copies ("in order to enable other authors to inspect them in order to ascertain precisely what was the subject of copyright"), but once again did not hold that the deposit copy defined or limited the scope of copyright protection, and certainly not under the 1909 Act.  2020's *Skidmore* was the first case anywhere to address the deposit copy question at issue in this case, but that decision suffers from its own lack of support.

Finally, although the *Compendium* is generally entitled to "lesser deference," based on the "power to persuade," that deference has its limits. In 2008, this Court declined to extend that deference, "because the Office's interpretation does not explain why Congress would include language in a definition if it intended courts to ignore that language…." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008).

The *Compendium*'s view sets up the untenable paradigm that protection for certain classes works – like musical compositions – is limited to the materials deposited, while protection for a growing list of other classes – like computer programs – "may cover the entire copyrightable content of the work, notwithstanding the fact that the applicant did not submit a copy of the entire work," and that this same approach leads to the even more troubling unequal treatment of "United States works" and "foreign works," which often do not require deposit copies at all. To paraphrase this Court in *Cartoon Network*, because the Office's interpretation does not explain why Congress would seek to change the scope of copyright protection in this decidedly unequal and unfair manner, based on an arbitrary (per Shafter) administrative policy, this Court should not be persuaded, and should not grant any deference to the *Compendium*'s view on this issue.[10]

---

[10] The United States Supreme Court is about to hear oral arguments in a case challenging larger principles of administrative deference, the outcome of which

Appellant also went through the citations listed by the Ninth Circuit in *Skidmore*, and showed that it likewise suffered from a lack of competent authority. The First Circuit in *Data General*[11] did not say that the deposit copy limits the scope of copyright protection, but rather that it is there to provide "**sufficient** material to **identify** the work" and "to prevent confusion about **which work** the author is attempting to register." The 1961 Report of the Register of Copyrights[12] also does not speak to whether the deposit copy limits the scope of copyright protection, but rather states repeatedly that the role of the deposit is to "identify" the work.

The only potential authority for the District Court's "deposit copy" holdings are *Skidmore* and the *Compendium*. *Skidmore*'s authority was insufficient, and the *Compendium* should not be given even "lesser deference." We urge the Court to take a fresh look at this critical issue of first impression, and to do so without feeling constrained by the *Compendium* or *Skidmore*.

That the Copyright Office accepts (and has always accepted) "identifying materials" in lieu of full copies in connection with so many types of works, and that

---

may very well have ramifications in the context of "lesser deference" as well. *Loper Bright Enterprises v. Raimondo*, 21-5166 (U.S.).

[11] *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010)

[12] *Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 71 (1961).

the law allows cases based on the infringement of foreign works to be brought with no deposit copy at all, shows that neither the speculative rationale offered by the Supreme Court in *Merrell v. Tice* ("to enable other authors to inspect them"), nor the rationale offered by the District Court in 2022 ("because they have not undergone the copyright process") (SPA14) should be afforded any weight.  Under the *Merrell v. Tice* formulation, deposit copies are held at the Copyright Office for inspection by other authors, but that rumination falls apart with the myriad classes for which "identifying materials" are submitted.  Using the apt example of computer code, the Copyright Office only requires deposit of a small fraction of the code of a copyrighted program.  Another "author," skilled in reading and writing computer code, could order a copy of the deposit, but would only be able to inspect the scant portions submitted.  He or she would not be able to inspect the withheld portions, likely making the exercise meaningless.  Indeed, that would appear to be exactly the point – the Copyright Office allows for the submission of small portions of computer code so that other authors **can not** inspect it.

Even if the purpose of the deposit copy was "to enable other authors to inspect them," per *Merrell v. Tice*, Sheeran testified repeatedly in the *Griffin* trial to his inability to read music:

> Sheeran: "I can play by ear. I have relative pitch, and I can't read music."
>
> ….

- 11 -

Sheeran: "I haven't got a degree in music. I can't read music. I'm not a – I am not classically trained in anything, but I can play what I can play."

….

