# 23-905-CV

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

---

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING CORPORATION, DBA ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MUSIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC (USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees,*

---

*On Appeal from the United States District Court for the Southern District of New York*

---

## PETITION FOR REHEARING *EN BANC*

PARNESS LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

PRELIMINARY STATEMENT ...........................................................1

ARGUMENT .......................................................................................3

    I.    The Panel Was Mistaken in its Conclusion on the "Deposit
        Copy" Issue ...........................................................................3

    II.   The Panel's Reliance on the *Compendium* and *Skidmore* is
        No Longer Appropriate, after the Supreme Court Overruled
        *Chevron* in *Loper Bright* .....................................................8

CONCLUSION ................................................................................15

# TABLE OF AUTHORITIES

CASES

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984) ... passim

*Data Gen. Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).................................................................................................................9

*Georgia v. Public.Resource.Org, Inc*., 590 U.S. 255, 257 (2020) .........................10

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .................... passim

*Merrell v. Tice*, 104 U.S. 557, 561 (1881)...........................................................4, 9

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co*., 712 F. Supp.2d 84 (S.D.N.Y. 2010), *reconsid. in part*, 09-cv-2669, 2010 WL 3958841 (S.D.N.Y. Sept. 27, 2010)...................................................................................................10

*Roy Export v. Columbia Broadcasting*, 672 F.2d 1095 (2d Cir. 1982)...................14

*Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir.) (*en banc*), *cert. denied sub nom*., 141 S. Ct. 453, *reh'g denied*, 141 S. Ct. 946 (2020)......................... passim

*Skidmore v. Swift & Co*., 323 U.S. 134 (1944).......................................................14


STATUTES

17 U.S.C. § 12 (1970) .............................................................................................4

17 U.S.C. § 13 (1970) ..........................................................................................3, 4

17 U.S.C. § 411(a) ..................................................................................................4

Federal Rule of Appellate Procedure 35(b) .............................................................1

**OTHER AUTHORITIES**

2 Nimmer on Copyright § 7.16[A][2][b] (2024) .......................................................4

*Compendium of U.S. Copyright Office Practices* ........................................... passim

Report of the Register of Copyrights on the General Revision of the U.S.
    Copyright Law (1961) ............................................................................9

## PRELIMINARY STATEMENT

Plaintiff-Appellant Structured Asset Sales, LLC ("Appellant") respectfully asks the Court for Rehearing *En Banc* of the Panel Opinion dated November 1, 2024, attached hereto, and upon rehearing to vacate and remand to the District Court the relevant orders and judgments entered against it.

Appellant respectfully submits this petition for rehearing *en banc* pursuant to Rule 35(b) of the Federal Rules of Appellate Procedure, as the panel decision involves two questions of exceptional importance, namely:

(i) whether the "deposit copy" submitted to the Copyright Office, and in particular sheet music submitted to the Copyright Office as deposit copies for musical compositions, prior to the point in time when the Copyright Office accepted sound recordings as deposit copies for music compositions (*i.e.*, 1978), works as a limitation on the legal scope of protection afforded by the 1909 version of the United States Copyright Act; and

(ii) whether, in answering the first question, the panel's reliance on the legal position expressed by the Copyright Office in its administrative manual, the *Compendium of U.S. Copyright Office Practices*, and that of the Ninth Circuit in *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir.) (*en banc*), *cert. denied sub nom.*, 141 S. Ct. 453, *reh'g denied*,

141 S. Ct. 946 (2020) which also relied on the view of the law expressed by the Copyright Office in the *Compendium*, was improper after the United States Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), in which the Supreme Court overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984).

The Panel's conclusion, that the "deposit copy" defines and limits the scope of protection afforded under the 1909 Copyright Act, cannot be squared with the language of the statute or the Panel's own expressed policy justification for its conclusion. Getting the correct answer on the "deposit copy" question is critical not just for Appellant and the other owners of the copyright for the "Let's Get It On" musical composition,[1] but for thousands of legacy songwriters, artists and/or musicians, who created millions of musical compositions and songs, including some of the greatest songs and musical compositions ever written, who had no choice – by virtue of the Copyright Office's policies – but to submit sheet music (rather than sound recordings) as deposits in connection with their copyright applications. This is an issue of exceptional importance that should be considered *en banc*.

---

[1] "Let's Get It On" was written and produced by Marvin Gaye and Edward Townsend, Jr., and recorded by Marvin Gaye. The Gaye recording was #1 on the Billboard Pop Singles Chart.

Moreover, because the Panel persisted in deferring to the *Compendium*'s view of the law, and to the *Skidmore* decision that also deferred to the *Compendium*'s view of the law, the Panel's conclusion ran afoul of the Supreme Court's overturning of 1984's *Chevron*, in 2024's *Loper Bright*, and for this additional reason also implicates an issue of exceptional importance that warrants *en banc* review. For these reasons, Appellant respectfully requests rehearing *en banc*.

## ARGUMENT

### I.    The Panel Was Mistaken in its Conclusion on the "Deposit Copy" Issue

There can be no dispute that the Copyright Act of 1909 does not say that sheet music (handwritten or otherwise) is the only type of material that can be submitted as a deposit copy for a musical composition – that was an administrative implementation of the Copyright Office. Nevertheless, the Panel affirmed the District Court's conclusion on the "deposit copy" issue based on the word "complete" (advancing an argument which is not found in any decision by the District Court):

> A composer seeking to protect a published musical work under the 1909 Act could do so by filing with the Copyright Office "two complete copies of the best edition thereof then published." 17 U.S.C. § 13 (1970). The statute thus makes clear that its enforceable protection for musical works is limited to the contents of the "complete copy" of the work filed with the Copyright Office at the time of registration. Extending its protection beyond the "complete copy" would negate the plain meaning of "complete."

ECF 102 at 13.

The Panel then worked to reinforce its conclusion by pointing out that whereas

the 1909 Copyright Act required submission of "complete" copies of musical

compositions, Congress decidedly did <u>not</u> so require "complete" copies for other

types of works:

> The 1909 Act required less than a "complete copy" for works other
> than musical compositions. For example, for a motion picture,
> Congress authorized deposit of "a title and description, with not less
> than two prints taken from different sections." 17 U.S.C. § 12 (1970).
> And for "a work of art or a plastic work or drawing," Congress
> authorized deposit of a "photograph or other identifying reproduction
> thereof." *Id*. So Congress's inclusion of "complete" to describe
> musical – but not other – works was deliberate.

*Id*. at 13-14.

> The Panel then attempted to justify its interpretation based on public policy:

> This understanding complies with the principle of **fair notice** that led
> to public registration of copyrights in the first place. Even before the
> 1909 Act, the Supreme Court recognized that an important reason for
> requiring a deposit copy was to allow others **"to ascertain precisely
> what was the subject of copyright."** *Merrell v. Tice*, 104 U.S. 557,
> 561 (1881). **One cannot fairly be liable for infringement without
> the ability to understand the contours of a prior creator's rights**.
> That is why the "deposit (and accompanying registration) requirement
> was (as it still is) a condition precedent to the right to bring an
> infringement action." 2 Nimmer on Copyright § 7.16[A][2][b] (2024);
> see 17 U.S.C. § 13 (1970); 17 U.S.C. § 411(a).

*Id*. at 14 (emphasis added).[2]

---

[2] The full quote from *Merrell* is "Perhaps a certificate of the Librarian attached to a
copy of the book, certifying that two copies of the same book, or of which that is a
true copy, were deposited in his office on such a day, would be competent
evidence, inasmuch as the Librarian's office is a public one; the copyright books
deposited with him are quasi-records, kept in his custody for public examination, –
**one object no doubt being to enable other authors to inspect them in order to**

The "fair notice" policy justification, however, cannot be squared with the Panel's statutory interpretation: If the **reason** that Congress required the submission of deposit copies was to provide "fair notice," "to ascertain precisely what was the subject of copyright," and to "to understand the contours of a prior creator's rights," Congress's decision should not have – indeed **could not** have – declined to impose the "complete" requirement across the board.