Sheeran's Counsel: "Objection. Lacks foundation. He said he doesn't read music."

*Griffin* ECF 280 at 116:2-3; ECF 284 at 149:15-17, 180:20-21).  Sheeran could not have "inspected" the deposit copy, even if he had wanted to.

Consistent with the foregoing practical reality, in both *SAS* and *Griffin*, Sheeran conceded having access to the LGIO **sound recording** prior to writing TOL. A75-76 ¶ 64; A930 ¶ 24; A1400; *Griffin* ECF 194 ¶ 9; ECF 290 at 80:2-4.  He then testified explicitly that his access came in the form of **hearing** the commercially-released Marvin Gaye **recording** of LGIO:

Q. Now, you previously testified that you were aware of and had heard Let's Get It On, the song at issue in this litigation, prior to writing Thinking Out Loud, correct?

A. Yeah. I first heard it in Austin Powers when I was young.  That's true, that's the first time I heard it.

*Griffin* ECF 280 at 118:19-23.  Sheeran did not testify to having ever seen (or inspected) **any** LGIO sheet music (handwritten or otherwise), and – in any event – by his own testimony he would not have been able to read it even if he had. Ironically, perhaps, the District Court ruled that Appellant could not reference the

- 12 -

sound recording at all (SPA15), but yet it was the sound recording to which Sheeran admitted having access for purposes of copyright infringement.

The District Court's justification – "because they have not undergone the copyright process" (SPA14) – is also unsound in the face of the many categories for which the Copyright Office accepts (or requires) "identifying materials." Considering, again, the example of computer code, only a fraction of the code of any program is submitted to the Copyright Office. So even if the Copyright Office inspects or reviews the code that is submitted as part of "the copyright process," the vast majority of the code is never even **seen** by the Copyright Office, and yet the Copyright Office and the federal courts recognize that the **whole** of the program, including the portions that were never submitted and remain on file with the author, is registered, protected, and can serve as the basis for an infringement action. "Musical compositions" are not among the categories that the *Compendium* says the Copyright Office accepts "identifying materials," but that does not change the fact that the entire "identifying materials" structure demonstrates that there is no justification for limiting the scope of copyright protection to the "deposit copy," **only** in the categories where identifying materials are not accepted.

Appellees respond to these arguments with the proposition that Congress granted the Copyright Office the power "to do exactly what SAS claims it lacks authority to do" (Appellees Br. 29), but the plain language of the cited sections of

the Act either says nothing about these issues, or else supports Appellant's positions. 17 U.S.C. § 207 (1947) does not speak to the issue at all, but rather states that the Copyright Office may promulgate rules. 17 U.S.C. § 13 (1956) is the section containing the "two complete copies of the best edition thereof then published" already discussed. The final citation, 17 U.S.C. § 408(c)(1) (1976), states that "This administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title.". As Appellant argued in its opening brief, placing works into different categories, and setting up different rules regarding those categories, is an "administrative classification" that does not and cannot limit the rights of copyright owners under the law. The foregoing section **supports** that understanding, and throws the "deposit copy" conclusion (and the *Compendium*'s position on the issue) into further doubt. The Copyright Office is empowered to make "arbitrary regulations" (Shafter, *Musical Composition* at 27), but not to unilaterally make substantive changes to Copyright Law.

Appellees criticize Appellant's use of *Data General*, as it involved "a different inquiry than scope of copyright in an infringement action" and "involved computer code." Appellees Br. 36-37. Appellees apparently forgot that *Data General* was brought into the mix by the District Court to **support** its "deposit copy" ruling. SPA33. Appellant pointed out in response the language in *Data General*

- 14 -

that "the deposit required by Section 408(b) serves the separate purpose of providing the Library's Copyright Office with sufficient material to identify the work in which the registrant claims a copyright" and "a key purpose of the Section 408(b) deposit requirement is to prevent confusion about which work the author is attempting to register." Appellees correctly note that the *Data General* court distinguished the earlier *Unistrut Corp. v. Power*, 280 F.2d 18 (1st Cir. 1960), but *Unistrut* involved two different versions of a catalog, where it was clear that only the first edition had been registered, and that the allegedly infringed material had been added to the second edition. No comparable allegations exist here – there are not two competing versions of the LGIO musical composition.[13]