Taking the first example provided by the Panel – motion pictures – would the provision of "a title and description, with not less than two prints taken from different sections" really allow someone to "ascertain **precisely**" what the copyright covered? Would it really provide one "the ability to understand the **contours** of a prior creator's rights," making it "fair" to impose liability?  Appellant submits that the answer to both questions is clearly "no."

Appellant raised this precise issue before the District Court and the Panel, demonstrating that the list of categories of works for which the Copyright Office accepts "identifying," rather than "complete," deposits, now numbers 20.  ECF 38

---

ascertain precisely what was the subject of copyright**."  *Merrell*, 104 U.S. at 561 (emphasis added).  Appellant pointed out to the District Court and to the Panel that the concept of "enable[ing] other authors to inspect them" is likewise undermined by allowing "identifying" materials for an increasing list of work categories.

at 28-30. To take the more modern example of computer code, the Copyright Office's regulations allow for the submission of small portions of computer code – even if it does not contain trade secrets – that surely cannot serve to provide "fair notice" or allow one to "ascertain precisely" what is at issue. *See*, *e.g.*, 2021 *Compendium* § 1509.1(F)(3) (with respect to "Source Code That Does Not Contain Trade Secret Material," "applicant should submit one copy of the first twenty-five pages and the last twenty-five pages of the source code for that version" or "fifty pages that represent the specific version").

The Panel, like the District Court before it and the 9th Circuit in *Skidmore*, struggled and failed to reconcile its interpretation of the 1909 Copyright Act with any cogent justification for such a reading. Indeed, the District Court came up with its own entirely different rationale for why matter outside the four corners of the deposit copy cannot be considered – "because they have not undergone the copyright process" – but this is yet another justification immediately undermined by the Copyright Office's varying policies with respect to what need and need not be submitted for various work categories. It is beyond debate, for example, that the vast majority of computer code protected by the Copyright Act "ha[s] not undergone the copyright process." And yet the Copyright Act protects the entirety of computer code referenced by – but decidedly not submitted with – an application.

These problems are compounded further by the interaction between the

Copyright Act and the Berne Convention, which together allow parties to initiate copyright infringement actions in the United States based on the domestic infringement of a "foreign work" – a work whose copyright protection arose in a foreign jurisdiction. The validity of the foreign work is adjudged by the rules of the **foreign** jurisdiction. Thus, if the foreign jurisdiction does not require registration as a prerequisite to initiating an infringement suit, the registration requirement under Section 411 of the Copyright Act – and therefore the deposit copy requitement – does not apply. In all such cases – U.S. copyright infringement cases based on the infringement of a foreign work from such a jurisdiction – there is nothing to provide "fair notice," no way for "other authors to inspect them in order to ascertain precisely what was the subject of copyright," and certainly no chance that the work at issue has "undergone the copyright process."

The Panel's extrapolation from the administrative instruction to submit "two complete copies of the best edition thereof then published" to mean that the scope of protection – as a matter of law – is limited to what was deposited, and only so limited with respect to some but not all categories of works was improper, and cannot be reconciled with common sense.

Furthermore, "Let's Get It On" was registered as a sound recording on June 15, 1973 (A317-18), **before** the composition was registered with a paper deposit of handwritten sheet music on July 17, 1973 (A569-75) (referencing Copyright

Registration RE0000860111, a renewal of N00000007555), meaning that the full original version of "Let's Get it On," as reflected by the commercially-released sound recording, was already on file with the Copyright Office when the applications for the musical composition came in. Under certain circumstances, courts have recognized a scope of protection for works broader than that reflected in an incomplete deposit copy. *Three Boys Music v. Bolton*, 212 F.3d 477, 486-87 (9th Cir. 2000). Where there is no prejudice using an incomplete deposit, there is no basis to limit not to use the full work Defendants had access to and copied from. Under the facts of this case, it is particularly bizarre to contemplate that the scope of protection for the musical composition should be limited to the handwritten sheet music when the sound recording was **already deposited** at the U.S. Copyright Office a month before the handwritten sheet music deposit came in.

For all of these reasons, this was and remains an issue of exceptional importance to creators of musical compositions – especially legacy creators who filed for protection in and before 1978the early 1970s – warranting *en banc* review.

## II. The Panel's Reliance on the *Compendium* and *Skidmore* is No Longer Appropriate, after the Supreme Court Overruled *Chevron* in *Loper Bright*

*En banc* review is also warranted by the Panel's implicit refusal to follow the Supreme Court's recent guidance in the *Loper Bright* case, in which the Court overruled *Chevron* and the so-called "*Chevron* Doctrine." The *Loper Bright*

decision was issued on June 28, 2024, **after** briefing and the April 17, 2024 oral argument, but **before** the Panel's decision on November 1, 2024.

Appellant demonstrated in its pre-*Loper Bright* briefing that all of the authority on which the District Court relied can be traced back to the *Compendium*'s statement of the law. *See* ECF 38 at 14-23. The District Court cited: (i) *Merrell*; (ii) *Skidmore* and (iii) the **Compendium**. SPA 13-14. *Skidmore*, in turn, cited: (i) *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); (ii) the Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (1961); (iii) *Merrell* and (v) the **Compendium**. *Skidmore,* 952 F.3d 1051, 1062-63.

As discussed above, *Merrell* (an 1881 case discussing the predecessor to the 1909 Copyright Act) speculated that a purpose of deposit copies was to "enable other authors to inspect them in order to ascertain precisely what was the subject of copyright." *Merrell*, 104 U.S. at 561. Neither *Data General* and the Report of the Register said that the deposit copy defines the bounds of copyright protection, but rather the opposite – that the deposit copy provides "**sufficient material to identify the work**" and is a "deposit of material **to identify** the work." *Data General*, 36 F.3d at 1161-62 (emphasis added); Report of the Register at 71 (emphasis added).

Thus, the only authority cited by **any** of the courts on the question (the 9th

Circuit in *Skidmore*, the District Court and the Panel) of whether the deposit copy

defines and limits the scope of copyright protection as a matter of law – is the

**Compendium**.  The District Court referenced the 2017 edition:

> The Copyright Office instructs that "a registration for a work of authorship **only covers the material that is included** in the deposit copy(ies)" and "**does not cover authorship that does not appear** in the deposit copy(ies), even if the applicant expressly claims that authorship in the application." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*. §504.2 (3d ed. 2017).

SPA14 (emphasis added).  The Panel similarly relied upon the 1967 edition of the

*Compendium*: "the Office's *Compendium of U.S. Copyright Office Practices*

explained that "protection extends only to the **material actually deposited**."

*Compendium of U.S. Copyright Office Practices* § 2.6.1.II.a (1st ed. 1967).  ECF

102 at 14.

It has long been recognized (well before *Loper Bright*) that the *Compendium*

is an "administrative manual," not legal authority in and of itself.  *Georgia v.*

*Public.Resource.Org, Inc*., 590 U.S. 255, 257 (2020); *Muench Photography, Inc. v.*

*Houghton Mifflin Harcourt Pub. Co*., 712 F. Supp.2d 84, 91 (S.D.N.Y. 2010),

*reconsid. in part*, 09-cv-2669, 2010 WL 3958841 (S.D.N.Y. Sept. 27, 2010).