Appellees struggle to distinguish *Nicholls* and *FireSabre*, both of which involved copyright infringement, neither of which involved computer code, and both of which are consistent with the *Data General* formulation of "sufficient material to identify the work in which the registrant claims a copyright" and "to furnish the Copyright Office with an opportunity to assess the copyrightability of the applicant's work." In *Nicholls*, the court equated an applicant's indication of a single color, but

---

[13] Similarly, Appellees' quotation from *Copyright Registration Practice* (Appellee Br. 30) is from a footnote discussing the need to register serial editions of books in order to cover the newly-added materials, another undisputed issue. As that treatise derives all of its authority regarding the deposit copy issue from the *Skidmore* decision, citing to it does not materially add to this discussion. *Copyright Registration Practice* §§ 27:11 n. 2.50, 27:14 n. 0.50.

- 15 -

an intent to protect **all** colors, as an "'error[]…committed without deceptive intent [which is] harmless and do[es] not invalidate the copyright,'" and "incomplete or erroneous deposit materials." *Nicholls v. Tufenkian Imp./Export Ventures, Inc*., 367 F. Supp. 2d 514, 520 (S.D.N.Y. 2005) (*quoting Behnam Jewelry Corp. v. Aron Basha Corp*., 1997 WL 639037, at *11 (S.D.N.Y. Oct. 14, 1997) and *citing Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486-87 (9th Cir. 2000); *Data General*, 36 F.3d at 1161-62)).

*FireSabre* draws its authority from *Nicholls*, quoting the "sufficient material to identify" language that derives from *Data General*, and reiterating that the principle includes "incomplete or erroneous deposit materials." *FireSabre Consulting LLC v. Sheehy*, No. 11-CV-4719 (CS), 2013 WL 5420977, *6 (S.D.N.Y. Sep. 26, 2013) (*quoting Nicholls*, 367 F. Supp. at 520).

Appellees are correct that "[i]t is undisputed that the LGO Deposit Copy does not **notate** a bass part or a drum pattern" (Op. Mem. at 38) but they are incorrect that the sheet music does not indicate how the bass or drums should be played, and Appellant's experts should have been allowed to testify as to how the sheet music does so, and the jury should have been allowed to decide whether the lack of full

annotation made the deposit copy "incomplete or erroneous," which the courts have the power to excuse.[14]

Appellant pointed out that **if** the *Compendium* and *Skidmore* were correct, not only would it result in materially disparate treatment of copyright holders based solely on the administrative class into which their works fell, but it would represent **substantially material** disparate treatment of the holders of United States works and foreign works, limiting protection for the former to the four corners of the materials they administratively deposited, and not limiting the latter in any respect. By way of illustration, another judge of the District Court found as follows in an infringement action concerning a musical composition that originated in Mexico:

> Master Sound's allegations and supporting documentation is sufficient to allow its case to proceed. It has identified the name of the compositions, and has identified (and will presumably produce to defendant), compact discs containing those compositions. In addition, it has provided a copyright registration for one composition, which it alleges is unnecessary under Mexican law in any event.

*Master Sound Int'l, Inc. v. Polygram Latino U.S.*, No. 98 CIV. 8468 (DLC), 1999 WL 595661, at *2 (S.D.N.Y. Aug. 6, 1999) (denying motion to dismiss copyright infringement claim). As reflected above, the *Master Sound* trial court was not bothered by the lack of a registration, and – by extension – a deposit copy. Evidence as to the scope of the allegedly-infringed copyright would come in in the usual

---

[14] *See* Amici Br. 22-25 regarding *Three Boys Music*, *supra*.

manner. A bright-line rule following the *Compendium* and *Skidmore*, however, would create a significant rift between United States work and foreign work copyright infringement cases, to the severe detriment of plaintiffs in the former, with no principled rationale behind it.