On June 28, 2024 – after oral argument before the Panel – the United States

Supreme Court issued its decision in *Loper Bright*.  The Court explained the

landscape created by *Chevron* and the *Chevron* Doctrine:

Our *Chevron* doctrine requires courts to use a two-step framework to interpret statutes administered by federal agencies. After determining that a case satisfies the various preconditions we have set for Chevron to apply, a reviewing court must first assess "whether Congress has directly spoken to the precise question at issue." *Id*., at 842, 104 S.Ct. 2778. If, and only if, congressional intent is "clear," that is the end of the inquiry. *Ibid*. But if the court determines that "the statute is silent or ambiguous with respect to the specific issue" at hand, the court must, at *Chevron*'s second step, defer to the agency's interpretation if it "is based on a permissible construction of the statute." *Id*., at 843, 104 S.Ct. 2778. The reviewing courts in each of the cases before us applied Chevron's framework to resolve in favor of the Government challenges to the same agency rule.

*Loper Bright*, 144 S. Ct. at 2254. The question before the Court was "whether *Chevron* should be overruled or clarified." *Id*. at 2257. The Court explained that while there was a history of the courts affording deference to agencies when it came to questions of fact, "the Court did not extend similar deference to agency resolutions of questions of law." *Id.* at 2258.

Further, the Court explained, the Administration Procedure Act of 1946 reinforced the role of courts – not agencies – in deciding questions of law:

The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that **courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "all relevant questions of law"** arising on review of agency action, § 706 (emphasis added) – even those involving ambiguous laws – and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.

*Id*. at 2261 (emphasis added).

Ultimately, the Court reached the conclusion that "[t]he deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA." *Id*. at 2263. It elaborated:

> In an agency case as in any other, though, even if some judges might (or might not) consider the statute ambiguous, there is a best reading all the same – "the reading the court would have reached" if no agency were involved. *Chevron*, 467 U.S. at 843, n. 11, 104 S.Ct. 2778. It therefore makes no sense to speak of a "permissible" interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.
>
> Perhaps most fundamentally, ***Chevron*'s presumption is misguided because agencies have no special competence in resolving statutory ambiguities. Courts do**. The Framers, as noted, anticipated that courts would often confront statutory ambiguities and expected that courts would resolve them by exercising independent legal judgment. And even *Chevron* itself reaffirmed that "[t]he judiciary is the final authority on issues of statutory construction" and recognized that "in the absence of an administrative interpretation," it is "necessary" for a court to "impose its own construction on the statute." *Id*., at 843, and n. 9, 104 S.Ct. 2778. *Chevron* gravely erred, though, in concluding that the inquiry is fundamentally different just because an administrative interpretation is in play. The very point of the traditional tools of statutory construction – the tools courts use every day – is to resolve statutory ambiguities. That is no less true when the ambiguity is about the scope of an agency's own power – perhaps the occasion on which abdication in favor of the agency is least appropriate.

*Id*. at 2266 (emphasis added). The Court concluded as follows:

> *Chevron* is overruled. **Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires**. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent

- 12 -

with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts **need not and under the APA may not defer to an agency interpretation of the law** simply because a statute is ambiguous.

*Id*. at 2273 (emphasis added).

One can view what the Copyright Office has done through *Compendium* either as an agency pronouncement of how to interpret the Copyright Act, or as a set of administrative rules promulgated based on the agency's interpretation of the law. One can also view the "two complete copies" phraseology as inherently clear or inherently ambiguous. It matters little, as *Loper Bright* instructs that this Court may no longer defer to the Copyright Office's view as to how to interpret the 1909 Copyright Act. Appellant maintains that the Panel relied upon the *Compendium*'s legal opinion. At the absolute minimum, the Panel turned to the *Compendium*'s pronouncement of the law to shore up its analysis. As reflected above, Appellant maintains that that analysis was flawed and is undermined by, *inter alia*, the various justifications advanced over the years (including the "fair notice" justification advanced by the Panel). The *Compendium*'s view of the law should not enter into the analysis **at all**, and the analysis of the Ninth Circuit, the District Court and the Panel, all of which ultimately relied on the *Compendium*, should be abandoned so that this question can be analyzed properly. As the Supreme Court recently taught, "courts decide legal questions by applying their own judgment…courts, not agencies, will decide 'all relevant questions of law.'"

Furthermore, as advanced by *amici* Randy Craig Wolfe Trust and Sound and Color, LLC (the plaintiffs in the *Skidmore* case), *Loper Bright* requires a fresh review of what the 1909 Copyright Act did and did not do, without the *Compendium*'s view coloring the analysis:

> The Copyright Office has claimed that the 1909 Act registration deposit strictly delimits the scope of copyright in a work. In fact, nothing in that Act states that the deposit defines scope – no court ever limited a copyright based on a deposit for over 100 years until *Led Zeppelin*.
>
> *Loper Bright* now makes it clear that the Office's interpretation of the 1909 statute is irrelevant. Appellees' claim that *Skidmore* deference[3] still applies ignores that the Office has the right to promulgate rules, not interpret and create law.
>
> Prior to 1976, common law governed the creation/scope of copyrights. *Roy Export v. Columbia Broadcasting*, 672 F.2d 1095, 1101 (2d Cir. 1982). The 1909 Act merely provided protections **for already existing works**. Registration with an administrative deposit was a way to obtain those protections; it had nothing to do with scope.
>
> Only in the 1976 Act did Congress address creation/scope of copyright (incorporating the common law creation standard), creating a single federal system.
>
> *Loper Bright* necessitates this Circuit doing what the lower court and the Ninth Circuit did not do: analyze the dual system in place from 1909 to 1978 and recognize the deposit did not determine scope.

ECF 97 at 1.

---

[3] *Amici* refer here to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which was unrelated to the *Skidmore* deposit copy case.

- 14 -

Finally, the Court will recall that the Ninth Circuit Court of Appeals granted rehearing *en banc* in the *Skidmore* matter to address, *inter alia*, the "deposit copy" issue. We urge this Court to do the same, in view of the exceptional importance of this issue, especially after the *Loper Bright* decision, which Appellant submits requires a legal analysis uninfluenced by the Copyright Office or the *Compendium*.

Proper application of the Supreme Court's decisions, here the June 2024 decision in *Loper Bright* overruling 40 years of precedent, is self-evidently a matter of exceptional importance, and for this additional reason Appellant urges this Court to grant its Petition for Rehearing *En Banc*.

## CONCLUSION

Appellant Structured Asset Sales, LLC respectfully requests that the Court grant its Petition for Rehearing *En Banc*, to address questions of exceptional importance relating to the proper interpretation of the 1909 Copyright Act, and the proper application of the United States Supreme Court's 2024 *Loper Bright* decision.

November 15, 2024     Respectfully submitted,

            /s/
          ——————————————
          HILLEL I. PARNESS
          PARNESS LAW FIRM, PLLC
          136 Madison Ave., 6th Floor
          New York, New York 10016
          (212) 447-5299
          hip@hiplaw.com
          *Counsel for Plaintiff-Appellant*
          *Structured Asset Sales, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 40(b)(1), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 3,851 words.



/s/
Hillel I. Parness

**OPINION**

23-905
*Structured Asset Sales, LLC v. Sheeran*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2023
Argued: April 17, 2024
Decided: November 1, 2024

No. 23-905

---

STRUCTURED ASSET SALES, LLC,

*Plaintiff-Appellant,*

*v.*

EDWARD CHRISTOPHER SHEERAN, PERSONALLY KNOWN AS ED
SHEERAN, SONY/ATV MUSIC PUBLISHING, LLC, ATLANTIC RECORDING
CORPORATION, DBA ATLANTIC RECORDS, BDI MUSIC LTD., BUCKS MU-
SIC GROUP LTD., THE ROYALTY NETWORK, INC., DAVID PLATZ MUSIC
(USA) INC., AMY WADGE, JAKE GOSLING,

*Defendants-Appellees.*[*]

---

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-5839, Louis L. Stanton, *Judge.*

---

Before:        CALABRESI, PARKER, and PARK, *Circuit Judges.*

---

[*] The Clerk is respectfully directed to update the caption accordingly.