Appellees write that Appellant's position would require "gutting a central purpose of the deposit requirement" and "would undermine a central purpose of the deposit requirement" (Appellees Br. 33, 38) without ever stating what that "central purpose" is, most likely because there are multiple competing (and conflicting) formulations, none of which is "central" or logically sound.

## II. THERE IS A MATERIAL QUESTION OF FACT – THAT SHOULD HAVE GONE TO THE JURY – AS TO WHETHER THE TWO ELEMENTS AT ISSUE (DUE TO THE DEPOSIT COPY RULINGS) CONSTITUTE A PROTECTIBLE SELECTION AND ARRANGEMENT

Appellant detailed in its opening memorandum how the District Court acknowledged, both **before and after** the *Griffin* trial, that there was no case in any jurisdiction that stated that two or three musical elements were insufficient as a matter of law to sustain a "selection and arrangement" theory of copyright originality, as opposed to cases analyzing various numbers of elements and coming to various conclusions as to whether originality was present. The District Court stated **before and after** the *Griffin* trial that there was no "bright line" rule. SPA23, SPA44, SPA47. The "numerosity" requirement is not derived from statute, but from caselaw,

and as the District Court acknowledged, in **this** Circuit it has only been "alluded to, but not strictly followed." SPA44 (*citing Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F. 3d 57, 66 (2d Cir. 2010) and *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F . 3d 996, 1004 (2d Cir. 1995). The *Nwosuocha* decision[15] does not herald a trend in this Circuit of courts "weigh[ing] the numerosity of the elements when deciding whether their combination should be protected." SPA44-45. Indeed, the case says nothing on the subject. Sufficiency of elements in a "selection and arrangement" theory of originality has always been a highly-fact-dependent question that should go – and should have gone here – to the jury.

## III.  THERE IS A MATERIAL QUESTION OF FACT – THAT SHOULD HAVE GONE TO THE JURY – AS TO WHETHER THE COMBINATION OF ELEMENTS AT ISSUE WAS "COMMONPLACE" BEFORE THE RELEASE OF LGIO IN 1973

Appellant pointed out that in its September 2022 decision on Appellees' Renewed Motion for Summary Judgment, the District Court observed that "[t]he parties' experts disagree as to whether the **combination** of the chord progression and harmonic rhythm present in both compositions is **original** and thus protectable," that "[t]he experts' **disagreement** on whether the backing pattern is sufficiently **uncommon** to warrant copyright protection is a genuine dispute as to a material fact,

---

[15] *Nwosuocha v. Glover*, 21-cv-04047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023).

preventing summary judgment" and that "[t]hey **squarely dispute** whether that combination was **commonplace** before LGO:" SPA24-25 (emphasis added).

The District Court's May 2023, post-*Griffin* trial decision, however, includes statements that directly and completely contradict the earlier factual findings about whether the combination of the two elements in question was commonplace before LGIO. SPA49-51.

The District Court was correct in September 2022, and incorrect in May 2023. Appellees' experts identified a grand total of **three** pre-LGIO songs in which they claimed that the two elements in question came together in combination: "Downtown," "Since I Lost My Baby" and "Georgy Girl." A524-27 ¶¶ 56-60. Appellant's experts addressed each of those songs and disputed Appellees' experts' opinions with respect to them and their relevance to the question of commonality prior to LGIO.[16]

With respect to "Downtown," Appellant's expert Dr. John Covach explained that the chord progression was **not** the same as that of LGIO, and therefore there was

---

[16] The District Court wrote that "Defendants' experts also identified, undisputed by SAS's expert, at least **four** songs that were released prior to 'Let's Get It On' that used virtually the same combination." SPA50-51 (emphasis added). As discussed herein, Appellant's experts **did** dispute the matter with respect to three pre-LGIO songs. As to that fourth song – "Get Off Of My Cloud" –Appellee's experts **never** represented that it contained **both** of the elements at issue. It was only ever held up as an example of a song with the same chord progression. A518-19: A613: A721-22.

no combination of the two elements. A1553-54 ¶ 10. ("as far as concerns the published sheet music, the backing pattern as I have defined it is not present").