In this appeal from a judgment of the United States District Court for the Southern District of New York (Stanton, *J.*), we consider whether the district court erred by dismissing an action alleging that Ed Sheeran's 2014 hit *Thinking Out Loud* infringes the copyright of Marvin Gaye's 1973 classic *Let's Get It On*.  It did not.  First, the Copyright Act of 1909 protects only the musical composition of *Let's Get It On* as defined by the sheet music deposited with the Copyright Office in 1973.  Second, we conclude that Plaintiff's "selection-and-arrangement" theory, predicated on the combination of a four-chord progression and a syncopated harmonic rhythm, fails as a matter of law.  Accordingly, we **AFFIRM** the judgment of the district court.

––––––––

HILLEL I. PARNESS, Parness Law Firm, PLLC, New York, New York, *for Plaintiff-Appellant*.

Alfred J. Fluehr, Francis Alexander, LLC, Media, Pennsylvania, *for amici curiae Randy Craig Wolfe Trust and Sound and Color, LLC*.

DONALD S. ZAKARIN, (Ilene S. Farkas, Andrew M. Goldsmith, and Brian M. Maida, *on the brief*) Pryor Cashman LLP, New York, New York, *for Defendants-Appellees*.

––––––––

PARK, *Circuit Judge*:

The question in this case is whether the district court erred by dismissing an action alleging that Ed Sheeran's 2014 hit *Thinking Out*

*Loud* infringes the copyright of Marvin Gaye's 1973 classic *Let's Get It On*.   It did not.

First, the Copyright Act of 1909 protects only the musical composition of *Let's Get It On* as defined by the sheet music deposited with the Copyright Office in 1973 ("Deposit Copy").   The Deposit Copy does not encompass Gaye's audio recording of the song.   We thus affirm the decision of the district court to exclude evidence and expert testimony relating to musical elements outside the Deposit Copy.

Second, Plaintiff's "selection-and-arrangement" theory fails as a matter of law.   Even when combined, the four-chord progression and syncopated harmonic rhythm at issue are too unoriginal for copyright protection.   Plaintiff failed to rebut evidence that this same combination appears in well-known songs predating *Let's Get It On*, leaving no triable issues of fact as to the originality of the alleged combination.   And no reasonable jury could find that the two songs, taken as a whole, are substantially similar in light of their dissimilar melodies and lyrics.

We affirm the judgment of the district court.

## I.   BACKGROUND

A.   <u>Factual Background</u>

In 2014, Defendants-Appellees Ed Sheeran and Amy Wadge wrote the romantic ballad *Thinking Out Loud*.   It topped global music charts and became one of the most-streamed songs in history, with

3

over 3.8 billion streams on YouTube and 2.5 billion on Spotify.[1] At the 58th Grammy Awards in 2016, it won Song of the Year and Best Pop Solo Performance and earned a Record of the Year nomination.

Forty-one years earlier—in 1973—Ed Townsend and Marvin Gaye wrote *Let's Get It On*. Gaye is a music icon and one of Motown's biggest stars, and *Let's Get It On* was one of his greatest hits. That same year, Townsend registered a copyright for *Let's Get It On* by sending a copy of the five pages of sheet music for the song's melody, harmony, rhythm, and lyrics—the "Deposit Copy"—to the Copyright Office. The copyright was registered as No. EP314589.

Plaintiff-Appellant Structured Asset Sales, LLC ("SAS") owns a one-ninth interest in the royalties from *Let's Get It On*—one third of Townsend's one-third share. SAS is a firm that purchases royalty interests from musical copyright holders, securitizes them, and sells the securities to other investors. The record before us indicates that the remaining two thirds of Townsend's interest (or two ninths) belong to Kathryn Griffin, Helen McDonald, and the Estate of Cherrigale Townsend. Successors to Gaye and Motown Records—including Defendant-Appellee Sony/ATV Music Publishing—own the remaining two thirds of *Let's Get It On*.

---

[1] *See* Ed Sheeran, *Thinking Out Loud*, YouTube, https://www.youtube.com/watch?v=lp-EO5I60KA (accessed Oct. 31, 2024) [https://perma.cc/C6T7-86FH]; Ed Sheeran, *Thinking Out Loud*, Spotify, https://open.spotify.com/track/1Slwb6dOYkBlWal1PGtnNg (accessed Oct. 31, 2024) [https://perma.cc/J77G-6VRF].

B.    Procedural History

1.    Griffin v. Sheeran

In 2017, Griffin, McDonald, and the Estate of Cherrigale Town-send brought a copyright infringement suit against Sheeran and various entities that produced, licensed, and distributed *Thinking Out Loud*.

The *Griffin* plaintiffs claimed that Sheeran plagiarized *Let's Get It On*.    They alleged that the songs' similar harmonies, drums, bass lines, and tempos proved that Sheeran copied Townsend's work. One alleged similarity is especially relevant here: the *Griffin* plaintiffs pointed to the combination of the chord progression in *Let's Get It On* and the way anticipation was used in connection with that chord progression ("Harmonic Rhythm") as evidence of Sheeran's infringement.

As a co-owner of the rights to *Let's Get It On*, SAS belatedly sought to join the *Griffin* lawsuit.    But the district court denied leave to intervene, and we affirmed in an interlocutory appeal, *see Griffin v. Sheeran*, 767 F. App'x 129 (2d Cir. 2019) (summary order).    We wrote that denying leave to intervene would "not give rise to undue inefficiencies."    *Id*. at 134.

2.    *This Lawsuit*

Unable to join *Griffin*, SAS filed this lawsuit in 2018 against Sheeran, Wadge, and those responsible for recording, distributing,

5

and licensing *Thinking Out Loud* (collectively, "Sheeran").[2]  It was assigned to the same district judge.

SAS's allegations in this action are materially the same as those at issue in *Griffin*: Sheeran copied *Let's Get It On*, as evidenced by the chord progression and harmonic rhythm of the two songs and other similarities to elements found in Gaye's audio recording.  Sheeran moved for summary judgment in this case in April 2021.

3.  *SAS's Expert Testimony*

In September 2021, while Sheeran's summary-judgment motion was pending, the district court resolved several of Sheeran's motions in limine.  It excluded, among other things, Gaye's audio recording of *Let's Get It On*.

The district court concluded that SAS's infringement claim was limited to the scope of Townsend's registration as reflected in the Deposit Copy.  The district court thus prohibited SAS from comparing "elements in *Thinking Out Loud* [that] are similar to elements in the Gaye sound recording (but not the Deposit Copy)," and it excluded evidence (including expert opinions) regarding musical elements that are not notated in the Deposit Copy.

One such element outside the Deposit Copy was the "bass line" in Gaye's recording: "There is no genuine question that there is no notation or specification of a bass line in the Deposit Copy.  That has

---

[2] Defendants-Appellees also include Sony/ATV Music Publishing, LLC; Atlantic Recording Corporation d/b/a Atlantic Records; BDi Music Ltd.; Bucks Music Group Ltd.; The Royalty Network, Inc.; David Platz Music (USA) Inc.; and Jake Gosling.

been accepted by both sides and is apparent from a visual inspection, and is beyond dispute."   Special App'x at 15.