With respect to the remaining two pre-LGIO songs – "Since I Lost My Baby" and "Georgy Girl" – Dr. Covach conceded that the particular **recordings** of those two songs identified by Appellee's expert **did** present a combination of the two elements, but that the commercially-published sheet music of those songs, reflecting the mainstream versions, did **not** combine the two elements. A1544-45 ¶ 11 ("The Ray French version cited by Dr. Ferrara was released in the UK only and was not a hit….in the published sheet music for 'Since I Lost My Baby'….the final chord differs"); A1545-46 ¶¶ 12-13 (with respect to "Georgy Girl": "This version of the song was never a radio hit, and could be found mostly on supermarket and drug-store shelves, and no longer available, decades before Ed Sheeran was even born…. in the published sheet music….while the four-chord progression is the same as the one in LGO, the harmonic rhythm does not match the one found in LGO").

The District Court was therefore correct in September 2022 in finding that on the record in this case there was a material question of fact concerning whether the combination of the two elements was commonplace before LGIO, and incorrect in May 2023 when it found otherwise. The District Court erred regardless, but if it was in any way influenced by the evidence that was introduced in the *Griffin* trial, that

would certainly be improper, and any decisions arising from that improper influence should be reversed.

Appellees' only retort to the foregoing is that the District Court must have course-corrected on its own between September 2022 and May 2023, speculating that the District Court suddenly remembered that back in September 2021 it had excluded Appellant's evidence of prior art (SPA16 ("the proof as to the existence of prior art shall be only that submitted by defendants")), and thus Appellees' experts' positions on prior art should be treated as uncontested, none of which is expressed in the District Court's decision. That reasoning is wrong, and we know it is wrong because the District Court **expressly rejected** that argument, explaining that Appellant's experts **could** opine on general musicological principles, and **could** comment on prior art introduced by Appellees:

> ….the prior art examples listed on Pages 9-10, Paragraph 7 of the Revised Everett Report, are stricken, except for "Hurdy Gurdy Man" by Donovan, **which is admissible because it is offered into evidence by Sheeran's expert**.

> References to prior art are **acceptable when they are used to illustrate general principles of musicology**. The Revised Everett Report can mention the prior art on Pages 12-13, Paragraph 3 because the songs are being used as examples of the different functions a chord progression may have within the formal structure of the song. The only song that is used to show the similarity between LGO and TOL is the Commodores' "Easy," **which is introduced by Sheeran's expert and may thus also be discussed in the Revised Everett Report**.

- 22 -

SPA21 ¶ 4 (emphasis added). The only deletion the District Court ordered from the report of Dr. Covach was a single instance of a single word, leaving his entire analysis of Appellees' prior art examples intact. SPA19-20 ¶ 2. In addition, the District Court explicitly confirmed that Appellant's experts were allowed to provide evidence about commonality, writing:

> The Revised Reports may use the terms "common," "uncommon," "noteworthy," and "stylistically commonplace." These are not legal conclusions but epithets characterizing a work's place on a scale of originality.

SPA19 ¶ 1.

In September 2022, the District Court correctly identified a material dispute among the experts, and a material question of fact barring the grant of summary judgment. The questions surrounding how many, if any, pre-LGIO songs contained the combination of elements, whether the existence of any or all of those songs made that combination "commonplace," were disputed, and should have been left for the jury to resolve.

## IV. THE DISTRICT COURT'S RULINGS REGARDING CONCERT REVENUES WERE CORRECT, AND SHOULD BE PRESERVED

Over the course of several decisions, culminating in its grant of Appellant's cross-motion for summary judgment, the District Court correctly decided that (i) the PRO blanket licenses do not cover copyright-infringing public performances of music; (ii) that the profits arising from such public performances are direct, rather

than indirect, and (iii) that Appellant had satisfied its burden of proving the "obvious" nexus between such performances and profits. The District Court's January 2020 (SPA1-10) and September 2022 (SPA18-36) decisions on these issues were undisturbed by its May 2023 (SPA37-52) grant of summary judgment to Appellees, and conditionally appeals that aspect of the May 2023 decision only if this Court finds to the contrary.