One of SAS's experts, John Covach, said that he could "infer" a bass line from the Deposit Copy.   According to Covach,

> The most direct and basic practice is for the bass line to be formed from the roots of each [of] the chords specified above the melody in the [Deposit Copy].   Since the chords specified are E♭–G minor–A♭–B♭7, the most obvious bass line is simply a succession of the notes E♭–G–A♭–B♭, and this is precisely what musicians would understand the [Deposit Copy] to be specifying.   Thus, a specific bass line is indicated by the chord symbols on the [Deposit Copy], even though it is not notated separately.

App'x at 462-63.

Covach said his inferred bass line was "the simplest and most obvious bass line that one versed in reading music would play if asked to play what is on the page."   Covach's inferred bass line matched the bass line in Gaye's sound recording of *Let's Get It On* and the bass line in *Thinking Out Loud.*   Covach thus pointed to his inferred bass line as an example of how the songs were similar. Sheeran moved to exclude Covach's testimony on the ground that it "admittedly and necessarily rel[ied] on an element that is not expressed in the Deposit Copy."

The district court agreed with Sheeran and excluded Covach's opinions on an inferred bass line.   It found that "[t]here is no bass line in the . . . Deposit Copy," and it emphasized that "copyright law protects only that which is literally expressed, not that which might be inferred or possibly derived from what is expressed."   The district court denied Sheeran's motion for summary judgment without

prejudice to allow the parties the opportunity to account for its clarification about what was protected by Townsend's registration.

4.     *Sheeran's Renewed Summary-Judgment Motion*

Sheeran then renewed his motion for summary judgment.   He argued that: "(i) the combination of two unprotectable elements is not sufficiently numerous or original to constitute an original work entitled to copyright protection under the 'selection and arrangement' theory of liability; and (ii) *Let's Get It On*'s backing pattern is not identical or nearly identical to that in *Thinking Out Loud*."

The district court denied Sheeran's motion.   *See Structured Asset Sales, LLC v. Sheeran*, 632 F. Supp. 3d 192 (S.D.N.Y. 2022).   It concluded that, as in *Griffin*, "'the question whether those elements [*i.e.,* chord progression and harmonic rhythm] in [*Let's Get It On*] demonstrate sufficient originality and creativity to warrant copyright protection is a factual question to be determined at trial.'"   *Id*. at 197 (quoting *Griffin v. Sheeran*, 351 F. Supp. 3d 492, 497 (S.D.N.Y. 2019) (internal quotation marks omitted)).   Sheeran then moved for reconsideration; that motion remained pending as *Griffin* proceeded to trial.

On May 4, 2023, the jury in *Griffin* found that Sheeran did not infringe the *Let's Get It On* copyright.[3]   Twelve days later, the district

---

[3]  *Griffin* could proceed without SAS because a "joint owner is not required to join his other co-owners in an action for infringement."   *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *see* 17 U.S.C. § 501(b) (The court "*may* require the joinder . . . of any person having or claiming an interest in the copyright." (emphasis added)).   If the *Griffin* plaintiffs had won, SAS could have enjoyed the benefits of the jury's award because copyright co-owners owe one another an accounting of profits.   *See, e.g., Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998).   But if they lost, SAS could still pursue

*(cont'd)*

8

court granted Sheeran's motion for reconsideration and awarded him summary judgment. *See Structured Asset Sales, LLC v. Sheeran*, 673 F. Supp. 3d 415 (S.D.N.Y. 2023). The district court concluded that reconsideration was warranted principally on the ground that its earlier decision had "overlooked" an issue that other district courts in the Second Circuit had only recently "started to weigh": a "numerosity requirement for selection and arrangement claims of infringement." *Id*. at 421, 422 (citing *Nwosuocha v. Glover*, No. 21-cv-4047, 2023 WL 2632158 (S.D.N.Y. Mar. 24, 2023); *see also Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074 (9th Cir. 2020) (en banc) ("We have extended copyright protection to a combination of unprotectable elements only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." (cleaned up)).[4]

---

its own claims because Sheeran could not have used a verdict in his favor against SAS. *See, e.g., Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79-80 (2d Cir. 2019) (explaining nonmutual offensive collateral estoppel); *Martin v. Wilks*, 490 U.S. 755, 761-62 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."); Restatement (Second) of Judgments § 54. Congress thus gave district courts discretion to permit copyright-infringement suits to proceed without the participation of all co-owners. A sound exercise of that discretion should account for the inefficiencies of duplicative litigation—in particular, the possibility of inconsistent verdicts and potential unfairness to defendants.

[4] The *Nwosuocha* court granted the defendant's motion to dismiss a copyright infringement claim based on the "'distinct and unique vocal cadence, delivery, rhythm, timing, phrasing, meter and/or pattern' or 'flow' as well as the 'lyrical theme' and 'structure' of the chorus." 2023 WL 2632158, at *7. Those elements "lack[ed] sufficient originality alone, or as combined, to merit compositional copyright protection or are categorically

(cont'd)

The district court concluded on reconsideration that "[t]here is no genuine issue of material fact as to whether defendants infringed the protected elements of [*Let's Get It On*]. The answer is that they did not." *SAS*, 673 F. Supp. 3d at 424-25. As it explained, "common sense dictates that in the context of a musical composition, 'numerous' requires more than just a commonplace chord progression and harmonic rhythm to warrant protecting their combination." *Id.* at 423. The district court went on to conclude that it was "an unassailable reality that the chord progression and harmonic rhythm in [*Let's Get It On*] are so commonplace, in isolation and in combination, that to protect their combination would give [*Let's Get It On*] an impermissible monopoly over a basic musical building block." *Id.* at 424. For these reasons, the district court granted Sheeran's motion for summary judgment. This appeal followed.

## II. DISCUSSION

We group SAS's challenges under two headings. First, SAS challenges several rulings related to the scope of the 1973 copyright registration for *Let's Get It On*. According to SAS, the district court erred by limiting the evidence it could present to support its infringement claim. That error, in SAS's view, flowed from the district court's misunderstanding of the scope of the 1973 registration. Second, SAS challenges the district court's entry of summary judgment for Sheeran. In its view, a jury must determine, based on the

---

ineligible for copyright protection." *Id*. We affirmed on other grounds and did not reach the numerosity issue. *See Nwosuocha v. Glover*, 2024 WL 2105473, at *1-2.

similarities between the two songs, whether Sheeran infringed the *Let's Get It On* copyright. Both challenges fail.

As to the first challenge, we affirm the district court's exclusion of evidence—including expert testimony—about anything beyond the four corners of the Deposit Copy, because the scope of a copyright in a musical work registered under the Copyright Act of 1909 ("1909 Act") is limited to the elements found in the copy of the work deposited with the Copyright Office.

As to the second challenge, the district court also correctly concluded that Sheeran was entitled to summary judgment. We agree that SAS failed to raise a triable issue of fact as to whether the selection and arrangement of the musical building blocks here—a four-chord progression and syncopated harmonic rhythm whose combination undisputedly is present in other prominent musical works—is original enough to be protectable. And taken as a whole, no reasonable jury could find that *Thinking Out Loud* is so substantially similar to *Let's Get It On* as to support an inference of wrongful copying. SAS's claim thus fails as a matter of law.

A.   The Scope of Copyright Registration

SAS argues that the district court's decision to limit the copyright registration to the four corners of the Deposit Copy was premised on an incorrect reading of the 1909 Act. On account of that misreading, according to SAS, the district court erroneously excluded key evidence of Sheeran's infringement.

The district court's legal conclusions about the scope of the registration turn on the meaning of the 1909 Act, which we review de novo. *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 170 (2d Cir. 2020).

1.    *Legal Standards*

The 1909 Act governs here because it was the copyright law in effect in 1973, when the registration at issue was filed.   *See Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999). The 1909 Act provided federal copyright protection for musical compositions against "any [public and for-profit] arrangement or setting of [the composition] or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced."   Copyright Act of 1909, ch. 320, § 1(e), 35 Stat. 1075 (codified as amended at 17 U.S.C. § 1(e)) (1970) (repealed effective 1978).