In a mirror-image posture, Appellees purport to seek reversal of those decisions if they were **not** abrogated in May 2023, but as Appellees failed to notice a cross-appeal or conditional cross-appeal, their position should not be considered by the Court. *Martinez v. Agway Energy Servs., LLC*, 88 F. 4th 401 n. 13 (2d Cir. 2023) ("[w]ithout a conditional cross-appeal, however, an appellee 'may not advance a theory that challenges some aspect of the lower court's judgment.'") (*quoting Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 349 (2d Cir. 2008)); *Rubio v. Cty. of Suffolk*, 328 F. App'x 36, 38 (2d Cir. 2009) (finding appellee had "failed to file a cross appeal, and 'without cross-appealing, [an appellee] may not advance a theory that challenges some aspect of the lower court's judgment.'" (*quoting Pacific Capital Bank*, 542 F.3d at 349)).

- 24 -

**A.** **Performing Rights Organizations' Blanket Public Performance Licenses Do Not Immunize Parties Against Copyright-Infringing Performances of Musical Compositions in the PROs' Repertories**

The District Court correctly found that the ASCAP and BMI blanket licenses would not shield Sheeran's performance of copyright-infringing songs, even if the infringed works were in the PROs' repertories. Appellees improperly seek to revisit the District Court's explicit rejection of the thinking of two California district courts[17] that held that the public performance licenses granted by PROs include in their scope a license to publicly perform copyright-infringing works. As a beneficial owner of the LGIO copyright, the Copyright Act grants Appellant and its co-owners the exclusive right to make derivative works of LGIO. 17 U.S.C. § 106. Anyone who makes an unauthorized derivative work of LGIO violates the owners' exclusive rights, because "consent of the copyright owner of a still-protected pre-existing work is necessary to render the derivative or collective work noninfringing…." 1 Nimmer on Copyright § 3.06 (2019); *see also* 17 U.S.C. § 501(a). Obviously, the infringer in that situation has no rights in the derivative work. Assuming that TOL is an infringing derivative of LGIO, Sheeran and the other Appellees violated Appellant's

---

[17] *Gray v. Perry*, No. 2:15-cv-5642 (CAS), 2017 WL 1240740, at *9-10 (C.D. Cal. Apr. 3, 2017); *Gray v. Perry*, No. 2:15-cv-5642 (CAS), 2019 WL 2992007, at *21 (C.D. Cal. Jul. 5, 2019); *Stoliarov v. Marshmello Creative, LLC*, No. 19-cv-3934 (PSG), 2021 WL 2514167, at *3 (C.D. Cal. Apr. 8, 2021), *aff'd in part, dismissed in part*, No. 21-55442, 2022 WL 819800 (9th Cir. Mar. 17, 2022).

exclusive right, and Appellees would have no copyright rights in TOL (at least with respect to the infringing portions).

The ASCAP membership agreements contains a grant by the joining member of a non-exclusive license to the musical compositions that the joining member currently or in the future "wrote, composed, published, acquired or owned," "has any right, title, interest or control." A256; A259. Likewise, BMI writer members grant the right to compositions "composed by you," and "the rights that you own or acquire publicly to perform," (A262) and BMI publisher members do the same with respect to compositions currently or in the future "owned or copyrighted by Publisher or in which Publisher owns or controls performing rights." A270.

If TOL is an unauthorized infringing derivative work of LGIO, Sheeran and his publishing company did not own any rights in the infringing TOL, and thus could not and did not convey any such rights to the PROs for inclusion in their repertories. If TOL infringes LGIO, it is in neither repertory, and the public performance of the composition is not covered by the blanket licenses.