The 1909 Act imposed different registration requirements for published and unpublished works.   A composer seeking to protect an unpublished musical work could do so "by the deposit, with claim of copyright, of one complete copy of such work" with the Copyright Office.   17 U.S.C. § 12 (1970).   Published works, by contrast, could be protected by affixing a copyright notice (the familiar ©) "to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor."   *Id.* § 10.   The author of the published work was then required "promptly" to deposit "*two* complete copies of the best edition thereof then published" with the Copyright Office.   *Id.* § 13 (emphasis added).   If the author of the published work failed to comply with the deposit requirement, his rights under the 1909 Act would be unenforceable.   *See id.*   Thus, to secure an enforceable copyright of a musical work, whether published or not, the 1909 Act required depositing with the Copyright Office at least one "complete copy" of the work.

12

But a copyright notice cannot be affixed to sound, so distributing a sound recording (such as by broadcasting it over the radio) did not constitute "publication" under the Act.   *Cf. Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 472 (1984) (Blackmun, J., dissenting) ("Although the underlying musical work could be copyrighted, the 1909 Act provided no protection for a particular performer's rendition of the work."); *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 325 (2d Cir. 1995) ("It is clear that merely transmitting a sound recording to the public on the airwaves does not constitute a 'distribution.'").   So a musical composition was "published" only if the sheet music were published.   A composer seeking to protect a published musical work under the 1909 Act could do so by filing with the Copyright Office "two complete copies of the best edition thereof then published."   17 U.S.C. § 13 (1970).[5]   The statute thus makes clear that its enforceable protection for musical works is limited to the contents of the "complete copy" of the work filed with the Copyright Office at the time of registration.   Extending its protection beyond the "complete copy" would negate the plain meaning of "complete."

Context reinforces this reading.   The 1909 Act required less than a "complete copy" for works other than musical compositions. For example, for a motion picture, Congress authorized deposit of "a title and description, with not less than two prints taken from different sections."   17 U.S.C. § 12 (1970).   And for "a work of art or a plastic work or drawing," Congress authorized deposit of a "photograph or other identifying reproduction thereof."   *Id*.   So Congress's inclusion of "complete" to describe musical—but not other—

---

[5] By contrast, the 1976 Copyright Act allowed registration of musical works by depositing sound recordings.   *See* 17 U.S.C. § 301(c).

works was deliberate.  *See Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("We assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act." (cleaned up)).

This understanding complies with the principle of fair notice that led to public registration of copyrights in the first place.   Even before the 1909 Act, the Supreme Court recognized that an important reason for requiring a deposit copy was to allow others "to ascertain precisely what was the subject of copyright."   *Merrell v. Tice*, 104 U.S. 557, 561 (1881).   One cannot fairly be liable for infringement without the ability to understand the contours of a prior creator's rights. That is why the "deposit (and accompanying registration) requirement was (as it still is) a condition precedent to the right to bring an infringement action."   2 Nimmer on Copyright § 7.16[A][2][b] (2024); *see* 17 U.S.C. § 13 (1970); 17 U.S.C. § 411(a).

The longstanding practices of the Copyright Office promote this interest in predictability and fair notice.   For example, the Office's *Compendium of U.S. Copyright Office Practices* explained that "protection extends only to the material actually deposited."   *Compendium of U.S. Copyright Office Practices* § 2.6.1.II.a (1st ed. 1967).   Indeed, the Copyright Office was required to retain the deposit copies of unpublished works—for which there would be no other way of identifying the exact work protected by the statute—unless the copyright owner had a chance to claim and remove them.   17 U.S.C. § 214 (1970).

In short, the 1909 Act protects only what was submitted to the Copyright Office at the time of registration.   We thus reach the same conclusion as the Ninth Circuit in *Skidmore*, 952 F.3d at 1063 (holding

14

that for a musical work registered under the 1909 Act, "[t]he inescapable conclusion is that the scope of the copyright is limited by the deposit copy").

### 2. *Application*

Under the text of the 1909 Act, the district court correctly confined this case to the Deposit Copy. Townsend mailed five pages of sheet music to the Copyright Office when he applied to register his copyright in *Let's Get It On*. Those pages represented a "complete copy" of the work secured by the copyright. *See* 17 U.S.C. §§ 12-13 (1970). The scope of copyright protection for *Let's Get It On* under the 1909 Act is limited to the four corners of the Deposit Copy. Elements of Gaye's popular audio recording of *Let's Get It On* that do not appear in the Deposit Copy are thus not protected by the registration.

SAS's arguments to the contrary are unavailing. First, SAS argues that a plaintiff must show "access and substantial similarity to the work," not to the deposit copy of the work. But that is not what the 1909 Act says. The Act "establishes a condition—copyright registration—that plaintiffs ordinarily must satisfy before filing an infringement claim and invoking the Act's remedial provisions." *Reed Elsevier v. Muchnick*, 559 U.S. 154, 158 (2010). And a musical "work" registered under the 1909 Act *is* the "complete copy" filed with the Copyright Office. SAS's contrary understanding would allow infringement suits for unregistered copyrights.

Second, SAS argues that registration of the Deposit Copy "did not shrink the scope of protection already established at common law." That is wrong. "[T]he securing of a statutory copyright, either by general publication with a proper notice or by registration of the work, ended the common-law protection." *Shoptalk*, 168 F.3d at

15

590; *see also Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 347 (1908) (common-law and statutory "rights do not co-exist in the same composition; when the statutory right begins the common-law right ends"); *Jewelers' Mercantile Agency v. Jewelers' Wkly. Publ'g Co.*, 155 N.Y. 241, 247 (1898) ("[N]o proposition is better settled than that a statutory copyright operates to divest a party of the common-law right."). "[A] single work cannot be protected from copying under both federal and state law at the same time." *Roy Export Co. Estab. v. Colum. Broad. Sys., Inc.*, 672 F.2d 1095, 1101 n.13 (2d Cir. 1982). So when Townsend registered the Deposit Copy, he lost any state common-law protections he may have enjoyed before. In any event, SAS did not bring a common-law claim, so this argument is not only wrong, but also irrelevant.

Finally, SAS argues that the deposit-copy rule would treat differently owners of U.S. works and foreign works, in "apparent violation" of the Berne Convention, which governs international enforcement of foreign copyrights. SAS notes that the Berne Convention obligates signatories to allow infringement suits, including in the United States, to enforce foreign copyrights regardless of any domestic requirements for registration. So if *Let's Get It On* had been registered abroad in a jurisdiction without the deposit-copy rule, the entirety of Gaye's sound recording could support SAS's infringement claim. Even if true, this argument is of no moment because SAS is seeking to enforce a domestic copyright, not a foreign one.

In sum, the Deposit Copy filed with the Copyright Office under the 1909 Act defines the scope of a musical composition registered in 1973. Material and elements not appearing in the deposited sheet music are not registered and are thus irrelevant to an action alleging

infringement of the registered work.   The district court properly confined SAS's case to the contents of the Deposit Copy and excluded evidence relating to Gaye's audio recording of *Let's Get It On*.[6]

### 3.   *Evidentiary Challenge*

SAS challenges the district court's exclusion of John Covach's expert opinions about an "implied bass line."   Rule 702 governs the admissibility of expert testimony: the expert must be qualified, his testimony must be helpful, and his conclusions must derive from reliable principles and methods.   *United States v. Apple, Inc.*, 791 F.3d 290, 335 n.24 (2d Cir. 2015).   We review the district court's

---

[6] In May 2020, during this litigation, SAS obtained a new copyright registration for the sound recording of *Let's Get It On*.   SAS stated that it planned to seek permission to amend its complaint to add allegations related to its newly obtained registration.   The district court wrote:

> [I]f the Fourth Amended Complaint were filed in this case, I would incline towards severing its claims under the 1973 deposit copy and proceeding with preparing and trying them separately . . . .   That being so, it is better to deny permission to file the Fourth Amended Complaint.   Plaintiff may, without further correspondence or conferences if it wishes, file a formal motion for leave to file it, so the matter may be presented more fully.