As to Appellees' argument that public performance of the allegedly-infringing TOL was licensed by virtue of the inclusion of the allegedly-infringed LGIO in the PRO repertories, that argument also fails. Just as Sheeran and his publisher could only convey to the PRO the rights **that they owned**, the writers and publishers of LGIO conveyed the public performance rights in the works that they owned, **and**

**only the works they owned**, to the PROs.  They own LGIO, but they do not **own** TOL.  The Copyright Act gives Appellant and his co-owners the right to take action against those who created, reproduced and publicly performed compositions that infringe LGIO, but it does not grant them **ownership** rights in infringing works. Therefore, if TOL infringes LGIO, neither Appellant nor Appellees own copyright rights in the infringing TOL, neither Appellant nor Appellees conveyed those rights to the PROs, and the PRO blanket licenses would not cover performances of TOL.

For these reasons, as well as the reasons provided by the District Court (SPA3-5), the District Court concluded correctly that PRO blanket licenses (and by extension any licenses) do not immunize defendants from the public performance of copyright-infringing works, and correctly rejected the thinking of the courts in *Gray* and *Stoliarov*.

> **B.** **The Profits Derived from Copyright Infringement, Including the Public Performance of Copyright-Infringing Songs, Are Direct Profits**

Appellees note that when Appellant first moved the District Court to compel Appellees to produce documents reflecting profits arising from concert performances of TOL, Appellant characterized those profits as "indirect."  Appellees also note, correctly, that after the District Court ruled that those profits are in fact direct profits (SPA1, SPA31), Appellant adopted that position as well.  That should

have come as no shock to Appellees, not just because the District Court's decision was beneficial for Appellant, but because in any event it was **law of the case**.[18]

As set forth in Appellant's opening brief, the District Court was correct in its conclusion that concert revenues are direct profits, drawing upon the solid foundation laid by, *inter alia*, *Lowry's Reps., Inc. v. Legg Mason, Inc*., 271 F. Supp.2d 737, 751 (D. Md. 2003) ("[i]n the case of '**direct profits**,' such as result from the sale or **performance of copyrighted material, the nexus is obvious**") (emphasis added) and *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc*., 772 F.2d 505, 517 (9th Cir. 1985) ("we conclude indirect profits from the hotel and gaming operations, as well as **direct profits from the show itself**, are recoverable if ascertainable.") (emphasis added).

### C. The Nexus Between Copyright-Infringing Public Performances and the Direct Profits Received for Such Performances is Obvious and Satisfied in this Case

The District Court was also correct in its finding that Appellant had satisfied its burdens of alleging, and then proving, the required nexus between the allegedly-infringing concert performances and the direct profits that arose therefrom. First, the District Court correctly found Appellant to have satisfied its **pleading** burden

---

[18] Appellant never "conceded" that concert revenues are indirect profits. After the District Court ruled that concert revenues were direct profits, Appellant cross-moved for summary judgment on that basis in 2021 and 2022. *SAS* ECF 186 (A1283-1325), 196 (A1371-81), 205, 209.

with respect to the nexus between concert performances of TOL and the profits received for those performances. A39 ¶ 29; A54 ¶ 62; *see also* A33 ¶ 11; A34 ¶ 17; A56-57 ¶ 70. Appellant also provided the District Court with facts from the public record concerning the success of TOL and how frequently Sheeran actually played it (456 times in concert between May 2014 and August 2019), and Appellees did not introduce any rebutting evidence. A146; A155; A156; A181.

At the summary judgment stage, the District Court found that Appellant had also satisfied its burden of **proof** with respect to the nexus, "in the form of an expert report, which calculated [] the portion of concert ticket revenue attributable to the live performance of TOL." SPA33. The District Court expressly (and correctly) adopted the "nexus is obvious" approach from *Lowry's*, and came to the correct conclusion.

## CONCLUSION

The District Court's rulings relating to the "deposit copy" issue (SPA11-12, 13-14, 15-16), and its grant of summary judgment (SPA37-52), including its rulings concerning "selection and arrangement" and whether the combination of elements was "commonplace" before the release of "Let's Get It On" in 1973, should all be reversed. In the alternative, the case should be remanded to allow Appellant's experts to opine as to how skilled musicians would play the "deposit copy," and to permit amendment of the Complaint to include the 2020 copyright registration. The

District Court's 2020 ruling (SPA1-10), and 2022 grant of Appellant's cross-motion for summary judgment, both concerning concert revenues (SPA29-36), should be recognized as undisturbed by the District Court's subsequent grant of summary judgment.