Special App'x at 11-12.

SAS never moved to amend.   We thus reject its argument that the district court erred by denying it leave to amend.   Although the district court said that it would likely do so, it expressly invited SAS to file a motion to obtain a definitive answer.   But SAS never filed a motion, so there is no denial by the district court to review.   *See, e.g.*, *United States v. Djibo*, 850 F. App'x 52, 57 (2d Cir. 2021) (summary order).   SAS subsequently brought a separate action against Sheeran based on the 2020 registration.   *See* Complaint, *Structured Asset Sales, LLC v. Sheeran*, 20-cv-4329 (S.D.N.Y June 8, 2020), ECF No. 1.

evidentiary ruling "under a highly deferential abuse of discretion standard," reversing only if the decision is "manifestly erroneous." *Bustamante v. KIND, LLC,* 100 F.4th 419, 426-27 (2d Cir. 2024) (cleaned up).

Covach conceded that the Deposit Copy "does not include a notated bass part," and that the bass line he "posited" was merely one of "many possibilities." Covach testified that he "inferred" the bass line—coincidentally the same bass line in the sound recording—from the Deposit Copy by selecting the lowest notes from each of the chords of the sheet music, which he claimed was the "most obvious bass line" to infer from the Deposit Copy.

There may be some instances in which expert testimony of this sort can aid the trier-of-fact in interpreting what, precisely, is represented in the four corners of the Deposit Copy. But on the record before us, the decision to exclude Covach's proffered testimony was not manifestly erroneous. If, as Covach claimed, the "posited" bass line is indeed so "obvious" as to be implicit in the Deposit Copy, then considering the unwritten bass line alongside the written chord progression would not have affected whether the combination of these unprotectible musical elements was original (as explained below), because the two elements, by hypothesis, would go together. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 362 (1991) ("[T]he selection and arrangement of [elements] cannot be so mechanical or routine as to require no creativity whatsoever."); *Matthew Bender & Co. v. W. Publ'g Co.,* 158 F.3d 674, 682 (2d Cir. 1998) ("[C]reativity inheres in making *non*-obvious choices from among more than a few options." (emphasis added)). Therefore, we see no reason to disturb the district court's decision to exclude Covach's testimony as "non-

18

helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (cleaned up).

The district court correctly excluded Covach's testimony and cabined the admissible evidence to the scope of the registration—the Deposit Copy.

## B.   <u>Summary Judgment</u>

SAS also argues that the district court erred by granting summary judgment to Sheeran.   Sheeran was entitled to summary judgment if "no genuine dispute of material fact" remained as to whether he infringed SAS's copyright.   Fed. R. Civ. P. 56(a).   We review the decision to grant summary judgment de novo and draw all reasonable inferences and resolve all ambiguities in favor of SAS.   *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005).

### 1.   *Legal Standards*

To establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999) (cleaned up).

Direct evidence of copying is rare, so copying may be inferred when (1) a defendant had access to the original work; and (2) the defendant's work bears a "substantial similarity" to the original.   *Lipton v. Nature Co.*, 71 F.3d 464, 470-71 (2d Cir. 1995).   "The determination of the extent of similarity that will constitute a substantial, and hence infringing, similarity presents one of the most difficult

19

questions in copyright law, and one that is the least susceptible of helpful generalizations." 4 Nimmer on Copyright § 13.03[A] (2024). "Slight or trivial similarities are not substantial and are therefore non-infringing," but "two works may not be literally identical and yet, for purposes of copyright infringement, may be found to be substantially similar." *Id.*

"The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (quoting *Hamil Am.*, 193 F.3d at 100). This test asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (cleaned up).

"[C]opyright protection may extend only to those components of a work that are original to the author," meaning they were "independently created" and possess "some minimal degree of creativity." *Feist*, 499 U.S. at 345.[7] Important here, music "'borrows, and must

---

[7] Although we generally "treat the question of whether particular elements of a work demonstrate sufficient originality and creativity to warrant copyright protection as a question for a factfinder," *Matthew Bender & Co.*, 158 F.3d at 681, the record is sometimes clear enough that we can determine as a matter of law that a particular work or component thereof does not "possess more than a *de minimis* quantum of creativity," *Feist*, 499 U.S. at 363. *See, e.g., Boone v. Jackson*, 206 F. App'x 30, 32 (2d Cir. 2006) (summary order) (concluding that plaintiffs had failed to raise a triable issue of fact as to whether the lyric "holla back" was original given that the defendants had identified over 30 contemporary American pop songs using the same phrase).

necessarily borrow, and use much which was well known and used before.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845) (Story, *J.*)); 1 Nimmer on Copyright § 2.05[B] (2024) ("In the field of popular songs, many, if not most, compositions bear some similarity to prior songs."). Affording robust copyright protection for simple combinations of common musical elements could thwart, rather than encourage, creativity. *See Feist*, 499 U.S. at 349-50 (noting that the goal of copyright law is to "encourage[] others to build freely upon the ideas and information conveyed by a work").

Copyright law accounts for both "the limited number of notes and chords available to composers and the resulting fact that common themes frequently reappear in various compositions, especially in popular music." *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988). Thus, basic musical building blocks like notes, rhythms, and chords are generally not copyrightable. *See Compendium of U.S. Copyright Office Practices* § 802.5(A) (3d ed. 2017) ("examples of common property musical material" include "chromatic scales" and "arpeggios"); 2 Patry on Copyright § 3:93 (2024) ("[M]usical compositions consisting of only a few musical notes, such as 'mi do re so, so re mi do,' diatonic or chromatic scales, and common chord progressions, are not protectable.").

But a work consisting of unprotectable elements may still be protectable as an original "selection and arrangement" of those elements. *Feist*, 499 U.S. at 348. "What is protectible then is the author's original contributions—the original way in which the author has selected, coordinated, and arranged the [unoriginal] elements of his or her work." *Knitwaves*, 71 F.3d at 1004 (cleaned up). Whether

21

a selection and arrangement of otherwise unprotectable elements is original enough to merit copyright protection "is a function of (i) the total number of options available, (ii) external factors that limit the viability of certain options and render others non-creative, and (iii) prior uses that render certain selections 'garden variety.'" *Matthew Bender & Co.*, 158 F.3d at 682-83.

In a selection-and-arrangement case, our typical ordinary-observer test must be "more discerning." *Hamil Am.*, 193 F.3d at 101. "[T]he term 'substantial similarity' is properly reserved for similarity that exists between the protected elements of a work and another work." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 101 (2d Cir. 2014). So, when addressing a selection and arrangement of unprotectable elements, we "attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar." *Knitwaves*, 71 F.3d at 1002 (emphasis omitted).

### 2. *Analysis*

SAS argues that the selection and arrangement of two musical elements—*Let's Get It On*'s chord progression and syncopated harmonic rhythm—is original enough to warrant copyright protection. On the record before us, we agree with the district court that SAS failed to raise a triable issue of fact that this combination of elements in the Deposit Copy is original and thus protectible.