January 16, 2024                                    Respectfully submitted,

                                                    _____/s/_____
                                                    HILLEL I. PARNESS
                                                    PARNESS LAW FIRM, PLLC
                                                    136 Madison Ave., 6th Floor
                                                    New York, New York 10016
                                                    (212) 447-5299
                                                    hip@hiplaw.com
                                                    *Counsel for Appellant*
                                                      *Structured Asset Sales, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 6,983 words.

_____/s/_____

Hillel I. Parness

# ADDENDUM

# MUSICAL COPYRIGHT

BY

## ALFRED M. SHAFTER
OF THE NEW YORK BAR

### INTRODUCTION BY JOHN HENRY WIGMORE
DEAN EMERITUS OF NORTHWESTERN UNIVERSITY LAW SCHOOL

CHICAGO
CALLAGHAN AND COMPANY
1932

Case 23-905, Document 70, 01/16/2024, 3604080, Page41 of 42

**ADD2**

played; but some form it must take. Folk songs—that precious heritage of nations—exist because they are transmitted by word of mouth. A folk song has no known author, but if one existed he could claim the melody for his own. The Iliad and the Odyssey were originally sung and not written; but this does not detract from proof of their existence by this physical form.

The "intangibility" of music has often led to mistakes, one of the most patent being the statement of an English judge [3] who said that a book was "something material" but a musical composition something that existed only in the mind of the composer. "A composer might sit down and play a tune, knowing every note of it in his own mind without writing down a note on paper," according to the learned judge, "and ask a man what he would give for it." The judge, however, overlooked the fact that the mere playing of the composition made it quite as material as the book composed of paper, print and binding.

## II. Can an Idea Be Copyrighted?

But, lest the reader labor under a delusion as to precisely *what* copyright is, let it be known at once that the mere physical accessories of composition—paper, ink and so forth—are not in themselves the subject of copyright. They simply make visible the musical "idea" which is the real subject of the copyright. They are the "physical manifestation of original thought." [4] This physical form is a necessity of copyright. The law recognizes this distinction, as well it may, by making it plain that the gift or even the sale of the paper on which

[3] Judge Bramwell in Hutchins v. Romer, 4 Q. B. D. 483 (1879).
[4] Weil, p. 3.

an idea is embodied *does not mean a transfer of copy-right*.[5]

### III.   ELEMENTS OF COPYRIGHTABLE WORK

Before a work of any type can be copyrighted, it must possess certain necessary qualifications.  These are form, quantity and quality (utility, merit, originality, good taste).

*Form*, the first requirement under the law, is regarded as an arbitrary regulation in that it requires ''visibility''; that is, music must appear on music paper, or ruled paper, so that it may be read.  Without this visible manifestation, the music cannot be granted protection. It is obvious that ''audible'' music—a phonograph record, or a piano roll—is as faithful a transcript of a musical idea as a ''visible'' recording on paper; [6] but the present statute insists on a form that is ''intelligible.'' No one looking at the grooves on a disc record can tell what sort of sounds will emanate from the phonograph when the record is played; but anyone with musical knowledge can study a printed, typed or written sheet of music and get some idea of what the composer has in mind.  In all probability the copyright office would refuse to register a record as such.

The present copyright laws are based on the provision in the Constitution (Article 1, Section 8) that copyright may be secured on an author's ''writings.''  This limiting word, repeated in the act now in force, may have been what prevented musical copyright until 1831; and even now it causes confusion, mainly because its interpretation has been left to the courts and to Congress.  Statues and photographs are protected under its provisions

---

[5] Sec. 41 of Copyright Act of 1909.

[6] Bowker, p. 67; criticism by Weil on p. 188; De Wolfe, p. 26.