### a. Chord Progression and Rhythm

*Let's Get It On* uses a simple progression of four chords, three of which are the basic I–IV–V chords. That chord progression is not protectable on its own. *See, e.g., Gray v. Hudson*, 28 F.4th 87, 100 (9th Cir. 2022); *Batiste v. Najm*, 28 F. Supp. 3d 595, 615-16 (E.D. La. 2014)

(collecting cases and concluding that "courts have been consistent in holding that the basic chord progressions so ubiquitous in popular music are unoriginal and, thus, unprotectable"); *see also Swirsky*, 376 F.3d at 848 (distinguishing between non-copyrightable "chord progressions" standing alone and a copyrightable "chorus," which involves these progressions "in combination with rhythm and pitch sequence"); *Johnson v. Gordon*, 409 F.3d 12, 23-24 (1st Cir. 2005) ("[The III, II] harmonic progression, which is a stereotypical building block of musical composition, lacks originality."). It is indisputable, and SAS properly conceded, that the chord progression in *Let's Get It On*, standing alone, cannot support an infringement claim.

SAS also alleges that Sheeran copied the harmonic rhythm—or the timing of chord changes—from *Let's Get It On*. What makes the harmonic rhythm special, according to SAS, is how the second and fourth chord changes come slightly ahead of the beat on which they might be expected to fall—a form of syncopation. But commonplace harmonic rhythms, like basic chord progressions, are unprotectable musical building blocks. "[C]ourts have been consistent in finding rhythm to be unprotectable," *Batiste*, 28 F. Supp. 3d at 616, because "originality of rhythm is a rarity, if not an impossibility," *N. Music Corp. v. King Rec. Distrib. Co.*, 105 F. Supp. 393, 400 (S.D.N.Y. 1952). *See Darrell*, 113 F.2d at 80 ("trite" musical choices fall outside of copyright's protections). *Let's Get It On*'s harmonic rhythm is an unprotectable basic syncopation technique, and SAS does not argue otherwise.

### b. Combination of Two Unprotectable Elements

SAS's primary argument is that, even if the chord progression and syncopated rhythm are individually unprotectable, the selection

and arrangement of those two elements in *Let's Get It On* was suffi-
ciently original to warrant protection.   The record before us does not
support this contention.

   Sheeran's expert, Dr. Lawrence Ferrara, determined that the
same combination of elements "was previously embodied in well-
known songs including [*Georgy Girl*] and [*Since I Lost My Baby*] that
predate [*Let's Get It On*]," and he therefore concluded that "[t]here is
nothing particularly novel, unique, or distinctive about combining the
centuries-old anticipation technique with any particular chord pro-
gression, let alone a commonplace chord progression."   Covach did
not dispute that Ferrara had identified at least two prior songs featur-
ing the same combination of elements; he merely observed that the
combination was not present in the most popular recorded version of
either prior song.   This is of no moment, however, where the evi-
dence of prior usage is being offered to show that the similarities be-
tween the two works are based on "garden variety" elements in the
public domain, *Matthew Bender & Co.*, 158 F.3d at 683, rather than to
rebut an inference of actual copying by identifying an earlier "com-
mon source" to which both authors had access and from which both
could have borrowed.   *Compare Boone*, 206 F. App'x at 32, *with Gaste*,
863 F.2d at 1068-69.

   Moreover, Covach did not provide any affirmative evidence to
counter Ferrara's analysis.   He simply asserted that the combination
of elements in *Let's Get It On* was "unmistakable" and "noteworthy,"
and that its use in *Thinking Out Loud* must therefore be a "specific ref-
erence" to Gaye's and Townsend's song.   That mere assertion does
not suffice to create a triable issue of fact on protectability.   *See, e.g.*,
*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d

Cir. 2008) (noting that "[a]n expert's conclusory opinions" or "opinions that are without factual basis" are "inappropriate material for consideration on a motion for summary judgment").

SAS's selection-and-arrangement claim also fails because it risks granting a monopoly over a combination of two fundamental musical building blocks. The four-chord progression at issue—ubiquitous in pop music—even coupled with a syncopated harmonic rhythm, is too well-explored to meet the originality threshold that copyright law demands. *See, e.g.*, *Skidmore*, 952 F.3d at 1075-76 ("[M]any works of art can be recast as compilations of individually unprotected constituent parts . . . deem[ing] substantially similar two vastly dissimilar musical compositions, novels, and paintings for sharing some of the same notes, words, or colors."). Overprotecting such basic elements would threaten to stifle creativity and undermine the purpose of copyright law: "To promote the Progress of Science and useful Arts." U.S. CONST., art. I, § 8, cl. 8; *see also Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly [that copyright affords] lie[s] in the general benefits derived by the public from the labors of authors.").

The district court thus correctly determined that SAS failed to raise a triable claim that *Let's Get It On*'s chord progression/harmonic rhythm combination was protectible.[8]

---

[8] "Where the quantum of originality is slight and the resulting copyright is 'thin,' infringement will be established only by *very close copying* because the majority of the work is unprotectable." *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996) (emphasis added). A plaintiff

*(cont'd)*

c.     Overall Similarity

Finally, we also agree with the district court that a reasonable jury could not find the songs as a whole substantially similar.   While "the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, [the] infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation."   *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003).   We must also consider whether the "total concept and overall feel" of the two songs is substantially similar.   *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (cleaned up).   The classic formulation in music cases "is whether defendant took from plaintiff's work[] so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such popular music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff."   *Arnstein v. Porter*, 154 F.2d 464, 473 (2d Cir. 1946).

Only substantial similarity—not *any* similarity—suffices. And similarity depends on context.   "In the field of popular songs, many, if not most, compositions bear some similarity to prior songs." 1 Nimmer on Copyright § 2.05[B].   So while a similar chord

---

seeking to enforce a thin copyright must therefore show that the challenged work features "the *particular* selection or arrangement," *Feist*, 499 U.S. at 351 (emphasis added), or "the *same* selection and arrangement" as the original, *id.* at 362 (emphasis added).   Here, however, as SAS's own complaint shows, Townsend used a I–iii–IV–V progression, while Sheeran used a I–I–IV–V progression.   App'x at 42.   *Thinking Out Loud* thus does not feature the *particular* selection and arrangement featured in the Deposit Copy.

progression and harmonic rhythm may create a similar sound and feel, that is not enough to show substantial similarity.

Here, no jury could find that, taken as a whole, *Let's Get It On* and *Thinking Out Loud* are substantially similar. Neither the melody nor the lyrics of *Thinking Out Loud* bears any resemblance to those in *Let's Get It On*. *Cf. N. Music Corp.*, 105 F. Supp. at 400 ("It is the arrangement or succession of musical notes, which are the finger prints of the composition, and establish its identity."); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564-65 (1985) (analyzing whether the infringing work copied "what was essentially the heart" of the original). "Undeniable and obvious differences exist between" them. *Skidmore*, 952 F.3d at 1080 (Watford, *J.*, concurring). So SAS's infringement claim fails.

*   *   *

In sum, the allegedly infringing elements here boil down to a similar, but not identical, four-chord progression paired with a commonplace harmonic syncopation, neither of which is sufficiently original to be protectable in isolation, nor is their combination. What is more, the songs are not substantially similar taken as a whole. Thus, no reasonable jury could infer that Sheeran plagiarized the Deposit Copy when he wrote *Thinking Out Loud*. We affirm the district court's entry of summary judgment in Sheeran's favor.[9]

---

[9] The district court concluded that selection-and-arrangement theories cannot proceed based on the combination of various numbers of unprotectable elements—*i.e.*, numerosity. We affirm on other grounds. Although the number of elements in combination is an aspect of the distinctiveness of music, originality is not a concept that is easily reducible to a simple test like numerosity.

27

### III.   CONCLUSION

The judgment of the district court is affirmed.[10]

---

[10]  The parties dispute the concert proceeds that SAS might have recovered.   Because SAS lost on its copyright-infringement claim, these challenges are moot.